IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| DONNA CAVE, et al | PLAINTIFFS |
| ANNE ORSI, et al | CONSOLIDATED PLAINTIFFS |
| THE SATANIC TEMPLE, et al | INTERVENORS |
| V.    Case No. 4:18-cv-00342-KGB | |
| JOHN THURSTON, Arkansas Secretary of State in his Official Capacity | DEFENDANT |

**BRIEF IN SUPPORT OF**
***ORSI* PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE**

**INTRODUCTION**

The Orsi Plaintiffs previously filed a Motion to Compel Production of Documents Directed to Senator Jason Rapert (Docket no. 79). The Orsi Plaintiffs incorporate all the allegations of fact and exhibits to that Motion in this Motion for Order to Show Cause, and all prior briefing on that issue.

1

The American History and Heritage Foundation objects to the disclosure of documents in the possession of its president, State Senator Jason Rapert, on the basis that the documents are not relevant to any issues and that they are protected under the First Amendment privilege of Freedom of Speech and Association. Both objections are without merit.

1. **Relief Sought by Plaintiffs and Intervenors.**

The AHHF contends that the information sought by the *Orsi* Plaintiff's is irrelevant because the *Orsi* Plaintiffs have no claim in this case. Insofar as they assert that the matter has already been decided by the United States Supreme Court, they are wrong. Their reliance on *Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854 (2005) and *McCreary v. ACLU,* 545 U.S. 844, 125 S.Ct. 2722 (2005) is badly misplaced.

Plaintiffs brought this action within a month of the installation of a Ten Commandments monument on the Arkansas State Capitol grounds. The monument was placed pursuant to Act 1231 of 2015. The exact text of the commandments was prescribed by the Arkansas General Assembly.

Objection to the placement of the monument was voiced at public hearings by Christians, Jews, other persons of faith, secularists, and non-believers.

Notwithstanding the widespread objections, and substantial publicity, the State went forward with the installation of a monument. The monument was destroyed within twenty-four hours. A new monument was created and installed. It was unveiled on April 26, 2018. This action was filed on May 23, 2018.

This lawsuit challenges not only the maintenance of this "passive" monument, but the fact that the state had recently erected a new monument. See Complaint, paragraph 1, 16, 20, 33, 34.

The monument plainly contains both religious text and religious symbolism. There is no good-faith secular purpose for the monument. There is a sham secular purpose articulated in Act 1231 of 2015.

The Establishment Clause of the First Amendment "means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947), The First Amendment, rendered applicable to the states by the Fourteenth Amendment, prohibits the state from endorsing one religion over another. The state has endorsed one religion over the rest by placing this monument. The Constitution requires that the monument be removed.

This case is controlled by *Stone v. Graham,* 449 U.S. 39 and *McCreary County v. American Civil Liberties Union of Kentucky*, 545 U.S. 844, 861 (2005). A third Supreme Court case, *Van Orden v. Perry,* 545 U.S. 677 (2005) is easily distinguishable. The recent case of *American Legion v. American Humanist Association*, 588 U.S. \_\_\_\_ (No. 17-1717) is even more easily distinguishable, but as the American History and Heritage Foundation does not appear to rely on that case, nothing further needs to be said about the case at this time.

In *Stone, supra,* the United States Supreme Court found that a Kentucky statute that required the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose. This was in spite of the finding of the Kentucky legislature that "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." 1978 Ky. Acts, ch. 436, § 1 (effective June 17, 1978), Ky.Rev.Stat. § 158.178 (1980). The Supreme Court was not fooled. "The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents,

4

killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12-17; Deuteronomy 5: 16-21. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1-11; Deuteronomy 5: 6-15." *Stone v. Graham*, 449 U.S. 39, 41-42 (1980).

In *McCreary County v. American Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005), two Kentucky Counties posted the Ten Commandments in their courthouses. They adopted nearly identical resolutions calling for a more extensive exhibit meant to show that the Commandments are Kentucky's "precedent legal code." The resolutions noted several grounds for taking that position, including the state legislature's acknowledgment of Christ as the "Prince of Ethics." After an initial challenge, the displays were modified to include eight smaller, historical documents containing religious references. Following a second challenge, the counties added framed copies of the Magna Carta, the Declaration of Independence, the Bill of Rights, the lyrics of the Star Spangled Banner, the Mayflower Compact, the National Motto, the Preamble to the Kentucky Constitution, and a picture of Lady Justice. Once again, the United States Supreme Court was not fooled by the transparent sham of a secular purpose. Following

5

*Stone*, the Supreme Court found that the clear religious purpose of the display rendered it a violation of the Constitution.

