# EXHIBIT 1

Relevant excerpts of Greaves's deposition

Page 77

```
 1    Q.    Okay.
 2                    MR. GILLISPIE:  Is there another one of
 3             those?
 4                    MR. CANTRELL:  There should have been. I
 5             gave all three --
 6                    MR. KEZHAYA:  I have one. He has one
 7             and --
 8                    MS. KEZHAYA:  That's one, two, three.
 9                    MR. KEZHAYA:  There's nothing particularly
10             interesting about it.
11                    MR. GILLISPIE:  Okay.
12                    MR. CANTRELL:  Yeah, all right.
13    Q.    (Mr. Cantrell) Okay. So what is -- what is the
14    symbol there? Is that the -- you called it a 4P; is that
15    right?
16    A.    Correct, yeah. Those are four P's overlapping one
17    another.
18    Q.    Okay. Is that also called The Process P Cross?
19    A.    Yeah, I think so.
20    Q.    Okay. What's the significance of the -- of the 4P
21    symbol?
22    A.    It's just -- P is for Process, and they also have
23    this philosophy of balance that was supposed to be
24    indicated by this flowing kind of circular symbol, from
25    what I understand.
```

Douglas Misicko 3/11/2020                    Donna Cave, et al. v. John Thurston

                                                            Page 78

 1    Q.    Okay. Is the 4P symbol derived from any other

 2    symbol?

 3    A.    Well, the -- the letter P.

 4    Q.    Okay. Anything else?

 5    A.    Not to my knowledge.

 6    Q.    Okay. Is it a variation of the swastika?

 7    A.    No.

 8          It's explicitly, as explained by the creator of the

 9    symbol, Timothy Wyllie, four P's overlapping one another.

10                 (Exhibit 4 marked for identification.)

11    Q.    Okay. You can set that aside.

12          All right. I'm handing you what I've marked as

13    Exhibit 4.

14          Can you tell me what this is?

15    A.    This looks like it's possibly the same article

16    provided in the previous exhibit but in full.

17    Q.    Okay. Take a look at the second page at the top,

18    that second sentence, "Began utilizing shocking symbols,"

19    do you see that?

20    A.    Yes.

21    Q.    Okay. So read along with me.

22          "Utilizing shocking symbols, the goat's head and a

23    strange-looking variation of the swastika and practicing

24    secret rituals, The Process was the quintessential cult."

25          Did I read that correctly?

Page 79

1   A.    You did.

2         But you read that in isolation where the context of

3   course shows that I'm describing them the way the outside

4   world saw them, not the way I agree them to be.

5         They weren't Satan worshipers either. And nor did

6   they have ties to MK Ultra in reality, as I -- as I

7   explained in the entirety of this article. There was a

8   panic surrounding them, and the panic was based on these

9   ideas.

10  Q.    Okay. Show me where you indicate that this is a

11  public perception as opposed to reality, I guess.

12  A.    Well, you can go to the -- I guess you could say

13  the third paragraph down after -- when it starts in 1992

14  I begin talking about when FBI Agent Ken Lanning releases

15  his report titled, "Investigator's Guide to Allegations

16  of Ritual Child Abuse" wherein he reported, quote:

17              We now have hundreds of victims

18          alleging that thousands of cults and there

19          is -- I'm sorry. We now have hundreds of

20          victims alleging that thousands of

21          offenders are abusing and even murdering

22          tens of thousands of people as part of

23          organized Satanic cults, and there is

24          little or no corroborative evidence.

25              Also in 1992 the False Memory

Douglas Misicko 3/11/2020                Donna Cave, et al. v. John Thurston

Page 80

1        Syndrome Foundation created by a, quote: A
2        group of families and professionals
3        affiliated with the University of
4        Pennsylvania in Philadelphia and the Johns
5        Hopkins Medical Institution in Baltimore
6        began exposing the methods by which
7        irresponsible therapists had manufactured
8        false memories that were later interpreted
9        as repressed memories.
10              In 1993 Jeffrey S. Victor released an
11       excellent sociological study titled,
12       Satanic Panic: The Creation of a
13       Contemporary Legend, which did much more
14       to offer a rational explanation for the
15       bald-faced bunk I had been weaned on in a
16       incredulous, shameful talk show culture.
17              More and more the claims of cult
18       crimes folded under unbiased inquiry,
19       revealed as the delusional ravings of
20       moralizing Christians twisted by the
21       fundamental belief that all that is good
22       and altruistic is of God and all that is
23       rotten, antisocial, and criminal is of
24       Satan, literally.
25              By 1995 even the disgracefully

