```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                         CENTRAL DIVISION

 3    DONNA CAVE, JUDITH LANSKY,
      PAT PIAZZA and SUSAN RUSSELL,    No. 4:18CV00342-KGB
 4                     Plaintiffs

 5    EUGENE LEVY, Rabbi; GALE
      STEWART; ANNE ORSI; WALTER
 6    RIDDICK; JOAN DIETZ; TERESA      Friday, February 18, 2022
      GRIDER; ARKANSAS SOCIETY OF      Little Rock, Arkansas
 7    FREETHINKERS; VICTOR H.          1:30 p.m.
      NIXON, Rev.; FREEDOM FROM
 8    RELIGION FOUNDATION INC.; and
      AMERICAN HUMANIST
 9    ASSOCIATION,
             Consolidated Plaintiffs
10
      v.
11
      JOHN THURSTON, Arkansas
12    Secretary of State, in his
      official capacity,
13                     Defendant

14
      SATANIC TEMPLE; DOUG MISICKO,
15    also known as Lucien Greaves;
      and ERIKA ROBBINS,
16                     Intervenors.

17            TRANSCRIPT OF TELEPHONE CONFERENCE
            BEFORE THE HONORABLE KRISTINE G. BAKER,
18                UNITED STATES DISTRICT JUDGE

19    APPEARANCES:

20    On Behalf of the Cave Plaintiffs:
          MR. JOHN L. BURNETT, Attorney at Law
21           Lavey & Burnett
             904 West 2nd Street
22           Little Rock, Arkansas  72201

23        MR. ANDREW G. SCHULTZ, Attorney at Law
             Rodey, Dickason, Sloan, Akin & Robb, P.A.
24           Post Office Box 1888
             Albuquerque, New Mexico  87103-1888
25                              [APPEARANCES CONTINUED]
```

```
1    APPEARANCES CONTINUED:

2    On Behalf of the Orsi Plaintiffs:
          MR. PATRICK C. ELLIOTT, Attorney at Law
3            Freedom from Religion Foundation
             Post Office Box 750
4            Madison, Wisconsin  53701

5
     On Behalf of Defendants:
6            MR. MICHAEL CANTRELL, Assistant Solicitor General
             MR. DYLAN L. JACOBS, Assistant Solicitor General
7              Arkansas Attorney General's Office
               Catlett-Prien Tower Building
8              323 Center Street, Suite 200
               Little Rock, Arkansas  72201-2610
9
             MS. LEA ELYSE PATTERSON, Attorney at Law
10             First Liberty Institute
               2001 West Plano Parkway
11             Suite 1600
               Plano, Texas  75075
12
     On Behalf of Intervenor The Satanic Temple:
13           MR. MATTHEW A. KEZHAYA, Attorney at Law
             MS. SONIA KEZHAYA, Attorney at Law
14             Kezhaya Law PLC
               1202 North East McClain Road
15             Bentonville, Arkansas  72712

16           MR. STUART P. DE HAAN, Attorney at Law
               De Haan Law Firm, PLLC
17             100 North Stone Avenue, Suite 512
               Tuscon, Arizona  85701
18
     On Behalf of American History and Heritage Foundation:
19           MR. TRAVIS W. STORY, Attorney at Law
               Story Law Firm, PLLC
20             3608 Steele Boulevard, Suite 105
               Fayetteville, Arkansas  72703
21
     On Behalf of Senator Rapert:
22           MR. PAUL BYRD, Attorney at Law
               Paul Byrd Law Firm, PLLC
23             415 North McKinley Street, Suite 210
               Little Rock, Arkansas  72205
24
             Proceedings reported by machine stenography.  Transcript
25   prepared utilizing computer-aided transcription.
```

P R O C E E D I N G S

1

2       THE COURT:  Good afternoon.  This is Judge Baker.  We

3  are on the record in case No. 4:18CV342, Cave, Levy and The

4  Satanic Temple versus John Thurston in his official capacity.

5       We're here this afternoon for a status conference.  I will

6  ask counsel for each group of parties involved to state whether

7  they are on the line, identify who you are, who is with you on

8  the line.  And let me know if we're waiting on anyone.

9       Counsel for the Cave plaintiffs.

10       MR. BURNETT:  Your Honor, this is John Burnett.  I am

11  on the line for the Cave plaintiffs.  I can barely hear.

12       THE COURT:  All right.  I can hear you.

13       MR. STORY:  I would say the same thing, Your Honor.

14  This is Travis Story for AHHF.  You are super hard to hear.

15       THE COURT:  Why don't we do this.  I'm going to exit

16  the call and call back in to join the conference call.  So I am

17  going to exit, and we'll try this one more time.  We're in the

18  courtroom, which is where we've been every prior call, using the

19  same system that we've used.  So I'm going to exit the call and

20  try again just to see if we have a bad connection.  Bear with

21  me.  We'll be right back on the call.

22       This is Judge Baker again.  Is this a better connection,

23  Mr. Burnett?

24       MR. BURNETT:  Well, I suppose the answer might be yes,

25  but barely.

Elaine Hinson, RMR, CRR, CCR, United States Court Reporter
elaine_hinson@ared.uscourts.gov (501)604-5155

1          THE COURT:  All right.  Let me try this.

2     Can you hear me now?

3          MR. BURNETT:  I can hear you.  I just have to be very

4     careful.

5          MR. KEZHAYA:  Your Honor, this is Matt Kezhaya.  It

6     sounds like you might be distant maybe from your microphone or

7     phone receiver or what have you.  It's not breaking up, in other

8     words.

9          THE COURT:  Is this any better?

10     Hang on.  We're going to disconnect and reconnect one more

11     time in a different way in the courtroom.  Bear with me just one

12     moment.  Thank you for your patience this afternoon.

13     This is Judge Baker.

14     Is this any better, Mr. Burnett?

15          MR. BURNETT:  Yes.

16          THE COURT:  So Cave plaintiffs, Mr. Burnett is on the

17     line.  Mr. Burnett, are we waiting on anyone else for the Cave

18     plaintiffs?

19          MR. SCHULTZ:  Your Honor, this is Andrew Schultz in

20     Albuquerque, New Mexico, also for the Cave plaintiffs.

21          THE COURT:  Thank you.  Anyone else for --

22          MR. BURNETT:  That's it for the Cave plaintiffs.

23          THE COURT:  Thank you.  How about for the Levy

24     plaintiffs?

25          MR. ELLIOTT:  Is that for the Orsi plaintiffs?

1      THE COURT:  The Orsi plaintiffs.  Our docket sheet has

2  changed with respect to that, yes.

3      MR. ELLIOTT:  Yes.

4      THE COURT:  And are you covering?  That's right?

5      MR. ELLIOTT:  Yes.  This is Patrick Elliott covering

6  for Gerry Schulze.

7      THE COURT:  Thank you.  Mr. Elliott, are we expecting

8  anyone else on the line for you and your folks?

9      MR. ELLIOTT:  No.

10      THE COURT:  How about for TST?

11      MR. KEZHAYA:  Your Honor, this is Matt Kezhaya

12  representing TST.  I have with me in my office Sonia Kezhaya, my

13  law partner.  And I believe Stu De Haan, our co-counsel, is also

14  on the line.  We are not expecting anyone else.

15      THE COURT:  Thank you.  How about for Secretary of

16  State Thurston?

17      MR. CANTRELL:  Yes, Your Honor.  This is Mike Cantrell

18  with the Attorney General's Office, and I am not aware of anyone

19  else.  But, if they are, if there's anyone else for Secretary

20  Thurston, they can announce themselves as well.

21      MS. PATTERSON:  Your Honor, this is Lea Patterson at

22  First Liberty, also for Secretary Thurston.

23      THE COURT:  Ms. Patterson, do you know if we're

24  waiting on anyone else?

25      MS. PATTERSON:  No, ma'am.

1        THE COURT:  All right.  How about we have other sort

2   of folks who have joined with respect to these issues based on

3   discovery.  How about Senator Rapert?  Anyone on the line for

4   Senator Rapert?

5        MR. BYRD:  Paul Byrd here, Your Honor, for Senator

6   Rapert in his individual capacity.

7        MR. JACOBS:  Your Honor, this is Dylan Jacobs with the

8   Attorney General's Office for Senator Rapert in his official

9   capacity.  I'm also appearing for Senator Ballinger and Senator

10  Hammer.

11       THE COURT:  Mr. Jacobs, do you know if Senator

12  Ballinger or Senator Hammer -- they don't have anyone in their

13  individual capacity that you are aware of.  Right?

14       MR. JACOBS:  No, Your Honor.  It's just me for the

15  whole capacity, I guess.

16       THE COURT:  All right.  I just wanted to make clear

17  that you weren't aware of anybody.

18      All right.  How about for American History and Heritage

19  Foundation?

20       MR. STORY:  Yes, Your Honor.  This is Travis Story for

21  AHHF, and we're not expecting anybody else to join us today.

22       THE COURT:  All right.  And are there any others on

23  the line that I may have overlooked?

24      All right.  I'll take silence as a no.

25      So we're here today for a status conference.  I was made

1    aware of the request for a status conference by certain parties

2    to set a dispositive motion briefing schedule and a trial date.