The AHHF relies on *Van Orden*, *supra*. Indeed, the General Assembly also purported to rely on it in Act 1231 of 2015. Ark. Code Ann. § 22-3-221 (b)(1). That case is distinguishable for many reasons. The official syllabus reads, "Among the 21 historical markers and 17 monuments surrounding the Texas State Capitol is a 6-foot-high monolith inscribed with the Ten Commandments. The legislative record illustrates that, after accepting the monument from the Fraternal Order of Eagles--a national social, civic, and patriotic organization--the State selected a site for it based on the recommendation of the state organization that maintains the capitol grounds. Petitioner, an Austin resident who encounters the monument during his frequent visits to those grounds, brought this 42 U.S.C. § 1983 suit seeking a declaration that the monument's placement violates the First Amendment's Establishment Clause and an injunction requiring its removal. Holding that the monument did not contravene the Clause, the District Court found that the State had a valid secular purpose in recognizing and commending the Eagles for their efforts to reduce juvenile delinquency, and that a reasonable observer, mindful of history, purpose, and context, would not conclude that this

6

passive monument conveyed the message that the State endorsed religion. The Fifth Circuit affirmed." *Van Orden v. Perry*, 545 U.S. 677, 677 (2005).

Van Orden was a plurality decision. That means that in order to find the legal impact of the decision, the reader must find the narrowest grounds on which the decision can be understood. The United States Supreme Court adopted the "narrowest grounds" doctrine in *Marks v. United States*, 430 U.S. 188 (1968). In Marks, the Supreme Court held, "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id,* 430 U.S. at 193 (internal quotation omitted).

"Although the "narrowest grounds" test is the only model of interpretation recognized by the Supreme Court, the Court has never fully explained what it entails. One court has opined that the "narrowest grounds" are simply understood as the "less far-reaching common ground." *Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1247 (11th Cir. 2001). Heather Bailey New, Determining the Precedential Value of Supreme Court Plurality Decisions in the Fifth Circuit, 20 App. Advoc. 112, 112 (2007). "When a majority of the Supreme Court agrees only on the outcome of a case and not on the grounds for that outcome, "the

holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotations omitted). *United States v. Bailey*, 571 F.3d 791, 798 (8th Cir. 2009). When the vote or votes of the concurring Justice are necessary to the majority opinion and expressly conditioned on the understanding of the majority opinion, the concurrence is controlling. *Keefe v. Adams*, 840 F.3d 523, 545 n.14 (8th Cir. 2016) (Kelly, Circuit Judge, concurring in part and dissenting in part). See also *United States v. Hirani*, 824 F.3d 741, 751 (8th Cir. 2016).

In *Van Orden, supra,* Chief Justice Rehnquist, Justice Scalia, Justice Kennedy and Justice Thomas joined in one opinion written by the Chief Justice. Justices Scalia and Thomas filed a concurring opinion. Justice Breyer cast the deciding vote with an opinion concurring in the judgment. Justices Ginsburg, O'Connor, Souter, and Stevens dissented. Justice Breyer's opinion was essential to the majority opinion. Therefore to find the narrowest grounds for the ruling, we must look to Justice Breyer's opinion.

Justice Breyer reasoned that there would inevitably be borderline cases, and this was one of them. The text was undeniably religious. But the context of this case also had to be considered. The tablets were part of a display that conveyed a

holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotations omitted). *United States v. Bailey*, 571 F.3d 791, 798 (8th Cir. 2009). When the vote or votes of the concurring Justice are necessary to the majority opinion and expressly conditioned on the understanding of the majority opinion, the concurrence is controlling. *Keefe v. Adams*, 840 F.3d 523, 545 n.14 (8th Cir. 2016) (Kelly, Circuit Judge, concurring in part and dissenting in part). See also *United States v. Hirani*, 824 F.3d 741, 751 (8th Cir. 2016).