Page 81

1          irresponsible Geraldo Rivera sensed the

2          sensationalist ship sinking and expressed

3          regret that, quote, Many innocent people

4          were convicted and went to prison, going

5          so far as to declare himself, quote,

6          Positive that the repressed memory therapy

7          movement is also a bunch of crap.

8     And I go on to explain what the reality was about

9     The Process thereafter. And I can keep reading.

10    Q.   Okay. Well, we'll make -- we'll make this whole

11    thing an exhibit.

12    A.   Okay.

13    Q.   So -- so -- or I guess it is an exhibit, so it will

14    be in the record.

15         Okay. And you can set that aside.

16         Are you familiar with The Phsychick Bible?

17    A.   I've heard the title. But I've never read the book,

18    nor do I own a copy.

19              (Exhibit 5 marked for identification.)

20    Q.   Okay. All right. I'm handing you what I've marked

21    as Exhibit 5.

22         Do you recognize the first page?

23    A.   No.

24         I mean, this is -- this is new material to me. I

25    know -- I knew a book of this title existed, but I -- I'm

Page 82

 1    not familiar with its content.

 2    Q.    Okay. Flip to the second page.

 3          Have you ever heard or been familiar with the idea

 4    that the -- what's called "The Process P Cross" can be

 5    derived from the swastika?

 6    A.    I mean, I spoke to the man who created the Process

 7    P Cross for The Process; and he explicitly stated on

 8    video even and I think multiple times and in the

 9    documentary that I'm in that the -- that The Process

10    symbol to him was four P's overlapping and that that's

11    what -- what constituted its creation.

12          And even its meaning, it was P's for process and

13    four P's overlapping for the sake of symmetry and

14    balance.

15    Q.    So --

16                    MR. KEZHAYA:  I'm going to object to this

17              exhibit. It's blatant hearsay, and I --  we've

18              been talking about the Process Church for a

19              good 30 minutes or so now, and I -- I'm not

20              seeing any relevance to this case.

21    Q.    (Mr. Cantrell) So before today have you been

22    familiar with the idea that the Process P Cross can be

23    derived from the swastika?

24    A.    Well, as stated in the article in the previous

25    exhibit, I thought it was a bit of ignorance that people

Page 83

1    associated it with a swastika just because it had those

2    kinds of -- that same kind of symmetry and balance.

3         My understanding of it is that it was four

4    interlocking P's.

5    Q.    Okay. Do you have any tattoos?

6    A.    I do.

7    Q.    What tattoos do you have?

8    A.    I have a binary 666 here. I have --

9    Q.    Can you show -- show us for the sake of the video.

10   A.    Sure, yeah.

11         Binary 666.

12         I have The Process symbol here.

13         I have what's called the "sigil of Lucifer" here.

14         And part of The Satanic Temple logo here.

15   Q.    Okay.

16   A.    And that's -- that's all of my tattoos.

17   Q.    Okay. Thank you.

18         So a minute ago you read something I believe about

19   the False Memory Syndrome Action Network; is that right?

20   A.    The False Memory Syndrome Foundation.

21   Q.    Okay. Is that different from the False Memory

22   Syndrome Action Network?

23   A.    It is.

24   Q.    Okay. What is the False Memory Syndrome Foundation?

25   A.    The False Memory Syndrome Foundation was founded I

Douglas Misicko 3/11/2020                    Donna Cave, et al. v. John Thurston

Page 110

1    was a lot in it that you could understand why LaVey

2    discarded it.

3         And I felt that the kind of triumph of the book

4    when it had certain seemingly explicit antisemitic

5    messages, it was -- you know, there was a certain I

6    thought affirmative power in the fact that LaVey, having

7    been culturally Jewish himself, founded the Church of

8    Satan and took what he thought were the -- the

9    affirmative elements of the social Darwinistic philosophy

10   in Might and Right is and deracialized it and made it

11   something not antisemitic.