3    I had said we would have a short turnaround with respect to

4    hearings on discovery matters, and clearly we have let -- I have

5    let that get away.  We have been in trial much of the fall, all

6    of the fall really, with multi-week trials and other trials back

7    to back, and then we hit our omicron bump and suspended trials

8    but tried to play catchup on a lot of criminal matters that we

9    had to take care of in order to move the criminal docket

10   through, so I wanted to have a status conference.

11       I have outlined in Docket No. 224 the discovery motions

12   that have been filed since we last visited, and they may have

13   been filed prior to that, but they have become ripe now.  So

14   what I would like to do is hear first from anyone who wishes to

15   speak with respect to the dispositive motion and the briefing

16   schedule along with the trial date.

17       I will say for the benefit of all, I'm perhaps the most

18   interested in moving this case along to get it resolved and

19   taken care of on the docket and juggling a lot of things with

20   respect to that, but I'm very conscious of that.  I know my

21   understanding from the joint status reports is that the parties

22   are interested in a dispositive motion briefing schedule,

23   anticipating multiple motions, dispositive motions, and would

24   like those ruled on by the Court with an eye toward a trial date

25   well after the time for the Court to rule on those, well being

1    relative.  I'm not looking at a year, but I'm looking at a
2    matter of months after a ruling, and so handling the case in
3    that fashion.

4        Before we get there, I recognize there's a lot of discovery
5    disputes that are pending, and I'll make my way through those
6    expeditiously in the next few weeks to rule on those and set a
7    schedule for everyone so that you are aware of what this case
8    looks like going forward in the next few months.  So I'm going
9    to say all of that for the record, but I'll open up the floor if
10   anyone wishes to speak to that request for me to set a
11   dispositive motion briefing schedule and trial date.

12       I'm just going to go through the roll call.  Counsel for
13   the Cave plaintiffs, do you wish to speak to that?

14           MR. SCHULTZ:  Thank you, Your Honor.  This is Andrew
15   Schultz.  We feel very strongly, Your Honor, that the Court
16   should do exactly that.  The Court needs to set the deadline.
17   This case has been pending now for quite some time.  Our largest
18   concern -- and we did state that.  We filed a response to
19   several of the pending motions.  The Cave plaintiffs are not a
20   party to any of the pending discovery motions.  We are taking no
21   position on them.  Our concern is that a number of the motions
22   ask this Court to reopen the discovery deadline, which expired
23   some time ago, and we are very concerned about that request.
24   And we are asking the Court, in considering all of these pending
25   discovery motions, not to reopen discovery so that the Court is

1    able to set the deadlines for a dispositive motion briefing

2    schedule.

3          THE COURT:  All right.  Thank you, Mr. Schultz.

4       Anyone for the Orsi plaintiffs wish to speak on that issue

5    with respect to dispositive motions and trial dates?

6          MR. ELLIOTT:  Yes.  This is Patrick Elliott.  I'm

7    fairly concerned about having a dispositive motions deadline

8    set, but the Orsi plaintiffs don't take a position on whether

9    discovery should be reopened or closed.

10          THE COURT:  All right.  Counsel for The Satanic Temple

11   intervenors?

12          MR. KEZHAYA:  This is Matt Kezhaya.  Our position, to

13   be clear, is not to reopen discovery but to modify a discussion

14   whether to permit the subpoenas that already went out.  We only

15   want to enforce those outstanding subpoenas and get the

16   discovery that we've been seeking since, as I recall, March

17   of 2020.

18       With respect to dispositive scheduling, I defer to the

19   Court's calendar.

20          THE COURT:  All right.  Counsel for Secretary

21   Thurston.

22          MR. CANTRELL:  Yes, Your Honor.  This is Mike

23   Cantrell.  Our position is that this discovery does not need to

24   be reopened.  There are matters pending with the Court that are

25   sort of holdover issues or residual issues for matters that were

1   initially dealt with before the close of discovery, and we

2   believe that would be appropriate for the Court to resolve those

3   issues.  But, besides that, discovery is not -- we do not

4   believe discovery needs to be reopened or the scheduling order

5   modified otherwise.

6        As far as dispositive motions and trial date, I believe it

7   sounds like, from what the Court said earlier, that that's the

8   same understanding that Secretary Thurston has with respect to

9   those issues, and we believe the Court has a good understanding

10  and a good mindset as far as getting this case resolved and

11  progressing.

12            THE COURT:  Counsel for Senator Rapert in his

13  individual capacity, do you wish to weigh in?

14            MR. BYRD:  Your Honor, I guess as far as dispositive

15  motions, and since I'm not a party, that's up to the Court and

16  the parties in the case.

17        As to the discovery, we certainly have a motion pending to

18  quash a subpoena.  I don't think that should affect the Court's

19  dispositive motions or trial dates.

20            THE COURT:  All right.  Anything further, Mr. Byrd?

21            MR. BYRD:  Unless this is my time to talk about my

22  motion to quash.

23            THE COURT:  No.  We'll get to that.  We'll get to

24  that.

25        Mr. Jacobs, anything on behalf of Senator Rapert,

1   Ballinger, Hammer in their official capacity or Ballinger and

2   Hammer in whatever capacity you represent them?

3           MR. JACOBS:  Your Honor, Dylan Jacobs.  We don't have

4   any position on any of those issues except to the extent that

5   the discovery deadline implicates the pending motions for Hammer

6   and Ballinger.  I think you can probably take those up when we

7   get to those motions later.

8           THE COURT:  Mr. Story, do you wish to add anything?

9           MR. STORY:  No, Your Honor.  We are not a party to the

10  underlying case, so I don't have anything as far as responding

11  to the dispositive motions.  Obviously, we can address the

12  discovery issues when we hit our motion to quash.

13          THE COURT:  All right.  If there's nothing further on

14  that issue, I'm going to turn to the individual motions.  The

15  Court, as I said, in Docket No. 224 set out a list of the

16  pending motions, the responses and the replies.  First, I'll

17  start off with a question.  Did we miss any?  Does anyone feel

18  that there should be something else on this list?  I think we

19  asked that question when we set the hearing, but let me know if

20  there are any that you believe that are ripe that we need to

21  turn our attention to as well with respect to this docket either

22  that are separate pending motions or that are lurking in issues

23  from before.  So I'm going to open up the floor.  If there are

24  any of those, now is your time to raise them with me and let me

25  know.

1      MR. KEZHAYA:  This is Matt Kezhaya.

2      MR. CANTRELL:  Your Honor -- go ahead, Matt.

3      MR. KEZHAYA:  I filed the bulk of the motions.  And it

4  looks like everything is accounted for, Your Honor.

5      THE COURT:  Was that Mr. Cantrell?  I don't know who

6  also wanted to speak.

7      MR. CANTRELL:  Yes, Your Honor.  This is Mike

8  Cantrell.  Your Honor, there is no pending motion, but there are

9  issues pertaining to the protective order that will need to be

10  addressed really logically before we're able to deal with some

11  of the motions that are on the list today.  And it's

12  specifically before No. -- looks like before Docket No. 203,

13  which implicates issues of confidentiality with respect to The

14  Satanic Temple's -- goodness -- their privilege log.  So we can

15  wait until that time to address that or address it now, as Your

16  Honor would like.

17      THE COURT:  All I need for you to do now is just flag

18  it.  The issue is the protective order.  Right?

19      MR. CANTRELL:  That's correct, Your Honor, and the

20  designations of confidentiality that The Satanic Temple has

21  made.

22      THE COURT:  All right.  We'll take it up when we get

23  to 203 if that's the motion you think it pertains to.  All

24  right?

25      MR. CANTRELL:  Yes, Your Honor.

1           THE COURT:  Anything else from anyone else?  Any other
2   pending motions we missed or issues lurking out there that may
3   not be fully set forth in a motion but that you think we need to
4   take up?
5           I take silence as none.  If there's anything after today,
6   I'm tasking you with raising it as soon as possible with the
7   Court in a written filing to let me know.
8           We're going to turn now, and we're going to go motion by
9   motion.  I will state for the record I have read it all.  I've
10  read the motions.  I've read the responses.  I've read the
11  replies.  After our hearing today -- I've read the exhibits, but
12  I will pore over the exhibits more carefully after our hearing
13  today.  You are welcome to speak to any motion but not required
14  to.  But I will hear anyone who wishes to talk about them, and
15  I'm going to go one by one.
16          The first one is Docket No. 189, the intervenors' motion to
17  exclude Bugbee or to permit a late subpoena.
18          Mr. Kezhaya, I'm happy to hear about this.  And if it
19  bleeds over into other motions that are pending on the docket
20  related to it, that's fine too.  You can alert me to that when
21  we get to the other motion if you want to speak to it.  I
22  realize a lot of these issues are overlapping and depend upon
23  certain rulings that I'll make that are threshold issues to move
24  forward.  So how you structure your argument generally is up to
25  you.  I just want to make sure that we touch on each one and

1     that I've given everyone who wishes to an opportunity to address

2     it.  So Docket No. 189.

3          You may proceed, Mr. Kezhaya.  It's the intervenors'

4     motion.

5               MR. KEZHAYA:  Thank you, Your Honor.  And may it

6     please the Court.  In light of the Court's reference that the

7     Court has read through everything, I'll be very brief.

8               THE COURT:  And I hate to interrupt, but I'm going to

9     interrupt at the outset.  We, in an effort to accommodate the

10    sound system, I am using a speakerphone.  And my court reporter

11    is listening to the speakerphone.  So if you are talking into

12    your speakerphone, talk right next to it and don't look away, or

13    pick up your receiver and talk into that so that you don't trail

14    off, because if you are reading your notes and you look away

15    from that microphone, it makes it a little challenging here on

16    our end.  I've got my volume turned all the way up here, but

17    we're dealing with not the latest of technology.  We're dealing

18    with what we have to make it work.  So I'm sorry to interrupt.