In *Van Orden, supra,* Chief Justice Rehnquist, Justice Scalia, Justice Kennedy and Justice Thomas joined in one opinion written by the Chief Justice. Justices Scalia and Thomas filed a concurring opinion. Justice Breyer cast the deciding vote with an opinion concurring in the judgment. Justices Ginsburg, O'Connor, Souter, and Stevens dissented. Justice Breyer's opinion was essential to the majority opinion. Therefore to find the narrowest grounds for the ruling, we must look to Justice Breyer's opinion.

Justice Breyer reasoned that there would inevitably be borderline cases, and this was one of them. The text was undeniably religious. But the context of this case also had to be considered. The tablets were part of a display that conveyed a

mixed message, religious and secular. The group that donated the monument was engaged in public service, working to combat juvenile delinquency. The physical setting suggested little or nothing of the sacred. But the "determinative" factor, according to Justice Breyer, was that "40 years passed in which the presence of this monument, legally speaking, went unchallenged (until the single legal objection raised by petitioner). And I am not aware of any evidence suggesting that this was due to a climate of intimidation. Hence, those 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to "engage in" any "religious practic[e]," to "compel" any "religious practic[e]," or to "work deterrence" of any "religious belief." *Schempp*, 374 U.S., at 305, 83 S.Ct. 1560 (Goldberg, J., concurring). Those 40 years suggest that the public visiting the capitol grounds has considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage." *Van Orden v. Perry*, 545 U.S. 677, 702–03, (2005).

Justice Breyer explicitly did not agree with the plurality's analysis. *Id.* at 705. He agreed, rather, with Justice O'Connor's statement of principles in

*McCreary County, supra*. He merely disagreed with Justice O'Connor as to the evidence as it bears on the application of the principles to the *Van Orden* case.

The Court need not, and should not, resolve the legal question on this motion. The Court should only determine that there is a legitimate, good faith dispute between the parties as to the legality of the monument and that discovery is important to resolve that dispute.

**2. Stare Decisis**

The United States Supreme Court has not settled the issues in this case. The fundamental difference between *Van Orden* and *McCreary County* was not the design of the monument, but the fact that the monument in *Van Orden* had been present for decades without being perceived as an attempt to establish religion, while the displays in *McCreary County* were of recent vintage and rather obviously placed with the intent of favoring a particular religion.

Here, too, the evidence will show that the placement of the Ten Commandments monument on the State Capitol Grounds was recent. There was controversy and a wealth of public statements making it clear that the purpose of the monument here was to express the state's preference for a particular version of the Christian religion.

### 3. Rule 26(b).

The documents sought here are relevant to the sectarian purpose of placing the monument. The circumstances surrounding the placement of a monument on public property are directly relevant to both its purpose and a determination as to whether it constitutes an endorsement of religion. Courts must review the context of modern displays placed on public property. As the Supreme Court decided in *McCreary Cty. v. ACLU of Ky.,* 545 U.S. 844, 866 (2005) the Court could not disregard "perfectly probative evidence," as it was required to review the history and context of the display.. The Supreme Court has long recognized that religious endorsement encompasses "the government's lending its support to the communication of a religious organization's religious message." *Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 601 (1989). Thus, information relating to the financial sponsorship of the Ten Commandments monument in this case from the organization sponsoring it is highly relevant.

Several courts deciding modern Ten Commandments cases have specifically recognized religious connections between the financial sponsor of the monument and the placement of the monument. *See Felix v. City of Bloomfield*, 841 F.3d 848, 852 (10th Cir. 2016) ("Mauzy then contacted a local business to begin constructing the Monument and reached out to two local churches for donations to fund its

construction."); *Prescott v. Oklahoma Capitol Pres. Comm'n*, 2015 OK 54, ¶ 6, 373 P.3d 1032, 1046–47 (The Act was sponsored by State Representative Mike Ritze of Broken Arrow, who is an '[o]rdained Southern Baptist Deacon and Sunday School teacher.' Representative Ritze not only voted to approve the Act, but after the passage of the Act, Representative Ritze personally contracted with SI Memorials for the creation of the monument."); *Green v. Haskell Cty. Bd. Of Comm'rs*, 568 F.3d 784, 790-91 (10th Cir. 2009) ("After receiving approval from the Board, Mr. Bush raised the necessary funds through religious groups in the community….This ceremony was organized by Mr. Bush, who informed the churches that had participated in the fundraising effort for the Monument that it would be taking place.")