12        And I thought there was credibility to the social

13   Darwinistic point view of meritocracy at the time in a

14   nonracialized way, but I -- I don't even agree with that

15   viewpoint now.

16        I don't agree with any -- any elements of the

17   social Darwinistic meritocratic philosophy as advanced by

18   LaVey and the Church of Satan as a -- as kind of

19   demonstrated by the philosophical split between The

20   Satanic Temple and the Church of Satan.

21   Q.   Shane Bugbee does podcasts; is that right?

22   A.   He -- he has done podcasts.

23   Q.   Okay. And you've participated in a -- a podcast

24   with Bugbee before, haven't you?

25   A.   Yes.

Douglas Misicko 3/11/2020                    Donna Cave, et al. v. John Thurston

```
                                                      Page 111
```

1        But I'll warn you, this is going to get into

2    slanderous conspiracy-theory territory of highly-edited

3    audio that people have posted and claimed is the pure

4    text of what I had said.

5        So if you're going to present that, I -- I think we

6    should really take objection to you entering that into

7    the court, unless you can claim you've really validated

8    the authenticity of this audio and its fidelity to its

9    true original form.

10                  MR. CANTRELL:  Okay. Well, I will ask --

11                  MR. KEZHAYA:  This is a hearsay objection.

12              And I think this is leading into 30(d)(3)

13              territory. I don't know anything about this

14              podcast, but it sounds to me like it's being

15              used to unreasonably annoy, embarrass, or

16              oppress.

17                  So what's the purpose of this?

18                  MR. CANTRELL:  So I will -- this is

19              impeachment. I will ask you --

20                  MR. KEZHAYA:  What's this about -- well,

21              hold on.

22                  You said it's impeachment.

23                  MR. CANTRELL:  Uh-huh.

24                  MR. KEZHAYA:  How does that make it more

25              or less likely that he's telling the truth?

Page 112

1          MR. CANTRELL:  Matt, there is a podcast in

2          which the witness is alleged to have made

3          antisemitic comments.

4          THE WITNESS:  And I -- I clearly did

5          not --

6          MR. KEZHAYA:  No. You hold on.

7          THE WITNESS:  No. It's offensive. And it's

8          also based on conspiracy-theory premises and

9          manipulated audio that I -- I really take

10          objection to being entered into the record

11          unless you can forensically validate that --

12          that material.

13          MR. KEZHAYA:  What -- what you are talking

14          about is a hearsay objection.

15          You are talking about an impeachment

16          point. So how does it make it more or less

17          likely he's telling the truth here?

18          MR. CANTRELL:  This case involves a text,

19          the Ten Commandments, which was originally

20          associated with Judaism. Antisemitic comments

21          are relevant in that context.

22          MR. KEZHAYA:  How?

23    Q.    (Mr. Cantrell) So -- so we have -- we have audio,

24    and I'd like for you to listen to part of it. And you can

25    tell -- you can tell us what -- what your opinion of

Page 113

1   it --

2   A.    No, I can't.

3         Because this is, like, 20 years ago. This is

4   manipulated audio. So I think the burden of proof is on

5   somebody else, somebody who's going to present this as

6   evidence to tell me that it's legitimate and valid rather

7   than making me listen to it for the first time and

8   determine, no, I said these words; or these were placed

9   this way or this sentence was taken out of context in

10  this manner.

11        You might as well be asking anybody on the street

12  to speak to this audio at this point. Because, there

13  again, it's around 20 years ago; and I would be listening

14  to it for the first time in a long time.

15        And I know it's been -- and I know it's been

16  altered.

17  Q.    Okay. So you have listened to --

18  A.    I have heard the claims, and I know specifically in

19  general that I -- that I was not saying that -- that

20  there should be prejudice exercised against Jewish people

21  for being Jewish.

22        But I was also saying that religious propositions

23  are clearly items of -- that are available for critical

24  scrutiny, but that it was wildly inappropriate to subject

25  people to ridicule based upon their ancestral heritage.