19    Take it, Mr. Kezhaya.

20              MR. KEZHAYA:  Thank you, Your Honor.  May it please

21    the Court.  I will be very brief.  Docket 189 can be very well

22    summarized as we got notice -- we got first notice of Shane

23    Bugbee as a witness 11 calendar days before the close of

24    discovery.  We couldn't do depositions.  We couldn't subpoena

25    any relevant documents.  Our hands are tied at that point.

1      The secretary of state knew of Shane Bugbee at least as

2  early as 2018 because they quoted a bunch of articles of Mr.

3  Bugbee in opposition to our intervention.  They were in contact

4  with him as early as February, but they didn't notice us until

5  April, 11 calendar days before the close of discovery.  That's

6  presumptively barred under Rule 37(c).  Bugbee should be

7  excluded as a witness.  And I'll otherwise rest on my brief.

8            THE COURT:  All right.  I think this pertains to

9  Secretary Thurston primarily with respect to a response.  Do you

10  wish to make one, Mr. Cantrell?  Again, you don't have to.  I've

11  read the filings, and I'll study them again carefully before

12  issuing a ruling, but you are welcome to if you choose to.

13            MR. CANTRELL:  Yes, Your Honor.  I'll make a brief

14  response.  Your Honor, we investigated former members of The

15  Satanic Temple in -- it was early 2020.  We found material

16  posted online from Mr. Bugbee, and we contacted him.  We spoke

17  with him and then thereafter found that he can be extremely

18  difficult to reach.

19      Mr. Bugbee made claims about The Satanic Temple that we

20  were not -- you know, we had no way to corroborate.  So still

21  being early and learning about sort of the satanic subculture

22  and related matters, from lack of familiarity, we were not sure

23  of his value as a witness until April 2020.  That was when he,

24  for the first time, provided emails, correspondence between him

25  and Mr. Misicko which substantiated his role as a consultant.

1    He provided those emails on April 11th.  We provided -- we

2    identified Mr. Bugbee as a witness on April 18th, which was the

3    same day that Mr. Bugbee signed his declaration, and so we did

4    not delay in identifying Mr. Bugbee as a witness.  We fulfilled

5    our obligations under the rules, and there is no basis for

6    excluding Mr. Bugbee or his declaration.  I will just note that

7    Mr. Kezhaya just on the record a bit ago stated that he does not

8    want to reopen discovery but to enforce the subpoenas that have

9    already been sent out.  Well, there has not been a subpoena for

10   Mr. Bugbee sent out, so I say that Mr. Kezhaya has abandoned his

11   request to subpoena Mr. Bugbee.

12          THE COURT:  I don't take that, Mr. Cantrell.  Move

13   along.  Move along.  I have a lot of reams of paper addressing

14   all of these issues.  I'm not finding waiver right now.  Move

15   along.  We're going to talk about the issues that are pending.

16   Move along.  Right?

17          MR. CANTRELL:  Your Honor --

18          THE COURT:  You can make whatever record you want to

19   make, but we have reams of paper to go through.  I don't take

20   that as a waiver.  Move along.

21          MR. CANTRELL:  I'm sorry, Your Honor.  Just to be very

22   clear, I did not intend to argue waiver.  I thought he was

23   affirmatively asking -- it sounded like he was affirmatively

24   abandoning that request, which was part of this motion.  But I

25   will move on, certainly, Your Honor.

```
1              THE COURT:  So, Mr. Cantrell, while we're on the
2    subject, you've been in touch with this person.  Right?
3              MR. CANTRELL:  Yes, Your Honor.
4              THE COURT:  You claim not to have an address for him.
5    Right?
6              MR. CANTRELL:  We do not have any address, Your Honor.
7              THE COURT:  You have a declaration you've presented
8    here.  Do you anticipate changing anything or adding to anything
9    in the declaration between now and a dispositive motion?
10             MR. CANTRELL:  Not that I am aware of, Your Honor.
11             THE COURT:  Because if you are going to, you would
12   have to have some element of control over this third-party
13   witness that you've identified.  Right?
14             MR. CANTRELL:  Your Honor, I'm not sure of that.  We
15   have not thought or planned about --
16             THE COURT:  Answer my question.  Answer my question.
17   Do you know how to reach this guy?  Flat out, do you know how to
18   reach this guy?
19             MR. CANTRELL:  Your Honor, we have a telephone number.
20   Yes, we have a telephone number for Mr. Bugbee.
21             THE COURT:  Have you provided it to all counsel in
22   this case?
23             MR. CANTRELL:  Yes, Your Honor.
24             THE COURT:  Move along.
25             MR. CANTRELL:  Your Honor, I apologize if I've said
```

1    something that has upset the Court.  Your Honor, that certainly

2    was not my intent.  Your Honor, I think, with that, I will just

3    rest on the briefing.  And that will be all of the argument on

4    this point, Your Honor.

5           THE COURT:  You have the opportunity to make whatever

6    record you want to make.  I don't take what Mr. Kezhaya said as

7    a waiver of a request to depose Mr. Bugbee if I don't strike him

8    as a witness.  As I understand the request and the filings, he

9    wants him struck as a witness because of the disclosure issue.

10   The Satanic Temple intervenors wish for him to be struck because

11   of the disclosure issue.  If I don't strike him, they want the

12   opportunity to conduct further discovery, including potentially

13   a deposition of him.

14       Part of the problem in issuing a subpoena is they can't

15   locate him to issue one.  You have to issue it to somewhere for

16   it to be served.  Right?  So that's my understanding of these

17   issues, and that's why I'm inquiring of you over the element of

18   control you have over this third-party witness because courts

19   look unfavorably on discovery, on surprise witnesses at the time

20   of trial, since that's not the purpose of discovery.  Those are

21   the reasons for my questions.  You are welcome to make whatever

22   record you wish to make.  I'm giving you that opportunity.

23          MR. CANTRELL:  Yes, Your Honor.  And I assure the

24   Court that it was not our intention to have any surprise

25   witness.  We did not think of Mr. Bugbee as being a source of

1    anything other than impeachment until April, when he provided

2    the documents that we had provided to The Satanic Temple.  So

3    that was when things changed, and that was when we quickly

4    identified Mr. Bugbee as a witness.

5        Your Honor, The Satanic Temple could have deposed Mr.

6    Bugbee in April or shortly thereafter could have filed a motion

7    for a late subpoena at that time.  They chose not to do that.

8    We actually went -- I asked Mr. Kezhaya -- after we identified

9    Mr. Bugbee as a witness, I asked Mr. Kezhaya if he wanted to

10   extend discovery and the other deadlines.  He agreed to an

11   extension of the other deadlines but not for discovery, which

12   was a surprise.  But, Your Honor, so to the extent that there

13   was any conferral with respect to discovery, The Satanic Temple

14   had an opportunity to pursue it but chose not to.

15            THE COURT:  So it's clear on the record and everybody

16   is on notice, I take a really narrow view of rebuttal, really

17   narrow.  And if it's rebuttal that's never seen the light of day

18   until rebuttal, a really narrow view.  I don't think I'm alone

19   in that on the bench in the federal system.  I want everybody to

20   be aware of that.  If you decide to go down that path, you do it

21   at your own risk.  You are all on notice.  I take a very, very

22   narrow view of rebuttal exhibits, rebuttal witnesses, rebuttal

23   proffers.

24       All right.  Next motion.  Docket No. 190.

25            MR. KEZHAYA:  This is Matt Kezhaya, Your Honor.  190

```
 1   is an amendment to 189.  I think we may have made a typo or

 2   forgotten an exhibit or something.  We've substantively already

 3   addressed 190 by addressing 189.

 4             THE COURT:  Mr. Cantrell, do you have anything further

 5   you wish to say in regard to 190?  Mr. Cantrell?

 6             MR. CANTRELL:  Nothing further, Your Honor.

 7             THE COURT:  Mr. Kezhaya, there's a reply, Docket 206.

 8   You are welcome to speak in reply on these issues if you wish.

 9   I'm happy for you to do that.  I'll let you make whatever record

10   you wish to make as well, but you are not required to.  I think

11   it's Docket 206 is the reply.

12             MR. KEZHAYA:  Yes, Your Honor.  We will waive reply.

13             THE COURT:  The next motion is Docket 192, which is

14   the motion to amend the scheduling order to allow the subpoenas

15   and for order to show cause.

16        Mr. Kezhaya, do you wish to speak to Docket 192?

17             MR. KEZHAYA:  We will rest on the briefs, Your Honor.

18             THE COURT:  Anybody wish to speak on Docket 192?  I

19   think Docket Nos. 200 and 201, which were filed on behalf of

20   Secretary Thurston, may also respond to that.  I also have a

21   Docket 202.  I'll just ask and open up the floor.

22        First, with Secretary Thurston, do you wish to speak to

23   Docket No. 192?

24             MR. CANTRELL:  Your Honor, I believe we can rest on

25   the briefs as well.
```

1          THE COURT:  Anybody else?  Does it affect -- Mr. Byrd,

2    do you wish to speak on Docket 192 with respect to that issue?