**4.     The Documents in the possession of AHHF and Sen. Rapert are neither irrelevant nor privileged.**

For the reasons set forth above, the documents sought by the *Orsi* Plaintiffs are clearly relevant.

**5.     Associational Privacy**

As to the assertion of privilege, the affidavits of Senator Rapert and Mr. Quattlebaum undeniably adopt the language necessary to raise an issue of an associational privilege.   But that is all they do. The affidavits are conclusory and

appear to have been drafted for the specific purpose of raising this defense, and none other.

It is highly implausible that donors to the effort to place this Monument on the State Capitol grounds are subject to any reasonable fear of retaliation. This implausibility is illustrated in part by the fact that numerous donors were named in a filing that Senator Rapert made in this very Court. See Docket 84-1. There is no evidence that any of the donors listed in the exhibit filed by Senator Rapert ever suffered any consequences whatsoever for their involvement in this endeavor to place the monument on the State Capitol grounds.

There is no evidence that disclosure of donors' names in this case would put them at any risk comparable to the risk suffered by supporters of equal rights for African Americans would have suffered in Alabama in 1958 (See. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163 (1958). Likewise, there is little question that opposition to same-sex marriage in California in 2010 was a highly controversial issue with people holding strong opinions on both sides. (See Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir. 2010) Nothing similar to the risk of adverse consequences from being identified with either side of these controversial issues is involved here. Nobody has expressed any objection to the Ten Commandments themselves. The objection is to placing the Ten Commandments

on public property under circumstances that evince a state preference for the Christian religion.

This Court can take judicial notice of the fact that there are numerous denominations of the Christian religion practiced in the State of Arkansas, with very little if any adverse consequences to the practitioners, however open and public their practice may be. However, before simply asserting that these affidavits were produced in bad faith for the sole purpose of avoiding discovery, the Orsi Plaintiffs believe it is appropriate for this Court to allow either discovery on this point or live testimony at a hearing at which time Senator Rapert and Mr Quattlebaum should be given the opportunity to explain the facts, if any, that underlie their conclusions.

**6.   The Movant's Equal Protection argument does not have anything to do with the Orsi Plaintiffs' seeking these records.**

The AHHF argues here about the theory of the intervenors.  It is the *Orsi* Plaintiffs who seek these documents consistent with the allegations of their complaint.

**7.   The AHHF's Request for a Protective Order is without merit.**

The *Orsi* Plaintiffs do not deny that a long and detailed telephone conversation was held involving counsel for the AHHF, counsel for the Orsi

Plaintiffs, and others. However, the request for a Protective Order is without merit.

## CONCLUSION

For the reasons set forth above, there is a legitimate dispute between the parties in this matter, and the involvement of the AHHF is significant in the resolution of that dispute. The AHHF's affidavits are bare, conclusory assertions inconsistent with their prior actions and unsupported by any factual basis. In the event the Court is willing to consider those affidavits, discovery should be had as to the reliability of those affidavits. Otherwise, the Court should grant Plaintiffs' Motion for an Order to show cause.

WHEREFORE, this Court should issue an Order to Show Cause directing Sen. Rapert to show why he should not be held in contempt for failure to comply with the subpoena *duces tecum*.

Respectfully Submitted

MONICA L. MILLER
Attorney for Plaintiffs
American Humanist Association
1777 T Street N.W.
Washington, D.C. 20009
Telephone: (202) 238-9088
Facsimile: (202) 238-9003
Email: mmiller@americanhumanist.org
CA Bar: 288343 / DC Bar: 101625

PATRICK C. ELLIOTT
Senior Counsel
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
(608) 230-8443
WI Bar No. 1074300

and

Baker Schulze Murphy and Patterson
2311 Biscayne Drive
Suite 300
Little Rock, AR 72227
Telephone: (501) 537-1000
Facsimile: (501) 537-1001
www.bsmp.law

J.G. "Gerry" Schulze
Attorney at Law
Ark. Bar No. 83156
gschulze@bsmp.law