Page 114

1    Q.    Okay. And I -- I think you may have assumed that I

2    was going somewhere that I -- I was not. And I want to

3    give you --

4    A.    But I know it comes from conspiracist material put

5    online to slander me, and I -- I don't appreciate the --

6    this tactic of doing a Google search to find any negative

7    things about me and then --

8    Q.    This will be --

9    A.    -- putting them in as though they're Gospel fact

10   into the public record.

11   Q.    Well, this will be your opportunity to tell us;

12   So --

13            MR. KEZHAYA:  No, that's not how it works.

14         Here's how the hearsay issue works. You are

15         saying that this is a true and correct copy of

16         his statement, right?

17            MR. CANTRELL:  Matt, I'm not making any

18         representations about whether it's a true and

19         correct copy.

20            MR. KEZHAYA:  Well, you're saying that.

21         And that is purporting to be a true and correct

22         copy of the statements that they had. That

23         sounds a lot like hearsay.

24            MR. CANTRELL:  My questions are for this

25         witness, for this witness.

Page 115

1            MR. KEZHAYA:  And if it's rooted in this,

2       whatever this hearsay statement is, I need to

3       understand how this is not being used to

4       unreasonably annoy, embarrass, or oppress.

5            Whatever -- whatever the contents are, he

6       clearly is annoyed by this; and I think it's

7       pretty unreasonable.

8  Q.    (Mr. Cantrell) So I'm going to go ahead and play

9  part of this. And -- and, first, just to -- to set it up,

10 this was -- this was a 24-hour podcast, right? It lasted

11 24 hours; is that right?

12 A.    I would have to listen to the full, unadulterated

13 24-hour podcast in its pure form and -- and tell you

14 whether the audio you are going to play is spliced

15 together from parts of it or it -- or if it's legitimate

16 at all.

17      I mean, you might as well be taking for all intents

18 and purposes a text of mine that I had written and --

19 and -- and rescrambling the words to give it an entirely

20 different meaning and then asking me if I remember it

21 when it's 20 years ago.

22      I mean, there's not going to be anything I can

23 really tell you from this. But if you have questions

24 about where I stand regarding religion and opinions I

25 have regarding the Jewish religion from the time we

Page 116

1    started The Satanic Temple, then -- then I can -- then I

2    can answer to that.

3          But this audio I think is wildly inappropriate.

4    Q.    So -- and this was called the "Might is Right

5    Special"; is that right?

6    A.    Well, here we go again --

7    Q.    This is a 24-hour podcast that you did with Shane

8    Bugbee?

9    A.    I -- I mean, here we go again. I mean, this is 20

10   years ago.

11   Q.    I know.

12   A.    From 24 hours of audio --

13   Q.    And the question --

14   A.    Audio put together now by conspiracy theorists made

15   to paint me to look bad, and -- and you're trying to

16   enter it into evidence. And, I mean, I don't even feel

17   this is authenticated --

18   Q.    This --

19   A.    -- nor can I authenticate it.

20   Q.    This is my opportunity to ask you about --

21   A.    But it's not my opportunity to answer to it. That's

22   what I'm telling you.

23   Q.    Okay.

24   A.    I can neither authenticate this nor --

25   Q.    All right. So we're going to listen to it --

```
                                              Page 117
 1           MR. KEZHAYA:  Let's just take a break real
 2       quick.
 3           MR. CANTRELL:  No. We're not going to take
 4       a break. We're going to listen to this.
 5           MR. KEZHAYA:  I am standing up and taking
 6       my client with me.
 7           MR. CANTRELL:  All right. I am starting
 8       the audio.
 9           MR. KEZHAYA:  Doug, come on.
10           MR. CANTRELL:  Are you --
11           MR. KEZHAYA:  Yeah, I just told you. I'm
12       taking my client with me.
13           MR. CANTRELL:  You're cutting off the
14       deposition?
15           MR. KEZHAYA:  We are taking a break right
16       now.
17           MR. CANTRELL:  We're not taking a break.
18           MR. KEZHAYA:  I'm taking a break right
19       now.
20           MR. CANTRELL:  All right. Well . . .
21           (Counsel confer sotto voce.)
22           THE COURT REPORTER:  Are we off the
23       record, sir? Or are we still on the record?
24           MR. CANTRELL:  We're on -- we're still on
25       the record. So I don't know -- I mean, they --
```

Page 118

1           the --

2                   MS. KEZHAYA:  Just take the break, man.

3                   MR. CANTRELL:  Well, okay. So what's

4           happened is the witness and Mr. Kezhaya have

5           just exited the room, and we will go ahead

6           and -- and take a break.