3    I'm not certain that it tees up Senator Rapert directly.  But I

4    have slept since I've read it, so I want to just open up for

5    anybody to talk about these issues if you choose to.

6        Is there anything that you need to add, Mr. Byrd, in regard

7    to Docket 192?

8          MR. BYRD:  I believe it will come up when we have the

9    discussion on our motion.

10          THE COURT:  Mr. Jacobs, anything you need to say?

11          MR. JACOBS:  No, Your Honor.  We don't have anything

12    to add beyond the briefing.

13          THE COURT:  Mr. Story, anything you need to say?

14          MR. STORY:  Not as to Docket 192, Your Honor.  Thank

15    you.

16          THE COURT:  Anybody else as far as Docket 192?

17        Mr. Burnett and Mr. Elliott, I'm not specifically asking

18    you about these because my understanding is the positions you've

19    taken with respect to discovery, that you haven't weighed in on

20    these issues, and that's perfectly acceptable.  That's part of

21    the reason I'm not asking.  But if you feel that you need to

22    chime in, you are certainly welcome to at any point.

23        Do either one of you wish to speak on 192?  Mr. Burnett?

24          MR. BURNETT:  No.

25          THE COURT:  Mr. Elliott?

1          MR. ELLIOTT:  No, Your Honor.

2          THE COURT:  Docket No. 195, nonparty witness Senator

3    Jason Rapert's motion to quash the intervenors' subpoena or, in

4    the alternative, for a protective order with incorporated brief.

5      Mr. Byrd.

6          MR. BYRD:  Yes, Your Honor.  And you've read our

7    pleadings.  One -- I have two basic things, just to give you a

8    chronology, because this case gets hard to track.  But Senator

9    Rapert's deposition was taken in September of 2019.  And then

10   Gerry Schulze for the Orsi plaintiffs filed a motion to compel

11   in September of 2019.  Then, best I can tell, because we're not

12   a party, so we don't always see everything that's going on, TST

13   filed some discovery asking for certain names from the state in

14   February of 2020.

15       So we went from Gerry Schulze's motion to compel Senator

16   Rapert on September 2019 all the way to a hearing last fall, I

17   recall, 2021, where American Heritage and History Foundation

18   showed up, and all of the parties were in the courtroom, all met

19   in the courtroom.  And we thought we had it resolved, what

20   documents there were.

21       Then, after the discovery is closed, we get a subpoena

22   again for Senator Rapert, which we feel like could have been

23   addressed back in February 2020 if that was what it was going to

24   be, or they could have joined in in the Orsi plaintiffs' motion

25   to compel but basically sat behind and waited while the Orsis

1   did it looks like the heavy lifting, and then it looked like

2   there were some regrets later, and they wanted to ask something

3   else.

4       But the second issue I want to bring up is just to its

5   scope.  It's asking us to go back seven years, to go into text

6   messages, emails, Twitter account, Facebook account and get

7   names.  Just, for example, if I have to find everywhere Jason

8   Rapert used the word "Satan," it's going to be a long search,

9   the word "devil."  For some reason I'm supposed to look up

10  everywhere where Matt Kezhaya and Stu De Haan, the lawyers, are

11  mentioned.  And, I mean, if that makes me have to go through for

12  seven years, and then also every time their names were mentioned

13  in any emails, in any pleadings that I forwarded to my client or

14  whatever, I mean, I don't know what a "pink mass" is or some of

15  those other issues.  They seem to have something to do with what

16  has come up in discovery among the parties in this case.

17      I guess I'm just like -- representing a nonparty, if we're

18  going to have to go seven years into this, we can't somehow

19  change the scope of it even, then, you know, I need some help

20  from the state maybe to help pay for it.  I mean, it's quite

21  burdensome as an individual lawyer representing an individual

22  client.  So that's what I have on it, Your Honor.  You've read

23  the brief.

24          THE COURT:  All right.  Mr. Kezhaya, my understanding

25  is this is primarily directed at The Satanic Temple intervenors'

1    propounded or issued subpoena.  I think -- and, Mr. Byrd, you

2    correct me if I'm wrong.  My understanding is that the issues

3    that were first filed in 2019 in the motion to compel with Mr.

4    Schulze, those have all been resolved satisfactorily.  You don't

5    have an issue with that.  What you are taking up is what has

6    more recently been requested of Senator Rapert in his individual

7    and/or official capacity, I guess.  I don't know.  I think I

8    have the subpoena.  But, at any rate, with respect to these

9    issues, Mr. Byrd, you are directing your objections primarily at

10   what The Satanic Temple intervenor has issued.  Is that right?

11         MR. BYRD:  That's correct, Your Honor.  What I'm

12   saying is I think they could have done this a lot sooner before

13   the discovery cutoff.  I realize I'm not a party.  I'm not a

14   party to the discovery cutoff.  But this could have happened a

15   long time ago to where I could have addressed it.  But at this

16   point I feel like it's a day late and a dollar short, and we're

17   worn out.  I thought we had gotten the job done, but now we have

18   to go back and do a seven-year search through multiple

19   platforms.  The scope of it is just too broad.  So we either

20   need relief outright, just quash it, because of where the case

21   is positioned and the parties are ready to move on to

22   dispositive motions, or give us some relief in the scope.  It's

23   just so broad and so long.

24         THE COURT:  I think I understand, Mr. Kezhaya.  Do you

25   wish to speak in response?

1          MR. KEZHAYA:  Yes, Your Honor.  Very briefly.  With

2     respect to the time and scope of the information sought, this

3     case has been ongoing functionally since 2015.  That's when the

4     efforts to install the Ten Commandments monument began, as near

5     as we can tell from the public record.  That's why we're seeking

6     to go back to 2015.  As for the end time of essentially now,

7     it's an ongoing federal violation or we've asserted so.  So we

8     need to know what all is going on.  The materials that we're

9     seeking are nothing new.  We did try to get these things from

10    the state back in March of 2020 if memory serves.  These very

11    same discovery requests that are on this list the things that

12    we're seeking as a subpoena, are copy and pasted from the

13    discovery requests we sent to the state.  None of this is new.

14    We're just trying to get at it from a different channel.

15         So for all the same reasons that the Court has already

16    found that the discovery requests are relevant and not

17    disproportionate, I don't see how there's any meaningful

18    difference if it's from Secretary Thurston or if it's from State

19    Senator Rapert.  For these reasons the subpoena should be

20    enforced.

21         THE COURT:  All right.  With respect to Docket No.

22    196, there's overlap likely here.  This is the American History

23    and Heritage Foundation's motion to quash the intervenors'

24    subpoena or, in the alternative, for a protective order.

25         Mr. Story, do you wish to address that?

1          MR. STORY:  Yes, Your Honor.  Briefly.  And I'll try

2     to only touch on what's not been argued.  The two issues that I

3     would have somewhat in response to Mr. Kezhaya's argument is,

4     one, the issue with obtaining these from the state, to the

5     extent that that's where they originally propounded the

6     discovery, the state is much better situated with, whether

7     that's funds or equipment, to do this, and personnel to do this,

8     than AHHF, which is a nonparty.  One of the requests for

9     production is asking for anything that has American History and

10     Heritage Foundation, which is the name of our organization,

11     and/or that references even the Ten Commandments, which just in

12     doing some anecdotal searches from my email, come up in almost

13     every email, thereby requiring a privilege log to be produced

14     for almost every email that I might have sent to clients.

15          And so when we start looking at the nature of what's being

16     requested, I believe it's overbroad and hard to actually produce

17     for a nonparty, which I think is a factor, as we've outlined in

18     our brief.

19          The other issue that I think is raised when we're looking

20     at the different parties is AHHF hasn't had anything to do with

21     this case.  We are not a party to this except to be involved in

22     these proceedings as they have been necessary and the Court has

23     requested and ordered.  But once we donated the monument to the

24     state, we effectively were out of everything.  So as to scope

25     and to time, we end up -- we end up having to deal with

1    basically all of the emails and whatnot regarding the

2    litigation, not anything that would be anywhere substantive or

3    relevant in the time period from '15 to now.

4         Once -- I believe it was in 20 -- I believe it was in '18

5    when we put the second monument up and donated that to the

6    state.  That was when -- that was effectively when -- I believe

7    it was April -- that was when AHHF really didn't have anything

8    else to do with this particular part of the case.  So I do

9    believe it's burdensome.  It's unduly burdensome for a nonparty

10   to be requested to provide all of this information.

11        As far as kind of by way of responding to -- responding to

12   what the subpoena has requested, again -- and we've raised some

13   of these issues, and we can continue to go down this road --

14   they are asking for, in Request for Production No. 14, all

15   financial records of AHHF, which I do think raises the issue of

16   donor privacy and gets us squarely back into that, which we have

17   raised before with the Court and have briefed for the Court.  So

18   I guess I would just incorporate those same arguments and same

19   briefs without necessarily having to take time to go through

20   them all.  But we would, again, assert that AHHF has a privilege

21   there as to the donors.  So we would ask that all of -- we would

22   ask that the entire subpoena be quashed because it's out of time

23   and for the other reasons we've stated.