7                   MS. KEZHAYA:  And Mr. Baker.

8                   MR. CANTRELL:  Oh, and Mr. Baker too.

9           Sure.

10                  So we will reconvene I guess whenever they

11          decide to come back.

12                  THE VIDEOGRAPHER:  We are going off the

13          record at 1:24 p.m.

14                  (Recess taken.)

15                  (Mr. Robinson enters.)

16                  THE VIDEOGRAPHER:  We're back on the

17          record at 1:34 p.m.

18   Q.   (Mr. Cantrell) Okay. So we're back on the record.

19          We were discussing a podcast that I understand goes

20   by the name "Might is Right Special." And I'm just going

21   to play it.

22          Here's a -- a section -- and, again, just to set

23   this up, I understand that in the course of the podcast,

24   there was discussion of Jews and whether it was okay to

25   have disdain for Jews and that -- and then this statement

Page 119

1    comes in the context of a discussion of why eugenics

2    wasn't all bad.

3         Okay. I'll just present that as my understanding of

4    the context of -- of this podcast.

5              MR. KEZHAYA:  And before we hit play, a

6              hearsay and an authenticity objection was

7              lodged. So I take the understanding that we are

8              playing this subject to those objections.

9              MR. CANTRELL:  Okay. All right. And,

10             actually, this is going to have to turn on, so

11             it may -- I don't think it will be very bright,

12             but . . .

13             MS. KEZHAYA:  Well, it may hit you in the

14             eye, is what he's saying.

15             MR. KEZHAYA:  You -- you may want to --

16             THE WITNESS:  It will be above my head, I

17             think.

18             MR. CANTRELL:  Yeah, I guess it turned

19             off. Can you turn it on?

20             MR. ROBINSON:  I don't know. It should

21             take just a second to warm up.

22             MR. CANTRELL:  Okay.

23             MR. ROBINSON:  You're good to go.

24             MR. CANTRELL:  Okay. All right. I'm going

25             to hit play now.

Page 120

1              (Audio plays from 1:36: p.m. to 1:37 p.m.)

2      NOTE: THE FOLLOWING IS NOT A VERBATIM TRANSCRIPT OF

3      AUDIO. QUALITY IS TOO POOR TO CERTIFY AS VERBATIM.

4                  MALE 1: "I tell you, the Three

5              Stooges were great Jews; and they're

6              funny, but it's like a joker coming in the

7              King's place and we throw pies at them.

8              They entertain, but who gives a fuck.

9                  MALE 2: "Okay.

10                 (Inaudible background conversation on

11             audio.)

12                 MALE 1: "You know what I'm saying? You

13             know, I may have broken bread with Moe Howard,

14             okay. I rank the Stooges up there with LaVey as

15             great, great people. The Stooges are great.

16                 MALE 2: "Right.

17                 MALE 1: "What?

18                 MALE 2: "Exactly.

19                 MALE 1: "Yeah, Jarod, all I want to

20             say is exactly agree with everything we're

21             saying.