24             THE COURT:  Mr. Kezhaya, do you wish to respond?

25             MR. KEZHAYA:  Yes, Your Honor.  With respect to the

1    time issue, again, I'll point out that we were seeking this very

2    same discovery from the state timely.  We sought it, if I recall

3    correctly, in March of 2020.  That discovery was not given to us

4    and has yet to be given to us.  So we're seeking the same

5    discovery from alternative means.  I think that that's good

6    cause to permit the subpoena.

7        There are three points that Mr. Story raised that I want to

8    address.  Point number one is that the state is better situated

9    economically to provide this discovery.  That may be true, but

10   they are not providing it, so I need to get it from somewhere.

11       The "AHHF" being a search term is well taken.  But I want

12   to know what all activities the AHHF is actually providing.  If

13   it was just a single instance to donate this particular

14   monument, I think that bears on the ultimate question of whether

15   this Ten Commandments monument is an unconstitutional

16   endorsement of a particular religious viewpoint.

17       As to relevant privacy, an associational privilege must be

18   proven by a privilege log.  Also, there's the *Felix* case out of

19   the Tenth Circuit, which very specifically addresses that that

20   particular Ten Commandments monument was religious because it

21   was funded by religious groups.  I need that proof that this

22   particular religious monument was funded by religious groups.

23   Short of that, it's going to be very difficult for us to prove

24   that element of the case.

25       So for these reasons, I think financial records are

1    absolutely necessary.  I think they waived any claim of

2    privilege by not providing a privilege log.  And this is very

3    important discovery that we need to prove the endorsement side

4    of the Ten Commandments issue.  That concludes our argument.

5           THE COURT:  All right.  There's no reply that was

6    filed, so I'm going to move on to the next one.

7        Docket No. 199, the intervenors' motion for order to show

8    cause or to compel production of information and documents from

9    State Senator Bob Ballinger.

10          MR. KEZHAYA:  Your Honor, we'll rest on our brief on

11   this one.

12          MR. JACOBS:  Your Honor, Dylan Jacobs for Senator

13   Ballinger.  We will rest on the briefs as well.

14          THE COURT:  All right.

15          MR. CANTRELL:  Your Honor, this is Mike Cantrell.  We

16   will also rest on our briefing.

17          THE COURT:  All right.  Does anyone wish to be heard

18   on Docket No. 199?  I think those are all of the parties that

19   are accounted for that briefed it.  But if you think you need to

20   speak on it, you may do so.  Let me know.  I am not hearing --

21          MR. BYRD:  Your Honor, this is Paul Byrd with Senator

22   Rapert.  The idea that a party stands in the same position as an

23   individual witness, I don't think that's apples to apples under

24   the case law as far as the burden and what's required in the

25   scope.  I think it's different for an individual third-party

1   witness as opposed to a party.  I can provide cites, and we had

2   it in our brief.  I will rest on that, Your Honor.

3           THE COURT:  Anything further from anyone else?

4           MR. KEZHAYA:  Your Honor, I don't know if I made this

5   point.  But as to the seven-year search time, I'm expecting all

6   of this to be electronic discovery.  So inputting that data

7   point of begin date January 1, 2015, is no more onerous than

8   2016 or '17, etc.  I don't think the seven-year -- the fact of

9   the time scope itself I don't think is relevant to the

10  proportionality analysis.

11          THE COURT:  All right.  Anyone else with respect to

12  Docket No. 199?

13      All right.  That takes us to Docket No. 203.  Mr. Cantrell,

14  this is my understanding of where you think a protective order

15  clarification may be necessary.  I'll let you speak to that

16  threshold issue first before we move to Docket 203.

17          MR. CANTRELL:  Yes, Your Honor.  Thank you.  Your

18  Honor, I raised the issue of the protective order during the

19  last status conference.  Specifically, there are a couple of

20  protective orders that are currently in place, one of which

21  pertains to The Satanic Temple's tax documents and related

22  documents.

23          THE COURT:  Based on how you read the order, right?

24  Based on how you read that order?  Is that right?

25          MR. CANTRELL:  That was my understanding based on the

1    order and the circumstances surrounding its being entered, yes,

2    Your Honor.  And if the Court is of a different opinion, I would

3    respectfully just request to have the opportunity to negotiate a

4    more comprehensive order if the Court desires to have one that

5    does apply across the board.

6         Your Honor, I will just note that with respect to The

7    Satanic Temple's designation of not only correspondence but also

8    their own privilege log as confidential, this was an issue that

9    we raised during the last status conference.  And the Court

10   directed The Satanic Temple to confer with the defendant and to

11   file a motion with the Court for a protective order if that was

12   needed.  And The Satanic Temple did not do either of those

13   things.  We were set up to confer, and we had an agreement to

14   confer.  And then The Satanic Temple abruptly broke off that

15   conferral, so here we are at this status conference, and that

16   has not been done.

17        So I don't know if the Court -- how the Court would want to

18   deal with the circumstances, but our position is that the

19   privilege log is not confidential, certainly.  And if there were

20   any other documents, tax documents or related things, that there

21   would need to be a showing of good cause under the governing

22   rules before these things could be, in fact, deemed

23   confidential.  So we would ask the Court to require those things

24   to be done before or in response to our challenge to the items

25   that The Satanic Temple has designated confidential other than

1    the tax documents.

2          THE COURT:  Mr. Kezhaya, do you wish to be heard on

3    this threshold issue about a protective order?

4          MR. KEZHAYA:  Yes, Your Honor.  Docket 122 is the

5    protective order at issue.  No part of it is limited to tax

6    documents or other government documents.  It's a normal

7    protective order that's designed to accommodate parties tagging

8    documents as confidential so that we don't read about it in

9    Twitter.  I don't want my privilege log out in the

10   Twittersphere.  I don't want the facts on the privilege log out

11   in the Twittersphere.  I'm trying to avoid this case turning

12   into a circus, which is why I tagged it confidential.  It needs

13   to be used only for purposes of this litigation.  I don't think

14   that's unreasonable.

15         THE COURT:  All right.  So let's just assume for the

16   sake of argument, Mr. Cantrell, that I say Docket 122 is a

17   standard protective order, it applies to all the parties, not

18   any single document, because it's not directed that way, nor is

19   it read that way.  What happens next with respect to your

20   motion, Docket 203?  I haven't made that ruling yet.  But what

21   if I do?

22         MR. CANTRELL:  In that case, Your Honor, we would

23   request the opportunity to negotiate a protective order that is

24   different and broader.

25         THE COURT:  Then I think it becomes a motion for

1   reconsideration with the Court.  I've entered an order that's a

2   protective order that would apply generically to everybody in

3   the case, right, so that it becomes a motion for reconsideration

4   with the Court.  I think the time for negotiation may have

5   passed.  If I give any time for negotiation, I'll promise you,

6   it's going to be short, and then it becomes a motion for

7   reconsideration.  Assume that I say Docket 122 is the protective

8   order in the case.  What happens to Docket 203?  I think 122

9   sets out the burden if you want to challenge a confidentiality

10  designation.  Right?  Typically protective orders do.  Generally

11  it's you get it designated as confidential.  If somebody thinks

12  it shouldn't be, it allocates a burden for somebody to have to

13  come in to either prove it up or to challenge it.  Generally

14  there's a mechanism in there.  Docket No. 122, is there a

15  mechanism in there to do that?

16         MR. CANTRELL:  I believe that there is a requirement

17  to raise it with the Court, which is what we attempted to kind

18  of flag it for the Court during the last status conference and

19  then anticipated that The Satanic Temple would be bringing the

20  issue before the Court with a motion but did not do that.

21         THE COURT:  Is it their burden, if Docket 122 is the

22  protective order, to do that, or is it yours?

23         MR. CANTRELL:  Well, Your Honor, it was based on the

24  Court's direction during the last status conference.

25         THE COURT:  No, no, no.  Docket 122, what does Docket

1   122 say?

2          MR. CANTRELL:  Your Honor, I'm sorry.  I don't have it

3   in front of me.

4          THE COURT:  All right.  I'll look at it.  I'll take it

5   under consideration.  You can move on with your argument.  I'll

6   stop questioning you.  You can make whatever argument you want

7   to make about Docket 203.

8          MR. KEZHAYA:  Your Honor, to interject, this is Matt

9   Kezhaya.  Docket 203 is my motion.

10         THE COURT:  Sorry about that.  Docket 203 then, Mr.

11  Kezhaya.  Go ahead.  I apologize.  Mr. Cantrell flagged the

12  protective order issue, so Docket 203, Mr. Kezhaya.

13      Mr. Cantrell, are we ready to move on from your protective

14  order threshold issue?  You can make whatever record you wish to

15  make.  I have the issue under advisement, but I'm happy to hear

16  from you any further on that threshold issue if you think you

17  need to say anything further.

18         MR. CANTRELL:  Your Honor, just very briefly.  There

19  is a required showing of good cause, I believe, for designating

20  documents as confidential.  And we would ask the Court to

21  require The Satanic Temple to do that.  If we need to file a

22  motion to that effect, then we will certainly be happy to do

23  that.  But that is something that we do believe is needed.