22                 UNKNOWN MALE: "Well the -- well,

23             you'd be amazed. I mean, sometimes I talk

24             to people, and sometimes they have ideas

25             that just totally contradict everything I

Page 121

```
 1              stand for. But, I mean, when -- when you
 2              talk to people that are on your same --
 3                   THE COURT REPORTER:  Can we pause, please?
 4                   MR. CANTRELL:  I'm trying to pause it.
 5                   (Audio plays.)
 6                   UNKNOWN MALE: "I mean, there's not
 7              really much there that you -- you can't --
 8              that you can disagree with.
 9                   MR. CANTRELL:  I'm trying to pause it.
10                   (Audio plays.)
11                   UNKNOWN MALE: "You dig?
12                   MR. CANTRELL:  Why is this --
13                   (Audio plays.)
14                   UNKNOWN MALE: "Oh, yeah, I dig. I'm
15              digging a grave right now.
16                   "Hey, but you know what? I got to fly
17              because I've got to get up early in the
18              morning."
19                   MR. CANTRELL:  Okay. I'm trying to -- hold
20              on.
21                   (Audio plays.)
22                   UNKNOWN MALE: "And it's 1:30" --
23                   MR. CANTRELL:  Okay. That was actually the
24              wrong -- there was a different file playing, so
25              that was actually not it.
```

```
                                                    Page 122
 1               MR. KEZHAYA:  Who --

 2               MR. CANTRELL:  Let me close this.

 3               MR. KEZHAYA:  Who or what was that?

 4               MR. CANTRELL:  That -- that was the same

 5          file. That was a little bit later.

 6               THE COURT REPORTER:  And I was asking to

 7          pause because I was having a little trouble

 8          with that stuff in the background. I didn't

 9          know if that was --

10               MR. CANTRELL:  Yeah.

11               THE COURT REPORTER:  -- anything you

12          wanted me to try and pick up or not.

13               MR. CANTRELL:  It's -- I mean, it just --

14          just the voices.

15               THE COURT REPORTER:  Okay.

16               MR. CANTRELL:  I mean . . .

17               THE COURT REPORTER:  It sounded like two

18          conversations over --

19               MR. CANTRELL:  Yeah, I think -- I think

20          what was going on was there were actually two

21          audio files playing, because we had two

22          different programs open.

23               And I apologize. Let's -- let's try that

24          again. And, actually, I'm going to --

25               Can you shut it off so I can tee it up,
```

Page 123

1      Josh?

2              MR. ROBINSON:  Sure.

3              MR. CANTRELL:  Should this be playing on

4      here?

5              MR. ROBINSON:  Yes.

6              MR. CANTRELL:  Okay. It looks like it's

7      stuck at -- right there.

8              (Counsel confer soto voce.)

9              THE COURT REPORTER:  Sir, there is

10     conversation that I'm able to hear but I'm not

11     taking down because I presume they're off the

12     record. We don't want to stop the video, so can

13     we agree that those conversations between

14     counsel will be off the record?

15             MR. CANTRELL:  Yes.

16             THE COURT REPORTER:  Thank you.

17             MR. KEZHAYA:  Can we maybe just go off the

18     record while you figure out whatever these

19     technical issues are?

20             MR. CANTRELL:  Yeah. And --

21             MR. KEZHAYA:  Actually, no. Let's stay on

22     the record, because that chips away at your

23     seven-hour time limit.

24             MR. CANTRELL:  Well, we're not taking

25     seven hours; that's for sure.

Page 124

1            MR. KEZHAYA:  Well, that's definitely for

2      sure; but just in case.

3            MR. CANTRELL:  Okay.

4            MS. KEZHAYA:  We're taking 24 hours.

5            (Counsel confer sotto voce.)

6            MR. CANTRELL:  Okay. Yeah. So go ahead

7      and -- okay. So I apologize. Here is -- here's

8      the clip that we're sending -- and, again, this

9      is -- again, my understanding this is part of

10     what is called the "Might is Right Special,"

11     part of a 24-hour podcast.

12            And I'll go ahead and -- and hit play.

13            (Audio plays from 1:40 p.m. to 1:42 p.m.)

14   NOTE: THE FOLLOWING IS NOT A VERBATIM TRANSCRIPT OF

15   AUDIO. QUALITY IS TOO POOR TO CERTIFY AS VERBATIM.

16            MALE 1: "Yeah, I mean, you know,

17     it's -- it's funny how people associate

18     Naz- -- like the Nazis went immediately

19     with that social Darwinism. It's the only

20     thing they can put together, you know what

21     I mean? And there's a -- they have a

22     knee-jerk reaction. All you have to do is

23     to mention social Darwinism, and they

24     immediately think of World War II.

25            MALE 2: "Right. That's exactly what I

Douglas Misicko 3/11/2020                    Donna Cave, et al. v. John Thurston

Page 125

1           was talking about, the -- the unconscious

2           collective trauma of World War II,

3           apparently.

4                MALE 1: "Exactly. It was just -- it

5           just threw things off, and I think it --

6           you know, speaking of eugenics, it -- it

7           kind of gave eugenics a bad name too.