24         THE COURT:  Anything further, Mr. Cantrell?

25         MR. CANTRELL:  No, Your Honor.

1          THE COURT:  Mr. Kezhaya, Docket 203.

2          MR. KEZHAYA:  Thank you, Your Honor.  May it please

3   the Court.  There are two issues in Docket 203.  Issue one is

4   that the privilege log that they produced is not consistent with

5   the Court's order.  Specifically, it does not have the general

6   nature of the document.  It doesn't give the factual predicate

7   for where the document came from, which is very important when

8   it comes to determining whether a document is privileged.  It

9   also lacks the identities and positions of persons who

10  [inaudible] --

11         THE COURT:  Mr. Kezhaya, I'm going to just slow you

12  down a little bit.  Our court reporter is having trouble getting

13  everything, and I know you are speaking quickly.  The first

14  thing is no factual predicate for the documents that are listed

15  in terms of describing the nature of the document.  The second

16  point that I understood you to make is that it doesn't disclose

17  who all received and/or sent a document on the privilege log.

18  That's not listed.  Do I have those two points correct?

19         MR. KEZHAYA:  Yes, Your Honor.

20         THE COURT:  And you may proceed from there.

21         MR. KEZHAYA:  Thank you, Your Honor.  And the last

22  deficiency is that it does not provide the present location and

23  the identity or position of the document's custodian.  And this

24  goes to whether the secretary of state actually has standing to

25  raise the issue of privilege.  So all three of those are

1    problems with the privilege log that they provided.

2         The second issue in Docket 203 is that State Capitol Police

3    records are not privileged.  They have a whole bunch of them.

4    Most of the privilege log is actually refusing to provide

5    documents under the nonexistent State Capitol Police record

6    privilege.  That's not the same.  So we're taking issue with

7    that.  We want production of a proper privilege log that

8    provides all of the information.  We also want all of the State

9    Capitol Police records because that's not a ground for

10   withholding these documents.  We do stipulate that that seems to

11   be a pretty reasonable thing to tag confidential.  That's why we

12   have Docket No. 122.  So for those reasons the Court should

13   compel the production of the State Capitol Police records and a

14   privilege log.  We'll otherwise rest on our brief.

15             THE COURT:  Mr. Cantrell, do you wish to respond?

16             MR. CANTRELL:  Yes, Your Honor.  Just briefly.  And

17   these matters are addressed in our brief on pages 5 and 6.  I'll

18   rest on those generally.  I'll say that if The Satanic Temple

19   had gone forward with the conference that we had planned and

20   intended to have, then these issues could have been resolved and

21   I believe would have been resolved.  But, again --

22             THE COURT:  How would they have been resolved?  What

23   would you have said at the conference?

24             MR. CANTRELL:  Your Honor, I could have explained that

25   the email is the type of document that pointed The Satanic

1    Temple to their own privilege log, that they also identified the

2    general nature of the document in that way.  Your Honor, the

3    identities and positions of all persons who are given or

4    received copies, that all of that information is in the log.

5              THE COURT:  Where is it in the log?

6              MR. CANTRELL:  I'm sorry.  I should say that all of

7    the individuals who received the documents who are recipients,

8    who sent or received those emails, are listed in the log.

9              THE COURT:  So where in the log?

10             MR. CANTRELL:  Your Honor, our log -- allow me one

11   second just to pull it up.  So, for example, email No. 1, email

12   from Chris Powell to Susan Carter, Kelly Boyd and Darrell

13   Hedden, those are the individuals who received or sent the

14   email.

15             THE COURT:  And that's everybody?  Like there's no CC

16   or BCC?  That's everybody?  Nobody else got it?  No CC or BCC?

17             MR. CANTRELL:  That is correct, Your Honor.

18             THE COURT:  And you are sure about that for every

19   document.

20             MR. CANTRELL:  Your Honor, every document that

21   contains any information, whether it was to, from, if it listed

22   a CC or a BCC, those are all included.

23             THE COURT:  Why not list the custodian?

24             MR. CANTRELL:  Your Honor, this is an issue that --

25             THE COURT:  This is the problem in this discovery.

1   Why not list the custodian?  I'm dealing with subpoenas to other

2   entities because we can't get to the custodian issue, so I'm

3   very curious to hear why you wouldn't list a custodian.

4         MR. CANTRELL:  Your Honor, the secretary of state does

5   not have a custodian per se.  To the extent that there would be

6   a custodian, it would be legal counsel.  These are emails that

7   are stored on the secretary of state's servers.  And each

8   individual person in some sense, I mean, is the custodian of

9   their own emails.  So it's a difficult question other than to

10  say, well, legal counsel would be the custodian.  But in my

11  conversations with -- and not to reveal any privileged

12  information, but in my conversations with my client, the

13  custodian is the secretary of state.  So it's a question that --

14  I believe perhaps, again, that is something that I could have

15  tried to deal with and address if we had had a conference with

16  opposing counsel, and this would not be an issue that the Court

17  would have to address.

18        THE COURT:  I think the Court has actually already

19  addressed it because I'm pretty sure I've ruled on it and

20  clarified about custodians, right, you know, all of the typical

21  things we see in a discovery, identification of the meaning of

22  custodian.  So I fail to understand why we're not identifying a

23  custodian, yet standing on objections that the discovery hasn't

24  been propounded to the right people.  Right?  I mean, at a

25  certain point people are entitled to documents.  That's what

1    discovery is about.  Dragging it out, objecting because it's not

2    the right custodian, objecting because you haven't asked the

3    right person, dragging feet, claiming you are out of time, all

4    of these things, for all parties -- I'm not going to say one or

5    the other more so than others, right?  But that's part of the

6    reason why we're still here, folks.  This is federal court, and

7    this is discovery.  You are entitled to each other's documents.

8    I'll make the technical rulings I need to make, but you are

9    wearing my patience thin with these issues, frankly.

10        I'll let you finish, Mr. Cantrell.

11        MR. CANTRELL:  Yes, Your Honor.  I will just say I

12   believed that we had dealt with the custodian issue in each of

13   these.  For example, number one lists confidential State Capitol

14   Police records maintained by the secretary of state.  It was my

15   understanding that that communicated both the location, given

16   that it was an email, and the custodian as the secretary of

17   state.  So, again, any question could have been clarified.  But

18   my understanding in producing this log was that we had

19   identified the custodian.

20        THE COURT:  So, Mr. Cantrell, if you get a discovery

21   request for the state police reports directed to Mr. Thurston,

22   is he going to produce them, or is he going to say he's not the

23   custodian and doesn't have the authority to do that?

24        MR. CANTRELL:  If the Court were to compel these

25   emails to be produced, they are in the secretary of state's

1    possession, so these could be produced.  Again, we would ask

2    that conversations about confidentiality be had and that these

3    be protected by a protective order.  But, Your Honor, I cannot

4    foresee any objection on the basis that the secretary of state

5    does not have these documents.

6        THE COURT:  And is that true for everything on the

7    privilege log that's represented in the way you've represented

8    it with respect to these documents of the state police?  In

9    other words, if you say on the log the document is maintained by

10   Secretary Thurston, is that true for all of those?

11       MR. CANTRELL:  Yes, Your Honor.  For each entry that

12   says maintained by the secretary of state, that is something

13   that is in the secretary of state's possession, so there's no

14   issue of standing.

15       THE COURT:  All right.  You may proceed.  Mr.

16   Cantrell, if you have anything further to say, you may.

17       MR. CANTRELL:  Yes, Your Honor.  I think -- give me

18   one second.  Oh, just on the issue of the State Capitol Police

19   records not being privileged, Your Honor, these are confidential

20   under Arkansas law.  And that's in addition to any FOIA

21   exemption under the statute, so these are records that are

22   deemed legally confidential and we would also hope be deemed

23   confidential under any protective order that applied.

24       THE COURT:  All right.  Mr. Kezhaya, there was a

25   reply.  Do you wish to speak in reply on Docket 203?

1     MR. KEZHAYA:  We'll rest on the briefs, Your Honor.

2     THE COURT:  Docket 212, Secretary Thurston's motion to

3  compel responsive documents withheld by The Satanic Temple.

4     Mr. Cantrell, you may speak to Docket 212.

5     MR. CANTRELL: Yes, Your Honor.  Thank you.  And may

6  it please the Court.  Your Honor, this motion deals with two

7  issues.  Number one is The Satanic Temple's blanket assertion of

8  attorney-client privilege and work product documents.  And we

9  filed both a brief in support and a reply.  I would ask the

10  Court to look closely at the reply, and the Court has already

11  read the matters.  But, again, without being able to go into the

12  matters that have been already designated confidential, it would

13  be difficult to argue this motion in any detail.  So with that

14  disclaimer, I would just rest on the briefing with respect to

15  the blanket assertion of privilege and work product.  I'm happy

16  to address any questions that the Court may have.

17     The second issue in the motion pertains to The Satanic

18  Temple's efforts to not produce documents.  Again, I believe

19  those issues are adequately dealt with in the briefing.  I would

20  ask the Court to note that we indicate that -- in those briefs

21  that that part of the motion could be held in abeyance depending

22  on how the Court deals with motions that have been previously

23  argued and are currently pending.  I just want to flag that.

24  But, otherwise, Your Honor, I think we will rest on our

25  briefing.

1          THE COURT:  All right.  Mr. Cantrell, just so I'm

2    clear, I note that Docket 219 is the reply.  That's the filing

3    you are highlighting for me too.  Right?

4          MR. CANTRELL:  Your Honor, I have -- Your Honor, I'm

5    sorry.  I'm looking at the documents that were filed under seal

6    that don't have docket entry numbers.

7          THE COURT:  I think they are 209 and 210 maybe, or

8    those might be other ones that go to another filing, but 209 and

9    210 are under seal filings I think in this case.