8           Well, completely ruined it.

9                MALE 2: "Threw the baby out with the

10          bath water, so to speak.

11               MALE 1: "Exactly. Precisely.

12               MALE 2: "I mean, just like

13          (inaudible) antisemitic to me --

14          (Cross-talk. Inaudible.) a bad word -- it

15          just depends"

16               MALE 1: "-- we're living in right now

17          because I -- I really think that eugenics

18          would be something that would be used much

19          more openly than it is now.

20               MALE 2: "Like, I think it's okay to

21          hate Jews if you hate them because they're

22          Jewish and they wear a stupid fucking

23          Frisbee on their head and walk around

24          thinking they're God's chosen people, but

25          it's not okay to hate somebody just

Page 126

1          because their parents were stupid fucking

2          Jews and wore stupid Frisbees on their

3          head and thought that Jews, they were

4          God's chosen people.

5              "I mean, that's not what they -- they

6          choose to go along with. And they're normal

7          people too.

8              MALE 1: "If they're Jews?"

9              MR. CANTRELL:  Okay. You can go ahead and

10          turn it off, Josh.

11              (Mr. Robinson exits.)

12   Q.    (Mr. Cantrell) Okay. So -- and let me ask you,

13   the -- the voice that began, "I think it's okay to hate

14   Jews if you hate them because they're Jewish," do you

15   recognize that as your voice?

16   A.    I recognize that as my voice, but I can't

17   authenticate the fidelity of that recording.

18   Q.    And I'm -- I'm not asking you to authenticate

19   fidelity of -- and at least as I understand what you're

20   saying.

21        But I am asking you if -- did you make the

22   statement that was recorded there?

23   A.    I can't authenticate that. I do not -- I cannot

24   authenticate the fidelity of that recording. I cannot say

25   that that recording was not altered.

Page 127

1    Q.    Did you make a statement that: "I think it's okay

2    to hate Jews if you hate them because they're Jewish and

3    they wear a stupid fucking Frisbee on their head and walk

4    around and think they're God's chosen people, but it's

5    not okay to hate somebody just because their parents were

6    stupid fucking Jews and wore stupid Frisbees on their

7    head and thought that Jews were God's chosen people"?

8    A.    That is exactly the statement I'm telling you I

9    cannot authenticate.

10   Q.    Okay. And I'm asking you: Did you make that

11   statement?

12   A.    I -- I don't know what the difference is between

13   your -- your question previously and the question now.

14   I'm telling you I can't tell you whether I made that

15   exact statement or not.

16   Q.    Okay. So is your -- is your testimony today then

17   that you did not make that statement?

18   A.    No.

19         My testimony is that I cannot authenticate that as

20   true to the form in which I spoke any statements on that

21   show.

22   Q.    Okay. On -- on that podcast did you express that

23   it's not okay to hate Jews for racist reasons?

24   A.    My understanding, my broad recollection of

25   something that happened nearly 20 years ago was that I

Douglas Misicko 3/11/2020                Donna Cave, et al. v. John Thurston

Page 128

1  was making an inarticulate point that it is okay to be

2  critical of superstitious religious beliefs but not okay

3  to be critical of somebody's ethnic or ancestral

4  background.

5  Q.    Okay. And so is it correct to characterize that as

6  saying it's -- it's not okay to dislike people again for

7  racist reasons, but it is okay to dislike people for

8  religious reasons?

9  A.    I would not agree with that statement today. I

10  don't know if I would have agreed with it back then.

11       But I just don't think it's -- it's okay to -- to

12  hate people for their religious beliefs, but I think it

13  is okay to be critical of beliefs that aren't -- aren't

14  based upon empirical evidence.

15                 (Exhibit 8 marked for identification.)

16  Q.    Okay. Let me move on. And I may have other

17  follow-up questions at some point, but let me move on.

18       All right. I'm handing you what I have marked as

19  Exhibit 8.

20       Do you recognize this as an article titled, "Who

21  are the 'Satanists' Designing an Idol for the Oklahoma

22  Capitol?" published in The Atlantic?

23  A.    Yes.

24       I see a date of February 4, 2014.

25  Q.    Okay. And did you give statements that were