10          MR. CANTRELL:  Yes.  I see 209 and 210.

11          THE COURT:  Is there another under seal filing with

12    respect to 212 that you think I should highlight?  And you are

13    welcome, if after today you want to send an email to all counsel

14    and the Court just to clarify after you've studied the docket, I

15    just want to make sure I'm looking at what you are looking at.

16    214 is a sealed brief that may go to this, but it would not have

17    been a reply.  It would have been in support of your motion

18    likely.

19          MR. CANTRELL:  Yes.  It's 214 I believe is the

20    motion -- I'm sorry -- the brief in support.

21          THE COURT:  And then 221, that's a reply.  So 221, 214

22    and 221.

23          MR. CANTRELL:  Yes, Your Honor.

24          THE COURT:  All right.  You look at those, Mr.

25    Cantrell, and find out.  The dates are clearly there on the

1    docket.  214 was filed on December 20th of 2021, the same date
2    as Docket No. 212 and the brief in support.  221 was filed on
3    January 10th of 2022, the same day as the reply, which is 219.
4    So you double-check and make sure that that's what you are
5    saying when you ask me to review carefully the filings.  Make
6    sure that that's what you are intending.  I want to make sure
7    I'm looking at what you intend for me to look at.  So if it
8    needs to change, send an email to all counsel and the Court
9    highlighting some other part of the docket.  Otherwise, I've
10   noted today that with respect to Docket 212, I'll also pay close
11   attention to 214 and 221 as well as the other docket entries on
12   the record that relate to it.
13          MR. CANTRELL:  Yes, Your Honor.  I believe you are
14   correct.  It is docket entry 221 that I'm asking the Court to
15   pay special attention to.
16          THE COURT:  All right.
17          MR. CANTRELL:  With that, Your Honor, we'll rest on
18   the briefing.
19          THE COURT:  Mr. Kezhaya, do you wish to address the
20   response?
21          MR. KEZHAYA:  Yes, Your Honor.  Very briefly.  With
22   respect to attorney-client privilege and work product, Stu De
23   Haan was TST's general counsel at the time of these emails.  As
24   the Court will see, in docket entry No. 210, all of the emails
25   that we compiled are emails that pertain to legal discussions

surrounding the Ten Commandments controversy in one form or another, whether it's getting the Baphomet monument erected, strategizing or messaging surrounding how do we functionally best get this Baphomet monument on to State Capitol grounds, how do we orient the facts so that that has the best chance of resulting in a successful lawsuit.  That's very classically what attorney-client privilege and work product is for.

One point of contention in the briefing that I want to be very clear about, the parties dispute whether work product is in the hands of the attorney or whether it's in the hands of the client.  According to Wright & Miller, it's in the hands of the client.  A client can't produce documents in contemplation of litigation and have that still be work product protected.  So that's addressing the two privilege points.

As for the parties' dispute over production of documents, that's the meaningful difference between our discovery requests to them and subpoenas versus theirs to us.  We sent these discovery requests timely and before the discovery cutoff and timely so that we could get the discovery before the discovery cutoff.  They, on the other hand, sent deficient requests for which the Court said, you need to send new ones.  They didn't do that.  Instead, they moved for contempt based on a lie that the Court retroactively modified the discovery requests.  That's the issue on our end.  We think that they should have complied with the Court's directive, not lied to the Court about what the

1    Court said.  That's why they need to produce those documents.

2    We'll otherwise rest on the briefs, Your Honor.

3         THE COURT:  Mr. Cantrell, Secretary Thurston filed a

4    reply.  You can speak to it if you wish.  Otherwise, I know I've

5    highlighted it.  We're straight on what documents you wish for

6    me to review carefully, and I will after today.  I've looked at

7    them prior to today, but I will certainly study all of the

8    docket entries that we've talked about today.  Do you wish to

9    speak any further in regard to Docket 212?

10        MR. CANTRELL:  Just very briefly, Your Honor, to say

11   that we reject The Satanic Temple's characterization of the

12   events surrounding this motion and proceeding.  We deal with

13   that in the briefing, and so I will just rest on the very

14   detailed description that we give in the briefing for that.

15   Thank you, Your Honor.

16        THE COURT:  The next one is Docket 218, the

17   intervenors' motion to compel state documents.

18        MR. KEZHAYA:  May I proceed, Your Honor?

19        THE COURT:  You may.

20        MR. KEZHAYA:  Thank you, Your Honor.  May it please

21   the Court.  This is Matt Kezhaya.  218 is functionally a renewed

22   motion to compel for the discovery requests that we sent back in

23   March of 2020.  The dispute in this motion is that the secretary

24   of state denies having constructive possession over these

25   materials.  We dispute that.  We think that *Kentucky v. Graham*

1    is very clear that this lawsuit is -- I'm quoting here -- "in

2    all respects other than name to be treated as a suit against the

3    entity."  That's why we keep talking about the state.  It's a

4    shorthand.  I know this is nominally, again, Secretary Thurston.

5    But in all practical applications, it's really the State of

6    Arkansas.

7         We're entitled to these documents not because they are the

8    Secretary of State's Office but because they are within the

9    possession of the State of Arkansas.  We cited a case from the

10   District of Massachusetts, *Tyler v. Suffolk County*, 256 F.R.D.

11   34.  The pin cite is at 37.  Very clearly, when you have this

12   kind of a lawsuit, you are entitled to the state's documents,

13   the public entity's documents.  That is the de facto real party

14   in interest.  That's why we're entitled to all of this stuff.

15        And, to be clear, the things that we are seeking is the

16   correspondence to and from General Assembly members functionally

17   about this case, state tax records for the AHHF and the NACL and

18   all other documents in the possession of the State of Arkansas

19   which relate to the AHHF or the NACL and all meeting minutes

20   which pertain to either PAC at issue in this case, all stuff

21   that the Court has already looked at, all subjects the Court has

22   already found relevant and not disproportionate.  We just want

23   our documents now, so the Court should compel.  We'll otherwise

24   rest on our briefs, Your Honor.

25             THE COURT:  Mr. Cantrell, do you wish to speak?

1          MR. CANTRELL:  Thank you, Your Honor.  Yes, Your

2    Honor.  Thank you.  Your Honor, the General Assembly and the

3    Department of Finance, which are the two entities that The

4    Satanic Temple is wanting documents from, they are not parties

5    to this litigation.  And that remains true despite the fact that

6    a state officer's suit against Secretary Thurston is treated as

7    a suit against the entity he represents under *Kentucky v.*

8    *Graham*.  And The Satanic Temple has misrepresented our position

9    on this point.  We've never claimed that we've lacked control of

10   documents on the grounds that Secretary Thurston is distinct

11   from the state if by the state is meant the Secretary of State's

12   Office.  So The Satanic Temple is claiming much more than that,

13   though.  They are claiming that just by bringing the state

14   officer suit against Secretary Thurston that The Satanic Temple

15   somehow made every branch of the State of Arkansas as well as

16   every department or agency, every employee, a defendant that is

17   subject to Rule 34.  And that's very clear, as we've set forth

18   in our briefing, that that is their position.  But that is

19   not -- that's never been the law.

20        Your Honor, even if that were the law, which it certainly

21   is not, but even if that were, it wouldn't follow that The

22   Satanic Temple could direct a request for production to

23   Secretary Thurston in order to get those documents.  I mean, if

24   all those other entities were parties to this action, The

25   Satanic Temple could proceed against them directly.

1    Well, they've recognized that, in currently pending motions

2  even, that members of the General Assembly are nonparties.  They

3  served requests for production on General Assembly members under

4  Rule 45, not under Rule 34, you know, entered into agreement

5  with counsel to accept nonparty service.  And so even The

6  Satanic Temple doesn't really believe the position, the legal

7  position, that they are urging in their motion.

8    Your Honor, The Satanic Temple could have pursued this

9  discovery during the discovery period.  We had 17 months of

10  discovery following their intervention in this litigation.  They

11  could have pursued this during that time.  They chose not to do

12  that.

13    Your Honor, just to go back to opposing counsel's statement

14  regarding their attempt to get documents from Secretary Thurston

15  in March of -- I believe it's March 2019 if I'm not mistaken --

16  in any case, March before the end of the discovery period.  Your

17  Honor, we responded, clearly setting forth the documents that we

18  had and that we don't have possession, custody or control of

19  emails for the General Assembly or any of the other documents.

20  We don't have -- not only do we not have control in the sense of

21  legal authority, there's also, as we set forth in our brief,

22  there's no practical ability to get those documents.  And that's

23  supported by the declaration of Dan Parker that is in the record

24  attached to our response.

25    So, with that, Your Honor, I believe we can -- well, I

1   should say we thoroughly briefed the issues.  There are cases

2   that are very clearly on point that I think demonstrate the

3   opposite of the position that The Satanic Temple has taken in

4   this case, and so I would direct the Court to our briefing

5   again.  And, Your Honor, I think at the end of the day there's

6   no legitimate basis for this motion to compel.  The Satanic

7   Temple had notice of that fact before filing it based on our

8   efforts to confer with them about it.  So, with that, Your

9   Honor, we will rest on our brief.

10          THE COURT:  Mr. Kezhaya, there's a reply.  Do you wish

11   to address the reply?

12          MR. KEZHAYA:  Yes, Your Honor.  With respect to the

13   nuanced position that it's the Secretary of State's Office, not

14   the State of Arkansas, that opposing counsel is raising, the Ten

15   Commandments monument is not sitting in the Secretary of State's

16   Office.  It's sitting on the State Capitol grounds.  It was

17   produced pursuant or in place because of an act of the General

18   Assembly.

19      One of the case-cited factors that we look to is

20   contemporaneous statements by members of the General Assembly,

21   not just in the public record, but all of them.  We want those

22   public statements.  The secretary of state we think has the

23   practical ability to get it because the secretary of state is a

24   constitutional officer of the state.  The State of Arkansas

25   placed this monument, not necessarily just Secretary Thurston.

1    That's why we're entitled to those emails and other

2    correspondence.

3          THE COURT:  Are you finished, Mr. Kezhaya?  I don't

4    want to interrupt you.

5          MR. KEZHAYA:  Yes, Your Honor.  That concludes our

6    argument.

7          THE COURT:  Here's what I'm left with today, and I'm

8    frustrated.  I have Mr. Cantrell telling me Secretary Thurston

9    can't produce these emails, correspondence and other things for

10   the General Assembly members.  I'm going to say out of the box

11   the position the secretary has taken in this case with respect

12   to being a custodian of documents is muddy.  It's muddy.  It's

13   been muddy since the beginning.  I've said that in a written

14   order.  This is not new.

15        Second, I have Senator Rapert and Senator Ballinger and the

16   other state senator -- bear with me just one moment -- Senator

17   Hammer coming in and arguing, and the American History and

18   Heritage Foundation, which has some relationship with Senator

19   Rapert in all of this, arguing to me that it's overly burdensome

20   for them to have to do this as a nonparty and perhaps the state

21   has better resources to do this.  What?  You have to pick a

22   horse and ride it, people.  If the state has better resources to

23   do it, then the state is the custodian of the documents and the

24   state needs to produce it.  Right?  And don't be telling me you

25   don't have constructive possession over it.

1          Help me square all of this, gentlemen, because it's

2   confusing.  It's irritating because, again, I will repeat the

3   purpose of discovery is for the parties to freely share and

4   exchange information that's not privileged or subject to some

5   exception to being disclosed.  I'll recognize all of that.  But

6   we have wasted inordinate time trying to track these things

7   down, and nobody is still taking a clear coherent message.  For

8   example, are Senator Ballinger and Senator Hammer represented

9   today in their official or individual capacity?  What am I doing

10  here?  What is going on?  It's frustrating.  I know it's costing

11  time and money for lawyers, and you are all good lawyers.  We

12  shouldn't have these issues in federal court.  We really

13  shouldn't.

14         Mr. Cantrell, did you wish to speak?

15              MR. CANTRELL:  Yes, Your Honor.  Just to address the

16  issue that Your Honor is concerned about, I believe it was

17  counsel for American History and Heritage Foundation that argued

18  that the state somehow has the resources to produce the

19  documents.  And I don't believe that the other -- that the

20  senators have taken that position.  Your Honor, if there's

21  anything I can do to clarify Secretary Thurston's position on

22  this, I would be very glad to do it.  My effort has been to very

23  clearly say that there is no possession, custody or control of

24  the requested documents on the secretary of state's part.

25         Your Honor, there has been no effort to try to muddy the

1    waters on that point.  Our position, we have tried to express
2    our position as clearly as we can.  Apparently, we failed to do
3    that.  But, Your Honor, my hope is to assure the Court that we
4    do not have -- Secretary Thurston does not have practical
5    ability, does not have legal control over these documents.  So
6    despite claims from opposing counsel, Secretary Thurston can't
7    produce the documents that they are wanting.  So I just wanted
8    to try to make that as clear as I can, Your Honor.  I believe
9    that, as we argued in the brief -- and I don't mean to be
10   rearguing the issue.  But in this case the burden is on The
11   Satanic Temple to show otherwise, and I don't believe they can
12   do that.
13          MR. JACOBS:  Your Honor, this is Dylan Jacobs.  May I
14   speak for a moment?
15          THE COURT:  You may.
16          MR. JACOBS:  I want to make a couple of things clear.
17   On the capacity point, when a state officer is sued or is
18   subpoenaed and our office is tasked with representing them, we
19   are normally the only attorneys to do so.  Senator Rapert having
20   private counsel assist additionally is -- I don't want to say
21   it's exclusive or unique, but it's certainly not the normal
22   course.  He's certainly entitled to do that.  But as far as
23   representing Senator Hammer and Senator Ballinger, our office is
24   representing them in all of those capacities that are relevant,
25   I suppose, as far as the subpoenas are concerned.  So I don't

1    want the Court to think that Senator Ballinger and Senator

2    Hammer are being left without representation as to some aspect

3    of their person.  They are not.

4        Second, on the issue of the state being in a better

5    position to do some of this, certainly Senator Hammer and

6    Senator Ballinger have not raised that issue.  The subpoenas

7    issued to them are seeking documents in their possession, and

8    the burden would be on them in producing that.  As Mr. Byrd

9    brought up, whether the state, in the event production was

10   compelled, would offer some sort of technical assistance in

11   doing that is sort of a side issue that is I don't think before

12   the Court.  I don't think I have anything else on that unless

13   the Court has questions.

14          THE COURT:  I do not.  Those are the end of the docket

15   numbers that I have before me.  We started off with a discussion

16   of whether I was missing anything, that there was anything else

17   ripe for discussion today.  I appreciate everyone's patience,

18   time and attention today in talking to me about these issues.

19   Anything further that we need to take up today?  I'm just going

20   to go lawyer by lawyer.  You are certainly welcome to raise

21   anything else.

22       Mr. Burnett, on behalf of the Cave plaintiffs, anything

23   else we need to take up today?

24          MR. BURNETT:  No, Your Honor.  Thank you.

25          MR. SCHULTZ:  Your Honor, this is Mr. Andrew Schultz.

1    Just a point of clarification, and perhaps the Court can help us

2    understand what will happen after we adjourn for today with

3    regard to the request on the dispositive motions scheduling

4    order.

5              THE COURT:  I'll issue a written order that takes care

6    of all of this discovery.  I appreciate that you wish to carve

7    out the claims that you have.  But I didn't rule that way from

8    the beginning because the relief that's being sought impacts

9    everybody.  Right?  It impacts everybody.  So that's why I said,

10   I permitted the intervention, recognizing that you all either

11   were silent or opposed.  It's been a while since I entered that

12   order.  But I see problems in parsing this through and setting

13   briefing schedules that are different, especially while

14   discovery disputes are ongoing, because what in my experience

15   happens is, if I permit some folks to brief dispositive issues

16   while discovery matters are ongoing, nuggets may be gained in

17   the discovery that change the tables, and people want to address

18   them later then in follow-up briefing or amended briefing,

19   supplemental briefing.  That's not particularly efficient.

20        None of this has been particularly efficient for various

21   reasons, I recognize, some of which has to do with my schedule

22   I'm fully willing to admit.  I will say it's a rare federal case

23   when I have to get on the phone with lawyers about discovery,

24   period.  Take that and go forward, lawyers in this case, to

25   understand.  This seems to be a problematic case.  We'll deal

1  with it as we can.

2      I'm not inclined at this point to carve up claims and

3  permit dispositive briefing on anything but a case-wide basis.

4  I'll re-study those issues, but that's where I'm standing right

5  now.  So generally what's going to happen is I'll enter an order

6  that takes care of these discovery matters.  If we're at the

7  point then to set a dispositive motion date, I will.  And I may

8  just do it anyway and set it out far enough that whatever

9  discovery needs to be had, or if I say no more discovery needs

10 to be had, everybody then knows the date that I want dispositive

11 motions filed.  I may also set a trial date.  Why?  So everybody

12 has their calendar clear and that's the date.  If it goes away,

13 everybody gets a free day or a free week or a free whatever

14 length of time we think this trial will take.  But in my

15 experience, if I wait to set a trial date until after

16 dispositive motions are ruled on, then we're looking at perhaps

17 a whole year later on the Court's calendar and as many lawyers

18 are involved in this case as are.  Anything further?

19          MR. SCHULTZ:  Thank you, Your Honor.

20          THE COURT:  Mr. Elliott, on behalf of the Orsi

21 plaintiffs?

22          MR. ELLIOTT:  No, Your Honor.

23          THE COURT:  Mr. Kezhaya, on behalf of TST?

24          MR. KEZHAYA:  Nothing from us, Your Honor.

25          THE COURT:  Mr. Cantrell or Ms. Patterson?

1          MR. CANTRELL:  Nothing from us, Your Honor.

2          THE COURT:  Mr. Byrd?

3          MR. BYRD:  Nothing more, Your Honor.

4          THE COURT:  Mr. Jacobs.

5          MR. JACOBS:  No, Your Honor.

6          THE COURT:  Mr. Story.

7          MR. STORY:  Nothing more, Your Honor.  Thank you.

8          THE COURT:  If there's nothing further, then we're

9    adjourned.  I appreciate again everybody's time and attention

10   today.  Have a good afternoon.

11        (Proceedings concluded at 3:09 p.m.)

12                        REPORTER'S CERTIFICATE

13        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15   /s/Elaine Hinson, RMR, CRR, CCR      Date:  March 10, 2022.
     United States Court Reporter

16

17

18

19

20

21

22

23

24

25