IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, et al                                              PLAINTIFF

v.                              Case No. 4:18-cv-00342-KGB

JOHN THURSTON, Arkansas Secretary of State
in his Official Capacity                                      DEFENDANT

**PLAINTIFFS' EXHIBITS TO MOTION FOR SUMMARY JUDGMENT**

| Document Description | Exhibit |
|---|---|
| Affidavit of Anne Orsi | Exhibit A |
| 4/27/2018 | Exhibit A-1 |
| 7/7/2018 | Exhibit A-2 |
| 4/4/2018 | Exhibit A-3 |
| 1/8/2017 | Exhibit A-4 |
| 4/2/2015 | Exhibit A-5 |
| 12/15/2016 | Exhibit A-6 |
| 6/29/2017 | Exhibit A-7 |
| 2/24/2016 | Exhibit A-8 |
| 5/2/2018 | Exhibit A-9 |
| 6/28/2017 | Exhibit A-10 |
| Expert Report of Mark David Hall | Exhibit B |
| Verified Expert Report of Steven K. Green | Exhibit C |
| Rebuttal Report of Mark David Hall | Exhibit D |
| Excerpts from Deposition of Kelly Boyd | Exhibit E |
| Boyd Depo. Ex. 17, Email | Exhibit E-1 |

| | |
|---|---|
| Boyd Depo. Ex. 18, Spreadsheet | Exhibit E-2 |
| Boyd Depo. Ex. 27 | Exhibit E-3 |
| Excerpts from Deposition of Kerry Jucas Moody | Exhibit F |
| Moody Depo. Ex. 13 | Exhibit F-1 |
| Excerpts from Deposition of Sen. Jason Rapert | Exhibit G |
| Cave Plaintiffs' Exhibit 11, Draft of Senate Bill 939 | Exhibit G-1 |
| Cave Plaintiffs' Exhibit 15, Appearances at Arts and Grounds Commission Hearing | Exhibit G-2 |
| Cave Plaintiffs' Exhibit No. 25, Text of Senator Rapert's Speech from Dedication Ceremony of Second Monument | Exhibit G-3 |
| Orsi Plaintiffs' Exhibit No. 2, Letter to Secretary of State's Office in Support of Ten Commandments Monument | Exhibit G-4 |
| Orsi Plaintiffs' Exhibit No. 5, Post from AHHF Facebook page | Exhibit G-5 |
| Orsi Plaintiffs' Exhibit No. 6, Guest Column | Exhibit G-6 |
| Excerpts from Deposition of Anne Orsi | Exhibit H |
| Excerpts from Deposition of Rabbi Eugene Levy | Exhibit I |
| Excerpts from Deposition of Gale Stewart | Exhibit J |
| Excerpts from Deposition of Teresa Gryder | Exhibit K |
| Transcript of Arts and Grounds Comm'n Public Hearing, Dec. 14, 2016 | Exhibit L |

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, et al PLAINTIFF

V. Case No. 4:18-cv-00342-KGB

MARK MARTIN, Arkansas Secretary of State
in his Official Capacity DEFENDANT

***AFFIDAVIT OF ANNE ORSI***

I, Anne Orsi, do hereby state the following under oath.

1. I am a citizen of the State of Arkansas.

2. I visit the State Capitol Grounds from time to time. At various times I have attended the Capitol Lighting Ceremony in conjunction with the holiday parade; at least one press conference and possibly more ; rallies supporting women's reproductive autonomy, the March for Science, the Women's March, and possibly other issues; public hearings pertaining to the monument in issue; and legislative committee hearings on the Act that is the subject of this suit as well as other pending legislation. I have done history and genealogy research at the Arkansas State Archives/Arkansas History Commission in the "Big Mac" building

Exhibit A

next to the State Capitol. I have assisted with the erection of the winter solstice display sponsored by the Arkansas Society of Freethinkers every year since 2009 except in 2017, and in each of those years except 2017 I have attended the solstice event held by the Arkansas Society of Freethinkers at the State Capitol next to the winter solstice display. I have visited some of the exhibits in the state capitol building. I have searched the state capitol grounds for a sundial donated decades ago by the National Society of the Colonial Dames of America in the State of Arkansas ("NSCDA" or "Colonial Dames"), another organization to which I belong, which has apparently disappeared without a record or trace from the spot on the state capitol grounds where it formerly stood. I have visited various monuments on the grounds as I have taken walks or biked through the public space. I have driven through the grounds traveling between 7th Street and 3rd Street. I have been on the state capitol grounds to meet friends who work in offices in the State Capitol Complex for mid-day or after-work walks, for lunch, and for other social activities. I have walked between the Supreme Court Clerk's office past the picnic tables toward the capitol building, near where the monument at issue currently sits. I attended the dedication of the second monument to protest it being erected on the state capitol grounds, I went to the monument to take a photo of it, and I have seen it since that time when I have either driven through the state capitol grounds or been at the state capitol for business or leisure.

3. The Arkansas General Assembly enacted Act 1231 of 2015, providing for the placement of a Ten Commandments monument display on the State Capitol Grounds. I attended a hearing at the State Capitol to oppose that legislation.

4. I spoke at a public hearing in opposition to the monument.

5. I went to the State Capitol Grounds the day after the first monument was placed on the State Capitol Grounds. I saw the remains of the first monument.

6. I went to the State Capitol Grounds the day the second monument was unveiled on the State Capitol Grounds. There were demonstrators both in favor of and in opposition to the monument.

7. I am a subscriber to the Arkansas Democrat Gazette. The numbered exhibits attached to this affidavit were published in the Arkansas Democrat Gazette:

a. Exhibit No. 1 4/27/2018

b. Exhibit No. 2 7/7/2018

c. Exhibit No. 3 4/4/2018

d. Exhibit No. 4 1/8/2017

e. Exhibit No. 5 4/2/2015

f. Exhibit No. 6 12/15/2016

    g. Exhibit No. 7 6/29/2017

h. Exhibit No. 8 2/24/2016

i. Exhibit No. 9 5/2/2018

j. Exhibit No. 10 6/28/2017.

FURTHER, affiant says nothing.

VERIFICATION

State of Arkansas )
SS. )
County of Pulaski )

I, Anne Orsi, affiant herein, state upon oath that I have read the statements contained in the foregoing Affidavit and they are true and correct to the best of my knowledge and belief.

Anne Orsi

ACKNOWLEDGMENT

State of Arkansas )
SS. )
County of Pulaski )

On this the 2 day of March, before me, Helena Scholze, the undersigned Notary Public, personally appeared Anne Orsi, satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes and consideration therein contained.

In witness whereof I hereunto set my hand and official seal.



HELENA M. SCHULZE
No. 12396136
PULASKI COUNTY
My Commission Expires 10-4-2023

Notary Public

My Commission Expires:

8/31/2018

Arkansas Democrat-Gazette | Friday, April 27, 2018 | 1B

# Ten Commandments returns

## Monolith, encircled by bollards, again on Capitol grounds

*HUNTER FIELD*
*ARKANSAS DEMOCRAT-GAZETTE*

**Arkansas Democrat-Gazette/STATON BREIDENTHAL**

**Employees from Wilbert Memorials install the new Ten Commandments monument Thursday at the state Capitol. The monument replaces one destroyed last year.**

Exhibit # 1

http://digital.olivesoftware.com/Olive/APA/ArDemocrat/Print.Article.aspx?mode=text&href=ARDEMOCRAT%2F2018%2F04%2F27&id=Ar00900 1/4

Cave v. Martin, Orsi Requests for Admissions propounded to Secretary of State Martin, Page 000001

**Ten Commandments video**
arkansasonline.com/42718tencommandments
**Photos from the ceremony**
arkansasonline.com/galleries

Satanists and Christians gathered on the state Capitol's damp lawn Thursday for the unveiling of a Ten Commandments monument for the second time in less than year.

A crowd of several dozen pastors, lawmakers and supporters heralded the monument's installation as a celebration of the state's and nation's heritage.

The Satanists joined sign-holding protesters opposing the monument's installation on government property. The Satanic Temple, American Civil Liberties Union and others promised to file lawsuits to seek removal of the monument.

This iteration of the Ten Commandments mirrors the version erected last June, except this one is surrounded by four 3-foot-tall concrete bollards.

Last year's monolith was destroyed within 24 hours of going up when a man rammed it with his vehicle. Michael Reed of Van Buren is accused of driving the vehicle. He was found mentally unfit to stand trial in November and committed to the State Hospital.

State Sen. Jason Rapert, R-Conway, drafted the 2015 legislation authorizing the monument's placement; he's also the president of the American History and Heritage Foundation, which purchased the monument.

"The sole reason that we donated this monument to the state of Arkansas is because the Ten Commandments are an important component to the foundation of the laws and the legal system of the United States of America and of the state of Arkansas," Rapert told the group gathered Thursday.

"Passive acknowledgments of the role played by the Ten Commandments in our nation's heritage are common throughout America, and the Supreme Court ruled in 2004 that such monuments are constitutional."

In split decisions in 2005, the U.S. Supreme Court ruled that a Texas display was constitutional, but a Kentucky display was unconstitutional.

Lucien Greaves, co-founder and spokesman for the Satanic Temple of Salem, Mass., said he was confident that a judge will order the monument's removal.

After Rapert's legislation cleared the General Assembly three years ago, Greaves' group also tried to erect a statue — a 10-foot-tall bronze Baphomet, a goat-headed, angel-winged god, to represent religious pluralism. That effort stalled after lawmakers passed a measure requiring legislative approval for new monuments before they're heard by the Capitol Arts and Grounds Commission.

The ACLU of Arkansas on Thursday said, "Politicians are exploiting their power to advance their personal religious beliefs — and violating the Constitution. We'll see them in court."

Little Rock attorney Gerry Schulze also said he plans to sue the state on behalf of several residents, including Anne Orsi, an Arkansas Society of Freethinkers board member.

Rapert said Thursday that he was confident the monolith would withstand any legal challenges. He pointed to a section of the Ten Commandments monument legislation that allows Arkansas Attorney General Leslie Rutledge to have Texas-based First Liberty Institute represent the state in any litigation, which Rapert said would be done for free.

At one point during Thursday's ceremony, Greaves tried to interject to rebut Rapert's answer to a question, but he was drowned out by applause from monument supporters.

"This gentleman is obviously trying to interrupt; he's not a part of this," Rapert said. "As a matter of fact, this gentleman has actually opposed the monument and literally went over and apparently stood on that truck in the middle of the night here in Little Rock and posted a picture of it, which is really a criminal trespass."

Greaves laughed, saying he hadn't done anything illegal.

Rapert said his foundation received more than 800 donations to replace the broken monument, totaling more than $85,000. The excess money, he said, would go toward helping other cities and states to erect similar displays.

Greaves, pausing between taking photos with his supporters and the new monument, ran through a list of court cases he said deems such displays unconstitutional.

"This will come down," he said.

# Faith films' execs give $25,000 to fix Commandments

*EMMA PETTIT*
*ARKANSAS ONLINE*

Exhibit No. 2

Executive producers of the Christian *God's Not Dead* movie series donated $25,000 Thursday to replace a Ten Commandments monument after the original was smashed less than a day after its installation on state Capitol grounds.

The 6-foot-tall stone inscribed with the 10 biblical laws was erected near the Arkansas Supreme Court building on June 27. Early the next day, according to police reports, Michael Tate Reed of Van Buren drove a Dodge Dart into the monument, which toppled, shattering the granite. He was arrested at the scene and faces misdemeanor charges of defacing an object of public respect and criminal trespass, and first-degree criminal mischief, a felony. Tate is being held in lieu of $100,000 bond.

The original *God's Not Dead* follows a college student who argues about the existence of God with an unbelieving professor. The follow-up, *God's Not Dead 2*, was filmed in Little Rock in 2015, the same year state Sen. Jason Rapert, R-Bigelow, sponsored a bill to get the Ten Commandments tribute installed. The two movies grossed more than $80 million combined, according to Box Office Mojo, a website that tracks movie revenue.

*God's Not Dead 3* will be filming in Little Rock in the fall, Rapert said.

At Thursday's news conference, representatives from PureFlix Entertainment and GND Media Group joined Rapert at the Capitol rotunda to present him with a $25,000 donation.

Bob Katz and Troy Duhon, executive producers for the series, contacted Gov. Asa Hutchinson after the monument's destruction and offered the money, according to a news release.

Duhon spoke briefly at Thursday's news conference and said his son asked him the previous night why it was important to rebuild the tribute.

"Tell me what America would look like if Americans honored the Ten Commandments," Duhon told him.

Rapert told reporters at a news conference June 28 that he had no intent to use taxpayer dollars for the new stone. The original was paid for by $26,000 in private funds raised by the American History & Heritage Foundation, which Rapert created.

Including the $25,000 gift, roughly $55,000 in total has been raised in private donations since the monument was destroyed, the senator said Thursday. People have sent in money online through a fundraising website and given by mail and in person, he said.

After thanking donors and several Arkansas lawmakers, Rapert told the audience the new monument would likely be outfitted with "aesthetically pleasing" security of some kind. That someone would drive to Little Rock and ram the monument was something "nobody could have foreseen," he said.

The American History & Heritage Foundation is "ready for any cost that is needed" to support the monument, Rapert said. Any excess money will be funneled to other foundation-approved projects, he said.

Arkansas' stone will be ready for installation in about two months, Rapert said. The new and old monuments will be the same "right down to the granite that was used," he said.

Rapert's legislative push for a Ten Commandments monument triggered a debate on the appropriateness of religious symbols on government property. Several secular groups, including the American Civil Liberties Union and the Satanic Temple, have promised lawsuits if a monument is erected.

EDITORIALS

Exhibit # 3

# Keep off the grass

## The devil went down to Little Rock ...

JUST CALL him Lucifer, if he's in need of some restraint.

Legislators and whoever else happens to be near the Capitol grounds on Aug. 16 could be treated to not only a protest, but also to a giant bronze statue of Baphomet. It's some sort of goat-headed demon from the occult . . . or something.

Well.

Why has old Ned taken such an interest in Arkansas' capitol, you ask? The Satanic Temple is bringing the statue as part of a protest against the Ten Commandments stationed on the grounds there.

A spokesman for the Satanic Temple, who for some reason uses a fake name, said his organization opposes our Ten Commandments monument on government property because displaying Moses' (heavy) instructions appears as though the state is endorsing one religion over another.

But who at the Satanic Temple thought it'd be a good idea to win over Arkansans (many of whom find themselves sho' nuff in a church pew of a Sunday morning) by bringing a statue of the devil to our state? Get thee hence,

guys. Most of us have spent our entire lives being taught that you-know-who goes to and fro in the land, looking for someone to devour. So bringing a statue of him to our doorstep doesn't bode well for anyone's cause if they seek to change hearts and minds.

But you knew this was coming. One monumental mistake follows another. Our betters in the Legislature have begun something of a Tower of Babel in which competing religious ideas are invited for a free-for-all on the Capitol grounds. For once the gates have been thrown open to one faith, all others must be allowed to enter.

Let us quote the Arkansas state constitution on the matter: "No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship, above any other."

Now a long line has formed down the block to compete with the Ten Commandments, and surely the courts will get involved. If they interpret the state and national constitutions as read, old Baphomet might hold court at the Capitol, too.

Other states have been in this predicament in the past. Down at Texas' Capitol, the state's attorney general at the time (who is now governor) had to defend the Ten Commandments in court by saying the display was one of many, and therefore perfectly legal. All he had to do was obliterate the holy, and mix it with other stuff. Then the Ten Commandments became just another archeological history lesson to illustrate the origins of law. And not to be taken literally, or seriously.

And this is how it starts. Once the state lays its hands on a religious symbol and chooses to use it for its own purposes, diluting the holy with generous heapings of the secular and profane—that is, the Ten Commandments with lots of other statues—the integrity of the religious symbol is compromised. And then it's—ta da!—legal.

What an unholy mess.

THE NEXT time somebody tells you that the state Capitol in Little Rock needs another religious monument, tell them to not just do something, sit there.

To sum up: The devil is coming to Little Rock, lawsuits will surely follow (after all, this is America), legal arguments will surely have to be made that the Ten Commandments aren't actually holy writ, and since these aren't the days of miracles, a lot of money will have to be spent on behalf of We the People. Meanwhile, our roads continue to resemble cheese graters, online sales tax sits uncollected, the Buffalo National River remains polluted, and a host of other problems go unaddressed.

As far as Baphomet, if you do see him, use all your well learned politesse. After all, our elected representatives all but invited him here.

Guest column

# Support for the Capitol monument

*JASON RAPERT*
*SPECIAL TO THE DEMOCRAT-GAZETTE*

Exhibit # 4

After multiple personal insults printed by your newspaper and turning the cheek several times, it is time to set the record straight. Error left unanswered sometimes gets mistaken for the truth.

Of all the things I ever thought the *Arkansas Democrat-Gazette* editorial board would ever decide to oppose, I would never have imagined they would actually dare come out vengefully against honoring the Ten Commandments. In various editorial columns and articles since 2015 they have called the Ten Commandments monument a "graven image," an "eyesore," a "garish monument," and used general derogatory comments to intimidate me, the Arkansas Legislature and Gov. Asa Hutchinson for passing Act 1231 of 2015 to honor the Ten Commandments as the historical moral foundation of law.

Of course, dear readers, they would have you to believe that this is all my fault, and they have engaged in an effort to demonize me personally for being the prime sponsor of the Arkansas Ten Commandments Monument Act. Well, my fellow Arkansans, I am guilty as charged for supporting the Ten Commandments and write today to take full responsibility for being so bold as to believe that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mount Sinai.

Before I lay out the reasons why I am still fully confident that the Arkansas Ten Commandments Monument is the right thing to do, let me say that it is very revealing and interesting to review another column the editors once penned about me on March 18, 2013, titled "Jason Rapert on the case." They wrote to applaud my efforts to rein in the now-convicted felon and former Treasurer Martha Shoffner (D) and the treasury reform bill I passed. They had much nicer things to say about me then, including that I was "like the hero in a dime-store novel, state senator and general reformer Jason Rapert has arrived on the scene to save the fair damsel called the public interest." They went even further to write "Happily, the state has a guardian of its interests in Jason Rapert, R-Integrity, who proposes to recruit a whole posse of good, experienced professionals to police Ms. Shoffner at the state treasurer's office ..." and gave me the nice title of Rough Rider Rapert.

They didn't stop there as they showered me with more nice compliments stating "but thank goodness there's a Jason Rapert in the Legislature to spearhead reforms like this." And finally they said, "the public can be grateful a state senator like Jason Rapert is awake—and ready to ride to the rescue, bills blazing."

But now that I have taken a stand for the Ten Commandments and other issues they apparently now opposelike marriage between one man and one woman—suddenly I am called all sorts of nasty names by Paul Greenberg, John Brummett and the editorial writers. This proves to me that not even the editors of what once we called with affection a newspaper can help themselves in the hateful political environment that we now live in. They praise me personally on my efforts to do something which they support, but they turn and try to demonize me personally on an issue they oppose. We deserve to have the editors of our statewide newspaper hold a higher standard in which issues can be debated forcefully without resorting to the nasty tabloid mentality of personal destruction that permeates our culture today. Editors, you may oppose my views, disagree with 99 out of 135 legislators, the governor of our state and a large majority of Arkansas people who believe in honoring the Ten Commandments, but you can maintain mutual respect for us all while disagreeing with us on this issue. Shame on you.

My, how times have surely changed at the *Arkansas Democrat-Gazette.* Not only has it become fashionable for them to criticize and attack people who

support the Ten Commandments, now it appears they have decided to use the tactics and arguments of the secular humanists, atheists, ultra-liberals and even the satanists by demonizing the recognition of longstanding aspects of tradition, the moral foundations of law and even reference the Ten Commandments as a "graven image." Imagine what Moses might say. It is almost as if the editors forget who buys their newspaper in Arkansas. If I were the general manager of a statewide newspaper in Arkansas, I sure would not want to insult practically 95 percent of the good people of the Natural State who believe in God and country and have shown they have a willingness to take a stand on those issues.

In 2005, the United States Supreme Court ruled in favor of allowing a monument of the Ten Commandments to remain on the Texas State Capitol grounds in the case of *Van Orden v. Perry*. It so happens that the Arkansas Ten Commandments monument that will soon be installed is an exact replica of the Texas monument and many other such monuments that are standing today on public property around our nation. Based on published reports available to anyone who cares to check it out, there are approximately 117 Ten Commandments monuments given by the Fraternal Order of the Eagles sitting on public property in America today at or near state capitols, city halls, municipal buildings, courthouses, parks, war memorials, police and fire stations, schools and other public lands.

Former Chief Justice William Rehnquist wrote the majority opinion in the *Van Orden v. Perry* case and eloquently laid out some very important information pertaining to the history of the Ten Commandments being honored in our nation.

The U.S. House of Representatives has Moses facing the Speaker, looking over the proceedings of Congress, and the Ten Commandments are depicted in the floor of the National Archives which you must pass over to view the Declaration of Independence. Many references to the Ten Commandments have been cited in Supreme Court rulings, and our Founding Fathers cited the Ten Commandments as a building block of American jurisprudence.

How is it that the *Arkansas Democrat-Gazette* summarily castigates me and others for sponsoring a bill to erect a monument honoring the historical significance of the Ten Commandments amongst the various other monuments

on our State Capitol grounds? I don't see them attacking the Civil War monument honoring the Confederacy.

If the Ten Commandments are good enough for the U.S. Supreme Court building, they are good enough for the Arkansas State Capitol grounds. The odd opinion the editors seem to have on this issue is really just another symptom of the times in which we live. In fact, political correctness has crept into every facet of our society and has made it quite difficult for people of principle, faith and civility. The lack of reverence for just about anything we once held dear in America has become fashionable to the detriment of civilized society. For many years, we could count on messages of significance from editorial boards, but the sharp minds and clear thinking of days gone by are sadly, well, they are gone. News isn't news anymore. News is now opinion columns packaged as news. What once was a free and fair press is now mostly a weapon of political manipulation wielded by political activists who never ran for an elected office, so they throw darts at anyone who happens to be an elected official.

Dear editors, the good people of Arkansas overwhelmingly support the Arkansas Ten Commandments Monument Act and honoring the great history and traditions of our great republic. We are not taking the Decalogue down from the U.S. Supreme Court building, erasing Moses from the U.S. House of Representatives, and we are definitely putting them up on the Arkansas State Capitol grounds—the law says so. A majority of us still believe in taking a stand for what is right, and in a day and time when some of you may not have reverence for the things that have made America exceptional, thank God Almighty there are still many more of us that do.

The *Arkansas Democrat-Gazette* is free to disagree with the majority of Arkansans, the U.S. Supreme Court, the Arkansas Legislature and me on this issue. That is your right. It is a wonderful free country in which we all have a right to our opinion and you have a right to yours. When the good people of Arkansas visit our beautiful State Capitol they will be greeted by "In God We Trust" on the walls of the Senate and House of Representatives chambers, and very soon they will also get to see a monument honoring the Ten Commandments. I am proud of our state for standing up for what we believe in and politicians who actually vote the way the folks back home want them to.

God bless Arkansas and God bless America.

8/31/2018 Arkansas Democrat-Gazette | Sunday, January 08, 2017 | 3H

*Jason Rapert is an Arkansas state senator. This piece was edited for length. View the entire submission at arkansasonline.com/RapertColumn .*

Cave v. Martin, Orsi Requests for Admissions propounded to Secretary of State Martin, Page 000067
http://digital.olivesoftware.com/Olive/APA/ArDemocrat/Print.Article.aspx?mode=text&href=ARDEMOCRAT%2F2017%2F01%2F08&id=Ar10300 5/5

# Bill passes to display holy rules at Capitol

***SPENCER WILLEMS***
***ARKANSAS DEMOCRAT-GAZETTE***

Exhibit #5

**Arkansas Democrat-Gazette/STATON BREIDENTHAL**
**Rep. Kim Hammer (center) is congratulated Wednesday by Reps. Tim Lemon and Sheilla Lampkin after the bill to allow a monument to the Ten Commandments on the Capitol grounds won final approval in the House.**

Lawmakers easily approved a bill Wednesday that would allow a private group to erect a monument of the biblical Ten Commandments on the state Capitol grounds.

Senate Bill 939 by Sen. Jason Rapert, R-Bigelow, passed through the House of Representatives on a 72-7 vote and was delivered to the off ice of Gov. Asa Hutchinson.

Proponents of the monument, which would not involve public money, said it would be modeled after similar monuments that have been erected in other public venues, including one outside the Texas Capitol.

On Wednesday, the bill's House co-sponsor, Rep. Kim Hammer, R-Benton, said that the purpose of the monument was not to assert the dominance or preference of one religion.

The purpose for a Ten Commandments display, Hammer argued, is historical. The foundation of the American democratic experiment was imbued with a reverence for the biblical rules.

"There is no doubt that the Founding Fathers outlined the moral foundations as they developed a free society, [one] resting on a firm moral foundation [where] they articulated the first principles of a political organization," Hammer said. "Thus they were meant not only to serve the 18th century but generations to come. ... The founders drafted an extraordinarily thoughtful plan of government, but it was up to us and to each generation to preserve and protect it."

Rep. John Walker, D-Little Rock, was the only legislator to speak against the legislation. He pointed out that though the nation's founders were predominantly Christians, they also built into the nation's Bill of Rights a clause that prevented the supremacy of one religion over another.

Walker suggested that those behind the bill were itching for a legal fight that they would likely lose given the track history of similar efforts in other states.

SB939 is modeled after legislation from Oklahoma that led to the installation of a Ten Commandments monument on its Capitol grounds in 2012.

Earlier this year, a federal lawsuit challenging the monument was dismissed for lack of standing.

A legal challenge to the decades-old monument in Texas failed at the U.S. Supreme Court on a 5-4 vote. That same day, the same court ruled against similar, more recent displays in Kentucky courthouses, holding that those did violate the U.S. Constitution.

But Walker pointed to Alabama Chief Justice Roy Moore, who was removed from office in 2003 after he refused to follow a federal court order to remove a monument of the Ten Commandments from the Alabama Judicial Building. Alabama voters returned Moore to the same post in 2013.

"I do not know why it is necessary to take on issues that are divisive," Walker said. "When can we come to our senses to determine we don't have to challenge

things ... where we have lost ... and continue that confrontation with the federal government. ... It is not necessary for us to repeat history that we know will fail."

Hammer pointed out various religious icons in and around the Capitol, including references to God in both legislative chambers and an angel on the Confederate war monument.

Hammer asked if the legislators should "sandblast" off the biblical references or "use the sword to cut off the head" of the Confederate monument's angel.

"We're not here to establish a religion. To be honest, that's been done by past and current generations in this state," Hammer said. "The evidence is all around."

**Rep. John Walker suggested that those behind the bill were itching for a legal fight that they would likely lose given the track history of similar efforts in other states.**

LAWMAKERS

near approval on ballot proposals. Page 7A.

BUDGET BILLS

sent to the governor. Page 1B.

8/31/2018 Arkansas Democrat-Gazette | Thursday, December 15, 2016 | 1B

# Sides aired on sacred 10; panelist's not sure why

*BRIAN FANNEY*
*ARKANSAS DEMOCRAT-GAZETTE*

Exhibit # 6

Arkansas Democrat-Gazette/STEPHEN B. THORNTON

Capitol Arts and Grounds Commissioner Tony Leraris speaks to a member of the public during a public hearing Wednesday in Little Rock concerning the lawmaker-approved plan to erect a Ten Commandments monument on the grounds of the state Capitol.

Arkansas Democrat-Gazette/STEPHEN B. THORNTON

Sunlight illuminates a portion of grass Wednesday where the proposed Ten Commandments monument will be erected

Cave v. Martin, Orsi Requests for Admissions propounded to Secretary of State Martin, Page 000105

http://digital.olivesoftware.com/Olive/APA/ArDemocrat/Print.Article.aspx?mode=text&href=ARDEMOCRAT%2F2016%2F12%2F15&id=Ar00709 1/4

**southwest of the state Capitol.**

A subcommittee of the Capitol Arts and Grounds Commission heard public testimony Wednesday for and against placing a Ten Commandments monument on the state Capitol grounds, even though the commission has already decided where the statue will go.

Act 1231 of 2015, sponsored by Sen. Jason Rapert, R-Bigelow, requires the commission to permit a Ten Commandments monument on the Capitol grounds.

"The great thing about your position is you don't have to decide whether you do put up this monument or not," Rapert told commissioners Wednesday. "The debate has already been had. The bill's already been passed. The governor's already signed the bill and it is the law of the state of Arkansas."

The commission previously decided that the monument would be placed near the southwest corner of the Capitol, near the grounds leading to the Arkansas Supreme Court. The 6,000-pound statue was built with private funds. It is in storage awaiting placement.

When Jim Linsley of Little Rock stood up for a second time toward the end of the hearing to make his case against the monument, Commissioner Tony Leraris of Fort Smith said his job is to follow the law.

When Linsley asked why the hearing was held, Leraris said state law requires a public discussion.

Linsley then asked, "For what end?"

"I really don't know," Leraris said.

Commissioner Melonaie Gullick of Conway added, "Everyone's comments mean something to us. We're listening to the comments, but we can't change the law."

Soon after, Gerry Schulze, a Little Rock lawyer, said commissioners do have an option.

"Every one of you took an oath to uphold and defend the constitution of the state of Arkansas and the United States of America. That is your obligation," he said. "You're being asked to perform an act that violates the constitution of the state of Arkansas or the constitution of the United States of America. Your oath requires you to recuse."

The commissioners present — Leraris, Gullick and Kelly VanHook of Searcy — did not respond to his comment.

The state constitution says: "No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship, above any other."

But multiple speakers in favor of the Ten Commandments monument, told commissioners they believed the text served as a basis for laws.

"I believe that the Ten Commandments are as much as a historical document to the United States of America as the Constitution and the Bill of Rights," said Toni Rose of Little Rock.

"It has every right to be on the grounds of our state Capitol and I would hope that our legislators — as they walk these grounds — will see the Ten Commandments and be reminded of their moral obligations to the citizens to whom they are responsible."

Others in favor of the monument said the state would be better off if the state were to follow the commandments.

"If this nation and this state were to observe the Ten Commandments and live in it, don't you believe this would be a much more peaceful nation? Don't you believe it would be a much more whole nation if there was no murder? 'Thou shalt not kill.' If there was no bearing false witness?" said Joshua Dye of Western Grove.

Those against the monument said it was clearly religious.

"You can tell that it's a religious motivation to have this commandment monument up," said Eugene Levy, a retired rabbi of Congregation B'nai Israel.

"They spoke totally in religious terms."

Others said the Ten Commandments would inspire other types of monuments on the Capitol grounds.

"'I am the Lord your God. You shall have no gods except me' — on the Capitol grounds," said Jeremy Brasher of Little Rock. "Do you want a Baphomet statue? Because that's how you get a Baphomet statue."

After lawmakers passed Act 1231, the New York-based Satanic Temple announced plans for an 8.5-foot-tall bronze statue of Baphomet. Later, the Saline Atheist & Skeptic Society filed a request for a brick wall to be constructed in front of both. Capitol Arts and Grounds Commission subcommittees will meet Jan. 25 to discuss the Baphomet statue and Feb. 9 to discuss the brick wall.

Representatives of the Society of Freethinkers and of the state chapter of the American Civil Liberties Union have promised lawsuits if any religious monuments are built on Capitol grounds, and they said lawmakers would be to blame for any attorneys' fees awarded to them.

About 50 people attended Wednesday's meeting. Eleven spoke in favor of the Ten Commandments monument. Sixteen were opposed. Some people stood up during the meeting and said they chose to submit written comments supporting the monument.

The U.S. Supreme Court handed down two decisions in 2005 that pertained to Ten Commandments displays.

In a 5-4 decision, the high court held in McCreary County v. American Civil Liberties Union that Ten Commandments displays needed to be removed from two Kentucky courthouses because they were erected along with other religious passages, and the religious motivations were clear.

But the same day, the court issued a separate 5-4 ruling in Van Orden v. Perry holding that the Texas state Capitol could keep its decades-old Ten Commandments monument because it conveyed historic and social meaning, and was merely one of several historical displays.

# Ten Commandments broken

## Display up at Capitol just 1 day, hit by car, now rubble

*EMMA PETTIT*
*ARKANSAS ONLINE*
*AND BRIAN FANNEY*
*ARKANSAS DEMOCRAT-GAZETTE*

**Special to the Democrat-Gazette**

**The Ten Commandments monument lies in pieces beside its base Wednesday morning at the state Capitol. Backers said a replacement monument is already on order.**

Exhibit # 7



8/31/2018 Arkansas Democrat-Gazette | Thursday, June 29, 2017 | 1A

**Special to the Democrat-Gazette**

**A member of the secretary of state's staff picks up pieces of the Ten Commandments monument Wednesday at the state Capitol. Tire tracks show where a car plowed into the monument before dawn.**

**Reed**

**Special to the Democrat Gazette**

Cave v. Martin, Orsi Requests for Admissions propounded to Secretary of State Martin, Page 000110
http://digital.olivesoftware.com/Olive/APA/ArDemocrat/Print.Article.aspx?mode=text&href=ARDEMOCRAT%2F2017%2F06%2F29&id=Ar00104 2/8

**Secretary of state workers start cleanup Wednesday around the smashed Ten Commandments monument that was just installed on Tuesday.**

**Arkansas Democrat-Gazette/STATON BREIDENTHAL**

**State Sen. Jason Rapert (right), who called on elected officials to take a stand against violence and against people "using weapons to destroy things" based on differences in viewpoints, said a replacement monument could be protected by steel posts.**

More
information
on the Web

Photos of the broken monument
arkansasonline.com/galleries

Less than 24 hours after being installed on the state Capitol grounds, a 6-foot-tall Ten Commandments monument was toppled Wednesday when a 32-year-old Arkansas man drove a vehicle into it, according to police reports.

Chris Powell, a spokesman with the secretary of state's office, said he was called early Wednesday and told that a man had driven a vehicle through the

monument. That driver — identified in an arrest report as Michael Tate Reed of Van Buren — was arrested by Capitol Police shortly after, Powell said. Reed apparently streamed the destruction live on Facebook, officials said.

Reed was previously accused of destroying a Ten Commandments monument in Oklahoma, according to news reports.

The destruction of the Arkansas monument put at least one planned lawsuit on hold until the statue is rebuilt. Plaintiffs must show that they are being harmed in order to prevail in a lawsuit.

"As far as our lawsuit goes, I believe we have to postpone it," said Lucien Greaves, a co-founder of the Massachusetts-based Satanic Temple. "I believe it takes our standing away. Our plaintiff hadn't even seen the monument yet at the time [the suspect] ran it over. Of course, if they put the monument back up, then we will sue."

The American Civil Liberties Union of Arkansas condemned the destruction but did not respond to requests for comment about whether it had legal standing to proceed with its planned lawsuit. The organization had said it would wait until the monument was installed to file suit.

Sen. Jason Rapert, R-Conway, who sponsored the 2015 legislation to erect the monument on Capitol grounds, told reporters at a news conference Wednesday that a new statue has already been ordered. He called on elected officials to take a stand against violence and against people "using weapons to destroy things" based on differences in viewpoints.

MONUMENT TOPPLED

According to the arrest report, about 4:45 a.m. Wednesday, an officer spotted a dark-colored vehicle "start from a stopped position and ram the Ten Commandments monument."

"I immediately exited my vehicle and placed the subject in custody," Cpl. Chad Durham wrote, noting that Reed was first taken to a local hospital and then booked into the Pulaski County jail.

The arrest report for Reed listed "unemployed/disabled" under occupation.

Reed, who was in jail shortly after 7:30 a.m., faces charges of defacing objects of public respect, trespassing on Capitol grounds and first-degree criminal mischief, according to the report. He was being held without bail pending an initial court appearance.

It was "absolutely" a shock to get the call about what happened, Powell said.

"We had some concerns, just because this was such a highly charged issue with some people," he said.

Rapert said, "That's the same hatred, that's the same motivation that motivates somebody to put on a mask and take a bat and go to a college campus and attack somebody who is standing there exercising their free-speech rights."

Rapert said the new statue could be paid for with insurance money or new donations. The new monument, which will be a copy of the toppled one, might be protected by steel posts surrounding it, he said.

"There is no intent for anybody to use taxpayer funds," he said.

CAUGHT ON VIDEO

Investigators believe that Reed recorded himself as he drove into the statue, the secretary of state's office said.

In a Facebook Live video to an account under the name Michael Reed, a driver appears to shine his headlights on the monument and shouts, "Freedom!" as he drives toward it. As the vehicle hits the granite, the video cuts out.

In another Facebook video posted early Wednesday, a man who called himself Michael Reed describes his beliefs in both Jesus and the separation of church and state. He spoke from a seat in a 2016 Dodge Dart.

"I'm a firm believer that part of salvation is that we not only have faith in Jesus Christ but we obey the commands of God, and that we confess Jesus as Lord," he said in the video. "But one thing I do not support is the violation of our constitutional right to have the freedom that's guaranteed to us, that guarantees us the separation of church and state."

There's "no one religion" that the government should represent, the man said.

In a different video posted earlier, the same man said he had to "confess my sin."

"I made a promise that I very much intended to keep that I would go get help if things didn't happen the way I thought they would," he said.

Later, he added: "I'm taking a sabbatical. I'm going to go. I'm leaving this place, and I'm gonna see God more and just trust in him."

The man also described interactions with police and medical personnel before Wednesday morning's wreck. He said in a Facebook post that if his plans were not carried out the way he wanted, he would return to a hospital.

OKLAHOMA STATUE

On Oct. 24, 2014, a then-29-year-old Michael Tate Reed was accused of ramming his truck into a Ten Commandments statue of a similar design at the Oklahoma Capitol in Oklahoma City, the *Tulsa World* reported.

Authorities said he also made threats against President Barack Obama, lit money on fire and walked into a federal building to spit on pictures, the newspaper reported.

Reed was diagnosed with schizoaffective disorder, the *World* reported. Reed was released from Norman's Griffin Memorial Hospital in January 2015 under an agreement with the Oklahoma County district attorney's office for continued treatment and therapy.

In an email to the *World* , Reed described how voices in his head became his norm and he apologized for running into the statue, the *World* reported.

"I am so sorry that this all happening and wished I could take it all back," Reed wrote, according to the *World* .

During Wednesday's news conference, Rapert said he has been supportive of mental health issues in Arkansas.

He did not participate in a vote to authorize Mental Health Crisis Stabilization Centers under Act 423 of 2017, according to legislative records.

If Reed is mentally ill, Rapert said he hopes he receives help. He also said he wants Reed to be prosecuted to the fullest extent of the law and that the attack appeared to be planned in advance.

A CULPABILITY MATTER

Rapert said a variety of organizations are "culpable" but not "responsible" for the destruction of the Ten Commandments monument.

"My No. 1 goal today is to ask people to think about this country and where we live and what we want it to be like," he said. "I don't want my children or your children or your families to live in a country where people take up violence against each other simply because they have a disagreement. That's not what America was founded on."

He said the ACLU of Arkansas, Satanic Temple, some members of the media and others were "culpable."

"I expect the *Arkansas Democrat-Gazette* and our newspaper media in this state to deliver news. When they use their columns to berate, belittle and intimidate people in their columns — using language that isn't appropriate — you have to understand that has the ability to foment hatred that is carried out in acts that you've seen here today," he said.

"You can't light a fuse and walk away and say you're not responsible for the explosion. We all have a responsibility to use language that is befitting our offices that we hold, and also befitting the roles that we play in society."

In response, David Barham, editorial page editor for the *Democrat-Gazette* , said he would let the newspaper's editorials speak for themselves. The editorial page is separate from the news-gathering side of the newspaper.

The ACLU of Arkansas denounced the monument's destruction.

"We strongly condemn any illegal act of destruction or vandalism," Rita Sklar, executive director of the group, said in a statement. "The ACLU remains committed to seeing this unconstitutional monument struck down by the courts and safely removed through legal means."

And Greaves, co-founder of the Satanic Temple, said he was familiar with Reed because of the incident in Oklahoma.

"When this happened in Oklahoma, they immediately started saying that he was a Satanist, and then it turned into this narrative, 'Well, he claimed the devil made him do it.' And the politicians in Oklahoma continued referring to this guy as a Satanist well after it was very clear that he considered himself a born-again self-described Jesus freak," he said in an interview.

"I want to be clear. We don't celebrate the monument being vandalized or destroyed in this way. It'll surely come down, but it can and should be taken down by legal means."

CLEANING UP THE PIECES

The broken pieces of the granite monolith were visible inside a taped-off area near the walkway to the Justice Building before 7 a.m. Wednesday. Tire tracks were visible in the grass on the western side of the small slope on which the statue sat.

Capitol crews later worked to clean up the chunks of granite. One employee drove a John Deere tractor as three other men discussed how to hoist one of the larger broken blocks onto a wooden platform to be hauled away.

A few people driving by pulled over to take photos and shout questions out of their car windows.

Rapert, who told a reporter Tuesday that he wanted to help install more Ten Commandments and "In God We Trust" monuments around the country, vowed Wednesday to press forward.

"They've inspired us," he said of organizations planning to file lawsuits. "We want to put up monuments in every state, every county, every city and every town. And every organization that wants one, we're going to help them do that."

"You come at us with your hatred. We come at you with our freedom," he said.

*Information for this article was contributed by Brandon Riddle of Arkansas Online; and by staff members of The Associated Press.*

# Commandments statue to invite suit, group says

## Rapert urged to drop plan

Exhibit # 8

*MICHAEL R. WICKLINE*
*ARKANSAS DEMOCRAT-GAZETTE*

The Washington, D.C.-based American Humanist Association on Tuesday called on Sen. Jason Rapert, R-Bigelow, to ax his plan to place a Ten Commandments monument on the grounds of the state Capitol after he created an online fundraising account for the monument last week.

A GoFundMe account set up in Rapert's name on Feb. 17 reported that $6,035 in donations have been received for the Arkansas Ten Commandments monument and $10,600 more is needed to complete the fundraising drive. The account reported that $3,035 in donations were received through the GoFundMe account and the other $3,000 was made in direct donations.

The association's Appignani Humanist Legal Center said in a letter dated Tuesday to Rapert that "this letter is to inform you of strong objections to this plan on behalf of Arkansas residents and others who see it as a blatant attempt to promote religion and a clear violation of the First Amendment's Establishment Clause.

"By pursuing this project, you are inviting litigation that will come at the expense of Arkansas taxpayers, all for the purpose of promoting your personal religious beliefs," the group's letter states.

The group noted that it has litigated cases involving church-state separation and the rights of humanists, other nontheists and Christians in state and federal courts across the nation, including "a recent victory involving a church-state violation" in Baxter County, in which a federal judge ruled that a Nativity scene displayed on the Baxter County Courthouse grounds violated the First Amendment prohibition on the establishment of religion.

"We respectfully request that you scrap this project and focus your attention on matters that are more relevant to the real-life needs of your constituents," the group's letter said.

In response, Rapert said that "I am committed to following Supreme Court precedent on this issue.

"The Supreme Court approved a Ten Commandments monument on a state Capitol grounds in 2004, and the Eighth Circuit approved a Ten Commandments monument in a public park in 2005," he wrote in an email.

"It is settled law that a Ten Commandments monument such as the one we intend in Arkansas is in full compliance with the Constitution. Act 1231 was passed by 99 out of 135 state legislators and signed into law by Gov. Asa Hutchinson in 2015 and will be fulfilled according to state law," Rapert said.

In April, Hutchinson signed into law legislation requiring the secretary of state to arrange for a privately funded Ten Commandments monument to be placed on the Capitol grounds in Little Rock.

Act 1231 states that the "placing of a monument to the Ten Commandments on the grounds of the Arkansas State Capitol would help the people of the United States and of the state of Arkansas to know the Ten Commandments as the moral foundation of the law." It requires the secretary of state to permit and arrange for the monument to be designed, constructed and paid for by private entities at no expense to the state. Similar monuments have been constructed in Oklahoma and Texas.

Oklahoma officials removed their monument from the Oklahoma Capitol in October at the order of a county judge. The Oklahoma Supreme Court ruled in June that the monument violated the Oklahoma Constitution.

If the constitutionality of the monument is challenged in court, the attorney general may prepare or present a legal defense of the monument or request the Liberty Institute to prepare and present a legal defense, according to Act 1231. Rapert has said the Liberty Institute has agreed to defend the state for free if asked to do so.

The American History & Heritage Foundation Inc., a nonprofit registered to Travis W. Story of Fayetteville, is listed as the Arkansas monument's private sponsor on the GoFundMe account. The nonprofit filed with the secretary of state's office on Oct. 19 of last year, according to the office's records.

COLUMNISTS

# Another graven image

## Upon the grounds of the state Capitol

*PAUL GREENBERG*

Exhibit # 9

These must be the end times, for the lion and lamb were both represented on the grounds of Arkansas' state Capitol for the grand unveiling of Ten Commandments No.

2. In the opposite corner was the most diverse crowd of animals political and otherwise assembled since old Noah unloaded his ark.

A crowd of several dozen preachers and legislators was there to celebrate this command performance. While delegations from the Satanic Temple and the American Civil Liberties Union plus still other outfits had gathered on the state Capitol's rain-sodden grounds to protest the entire proceedings and to promise/threaten that litigation would follow celebration soon enough.

If this circus had a ringmaster, it had to be Jason Rapert, state senator from Conway. In addition to serving as president of the American History and Heritage Foundation that put up the money to buy the second of two such monuments after the first one allegedly was run over by Michael Reed of Van

Buren, who was found mentally unfit and hustled off to the State Hospital where he now resides.

Brother Rapert not only has a rug on the floor and a title on the door but his own foundation and its own vast store of legalese at his command. For what would a prophet be these oh-so-modern days without a sales pitch? Here's a sample of Senator Rapert's: "The sole reason that we donated this monument to the state of Arkansas is because the Ten Commandments are an important component to the foundation of the laws and the legal system of the United States of America and of the state of Arkansas. Passive acknowledgments of the role played by the Ten Commandments in our nation's heritage are common throughout America, and the Supreme Court ruled in 2004 that such monuments are constitutional."

So all of us are supposed to believe that the reasons for this latest blend of church and state are purely secular? It's as if Moses had come down from Sinai proclaiming not a religious revelation but that he'd been given only a secular code of law, the better to withstand any legal changes. This is less revelation than rationalization. Which is what happens when, yielding to political and legal pressures, men make a confession less of faith than of faithlessness.

Uh-huh. Ain't nobody here but us idolators. The line forms to your immediate left. Leading the queue is Lucien Greaves, co-founder of the Satanic Temple of Salem, Mass.—yes, that Salem, site of the original witch hunt on this continent. Which set the sad precedent for many an inquisition to follow in this supposed land of the free and home of the brave. Mr. Greaves' group proposed a 10-foot-tall bronze image of Baphomet, complete with a goat's head and angel's wings. The nightmarish image is supposed to represent religious pluralism but comes closer to summing up irreligious nuttism.

Oh, First Amendment to the Constitution! What crimes not just political but aesthetic are carried out in thy name! Hey, it's a free if not anarchic country and everyone is free to dream up his own god to worship in his own way, however outlandish.

But fair is fair: If these zealots are willing to let us respectables practice our own religious faiths, we the vast majority should let others do their thing.

America, today's Rome, might do well to note how the Roman empire treated the multitude of sects that sprang up during its long decline—with tolerance.

To quote English historian Edward Gibbon: "The various modes of worship which prevailed in the Roman world were all considered by the people as equally true; by philosopher as equally false; and by the magistrate as equally useful." Rome's centuries of decline were longer than many another civilization's whole history. Why argue with success?

Judging just by longevity, toleration would seem to make a lot more sense than dancing to the tune of that old devil intolerance. If such a policy was good enough for the Caesars, why not for us? The proof is in the results, and their lesson is that tolerance pays. Clio, muse of history, has many a moral yet to leave with us before her story is concluded. Let us heed her while there is yet time. Just because her song contains no surprises is no reason to miss it. Now let us go and study.



*Paul Greenberg is the Pulitzer Prize-winning editorial writer and columnist for the Arkansas Democrat-Gazette.*

8/31/2018 Arkansas Democrat-Gazette | Wednesday, June 28, 2017 | 1A

# Ten Commandments in at Capitol

## ACLU, Satanists promise lawsuits

*BRIAN FANNEY*
*ARKANSAS DEMOCRAT-GAZETTE*
*AND EMMA PETTIT*
*ARKANSAS ONLINE*

**Arkansas Democrat-Gazette/JEFF MITCHELL**

**Scott Stewart, a senior pastor at the Agape Church in west Little Rock, checks out the Ten Commandments monument Tuesday on the state Capitol grounds. The design was taken from the tablet in Cecil B. DeMille's 1956 film of the same name.**

Exhibit # 10

Cave v. Martin, Orsi Requests for Admissions propounded to Secretary of State Martin, Page 000156
http://digital.olivesoftware.com/Olive/APA/ArDemocrat/PrintArticle.aspx?mode=text&href=ARDEMOCRAT%2F2017%2F06%2F28&id=Ar00104 1/7

Arkansas Democrat-Gazette/JEFF MITCHELL
State Sen. Jason Rapert, R-Bigelow, who sponsored the legislation that led to installation of the Ten Commandments monument on the state Capitol grounds, said Tuesday after the unveiling that the American History & Heritage Foundation, of which he is a board member, would turn to helping others place Ten Commandments monuments around the country.

More information on the Web

Photos of monument installation
arkansasonline.com/galleries

A 6-foot-tall monument to the Ten Commandments was installed at the state Capitol on Tuesday morning amid a continuing debate on the legality of religious symbols on public property.

A small crowd stood near a walkway that connects the Capitol to the Arkansas Supreme Court to watch the monolith be lifted and lowered into place. Etched on the statue's granite face are the Ten Commandments as well as an eye to represent the all-seeing eye of God; an eagle atop a flag; and Stars of David.

Among the observers was Sen. Jason Rapert, R-Bigelow, who sponsored Act 1231 of 2015, which required the monument be erected somewhere on the Capitol grounds.

"It's always good to see things fulfilled, and I think it's a great day for the people of Arkansas," he said in an interview. Rapert also noted the Ten Commandments monument was paid for by more than $26,000 in private donations.

He pointed to the various monuments on the Capitol lawn, which celebrate firefighters, fallen Confederate soldiers and Vietnam veterans.

"We have many monuments on our Capitol grounds that honor many various different things, but we did not have a monument that gave honor to the historical, moral foundation of law. The Ten Commandments is one of the first written codes of law ever. That's why we chose to build that particular monument."

Soon after the monument was set on its concrete foundation, the Satanic Temple and the American Civil Liberties Union of Arkansas said they would act on their repeated promises to sue the state if the monument was erected.

The Arkansas Society of Freethinkers also said in a statement that it expected a lawsuit to be filed soon and that legal "precedents nationwide require the removal of the monument."

The Ten Commandments monument quotes the Bible and includes the words: "I AM the LORD thy God. Thou shalt have no other gods before me. Thou shalt not make to thyself any graven images. Thou shalt not take the Name of the Lord thy God in vain. Remember the Sabbath day, to keep it holy."

In an interview, Rita Sklar, executive director of the ACLU of Arkansas, said she planned to challenge the monument as a violation of the First Amendment to the U.S. Constitution.

"There is no law in federal, state or local government — that's standing any more, anyway — that admonishes Americans to have no other God before one God," she said.

The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The Arkansas Constitution also forbids the state from favoring one religion over another.

It states: "No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship, above any other."

Sklar rejected Rapert's argument that the monument served a historical purpose rather than a religious one.

"This is to make a statement," Sklar said. "This is to win supporters."

The particular version of the Ten Commandments selected amounts to a religious choice, she added.

"There's the Catholic version. There's the Protestant version. There's the Hebrew version," she said. "The selection of these particular commandments has a special place in the Christian religion in particular, and this wording is from the Protestant sect of the Christian religion."

While the ACLU of Arkansas plans to fight to take down the Ten Commandments, Lucien Greaves, co-founder of the Massachusetts-based Satanic Temple, said his organization planned to take a different tack.

"We're not actually suing to have the Ten Commandments monument taken down," he said. "It's to have our monument put up."

The Satanic Temple wants to erect an 8½-foot-tall bronze statue of Baphomet — a deity that is part man, part goat — on the state grounds.

It began the process to seek approval by going before the Capitol Arts and Grounds Commission. However, Act 274 of 2017, by Rep. Kim Hammer, R-Benton, halted the temple's progress.

The act, which went into effect in February, requires lawmakers to approve proposals to erect new monuments before they can be considered by the Capitol Arts and Grounds Commission.

"It doesn't make our exclusion legal, and obviously we are going to sue," Greaves said. "The nature of the complaint is different, and for that reason we stand out on our own."

Rapert said the Baphomet statue was "meant to disrupt what we were doing."

Chris Powell, a spokesman for Secretary of State Mark Martin, said $1,558.70 was donated for maintenance. Powell said a recent replacement of the Little Rock Nine Memorial's base cost $7,500.

Act 1231, which authorized the Ten Commandments monument, allows Arkansas Attorney General Leslie Rutledge to choose whether her office or the Liberty Legal Institute would defend the state in case of a lawsuit. Rapert said the institute had agreed to do the work for free.

Judd Deere, a spokesman for Rutledge, declined to comment about what Rutledge might decide.

"We haven't seen a lawsuit, so at this time it would be inappropriate for me to offer comment," he said.

Rapert said the U.S. Supreme Court's building includes references to the Ten Commandments.

"If it's good enough for the United States Supreme Court, it is good enough for the state Capitol of Arkansas," he said.

However, Sklar said there's a difference between historic displays and Arkansas' new installation.

The U.S. Supreme Court handed down two decisions in 2005 that pertained to Ten Commandments displays.

In a 5-4 decision, the high court held in *McCreary County v. American Civil Liberties Union* that Ten Commandments displays needed to be removed from two Kentucky courthouses because they were erected along with other religious passages, and the religious motivations were clear.

But the same day, the court issued a separate 5-4 ruling in *Van Orden v. Perry* holding that the Texas Capitol could keep its decades-old Ten Commandments

monument because it conveyed historic and social meaning, and was merely one of several historical displays.

"Religious monuments have been upheld by the court in much older buildings where the monument has existed for a long time and is part of the historic structure," Sklar said. "Nobody is going to take down the U.S. Supreme Court or the U.S. Capitol, but they have not looked so well on newer monuments that are clearly erected for religious purposes."

While talk of lawsuits dominated the news Tuesday afternoon, the small crowd that gathered in the morning to witness the monument's installation noted its handiwork and design.

Scott Stewart, a senior pastor at the Agape Church in west Little Rock, stopped by on the sunny morning because his church raised donations to fund the monument.

"As opposed to removing something, [Arkansas] is marking a trend in the nation by replacing something," Stewart said as he watched workers wipe dust from the statue's base. The pastor said he liked the look of the stone, though he would have made it more "contemporary" if he designed it himself.

Each line and design was sandblasted into the slab of mahogany granite from Milbank, S.D., said Gary Mosier, sales manager for Wilbert Memorials, based in Parsons, Kan.

The design of the Ten Commandments statue comes from Cecil B. DeMille's 1956 film with the same title, Mosier said. DeMille advertised the movie by unveiling granite carvings of the biblical laws across the country.

Mosier's company made a copy of the original carving, which was erected in Texas and carved by hand, he said.

Wilbert Memorials employees Richard Nance and Mark Giltner high-fived after the 2-ton slab descended onto the setting compound without making a mess. Nance shaved the dried mixture off the base as Giltner spritzed rubbing alcohol onto the stone's face.

Giltner estimated that he's installed about 20 other Ten Commandments statues during his career, mostly in Oklahoma.

Nance, still a "greenhorn," wiped his hands on his shirt and admired his work.

"Practice makes perfect, you know what I mean?" he said. "Looks good, though."

Now that the monument has been installed, Rapert said, the American History & Heritage Foundation, of which he is a board member, would turn to helping others place Ten Commandments monuments around the country.

"We're obviously committed to helping people replicate what we've done," he said.

Expert Report Submitted in

*Donna Cave v. John Thurston*

No. 4: 18-cv-00342-KGB

*Anne Orsi v. John Thurston*

No. 4: 18-cv-343-KGB

Mark David Hall

Herbert Hoover Distinguished Professor of Politics

Faculty Fellow William Penn Honors Program

George Fox University

November 6, 2019

Exhibit B

**TABLE OF CONTENTS**

I. Qualifications and Research Relied Upon ... 1

II. Overview ... 2

III. Why History Matters ... 4

IV. The Historical Understanding of the Establishment Clause ... 11

State Governments on Church and State ... 12

*Connecticut* ... 14
*Pennsylvania* ... 17
*Georgia* ... 20

Church and State in the Continental and Confederation Congresses ... 23
Church-State Relations in the New Republic ... 28
Conclusion ... 39

V. America's Long Tradition of Religious Displays on Public Property ... 39

Crosses ... 39
Ten Commandments ... 43
Religious Inscriptions on Public Buildings ... 59
Memorials With Symbols/Language From Minority Faiths ... 61

VI. Freedom From Religion? The Rise of Strict Separationism ... 67

Church, State, and the Establishment Clause ... 68
The Anti-Catholic Origins of Separationism ... 72
The Continued Relevance of Anti-Catholic Animus ... 78
Separationist Rhetoric Becomes a Reality ... 83

VII. Conclusion ... 84

## I. Qualifications and Research Relied Upon

1. I am the Herbert Hoover Distinguished Professor of Politics and Faculty Fellow in the William Penn Honors Program at George Fox University. I am also Associated Faculty at the Center for the Study of Law and Religion at Emory University and a Senior Fellow at Baylor University's Institute for Studies of Religion. This report relates to my opinions as an expert in the history of religious liberty, church-state relations, and religion and politics in the United States. My background, experience, and publications are summarized in my curriculum vitae, which is attached to this report. I began teaching political science full time after receiving a Ph.D. in Government from the University of Virginia in 1993.

2. I am the author or co-editor of a number of works on church-state relations, the most significant of which are *Great Christian Jurists in American History*, ed. with Daniel L. Dreisbach (Cambridge, 2019); *Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth* (Nelson, 2019); *Faith and the Founders of the American Republic*, ed. with Dreisbach (Oxford, 2014); *The Sacred Rights of Conscience*: *Selected Readings on Religious Liberty and Church-State Relations in the American Founding*, ed. with Dreisbach (Liberty Fund, 2009); *The Forgotten Founders on Religion and Public Life*, ed. with Dreisbach and Jeffry H. Morrison, (Notre Dame, 2009); *The Founders on God and Government*, ed. with Dreisbach and Morrison (Rowman & Littlefield, 2004); "America's Founders, Religious Liberty, and the Common Good," *University of St. Thomas Law Journal* 15 (2019): 642-61; "Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment," *American Political Thought* 3 (Spring 2014): 32-63; "Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in

Religion Clause Cases," *Oregon Law Review* 85 (2006): 563-614.  As well, much of my work on American political thought touches these issues.  See, for instance, *Roger Sherman and the Creation of the American Republic* (Oxford, 2013) and *The Political and Legal Philosophy of James Wilson, 1742-1798* (Missouri, 1997).  Portions of this report are drawn from these and other publications.

     3.   In preparing this report, I reviewed:

    a.   The complaint in *Donna Cave v. John Thurston*, No. 4: 18-cv-00342-KGB,

    b.   The complaint in *Anne Orsi v. John Thurston*, No. 4: 18-cv-343-KGB,

    c.   An Act Concerning the Placement of a Ten Commandments Monument Display on the State Capitol Grounds, April 7, 2015,

    d.   Declaration of Judge E.J. Ruegemer for *Card v. City of Everett*, No. CV03-2385L Sept. 19, 2003, and

    e.   The sources cited in the footnotes of this report.

     4.   I base the following opinions on my own knowledge, research, experience, and publications, and the work of other academics and writers.  The materials I have used to research and write this report are the standard sources used by other experts in my field.

## II.  Overview

     5.   I have been asked by the State of Arkansas to provide testimony concerning the Supreme Court's use of history in Religion Clause cases, the historical understanding of the Establishment Clause, the Nation's and States' history and tradition of including religious displays on public property, and the origin of the notion that church and state should be strictly separated.  Although I review a number of court cases in this report, I am not an attorney and do not presume to offer a legal opinion on any of the matters that I discuss.

6.   In *Everson v. Board of Education* (1947), Justices Hugo Black and Wiley Rutledge insisted in their respective opinions that the Establishment Clause must be interpreted in light of its "generating history."  Few justices have challenged this claim, and conservative and liberal judges alike continue to make historical arguments to support their Establishment Clause opinions.

7.   In *Everson,* Justice Black concluded that the "First Amendment has erected a wall between church and state.  That wall must be kept high and impregnable."[1]  Although they differed with respect to how the case should be decided, Justice Rutledge agreed with Black's historical analysis.  By exploring a wide range of State practices, actions of the Continental and Confederation Congresses, debates over the language of the First Amendment, and the acts of federal officials in the new republic, I show that there is little evidence to support the proposition that the founders desired to strictly separate church and state.  The historical understanding of the Establishment Clause does not require religious practices, language, images, and monuments to be banished from the public square.

8.   Moving from the founding era, I demonstrate that America's national government, as well as state and municipal governments, have a long history of erecting, or allowing to be erected, religious monuments or monuments containing religious symbols on public property.  As well, religious phrases and images are often incorporated into public buildings.  These practices are, in Chief Justice Warren Burger's words, "deeply embedded in the history and tradition of this country."[2]

---

[1] *Everson v. Board of Education*, 330 U.S. 1, 18 (1947).

[2] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

9. In the nineteenth and early twentieth centuries, anti-Catholic animus gave rise to a form of church-state separation, the primary effect of which was to discriminate against Roman Catholics. In the mid-twentieth century, the United States Supreme Court began to apply the doctrine that church and state should be separated to practices favored by Protestants. This turn of events, in conjunction with other factors, caused many Americans to reject the idea that church and state should be strictly separated.

## III. Why History Matters

10. In *Everson v. Board of Education* (1947), Justice Hugo Black contended that the "meaning and scope of the First Amendment" have been interpreted in "light of its history and the evils it was designed forever to suppress."[3] These evils included

> efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of nonbelief in their doctrines, and failure to pay taxes and tithes to support them.[4]

11. Black's majority opinion concluded that because New Jersey's program of reimbursing parents for the cost of transporting their children to schools, including religious schools, was not the sort of evil the founders desired to prohibit, that the State's program was constitutional.

12. Justice Wiley Rutledge and three other justices dissented from the majority's holding, but Rutledge agreed with Black that the First Amendment must be understood in light of the founders' views. In his words, "[n]o provision of the Constitution is more

[3] 330 U.S. 1, 14-15 (1947).

[4] *Ibid*., 9.

closely tied to or given content by its generating history than the religious clause of the First Amendment. It is at once the refined product and the terse summation of that history."[5]

13. Since *Everson*, the vast majority of jurists who have written Religion Clause opinions have made historical arguments to support their conclusions.[6] Judicial liberals have been even more likely to appeal to founding era history than have judicial conservatives.[7] I provide a detailed study of the justices' use of history in Religion Clause opinions in a 2006 law review article, but discuss only the most significant cases here.[8]

14. One of the most extensive discussions of the Court's use of history was made by Justice William Brennan in his concurring opinion in *Abington School District v. Schempp*, 374 U.S. 203 (1963). He contended that:

> the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers. It is a line which the Court has consistently sought to mark in its decisions expounding the religious guarantees of the First Amendment. What the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the

---

[5] *Ibid.*, 33.

[6] Mark David Hall, "Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases," *Oregon Law Review* 85 (2006): 563-613. A slightly revised version of the article was reprinted in the *High Court Quarterly Review* 5 (2009): 109-153.

[7] Hall, "Jeffersonian Walls and Madisonian Lines," 580. Jurisprudential liberals favor individuals or groups over the State in Free Exercise cases, and oppose government support of religion in Establishment Clause ones. Conservatives hold the opposite positions. These definitions are compatible with those used in Lee Epstein, Jeffrey Segal, Harold Spaeth, and Thomas Walker, *The Supreme Court Compendium: Data, Decisions, and Developments* 3rd (Washington, D.C.: CQ Press, 2003), 597-99.

[8] *Ibid*., 563-613.

> organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. When the secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government.[9]

15. Like Justice Black in *Everson*, Brennan emphasized that the founders wanted to prohibit coercion in matters of faith. He specifically noted that there are "myriad forms of involvements of government with religion" that do not violate the Establishment Clause.[10]

16. In the 1983 case of *Marsh v. Chambers*, Chief Justice Burger made sweeping historical arguments in an opinion upholding the constitutionality of legislative chaplains and prayer.[11] Drawing from a wide range of documents, actions, and founders, Burger demonstrated that legislative chaplains and prayer were widespread in the founding era.[12] He emphasized that the men who drafted and approved the First Amendment agreed to hire legislative chaplains and approved of legislative prayer.[13] Important as well, in his opinion, was that the Nation and States had a long tradition of engaging in these practices. As such, they are "deeply embedded in the history and tradition of this country."[14]

---

[9] 374 U.S. 203, 294-95 (1963).

[10] *Ibid*., 295.

[11] 463 U.S. 783 (1983).

[12] *Ibid*., 786-95.

[13] *Ibid*., 787-88.

[14] *Ibid*., 786. To support this proposition, Burger quoted his majority opinion in *Walz v. Tax Commissioner*: "It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence, and indeed predates it. Yet an unbroken practice of according

17. The following year, Chief Justice Burger wrote the majority opinion in a case involving a nativity scene on public property.  He found it to be constitutional, reasoning that "[t]here is an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life from at least 1789."[15]  Particularly relevant for the case currently being litigated, he noted that the "very chamber in which oral arguments on this case were heard is decorated with a notable and permanent—not seasonal—symbol of religion: Moses with the Ten Commandments."[16]

18. In the 1989 case of *County of Allegheny v. ACLU*, Justice Blackmun's majority opinion found one holiday display on public property to be constitutional and another to be unconstitutional.[17]  In an opinion concurring in part and dissenting in part, Justice Anthony Kennedy observed that:

> Our cases disclose two limiting principles: government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it, in fact, "establishes a [state] religion or religious faith, or tends to do so." *Lynch v. Donnelly*, 465 U.S. at 678.[18]

19. With respect to religious displays on public property, he concluded that:

> [T]he principles of the Establishment Clause and our Nation's historic traditions of diversity and pluralism allow communities to make reasonable judgments respecting the accommodation or acknowledgement of holidays with both cultural and religious aspects.  No constitutional

---

the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside." 397 U.S. 664, 678 (1970).

[15] *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

[16] *Ibid.*, 677.

[17] 492 U.S. 573 (1989).

[18] *Ibid.*, 659.

> violation occurs when they do so by displaying a symbol of the holiday's religious origins.[19]

20. The significance of history for contemporary Religion Clause jurisprudence is illustrated well by the Ten Commandment cases of *Van Orden v. Perry*,[20] and *McCreary County v. ACLU of Kentucky*.[21] Authors of seven of the ten opinions in these cases collectively made sixty-two distinct appeals to the founders and founding era history. They also discussed the relevance of practices since that time.[22]

21. In *Van Orden*, five justices agreed a granite monument commemorating the Ten Commandments on the Texas State House grounds did not violate the Establishment Clause. However, in *McCreary* five justices declared that paper copies of the Ten Commandments posted in a county courthouse to be unconstitutional. Justice Breyer cast the deciding vote in both cases. In addition to historical arguments, justices considered factors such as the context of both displays.[23] In voting to uphold the Ten Commandments monument, Breyer emphasized that declaring it to be unconstitutional would "exhibit a hostility towards religion that has no place in our Establishment Clause

---

[19] *Ibid.*, 679. In his opinion, Kennedy explained that it is the principles embraced by the founders that are determinative. Therefore, the fact that "displays commemorating religious holidays were not commonplace in 1791" does not entail that such displays are inconsistent with the values underlying the Establishment Clause. *Ibid.*, 669.

[20] 125 S. Ct. 2854 (2005).

[21] 125 S. Ct. 2722 (2005).

[22] Hall, "Jeffersonian Walls and Madisonian Lines," 600.

[23] See especially *Van Orden v. Perry*, 545 U.S. 677, 700-05 (2005) (Breyer, J., concurring).

traditions."[24]  The Texas monument, it is worth noting, is virtually identical to the one currently being challenged in Arkansas.[25]

22. In *Town of Greece v. Galloway*, 572 U.S. ___ (2014), justices considered the constitutionality of a city council's practice of opening its meetings with prayer.  In his majority opinion, Kennedy observed that the "Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures."[26]  Drawing heavily from founding era practices, and practices since that time, he concluded that opening a city council meeting with prayer is constitutional.  The United States Court of Appeals for the Eighth Circuit has stated that *Greece v. Galloway* provides "an unequivocal directive" that "'the Establishment Clause *must* be interpreted by reference to historical practices and understanding.'"[27]

23. Concurring opinions by Justices Alito and Thomas, like Justice Kagan's dissenting opinion, all made historical arguments to support their respective conclusions. It is noteworthy that Justice Kagan specifically noted that she agreed with the majority that the issue is "whether the prayer practice in the Town of Greece fits within the

---

[24] *Ibid.*, 704 (Breyer, J., concurring).  Like Justice Kennedy in *County of Allegheny*, Justice Thomas emphasized that framers of the Establishment Clause primarily intended to prevent coercion in matters of faith.  Accordingly, he would have upheld both displays because neither was coercive.  *Ibid.*, 692-98 (Thomas, J. concurring).

[25] Compare the image of the Texas monument available here: http://www.eaglesmonuments.com/states/Texas.html (accessed June 28, 2019) to the photo attached as Appendix #1.

[26] 572 U.S. ___, 9 (2014) (Kennedy, J., majority opinion).

[27] *New Doe Child #1 v. United States*, 901 F.3d 1015, 1020 (2018) (internal quotation marks omitted and emphasis added).

tradition long followed in Congress and the state legislatures."[28] She, along with Justices Ginsburg, Kagan, and Breyer, interpreted this history differently than the majority, but it bears emphasizing that no justice rejected the proposition that history plays a critical role in helping justices resolve such cases.

24. In the Supreme Court's most recent Establishment Clause case, *American Legion v. American Humanist Association*, the justices considered the constitutionality of an "immense Latin cross [that] stands on a traffic island at the center of a busy three-way intersection in Bladensburg, Maryland."[29] By a vote of 7-2, they held that it did not violate the First Amendment. Justice Alito noted that in recent Establishment Clause cases, justices have not relied upon the *Lemon* Test, but have instead "taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance."[30] He pointed to both *Marsh* and *Galloway* as cases where justices relied on founding era history *and* American traditions. He concluded that where "categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are likewise constitutional."[31] The Bladensburg Cross, in the Court's estimation, fits this category.[32]

25. *American Legion v. American Humanist Association* generated six opinions, none of which denied the importance of history for helping justices decide Establishment Clause cases. Of particular note, Justice Neil Gorsuch, in his concurring opinion,

---

[28] 572 U.S. ___, 9 (2014) (Kagan, J. dissenting).

[29] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2103 (2019), (Ginsburg, J., dissenting).

[30] *Ibid.*, 2087 (plurality opinion).

[31] *Ibid.*, 2089.

[32] *Ibid.*

contended that monuments need not be ancient to be constitutional. He asked, for instance, "about the Star of David monument erected in South Carolina in 2001 to commemorate victims of the Holocaust, or the cross that marines placed in California in 2004 to honor their comrades who fell during the War on Terror?"[33] It is clear that he believes both monuments are as constitutional as the Bladensburg Cross.[34]

26. Justice Ginsburg, writing for herself and Justice Sotomayor, dissented from the Court's decision, but not its use of history. Indeed, she referenced three different founders and founding documents to buttress her opinion.[35] Particularly relevant to Ginsburg was her view that "the Latin cross has been the 'defining symbol' of Christianity."[36]

27. Justices regularly disagree about how to interpret the Establishment Clause, but there is a widely shared consensus that its "generating history" informs its meaning. Conservatives and liberals alike appeal to the founders' views to help them interpret the Establishment Clause, and both recognize the relevance of historical practices since that time.

## IV. The Historical Understanding of the Establishment Clause

28. Since *Everson*, justices have insisted that "no provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment. It is at once the refined product and the terse summation of that

---

[33] *Ibid*., 2102 (Gorsuch, J., concurring).

[34] *Ibid*.

[35] *Ibid*., 2103-16 (Ginsburg, J., dissenting).

[36] *Ibid*., 2107.

history."[37] Some justices and academics have contended that this history requires the strict separation of church and state, but this position *appears* tenable only if one focuses on just a few documents penned by Madison and Jefferson years before and after the First Amendment was drafted and ratified.[38] Consideration of a wide range of founders and founding era practices reveals little support for the erection of a wall of separation between church and state. And it certainly does not require a religion-free public square.

**State Governments on Church and State**

29. Some States never had an established church, and after 1776 those that did either disestablished them or moved to a system of plural or multiple establishments.[39] But most continued to protect, encourage, and support Christianity and/or Christian practices. For example, when delegates met in Philadelphia to draft a new constitution, Georgia, New Hampshire, Massachusetts, New Jersey, North Carolina, South Carolina, Vermont, and even Rhode Island required civic officials to be Protestants, whereas Delaware, Maryland, and Pennsylvania insisted that they must "merely" be Christians.

---

[37] 330 U.S. 1, 33 (1947).

[38] Especially important for this separationist narrative are Jefferson's Virginia Statute for Religious Liberty (1786) and letter to the Danbury Baptists (1802) and Madison's Memorial and Remonstrance (1785) and Detached Memoranda (c. 1818). I explain why it is a mistake to rely on a few isolated documents by these men in my articles "Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment," "Jeffersonian Walls and Madisonian Lines," and "Everson's Syllogism," available at: https://www.lawliberty.org/2017/01/12/eversons-syllogism/ (accessed July 1, 2019).

[39] Usually, establishments involve a State or Nation favoring a particular denomination; often providing tax dollars to support it. A plural or multiple establishment generally requires individuals to support a church of their choosing. Michael McConnell provides an excellent summary of the founding generation's understanding of what it means to have a religious establishment in "Establishment and Disestablishment at the Founding, Part I: Establishment of Religion," *William and Mary Law Review* 44 (April 2003), 2105-208.

New York and Virginia did not have religious tests, and the interesting case of Connecticut is discussed below.[40]

30. Of course, some States promoted religion more than others; a good rule of thumb is that the northern states (with the partial exception of Rhode Island) were more engaged in such practices than the southern ones.[41] A full survey of how States promoted faith goes well beyond the scope of this report, but brief consideration of three different States (one from each region) and a few lesser-known but still important founders helps show that there is little evidence that America's civic leaders wanted to build a wall of separation between church and state.[42] Indeed, most of them seemed to believe, as

[40] Dreisbach and Hall, *Sacred Rights*, 242-64; John K. Wilson, "Religion Under the State Constitutions, 1776-1800," *The Journal of Church and State* 32 (Autumn 1990), 764; Derek Davis, *Religion and the Continental Congress:* 1774-1789 (New York: Oxford University Press, 2000), 34; and Gerard V. Bradley, "The No Religious Test Clause and the Constitution of Religious Liberty: A Machine That Has Gone of Itself," *Case Western Law Review* 37 (1987), 681-87. I should perhaps note that I do not support religious tests for office or many of the laws/practices discussed in Section IV. I reference them merely to help show that America's founders did not embrace the strict separation of church and state.

[41] Rhode Island never had an established church, but even this colony did not completely separate church and state. For instance, in 1647 its General Court agreed to statutes punishing witchcraft and sodomy (and cited St. Paul in support of the latter). And the last sentence of its criminal laws encouraged all men to "walk as their consciences persuade them, every one in the name of his God; and let the saints of the Most High walk in this colony without molestation, in the name of Jehovah their God, for ever and ever." *The Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations, 1647-1719* ed. John D. Cushing (Wilmington: Michael Glazier, 1977), 21, 25, 44. William G. McLoughlin reports that Seventh Day Baptists in the state "petitioned the legislature in 1784 for the repeal of a law requiring all persons to attend church on Sunday; the petition was granted, but the existence of the law in that state dominated by Baptists and Quakers indicated the pervasiveness of the belief that the Sabbath must be kept holy." *New England Dissent, 1630-1883, The Baptists and Separation of Church and State* (Cambridge: Harvard University Press, 1971), 2: 758.

[42] A good overview of church-state relations in America from the colonial era to the passage of the First Amendment may be found in Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford

evidenced by their words and deeds, that civic authorities should protect, promote, and encourage religion.[43]

**Connecticut**

31. Consider, for instance, the case of Connecticut's Roger Sherman. He is the only statesman to help draft and sign the Declaration and Resolves (1774), the Articles of Association (1774), the Declaration of Independence (1776), the Articles of Confederation (1777, 1778), and the Constitution (1787). He served longer in the Continental and Confederation Congresses than all but four men, and he was regularly appointed to key committees, including those charged with drafting the Declaration of Independence and the Articles of Confederation. At the Constitutional Convention, Sherman often outmaneuvered Madison and, according to David Brian Robertson, the "political synergy between Madison and Sherman . . . may have been necessary for the Constitution's adoption."[44] He was also a Representative and Senator in the new republic where, among other things, he played a major role in drafting the Bill of Rights.

---

University Press, 1986). See also, the introductions to each chapter, and the primary sources documents collected in Dreisbach and Hall, *Sacred Rights of Conscience*.

[43] Emerging research suggests that Hebrew religious ideas deserve credit for the legitimation and development of modern republican forms of government. For example, Eric Nelson has shown that the sixteenth- and seventeenth-century rediscovery of Hebrew grammars and rabbinic materials transformed early European political thought. *The Hebrew Republic: Jewish Sources and the Transformation of Political Thought* (Cambridge: Harvard University Press, 2010). The explosion of Hebrew scholarship across Europe during this period affected virtually every aspect of intellectual life. As Nelson explains, "Readers began to see in the five books of Moses not just political wisdom, but a political constitution." *Ibid.*, 16. "Moses was now to be understood as a *lawgiver*, as the founder of a *politeia* in the Greek sense" (emphasis in original). *Ibid.*

[44] David Brian Robertson, "Madison's Opponents and Constitutional Design," *American Political Science Review*, 99 (May 2005): 225-43, 242.

32. After America declared independence, many States revised their laws. Connecticut asked Roger Sherman and Richard Law to undertake this endeavor in 1783. They worked on their project throughout the summer and fall, and the General Assembly reviewed their work, accepted, rejected, and amended their proposals, and approved the new State code in January of 1784. Particularly relevant for present purposes is the statute Sherman drafted to protect religious liberty in the State. Although it was passed about the time the Virginia Statute for Religious Liberty became law, and even though Sherman helped draft the First Amendment and Jefferson did not, this statute has been almost completely neglected by Supreme Court justices and scholars alike. Sherman's religious liberty bill began with a preamble that highlights the importance of religion and the duty of civil authorities to promote the Christian faith:

> As the happiness of a people, and the good order of civil society, essentially depend upon piety, religion, and morality, it is the duty of the civil authority to provide for the support and encouragement thereof; so as that Christians of every denomination, demeaning themselves peaceably, and as good subjects of the State, may be equally under the protection of the laws: and as the people of this State have in general, been of one profession in matters of faith, religious worship, and the mode of settling and supporting the ministers of the Gospel, they have by law been formed into Ecclesiastical Societies, for the more convenient support of their worship and ministry: and to the end that other denominations of Christians who differ from the worship and ministry so established and supported, may enjoy free liberty of conscience in the matters aforesaid.[45]

33. This preamble illustrates well the common view among America's founders that Christianity was necessary for public happiness and political prosperity.[46] Because

[45] *The First Laws of the State of Connecticut*, ed. John D. Cushing (Wilmington: Michael Glazier, 1982), 21.

[46] James Hutson, "'Nursing Fathers': The Model of Church-State Relations in America from James I to Jefferson," in *Forgotten Features of the Founding: The Recovery of Religious Themes in the Early American Republic* (Lanham: Lexington Books, 2003), 45-72.

religion is so important, many founders continued to believe that governments should support it. This is crystal clear from Connecticut's revised statutes, which among other things:

a. required all citizens "on the Lord's-Day carefully to apply themselves to duties of Religion and Piety, publicly and privately";

b. required all citizens to attend church each Sunday;

c. provided tax money to support churches and ministers;

d. punished Sabbath breakers;

e. required each family to possess a Bible and instructed town leaders to "supply" Bibles and "a suitable Number of Orthodox Catechisms, and other good Books of practical Godliness" to families in need;

f. required civil office holders and voters to take oaths witnessed "by the Everlasting GOD";

g. required families who adopted "an Indian Child" to instruct him or her in "the principles of the Christian Religion";

h. passed numerous statutes reflecting Christian morality on issues such as adultery, divorce, drunkenness, fornication, gaming, and horse racing.[47]

34. Connecticut's leaders believed that State support for Christianity was compatible with "free liberty of conscience," at least for "Christians of every denomination." And, rather than favor Congregationalism, as had historically been the practice, the new statutes provided for a plural establishment whereby individuals would be taxed to support the churches they chose to attend (so long as they chose to attend Protestant churches).[48] These provisions favored some believers over others, although there "were only a handful of Catholics in late-18th century Connecticut and a half-dozen

[47] *First Laws of the State of Connecticut*, 213-14, 21-22, 157-60, 235-37, 258-59, 182-87, 196-97, 101, 8, 41, 43, 87, 89, 97, 67.

[48] *Ibid*., 21-22, 213-14.

Jews."[49] In other words, 99.99% of the State's citizens were Protestants. This reality perhaps explains why Connecticut, unlike virtually every other State, did not have a traditional religious test other than to require freemen and officeholders to take an oath in the name of the "Everliving God."[50]

35. The other New England States (with the partial exception of Rhode Island) had statutes similar to Connecticut's, and in general remained more convinced that States should encourage faith than the rest of the Nation. This is evidenced in part by the survival of plural establishments in these States until: 1807 (Vermont), 1819 (Connecticut), 1819 (New Hampshire), 1820 (Maine), and 1833 (Massachusetts). I have focused on Connecticut because Sherman and his protégé, Oliver Ellsworth, went on to play major roles in drafting the First Amendment.[51]

**Pennsylvania**

36. Pennsylvania was founded by the Quaker William Penn in 1681 as a haven for Quakers and other religious dissenters. Civic officials tolerated non-Quakers, but even they adopted religious tests for office and used the power of the State to promote Christian morality.[52] Quakers lost power in the 1750s, but Pennsylvania continued to protect religious liberty as evidenced by its 1776 constitution which recognized that "all

---

[49] Collier, "Common Law and Individual Rights in Connecticut Before the Federal Bill of Rights," *Connecticut Bar Journal* 76 (2002): 4.

[50] Cushing, *First Laws of Connecticut*, 196-97. Connecticut did have a law that prohibited someone raised a Christian who later repudiated key tenets of his faith from holding civic office. Taken literally, this statute does not prevent a life-long atheist or Jew from holding office. *Ibid.*, 67.

[51] On Ellsworth, see Mark David Hall, "Oliver Ellsworth: A Young Puritan in the New Republic," available at: http://www.libertylawsite.org/2017/03/27/oliver-ellsworth-a-young-puritan-in-the-new-republic/ (accessed May 15, 2018).

[52] Dreisbach and Hall, *Sacred Rights of Conscience*, 116-19.

men have a natural and unalienable right to worship Almighty God according to the dictates of their own conscience."[53]   And yet, as was the case in many States, the right to religious liberty went hand-in-hand with a religious test for political office.   In Pennsylvania, a would-be office-holder had to swear or affirm that

> I do believe in one God, the creator and governor of the universe, the rewarder of the good and the punisher of the wicked.   And I do acknowledge the Scriptures of the Old and New Testament to be given by Divine inspiration.[54]

37. As a practical matter, this test excluded few citizens from public office, but it did exclude some, notably members of Philadelphia's Jewish community.   The constitution also required that: "[l]aws for the encouragement of virtue, and prevention of vice and immorality, shall be made and constantly kept in force, and provision shall be made for their due execution."[55]

38. The Pennsylvania Constitution of 1776 stipulated that a "Council of Censors" meet every seven years to determine if the constitution needed to be amended.   When this body met in 1783, leaders of Philadelphia's Jewish synagogue submitted a petition requesting that the religious test be revised so that Jews as well as Christians could hold public office.[56]   The petition did not condemn religious tests per se, and it even seems to support banning atheists from public office.   The Council considered the petition, tabled it, and took no further action.   However, when the State rewrote its constitution in 1789-

---

[53] *Ibid*., 242.

[54] *Ibid.*

[55] *Ibid.*

[56] *Ibid*., 294-95.

90, it amended its religious test to permit any "person, who acknowledges the being of a God and a future state of rewards and punishments" to hold public office.[57]

39. In 1779, Pennsylvania passed an "act for the suppression of vice and immorality." Its preamble gives an excellent sense of what the legislature desired to encourage and discourage:

> Whereas sufficient provision has not hitherto been made by law for the due observation of the Lord's day, commonly called Sunday, and the preventing of profane swearing, cursing, drunkenness, cock fighting, bull-baiting, horse racing, shooting matches, and the playing or gaming for money or other valuable things, fighting of duels, and such evil practices, which tend greatly to debauch the minds and corrupt the morals of the subjects of this commonwealth . . .[58]

40. One of the greatest evils in the founding era was slavery, and in 1780 the Pennsylvania legislators put this institution on the road to extinction in their Commonwealth. And they did so for theological reasons, explaining that when they reflected on God's deliverance from Great Britain:

> we are unavoidably led to a serious and grateful sense of the manifold blessings which we have undeservedly received from the hand of that Being from whom every good and perfect gift cometh [James 1: 17]. Impressed with these ideas, we conceive that it is our duty, and we rejoice that it is in our power to extend a portion of that freedom to others, which hath been extended to us; and a release from that state of thralldom to which we ourselves were tyrannically doomed, and from which we have now every prospect of being delivered. It is not for us to enquire why, in the creation of mankind, the inhabitants of the several parts of the earth were distinguished by a difference in feature or complexion. It is sufficient to know that all are the work of an Almighty Hand . . .[59]

---

[57] *Ibid*., 243.

[58] *The First Laws of the Commonwealth of Pennsylvania*, ed. John D. Cushing (Wilmington: Michael Glazier, 1984), 181.

[59] *Ibid*., 282.

**Georgia**

41. The Church of England had been established in Georgia, South Carolina, North Carolina, Virginia, Maryland, and parts of New York.[60] It is not surprising that during or immediately after the War for Independence—a war fought against *England*—that this church was disestablished in each of these States. South Carolina creatively established in its place the "Protestant Christian religion" as the State's official faith in 1778, but this experiment only lasted until 1790.[61] Church and state were more thoroughly separated in the South than in New England, but even here there was hardly a wall of separation between the two. Consider, for example, the case of Georgia.

42. I focus on Georgia because one of the chief architects of church-state relations in the State, Abraham Baldwin, helped draft the First Amendment. Baldwin was born in Connecticut, graduated from Yale College, was a tutor at Yale for three years, and served as a full-time chaplain in the Revolutionary Army from 1779-1783. Yale President Ezra Stiles recruited him to be a professor of divinity, but Baldwin declined and studied law instead. He was admitted to the Fairfield bar in 1783, and moved to Georgia in 1784.[62]

43. Baldwin was elected to Georgia's General Assembly the same year he arrived in the State. After Governor Lyman Hall requested that the legislature design a school system where "[e]very encouragement [is] given to introduce religion,"[63] Baldwin drafted

---

[60] Frank Lambert, *The Founding Fathers and the Place of Religion*, (Princeton: Princeton University Press, 2003), 315.

[61] Dreisbach and Hall, *Sacred Rights of Conscience*, 244.

[62] Mark J. Chadsey, "Abraham Baldwin and the Establishment Clause," *Journal of Catholic Legal Studies* 51 (2012): 20-27.

[63] Quoted in *Ibid*., 31.

a statute to create a State university and to provide oversight for other public schools in the State. The statute began with a preamble proclaiming that it should be:

> among the first objects of those who wish well to the national prosperity, to encourage and support the principles of religion and morality, and early to place the youth under the forming hand of society, that by instruction they may be molded to the love of virtue and good order.[64]

44. The statute also required that "[a]ll officers appointed to the instruction and government of the university shall be of the Christian religion . . ."[65] But, as was the case in many States in this era, this law went hand-in-hand with a religious liberty provision, in this case one demanding that:

> trustees shall not exclude any person of any religious denomination whatever, from free and equal liberty and advantages of education, or from any of the liberties, privileges, and immunities of the university in his education, on account of his or their speculative sentiments in religion, or being of a different religious profession.[66]

45. Baldwin's statute favored Christianity with respect to employment, although the provision quoted above prohibits trustees from discriminating against people of a "different religious profession." This part of the law may have been crafted specifically to protect members of Savannah's Jewish community. The legislature approved the bill, and Baldwin was appointed the first president of the University of Georgia (even as he continued to hold other public offices).

46. In 1785, Baldwin drafted a statute entitled *For the Regular Establishment and Support of the Public Duties of Religion.* It began with a preamble declaring that:

---

[64] John D. Cushing, ed. *First Laws of the State of Georgia* (Wilmington: Glazier, 1981), 1: 299.

[65] *Ibid*., 301.

[66] *Ibid.*

> AS THE KNOWLEDGE and practice of the principles of the Christian religion tends greatly to make good members of society, as well as good men, and is no less necessary to present, than to future happiness, its regular establishment and support is among the most important objects of legislative determination; and that the minds of the citizens of this State may be properly informed and impressed by the great principles of moral obligation and thus be induced by inclination furnished with opportunity, and favored by law to render public religious honors to the Supreme Being.[67]

47. The bill guaranteed that "all the different sects and denominations of the Christian religion shall have free and equal liberty and toleration in the exercise of their religion within the state."[68] It also required each county "which contains thirty heads of families" to choose a "Minister of the Gospel who shall on every Sunday publicly explain and inculcate the great doctrines and precepts of the Christian religion."[69] This minister would be supported by public tax revenues, and the bill provided that counties with larger populations could have multiple ministers.

48. The bill drafted by Baldwin was passed by the State legislature, but apparently its provisions were never acted upon.[70] As in other States, Georgians were coming to question the wisdom of even multiple establishments. Yet this is not to say they embraced the separation of church and state. For instance, in 1786 the State passed a copyright act that specifically denied protection to works "that may be profane, treasonable, defamatory, or injurious to government, morals, or religion…"[71]

---

[67] *The Colonial Records of the State of Georgia*, ed. Lucian Lamar Knight, Kenneth Coleman, Milton Ready (Atlanta: Charles P. Byrd, 1911), 91: part 2, 395.

[68] *Ibid*., 397.

[69] *Ibid*, 395-96.

[70] Chadsey, "Abraham Baldwin and the Establishment Clause," 34.

[71] *The Colonial Records of the State of Georgia*, 489.

49. In addition to serving in Georgia's legislature, Baldwin was a member of the Confederation Congress and a delegate to the Constitutional Convention. In 1788, he was elected to the United States House of Representatives where he served until he was elevated to the Senate in 1800. He was a Senator until his death in 1807. With respect to the Bill of Rights, he was a member of the important committee that drafted the amendments initially debated by the House of Representatives, and he eventually voted to approve the amendments sent to the States for ratification. If jurists and scholars are truly interested in the historical meaning of the Establishment Clause, there is no good reason to ignore the views of men like Abraham Baldwin.

**Church and State in the Continental and Confederation Congresses**

50. Unlike the States, the Continental and Confederation Congresses had little power to pass legislation that directly restricted or affected individuals. Yet, within their limited sphere of authority, national leaders encouraged religious practices in a variety of ways.

51. The First Continental Congress convened on September 5, 1774. The next day, Massachusetts's Thomas Cushing proposed that they open their meetings with prayer. Several delegates objected, worried that the body was "so divided in religious sentiments" that they would be unable to agree on a minister to officiate.[72] The Congregationalist Samuel Adams responded that "he was no bigot, and could hear a prayer from a gentleman of piety and virtue" and suggested that they invite the Anglican minister Jacob Duché to open the body with prayer.[73] Congress agreed. The following day, Reverend Duché "arrived in his Pontificallibus [i.e., liturgical vestments], read

[72] Dreisbach and Hall, *Sacred Rights of Conscience*, 216.

[73] *Ibid.*

several Prayers" and then, according to John Adams, "struck out into an extemporary prayer, which filled the bosom of every man present."[74]

52. Duché was formally appointed chaplain to Congress 1776, but he was captured by the British the following year and became a Loyalist.  He fled to England and was unable to return to America until 1792.  In December of 1776, Congress appointed two chaplains to replace him—an Anglican and a Presbyterian.  The Continental and Confederation Congresses continued to utilize two chaplains from different denominations until it disbanded; at which time the first federal Congress adopted this practice—one that continues to the present day.[75]

53. It should be noted as well that on February 29, 1788, the Confederation Congress voted to pay congressional chaplains $300 per year.  James Madison was present and voted in favor of doing so.[76]

54. Congress was always short on cash, but nevertheless it agreed in 1775 to create a Chaplain Corps for the Continental Army and to pay the ministers who served in it.  When Congress later considered the cost-saving measure of having chaplains at the brigade rather than the regiment level, General Washington objected.[77]  Throughout the war, Washington encouraged his officers and men to attend worship services.  At Valley Forge, for instance, he issued the following order:

---

[74] *Ibid.*

[75] Davis, *Religion and the Continental Congress*, 75-77; Journals of the Continental Congress, 1774-1789, ed. Worthington C. Ford et al. (Washington, DC: Government Printing Office, 1904-37), 5: 530, 887 (hereinafter *JCC*); Ida A. Brudnick, "House and Senate Chaplains: An Overview," *Congressional Research Service Report*, May 26, 2011.

[76] Dreisbach and Hall, *Sacred Rights of Conscience*, 219.

[77] Davis, *Religion and the Continental Congress*, 80-81.

> The Commander-in-Chief directs that divine service be performed every Sunday at 11 o'clock in each brigade which has a chaplain. Those brigades which have none will attend the places of worship nearest to them. It is expected that officers of all ranks will, by their attendance, set an example to their men. While we are duly performing the duty of good soldiers, we certainly ought not to be inattentive to the higher duties of religion. To the distinguished character of a Patriot, it should be our highest glory to add the more distinguished character of a Christian.
>
> The signal instances of Providential goodness which we have experienced, and which have almost crowned our arms with complete success, demand from us, in a peculiar manner, the warmest returns of gratitude and piety to the Supreme Author of all good.[78]

55. The Continental and Confederation Congresses issued more than a dozen calls for prayer, fasting, and thanksgiving. The first one encouraged "Christians, of all denominations, to assemble for public worship" on July 20, 1775.[79] On that day, "Congress attended *en masse* Reverend Duché's Episcopal church in the morning, and Dr. Francis Allison's First Presbyterian Church in the afternoon."[80] Two years later, Congress observed that it is the "indispensable duty of all men to adore the superintending providence of Almighty God," and encouraged citizens to

> join the penitent confession of their manifold sins, whereby they had forfeited every favor, and their humble and earnest supplication that it may please God, through the merits of Jesus Christ, mercifully to forgive and blot them out of remembrance. . .

[78] Quoted in Davis, *Religion and the Continental Congress*, 81.

[79] Dreisbach and Hall, *Sacred Rights of Conscience*, 217.

[80] Davis, *Religion and the Continental Congress*, 86. See also, Ann Fairfax Withington, *Toward a More Perfect Union: Virtue and the Formation of America Republics* (New York: Oxford University Press, 1991).

The call ends by recommending that Americans ask God "to prosper the means of religion for the promotion and enlargement of that kingdom which consisteth 'in righteousness, peace and joy in the Holy Ghost.' [Romans 14:7]"[81]

56. In like fashion, in May 1778, Congress "recommended to ministers of the gospel of all denominations to read or cause to be read, immediately after divine services" an address by Congress "in their respective churches and chapels, and other places of divine worship."[82] As with earlier calls, this address proclaimed that America is relying on God's providential care, incorporated Scripture into the text without citation (e.g., "the time will soon arrive when every man shall sit under his own vine and under his own fig-tree, and there shall be none to make him afraid" [Micah 4:4]), and asked Americans to "assiduously cultivate" the "assistance of Heaven."[83]

57. Congress also encouraged citizens to be virtuous, and it sometimes asked State leaders to adopt laws promoting morality.[84] For instance, in 1778 it approved a resolution stating:

> Whereas true religion and good morals are the only solid foundations of public liberty and happiness:
>
> Resolved, that it be, and it is hereby earnestly recommended to the several States, to take the most effectual measures for the encouragement thereof, and for the suppressing of theatrical entertainments, horse racing, gaming, and such other diversions as are productive of idleness, dissipation, and a general depravity of principles and manners.
>
> Resolved, that all officers in the army of the Unites States, be, and hereby are strictly enjoined to see that the good and wholesome rules provided for the discountenancing of profaneness and vice, and the

[81] Dreisbach and Hall, *Sacred Rights*, 224.

[82] *JCC*, 11: 481.

[83] *Ibid.*

[84] *Ibid.*, 1: 78.

> preservation of morals among the soldiers, are duly and punctually observed.[85]

Congress overwhelmingly approved these resolutions.[86]

58. Before the War for Independence, Americans imported Bibles from Great Britain. The war curtailed this trade, leading to a shortage of this sacred text. In 1777, a group of ministers asked Congress to address this problem. Congress initially approved the importation of twenty thousand Bibles at its own expense, but this motion was ultimately tabled—almost certainly because of the lack of funds.

59. Four years later, Robert Aitken asked Congress to authorize him to publish the first American edition of the Holy Scriptures in the English language. Congress requested that its two chaplains, William White and George Duffield, examine the text. After receiving a positive report from these ministers, Congress provided the following endorsement for what is now known as "Aitken's Bible":

> That the United States in Congress assembled, highly approve the pious and laudable undertaking of Mr. Aitken, as subservient to the interest of religion, as well as an instance of the progress of arts in this country, and being satisfied from the above report [of White and Duffield] of his care and accuracy in the execution of the work, they recommend this edition of the Bible to the inhabitants of the United States, and hereby authorize him to publish this recommendation in the manner he shall think proper.[87]

60. Ten thousand copies of Aitken's Bible were printed with the congressional endorsement.[88]

---

[85] Dreisbach and Hall, *Sacred Rights,* 225-26.

[86] See, for example, *JCC,* 12: 1001-03.

[87] Dreisbach and Hall, *Sacred Rights of Conscience*, 234-35.

[88] *Ibid*., 231.

61. In 1776, the Continental Congress appointed Benjamin Franklin, John Adams, and Thomas Jefferson to a committee to begin the process of creating a national seal. Jefferson proposed that the Nation adopt one with the images of:

> Pharaoh sitting in an open chariot, a crown on his head & a sword in his hand, passing through the divided waters of the Red Sea in pursuit of the Israelites: rays from a pillar of fire in the cloud, expressive of the divine presence & command, reaching to Moses who stands on the shore &, extending his hand over the sea, causes it to overwhelm Pharaoh.[89]

62. His motto for the new Nation would have been: "Rebellion to tyrants is obedience to God."[90] Franklin's proposal was virtually identical to Jefferson's.

63. Note that Jefferson thought it appropriate to portray a miraculous event involving the prophet Moses *on the national seal*.[91] According to Exodus 19-20, it was Moses who received the Ten Commandments from God on Mount Sinai. It thus seems unlikely that Jefferson would have a principled objection to a State erecting a monument commemorating the Ten Commandments.

**Church-State Relations in the New Republic**

64. Within their constitutional powers, Congress and the other branches of the new federal government did not hesitate to encourage religious practices. As with state and earlier national officials, there is little evidence that civic leaders in the new republic desired the strict separation of church and state. Even Jefferson and Madison did not consistently act as if there was a wall of separation between the federal government and

---

[89] *Ibid*., 229.

[90] *Ibid*. Jefferson "later suggested it as an alternative motto for the Great Seal of Virginia, and he later added it to his personal seal." Davis, *Religion and the Continental Congress*, 138.

[91] Exodus 14 (describing God parting the Red Sea); Deuteronomy 34:10 (referring to Moses as a prophet).

religion. And when one considers a wide range of leaders in the era, it becomes clear that the founders did not desire to banish religion from the public square.

65. Particularly relevant for interpreting the First Amendment are the actions of the first Congress, the body that drafted and proposed this constitutional provision. One of Congress's first acts was to agree to appoint and, later, to pay congressional and military chaplains.[92] Shortly after doing so, it reauthorized the Northwest Ordinance, which declares that "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."[93]

66. The first federal Congress passed the First Amendment, of which James Madison was an important advocate. But he did not act alone, and his colleagues were certainly not cowed by his proposals. In a major speech on June 8, 1789, Madison proposed a host of amendments, but the House declined to discuss them at that time. Madison pushed the issue again on July 21, and he was again put off; although this time the House approved a motion by Fisher Ames to form a select committee composed of one member from each State to consider amendments. Madison served on the committee, but it was chaired by John Vining of Delaware. There is no reason to believe that Vining, or seasoned statesmen on the committee such as Roger Sherman, Elias Boudinot, and Abraham Baldwin, simply deferred to Madison. There are no records of the committee's deliberations, but it did produce a handwritten draft bill of rights in

[92] Dreisbach and Hall, *Sacred Rights of Conscience*, 472-73.

[93] *Ibid*., 236-38, 473.

Sherman's handwriting.[94] This is the only handwritten draft of the Bill of Rights known to exist.

67. The select committee eventually issued a printed report proposing nineteen changes to the Constitution. The full House debated these proposed amendments, not the amendments suggested by Madison on June 8. Madison and a majority of the committee thought that the amendments should be interspersed throughout the Constitution, but Roger Sherman objected, arguing that

> we cannot incorporate these amendments in the body of the Constitution. It would be mixing brass, iron, and clay [Daniel 2:35]. . . . I conceive that we have no right to do this, as the Constitution is an act of the people, and ought to remain entire—whereas the amendments will be the act of the several legislatures.

68. Sherman was overruled, but he eventually won the day and the amendments were annexed to the Constitution rather than interspersed throughout it.[95]

69. Madison originally suggested three amendments that touched on religion:

a. "The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext infringed."

b. "No person religiously scrupulous of bearing arms, shall be compelled to render military service in person."

c. "No state shall violate the equal rights of conscience."[96]

70. He considered the third proposal to be "the most valuable amendment" of all, but it was rejected by the Senate and he was unable to save it.[97] Nor was he successful in protecting religious pacifists.

[94] *Documentary History of the First Federal Congress, 1789-1791*, ed. Linda Grant De Pauw et al. (Baltimore: Johns Hopkins University Press, 1972-2012), 3: 283 [Hereafter *DHFFC*].

[95] *Ibid*., 11: 1208, 1212, 1233; 4: 27-31.

[96] Dreisbach and Hall, *Sacred Rights of Conscience*, 420-21.

71. On August 22, the House appointed Sherman, Egbert Benson, and Theodore Sedgwick—*not* Madison—to "prepare an introduction to and arrangement of Articles of Amendment."[98]  Their report consisted of sixteen articles and was sent to the Senate, which amended and returned them to the House.  The House agreed to some of the Senate's amendments, disagreed with others, and appointed Madison, Sherman, and John Vining to a conference committee to reconcile the differences.

72. The Senate chose Oliver Ellsworth to head the Senate delegation, and he was joined by Charles Carroll and William Paterson.  The committee eventually reported twelve proposed amendments (in Ellsworth's handwriting), which the House approved with a few minor changes.  The Senate approved the twelve amendments passed by the House, and they were sent to the States where the ten that we now know as the Bill of Rights were quickly ratified.

73. Particularly relevant for present purposes is the final wording of the First Amendment's religion clauses: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…"[99]

74. Madison certainly deserves credit for his contributions to the framing of the Bill of Rights and the First Amendment.  Yet, as this brief treatment makes clear, he was not a god among men imposing his personal views on cowed colleagues.  Approximately eighty-seven Representatives and Senators participated in the debates over, and voted for

---

[97] *Ibid*., 430; *DHFFC*, 11: 1292; 4: 39.

[98] *DHFFC*, 4: 7.

[99] *Ibid*., 4: 6-9; 35-48; 3: 216-18, 228-29; 11: 1292, 19: 1430, 1827; Robert A. Rutland, *Birth of the Bill of Rights* (New York: Collier, 1962), 194-221.  For a discussion of Ellsworth's role on the conference committee, see William R. Casto, "Oliver Ellsworth's Calvinist Vision of Church and State in the Early Republic," in Dreisbach, Hall, and Morrison, *The Forgotten Founders on Religion and Public Life*, 65-100.

or against, what became the First Amendment. And a list of those who played significant roles must include, besides Madison: Roger Sherman, Oliver Ellsworth, Benjamin Huntington, Abraham Baldwin, Elias Boudinot, William Paterson, Samuel Livermore, Charles Carroll, and Fisher Ames.[100]

75. In addition to studying debates over the First Amendment, other actions by the first federal Congress shed light on its understanding of the Establishment Clause. Consider this: *on the day after* the House approved the final wording of the Bill of Rights, Elias Boudinot, later president of the American Bible Society, proposed that Congress ask the President to recommend a day of public thanksgiving and prayer. In response to objections by Aedenus Burke and Thomas Tucker that these practices mimicked European customs and that such calls were properly issued by States, Roger Sherman:

> justified the practice of thanksgiving, on any signal event, not only as a laudable one in itself, but as warranted by a number of precedents in holy writ: for instance, the solemn thanksgivings and rejoicings which took place in the time of Solomon, after the building of the temple, was a case in point. This example, he thought, worthy of Christian imitation on the

[100] For profiles of many of these individuals, and others who played important roles in America's founding, see, Dreisbach, Hall, Morrison, eds. *The Founders on God and Government* (George Washington, John Adams, Thomas Jefferson, James Madison, John Witherspoon, Benjamin Franklin, James Wilson, George Mason, and the Carrolls of Maryland); Dreisbach, Hall, and Morrison, eds. *The Forgotten Founders on Religion and Public Life* (Abigail Adams, Samuel Adams, Oliver Ellsworth, Alexander Hamilton, Patrick Henry, John Jay, Thomas Paine, Edmund Randolph, Benjamin Rush, Roger Sherman, and Mercy Otis Warren); Dreisbach and Hall, eds. *Faith and the Founders of the American Republic* (Gouverneur Morris, John Hancock, Elias Boudinot, John Dickinson, and Isaac Backus. This book also includes eight thematic chapters on topics including deism, Judaism, and Islam). Anyone seeking to discover how the Establishment Clause was originally understood must look beyond members of the first federal Congress to others who participated in debates on these matters, especially in the State legislatures that ultimately approved the First Amendment.

> present occasion; and he would agree with the gentleman who moved the resolution.[101]

76. Note that Sherman explicitly appealed to the Bible—i.e. "holy writ"—to defend the practice of civic leaders encouraging citizens to pray. The House approved the motion and appointed Boudinot, Sherman, and Peter Silvester of New York to a committee to meet with Senators about the matter.

77. The Senate concurred with the House, and Congress requested that President Washington issue his famous 1789 Thanksgiving Proclamation. The text of his proclamation is worth quoting at some length:

> Whereas it is the duty of all nations to acknowledge the providence of Almighty God, to obey His will, to be grateful for His benefits, and humbly to implore His protection and favor . . .
>
> I do recommend and assign Thursday the 26th day of November next to be devoted by the people of these states to the service of that great and glorious Being, who is the beneficent Author of all the good that was, that is, or that will be—That we may then all unite in rendering unto him our sincere and humble thanks—for his kind care and protection of the people of this country previous to their becoming a nation—for the signal and manifold mercies, and the favorable interpositions of his Providence which we experienced in the course and conclusion of the late war—for the great degree of tranquility, union, and plenty, which we have since enjoyed—for the peaceable and rational manner, in which we have been enabled to establish constitutions of government for our safety and happiness, and particularly the national one now lately instituted—for the civil and religious liberty with which we are blessed; and the means we have of acquiring and diffusing useful knowledge; and in general for all the great and various favors which he hath been pleased to confer upon us.
>
> And also that we may then unite in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations and beseech him to pardon our national and other transgressions—to enable us all, whether in public or private stations, to perform our several and relative duties properly and punctually—to render our national government a blessing to all the people, by constantly being a government of wise, just, and constitutional laws, discreetly and faithfully executed

[101] *DHFFC*, 11: 1500-01.

> and obeyed—to protect and guide all sovereigns and nations (especially such as have shewn kindness unto us) and to bless them with good government, peace, and concord—To promote the knowledge and practice of true religion and virtue, and the increase of science among them and us—and generally to grant unto all mankind such a degree of temporal prosperity as he alone knows to be best.[102]

78. It would appear that first Congress and the first president of the United States did not think it inappropriate for the chief executive to encourage his fellow citizens to pray and to recognize the importance of faith.

79. Throughout his long career in politics, John Adams repeatedly spoke of the importance of religion and morality. And his actions, at both the State and national level, make it evident that he thought that civic officials should encourage religious beliefs and practices. In his presidential calls for prayer and fasting, he followed his predecessor in acknowledging Providence, the duty to worship God, and the necessity for citizens to confess their individual and collective sins. And he clearly referenced Jesus Christ (the "Redeemer of the world") and the third person of the Trinity:

> I have therefore thought fit to recommend . . . that all religious congregations do, with the deepest humility, acknowledge before God the manifold sins and transgressions with which we are justly chargeable as individuals and as a nation, beseeching Him at the same time, of His infinite grace, through the Redeemer of the World, freely to remit all our offenses, and to incline us by His Holy Spirit to that sincere repentance and reformation which may afford us reason to hope for his inestimable favor and heavenly benediction . . .[103]

80. Similarly, in a 1799 proclamation, he recommended another day to be:

> observed throughout the United States of America as a day of solemn humiliation, fasting, and prayer; that the citizens on that day abstain as far as may be from their secular occupations, devote the time to the sacred duties of religion in public and in private; that they call to mind our numerous offenses against the Most High God, confess them before Him

[102] Dreisbach and Hall, *Sacred Rights of Conscience*, 453-54.

[103] *Ibid*., 456.

> with the sincerest penitence, implore His pardoning mercy, through the Great Mediator and Redeemer, for our past transgressions, and that through the grace of His Holy Spirit we may be disposed and enabled to yield a more suitable obedience to His righteous requisitions in time to come; that He would interpose to arrest the progress of that impiety and licentiousness in principle and practice so offensive to Himself and so ruinous to mankind; that He would make us deeply sensible that "righteousness exalteth a nation, but sin is a reproach to any people;" [Proverbs 14:34] that He would turn us from our transgressions and turn His displeasure from us; that He would withhold us from unreasonable discontent, from disunion, faction, sedition, and insurrection . . . [104]

81. It is hardly unusual that Adams would appeal to Proverbs 14:34, which was, according to Daniel L. Dreisbach, one of the founders' favorite biblical passages.[105]

82. The proclamations quoted above leave no doubt that Adams thought it appropriate for presidents to issue robustly Christian calls for prayer and fasting.[106]

83. Much of what separationists think they know about Jefferson's views on church-state relations comes from the short missive he sent to the Danbury Baptist Association in 1802. In it, he famously observed that the First Amendment created a "wall of separation between Church & State."[107] This metaphor lay dormant with respect to the Supreme Court's Establishment Clause jurisprudence until 1947, when Justices Black and Rutledge seized upon it as a definitive statement of the founders' views on church-state relations.[108] Since then, separationists have turned to this letter time and time again when interpreting this amendment.

---

[104] *Ibid*., 457.

[105] Dreisbach, *Reading the Bible with the Founding Fathers* (New York: Oxford University Press, 2017), 145-58.

[106] Every president, with the exception of Jefferson and Andrew Jackson, has issued calls for prayer. Davis, *Religion and the Continental Congress*, 90.

[107] Dreisbach and Hall, *Sacred Rights of Conscience*, 528.

[108] *Ibid*., 533-34. The letter was first referenced by the Supreme Court in the Free Exercise Clause case of *Reynolds v. United States*, 98 U.S. 145 (1879).

84. As appealing as the wall metaphor is to contemporary activists, it obscures far more than it illuminates. In *Thomas Jefferson and the Wall of Separation Between Church and State*, Daniel L. Dreisbach demonstrates that this letter was a profoundly political document, not a principled statement of Jefferson's constitutional views. Moreover, the metaphor did not originate with Jefferson, and he used it only once in his life. Even more remarkably, two days after he penned it he attended church services in the U.S. Capitol where he heard John Leland, the great Baptist minister and himself an opponent of established churches, preach.[109]

85. As governor of Virginia, Jefferson issued a proclamation that encouraged "the good people of this commonwealth" to set apart a day for "public and solemn thanksgiving and prayer to Almighty God" and urged "ministers of religion to meet their respective societies . . . to assist them in their prayers, edify them with their discourses, and generally to perform the sacred duties of their function, proper for the occasion."[110] When he revised Virginia's laws, in addition to crafting his now-famous Statute for Religious Liberty, he also drafted bills stipulating when the governor could appoint "days of public fasting and humiliation, or thanksgiving" and to punish "Disturbers of Religious Worship and Sabbath Breakers."[111]

86. Unlike Washington and Adams, Jefferson did not issue calls for prayer when he was president of the United States. In an 1808 letter to Samuel Miller, he indicated that he believed both the First and the Tenth Amendments prevented him from doing so.

---

[109] Daniel L. Dreisbach, *Thomas Jefferson and the Wall of Separation Between Church and State* (New York: New York University Press, 2002), 21-22.

[110] *Ibid.*, 138, 139.

[111] Dreisbach and Hall, *Sacred Rights of Conscience*, 251-52.

Such calls for prayer, he suggested, would be more properly issued by State governments.[112] Yet in more than one speech he invited his audiences to pray. For instance, Jefferson closed his second inaugural address by noting that he would need "the favor of that Being in whose hands we are, who led our forefathers, as Israel of old" and asked his listeners to "join with me in supplications, that he [God] will so enlighten the minds of your servants, guide their councils, and prosper their measures, that whatsoever they do, shall result in your good, and shall secure to you the peace, friends, and approbation of all nations."[113]

87. Remarkably, for someone supposedly committed to a "wall of separation between church and state," in 1803 Jefferson sent a treaty concerning the Kaskaskia Indians to the Senate for approval. The third article in the treaty stipulated that:

> *whereas*, the greater part of the said tribe have been baptized and received into the Catholic church to which they are much attached, the United States will give annually for seven years one hundred dollars towards the support of a priest of that religion, who will engage to perform for the said tribe the duties of his office and also to instruct as many of their children as possible in the rudiments of literature. And the United States will further give the sum of three hundred dollars to assist the said tribe in the erection of a church.[114]

88. According to James Hutson of the Library of Congress, when he was president, Jefferson regularly worshipped in the Capitol and, in addition, "made executive-branch buildings—the Treasury and the War Office—available for church services."[115]

---

[112] *Ibid*., 531.

[113] *Ibid*., 530.

[114] *Ibid*., 476.

[115] James Hutson, "Thomas Jefferson's Letter to the Danbury Baptists: A Controversy Rejoined" *The William and Mary Quarterly*, 56, (Oct., 1999), 786. Hutson also notes

89. Like his mentor, James Madison attended church services in the U.S. Capitol Building.[116] Unlike him, he issued four calls for prayer and fasting, the second of which recommends:

> to all who shall be piously disposed to unite their hearts and voices in addressing the one and the same time their vows and adorations to the Great Parent and Sovereign of the Universe . . . [supplicating Him to] pardon our manifold transgressions and awaken and strengthen in all the wholesome purposes of repentance and amendment . . . [so that] we may be enabled to beat our swords into plowshares [Isaiah 2: 4] and enjoy in peace ever man the fruits of his honest industry and rewards of his lawful enterprise.[117]

90. Finally, it is worth noting that federal courts have consistently included prayers as part of public judicial proceedings. The United States Supreme Court begins court sessions with the prayer "God save the United States and this Honorable Court." The first recorded instance of the Supreme Court opening with prayer was in 1827, but federal circuit courts adopted the practice as early as 1800. For instance, according to a New Hampshire paper:

> After the Jury were empaneled, the Judge delivered a most elegant and appropriate Charge . . . *Religion and Morality* were pleasingly inculcated and enforce, as being necessary to good government, good order and good laws, for "when the righteous are in authority, the people rejoice." [Proverbs 29: 2] . . .
>
> After the Charge was delivered, the Rev. Mr. [Timothy] Alden addressed the Throne of Grace [Hebrews 4: 16], in an excellent, well adapted prayer (emphasis original).[118]

---

that when Jefferson "retired from the presidency, he resumed his earlier habit of worshiping in the Albemarle County Courthouse" *Ibid*., 788.

[116] *Ibid.*

[117] Dreisbach and Hall, *Sacred Rights of Conscience*, 458-59.

[118] *United States Oracle*, May 24, 1800, available in *The Documentary History of the Supreme Court of the United States, 1789-1800*, ed. Maeva Marcus (New York: Columbia University Press, 1990), 3: 436.

## Conclusion

91. An honest appraisal of the founding and early national eras reveals little support for the proposition that America's founders desired to build a "high and impregnable" wall of separation between church and state.[119] Jefferson and Madison desired a greater degree of separation than did most founders, but even they did not act as if religion had no place in the public square. When one turns from these two Virginians to the rest of the founding generation, it becomes evident that few civic leaders desired the strict separation of church and state. To be sure, many had concluded that States should not have official, established churches, and (without any exception of which I am aware) they were against government coercion in matters of faith. But none understood the Establishment Clause to prohibit civic officials from incorporating religious language or symbols into public buildings and monuments.

## V. America's Long Tradition of Religious Displays on Public Property

92. The historical understanding of the Establishment Clause clearly permits national, state, and municipal governments to erect, or allow to be erected, religious monuments and buildings containing religious inscriptions and images. Moreover, governments have regularly done so throughout our Nation's history.

### Crosses

93. The cross is perhaps the best know symbol of Christianity. Christians regularly display and wear crosses in remembrance of what they consider to be God's Son, Jesus Christ's, sacrifice for humanity. But symbols can and do have more than one

[119] *Everson v. Board of Educatio*n, 330 U.S. 1, 18 (1947).

meaning.[120] In the West, and throughout American history, crosses have often been used to commemorate and honor the dead. In the context of war, they have often been used to recognize the sacrifice that soldiers have made for their Nation.[121] Most notably, hundreds of thousands of tombstones with crosses on them fill Arlington National Cemetery, and the other 143 National cemeteries throughout the Nation.[122] Other crosses on public land include[123]:

- "In Richmond, Virginia, a large Latin cross set near the falls of the James River. Known as the Christopher Newport Cross, it commemorates the 1607 expedition of Captain Newport, who sailed upriver as far as the falls, and bears the inscription 'Dei Gratia Virginia Condita,' or 'Virginia was founded by the Grace of God.'"[124]

- "In Mobile, Alabama, a large stone cross, known as the Bienville Cross, sits in the heart of downtown in a public square. As shown by its inscription, it is a monument to Jean Baptiste LeMoyne, Sieur de Bienville (1680-1768), founder of

[120] An obvious, contemporary example of a symbol with more than one meaning is the rainbow. For millennia, Jews and Christians have viewed it as an important sign of God's covenant with Noah that "the waters shall no more become a flood to destroy all flesh" (Genesis 9:15 (and, generally, 9:13-17)). Yet, since 1978, the rainbow flag has been a symbol for LGBTQ rights https://www.insider.com/why-rainbow-lgbt-gay-pride-2017-6 (accessed June 29, 2019). See also, *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1135-37 (2009).

[121] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2074-76 (2019).

[122] Peter Gardella, *American Civil Religion: What Americans Hold Sacred* (New York: Oxford University Press, 2014), 191, 195.

[123] All but the last of the crosses mentioned above come from a professors' *amicus* brief (hereinafter "Professors' brief") I helped write for *American Legion v. American Humanist Association*. I quote the descriptions from the brief, and then cite an additional internet source that describes the monument and, ideally, provides an image of it. The Professors' brief may be found here: https://www.supremecourt.gov/DocketPDF/17/17-1717/77608/20181226144524325_17-1717%20Professors%20Amicus%20Brief.pdf (accessed June 15, 2019).

[124] Professors' brief, 16. See also, https://www.hmdb.org/marker.asp?marker=23819 (accessed June 27, 2019).

the city, whose recited accomplishments include bringing 'the Prosperity of true Civilization and the Happiness of real Christianity.'"[125]

- "The Father Millet Cross, which currently stands in Fort Niagara State Park in upstate New York, was originally erected in 1688 by a Jesuit priest, Father Pierre Millet. In 1925, President Calvin Coolidge set aside a 320-square-foot section of Fort Niagara Military Reservation 'for the erection of another cross commemorative of the cross erected and blessed by Father Millet.'"[126]

- "In Santa Fe, New Mexico, there is the Cross of the Martyrs, a large steel cross erected to commemorate the 21 Franciscan Friars who perished in the 1680 Indian uprising known as the Pueblo Revolt."[127]

- "The Cross Mountain Cross, in Fredericksburg, Texas, stands where the first settlers of what is now Fredericksburg first discovered a timber cross on a hilltop in 1847. A cross has remained there since; the original replaced with a permanent lighted version in 1946, which today resides in the city-maintained Cross Mountain Park."[128]

- "Since 1858, a cross has stood atop the Chapel of the Centurion at Fort Monroe, in Hampton, Virginia. Named for Cornelius, the Roman centurion converted to Christianity by St. Peter, the Chapel served as the United States Army's oldest wooden structure in continuous use for religious services until it was decommissioned in 2011."[129]

- "The Irish Brigade Monument, a 19-foot Celtic cross, was placed in Gettysburg National Military Park in 1888 to honor soldiers from three New York regiments who fought and died at Gettysburg."[130]

---

[125] "Professors' brief," 16. See also, http://digital.archives.alabama.gov/cdm/ref/collection/photo/id/19464 (accessed June 27, 2019).

[126] "Professors' brief," 16. Although no longer a national park, the cross is currently on the grounds of the "Old Fort Niagara State Historic Site, a component of New York's state park system." See, https://www.nationalparkstraveler.org/2009/09/pruning-parks-father-millet-cross-national-monument-1925-1949-was-smallest-national-monument-ever-es4482 (accessed June 27, 2019).

[127] "Professors' brief," 17. See also, https://www.hmdb.org/marker.asp?marker=73092 (accessed June 27, 2019).

[128] "Professors' brief," 17. See also, https://www.visitfredericksburgtx.com/2019/04/11/the-history-and-mystery-of-cross-mountain/ (accessed June 27, 2019).

[129] "Professors' brief," 17. See also, https://www.loc.gov/item/va1661/ (accessed June 27, 2019).

[130] "Professors' brief," 18. See also, http://gettysburg.stonesentinels.com/union-monuments/new-york/new-york-infantry/irish-brigade/ (accessed June 27, 2019).

- "The Jeannette Monument at the United States Naval Academy, a Latin cross dedicated to sailors who died exploring the Arctic in 1881, was erected in 1890, and is the largest monument in the Naval Academy Cemetery."[131]

- "The Father Serra Cross is an 11-foot granite Celtic cross donated to the City of Monterey in 1905 and installed on public land in 1908. The cross features a portrait of Father Junipero Serra and an image of his Carmel Mission."[132]

- "A large Celtic cross known as the Wayside Cross sits in New Canaan, Connecticut's historic green. Erected in 1923 as a war memorial, it bears the inscription: 'Dedicated to the glory of Almighty God in memory of the New Canaan men and women who, by their unselfish patriotism, have advanced the American ideals of liberty and the brotherhood of man.'"[133]

- "Then, in New York City, there stands the Ground Zero Cross. Composed of steel beams approximating the shape of a Latin cross and found amid the wreckage of the World Trade Center, the cross is now erected at the National September 11 Memorial & Museum."[134]

- And, of course, this list must include the Bladensburg Cross, an "immense Latin cross"[135] on public property in Maryland that the United States Supreme Court recently determined to be constitutional.[136]

94. Crosses are widely recognized as a central symbol of Christianity. However, many of the crosses listed above were used to memorialize and honor a wide range of

---

[131] "Professors' brief," 18. See also, https://www.usna.edu/Cemetery/History_and_Memory/First_Monuments.php (accessed June 27, 2019).

[132] "Professors' brief," 18. See also, http://www.waymarking.com/waymarks/WM7HF5_Serra_Landing_Monterey_CA (accessed June 27, 2019).

[133] "Professors' brief," 18-19. See also, http://ctmonuments.net/2011/07/wayside-cross-new-canaan/ (accessed June 27, 2019).

[134] "Professors' brief," 19. See also, https://www.911memorial.org/blog/wtc-cross-installed-911-memorial-museum-updated (accessed June 27, 2019).

[135] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2103 (2019) (Ginsburg, J., dissenting).

[136] *Ibid.*, 2090 (majority opinion). See also, https://religionnews.com/2019/06/24/the-supreme-court-made-a-special-case-of-the-bladensburg-cross-lets-keep-it-that-way/ (accessed July 8, 2019).

people, including men and women who were not Christians. As discussed, the United States Supreme Court has held such memorials to be constitutional.[137]

**Ten Commandments**

95. If the cross is often thought of as a symbol of Christianity, the Ten Commandments are accepted by Jews, Christians, and Muslims. The commandments, it is true, are numbered and listed in different ways by various faith traditions,[138] but all lists are substantially the same. Even in the context of a religious building such as a church or synagogue, a display of the Ten Commandments is arguably not *simply* religious as some of the commandments, such as "do not kill," are moral precepts shared by people of different faiths and no faith at all.

96. American civic leaders and scholars have long contended that the Ten Commandments had an important influence on the development of Western morality and law.

97. For instance, John Quincy Adams wrote to his son that:

> The law given from Sinai was a civil and municipal as well as a moral and religious code; it contained many statutes adapted to that time only, and to the particular circumstances of the nation to whom it was given; but many others were of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws.[139]

98. Similarly, in 1997, the House of Representatives recognized that "the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization" and "the Ten Commandments set forth a code of

---

[137] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2090 (2019).

[138] Paul Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *Fordham Law Review 73* (March 2005): 1477-1520.

[139] Quoted in Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers*, 46.

moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society."[140]   As such, the House resolved that: "(1) the Ten Commandments are a declaration of fundamental principles that are the cornerstones of a fair and just society; and (2) the public display, including display in government offices and courthouses, of the Ten Commandments should be permitted."[141]

99. More recently, Justice Alito observed in *American Legion v. American Humanist Association* (2019) that:

> For believing Jews and Christians, the Ten Commandments are the word of God handed down to Moses on Mount Sinai, but the image of the Ten Commandments has also been used to convey other meanings.  They have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in our courtroom and in other prominent public buildings in our Nation's capital.[142]

100.    In the oral arguments for that case, the American Humanist Association's attorney, Monica Miller, observed that the Ten Commandments can have "some sort of dual secular meaning"; they are "basically shorthand for law itself."[143]

101.    In the mid-twentieth century, E.J. Ruegemer, a Minnesota judge, became concerned with what he perceived to be the rise of juvenile delinquency in the United States.  He believed that "if troubled youths were exposed to one of mankind's earliest

---

[140] Available at: https://www.congress.gov/bill/105th-congress/house-concurrent-resolution/31/text (accessed July 6, 2019).

[141] *Ibid*.

[142] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2083 (2019), (Alito, J.).  Even the separationist Justice John Paul Stevens, who dissented in *Van Orden v. Perry*, observed in *County of Allegheny v. ACLU* that "a carving of Moses holding the Ten Commandments, if that is the only adornment on a courtroom wall, conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law." 492 U.S. 573, 652 (1989).

[143] Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2018/17-1717_7l48.pdf, 55 (accessed July 8, 2019).

and long-lasting codes of conduct, those youths might be less inclined to break the law."[144] He formed a committee "consisting of fellow judges, lawyers, various city officials, and clergy of several faiths" to develop a "version of the Ten Commandments which was not identifiable to any particular religious group."[145] He eventually partnered with Cecil B. DeMille and the Fraternal Order of Eagles to help place granite monuments inscribed with the Ten Commandments throughout the United States.[146] Many of these monuments were placed on public property, in one case on the Texas State House grounds. In *Van Orden v. Perry*, (2006), the United States Supreme Court determined that "the display of a monument inscribed with the Ten Commandments on the Texas State House grounds" does not violate the Establishment Clause.[147]

102. Judge Ruegemer estimated that "there are probably about 140-150 granite monuments of the Ten Commandments from the Eagles located throughout the United

---

[144] Declaration of Judge E.J. Ruegemer for *Card v. City of Everett*, No. CV03-2385L, Sept. 19, 2003, 2. *Card v. City of Everett* involved an Establishment Clause challenge to a monument of the Ten Commandments donated to the City of Everett, Washington, by the local chapter of the Fraternal Order of Eagles. The United States Court of Appeals for the Ninth Circuit eventually found it to be constitutionally permissible in *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008). The Everett monument is virtually identical the one currently being litigated in Arkansas.

[145] *Ibid*., 3. The United States Court of Appeals for the Eighth Circuit agreed that a monument virtually identical to the one on the Arkansas State Capitol grounds contains "a nonsectarian version of the Ten Commandments." *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 773 (2005). See also, Brief of the Fraternal Order of Eagles as *amicus curiae* in Support of Respondents. *Van Orden v. Perry*, 2005 WL 263789, 2005 U.S. S. Ct. Briefs LEXIS 134 (Supreme Court of the United States January 31, 2005), 5-9.

[146] Declaration of Judge E.J. Ruegemer, 3-4. DeMille was only involved in the early stages of what has been referred to as the Eagles' Ten Commandment Project. Sue A. Hoffman provides an extensive history of the origins and history of this project in: *In Search of God and the Ten Commandments: One Person's Journey to Preserve a Small Part of America's God-given Values and Freedoms* (self-published, 2014), 76-79.

[147] 545 U.S. 677, 681 (2005) (Rehnquist, C.J., majority opinion).

States."[148] The monument commemorating the Ten Commandments on the Arkansas State Capitol Grounds was not provided by the Eagles, but it is virtually the same as the 106 monuments that they helped to place on public property elsewhere (listed below) and that was held to be constitutional in *Van Orden.*[149] These monuments, which were erected between 1956 and 1983, are located in[150]:

- Albert Lea, Minnesota – 1956; Central Park.[151]
- Ambridge, Pennsylvania – 1955; P. J. Caul Memorial Park.[152]
- Aspen, Colorado – 1968; Conner Memorial Park.[153]

---

[148] Declaration of Judge E.J. Ruegemer, 4.

[149] Compare the image of the Texas monument available here: http://www.eaglesmonuments.com/states/Texas.html (accessed June 28, 2019) to the photo attached as Appendix #1.

[150] The following list of monuments is taken from two main sources. The first is a list dated July 7, 2019 on this website: http://www.eaglesmonuments.com/states/city-list.html (accessed July 8, 2019). It was created and is maintained by Robert Ritter, a "retired attorney on inactive status in Virginia," founder of "the Jefferson Madison Center for Religious Liberty," and former "legal coordinator and staff attorney at the American Humanist Association in Washington, D.C." Ritter believes that it is constitutionally impermissible to permit Ten Commandment monuments to remain on public property.

The second source is Sue Hoffman's book, *In Search of God and the Ten Commandments*. A retired teacher, Hoffman believes it is constitutionally permissible to keep monuments of the Ten Commandments on public property. In addition to providing a good overview of the Eagles' Ten Commandments Project, her book contains 58 photographs, mostly taken between 2008 and 2012, documenting Ten Commandments monuments on public property.

I list only monuments that remain on public land. Even though Ritter's list is dated July 7, 2019, and Hoffman's book was published in 2014, it is possible that some of the monuments they document were removed in recent years. To check the accuracy of my list, I selected a sample of 20 monuments and then called or emailed city or county officials on July 9 and 10, 2019. I talked to or heard back from eighteen of these officials, and in each case they confirmed that the monument in their city/county is still in place and that it remains on public property.

[151] http://www.eaglesmonuments.com/states/Minnesota.html (accessed July 3, 2019).

[152] http://www.eaglesmonuments.com/states/Pennsylvania.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments,* 158.

- Auburn, Washington – 1965; Mountain View Cemetery.[154]

- Austin, Minnesota – 1960; Mower County Courthouse.[155]

- Austin, Texas – 1961; Texas State Capitol.[156]

- Blackfoot, Iowa – 1990; Wilbert Cammack Memorial Park.[157]

- Bozeman, Montana – 1970; Soroptimist Park.[158]

- Brownsville, Pennsylvania – 1957; Brownsville Municipal Building.[159]

- Buffalo, Wyoming – 1981; Willow Grove Cemetery.[160]

- Caldwell, Idaho – 1983; Development Services.[161]

- Casper, Wyoming – 1965; Historic Monument Plaza.[162]

- Cedar Rapids, Iowa – 1957; park beside Cedar River.[163]

- Cheyenne, Wyoming – 1970; Lyons Park.[164]

---

[153] http://www.eaglesmonuments.com/states/Colorado.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 272.

[154] http://www.eaglesmonuments.com/states/Washington.html (accessed July 3, 2019).

[155] http://www.eaglesmonuments.com/states/Minnesota.html (accessed July 3, 2019).

[156] http://www.eaglesmonuments.com/states/Texas.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 233.

[157] http://www.eaglesmonuments.com/states/Iowa.html (accessed July 3, 2019). Confirmed by email from Mayor Marc Carroll, City of Blackfoot, on July 10, 2019.

[158] http://www.eaglesmonuments.com/states/Montana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 283.

[159] http://www.eaglesmonuments.com/states/Pennsylvania.html (accessed July 3, 2019).

[160] http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 303.

[161] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019). Confirmed by email from city attorney Mark Hilty, City of Caldwell, on July 10, 2019.

[162] http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 253.

[163] http://www.eaglesmonuments.com/states/Iowa.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments,* 183.

- Chicago Heights, Illinois – 1955, Chicago Heights Park District office.[165]
- Clearfield, Pennsylvania – 1973; Clearfield County Courthouse.[166]
- Cloquet, Montana – 1962; Fire and police department building.[167]
- Clovis, New Mexico – 1967; Curry County Courthouse.[168]
- Cody, Wyoming – 1966; City Park.[169]
- Coeur d'Alene, Idaho – 1973; Ronald D. Rankin Veterans Memorial Plaza.[170]
- Columbus, Indiana – Year unknown; Bartholomew County Courthouse.[171]
- Corpus Christi, Texas – 1960; Nueces County Courthouse.[172]
- Crown Point, Indiana – 1957; Old Lake County Courthouse.[173]
- Cumberland, Maryland – 1957; Allegany County Courthouse.[174]

---

164 http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 285.

165 http://www.eaglesmonuments.com/states/Illinois.html (accessed July 3, 2019).

166 http://www.eaglesmonuments.com/states/Pennsylvania.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 296.

167 http://www.eaglesmonuments.com/states/Montana.html (accessed July 3, 2019).

168 http://www.eaglesmonuments.com/states/New_Mexico.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 265.

169 http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 261.

170 http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 295. Confirmed by email from Chris Fillios, on July 23, 2019.

171 http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019). I left a phone message with the Bartholomew County Courthouse in Columbus, Indiana. Someone called me back on July 10, 2019 and confirmed the monument is still in place.

172 http://www.eaglesmonuments.com/states/Texas.html (accessed July 3, 2019).

173 http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019). I called the Idaho County Courthouse in Crown Point and confirmed that the monument is still in place on July 10, 2019.

174 http://www.eaglesmonuments.com/states/Maryland.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 185.

- Dallas, Texas – 1956; Texas State Fair Park.[175]
- Denver, Colorado – 1955; Lincoln Park (Colorado State Capitol).[176]
- Detroit Lakes, Minnesota – 1962; City Park.[177]
- Dunseith, North Dakota – 1956; International Peace Garden.[178]
- Evansville, Indiana – 1955; Old Vanderburgh County Courthouse.[179]
- Everett, Washington – 1959; police department.[180]
- Fallon, Nevada – 1972; City Hall.[181]
- Fargo, North Dakota – 1958; City Hall.[182]
- Faribault, Minnesota – 1957; Buckham Memorial Library.[183]
- Follansbee, West Virginia – 1962; City Park.[184]

---

[175] http://www.eaglesmonuments.com/states/Texas.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 175.

[176] http://www.eaglesmonuments.com/states/Colorado.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 165. Case dealing with this monument: *State v. Freedom From Religion Found., Inc.*, 898 P.2d 1013, 1015 (Colo. 1995).

[177] http://www.eaglesmonuments.com/states/Minnesota.html (accessed July 3, 2019).

[178] http://www.eaglesmonuments.com/states/North_Dakota.html (accessed July 3, 2019).

[179] http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 167.

[180] http://www.eaglesmonuments.com/states/Washington.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 219. I called the Everett Police Department and confirmed that the monument was still in place on July 10, 2019. Case dealing with this monument: *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008).

[181] http://www.eaglesmonuments.com/states/Nevada.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 292.

[182] http://www.eaglesmonuments.com/states/North_Dakota.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*,199. Cases dealing with this monument: *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015 (8th Cir. 2012); *Red River Freethinkers v. City of Fargo*, 764 F.3d 948 (8th Cir. 2014).

[183] http://www.eaglesmonuments.com/states/Minnesota.html (accessed July 3, 2019).

[184] http://www.eaglesmonuments.com/states/West_Virginia.html (accessed July 3, 2019).

- Fort Lauderdale, Florida – 1958; War Memorial Auditorium.[185]

- Freemont, Nebraska – 1961; Memorial Park.[186]

- Galveston, Texas – 1957; Broadway Avenue and 23rd St.[187]

- Gardner, Massachusetts – 1955; City Hall.[188]

- Gastonia, North Carolina – 1957; Gastonia City Council.[189]

- Gillette, Wyoming – 1978; City Park.[190]

- Grand Junction, Colorado – 1959; City Hall.[191]

- Grangeville, Idaho – 1982; Idaho County Courthouse.[192]

- Great Falls, Montana – 1967; Cascade County Court House.[193]

- Green River, Wyoming – 1968; Riverview Cemetery.[194]

- Hastings, Nebraska – 1960; Parkview Cemetery.[195]

---

[185] http://www.eaglesmonuments.com/states/Florida.html (accessed July 3, 2019).

[186] http://www.eaglesmonuments.com/states/Nebraska.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 232.

[187] http://www.eaglesmonuments.com/states/Texas.html (accessed July 3, 2019).

[188] http://www.eaglesmonuments.com/states/Massachusetts.html (accessed July 3, 2019).

[189] http://www.eaglesmonuments.com/states/North_Carolina.html (accessed July 3, 2019).

[190] http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019).

[191] http://www.eaglesmonuments.com/states/Colorado.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 222.  I called the Idaho County Courthouse in Grangeville and confirmed that the monument is still in place on July 10, 2019.

[192] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019).

[193] http://www.eaglesmonuments.com/states/Montana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 264.

[194] http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 270.

[195] http://www.eaglesmonuments.com/states/Nebraska.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 225.

- Hayden, Idaho – 1993; City Park (adjacent to City Hall).[196]
- Helena, Montana – 1956; Montana State Capitol.[197]
- Hobbs, New Mexico – 1970; City Hall.[198]
- Idaho Falls, Idaho – 1969; park along Memorial Dr.[199]
- Jackson's Mill, West Virginia – Year unknown; "West Virginia Building."[200]
- Jefferson City, Missouri – 1958; Missouri State Capitol.[201]
- Junction City, Kansas – 1958; Municipal Building.[202]
- Kalispell, Montana – 1969; Flathead County Courthouse.[203]
- Kellogg, Idaho – 1971; Boy Scout House at City Park.[204]
- Kemmerer, Wyoming – 1972; Triangle Park.[205]
- Las Vegas, Nevada – 1973; Dula Gymnasium.[206]

---

196 http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 307.

197 http://www.eaglesmonuments.com/states/Montana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 171.

198 http://www.eaglesmonuments.com/states/New_Mexico.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 282.

199 http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019). Confirmed by email from Tracy Session of Idaho Falls Parks Department, July 13, 2019.

200 http://www.eaglesmonuments.com/states/West_Virginia.html (accessed July 3, 2019).

201 http://www.eaglesmonuments.com/states/Missouri.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 205.

202 http://www.eaglesmonuments.com/states/Kansas.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 211.

203 http://www.eaglesmonuments.com/states/Montana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 278.

204 http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019). I called the City of Kellogg's City Hall and confirmed that the monument is still in place on July 10, 2019.

205 http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 293.

- Lawrenceville, Illinois – Year unknown; Lawrence County Courthouse.[207]

- Lebanon, Indiana – 1957; Boone County Courthouse.[208]

- Logan, Ohio – 1959; Worthington Park.[209]

- Lorain, Ohio – 1961; Lakeview Beach.[210]

- Lovelock, Nevada – 1967; Pershing County Courthouse.[211]

- Malad, Idaho – 1976; Malad City Park.[212]

- Manden, North Dakota – 1968; Morton County Memorial Courthouse.[213]

- Minot, North Dakota – 1963; Roosevelt Park.[214]

- Monongahela, Pennsylvania – 1975; Chess Park.[215]

- Monessen, Pennsylvania – 1957; Monessen City Park.[216]

- Moorhead, Minnesota – 1960; Clay County Jail.[217]

---

[206] http://www.eaglesmonuments.com/states/Nevada.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 295.

[207] http://www.eaglesmonuments.com/states/Illinois.html (accessed July 3, 2019).

[208] http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019).

[209] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 217.

[210] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[211] http://www.eaglesmonuments.com/states/Nevada.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 267.

[212] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 301.

[213] http://www.eaglesmonuments.com/states/North_Dakota.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 273.

[214] http://www.eaglesmonuments.com/states/North_Dakota.html (accessed July 3, 2019).

[215] http://www.eaglesmonuments.com/states/Pennsylvania.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 215.

[216] http://www.eaglesmonuments.com/states/Pennsylvania.html (accessed July 3, 2019).

[217] http://www.eaglesmonuments.com/states/Minnesota.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 228.

- Moundsville, West Virginia – 1957; Central Elementary School.[218]

- Nampa, Idaho – 1975; Veterans Memorial (adjacent to Nampa City Hall).[219]

- Newark, Ohio – 1957; Licking County Courthouse.[220]

- Norwalk, Ohio – 1960; City Hall.[221]

- Oakland, California – 1966; Oakland Zoo (in storage).[222]

- Parma, Idaho –  1966; Parma City Public Swimming Pool.[223]

- Paulding, Ohio – 1961; Paulding County Courthouse.[224]

- Payette, Idaho – 1986; Police Dept. - City Hall.[225]

- Phoenix, Arizona – 1964; Wesley Bolin Plaza (Arizona State Capitol).[226]

- Plattsmouth, Nebraska – 1965; Memorial Park.[227]

---

[218] http://www.eaglesmonuments.com/states/West_Virginia.html (accessed July 3, 2019).

[219] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019). Confirmed by email from Kristen D. Pudlow, Assistant to the Mayor, City of Nampa, on July 10, 2019.

[220] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[221] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[222] http://www.eaglesmonuments.com/states/California.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 260.

[223] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 10, 2019).  I called the City of Parma's City Hall and confirmed that the monument is still in place on July 10, 2019.

[224] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[225] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019).  I called the Payette City Park & Police Department and confirmed that the monument is still in place on July 10, 2019.

[226] http://www.eaglesmonuments.com/states/Arizona.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 247.  I left a message with the Arizona Capitol Museum and someone called me back and confirmed that the monument is still in place on July 10, 2019.

[227] http://www.eaglesmonuments.com/states/Nebraska.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 256.  Case dealing with this

- Pleasant Grove City, Utah – 1971; Pioneer Park.[228]

- Pocatello, Idaho – 1967; Bannock County Courthouse.[229]

- Post Falls, Idaho – 1985; City Hall.[230]

- Princeton, Indiana – 1956; Gibson County Courthouse.[231]

- Redondo Beach, California – 1961; Civic Center garden.[232]

- Roswell, New Mexico – 1973; Chaves County Courthouse.[233]

- Rutland, Vermont – 1964; Court Square (Park).[234]

- Saint Maries, Idaho – 1968; Benewah County Courthouse.[235]

- Sandpoint, Idaho – 1972; Farmin Park.[236]

- Santa Fe, New Mexico – 1968; Fire Station No. 3.[237]

---

monument: *ACLU Nebraska Foundation v. City of Plattsmouth, Neb.*, 419 F.3d 772 (8th Cir. 2005).

[228] http://www.eaglesmonuments.com/states/Utah.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 289.  Case dealing with this monument: *Pleasant Grove City v. Summum*, 129 S.Ct. 1125, 1129 (2009).

[229] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 266.  I called the Bannock County Courthouse and confirmed that the monument is still in place on July 10, 2019.

[230] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 229.

[231] http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 174.

[232] http://www.eaglesmonuments.com/states/California.html (accessed July 3, 2019).

[233] http://www.eaglesmonuments.com/states/New_Mexico.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 294.

[234] http://www.eaglesmonuments.com/states/Vermont.html (accessed July 3, 2019).

[235] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019).  I called the Benewah County Courthouse and confirmed that the monument is still in place on July 10, 2019.

[236] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019).

[237] http://www.eaglesmonuments.com/states/New_Mexico.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 271.

- Sheridan, Wyoming – 1969; 1912 Chicago, Burlington, and Quincy Railroad Depot.[238]

- Somersworth, New Hampshire – 1958; in the intersection adjacent to City Hall.[239]

- South Bend, Indiana – 1957; Morris Performing Arts Center.[240]

- Springfield, Ohio – 1959; Clark County Common Pleas Court.[241]

- Thermopolis, Wyoming – 1967; Hot Springs County Courthouse.[242]

- Toledo, Ohio – 1957; Lucas County Courthouse.[243]

- Trenton, New Jersey – 1956; City Hall.[244]

- Troy, Ohio – 1964; Miami County Courthouse.[245]

- Tucumcari, New Mexico – 1975; Tucumcari Municipal Court.[246]

- Verona, Pennsylvania – 1958; Verona Municipal Building.[247]

- Valley City, Nevada – 1960; Veterans Memorial Park.[248]

- Vincennes, Indiana – 1958; Knox County Courthouse.[249]

---

[238] http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 275.

[239] http://www.eaglesmonuments.com/states/New_Hampshire.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 202.

[240] http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019).

[241] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 221.

[242] http://www.eaglesmonuments.com/states/Wyoming.html (accessed July 3, 2019).  I called the Hot Springs County Courthouse in Thermopolis and confirmed that the monument is still in place on July 10, 2019.

[243] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[244] http://www.eaglesmonuments.com/states/New_Jersey.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments,* 175.

[245] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[246] http://www.eaglesmonuments.com/states/New_Mexico.html (accessed July 3, 2019).

[247] http://www.eaglesmonuments.com/states/Pennsylvania.html (accessed July 3, 2019).

[248] http://www.eaglesmonuments.com/states/Nevada.html (accessed July 3, 2019).

- Virginia City, Nevada – 1971; roadside park overlooking the mountains.[250]

- Wallace, Idaho – 1970; Shoshone County Courthouse.[251]

- Waukegan, Illinois – 1960; Waukegan Police Department.[252]

- Winnemucca, Nevada – 1975; Humboldt County Courthouse.[253]

- Winona, Minnesota – 1958; Veterans Memorial Park.[254]

- Xenia, Ohio – 1957; Greene County Courthouse.[255]

- Yerington, Nevada – 1968; Lyon County Courthouse.[256]

- Yuma, Arizona – 1968; Heritage Library Park.[257]

103.    When the United States Supreme Court upheld the constitutionality of one

of these monuments, Chief Justice William Rehnquist observed that "acknowledgements

---

[249] http://www.eaglesmonuments.com/states/Indiana.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 214.

[250] http://www.eaglesmonuments.com/states/Nevada.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 286.

[251] http://www.eaglesmonuments.com/states/Idaho.html (accessed July 3, 2019).  I called the Shoshone County Courthouse and confirmed that the monument is still in place on July 10, 2019.

[252] http://www.eaglesmonuments.com/states/Illinois.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 224.

[253] http://www.eaglesmonuments.com/states/Nevada.html (accessed July 3, 2019).  I called the Humboldt County Courthouse in Winnemucca, Nevada and confirmed the monument is still in place on July 10, 2019.

[254] http://www.eaglesmonuments.com/states/Minnesota.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 208.

[255] http://www.eaglesmonuments.com/states/Ohio.html (accessed July 3, 2019).

[256] Hoffman, In Search of God and the Ten Commandments, 273.

[257] http://www.eaglesmonuments.com/states/Arizona.html (accessed June 28, 2019); Hoffman, *In Search of God and the Ten Commandments*, 274.

of the role played by the Ten Commandments in our Nation's heritage are common throughout America."[258] To illustrate this point, he noted that:

> We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.
>
> Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital. For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress' Jefferson Building since 1897. And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8). A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives. Inside the Department of Justice, a statue entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet. In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments. So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia. Moses is also prominently featured in the Chamber of the United States House of Representatives.[259]

104. This section has focused on the most conspicuous representations of the Ten Commandments on public property—granite monuments and images of the commandments on or by some of our national government's most important buildings. It is likely that an exhaustive study of national, state, and municipal government buildings

[258] *Van Orden v. Perry*, 545 U.S. 677, 688 (2005).

[259] *Ibid*., 688-89.

throughout the Nation would discover hundreds of other displays of the Ten Commandments.[260]

105. For instance, the study would uncover:

a. a plaque containing the full text of the Ten Commandments in Alabama's State Capitol,[261]

b. a framed copy the Commandments in Georgia's State Capitol,[262]

c. a mural of Moses with the Ten Commandments in the Rumford District Court courtroom in Rumford, Maine,[263]

d. a mural of Moses receiving the Ten Commandments in the Capitol Courtroom in Saint Paul, Minnesota,[264]

e. a mural of Moses holding the Ten Commandments at the Queens Supreme Court Building, New York,[265]

---

[260] In his dissenting opinion in *Van Orden v. Perry*, 545 U.S. 677, 713 (2005), Justice Stevens noted that the Eagles donated "over a hundred largely identical monoliths [of the Ten Commandments], *and over a thousand paper replicas*, distributed to state and local governments throughout the Nation over the course of several decades" (emphasis added). An *amicus* brief by the United States in *Van Orden v. Perry* contains an appendix that lists at least one display of the Ten Commandments on public property for each State of the Union. The brief is available here: https://www.justice.gov/osg/brief/orden-v-perry-amicus-merits (accessed 10/1/2019).

An organization called Ten Commandments Georgia claims to have placed a parchment copy of the Ten Commandments (along with eight other documents) in 46 public facilities in the State: http://www.tencommandmentsga.org/success/county Displays.cfm (accessed July 3, 2019). Finally, Barbara Hoffman writes that in 1954 alone "the Youth Guidance Commission [of the Eagles] saw the distribution of over 18,000 prints of the Ten Commandments, which were placed in Eagle homes, many state capitols, and in county and local government offices." *In Search of God and the Ten Commandments*, 34.

[261] https://www.al.com/politics/2018/11/ten-commandments-amendment-cruising-to-overwhelming-passage.html (accessed June 28, 2019).

[262] http://tencommandmentsga.org/downloads/PlacingHistoricalDisplays.pdf (accessed June 28, 2019).

[263] https://www.sunjournal.com/2019/03/10/art-courts-and-the-legacy-of-monmouths-harry-cochrane/ (accessed June 28, 2019).

[264] http://www.mnhs.org/capitol/learn/art/8949 (accessed June 28, 2019).

    f. a mural of Moses carving the Ten Commandments at the State Supreme Court building in Harrisburg, Pennsylvania, and[266]

g. a mural of Moses holding the Ten Commandments in the Supreme Court Room, City-County Building, Pittsburg, Pennsylvania.[267]

106. An exhaustive study documenting every display of the Ten Commandments on public property goes well beyond the scope of this report. It is also unnecessary. The examples listed above are more than sufficient to show that erecting monuments or displays of the Ten Commandments on public property is a practice that is "deeply embedded in the history and tradition of this country."[268]

**Religious Inscriptions on Public Buildings**

107. Numerous public buildings contain biblical and religious inscriptions. This brief section primarily considers structures in our Nation's capital. Since its adoption in 1791, the First Amendment has restricted the ability of the national government to pass laws respecting an establishment of religion, but there is little evidence that anyone raised a constitutional objection to the inclusion of religious language on these public buildings when they were designed and built.

---

[265] https://forgotten-ny.com/2015/11/queens-supreme-court-jamaica/ (accessed July 3, 2019).

[266] Anna Marie Jehorek, *The Pennsylvania Capitol*, "Pull Over and Let Me Out," https://pulloverandletmeout.com/touring-the-pennsylvania-state-capitol-in-harrisburg/ (accessed July 3, 2019).

[267] Albert M. Tannler, *Architecture Feature: Edward Trumbull in Pittsburgh*, Pittsburgh History & Landmarks Foundation, https://phlf.org/2017/10/02/architecture-feature-edward-trumbull-pittsburgh/ (accessed July 3, 2019).

There is a relief sculpture on the external wall of the Arkansas Supreme Court's courtroom that contains a depiction of Moses, but he is not carrying copies of the Ten Commandments so I do not include this image on the above list. *Welcome to The Arkansas Supreme Court Justice Building*, https://www.arcourts.gov/sites/default/files/2015%20building%20brochure%20no%20crops%20%283%29.pdf (accessed August 28, 2019).

[268] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

108. The most prominent structure in District of Columbia is the Washington Monument. It is capped with an 8.9 inch aluminum tip that faces east and is inscribed with the Latin words "'Laus Deo,' which translate to, 'Praise be to God.'"[269]

109. Inside the monument, one can find "[o]ne hundred and ninety-three unique stone tablets [that] are set into interior walls of the Washington Monument, donated to the monument in honor of the Nation's first president."[270] Some of these include biblical verses such as Proverbs 10:7 ("the memory of the just is blessed"),[271] and phrases including "In God We Trust."[272] One includes a sculpted image of an open Bible.[273]

110. Biblical quotations and religious phrases can be found in numerous federal buildings.

a. For instance, the Department of Agriculture's exterior northern wall includes a verse from II Timothy: "The husbandman that laboreth must be first partaker of the fruit" (II Tim. 2:6).[274]

b. Similarly, the Library of Congress's Jefferson Building includes the following quotations: "What doth the Lord require of thee, but to do justly, to love mercy, and to walk humbly with thy God?" (Micah 6:8); "The Heavens declare the glory of God; and the firmament showeth his handiwork" (Proverbs 19:1); and "The light shineth in darkness and the darkness comprehendeth it not" (John 15:1).[275]

---

[269] https://www.nps.gov/wamo/learn/historyculture/index.htm (accessed June 28, 2019).

[270] Judith M. Jacob, *The Washington Monument: A Technical History and Catalog of the Commemorative Stones* (Washington, D.C.: National Park Service, 2005), 1. Available at: https://www.nps.gov/parkhistory/online_books/wamo/stones.pdf (accessed June 28, 2019).

[271] *Ibid*., 192.

[272] *Ibid*., 57.

[273] *Ibid*., 190.

[274] Clint W. Ensign, Inscriptions of a Nation: Collected Quotations from Washington Monuments (Washington, D.C. Congressional Quarterly, 1994).

[275] *Ibid*., 22, 24, 31.

c. In addition, both chambers of Congress and the U.S. Capitol Visitors Center feature prominently the phrase "In God We Trust," and the Capitol's prayer room includes the inscription "Preserve me, O God: for in Thee do I put my trust."[276]

111. This section focuses on buildings in the Nation's capital, but it is also worth noting that the public area of the Richard Sheppard Arnold United States Courthouse, which houses the Court presiding over this very case, contains a plaque with the words "IN GOD WE TRUST."[277]

**Memorials With Symbols/Language From Minority Faiths**

112. In the late eighteenth century, approximately 98% of Americans of European descent were Protestants, 2% were Roman Catholics, and there were approximately 2,000 Jews in a handful of American cities.[278] As America became more diverse, so did its practices and monuments.[279] For instance, after World War I, the tombstones of Jewish soldiers buried in national cemeteries could include the Star of

---

[276] *Ibid*., 57, 58; Tim Schmig, *Our Story in Stones* (self-published, 2017), 12-13. In 1865, Congress authorized the inscription of "In God We Trust" on U.S. coins. In 1956, Congress made "In God We Trust" the national motto, see 36 U.S.C. 302, and directed that it be inscribed on all currency, 31 U.S.C. 5112(d)(1). The latter practice was upheld by the United States Court of Appeals for the Eighth Circuit in *New Doe Child #1 v. United States*, 901 F.3d 1015 (2018). In 2006, the State of Florida adopted "In God We Trust" as its State motto. https://dos.myflorida.com/florida-facts/florida-state-symbols/state-motto/ (accessed July 4, 2019).

[277] See the photograph attached to this report as Appendix #2.

[278] Barry A. Kosmin and Seymour P. Lachman, *One Nation Under God: Religion in Contemporary American Society* (New York: Harmony Books, 1993), 28-29; David G. Dalin, "Jews, Judaism, and the American Founding," in Dreisbach and Hall, *Faith and the Founders of the American Republic*, 63.

[279] For instance, a rabbi was invited to open the House of Representatives with prayer in 1860. He appeared in "full rabbinic dress, 'piously in a white tallit and a large velvet skullcap,'" and his prayer 'invoked several uniquely Jewish themes and repeated the Biblical priestly blessing in Hebrew." *Town of Greece v. Galloway*, 572 U.S. __, 4 (2014) (Alito, J., concurring).

David rather than a Latin Cross.[280] Later, the tombstones of Muslim soldiers could include the Crescent and Star, adherents of Baha'i a 9 Pointed Star, and so on.[281]

113. In the nineteenth century, the Star of David became widely accepted by European Jews as "a striking symbol that would represent Judaism as the cross did Christianity."[282] It appears on Israel's flag, and as the central symbol in the Magen David Adom or "Red Shield of David"; Israel's member of The International Federation of Red Cross and Red Crescent Societies.[283]

114. In 2012, Ohio approved a Holocaust and Liberators Memorial, a central feature of which is a fractured Star of David.[284] Before it was dedicated, the Freedom From Religion Foundation sent a letter to head of the State's Holocaust Memorial Committee objecting to erecting a "religious symbol on government property."[285] The organization had no objection to the memorial per se, merely the inclusion of a "readily

[280] See https://www.cem.va.gov/cem/history/hmhist.asp (accessed July 1, 2019).

[281] See https://www.cem.va.gov/cem/hmm/emblems.asp (accessed June 28, 2019). These are not just theoretical possibilities, even for small religious groups. For instance, according to Jay Wexler, there are eight Wiccan pentacle markers in Arlington National Cemetery. Wexler, *Our Non-Christian Nation: How Atheists, Satanists, Pagans, and Others Are Demanding Their Rightful Place in Public Life* (Stanford: Redwood Press, 2019), 56.

[282] Adele Berlin and Maxine Grossman, ed. *The Oxford Dictionary of the Jewish Religion*, 2nd (New York: Oxford University Press, 2011), n.p. (entry for "Magen David") (accessed online June 29, 2019).

[283] Elon Gilad, "How Israel Got Its Flag and What It Means," *Haaretz* (May 11, 2016) available at: https://www.haaretz.com/israel-news/.premium-how-israel-got-its-flag-and-what-it-means-1.5381190 (accessed October 30, 2019); https://www.mdais.org/en (accessed October 30, 2019).

[284] See http://www.ohiostatehouse.org/about/capitol-square/statues-and-monuments/ohio-holocaust-and-liberators-memorial (accessed June 28, 2019) and https://ohioholocaustmemorial.org/ (accessed June 29, 2019).

[285] See https://ffrf.org/images/Ohio%20Statehouse%20Holocaust%20Memorial.pdf, at 1. (accessed June 29, 2019).

identifiable Jewish symbol."[286] Several federal court judges have agreed that, in the words of Judge Kermit Bye, the "six-point star is the Star of David, a Jewish religious symbol."[287] In spite of the Freedom From Religion Foundation's objections, the State dedicated the Memorial on June 2, 2014.[288]

115. Other monuments with Jewish symbols exist around the Nation. South Carolina's 2001 Holocaust Memorial features the Star of David prominently, as does New Orleans's 2003 memorial.[289] Philadelphia's monument to "Six Million Jewish Martyrs," on the other hand, depicts, according to Justice Alito, "a burning bush, Torah scrolls, and a blazing menorah."[290] Charleston, South Carolina's 1999 memorial contains as its "the central element" a "lonely discarded tallit, the Jewish prayer shawl used by men in the synagogue and also in which for some it was customary to be wrapped for burial."[291]

---

[286] *Ibid*., 2.

[287] *ACLU Nebraska Foundation v. City of Plattsmouth*, 358 F.3d 1020, fn. 4 (8th Cir. 2003). In that case, the Star of David was on a monument of the Ten Commandments virtually identical to the one at issue in the present case. The monument was eventually found to be constitutional in *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 1020772 (2005). See also, *Green v. Board of County Commissioners*, 450 F. Supp. 2d 1273, 1288 (E.D. Okla. 2006).

[288] http://www.ohiostatehouse.org/about/capitol-square/statues-and-monuments/ohio-holocaust-and-liberators-memorial (accessed July 5, 2019).

[289] https://www.onecolumbiasc.com/public-art/south-carolina-holocaust-memorial/ and http://star-of-david.blogspot.com/2007/05/new-orleans-holocaust-memorial.html (accessed June 29, 2019). Stars of David, alongside other religious symbols, are included in the National September 11 Memorial & Museum: https://www.911memorial.org/blog/collection-symbols-forged-wtc-steel (accessed June 29, 2019).

[290] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2090 n.34 (2019) (plurality opinion). See also, https://www.associationforpublicart.org/artwork/monument-to-six-million-jewish-martyrs/ (accessed June 29, 2019).

[291] See http://samgrubersjewishartmonuments.blogspot.com/2017/02/usa-charlestons-holocaust-memorial-in.html (accessed June 29, 2019); See also,

116. The United States Holocaust Memorial Museum in Washington, D.C. was built on land donated by the federal government and receives annual appropriations from the United States Congress. Its Hall of Remembrance can be interpreted as referencing the Star of David, and passages from the Hebrew Scriptures are inscribed on the building's walls, including: "What have you done? Hark, thy brother's blood cries out to me from the ground!" (Genesis 4:10); "Only guard yourself and guard your soul carefully, lest you forget the things your eyes saw, and lest these things depart your heart all the days of your life, and you shall make them known to your children, and to your children's children." (Deuteronomy 4:9); "I call heaven and earth to witness this day: I have put before you life and death, blessing and curse. Choose life—that you and your offspring shall live." (Deuteronomy 30:19); and "You are my witnesses." (Isaiah 43:10).[292]

117. Similarly, Idaho's Anne Frank Human Rights Memorial, dedicated in 2002, contains numerous inscriptions, including: "Let my people go" (Moses); "Let justice roll down like waters, and righteousness like an ever-flowing stream" (Amos); "What you do not want done to yourself, do not do to others" (Confucius);[293] "Not in the

---

http://www.waymarking.com/waymarks/WM4HN4_Charleston_Holocaust_Memorial_Charleston_South_Carolina and http://jhssc.org/2018/04/28/building-a-memorial-in-marion-square/ (accessed July 8, 2019).

[292] Avril Alba, *The Holocaust Memorial Museum Sacred Secular Space* (London: Palgrave Macmillan, 2015), 78-79, 66; https://www.ushmm.org/collections/ask-a-research-question/frequently-asked-questions#1 (accessed July 5, 2019); and Ryan Coonerty, *Etched in Stone: Enduring Words From Our Nation's Monuments* Washington, D.C.: National Geographic, 2008), 112.

[293] The Memorial's website describes Confucius as "a Chinese teacher, philosopher and political figure," but some followers and scholars consider him to be a religious figure as well. On this debate see Peter L. Berger, "Is Confucianism a Religion?" available at: https://www.the-american-interest.com/2012/02/15/is-confucianism-a-religion/

sky, nor in mid-ocean, in a mountain cave, is found that place on earth where abiding one may escape from the consequences of one's evil deed" (Buddha).[294]

118.    As America becomes more diverse, the range of religious images and language used in public memorials is bound to expand.  For instance, in 2001, New York City dedicated a tree and plaque to commemorate "the founding of the Hare Krishna religion in the United States."  The plaque included "the group's distinctive 16-word mantra: 'Hare Krishna, Hare Krishna, Krishna Krishna, Hare Hare Hare Rama, Hare Rama, Rama Rama, Hare Hare.'"[295]  And, to give one last example, Justice Alito noted in his opinion in the Bladensburg Cross case that "a new memorial to Native American veterans in Washington, D.C., will portray a steel circle to represent 'the hole in the sky where the creator lives.'"[296]  Such diversity is properly celebrated.[297]

---

[294] All of these quotations may be found here:  https://annefrankmemorial.org/memorial-tour/#section9 (accessed July 10, 2019).  The Memorial was built by the Wassmuth Center for Human Rights on land owned by the City of Boise.  It is considered to be a public park.

[295] See http://www.harekrsna.com/philosophy/acarya/newyork.htm (accessed July 5, 2019).

[296] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2090 (2019) (plurality opinion).  As well, the Memorial's "design incorporates water for sacred ceremonies, benches for gathering and reflection, and four lances where veterans, family members, tribal leaders, and others can tie cloths for prayers and healing."  See, https://americanindian.si.edu/nnavm/ (accessed July 12, 2019).

[297] I do not include in this section temporary recognitions of religious holidays, such as the 45-foot Christmas tree and 18-foot menorah upheld in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989).  American governments (national, state, and municipal) have long recognized Christian holidays (especially Christmas), but only in recent decades have they begun to recognize non-Christian ones as well (https://washington.org/visit-dc/holidays-white-house-first-family-traditions) (accessed July 5, 2019).  Since the turn of this century, for instance, the White House has hosted events to commemorate Hindu, Islamic, Jewish, and Sikh holy days (https://s3.amazonaws.com/becketpdf/Van-Orden-USSC-BFRL-Amicus.pdf, esp. 6-7) (accessed July 5, 2019).

119.     America has a long tradition of erecting monuments that include religious symbolism and language.  As the Nation has become diverse, so have the symbols civic officials have utilized to commemorate and memorialize people and events.  Symbols may have different meanings, but crosses are often associated with Christianity, the Ten Commandments with Judaism, Christianity, and Islam, and the Star of David with Judaism.  The United States Supreme Court has upheld the practice of erecting crosses and monuments of the Ten Commandments on public property.  Some have suggested that these monuments are constitutional, at least in part, because they were erected many decades ago.[298]  But to conclude that recently erected monuments with religious symbols violate the Establishment Clause would disproportionately impact symbols of minority religions.[299]

120.     Such a policy would have the perverse (and almost certainly unintended) effect of requiring the removal of the Star of David from Holocaust memorials on public property while permitting the Bladensburg Cross to remain in place.  It is reasonable to view even recently erected monuments containing religious language and symbols as being "deeply embedded in the history and tradition of this country."[300] A practice does

---

[298] See, for instance, Justice Breyer's suggestion in the Bladensburg cross case oral arguments that: "History counts. And so, yes, okay, but no more." Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2018/17-1717_7l48.pdf, 61 (accessed July 1, 2019); and his concurring opinion in *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2090 (2019).  See also, Garrett Epps, "Religious Monuments Are Fine Now—If They're Old: The Supreme Court's Peace Cross decision is very messy," June 21, 2019.  Available at: https://www.theatlantic.com/ideas/archive/2019/06/peace-cross-splits-supreme-court/592222/ (accessed October 21, 2019).

[299] Note that most of the monuments discussed in this section were created after 1990; many in the twenty-first century.

[300] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

not need to be longstanding in a particular State for it to be considered part of America's history.

121. Consider a hypothetical where a large island arises off the coast of California, is colonized by American citizens, and eventually becomes the 51st State. Surely it would be constitutionally permissible for its legislature to hire chaplains, open legislative sessions with prayer, recognize religious holidays, and erect monuments containing religious symbols and language on the same term as older States. Such practices are deeply embedded in the American political tradition even if they would be recently adopted in the newly formed State.

## VI. Freedom From Religion? The Rise of Strict Separationism

122. In this report, I have provided a great deal of evidence concerning the historical understanding of the Establishment Clause. None of this evidence suggests that governments cannot erect monuments of the Ten Commandments on public property. Moreover, I have demonstrated that Americans have a long history of including religious language, images, and symbols in public spaces. Yet, in recent decades, some individuals and organizations have argued that such practices violate the Establishment Clause. These claims raise two questions that will be briefly addressed in this section: (1) what does the Establishment Clause prohibit? and (2) what gave rise to the contemporary view that the Establishment Clause requires the strict separation of church and state?

123. As explained below, although church and state are separate institutions, nineteenth and twentieth-century anti-Catholic animus played a crucial role in explaining why many American came to embrace a separationist conception of the Establishment Clause. This modern, separationist notion differs from the founding generation's views of church-state relations that gave rise to the First Amendment.

**Church, State, and the Establishment Clause**

124. The Christian tradition has long held that church and state are separate institutions with different roles and responsibilities. This idea can be traced back to Jesus, who admonished his followers in Matthew 22:21 to "Render unto Caesar the things which are Caesar's; and unto God the things that are God's." Pope Gelasius I, in 494, explained that there are two powers by which this world is chiefly ruled: "the sacred authority of the priesthood and the royal power."[301] He, and most Christian leaders until the modern era, held that the two must be kept separate, but that they should cooperate with and support each other.[302]

125. America's earliest colonial leaders recognized that church and state were separate institutions, but most agreed that the two should work together. It was not uncommon to refer to the state as "Nursing Father" of the church.[303] This awkward phrase comes from Isaiah 49:23, "kings shall be thy nursing fathers . . ." (KJV) and was understood as requiring rulers to support Christian institutions and policies. Nine of the

[301] Quoted in Brian Tierney, *The Crises of Church and State: 1050-1300* (Toronto: University of Toronto Press, 1988), 13.

[302] Of course civic and ecclesiastical powers often disagreed as to the proper relation between the two spheres of authority. See, for instance, Tierney, *Crises of Church and State*. For an excellent, brief overview of this issue, see Daniel L. Dreisbach "The Meaning of the Separation of Church and State: Competing Views," in *The Oxford Handbook of Church and State in the United States*, ed. Derek Davis (New York: Oxford University Press, 2010), 207-25.

[303] James Hutson, "'Nursing Fathers': The Model of Church-State Relations in America from James I to Jefferson," in *Forgotten Features of the Founding: The Recovery of Religious Themes in the Early American Republic* (Lanham: Lexington Books, 2003), 45-72.

thirteen American colonies had established churches, and as we have seen they all had religious tests for office.[304]

125. After independence, most States either disestablished their churches (especially States where the Church of England was previously established) or moved to a system of "plural" or "multiple" establishments. States began to move away from religious tests for civic office, and every State protected religious liberty as a matter of constitutional or statutory law. The new national Constitution banned religious tests for federal offices and did not give Congress the power to restrict religious freedom or establish a national church. These latter protections did not assuage the fears of Anti-Federalists, so Congress proposed and the States ratified what we now call the First Amendment.[305]

126. It is regularly asserted that opponents of established churches or religious tests for office desired the strict separation of church and state.[306] I have already shown that few founders wanted to build a "high and impregnable" wall of separation between the two.[307] Even Madison and Jefferson, whatever their private thoughts or later regrets, did not act as if religion must be banished from the public square.[308]

---

[304] Mark David Hall, *Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth* (Nashville: Nelson Books, 2019), 89-90.

[305] See, generally, Curry, *The First Freedoms* and Dreisbach and Hall, *Sacred Rights of Conscience*, 239-438.

[306] See, for instance, Richard Hughes, *Myths America Lives By* (Urbana: University of Illinois Press, 2003), 55; Susan Jacoby, *Freethinkers, A History of American Secularism* (New York: Metropolitan, 2004), 28.

[307] *Everson v. Board of Education*, 330 U.S. 1, 18 (1947).

[308] Hall, *Did America Have a Christian Founding?*, 57-86.

127. Philip Hamburger, in his book *Separation of Church and State*, agrees that eighteenth century opponents of establishments did not want to separate the two institutions.[309] Instead, they desired "a freedom from the laws that created these establishments."[310] Even "most Baptists refrained from demanding the separation of church and state or denouncing all connection between them," emphasizing instead that human laws "should not regulate worship, compel the payment of taxes in support of religion, or discriminate among religions."[311] It should thus come as no surprise that the great Baptist minister John Leland, himself an opponent of religious establishments, had no objections to preaching at a church service in the U.S. Capitol.[312]

128. If the Establishment Clause did not build a wall of separation between church and state, what does it do? In an influential article, Michael McConnell contends that the Establishment Clause was understood to prohibit six categories of government action:

a. government control over the doctrine and personnel of the established church;

b. mandatory attendance in the established church;

c. government financial support of the established church;

d. restrictions on worship in dissenting churches;

e. restrictions on political participation by dissenters;

[309] Hamburger, *The Separation of Church and State* (Cambridge: Harvard University Press, 2002), 9, 78.

[310] *Ibid*., 10.

[311] *Ibid*., 170-71.

[312] Dreisbach, *Thomas Jefferson and the Wall of Separation Between Church and State*, 21-22; Hamburger, *Separation of Church and State*, 162-65.

  f. use of the established church to carry out civil functions.[313]

McConnell's list of practices prohibited by the Establishment Clause comports well with my discussion of the founders' views of church-state relations and Hamburger's treatment of the subject.

  129. Justice Black articulated a similar understanding of the evils the Establishment Clause was intended to prevent, which included:

> efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed.  Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of nonbelief in their doctrines, and failure to pay taxes and tithes to support them.[314]

  130. Justice Black, it is true, came to embrace a stricter understanding of the separation of church and state but, as we shall see, he may have done so for reasons completely unrelated to the historical understanding of the Establishment Clause.

  131. America's founders understood that church and state were two separate institutions, and many were coming to question some of the ways States had historically supported and encouraged religion.  They opposed coercion in matters of faith, and many were rejecting formal religious establishments as well.  But virtually none of them desired to build a wall of separation between church and state; certainly not a wall that would prohibit monuments of the Ten Commandments on public property.  So, the

---

[313] Michael McConnell, "Establishment and Disestablishment at the Founding, Part I: Establishment of Religion," *William and Mary Law Review* 44 (April 2003), 2131.  See also, Hamburger, *Separation of Church and State*, 53-107.

[314] *Everson v. Board of Education*, 330 U.S. 1, 9 (1947).

question remains, from where did the idea that church and state must be strictly separated come?

**The Anti-Catholic Origins of Separationism**

132. Philip Hamburger provides the most persuasive account of the rise of contemporary ideas that church and state must be strictly separated. He contends, first, that anti-Catholic animus in the nineteenth and early twentieth centuries encouraged a *rhetoric* of church-state separation. Although this rhetoric was often abstract and general, in practice it usually amounted to protecting Protestantism and discriminating against Catholic institutions and programs. Only in the mid-twentieth century did U.S. Supreme Court justices start applying separationist principles to practices favored by Protestants.

133. Protestant suspicion of Roman Catholics is nothing new; some American colonies banned Catholics altogether and many States did not permit them to hold civil office until the nineteenth century. Laws prohibiting Catholics were repealed in the early eighteenth century, sometimes because of pressure from Great Britain. France's assistance during the War for American Independence may have inclined some Protestants to look more favorably on Catholic citizens, but anti-Catholic animus returned with a vengeance in the nineteenth century when the number of Catholics in the United States skyrocketed.[315] The following table charts Catholic growth as a percentage of the American population:

[315] Daniel L. Dreisbach and Mark David Hall, *The Sacred Rights of Conscience: Selected Readings on Religious Liberty and Church-State Relations in the American Founding* (Indianapolis: Liberty Fund Press, 2009), 98; Maura Jane Farrelly, *Anti-Catholicism in America, 1620-1860* (New York: Cambridge University Press, 2018), 36-133.

TABLE 1
Catholics as Percentage of U.S. Population

| Year | Percentage |
|---|---|
| 1776 | 1.8% |
| 1850 | 14% |
| 1860 | 21% |
| 1890 | 26% |
| 1906 | 32% |
| 1926 | 30%[316] |

134. This growth was concerning to some Protestants because they considered Roman Catholics to hold erroneous theological views. As well, beginning in the 1830s, a slew of books portrayed the Catholic Church as an evil, dangerous institution. For instance, *Awful Disclosures of Maria Monk, or, The Hidden Secrets of a Nun's Life in a Convent Exposed*, an 1836 "memoir" of former nun named Maria Monk, described in great detail how priests would rape nuns and then baptize and murder their babies.[317] This work, like *Six Months in a Convent* (1835), *The Testimony of an Escaped Novice* (1855), and *Rosamond: or, A Narrative of the Captivity and Sufferings of an American Female under the Popish Priests, in the Island of Cuba* (1834) told similar tales. These accounts were sometimes loosely based on facts, but they were mostly figments of an author's feverish imagination.[318]

[316] Roger Finke and Rodney Stark, *The Churching of America, 1776-2005: Winners and Losers in Our Religious Economy*, (New Brunswick: Rutgers University Press, 1992), 55; and Mark A. Noll, *A History of Christianity in the United States and Canada* (Grand Rapids: Eerdmans, 1992), 361.

[317] Maria Monk, *Awful Disclosures of Maria Monk, or, The Hidden Secrets of a Nun's Life in a Convent Exposed*, rev. ed. (New York, 1836); locations 575, 1597 of ebook.

[318] Rebecca Theresa Reed, *Six Months in a Convent* (Boston, 1835); Josephine Bunkley, *The Testimony of an Escaped Novice* (New York: 1855), and Rosemond Culbertson,

135. Other Protestants were concerned with the more mundane possibility that Catholics simply could not be good American citizens. For instance, Samuel Morse, the inventor of the telegraph, contended in a popular series of articles that were later published as *Imminent Dangers to the Free Institutions of the United States Through Foreign Immigration and the Present State of the Naturalization Laws* that "*Protestantism* favors *Republicanism*, while *Popery* as naturally supports *Monarchical* power" (emphasis in original).[319] Not only does Catholicism encourage political tyranny, immigrants are:

> the priest-ridden troops of the Holy Alliance, with their Jesuit officers well skilled in all the aris [sic] of darkness. Now emigrants are selected for a service to their tyrants, and by their tyrants; not for their affinity to liberty, but for their mental servitude, and their docility in obeying the orders of their priests.[320]

Morse's solution to this problem was not to ban Catholic immigration altogether, but to pass a naturalization act that would prohibit all future immigrants from voting.[321] Similar books and pamphlets were published by Henry Ward Beecher, William C. Brownlee, Josiah Strong, and others.[322]

---

*Rosamond: or, A Narrative of the Captivity and Sufferings of an American Female under the Popish Priests, in the Island of Cuba* (New York, 1836); Farrelly, *Anti-Catholicism in America*,151-56.

[319] Samuel F.B. Morse, *Imminent Dangers to the Free Institutions of the United States Through Foreign Immigration* (1835, reprint; New York: Arno Press, 1969), 8.

[320] Morse, *Imminent Dangers*, 28.

[321] *Ibid*., 28.

[322] Henry Ward Beecher, *A Plea for the West* (1835); William C. Brownlee, *Popery: An Enemy to civil and Religious Liberty and Dangerous to Our Republic* (1836); Josiah Strong, *our Country* (1885).

136.     A major purpose of the creation of public schools was to help form good, democratic, and Protestant citizens.  Horace Mann of Massachusetts, sometimes called the father of the public school system, wrote that a nonsectarian public school:

> earnestly inculcates all Christian morals; it founds its morals on the basis of religion; it welcomes the religion of the Bible; and, in receiving the Bible, it allows it to do what it is allowed by no other system – *to speak for itself* (emphasis in original).[323]

137.     Mann had little doubt that this approach was nonsectarian, but to Roman Catholics it was a very Protestant way of teaching religion.  So, too, was the practice of using the King James version of the Bible rather than the Douay version favored by Catholics.  When Catholics objected to funding what they considered to be Protestant schools and asked for a share of State funds or that the Douay Bible be read to their children, they were accused of being "sectarian."[324]

138.     In 1852, a political movement known as the Know-Nothings (because when they were asked about their political activity, members inevitably responded "I know nothing") was formed.  Its members were primarily motivated by anti-Catholic bigotry, and in the mid-1850s they founded a political party known as the American Party.  In 1854, about seventy-five of its members were elected to Congress where they "pledged to oppose the pope and his minions."[325]  Two years later, the party convinced

---

[323] Quoted in Green, *Second Disestablishment*, 262.

[324] Hamburger, *Separation of Church and State*, 219; Green, *The Second Disestablishment*, 256-87; David Sehat, *The Myth of American Religious Freedom* (New York: Oxford University Press, 2011), 155-68; Stephen Waldman, *Sacred Liberty: America's Long, Bloody, and Ongoing Struggle for Religious Freedom* (New York: HarperOne, 2019), 69-71.

[325] Mark S. Massa, *Anti-Catholicism in America: The Last Acceptable Prejudice* (New York: Crossroad Books, 2003), 28.

former President Millard Fillmore to run under its banner.  He received 23% of the popular vote.[326]

139.    The American Party had run its course by 1860.  Among its critics was Abraham Lincoln.  In an August 24, 1855 letter to Joshua Speed, he wrote:

> I am not a Know-Nothing.  That is certain.  How could I be?  How can any one who abhors the oppression of negroes, be in favor of degrading classes of white people?  Our progress in degeneracy appears to me to be pretty rapid.  As a nation, we began by declaring that "*all men are created equal*."  We now practically read it "all men are created equal, *except negroes*." When the Know-Nothings get control, it will read "all men are created equals, except negroes, *and foreigners, and catholics*."  When it comes to that I should prefer emigrating to some country where they make no pretense of loving liberty—to Russia, for instance, where despotism can be taken pure, and without the base alloy of hypocrisy.[327]

Lincoln never voiced his objections publicly, at least in part because he did not want to alienate voters who supported the party.

140.    With respect to church-state relations, the most important development in this era was the introduction of a constitutional amendment by Representative James Blaine which reads as follows:

> No State shall make any law respecting an establishment of religion, or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefor, nor any public lands devoted thereto, shall ever be under the control of any religious sect; nor shall any money so raised or lands so devoted be divided between religious sects or denominations.[328]

---

[326] Farrelly, *Anti-Catholicism in America*, 167.

[327] Abraham Lincoln, *Selected Speeches and Writings* ed. Don E. Fehrenbacher (New York: Vintage Books, 1989), 105-06 (emphasis in original).

[328] Quoted in Hamburger, *Separation of Church and State*, 297-98.

141. Philip Hamburger argues persuasively that, although neutral on its face, this proposed amendment was "an anti-Catholic measure."[329] It was deemed necessary because the First Amendment did not apply to the States and few States understood their constitutions to prohibit governments from funding "sectarian" schools.[330] Proposed in 1875, the amendment passed overwhelmingly in the House but did not receive the necessary two-thirds majority in the Senate.

142. After the Blaine amendment failed, advocates sought to add similar amendments (often called "Baby Blaines"), to State constitutions, and even "demanded that Congress require such clauses in the constitutions of territories seeking admission to the Union."[331] Eventually, between 31 and 38 States passed Blaine amendments.[332] Although their supporters spoke broadly of "the sound principle of separation of church and state," their targets remained "sectarian" schools.[333] For instance, in New York, advocates emphasized that their amendment to separate church and state "cannot by any reasonable interpretation or construction be taken to prohibit the reading of the Bible in public schools."[334]

143. That "sectarian" in this context was a code-word for "Catholic" has been recognized by a seven Supreme Court justices, including four justices in *Mitchell v.*

---

[329] *Ibid.*

[330] *Ibid*., 334-59.

[331] *Ibid.*, 338.

[332] Scholars and jurists debate whether some of these provisions are technically "Blaine amendments." *Amicus curiae* brief of the Becket Fund for Religious Liberty in *Espinoza v. Montana* (2019), 11. Available at: https://www.supremecourt.gov/DocketPDF/18/18-1195/116251/20190918150903856_No.%2018-1195tsacTheBecketFundForRegigious Liberty.pdf (accessed October 23, 2019).

[333] Hamburger, *Separation of Church and State*, 340.

[334] *Ibid.*

*Helms* (2000). Here, Justice Thomas, writing for himself, Chief Justice Rehnquist, and Justices Scalia and Kennedy, observed:

> hostility to aid to pervasively sectarian schools has a shameful pedigree that we do not hesitate to disavow . . . . Opposition to aid to "sectarian" schools acquired prominence in the 1870's with Congress's consideration (and near passage) of the Blaine Amendment, which would have amended the Constitution to bar any aid to sectarian institutions. Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that "sectarian" was code for "Catholic" . . . Notwithstanding its history, of course, "sectarian" could, on its face, describe the school of any religious sect, but the Court eliminated this possibility of confusion when, in *Hunt v. McNair*, 413 U.S., at 743, it coined the term "pervasively sectarian"—a term which, at that time, could be applied almost exclusively to Catholic parochial schools.[335]

144. This view is not limited to conservative jurists. In the 2002 case of *Zelman v. Simmons-Harris*, Justice Breyer, joined by Justices Stevens and Souter, noted that:

> the "Protestant position" on this matter, scholars report, "was that public schools must be 'nonsectarian' (which was usually understood to allow Bible reading and other Protestant observances) and public money must not support 'sectarian' schools (which in practical terms meant Catholic)." . . . And this sentiment played a significant role in creating a movement that sought to amend several State constitutions (often successfully), and to amend the United States Constitution (unsuccessfully) to make certain that government would not help pay for "sectarian" (*i.e.*, Catholic) schooling for children.[336]

**The Continued Relevance of Anti-Catholic Animus**

145. Although Roman Catholics were often viewed as a monolith by Protestants, there were in fact significant differences between Catholics from different ethnic groups. The First World War encouraged these groups to cooperate in new and significant ways. After the war, the American Catholic church began speaking with

[335] *Mitchel v. Helms*, 530 U.S. 793, 828-29 (2000).

[336] *Zelman v. Simmons-Harris*, 536 U.S. 639, 721 (2002).

increased confidence into debates of the time, for instance, in favor of censoring sexually explicit or sacrilegious movies. Protestant leaders often favored similar bans, but Catholic calls for censorship raised, in some minds, the specter of theocracy.[337]

146. The most infamous groups to respond to perceived Catholic threats in the 1920s and 1930s were the Masons and the Second Ku Klux Klan.[338] Masonry consists of decentralized fraternal organizations that have long been suspicious of the Catholic church. The Roman Catholic church returned the favor in 1738 when it prohibited Catholics from joining the organization.[339] The First KKK was largely a Southern phenomenon concerned with racial superiority. The Second KKK, which started in 1915, flourished throughout the nation and was vehemently anti-Catholic. Some of its largest chapters were in Indiana and Ohio, and Klan-backed candidates were elected governor in Oregon, Colorado, Indiana, and Kansas.[340]

147. In 1922, the KKK, with the assistance of the Masons, convinced voters in Oregon to ban all private schools. Although the law was facially neutral, in fact virtually all private schools in the State were Roman Catholic and, according to Hamburger, "secular and Protestant private schools received quiet assurances that they would be accommodated, leaving Catholics almost alone to challenge the law."[341] Fortunately, the

---

[337] Green, *Third Disestablishment*, 16-57.

[338] Hamburger, *Separation of Church and State*, 396-422.

[339] Steven C. Bullock, *Revolutionary Brotherhood: Freemasonry and the Transformation of the American Social Order, 1730-1840*, 2nd ed. (Chapel Hill: University of North Carolina Press, 1996); Ed Condon, "The Real Reason Catholics Can't Be Freemasons," *Catholic Herald* (August 10, 2017) available at: https://catholicherald.co.uk/issues/august-11th-2017/the-real-reason-catholics-cant-be-freemasons/ (accessed Oct. 31, 2019).

[340] Waldman, *Sacred Liberty*, 153.

[341] Hamburger, *Wall of Separation*, 415-19, 418.

United States Supreme Court declared Oregon's law to be unconstitutional in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).

148. In 1928, for the first time, a major party put a Roman Catholic on its presidential ticket. Alfred Emanuel Smith, an Irish-Catholic and well-known opponent of Prohibition, had been elected governor of New York four times. He was by some accounts a lukewarm Catholic, but his political opponents nevertheless charged that electing him as president would be tantamount to electing the pope. A well-known political cartoon entitled "Cabinet Meeting—If Al Were President" has the pope sitting at the head of a table surrounded by cardinals and Al playing the role of a servant (serving, of course, hard liquor).[342] Smith's faith may not have cost him the presidency, but it indisputably contributed to his losing the election to Herbert Hoover by 444 to 87 electoral votes.

149. The Second World War unified Americans in many ways, but Protestant-Catholic suspicions remained. Shortly after the war, the anti-Catholic polemicist Paul Blanshard began his meteoric rise to fame as a critic of Catholic power. In 1947 and 1948 he published a series of articles in *The Nation* arguing that Catholicism and liberal democracy were incompatible. These articles became the basis for *American Freedom and Catholic Power*, which remained on the *New York Times* best-seller list for seven months.[343] Like Samuel Morse, he portrayed the pope as "the Commander-in-Chief of the Catholic army, and more than a million clerical soldiers throughout the world—

[342] Available at: https://campaignstops.blogs.nytimes.com/2011/12/10/when-a-catholic-terrified-the-heartland/ (accessed October 23, 2019).

[343] Massa, *Anti-Catholicism in America*, 59.

priests, nuns, and brothers—follow him with unquestioning obedience."[344] Blanshard published more than a dozen books criticizing Catholic power and would serve as general counsel for the organization Protestants and Other Americans United for Separation of Church and State.

150. Coinciding with Blanshard's ascent, an organization with nativist roots challenged a New Jersey program that reimbursed parents for the cost of transporting their children to parochial schools.[345] The group—the Junior Order of United American Mechanics—limited membership to "white, native-born Americans who were in 'favor of free education and opposed to any union of Church and State.'"[346] Among its goals was "to prevent sectarian interference [in public schools] and to uphold the reading of the Holy Bible therein."[347] The case resulted in the Supreme Court case of *Everson v. Board of Education* (1947).

151. Hugo Black, author of the majority opinion in *Everson,* was a one-time member of the KKK.[348] His son later recalled that:

> The Ku Klux Klan and Daddy, so far as I could tell, only had one thing in common. He suspected the Catholic Church. He used to read all of Paul Blanshard's books exposing power abuse in the Catholic Church. He thought the Pope and bishops had too much power and property.[349]

[344] Paul Blanshard, *American Freedom and Catholic Power*, 2nd ed. (Beacon Hill: Beacon Press, 1958), 27.

[345] Hamburger, *Separation of Church and State*, 451-63.

[346] *Ibid.*, 455.

[347] *Ibid.*

[348] *Ibid*., 422-34.

[349] *Ibid*., 463.

152. As well, at least seven justices on the *Everson* court were members of "one Masonic organization or another."[350]

153. It should be noted that the majority in *Everson* upheld a program that *benefited* families that sent their children to private schools, including Catholic schools, and that anti-Catholic animus was not evident in either Black's or Rutledge's opinions. The same cannot be said about Justice Jackson's dissenting opinion, which was joined by Rutledge. Jackson observed that the Catholic Church "relies on early and indelible indoctrination in the faith and order of the Church by the word and example of persons concentrated to the task. Our public school, if not a product of Protestantism, at least is more consistent with it than with the Catholic culture and scheme of values."[351]

154. Eleven days after *Everson* was decided, Senator Robert Taft introduced a federal education bill that would have provided grants to States, which could in turn distribute funds to public and private schools—including religious schools. The possibility of federal funds making their way to religious (especially Catholic) schools led James M. Dawson, director of the Baptist Joint Committee, to call a "meeting of Protestant, educational, and fraternal leaders."[352] These individuals founded Protestants and Other Americans United for Separation of Church and State in 1948. The organization's founding manifesto complained of a "powerful church, unaccustomed in its own history and tradition to the American ideal of separation of church and state."[353] Catholics could be excused for thinking that the organization was targeting them. As

[350] *Ibid.*, 451.

[351] 330 U.S. 1, 23 (1947).

[352] Green, *Third Disestablishment*, 128.

[353] Quoted in Hamburger, *Separation of Church and State*, 471.

might be expected, members of Protestants and Other Americans United vigorously opposed the nomination and election of President John F. Kennedy, a Catholic.

**Separationist Rhetoric Becomes a Reality**

155. The logic of both the majority and dissenting opinions in *Everson* pointed toward the strict separation of church and state, a direction seemingly confirmed by the Court's decision in *McCollum v. Board of Education*, 333 U.S. 203 (1948). Here, by an 8-1 vote, justices invalidated an Illinois plan that set aside part of a school day for voluntary religious instruction. Many traditional Protestants were stunned by the opinion. In Hamburger's words:

> They had sought their familiar Protestant separation and now suddenly found themselves confronted with a secular version, which threatened the nonsectarian religiosity of America's institutions.[354]

156. Without doubt, some Americans have favored the separation of church and state as a matter of principle.[355] But Hamburger and Green demonstrate that many supported separationism because they understood it to limit Catholic power.[356] When the Supreme Court started using the Establishment Clause to declare unconstitutional practices such as school prayer, they rejected separationism.

---

[354] *Ibid.*, 477.

[355] For instance, Roger Williams favored the separation of church and state for biblical and theological reasons. And, as Hamburger points out, in the early nineteenth century some Jeffersonians favored separation as a matter of principle, as did some free thinkers after the Civil War. But much of the popular support for separating church and state was motivated by anti-Catholic animus. Hamburger, *Separation of Church and State*, 117-89, 287-333.

[356] Green's *The Third Disestablishment* is, in my opinion, a logical extension of Hamburger's *Separation of Church and State*. Green criticizes Hamburger's work in several places, e.g. *Second Disestablishment*, 8, and *Third Disestablishment*, 79, but collectively their works highlight the anti-Catholic origins of separationism.

157. In time, Protestants would come to cooperate with Catholics to oppose what they perceived to be the forces of secularization. An early manifestation of this cooperation may be seen in Protestant support, after years of opposing governmental aid to religious schools, for the Elementary and Secondary Education Act of 1965. This law provided federal tax dollars to religious institutions.[357] When challenges to the provision of federal funds to religious entities reached the Supreme Court, those favoring a wall of separation between church and state often won. But Green concludes that the period between 1971 and 1975 was "to be the high point of strict separationism on the Court."[358]

158. Anti-Catholic animus played an important role in the modern movement to strictly separate church and state, but I do not mean to suggest that its contemporary advocates are motivated by such hatred. I recount this history because it is important for helping explain how some Americans came to embrace an understanding of the Establishment Clause that America's founders would not have recognized.

## VII. Conclusion

159. Based on more than twenty-five years of studying religious liberty and church-state relations in the United States, it is my opinion that the historical understanding of the First Amendment permits a State to erect, or allow to be erected, a monument of the Ten Commandments on public property. Such a practice is "deeply

---

[357] Green, *Third Disestablishment*, 326-28. More recently, see "Evangelicals & Catholics Together: The Christian Mission in the Third Millennium," *First Things* (May 1994). Available at: https://www.firstthings.com/article/1994/05/evangelicals-catholics-together-the-christian-mission-in-the-third-millennium (Accessed October 24, 2019).

[358] Green, *Third Disestablishment*, 345.

embedded in the history and tradition of this country,"[359] and there is no good reason to believe that it violates the Establishment Clause as understood by America's founders.

[359] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

Respectfully submitted,

Mark David Hall

Herbert Hoover Distinguished Professor of Politics

Faculty Fellow, William Penn Honors Program

George Fox University

Appendix #1

Ten Commandments Monument at the Arkansas State Capitol

the Ten Commandments
I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbors.
PRESENTED TO THE PEOPLE OF ARKANSAS BY THE AMERICAN HISTORY AND HERITAGE FOUNDATION

Appendix #2

"In God We Trust" Plaque at
the Richard Sheppard Arnold United States Courthouse

WELCOME

Appendix #3

Dr. Mark David Hall
Curriculum Vitae

**Mark David Hall**

George Fox University
Department of History and Political Science
414 N. Meridian St., Box #6092
Newberg, OR 97132

mhall@georgefox.edu
office: (503) 554-2674
mobile: (971) 998-9536

---

**Academic Employment**

George Fox University, Herbert Hoover Distinguished Professor of Politics, Fall 2005-present; Associate Professor, Fall 2001-Spring 2005.

George Fox University, William Penn Honors Program. Faculty Fellow, 2013-present; Interim Director, 2012-2013.

Center for the Study of Law and Religion at Emory University. Associated Faculty, Fall 2016-present.

Baylor Institute for the Studies of Religion. Senior Fellow, Fall 2011-present.

East Central University, Department of Political Science. Associate Professor, Fall 1999-Spring 2001; Assistant Professor: 1993-1999.

The University of Virginia, Department of Government and Foreign Affairs. Instructor, Fall 1992.

**Education**

Ph.D. Government, The University of Virginia, Department of Government and Foreign Affairs, May 1993.

B.A. Political Science, Wheaton College (IL), 1988.

**Teaching Interests**

American Political Theory, Religion and Politics, Constitutional Law, and Great Books.

**Publications**

**Books**

*Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth*. Nashville: Thomas Nelson, 2019.

*Great Christian Jurists in American History*. Edited with Daniel L. Dreisbach. New York: Cambridge University Press, 2019.

*America and the Just War Tradition: A History of U.S. Conflicts*. Edited with J. Daryl Charles. Notre Dame: University of Notre Dame Press, 2019.

*Collected Works of Roger Sherman*. Editor. Indianapolis: Liberty Fund Press, 2016.

*Faith and the Founders of the American Republic*. Edited with Daniel L. Dreisbach. New York: Oxford University Press, 2014.

*Roger Sherman and the Creation of the American Republic*. New York: Oxford University Press, 2013.

*America's Forgotten Founders*. Edited with Gary L. Gregg. Wilmington: ISI Books, 2012.

*The Sacred Rights of Conscience*: *Selected Readings on Religious Liberty and Church-State Relations in the American Founding*. Edited with Daniel L. Dreisbach. Indianapolis: Liberty Fund Press, 2009.

*The Forgotten Founders on Religion and Public Life*. Edited with Daniel L. Dreisbach and Jeffry H. Morrison. Notre Dame: University of Notre Dame Press, 2009.

*Collected Works of James Wilson*, 2 vols. Edited with Kermit L. Hall. Indianapolis: Liberty Fund Press, 2007.

*The Founders on God and Government*. Edited with Daniel L. Dreisbach and Jeffry H. Morrison. Lanham: Rowman and Littlefield, 2004.

*The Political and Legal Philosophy of James Wilson, 1742-1798*. Columbia: The University of Missouri Press, 1997.

**Articles and Book Chapters**

"Religious Accommodations and the Common Good." In *Set Free: Restoring Religious Freedom for All*. Abilene: Abilene Christian University Press, forthcoming.

"Why Tolerate Religion? The Rise and Fall of Religious Liberty in America." *Citizens and Statesmen: An Annual Review of Political Theory and Public Life*. 12 (Fall 2019).

"The Just War Tradition and America's Wars." With J. Daryl Charles. In *America's Wars: A Just War Perspective*. Edited with J. Daryl Charles. Notre Dame: University of Notre Dame Press, 2019.

"America's Founders, Religious Liberty, and the Common Good," *University of St. Thomas Law Journal*. 15 (2019): 642-661.

"Roger Sherman and Oliver Ellsworth." In *Great Christian Jurists in American History*. Edited by Daniel L. Dreisbach and Mark David Hall. New York: Cambridge University Press, 2019.

"Whose Rebellion? Reformed Resistance Theory in America, part 2." Co-authored with Sarah A. Morgan Smith. Invited article for *Unio cum Christo*. 4 (April 2018): 171-188.

"Whose Rebellion? Reformed Resistance Theory in America, part 1." Co-authored with Sarah A. Morgan Smith. Invited article for *Unio cum Christo*. 3 (October 2017): 169-184.

"Were Any of the Founders Deists?" In *The Wiley Blackwell Companion to Religion and Politics in the U.S*. Edited by Barbara A. McGraw. West Sussex: Wiley Blackwell Publishing, 2016.

"Religious Accommodations and the Common Good." Heritage Foundation Backgrounder (October 26, 2015): http://www.heritage.org/research/reports/2015/10/religious-accommodations-and-the-common-good.

"Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment." *American Political Thought*. 3 (Spring 2014): 32-63.

"Vindiciae Contra Tyrannos: The Influence of the Reformed Tradition in the American Founding." In *Faith and the Founders of the American Republic*. Edited by Daniel L. Dreisbach and Mark David Hall. New York: Oxford University Press, 2014.

"Did America Have a Christian Founding?" *First Principles Series*, The Heritage Foundation, June 7, 2011. http://www.heritage.org/research/lecture/2011/06/did-america-have-a-christian-founding.

"Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases." *High Court Quarterly Review*. 5 (2009): 109-153. This is a revised version of the article originally published in *Oregon Law Review* 85 (2006): 563-614, which was republished in Margaret Monahan Hogan and Lauretta Conklin Frederking, eds., *The American Experiment: Religious Freedom*. Portland: The University of Portland, 2008.

"Religion and the American Founding." In *A History of the U.S. Political System: Ideas, Interests, and Institutions*. Edited by Richard A. Harris and Daniel J. Tichenor, 1: 99-112. Santa Barbara: ABC-Clio, 2010.

"Roger Sherman: An Old Puritan in a New Nation." In *The Forgotten Founders on Religion and*

*Public Life*. Edited by Daniel L. Dreisbach, Mark David Hall, and Jeffry H. Morrison. Notre Dame: University of Notre Dame Press, 2009.

"Justice, Law, and the Creation of the American Republic: The Forgotten Legacy of James Wilson." *First Principles Series*, The Heritage Foundation, June 1, 2009. http://www.heritage.org/Research/Thought/upload/FP26.pdf.

"James Wilson" and "Roger Sherman." In *America's Forgotten Founders*. Edited by Gary L. Gregg and Mark David Hall. Wilmington: ISI Books, 2011. Originally published by the McConnell Center, University of Louisville, 2008.

"Political Obligation and the United States Supreme Court," with George Klosko. In George Klosko, *Political Obligations*. New York: Oxford University Press, 2005. This is a revised version of our article of the same title published in *The Journal of Politics* 60 (May 1998): 462-80.

"James Wilson: Presbyterian, Anglican, Thomist, or Deist?: Does it Matter?" in *The Founders on God and Government*. Edited by Daniel L. Dreisbach, Mark D. Hall, and Jeffry H. Morrison. Lanham: Rowman and Littlefield, 2004.

"James Wilson's Law Lectures." *The Pennsylvania Magazine of History and Biography*. CXXVIII (January 2004): 63-76.

"Beyond Self-Interest: The Political Theory and Practice of Evangelical Women in Antebellum America." *Journal of Church and State*. 44 (Summer 2002): 477-99.

"The Declaration of Independence in the Supreme Court." In *The Declaration of Independence: Origins and Impact*. Edited by Scott Douglas Gerber. Washington, D.C.: Congressional Quarterly Press, 2002.

"Catharine Beecher: America's First Female Philosopher and Theologian." *Fides et Historia*. 32 (Winter/Spring 2000): 65-80.

"James Wilson: Democratic Theorist and Supreme Court Justice." In *Seriatim: The Early Supreme Court*. Edited by Scott Douglas Gerber. New York: New York University Press, 1998.

"The Wilsonian Dilemma." *Southeastern Political Review*. 25 (December 1997): 641-658.

**Invited Lectures**

"Did America Have a Christian Founding?" American Bible Society, Washington, DC. November 2019.

"Did America Have a Christian Founding?" Liberty University, Lynchburg, VA. November 2019.

"Did America Have a Christian Founding?" Heritage Foundation, Washington DC. November 2019.

"Did America Have a Christian Founding?" Faith & Law, Washington, DC. November 2019.

"Did America Have a Christian Founding?" First Liberty Fellowship Program, Washington, DC. November 2019.

"Did America Have a Christian Founding?" Gonzaga University, October 2019.

"Did America Have a Christian Founding?" Birmingham Southern University, October 2019.

"Did America Have a Christian Founding?" Faulkner University, October 2019.

"The Founding Fathers and Public Leadership: Roger Sherman and James Wilson." Tommy G. Thompson Center, University of Wisconsin-Madison, September 2019.

"America and the Just War Tradition." University of Louisville, September 2019.

"Did America Have a Christian Founding?: A Debate With Steven K. Green." Willamette University, September, 2019.

"Did America Have a Christian Founding?: A Debate With Andrew Seidel." University of Louisville, September 2019.

"Did America Have a Christian Founding?" Asbury University, September 2019.

"What are the Religious Roots of the American Founding?" University of the Cumberlands, September 2019.

"America and the Just War Tradition." National Christian Forensics and Communications Association, August 2019.

"Did America Have a Christian Founding?" Intercollegiate Studies Institute National Honors Conference, July 2019.

"The Political and Legal Philosophy of James Wilson." Center for Constitutional Studies Group, University of Edinburgh, July 2019.

"Understanding (Non)-Establishment: Some Historical Stories and Considerations." Blackstone Legal Fellowship, June 2019.

"Christianity, Modernity, and the American Founding."  Witherspoon Institute, June 2019.

"America and the Just War Tradition."  Presentation with J. Daryl Charles at the Institute for Humane Studies, May 2019.

"America and the Just War Tradition."  Presentation with J. Daryl Charles at the United States Department of State, May 2019.

"America and the Just War Tradition."  Presentation with J. Daryl Charles at the Institute for Religion and Democracy, May 2019.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Fresno Pacific University, April 2019.

"America and the Just War Tradition."  Presentation with J. Daryl Charles at Seattle Pacific University, April 2019.

"America and the Just War Tradition."  Presentation with J. Daryl Charles at Corban College, April 2019.

 "America and the Just War Tradition."  Presentation with J. Daryl Charles at George Fox University, April 2019.

"Did America Have a Christian Founding?" Cairn University, April 2019.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Cairn University March 2019.

"Did America Have a Christian Founding?" Northwestern College (Iowa), March 2019.

"Did America Have a Christian Founding?" Michigan State University, March 2019.

"Did America Have a Christian Founding?" Hope College, March 2019.

"Did America Have a Christian Founding?" Wheaton College, March 2019.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Colorado Christian College, February 2019.

"Vindiciae, Contra Tyrannos: The Influence of the Reformed Tradition on the American Founding."  University of Alaska at Anchorage, February 2019.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Biola

University, January 2019.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Oral Roberts
University, November 2018.

"Religious Freedom in America: The Early Colonies to the Present Day."  Jack Miller Center
Jefferson Seminar, October 2018.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Constitution Day
Address at St. Vincent College, September 2018.

"Faith and the Founders of the American Republic" and "Why Tolerate Religion."  ISI National
Honors Conference, July 2018.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  Institute for
Humane Studies National Honors Conference, June 2018.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America." Cairn University,
April 2018.

"Religious Liberty and Discrimination."  Debate with Steven K. Green at Linfield College,
November, 2017.

"America's Founders on Religious Liberty and the Common Good."  Keynote address, Annual
Meeting of the Philadelphia Society, October 2017.

"Faith and the Founders of the American Republic."  Keynote address, ISI Regional Conference,
October 2017.

"Resistance to Tyrants is Obedience to God."  Legacy of the Reformation Conference.  Liberty
University, September 2017.

"Did America Have a Christian Founding?"  College of the Ozarks, August 2017.

"Religious Liberty and Church-State Relations: Then and Now."  ISI National Honors
Conference, August 2017.

"Faith and the Founders of the American Republic."  Azusa Pacific University,
March 2017.

"Roger Sherman and the Creation of the American Republic."  Grove City College and
American Founders' Luncheon, December 2016.

"Why Tolerate Religion?: The Rise and Fall of Religious Liberty in America."  John Brown

University, October 2016.

"Faith and the Founders of the American Republic." Lecture at the University of Oklahoma, October 2016.

"History Lesson: Founders, Intent, & Foundation of Religious Liberty." Plenary Address at the Pensmore National Symposium on Religious Liberty, October 2016. Available online: https://www.youtube.com/watch?v=NNFEeqmLVpg

"Did America Have a Christian Founding?" Association of Classical and Christian Schools Annual Conference, July 2016.

"Same-Sex Marriage and Religious Liberty: Are they in Conflict?" Agora Forum, Eastern University, February 2016.

"*Vindiciae, Contra Tyrannos*: The Influence of the Reformed Tradition on the American Founding." Westminster Theological Seminary, February 2016.

"Were any of the Founders Deists?," "Did America Have a Christian Founding?," "Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases," and "Religious Accommodations and the Public Good." Big Sky Worldview Forum, Billings, Montana. November 2015.

"The Articles of Confederation," "Slavery in the Early Republic," and "The Progressive Movement and the Bill of Rights." Bill of Rights Institute conference for teacher training, Salt Lake City, Utah. October 2015.

"Same-Sex marriage and religious freedom: Are they in conflict?" Northwood University. September 2015.

"Religious Liberty and Same-Sex Wedding Ceremonies: Historic Precedents, Future Possibilities." Lecture at John Brown University. April 2015.

"Religious Liberty in America: From the Founding Era to *Hobby Lobby*." Lecture at Linfield College. February 2015.

"Religious Freedom and American History." Plenary address at the Religious Freedom Summit, Cedarville University. October 2014.

"Christianity, the Bible, and the Founders of the American Republic." Green Scholars Initiative Speaker Series. Springfield, Missouri. July 2014.

"Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases." Family Research Council, Washington, D.C. June 2014.

"Why Johnny Can Read; But It Doesn't Really Matter." Commencement address delivered at Cedar Tree School, Vancouver, Washington. June 2014.

"The First Freedom: Religious Liberty and Church-State Relations in the American Founding." Northwest University, Kirkland, Washington. February 2014.

"Religion and the American Founding." American Enterprise Institute's Values & Capitalism faculty retreat, Houston. January 2014.

"Liberty and the Declaration of Independence and Constitution," "Federalism and Freedom," "The Supreme Court and the First Amendment." Bill of Rights Institute conference for teacher training, Cheyenne, Wyoming. October 2013.

"Did America Have a Christian Founding?" Debate between Mark David Hall and Steven K. Green, University of Idaho School of Law. November 2012.

"Faith and the Founders of the American Republic," Constitution Day Address, University of Idaho School of Law. September 2012.

"The Sacred Rights of Conscience: Religious Liberty and Church-State Relations in the American Founding." Azusa Pacific University. March 2012.

"Religious Liberty in Early America," "Religious Liberty and Church-State Relations in the American Founding," and "The Supreme Court and the Religion Clauses." George Washington Institute for Religious Freedom conference for teacher training. February 2012.

"Civic Values in the Declaration of Independence," "Principles of the Constitution," "Federalism and Civic Values in Modern Times," "Historical and Philosophical Origins of the First Amendment," "Religious Liberty in the Founding Era," and "Religious Liberty in Modern Times." Bill of Rights Institute conference for teacher training. July 2011.

"Did America Have a Christian Founding?" Heritage Foundation (covered by C-SPAN). Washington, D.C. December 2010.

"The Scot as a Nationalist: James Wilson and the Creation of the American Republic." St. Andrews Society of Washington, D.C. December 2010.

"Faith and the Founders of the American Republic." Maryville Symposium on Faith and the Liberal Arts. September 2010.

"Faith and the Founders of the American Republic." Buechner Institute at King College. September 2010.

"James Wilson and the Role of Natural Law in the American Experiment in Self-Government."
James Madison Program Conference, Princeton, May 2010.

"Roger Sherman and the Creation of the American Republic."  McConnell Center for Political
Leadership, University of Louisville.  September 2008.

"Church-State Relations in the United States."  The Hebrew University of Jerusalem.  June 2008.

"Famous and Forgotten Founders: The Case of Roger Sherman."  McConnell Center for Political
Leadership, University of Louisville.  March 2008.

"Respecting an Establishment of Religion."  Oregon Chautauqua lecture, delivered at multiple
locations throughout Oregon.  2006-2008.

"Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History and the First
Amendment's Religion Clause."  Featured presentation at "The American Experiment:
Religious Freedom," a conference hosted by The University of Portland Garaventa Center
for Catholic Intellectual Life and American Culture.  April 2007.

"Why Johnny Can Read; But It Doesn't Really Matter."  Commencement address delivered at
Veritas School, Newberg.  May 2005.

"John Rawls, Liberalism, and Christianity."  Regent University.  November 2002.

"James Wilson on Religion, Morality, and the Constitution."  John Courtney Murray Lecture, the
American Enterprise Institute, Washington, D.C.  January 2000.

**Selected Papers and Conference Participation**

"The Sacred Rights of Conscience."  Discussion leader for IHS colloquium for college students.
William Jessup University.  April 2019.

"Proclaim Liberty Throughout All the Land: The Bible, Liberty, and the American Founding."
Discussion Leader for Liberty Fund colloquium.  March 2019.

"The Sacred Rights of Conscience."  Discussion leader for IHS colloquium for
college students.  Assumption College.  February 2019.

"Liberty in the Book of Genesis."  Liberty Fund Colloquium.  Greenville, South Carolina.
February 2019.

"Liberty, Political Neutrality, and Religion."  Liberty Fund Colloquium.  Jekyll Island, Georgia.
November 2018.

"The Sacred Rights of Conscience." Discussion leader for ISI/Liberty Fund colloquium for college students. Providence. November 2018.

"The Sacred Rights of Conscience." Discussion leader for IHS colloquium for college students. Azusa Pacific University. September 2018.

"Liberty, Markets, and Ideas in the Works of Joyce Appleby." Liberty Fund Colloquium. Indianapolis. August 2018.

"Roger Sherman, Ordered Liberty, and the Creation of the American Republic." Liberty Fund colloquium director. Indianapolis, April 2018.

"Thomas Jefferson: Revolutionary?" Liberty Fund colloquium. Williamsburg. March 2018.

Fourth Annual Salmon P. Chase Lecture and Colloquium. Invited Participant, Georgetown Law School. December 2017.

"The Future of Libertarianism and Conservativism." Directed conference co-sponsored by the Institute for Humane Studies and the Intercollegiate Studies Institute. Newberg. September 2017.

"Liberty and the Declaration of Independence." Discussion leader for Acton/Liberty Fund colloquium. Philadelphia, August 2017.

"The Sacred Rights of Conscience." Discussion leader for ISI/Liberty Fund colloquium for college students. Baltimore. March 2017.

"The Birth of a New American State: Indiana." Discussion leader for Liberty Fund colloquium. Indianapolis. December 2016.

"Federalism and Constitutionalism." Discussion leader for ISI/Liberty Fund colloquium for college students. Providence. September 2016.

"The Sacred Rights of Conscience." Discussion leader for McConnell Center/Liberty Fund colloquium for high school teachers. Boston, February 2016.

"Law, Liberty, and the State." Liberty Fund Colloquium. Portland, Maine. October 2015.

"Liberty, Emancipation, and the Rule of Law." Jack Miller Center Jeffersonian Colloquium, Portland. March 2015.

"The Presidents and the Constitution: John Adams." Discussion leader for Ashbrook Center-Liberty Fund Colloquium for high school teachers, Quincy, MA. November 2014.

"*Burwell v. Hobby Lobby*." Chair of roundtable panel at the annual meeting of the American Political Science Association, Washington, D.C. August 2014.

"Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment." Paper presented at the annual meeting of the American Political Science Association, Chicago. August 2013.

"Understanding the Declaration of Independence in Historical Context." Discussion leader for Liberty Fund Colloquium. Indianapolis. June 2013.

"The Sacred Rights of Conscience: The Development of Religious Liberty in America, 1610-1835." Liberty Fund Colloquium director. Indianapolis. June 2013.

"Milton's Conception of Liberty," Liberty Fund Colloquium. Seattle. October, 2013.

"Liberty and Responsibility in Adam Smith." Liberty Fund Colloquium. Holland, Michigan. August 2013.

"The Sacred Rights of Conscience: Testing Constitutional Principles of Religious Liberty and Church-State Relations in the New Nation, Part III." Liberty Fund colloquium co-director. Indianapolis, April 2013.

"Federalism and the Separation of Powers." Discussion leader for Ashbrook Center-Liberty Fund colloquium for business leaders. Cincinnati. February 2013.

"The Sacred Rights of Conscience." Discussion leader for Liberty Fund colloquium for high school teachers. Washington, D.C., February 2012.

"Reformed Political Thought and the Creation of the American Republic." Paper accepted for presentation at the annual meeting of the American Political Science Association, New Orleans. September 2012 (convention was cancelled).

"Order and Disorder in International Politics: From *Pacem in Terris* to the Regensburg Address." Panel discussant at the annual meeting of the American Political Science Association, Seattle. August 2011.

"Religion, Society, and the Rule of Law." Council for Christian Colleges and Universities International Seminar. June 2011.

"Roger Sherman, Ordered Liberty, and the Creation of the American Republic." Liberty Fund colloquium director. Indianapolis, November 2010.

"Vindiciae, Contra Tyrannos: The Influence of the Reformed Tradition on the American

Founding."  Paper presented at the annual meeting of the American Political Science Association, Washington, D.C.  September 2010.

"*Christian Legal Society v. Martinez* and the Future of Religious Liberty in America."  Chair of roundtable panel at the annual meeting of the American Political Science Association, Washington, D.C.  September 2010 (covered by C-SPAN).

"Resistance to Tyrants is Obedience to God."  Liberty Fund colloquium.  Orange Beach, Alabama.  May 2010.

"The Sacred Rights of Conscience: Defining Religious Liberty in the Founding Era."  Liberty Fund colloquium co-director.  Cincinnati, November 2009.

"Herbert Hoover Symposium XVII."  Director.  Newberg, October 2009.

"Evangelical Political Thought and Natural Law."  Panel discussant at the annual meeting of the American Political Science Association, Toronto, September 2009.

"Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases."  Paper presented at the annual meeting of the American Political Science Association, Toronto.  September 2009.

"The Great Awakening Revisited, Political Theology, and the Rise of American Liberty." Liberty Fund colloquium.  Orange Beach, Alabama.  May 2009.

"James Wilson, the Law of Nature, and the Protection of Liberty."  Liberty Fund colloquium. San Diego, January 2009.

"2008-2009 Socratic Leadership Seminar I," Liberty Fund seminar.  Indianapolis, October 2008.

"Reformed Theology and the American Founding: The Case of Roger Sherman."  Paper presented at the annual meeting of the American Political Science Association, Boston. August 2008.

"Roger Sherman, Religious Liberty, and Church-State Relations."  Paper presented at the annual meeting of the American Political Science Association, Boston. August 2008.

"Defending Democracy, Defeating Terrorism." Foundation for the Defense of Democracy Academic Fellows Program.  Tel Aviv, Israel.  June 2008.

"The Sacred Rights of Conscience: Biblical and European Themes of Religious Liberty in Colonial America."  Liberty Fund colloquium co-director.  Cincinnati, October  2007.

"Herbert Hoover Symposium XVI."  Director.  Newberg, October 2007.

"Religion and the American Founding." Conference Director, George Fox University, March 2007.

"China Confronts New Security Issues." A National Science Foundation Chautauqua Short Course in Beijing, China, June 2006.

"National Faculty Leadership Conference." Chair of political science and law steering committee, Washington, D.C., June 2006.

"Liberty and Liberal Education." Intercollegiate Studies Institute Faculty Colloquium, Seattle, October 2002.

"Religion, Freedom, and Prosperity in Oklahoma." Conference Director. Ada, Oklahoma, April 2001.

"Religion in the American Founding: Alternative Perspectives." Panel discussant at the annual meeting of the American Political Science Association, San Francisco, August 2001.

"James Wilson, Thomism, and the Founding Era." Paper presented at the annual meeting of the American Political Science Association, Washington, D.C. September 2000.

"Templeton Institute for the Advanced Study of Freedom." Newport, RI, May 1999; Galway, Ireland, June 2000.

"Emma Willard on Citizenship and Politics." Paper presented at Baylor University Symposium, "Cultivating Citizens: Soulcraft & Citizenship in Contemporary America," Waco. October 1999.

"Religion, Irreligion, and the Founding." Panel discussant at the annual meeting of the American Political Science Association, Atlanta, September 1999.

"Catharine Beecher and the Creation of Virtuous Citizens." Paper presented at the annual meeting of the Association for the Scientific Study of Religion: Southwest, Dallas. March 1999.

"American Evangelicalism and Fundamentalism." Calvin College Faculty Summer Seminar under the direction of George Marsden, Summer 1999.

"Religious Liberty in Early Nineteenth-Century America." Liberty Fund colloquium. Richmond, March 1999.

"Beyond Self-Interest: The Political Theory of American Women, 1800-1860." Paper presented at the annual meeting of the American Political Science Association, Boston. August

1998.

"The Political and Legal Philosophy of James Wilson, 1742-1798." Roundtable panel participant at the annual meeting of the American Political Science Association, Boston. August 1998.

"The Second Great Awakening and the Development of the Political Theory of American Women." Paper presented at the annual meeting of the Association for the Scientific Study of Religion: Southwest, Dallas. March 1998.

"Political Theory After Liberalism." Calvin College Faculty Summer Seminar under the direction of Nicholas Wolterstorff, Summer 1998, Spring 1999.

"Republican Motherhood in the Early Nineteenth Century: The Evolution of a Concept." Paper presented at the annual meeting of the Oklahoma Political Science Association, Ada. November 1997.

"Political Obligation and the United States Supreme Court," with George Klosko. Paper presented at the annual meeting of the American Political Science Association, San Francisco. August 1996.

"Foundations of American Liberty," Salvatori Center for Academic Leadership Conference, The Heritage Foundation, Summer 1994, Spring 1995.

"Religion and Politics in the United States: Lessons from the Founders." Paper Presented at the annual meeting of the Association for the Scientific Study of Religion: Southwest, Dallas. March 1995.

"The Changing Dynamics of State Constitutional Law and Politics." Panel discussant at the annual meeting of the American Political Science Association, New York, September 1994.

"The Wilsonian Dilemma." Paper presented at the annual meeting of the Southern Political Science Association, Savannah. November 1993.

"The Christian Foundation of James Wilson's Legal Philosophy." Paper presented at the annual meeting of the American Political Science Association, Chicago. September 1992.

**Other Publications**

"Religious Liberty in the Founding Era: Lessons for Today." *Faithful Lives: Christian Reflections on the World*. 2 (2017), 9-25.

"Religious Liberty and Same-Sex Wedding Ceremonies." *Christian Lawyer*. December 2015,

15-18.

“Roger Sherman.” In *Encyclopedia of the American Enlightenment*, edited by Mark G. Spencer. New York: Bloomsbury, 2015.

“Faith and the Founders of the American Republic.” In *Faith and Politics: Religion in the Public Square* (Maryville: Proceedings of the Maryville Symposium 2010, 2011): 55-79.

“The Sacred Rights of Conscience: America’s Founders on Church and State.” *Oregon Humanities* (Fall/Winter 2005): 40-46.

“Emma Willard on the Political Position of Women.” *Hungarian Journal of English and American Studies* 6 (Fall 2000): 11-26.

“Susan B. Anthony,” “Catharine Beecher,” “Angelina Grimké,” “Sarah Grimké,” “Elizabeth Cady Stanton,” “Harriet Beecher Stowe,” and “Emma Willard.” In *The Encyclopedia of Religion in American Politics*, edited by Jeffrey Schultz, John West, Jr., and Iain Maclean. Phoenix: The Oryx Press, 1998.

“Religion and Politics.” In *Survey of Social Science: Government and Politics*, edited by Frank N. Magil. Pasadena: Salem Press, 1995, 1685-1691.

Opinion pieces and letters on a variety of issues in newspapers including *The Oregonian*, *The Washington Post*, *The Daily Oklahoman*, *The Newberg Graphic*, *Daily Signal*, *Law & Liberty*, *Intercollegiate Review*, and *Learn Liberty*.

**Book Reviews**

*The Founding Myth: Why Christian Nationalism is Un-American*, by Andrew Seidel, August 2019. Available at: https://www.lawliberty.org/2019/08/06/unlearning-the-founding-myth/

*The Third Disestablishment: Church, State, & American Culture, 1940-1975*, by Steven K. Green, May 2019. Available at: https://www.lawliberty.org/2019/05/16/a-strict-separationist-speaks/

*Religious Freedom, LGBT Rights, and the Prospects for Common Ground*, ed. William N. Eskridge, Jr. and Robin Fretwell Wilson, March 2019. Available at: https://www.lawliberty.org/book-review/the-road-to-compromise/

*Swords and Plowshares: American Evangelicals on War, 1937-1973*, by Timothy D. Padgett. *Christianity Today*, January 2019. Available at: https://www.christianitytoday.com/ct/2019/january-web-only/timothy-padgett-swords-plowshares-evangelicals-war.html?utm_source=ctweekly-

html&utm_medium=Newsletter&utm_term=13251582&utm_content=631812161&utm_campaign=email

*The Founders and the Bible*, by Carl J. Richard.  *American Political Thought*, Summer 2017, 483-486.

*Benjamin Franklin: The Religious Life of a Founding Father*, by Thomas S. Kidd, *Education and Culture: A Critical Review*, (Summer 2017).

*In the Beginning Was the Word: The Bible in American Public Life, 1492-1783*, by Mark A. Noll, *Journal of American History*, (October 2016), 1265-1266.

*Inventing a Christian America: The Myth of the Religious Founding*, by Steven K. Green.  *First Things Online*, (September 2015): http://www.firstthings.com/web-exclusives/2015/09/the-myth-of-americas-religious-founding.

*Nature's God: The Heretical Origins of the American Republic*, by Matthew Stewart.  Featured Review, *Christian Scholar's Review*, (Spring 2015): 285-291.

*The First Thanksgiving: What the Real Story Tells Us About Loving God and Learning From History*, by Tracy McKenzie.  *Anglican and Episcopal History*, (December 2014): 448-449.

*Thomas Jefferson's Qur'an: Islam and the Founders*, by Denise A. Spellberg.  *Journal of American History*. 101 (December 2014): 563.

*God's Arbiters: Americans and the Philippines, 1898-1902*, by Susan K. Harris.  *Anglican and Episcopal History*, (September 2014), 363-364.

*The Religious Beliefs of America's Founders: Reason, Revelation, and Revolution*, by Gregg L. Frazer.  *Journal of American History*, 99 (March 2013): 1226-1227.

*God of Liberty: A Religious History of the American Revolution*, by Thomas S. Kidd.  *Journal of American History*, 98 (June 2011): 191.

*The Political Origins of Religious Liberty*, by Anthony Gill.  *Journal of the American Academy of Religion*, 77 (March 2009): 165-69.

*Uncovering the Constitution's Moral Design*, by Paul R. DeHart.  *Politics and Religion*, 1 (December 2008): 496-97.

*Rough Crossings: Britain, The Slaves, and the American Revolution*, by Simon Schama.  *The Oregonian*, (May 14, 2006): O16.

*Myths America Lives By*, by Richard T. Hughes.  *Religion and Politics Newsletter*, XXI (Spring 2005): 32-33.

*Conscience and Community: Revisiting Toleration and Religious Dissent in Early Modern England and America*, by Andrew R. Murphy.  *Canadian Journal of Political Science*, 35 (December 2002): 959-60.

*The Political Writings of William Penn*, ed. Andrew R. Murphy.  *Religion and Politics Newsletter*, XIX (Fall 2002): 3.

*Excluded from Suffrage History: Matilda Joslyn Gage, Nineteenth-Century American Feminist*, by Leila R. Brammer.  *Journal of Church and State*, 44 (Winter 2002): 161-62.

*The Religious World of Antislavery Women: Spirituality in the Lives of Five Abolitionist Lecturers*, by Anna M. Speicher.  *Journal of Church and State*, 43 (Winter 2001): 160-62.

*Virtue and the Making of Modern Liberalism*, by Peter Berkowitz.  *Religion and Politics Newsletter*, 16 (Winter 2000): 7.

*Free in the World: American Slavery and Constitutional Failure*, by Mark E. Brandon.  H-SHEAR, H-Net Reviews, (February 2000).

*Most Humble Servants: The Advisory Role of Early Judges*, by Stewart Jay.  *William and Mary Quarterly*, 56 (January 1999): 222-24.

*New Deal Justice: The Constitutional Jurisprudence of Hugo L. Black, Felix Frankfurter, and Robert H. Jackson*, by Jeffrey D. Hockett.  *Oklahoma Politics*, 7 (October 1998): 99-101.

*Religion and Politics in the Early Republic: Jasper Adams and the Church-State Debate*, by Daniel L. Dreisbach.  *Review of Religious Research*, 39 (June 1998): 371-72.

*A Conscience As Large As The World: Yves R. Simon Versus The Catholic Neoconservatives*, by Thomas R. Rourke.  *American Political Science Review*, 91 (December 1997): 951-952.

*The Politics of Revelation and Reason: Religion and Civic Life in the New Nation*, by John G. West, Jr.  *Review of Religious Research*, 39 (September 1997): 85-86.

*The Myth of American Individualism: The Protestant Origins of American Political Thought*, by Barry Alan Shain.  *Religion and Politics Newsletter*, 12 (Summer 1996): 15-16.

*John Quincy Adams and the Public Virtues of Diplomacy*, by Greg Russell.  *Oklahoma Politics*, 4 (October 1995): 91-92.

*The Moral Sense*, by James Q. Wilson. *Southeastern Political Review*, 23 (March 1995): 170-71.

**Awards and Honors**

Fellowship Research Grant, The Earhart Foundation, Summer 2014.

Fellowship Research Grant, The Earhart Foundation, 2012-2013.

American Political Science Association, Travel Grant, Summer 2012.

Fellowship Research Grant, The Earhart Foundation, Summer 2010.

National Endowment for the Humanities, Summer Stipend, 2007.

Fellowship Research Grant, The Earhart Foundation, Summer 2007.

CCCU Initiative Grant, Project Director, 2006-2008.

Chautauqua Scholar, Oregon Council for the Humanities, 2005-2008.

Fellowship Research Grant, The Earhart Foundation, Summer 2005.

Researcher of the Year, George Fox University, 2003.

Summer Research Grants, George Fox University, 2004, 2003, and 2002.

Hatfield Public Service and Constitutional Studies Grant Program Award, 2001.

Freedom Project Award, The John Templeton Foundation, 2000-2001.

Freedom Project Award, The John Templeton Foundation, 1999-2000.

Fellowship Research Grant, The Earhart Foundation, 1998-1999.

Summer Research Grants, Oklahoma Humanities Council, 1999, 1997, 1994.

Oklahoma Political Science Teacher of the Year, The Oklahoma Political Science Association, 1998.

Mellon Research Fellow, Virginia Historical Society, Summer 1998.

Governor's Fellow, The University of Virginia, 1992-1993.

Bradley Fellow, The University of Virginia, 1988-1992.

**Service**

Outside reader for reader for Gary Lee Stewart’s dissertation, “Justifying Revolution: The

Reformed American Clergy's Argument for Political Resistance, 1763-1783, (Southern Baptist Theological Seminary), March 2017.

Outside reader for reader for Sarah Morgan Smith's dissertation "With a Publick Spirit: Community and Commitment in New England, 1630-1689" (Rutgers University), March 2016.

External manuscript reviewer for Oxford University Press, University of Illinois Press, Liberty Fund Press, Rowman and Littlefield, *American Political Science Review*, *American Political Thought*, *History of Political Thought*, *Pennsylvania Magazine of History and Biography*, *Politics and Religion,* and *Religion and Politics*.

External grant reviewer for American Political Science Association and National Endowment for the Humanities.

Faculty Advisor, Intercollegiate Studies Institute chapter at George Fox University, 2005-present.

Faculty Advisor, College Republicans chapter at George Fox University, 2005-present.

Faculty Advisor, Pi Sigma Alpha chapter at George Fox University, 2002-present.

George Fox University, Honor Program Committee, 2013-present; Curriculum Committee (chair), 2016-2017, member 2017-present; Richter Scholars Committee, 2004-2010; Faculty Development Committee, 2001-2004, 2011-2012; Chair, Task Force on Honors Program, 2011-2012; Ad hoc committee on Intensified Studies, 2003-2004.

Oklahoma State Regents for Higher Education Faculty Transfer Curriculum Committee, 1995-2001.

Faculty Advisor, Pi Sigma Alpha chapter at East Central University, 1995-2001.

East Central University: North Central Association Self-Study: Missions and Purposes Subcommittee, January 2000-2001; Library Committee, 1996-1998; Athletic Committee, 1994-1996.

**Offices**

Member, Oregon Advisory Committee of the U.S. Civil Rights Commission, 2019-present.

Affiliate Scholar, Faith and Liberty Discovery Center, 2018-present.

Affiliate Scholar, John Jay Institute, 2013-present.

Board of Governors, Veritas School, Newberg, Oregon, 2004-present.

President, Christians in Political Science, 2010-2014, Vice-President 2008-2010.

President, Association for the Scientific Study of Religion: Southwest, 1996-1999.

Member, Academic Advisory Board, *The Encyclopedia of Religion in American Politics*, The Oryx Press.

Academic Coordinator, Oklahoma Girls State, 1995-2000.

**References**

Daniel L. Dreisbach, Professor, Department of Justice, Law, and Society, American University.

George Klosko, Henry L. and Grace Doherty Professor of Politics, The University of Virginia.

Henry J. Abraham, Professor Emeritus, Department of Politics, The University of Virginia.

Garrett Ward Sheldon, The John Morton Beaty Professor of Political Science, The University of Virginia's College at Wise.

Thomas S. Kidd, Distinguished Professor of History, Baylor University.

Paul Otto, Professor of History, George Fox University.

Contact information for references available upon request.

Revised: October 2019

Expert Report of Professor Steven K. Green, J.D., Ph.D.

Submitted on Behalf of Orsi Plaintiffs in

Cave, et al. v. Thurston

No. 4: 18-cv-342-KGB

Exhibit C

I.        Qualifications of Expert and Materials Relied Upon

1. I am the Fred H. Paulus Professor of Law and Affiliated Professor of Religious Studies and History at Willamette University in Salem, Oregon.  In the College of Law (my primary appointment), I teach courses in Constitutional Law, First Amendment Law, Legal History, Jurisprudence (legal philosophy), Education Law, and Criminal Law.  In the College of Arts and Sciences, I teach courses in Constitutional History and American Religious History.   In addition to holding a J.D., I have a M.A. in American Religious History and a Ph.D. in American Constitutional History.  A copy of my curriculum vita is attached to this report.

2. My scholarship pertains almost exclusively to the intersection of law, religion, and history.  I am the author of six books and more than fifty scholarly articles and book chapters in the area (I am completing my seventh book, entitled *Separating Church and State: A History*, through Cornell University Press).  My chapters and articles appeared in leading anthologies and law reviews including the *Oxford Research Encyclopedia of American History*, *Oxford Handbook on Church and State in the United States*, *Yale Biographical Dictionary of American Law*, *Cornell Law Review*, *Notre Dame Law Review*, *Emory Law Journal*, *Boston College Law Review*, *Syracuse Law Review*, *Hastings Constitutional Law Quarterly*, *Journal of Church and State*, *First Amendment Law Review*, and the *Oxford Journal of Law and Religion*. I am a member of the Constitutional Law Section of the Association of American Law Schools, a member of the American Academy of Religion and serve on the steering committee of its Law, Religion, and Culture unit, and I serve on the editorial advisory board of the *Journal of Church and State*.

3. I have examined the particular issue of a relationship between the law and the Ten Commandments in three writings, most comprehensively in "The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 *Journal of Law and Religion* 101(2000). *See* also *The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010); "'Bad History:' The Lure of History in Establishment Clause Adjudication," 81 *Notre Dame Law Review* 101 (2006). Finally, in 2005, I authored an *amicus curiae* brief in *McCreary County v. ACLU* on behalf of approximately twenty leading legal historians and law scholars.

4. The foregoing report is based on my knowledge, research, and study in this area and on the work of other reputable scholars. The opinions expressed below are my own and do not reflect the views of Willamette University or any other institution. In preparing this report, I reviewed the Expert Report by Mark David Hall, the Ten Commandments Monument Display Act, A.C.A. § 22-3-221 (2015), and the sources cited in the report below. I am receiving $100 per hour for my work on this case.

II. <u>Summary</u>

5. This expert report is being filed on behalf of the Orsi plaintiffs in *Cave v. Thurston*, a challenge to the constitutionality of a Ten Commandments monument placed pursuant to the Ten Commandments Monument Display Act. The purpose of this report is to rebut several of the claims raised in the report filed by Professor Mark David Hall, an expert for the State of Arkansas ("State's expert"). In so doing, this report explains the relevant history related to claims that the Ten Commandments serves as a foundational principle to American law and the nation's governing documents, and to explain the lack of historic support for the placement of Ten Commandments monuments on public property.

6. This report addresses five points. First, courts of law should approach historical evidence with caution, particularly when its advocates make broad claims about its conclusive ability to resolve current legal disputes. History informs and provides context; it does not direct legal conclusions. While history alone has never justified any action under the Establishment Clause, history is most salient is when it addresses specific practices approved by the Framers of the First Amendment; thus, general assertions about a religious milieu at the time of the nation's founding, or the practice of erecting religious symbols as memorials, for example, have little relevance to the pedigree of Ten Commandments monuments.

7. Second, the religious rhetoric that coincided with the nation's founding can easily be misinterpreted and misconstrued. Although religious language can be found in many of the speeches and writings of the era, there is no basis for assuming that the leading political figures relied on religious principles to any significant degree when drafting the nation's governing documents or establishing the nation's legal system. More important, there is an absence of any evidence that the Framers relied on, or considered, the Ten Commandments to undergird either the political or legal systems.

8. Third, relatedly, there is a dearth of legal commentary and case law in the nineteenth century to indicate that judges, lawyers, and legal scholars believed that the Ten Commandments served as any basis for American law generally, much less for specific substantive areas of the law. The only places where judges mentioned any connection between the Ten Commandments and the law were in discussions concerning Sunday law enforcement and suits over adultery. Even then, in these dozen or so cases, the references to the Ten Commandments were allegorical.

9. Fourth, publicly-erected and publicly-owned Ten Commandments monuments lack the historical pedigree of other forms of government religious expression, such as with legislative

chaplains, *see Marsh v. Chambers*, 463 U.S. 783 (1983). The State's expert invites the court to analogize the Ten Commandments to different forms of government religious expression that rely on distinct justifications for that expression. This is inconsistent with the Supreme Court's historical and jurisprudential approach to such issues.

10. Lastly, courts have recognized – as they must – that the Ten Commandments is first and foremost a religious document, exclusive to Jewish and Christian traditions. More important, there are multiple versions of the Ten Commandments, with the differences in ordering and phrasing breaking down along sectarian lines. As a result, any Ten Commandments monument will invariably track the recognized phrasing of one religious tradition over others, placing the government in the position of showing favoritism of one faith over others.

III. Relevant Historical Methodology

11. The State expert's report makes a broad claim about the relevance of history for legal decision-making in areas of church-state adjudication, a claim that knows few bounds. Certainly, the Supreme Court has relied on historical evidence to assist its understanding of the purposes and context of constitutional language, *see*, *e.g*., *District of Columbia v. Heller*, 554 U.S. 570 (2008) (interpreting the Second Amendment). And, as the State expert's report notes, the justices have looked to history when interpreting the First Amendment's Religion Clauses.[1] That said, if used at all, courts should approach historical data with caution and apply it judiciously. While history serves as an indispensable source of information for some Establishment Clause controversies, its role and effectiveness in Supreme Court adjudication is

[1] See Everson v. Board of Education, 330 U.S. 1, 8-15 (1947); McCollum v. Board of Education, 333 U.S. 203, 213-225 (1948) (Frankfurter, J., concurring); McGowan v. Maryland, 366 U.S. 420, 431-447 (1961); id. at 484-495 (Frankfurter, J., concurring); Engel v. Vitale, 370 U.S. 421, 425-430 (1962); Abington Township School Dist. v. Schempp, 374 U.S. 203, 254-258, 266-276 (1963) (Brennan, J., concurring); Marsh v. Chambers, 463 U.S. 783, 787-789 (1983); Wallace v. Jaffree, 472 U.S. 38, 92-106 (Rehnquist, J., dissenting).

necessarily limited.  History can never provide specific answers to modern controversies; neither can history tell us what the Founders may have thought about future church-state conflicts or, in many instances, even about the church-state conflicts they faced.  The historical record is too amorphous and too easily misread or manipulated to resolve modern controversies.  At best, history can only inform; it cannot resolve legal controversies.[2]

12. In particular, courts should resist drawing conclusions about particular practices based on general observations about the past.  This is what the report by the State's expert has done: it invites the Court to make conclusions about the constitutionality of modern Ten Commandments monuments based on a narrative that asserts a high degree of religiosity among members of the founding generation and of their use of religious rhetoric (see discussion below).  It proposes a standard of historical saliency by analogy – if one religious practice has been deemed constitutional (e.g., legislative chaplains), then a completely different manifestation (e.g., a Ten Commandments monument) must also be constitutional because both involved government religious speech.  This runs counter to the historical approach used in certain cases by the Supreme Court.

13. In two recent decisions, members of the Supreme Court have addressed the proper methodology to be applied to historical data.  *Town of Greece v. Galloway*, 572 U.S. 565 (2014), involved a challenge to a town's practice of inviting local clergy to deliver invocations at monthly town council meetings.  In upholding the prayers, the Court considered the historical

---

[2] See Ethan Bercot, "Forgetting to Weigh: The Use of History in Supreme Court's Establishment Clause," 102 *Geo. L.J.* 845, 863 (2014) ("[H]istorical analysis focuses the Court's attention on the minutiae of antiquated practices rather than on the broad principles that can be deprived from them."); Christopher L. Eisgruber, "The Living Hand of the Past: History and Constitutional Justice," 65 *Ford. L. Rev.* 1611 (1997) ("History should figure in constitutional interpretation as an aid to the pursuit of justice, not a constraint upon it."); Cass R. Sunstein, "The Idea of a Useable Past," 95 *Colum. L. Rev.* 601, 602 (1995) ("[A]ny historical account, offered by someone in a particular time and place, will reflect current preoccupation and potentially controversial assumptions.  To say the least, it is hard to avoid forms of selectivity when dealing with the past."); Green, "Bad History," at 1728-1734.

pedigree of prayers being delivered in legislative assemblies, as it had done in *Marsh v. Chambers*, 463 U.S. 783 (1983). Justice Kennedy described the Court's measured use of history to resolve the dispute, stating that while the "Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" that approach "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." 572 U.S. at 576. History rises in relevance, Justice Kennedy wrote, and has greater saliency on interpretations of the Establishment Clause, "where history shows that the *specific* practice is permitted." *Ibid*. at 577 (emphasis supplied). The principal dissent agreed with that approach in principle, noting that history is relevant where the specific practice has "a long history" and "a distinctive constitutional warrant by virtue of tradition." *Ibid*. at 622 (Kagan, J., dissenting).

14. This past term, the Court upheld the constitutionality of a concrete Latin cross erected as a war memorial following World War I. *American Legion v. American Humanist Association*, 139 S.Ct. 2067 (2019). Commenting on the Court's historical methodology, Justice Alito noted that it had taken a "modest approach that focuses on the *particular* issue at hand and looks to history for guidance." *Ibid*. at 2087 (emphasis supplied). But notably, the portions of Justice Alito's opinion that criticized *Lemon* and proposed that courts "look[] to history for guidance"—Parts II-A and II-D—failed to garner a majority.[3] The majority opinion in *American Legion*

[3] *American* Legion, 139 S.Ct. at 2079-2082, 2087-2089. Justice Kagan disagreed with these sections. *Ibid.* at 2094. Justices Thomas and Gorsuch only concurred in the judgment. *Ibid.* at 2094-2103. Justice Breyer wrote that "I do not understand the Court's opinion today to adopt a 'history and tradition' test that would permit *any newly constructed religious memorial* on public land." *Ibid*. at 2091 (Breyer, J. concurring) (emphasis supplied). Justice Kagan also urged a measured approach, noting that while she "too 'look[s] to history for guidance,'" she preferred "to do so case-by-case, rather than to sign on to any broader statements about history's role in Establishment Clause analysis." *Ibid*. at 2094 (Kagan, J., concurring).

(Parts I, II-B, II-C, III, and IV) held that: (1) certain old monuments should be scrutinized with a presumption of constitutionality; and (2) the Bladensburg Cross was constitutional because its purpose and meaning were predominantly secular-a conclusion that was tethered to the specific role of the Latin cross in World War I and the fact that that particular cross was nearly a century old.  *See ibid.* at 2089 (the Bladensburg Cross "carries *special significance* in commemorating *World War I*"); *ibid.* ("the symbol took on an added *secular meaning* when used in *World War I memorials*") (emphasis added).

15.   Consequently, what is relevant historically for determining the constitutionality of Ten Commandments monuments, and consistent with the methodological approach endorsed by the Supreme Court, would be evidence of a long-standing practice of government erected and maintained Ten Commandments monuments. Additional salient evidence would be that the Framers understood there to be a direct relationship between the Ten Commandments and those foundational principles of republican governance and law.

IV.   The "Religious" Milieu of the Founding Period

16. Much of the State's expert report is dedicated to making two points: that religious discourse, and reliance upon religious ideas, were prevalent during the founding period; and as a result, the political leaders did not desire or attempt to enact a regime of separation of church and state.  The take-away from this account is that members of the founding generation would have been untroubled by a government-maintained Ten Commandments monument.

17. To a degree, the State expert's report is inviting the Court to participate in the longstanding scholarly debate over the original understanding of religious disestablishment at the state and federal levels and the meaning of the Establishment Clause.  This scholarly debate is ongoing and will likely not be resolved in our lifetimes.  Although courts occasionally opine on

the historical understanding of church-state separation, it is not necessary for this Court to engage in this debate to decide the instant controversy, let for it alone to resolve which side is correct. Nonetheless, because the State expert's report reserves considerable space to this question, this report will respond to two general claims contained in that report.

18. Religious Discourse. Scholars from across the ideological spectrum acknowledge the prevalence of religious rhetoric during the founding period, often appearing in the form of references to scripture, allusions to Old Testament Israel, and assertions of interposing Providence, among others. Members of the founding generation were biblically literate – particularly by today's standards – and religious imagery infused public discussions about revolution, politics, and cultural norms.[4] This fact is unremarkable for several reasons. First, the Bible was the most common and widely read book in colonial America; if a colonial household had only one book, it was the Bible. As a result, it was the source of common idioms, phrases, and analogies. People from all walks of life with varying degrees of religiosity utilized religious terminology, including religiously heterodox figures such as Benjamin Franklin, Thomas Jefferson, and Thomas Paine.[5] Consequently, "[t]he mere fact that the founding generation frequently quoted from and alluded to the Bible reveals little about the American founding or the Bible's influence on late eighteenth-century political thought, except that the Bible was a familiar and useful literary source."[6] In fact, "[t]he language of the English Bible so permeated

[4] Gordon Wood, "Religion and the American Revolution," in Harry S. Stout and D. G. Hart, eds., *New Directions in American Religious History* (New York: Oxford University Press, 1997), 182-187; James F. Byrd, *Sacred Scripture, Sacred War: The Bible and the American Revolution* (New York: Oxford University Press, 2013); Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers* (New York: Oxford University Press, 2018), 5, 29-37.
[5] Steven K. Green, *Inventing a Christian America: The Myth of the Religious Founding* (New York: Oxford University Press, 2015), 110-130.
[6] Dreisbach, *Reading the Bible with the Founding Fathers*, 7.

the vernacular that some speakers and writers may not always have been conscious of the fact that a popular phrase or image had biblical origins."[7]

19. Second, political and religious leaders understood the power of religious rhetoric to inspire and unify colonists as they embarked in a rebellion against the most powerful nation on earth. Contemporaries understood the significance of comparing Great Britain to ancient Egypt and the American colonists to the fleeing Children of Israel. Similarly, political and religious leaders claimed that military successes – when they finally materialized – were a sign of God's blessing or the works of his providential hand. Like Americans today, colonists wanted to believe that God was on their side when confronting seemingly insurmountable odds.[8] Understanding the risks and challenges the colonialists faced, it would have been surprising if they had not engaged in religious rhetoric. That rhetoric, however, needs to be considered within its context, and not used as a proof-text for arguing that the Framers intended to infuse religious principles into the nation's governing systems. In essence, the commonality of religious rhetoric tells us little about the ideological foundations of the nation's political or legal systems.

20. Attributing an undue weight to religious rhetoric also runs the danger of focusing on the minutiae and losing sight of the forest for the trees. The State expert's report describes in great detail how public officials and the federal and state governments continued to engage in religious practices even after disestablishing: declaring days of prayer and thanksgiving, appointing legislative chaplains, reenacting Sunday laws and other behavioral regulations, etc. According to Derek Davis, author of the leading study on religion and the Continental Congress, "[t]hese practices were not new," they are "best explained holdovers from the colonial period" and were "deemed substantially harmless by most governmental leaders." Yet, people's attitudes

[7] Ibid., 76.
[8] Green, *Inventing a Christian America*, 115, 119, 189-190.

toward church-state matters were not static but were evolving over time.  Davis maintains that the Continental Congress's fifteen years of governance "was a transitional phase between the old traditional theory, under which religion served as the glue for the social and political order, and the newer theory, under which it was thought that both religion and government might function best if constitutionally separated from another."  Davis concludes that the occurrence of these religious practices "recedes in significance, however, when it is recognized that the separationist paradigm was at that time only beginning to be recognized for its advantages to national life. . . . All of the evidence, then, when examined in historical context, supports separationism as that paradigm of church-state thought that best captures the progressively evolving intentions of the founding fathers."[9]

21. The overarching reality is that members of the founding generation initiated and witnessed a significant transformation in church-state relations.  While some people remained wedded to old practices and customs, the fact is that the new nation embarked down a path never-before taken.  The rate of transformation was truly remarkable.  In 1776, when the Continental Congress invited the colonial governments to reorganize as republican states, nine of thirteen colonies maintained religious establishments, meaning the forced taxation to support houses of worship and the imposition of civil disabilities on the basis of religious affiliation.  In a brief fifteen years, by the time of the ratification of the First Amendment in 1791, that number had been reversed, with religious establishments being either abolished or rendered inoperable in eleven of fourteen states.  And in those three New England states that retained public support for

---

[9] Derek Davis, *Religion and the Continental Congress* (New York: Oxford University Press, 2002), 81-93, 144-145, 227; Steven K. Green "A 'Spacious Conception': Separationism as an Idea," 85 *Oregon L. Rev.* 443-480, 474 ("the Founders viewed church-state separation as an unfolding idea, not as accomplished reality, [so] no document or practice can accurately represent contemporary perspectives about the issue.").

religion, the establishments were a source of political and religious controversy until they were ultimately abolished in the early nineteenth century.[10]

This is the overarching fact that must not become lost in the minutia — all of the states moved toward abolishing religious establishments and separating state and church. At a minimum, this indicates the dynamic nature of the founding period and that people's perspectives toward church-state matters were not static but evolving.[11] At a maximum, it shows that the end of that evolution was the very separation that the State's expert claims does not exist.

22. James Madison's involvement in the First Amendment. The effort of the State expert's report in minimizing the leadership of James Madison in the drafting of the First Amendment's Religion Clauses goes against the prevailing scholarly consensus on Madison's instrumental role.[12] On June 8, 1789, Madison introduced into the House of Representatives a series of proposed amendments to the Constitution, in part to fulfil a promise to those state conventions that had ratified the new constitution on the condition that the First Congress would draft amendments to protect individual rights. According to biographer Irving Brant, Madison's amendments relied heavily on various state proposals, Virginia's in particular; however, his amendments concerning religion and rights of conscience "came from Madison alone. . . . Religious freedom was Madison's first concern."[13] Madison proposed two amendments that dealt expressly with religion, both of which indicated his strong commitment to religious

[10] Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford University Press, 1986), 134-222. Vermont was an enigma. Even though it's 1786 constitution abolished forced taxes for religious worship, several towns continued to extract assessments based on an unrepealed 1783 law, a practice that continued sporadically until that law's repeal in 1807. Ibid., 188-190.

[11] Green "A Spacious Conception," at 456-480.

[12] Richard Labunski, *James Madison and the Struggle for the Bill of Rights* (New York: Oxford University Press, 2006), 178-240; Irving Brant, *James Madison: Father of the Constitution* (Indianapolis: Bobbs-Merrill Co., 1950), 264-268; Ralph Ketcham, *James Madison* (Charlottesville: University Press of Virginia, 1990), 289-292.

[13] *Daily Advertiser*, June 9, 1789, in *Complete Bill of Rights*, 57. See also *Annals of Congress* (June 8, 1787), 1:448. Labunski, *James Madison and the Struggle for the Bill of Rights*, 187-194, 198-200; Brant, *James Madison: Father of the Constitution*, 264-266, 268.

freedom and church-state separation. The first, which would evolve into the First Amendment, was to be inserted into Article I, section 9 of the Constitution which limits powers of Congress. It provided:

> The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed.[14]

Madison's second proposed religious amendment, to be inserted in Article I, section 10 which limits the powers of the states, provided that "No State shall violate the equal rights of conscience, or the freedom of the press, or the trial by jury in criminal cases."[15] These two proposed amendments demonstrated Madison's strong commitment to religious freedom and church-state disestablishment.[16]

23. After much delay, on August 15, 1789, the House, acting as a committee of the whole, took up Madison's first proposed amendment (the second proposal, which would have prohibited states from violating equal rights of conscience, was gone). The Committee on Amendments had revised Madison's proposal to read: "no religion shall be established by law, nor shall the equal rights of conscience be infringed." Three representatives questioned the propriety of the amendment, with two – Peter Sylvester of New York and Benjamin Huntington of Massachusetts – expressing concern that the disestablishment clause could be interpreted as expressing hostility toward religion. (The third, Roger Sherman of Connecticut, moved that the amendment be struck "insomuch as congress had no authority whatsoever . . . to make religious establishments.") Other members suggested changes to the proposed language, most involving phrasing rather than substance. In one substantive proposal, Elbridge Gerry of Massachusetts

[14] *Annals*, 1:451.
[15] Ibid., 1:452.
[16] Noah Feldman, *The Three Lives of James Madison: Genius, Partisan, President* (New York: Random House, 2017), 66.

offered narrowing language to read that "no religious doctrine shall be established by law."  This language, if adopted, would have authorized non-preferential establishments at the federal level, consistent with the New England practice of multiple establishments.  The House did not approve Gerry's proposal or other language that would have narrowed the scope of the clause to prohibit only the establishment of a "national religion."  Instead, the House adopted language proposed by Samuel Livermore of New Hampshire that "congress shall make no laws touching religion, or infringing the rights of conscience."  After being submitted to a committee on style, the House adopted a motion by Fisher Ames of Massachusetts that read "Congress shall make no law establishing religion, or to prevent the free exercise thereof, or to infringe the rights of conscience."  The language was likely written by Madison, who employed a common technique of having a colleague submit a proposal – Ames being from a state with a religious establishment – to garner wider support.[17]

24. From there, the amendment went to the Senate for consideration.  Records of the Senate debates do not exist, so any meaning must be gleaned from the various proposals listed in the Senate Journal.  Unidentified senators offered a handful of substitutes that would have limited the scope of the amendment: preventing establishing "one religious sect or society in preference to others," "a particular denomination," or "any Religious Sect or Society."  All of these proposals would have forbidden only an exclusive establishment, thereby authorizing a multiple religious establishment at the national level.  Each of the substitutes failed to garner a majority vote.  On September 9, 1789, the Senate finally adopted language providing "Congress shall make no law establishing articles of faith, or a mode of worship, or prohibiting the free exercise of religion," language slightly broader than the other Senate proposals but still narrower

---

[17] *Annals*, 1:757-759 (August 15, 1789); ibid., 1:796 (August 20, 1789); Brant, *James Madison: Father of the Constitution*, 271; Labunski, *James Madison and the Struggle for the Bill of Rights*, 223-224.

than the House version.[18] The House objected to the Senate's revisions of several amendments, including the religious amendment, and called for a conference committee to resolve the differences. Madison, Roger Sherman of Connecticut and John Vining of Delaware represented the House while the Senate appointed Oliver Ellsworth of Connecticut, William Paterson of New Jersey and Charles Carroll of Maryland, meaning that two of the six members hailed from states with religious establishments. Before the committee met the Senate "recede[d]" from their language for the religion clauses, deferring to the House. The committee then drafted that familiar language that would become the First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Although the exact author of this final language is unknown, two factors suggest that Madison was responsible for the ultimate phrasing. First, the final language closely tracked the House proposal (likely written by Madison) to which the Senate had already acceded. Second, Madison led the House committee delegation, and according to Brant, and his associates Vining and Sherman "had shown no interest in the clause on religion." Whether Madison rightly deserves the appellation of "Father of the Constitution," he is entitled to the designation as "Father of the First Amendment." As Professor Feldman concludes, "[w]ithout Madison, the bill of rights would not have been enacted."[19]

25. There is no dispute that James Madison believed that the First Amendment required a separation of the authority and functions of the church and the state. In his *Memorial and Remonstrance* (1785), Madison wrote that civil government lacked authority or "jurisdiction" over religious matters. He analogized to the concept of separation of powers, praising "the metes

[18] Senate Journal (September 3, 1789), 1:70; *Complete Bill of Rights*, 3-6.
[19] House Journal, 146, in *Complete Bill of Rights*, 6; Senate Journal, 142, ibid., 7-8; Brant, *James Madison: Father of the Constitution*, 271; Brant, "Madison: On the Separation of Church and State," 16; Labunski, *James Madison and the Struggle for the Bill of Rights*, 239; Feldman, "*Three Lives of James Madison*," 276.

and bounds which separate" each entity. In his First Inaugural Address, Madison declared his obligation "to avoid the slightest interference with the rights of conscience, or with the functions of religion so wisely exempted from civil jurisdiction." Later as President, Madison vetoed two congressional bills that would have awarded land and privileges to churches. And in later letters and writings, Madison employed the exact language of "separation" to indicate the proper relationship between religion and government,[20] with him remarking that "the number, the industry, and the morality of the priesthood, and the devotion of the people have been manifestly increased by the total separation of the Church from the state."[21] Accordingly, members of the Supreme Court have been on a firm footing by relying on James Madison for interpreting the Religion Clauses and in aligning that interpretation with church-state separation. *See Everson v. Board of Education*, 330 U.S. 1, 11-13 (1947); ibid. at 33-43 (Rutledge, J., dissenting); *Engel v. Vitale*, 370 U.S. 421, 431 n.13 (1962); *Abington School District v. Schempp*, 374 U.S. 203, 213-214 (1963); *Wallace v. Jaffree*, 472 U.S. 38, 54 n.38 (1985); *McCreary County v. ACLU*, 545 U.S. 844, 878 (2005).

V. The Historical "Pedigree" of the Ten Commandments

26. Proponents of Ten Commandments monuments commonly justify the public positing on grounds that the commandments serve as a leading basis for American law. The Fraternal Order of Eagles has justified the public placement of their monuments on similar grounds: "Th[e] secular significance of the ten commandments, and their role in the foundation of our legal system is undeniable. . . . Their place in the history of our legal system renders them a

[20] First Inaugural Address, March 4, 1809, at https://avalon.law.yale.edu/19th_century/madison1.asp; Veto Messages (1811), in *James Madison on Religious Liberty*, ed., Robert S, Alley (Buffalo: Prometheus Books, 1985), 79-80; Detached Memoranda (1817?), ibid., 89-94.
[21] James Madison to Robert Walsh, March 2, 1819; see also James Madison to Edward Livingston, July 10, 1822 (decrying an "alliance or coalition between Government and Religion," and advocating "a perfect separation between ecclesiastical and civil matters."), *James Madison on Religious Liberty*, 80-83.

powerful symbol of the rule of law."[22]  Members of the Supreme Court have made similar claims; according to Justice Alito, the Ten Commandments "have historical significance as one of the foundations of our legal system." *American Legion*, 137 S.Ct. at 2083.  While this premise is widely embraced, it lacks a historical basis.  As addressed above, this author has examined this claim in several published works, as has Professor Paul Finkelman, and both of us have concluded that there is lack of historical evidence that the Framers and later political and legal figures considered the Ten Commandments to be a basis for either American law or government.[23]

27. The sources of law for the American colonies and later the United States are broad and varied. The principal early sources are the common and statutory law of England, but also influential was the law of the non-common law courts of England, such as equity, chancery, admiralty, and ecclesiastical courts.  Most legal historians consider the Magna Carta of 1215 to be a seminal source of modern English and American law.  Magna Carta addressed various legal subjects, including: inheritance; land ownership and sale; taxation; jury trials and trial procedure; proportionality in punishment; and the taking of property without compensation. Magna Carta contains principles that are central to our legal culture today, including assertions that no person can be "seized or imprisoned, or stripped of his rights or possessions … except by the lawful judgment of his equals or by the law of the land." Magna Carta made no reference to either the Ten Commandments as a whole or any particular one of the Commandments.[24]

---

[22] See Brief of Fraternal Order of Eagles as Amicus Curiae in Support of Respondents in Van Orden v. Perry, at 12.
[23] Green, "The Fount of Everything Just and Right," passim; Paul Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," 73 *Fordham L. Rev.* 1477 (2005).
[24] *See* Bernard Bailyn, *The Ideological Origins of the American Revolution* 22-54 (1967); Neil H. Cogan ed., *Contexts of the Constitution* (New York: Foundation Press,1999), 657-666.

28. Colonialists were also influenced by the 1689 English Bill of Rights, which made the monarchy subject to the laws of Parliament and established legal rights and relationships for British citizens (e.g., freedom of speech; excessive bail and fines; cruel and unusual punishment; and the right to a jury trial). Like Magna Carta, the English Bill of Rights was highly influential in the colonies; many of the colonies incorporated liberties guaranteed by Magna Carta and the English Bill of Rights directly into their laws and governing documents. Like Magna Carta, the English Bill of Rights did not mention the Ten Commandments. It made passing references to "God," but these references were highly formalistic and bore no relationship to the substance of the document.[25]

29. A highly influential source for late colonial and early American law was William Blackstone, whose *Commentaries* (1765) were more popular on this side of the Atlantic Ocean than in Great Britain. Even though the *Commentaries* contained a section on "Offenses Against God and Religion" – not surprising since Blackstone defended the established Church of England – and Blackstone asserted that the ultimate authority for the law was "divine law" as revealed in the scriptures, he recognized that a high proportion of legal matters were controlled by a secular body of "municipal or civil law." Despite his discussions about ecclesiastical and religious influences to the law, Blackstone did not claim that the Ten Commandments served as a basis for the law.[26]

30. Unlike other colonies that relied on secular sources for the law, the early legal codes of the New England colonies (Massachusetts Bay, New Haven, Connecticut, and Plymouth), relied in part on Biblical law, with the *Lawes and Libertyes* of Massachusetts Bay citing to

[25] *Contexts of the Constitution*, 686-692.

[26] William Blackstone, *Commentaries on the Laws of England*, ed., Charles Harr (Boston: Beacon Press, 1962), 2: 38-45; 4: 41-61.

scriptural authority for several offenses and behavioral rules. Yet, even in those colonies, reliance on the Ten Commandments (as opposed to reliance on biblical law as a whole) was proportionately insignificant and largely limited to particular criminal and domestic laws, such as blasphemy and adultery. Thus, even though many early Puritan leaders believed in the supremacy of biblical law, they relied primarily on other secular sources for the bulk of their laws. Furthermore, these colonies' reliance on biblical principles was relatively short-lived. The Glorious Revolution of 1688-89 brought about a new charter in Massachusetts Bay, ending the "experiment" of this most-religious-of-all-the-colonies. The new charter removed almost all references to biblical law and replaced them with common law practices and procedures.[27]

31. During the founding period, one finds occasional references to the Ten Commandments or Mosaic law, most commonly in sermons where clergy drew parallels to Old Testament Israel.[28] But even though Calvinist clergy saw Old Testament Israel as a model, they generally believed that Christians were not bound by the Old Testament, including by the Ten Commandments. Considering political writings rather than sermons, there is a general dearth of references to Mosaic law, the Decalogue, or the Ten Commandments. Of the central legal documents, the Declaration of Independence contains four natural law/rights allusions to God;[29] in contrast, the Constitution and the Bill of Rights did not include even a perfunctory or formalistic reference to God. Rather than relying on divine authority, the Constitution is "ordained" by "the People of the United States."[30]

---

[27] Bradley Chapin, "Criminal Justice in Colonial America, 1606-1660," at 4-15 (1983); George Lee Haskins, *Law and Authority in Early Massachusetts,* 136-162 (1960).

[28] *See* Samuel Langdon, "The Republic of Israelites an Example to the American States" (1788).

[29] Thomas Jefferson, for one, doubted the authenticity and authority of the Ten Commandments. In a letter to John Adams, Jefferson wrote that "the whole history of [the Ten Commandments] is so defective and doubtful that it seems vain to attempt minute enquiry into it; and such tricks have been plaid with their text … that we have a right, from that cause, to entertain much doubt what parts of them are genuine." Jefferson to Adams, Jan. 24, 1814, The *Adams-Jefferson Letters* 421 (Lester J. Cappon ed., 1959).

[30] Green, *Inventing a Christian America*, 178-182.

32. As a result, it comes as no surprise that the Ten Commandments and biblical law received nary a mention in the debates and publications surrounding the founding documents. In the wide-ranging debates – reprinted in Madison's *Notes*, the *Annals of Congress*, Farrand's *Records*, Elliot's *Debates*, and elsewhere – the Founders mentioned Roman law, European Continental law, British law, and various other legal systems, but as can best be determined, no delegate ever relied on the Ten Commandments or the Bible as a source of authority. The only serious discussion of religion led to the clause prohibiting religious tests for office-holding, clearly not an endorsement of the legal status of Judeo-Christianity. Similarly, neither the "Bible" nor "scripture" nor the "Ten Commandments" appears in the index of the *Federalist Papers*, which are generally considered to contain the most important discussions of the meaning of the United States Constitution at the time of ratification. The authors of the *Federalist Papers* made a handful of passing references to "God" and "gods," the "Almighty," "Heaven," and to religion; in one place (*Federalist* 43), Madison refers to "the transcendent law of nature and of nature's God," but this reference suggest Enlightenment natural law views rather than of an Old Testament God. Rather than asserting a connection between biblical law and the new nation, most references to religion in the *Federalist Papers* denounce religious factions and intolerance and the mixing of church and state.[31]

33. Admittedly, a handful of later legal commentators made vague claims that could be interpreted as asserting a relationship between the Ten Commandments and the law. For example, Joseph Story, influential among early American lawyers through his numerous legal treatises, including his *Commentaries on the Constitution*, wrote an article in 1836 on "natural law" in which he referred to God as "our Lawgiver and Judge, [to whom] we owe an unreserved

[31] *See generally* The Federalist Papers (Clinton Rossiter ed., 1961).

obedience to his commands." However, this assertion was aspirational; it did not suggest that Justice Story believed that the law was derived from God's Commandments. In his three-volume *Commentaries*, he placed no emphasis on religious influences. Story never mentioned the Ten Commandments in his treatise, while his single mention of the Bible came in a discussion of Freedom of the Press (§ 1875) with him merely noting that some governments have regulated the printing of the Bible and its translation. Also, in his widely read *A Course of Legal Study* (1836), University of Maryland professor David Hoffman wrote that "[t]he purity and sublimity of the morals of the Bible have at no time been questioned; it is the foundation of the common law of every christian nation." Although Hoffman maintained the law had a philosophical debt to the Bible, referring to the biblical books of Leviticus, Numbers, and Deuteronomy as containing the "ritual, moral, and civil law of the Jews," he, like Story, stopped short of claiming that Anglo-American law was derived from the Decalogue or Pentateuch. In fact, Hoffman cautioned his readers against drawing parallels between scripture and the law, noting that the Bible's "figurative [and] symbolic language" presented a "most serious impediment" to applying biblical principles to the law.[32]

34. In addition to the lack of references to the Ten Commandments in the founding documents, there also is no significant reliance on the Commandments in early American case law.[33] References to the Ten Commandments appear chiefly in a handful of early nineteenth century cases where judges drew parallels to the fourth commandment when validating the enforcement of Sunday laws. In a few other cases, judges made rhetorical references to the

[32] Joseph Story, *Natural Law, in* Encyclopedia Americana 9:150-158 (Francis Lieber ed., rev. ed. 1836); Joseph Story, *Commentaries on the Constitution of the United States* (1833); David Hoffman, *A Course of Legal Study* 1:65-78 (1836).

[33] This conclusion is based on my Ph.D. dissertation research of more than 400 church-state cases of the nineteenth century. See Steven K. Green, *The Second Disestablishment: Church and State in Nineteenth-Century America* (New York: Oxford University Press, 2010), 182-190; Green, "The Fount of Everything Just and Right," 553-558.

Decalogue when interpreting rules governing labor or judicial activity on Sundays.  Finally, in a smaller number of suits alleging adultery, judges referenced the seventh commandment.  For the most part, however, early judicial discussions of the Ten Commandments were not detailed, with most allusions being illustrative or oratorical, and with the courts not relying on the Decalogue as authority for their holdings.  In essence, the biblical references were hortatory, with the holdings generally resting on secular legal grounds.[34]

35. For example, in one early case, *Pearce v. Atwood*, 13 Mass. 324 (1816), the Massachusetts Supreme Judicial Court upheld a Sunday law as based on "common practices." Referring to the fourth commandment, the court noted that "it may be inferred, that one day in seven was, according to divine will, to be set apart as a day of rest from labor." But, the court continued, "it is not necessary to resort to the laws promulgated by Moses, in order to prove that the Christian Sabbath ought to be observed by Christians, as a day of holy rest and religious worship." The court viewed its authority as arising from the "uniform usage" among the Christian citizens of the state, not from any religious basis for the law. In another Sunday law enforcement case, the West Virginia Supreme Court of Appeals opined that the "re-enactment of the Sabbath on Mount Sinai among the commandments of the moral law was designed not for Jews alone, but for all who should receive the word of God," declaring that "the decalogue [was] a permanent and universal obligation." *Raines v. Watson*, 2 W. Va. 371, 387 (1868).  Despite such language, the court did not declare that the Ten Commandments was a basis for American law generally.

---

[34] See Commonwealth v. Wolf, 3 Serg. and Rawle 48 (Pa., 1817); Fox v. Abel, 2 Conn 541, 554 (1818); City Council v. Benjamin, 2 Strob 508 (S.C., 1845); Neal v. Crew, 12 Ga. 93, 100 (1852); State v. Boyle, 9 La. Ann. 371 (1854); People v. Hoym, 20 How. Prac. 76 (N.Y. Super, 1860); Kountz v. Price, 40 Miss 341 (1866); State v. O'Rourk, 35 Neb. 614 (1892); Moore v. Strickland, 46 W.Va. 515 (1899).

36. Court decisions pertaining to the Sabbath and other subject matter addressed in the Ten Commandments represent a small subset of the areas of decisional law; aside from those decisions, the vast majority of church-state decisions – both from the early American period and today – make no mention whatsoever of the Commandments or biblical law. The conclusion is that members of the founding generation and later generations did not view the Ten Commandments as underlying or necessarily informing American law.[35] In sum, there is a lack of historical support for the proposition that the Ten Commandments serve as a basis for American law or that early Americans thought so. While the Ten Commandments have influenced various notions of right and wrong, a wide variety of other documents have played a more dominant and central role in the development of American law. No scholar who has seriously studied this issue can assert that the Ten Commandments has played a dominant role, or even a significant role, in the development of American law as a whole.

VI. Public Displays of Ten Commandments are of Recent Invention and Lack the Historical Pedigree of Other Religious Symbols

37. The State's expert report maintains that the United States has had a "long tradition of religious displays in public property." Expert Rpt. at 39. But in fact, there "is a complete lack of evidence that our founding fathers were aware of the practice of placing crosses" or other religious displays on public land. *Greater Houston Chapter of ACLU v. Eckels*, 589 F. Supp. 222, 237 (S.D. Tex. 1984). *See Glassroth v. Moore*, 335 F.3d 1282, 1298 (11th Cir. 2003) ("there is no evidence of an 'unambiguous and unbroken history' of displaying religious symbols in judicial buildings"). To be sure, the outdoor display of crosses was not uncommon, though as the Professors' Brief in *American Legion* indicates, the vast majority of such displays have been associated with cemeteries and war memorials, rather than as free-standing monuments as exist

[35] Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," 73 *Fordham L. Rev.*, *passim*.

with the Ten Commandments.  Most crosses in public cemeteries are associated with particular

graves;[36] as a result, "[i]n a cemetery, the privately selected religious symbols on individual

graves are best understood as the private speech of each veteran." *American Legion*, 137 S.Ct. at

2112 (Ginsburg, J., dissenting). Excluding cemeteries, many of the outdoor crosses described in

the report of the State's expert were erected by private individuals on land later ceded to

government entities during a time that people did not make firm distinctions between public and

private symbolic expression.[37] Their existence is not particularly compelling.   Regardless, the

public displays of Christian crosses are *sui generis* to that religious symbol.

        38. Any historical pedigree that might exist with the public display of crosses  does not

apply to Ten Commandments monuments, which were chiefly an invention of the mid-twentieth

century.  Numerous court decisions have discussed the advent of modern Ten Commandments

monuments in the 1950s. *See Card v. City of Everett*, 520 F.3d 1009, 1012-1013 (9th Cir.

2008).[38]  Ten Commandments monuments, like the one authorized by the Arkansas Ten

Commandments Monument Act, A.C.A. § 22-3-221 (2015), are of recent invention and do not

possess "a long history" or "a distinctive constitutional warrant by virtue of tradition." Because

there is a lack of a historical pedigree for erecting Ten Commandments monuments on public

property, the Ten Commandments Monument Display Act would appear to run counter to the

Court's directive that such uses of religious symbolism are permitted "where history shows that

the specific practice is permitted." *American Legion*, 137 U.S. at 577.

---

[36] Douglas Keister, *Stories in Stone: A Field Guide to Cemetery Symbolism and Iconography* (Salt Lake City, UT: Gibbs Smith, Pub., 2004), 174-179 (documenting the commonality of crosses in cemeteries).

[37] See Ryan K. Smith, "The Cross: Church Symbol and Contest in Nineteenth-Century America," 70 *Church History* (2001), 705-735 (demonstrating that, outside of cemeteries and memorials, the public display of crosses in America did not become common until the mid-nineteenth century).

[38] See also Books v. City of Elkhart, 235 F.3d 292, 294 (7th Cir. 2000) (discussing the same origins of Ten Commandment monuments).  See Kevin M. Kruse, *One Nation Under God* (New York: Basic Books, 2015), 140-148.

VII. Any Public Ten Commandments Monument is Inevitably Religious-Specific and Sectarian

39. It is indisputable that the Ten Commandments originated as, and remain, a religious text. "[T]he Ten Commandments is a religious and sacred text that transcends secular ethical or moral concerns.… [I]ts very text commands the reader to worship only the Lord God, to avoid idolatry, to not use the Lord's name in vain, and to observe the Sabbath. These particular commandments are wholly religious in nature, and serve no conceivable secular function." *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770-71 (7th Cir. 2001). Jews and Christians believe the Ten Commandments was one of those rare instances when God spoke directly to humankind writ-large, rather than through the medium of prayer or a prophet. For many believers, it is sacred script.

40. Courts have uniformly recognized the religious nature of the Ten Commandments, that it is "'an instrument of religion.'" *Stone v. Graham*, 449 U.S. 39, 41, n.3 (1980). *See also Van Orden v. Perry*, 545 U.S. 677, 689 (2005) ("Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain."); *McCreary County v. ACLU*, 545 U.S. 844, 859 (2005). As the Supreme Court observed in *Stone v. Graham*:

> The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12–17; Deuteronomy 5: 16–21. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1–11; Deuteronomy 5: 6–15.

449 U.S. at 41-42.[39]

[39] See also, Glassroth v. Moore, 335 F.3d 1282, 1295 (11th Cir. 2003); *Adland v. Russ,* 307 F.3d 471, 480 (6th Cir. 2002); *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770-71 (7th Cir. 2001), *cert. denied*, 534 U.S. 1162 (2002); *Books v. City of Elkhart,* 235 F.3d 292, 302 (7th Cir. 2000); *Harvey v. Cobb County,* 811 F. Supp. 669, 677-78 (N.D. Ga. 1993), *aff'd mem.*, 15 F.3d 1097 (11th Cir. 1994).

41. The Ten Commandments are found in Chapter 20 of the Book of Exodus. They are later repeated (although not word-for-word) in Chapter 5 of Deuteronomy. As an initial matter, therefore, the creators of any Ten Commandments monument must choose between the two renditions (the monuments by the Fraternal Order of Eagles track the version from Exodus). Then, the language of any Ten Commandments monument must rely on a particular translation or version of the Bible; the language of the vast majority of Ten Commandments monuments is derived from the Protestant King James Bible. *Van Orden*, 545 U.S. at 708 (Stevens, J. dissenting).

42. This last point highlights an inherent problem with any public display of a Ten Commandments monument: its content will inevitably be sect-specific. There are at least four separate versions of the Ten Commandments involving both ordering and language: Jewish, Catholic, Lutheran, and general Protestant. As Professor Finkelman has demonstrated:

> For Jews the First Commandment is an affirmative statement: "I the LORD am your God who brought you out of the land of Egypt, the house of bondage." This sentence stands alone for Jews as the First Commandment. It is a statement of faith that in itself is a Commandment. It is a statement, of course, that can only apply to Jews, as they are the people who were "brought . . . out of the land of Egypt, the house of bondage." No Christians adopt this verse as a Commandment. Most Protestants do not consider this to be part of the Ten Commandments. Rather, it is for them simply a prefatory statement. Roman Catholics and Lutherans incorporate this sentence into their First Commandment, but it does not stand alone. Thus, there are actually three versions of "the First Commandment" -- Jewish, Protestant, and Catholic/Lutheran.[40]

Similar differences exist with wording and ordering the Second Commandment for the various faith traditions:

> For Jews, this Commandment contains verses 3-6 of Exodus 20, beginning with the words: "You shall have no other gods beside Me," and continuing with verses 4-6. Verse 4 declares: "You shall not make for yourself a sculptured image, or any likeness of what is in the heavens above, or on the earth below, or in the waters under the earth." For Protestants, the Second Commandment contains only verses 4-6, beginning with "Thou shalt not make unto thee any graven image, or any likeness of anything that is in heaven

[40] Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," at 1486.

above, or that is in the earth beneath, or that is in the water under the earth." Thus, the verses constituting the Protestant First and Second Commandments form the entirety of the Second Commandment for Jews.

Catholics and Lutherans, on the other hand, consider their First Commandment to include everything that is the Jewish First and Second Commandments, as well as everything that is in the Protestant First and Second Commandment. Thus, their First Commandment contains all of verses 2-6.[41]

43. The fact that Jews, Catholics, Lutherans, and non-Lutheran Protestants all have different First and Second Commandments leads to a different numbering system throughout the rest of the Commandments.  This difference in numbering matters visually, as well.  The Ten Commandments is commonly depicted as two tablets; traditionally, non-Lutheran Protestant depictions of the Commandments place five commandments on each tablet, whereas traditionally, Catholic and Lutheran representations of the Commandments list three commandments on the left and seven on the right, whereas Orthodox Christians tend to place four commandments on the left tablet with six on the right side.  Thus, any knowledgeable communicant will instantly know whether a particular monument represents their faith tradition.[42]

44. Differences exist also in language, with the Jewish version admonishing "You shall not murder," while the Protestant Sixth Commandment states "Thou shalt not kill" (which is the Fifth Commandment for Catholics: "You shall not kill").  Ibid. at 1486-1491.

The point is that it is impossible to have a theologically neutral version of the Ten Commandments.  Any monument that contains the Ten Commandments must choose among a variety of numbering systems and terms, and in doing so will endorse one religion over others.  Despite assertions of the Fraternal Order of Eagles and other monument proponents, Ten

---

[41] Ibid. at 1486-1487.
[42] Keister, *Stories in Stone*, 156.

Commandments monuments are neither nonsectarian nor nondenominational.

VIII. Conclusion

45. Arguments that a Ten Commandments monument is justified because of a historical relationship between the commandments and American law are not supported by the historical record, as are arguments of a historical pedigree of erecting Ten Commandments monuments. In addition, the placement of a Ten Commandments monument on the Arkansas State Capitol grounds would risk creating the impression the State is affiliating itself with the religious beliefs of a particular faith tradition.

Respectfully submitted,

Steven K. Green, J.D., Ph.D.

December 6, 2019

Dr. Steven Green

**STEVEN KEITH GREEN**
Willamette University
900 State St., SE
Salem, OR 97301
503-370-6732
sgreen@willamette.edu

## CURRENT EMPLOYMENT

**The Fred H. Paulus Professor of Law** and **Affiliated Professor of Religious Studies and History,** Willamette University, 900 State St., SE, Salem, OR 97301, (503) 370-6405. Teaching areas: Constitutional Law, First Amendment, Legal History, Education Law, Jurisprudence, Religious History, and Criminal Law. (Professor rank since 2006).

**Associate Professor of Law** (2001-2005) Willamette University College of Law.

**Director**, Willamette Center for Religion, Law and Democracy, Willamette University (since 2007). Direct interdisciplinary academic program in religion and public life.

## EDUCATION

**Ph.D.** in Constitutional History, University of North Carolina, Chapel Hill, 1997.

**M.A.** in American Religious History, University of North Carolina, Chapel Hill, 1987.

**J.D.**, University of Texas School of Law, 1981.

**B.A.** in History and Political Science (Religious Studies minor), Texas Christian University, 1978. *Magna Cum Laude*, Phi Beta Kappa.

Additional graduate study at Duke Law School and Duke Divinity School, 1986-1988.

## OTHER TEACHING EXPERIENCE

**Visiting Assistant Professor**, Vermont Law School, 1988-1991. Taught courses in Church and State, Wills and Estates, Criminal Law, Lawyering (civil procedure, ethics and jurisprudence), Appellate Advocacy, and Legal Writing and Analysis.

**Guest Lecturer**, Georgetown University Law Center and Washington College of Law of American University, 1994-2001. Regular guest lecturer in church-state and First Amendment classes.

**Graduate Teaching Fellow**, University of North Carolina, 1986-1988. Lectured, led discussion groups, and graded papers and examinations in undergraduate history courses in American survey (both sections), American constitutional history, and military history.

**AWARDS**

Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2014.
Religious Liberty Award, United Sikhs of Oregon, 2010.
Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2006.
Professor of the Year Award for Teaching, Willamette College of Law, 2003.

**PUBLICATIONS**

**Books**

*Separating Church and State* (Cornell University Press, in progress).

*The Third Disestablishment: Church, State, and American Culture, 1940-1975* (Oxford University Press, 2019).

*Inventing a Christian America* (Oxford University Press, 2015).

*The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford University Press, 2012).

> Finalist, Oregon Book Award (2013); Nominated for the John Philip Reid Book Award by the American Society for Legal History (2013); Nominated for the Philip Schaff Prize by the American Society of Church History (2013).

*The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010).

*Religious Freedom and the Supreme Court*, with Ronald B. Flowers and Melissa Rogers (Baylor University Press, 2008).

*Stars in the Constitutional Constellation: Federal and State Constitutional Provisions on Church & State* (Americans United Research Foundation, 1993).

**Book Chapters**

"The Bible in American Law, Politics, and Rhetoric," *The Bible in America* (Society for Biblical Literature, forthcoming 20209).

"The Irrelevance of Disestablishment," in *The Legitimate Scope of Religious Establishment* (forthcoming).

"The Public Funding of Private Religious Schools," in *The Oxford Handbook of Religion and American Education*, Michael Waggoner, ed. (Oxford University Press, 2018).

"The Legacy of People v. Philips for the Twentieth Century," in *Religious Freedom in America* (Fordham University Press, 2016).

"The Nineteenth-Century 'School Question': An Episode in Religious Intolerance or an Expansion of Religious Freedom?" in *The Lively Experiment: The Story of Religious Toleration in America*, Chris Beneke, ed. (Rowman & Littlefield, 2015).

"The Separation of Church and State in the United States," *Oxford Research Encyclopedia of American History* (Oxford University Press, 2015).

"The First School Prayer Debate and its Impact on Modern Church-State Doctrine," in *Religious Freedom in America* (University of Oklahoma Press, 2015).

 "Separationism as an Organizing Principle," in *The Wiley-Blackwell Companion to Religious Diversity* (Wiley-Blackwell Pub., 2013).

"Religion and Law," in *The Wiley-Blackwell Companion to American Legal History* (Wiley-Blackwell Publishing Co., 2013).

"School Prayer," in *The Oxford Encyclopedia of American Political and Legal History* (Oxford University Press, 2012).

"The 'Second Disestablishment': The Evolution of Nineteenth Century Understandings of Separation of Church and State," in *No Establishment of Religion: America's Contribution to Religious Liberty*, John Witte, Jr., ed. (Oxford University Press, 2012).

"In Bad Faith: The Corruption of Charitable Choice," in *Fundamentalism and the Rule of Law*, Marci Hamilton, ed. (Palgrave MacMillan Pub., 2011).

"Church and State in the Nineteenth Century," in *Oxford Handbook on Church and State in the United States*, Derek H. Davis, ed. (Oxford University Press, 2010).

"William Strong," in *The Yale Biographical Dictionary of American Law*, Roger K. Newman, ed. (Yale University Press, 2009).

 "Respecting Respective Spheres: The Role of Religion in Public Life," in *The American Experiment Religious Freedom*, M. Hogan and L. Frederking, eds., (Garaventa Center, 2008).

*The Encyclopedia of American Civil Liberties* (Eight Entries), Paul Finkelman, ed. (Routledge Reference Pub., 2006).

"Seminal or Symbolic: The Meaning of Zelman v. Simmons-Harris and its Future Impact," in *What's Next for School Vouchers*, Paul Peterson, ed., (Hoover Institute Press/Stanford University Press, 2003).

**Articles and Reviews**

Review: *Sacred Liberty: America's Long, Bloody, and Ongoing Struggle for Religious Freedom*. By Steven Waldman. *Church History* 88 (2019): 869-870.

"H.W.W.P. (How Would Washington Pray)? The Futile Search for Historical Authority in Religion Clause Cases," in progress.

"The Path No Taken: Reinhold Niebuhr, John Courtney Murray, and the Proposition of Church-State Separation," *Oxford Journal of Law and Religion* 7 (2019): 1-20.

"The Irrelevance of Church-State Separation in the Twenty-First Century," *Syracuse Law Review* 69 (2019): 999-1040.

Review: *Taxing the Church: Religion, Exemptions, Entanglement, and the Constitution*, by Edward A. Zelinsky, *Reading Religion* (September, 2018).

Review: *Religious Freedom: The Contested History of an American Ideal*, by Tisa Wenger, *Church History* (2018).

"The Mixed Legacy of Magna Carta for American Religious Freedom," *Journal of Law and Religion* 32 (2017).

Review: *Reading the Bible with the Founding Fathers*, by Daniel L. Dreisbach, *Church History* (2017).

Review: *The Evangelical Origins of the Living Constitution*, by John Compton, *American Historical Review* 120 (Feb. 2015): 279-280.

Review: *Religious Lessons: Catholic Sisters and the Captured Schools Crisis in New Mexico*, by Kathleen Holscher, *Church History* (2014).

Review: *The Religious Roots of the First Amendment*, by Nicholas Miller, 93 *Church History* (2013): 624-625.

Review: *The Spirit of the Law: Religious Voices and the Constitution in Modern America*, by Sarah Barringer Gordon, *American Historical Review* 117 (2012).

"The Slow, Tragic Demise of Standing in Establishment Clause Challenges," 5 *Advance* 117-129 (Fall 2011).

"Understanding the 'Christian Nation' Myth," 2010 *Cardozo Law Review De Novo* 245 (2010).

"All Things Not Being Equal: Reconciling Student Religions Expression in the Public Schools," 42 *U.C. Davis Law Review* 843 (2009).

"The Insignificance of the Blaine Amendment," 2008 *B.Y.U. Law Review* 295.

"Religious Liberty as a Positive and Negative Right," 70 *Albany Law Review* 101 (2007).

"Reconciling the Irreconcilable: Military Chaplains and the First Amendment," 110 *West Virginia Law Review* 167 (2007).

"A 'Spacious Conception': Separationism as an Idea," 85 *Oregon Law Review* 443 (2006).

"Religion Clause Federalism: State Flexibility over Religious Matters and the 'One-Way Ratchet'," 56 *Emory Law Journal* 107 (2006).

"'Bad History:' The Lure of History in Establishment Clause Adjudication, 81 *Notre Dame Law Review* 101 (2006).

"A 'Legacy of Discrimination?' The Rhetoric and Reality of the Faith Based Initiative: Oregon as a Case Study," 84 *Oregon Law Review* 725 (2006).

"Federalism and the Establishment Clause: A Reassessment," 38 *Creighton Law Review* 761 (June 2005).

"Locke v. Davey and the Limits to Neutrality Theory," 77 *Temple Law Review* 913 (Winter 2004).

"'Blaming Blaine': The Mixed Legacy of the Blaine Amendment," 2 *First Amendment Law Review* 107 (Winter 2003).

Review: *Clergy Malpractice in America*, by Mark A. Weitz, 45 *Journal of Church and State* 189 (Winter 2003).

"Religious Discrimination, Public Funding, and Constitutional Values," 30 *Hastings Constitutional Law Quarterly* 1 (Fall 2002).

"Of (Un)Equal Jurisprudential Pedigree: Rectifying the Imbalance between Separation and Neutrality," 43 *Boston College Law Review* 1111(Sept. 2002).

"The Illusionary Aspect of 'Private Choice,'" 38 *Willamette Law Review* 549 (Fall 2002).

"Critical Legal Issues Involving Vouchers," 75 *St. John's Univ. Law Review* 209 (Spring 2001).

"The Constitutionality of Vouchers After Mitchell v. Helms," 57 *N.Y.U. Annual Survey of American Law* 57 (2001).

"Charitable Choice and Neutrality," 57 *N.Y.U. Annual Survey of American Law* 33 (2001).

"The Ambiguity of Neutrality," 86 *Cornell Law Review* 101 (March 2001).

"Should We Put Faith in Charitable Choice?" 10 *The Responsive Community* 31 (Fall 2000).

"The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 *Journal of Law and Religion* 101 (2000).

"'Private' Prayer and Public Audiences," 5 *Nexus* 27 (2000).

"Private School Vouchers and the Confusion over 'Direct' Aid," 10 *George Mason Univ. Civil Rights Law Journal* 47 (2000).

"Justice David J. Brewer and the 'Christian Nation' Decision," 63 *Albany Law Review* 101 (1999).

"Contemporary Challenges Facing the First Amendment's Religion Clauses," 48 *New York Law School Law Review* 102 (1999).

"Religion in Public Schools: Of Misnomers and Misinformation," 46 *Federal Lawyer* 38 (June 1999).

"Is Public Education Hostile to Religion?" 83 *American Teacher* 4 (Dec. 1998).

Review: *The Culture of Disbelief* by Stephen L. Carter, 30 *Georgia State Bar Journal* 240 (Summer 1994).

"The Legal Argument Against Private School Choice," 62 *University of Cincinnati Law Review* 37 (Summer 1993).

"The Blaine Amendment Reconsidered," 36 *American Journal of Legal History* 38 (January 1992).

"Evangelicals and the Becker Amendment: A Lesson in Church-State Moderation," 33 *Journal of Church and State* 541 (Summer 1991).

"The Misnomer of Equality Under the Equal Access Act," 14 *Vermont Law Review* 369 (1990).

"The Misguided Search for a Christian America," 42 *Church & State* 105 (May 1989).

"Freedom of Religion in Alaska: Interpreting the Alaska Constitution," 5 *Alaska Law Review* 237 (December 1988).

**PRESENTATIONS, PAPERS AND LECTURES**

Commentator on *Teaching Mindfulness and Yoga in Public Schools*, *American Academy of Religion*, San Diego, CA, Nov. 25, 2019.

Respondent on *The Third Disestablishment*, *American Academy of Religion*, San Diego, CA, Nov. 23, 2019.

Church-State Workshop, *Georgia State University Law School*, Atlanta, Aug. 8-9, 2019.

"The Irrelevance of Church-State Separation," Religion in American Life Conference, *University of East Anglia*, Norwich, UK, July 24-25, 2019.

Annual Historian's Lecture on *Inventing a Christian America*, *Minnesota Historical Society*, St. Paul, MN, March 9, 2019.

"The Public Funding of Private Religious Schools," *American Academy of Religion*, Denver, Co., Nov. 19, 2018.

Forum on Religious Liberty Issues, LDS Church, Roseburg, OR, October 14, 2018.

"Religious Liberty and Non-Discrimination," Constitution Day, Willamette University, Salem, OR, September 17, 2018.

Debate on *Masterpiece Cakeshop*, Federalist Society and American Constitution Society, Willamette University, Salem, OR, February 12, 2018.

"The Bible and American Public Life in the Time of Trump," *Society for Biblical Literature*, Boston, MA, Nov. 19, 2017.

"The Future of "No-Aid" Separationism and State "Blaine" Amendments after *Trinity Lutheran Church v. Comer*," Religion and Law Discussion Group, *American Academy of Religion*, Boston, MA, Nov. 19, 2017.

Debate, "Masterpiece Cakeshop and Religious Discrimination," Linfield College, McMinnville, OR, Nov. 9, 2017.

"Constitution Day Talk," *American Constitution Society*, Willamette University College of Law, Salem, OR, Sept. 19, 2017.

"The Constitutionality of President Trump's Travel Ban," *Federalist Society* Debate, Willamette University College of Law, Salem, OR, Aug. 28, 2017.

"*Trinity Lutheran* and the Future of Sate Blaine Amendments," *Federalist Society Western Conference*, Ronald Reagan Presidential Library, Simi Valley, CA, Jan. 28, 2017.

"The Emerging Imbalance within Separationism," *Religion and Law Discussion Group, American Academy of Religion*, San Antonio, TX, Nov. 20, 2016.

"A Fine Mess You Left Us," *Oregon Law Review Symposium on the Legacy of David Frohnmeyer*, Portland, OR, April 1, 2016.

"The Irrelevance of Church-State Separation," *Religious Liberty in the Twenty-First Century*, Claremont Graduate University, Claremont, CA, March 25-26, 2016.

"The Irrelevance of Disestablishment," *The Legitimate Scope of Religious Establishment*, Venice, Italy, March 7-9, 2016.

"Magna Carta and Religious Freedom," *Magna Carta Conference*, Dartmouth University, Hanover, NH, Nov. 7, 2015.

Panelist, "Christian Nationalism," Society of U.S. Intellectual History, Washington, DC, Oct. 17, 2015.

Debate, "Gay Marriage and Religious Liberty," Willamette University College of Law Federalist Society, Sept. 9, 2015.

Keynote, "Religious Liberty in American History, Ashland University, Newport, RI, May 1-3, 2015.

Panelist, "Vaccinations and the Law," *Salem Statesman Journal* and Willamette University College of Law, Salem, OR, April 16, 2015.

"The Hobby Lobby Decision," *Twenty-First Century Healthcare Reform Symposium*, Willamette University College of Law, Salem, OR, Feb. 27, 2015.

"The Hobby Lobby and Greece v. Galloway Decisions," Beit Haverim, Lake Oswego, OR, Jan. 18, 2015.

"The Meaning and Ramifications of Greece v. Galloway," *Religion and Law Discussion Group, American Academy of Religion*, San Diego, Ca., Nov. 23, 2014.

"The Hobby Lobby Decision," University of Memphis Law School, Memphis, Nov. 7, 2014.

"The Hobby Lobby Ruling," *The Hobby Lobby Aftermath*, Northwest Religious Liberty Association, Vancouver, WA, Sept. 29, 2014.

"Did America Have a Christian Founding?" George Fox University, Newberg, OR, Sept. 18, 2014.

Panelist, *Religious Liberty and the Roberts' Court*, American Constitution Society, Portland, OR, July 8, 2014.

Panelist, *The Sacred Rights of Conscience*, Liberty Fund, Indianapolis, June 13-15, 2014.

Panelist, "The Contraceptive Care Debate: Obama Care and Religious Accommodation," Willamette University College of Law, Salem, OR, March 20, 2014.

"The Rhetoric of Separation in Public and Policy Debates," *Weapons of Mass Seduction Conference*, Ghent University, Ghent, Belgium, November 6-9, 2013.

Keynote: "The Nineteenth Century School Question: An Episode of Religious Intolerance or an Expansion of Religious Freedom?" *Religious Freedom, Cultural Conflict, and the Moral Role of the State Conference*, Brown University and Salve Regina University, Newport, RI, October 3-6, 2013.

"The First School Prayer Debate and its Impact on Modern Church-State Doctrine," *Fifty Years after Schempp*, Indiana University, Bloomington, IN, Sept 27-29, 2013.

"The Endorsement Test and Funding," *Symposium on the Endorsement Test,* Charleston Law School and Furman University, Charleston, SC, April 15, 2013.

"The Legacy of People v. Philips," *Conference on Religious Freedom in America,* New York University Law School, New York, NY, April 13, 2013.

Keynote: "The Unknown Disestablishment of the Nineteenth Century," *Religion and the State Conference,* Roger Williams University, Bristol, RI, April 12, 2013.

"The Origins of the School Controversy," *Religion in American Life Conference,* King's College-London, London, UK, Feb. 22-24, 2013.

"How America Became a Christian Nation," *American Society for Church History*, New Orleans, LA, January 6, 2013.

"Did America Have a Christian Founding?" University of Idaho Law School, Moscow, ID, Nov. 15, 2012.

"Religion and the 2012 Presidential Election," Lake Oswego Congregational Church, Lake Oswego, OR, October 21, 2012.

"Religious Conscience Clause Exceptions," Planned Parenthood of Oregon and Americans United for Separation of Church and State, First Unitarian Church, Portland, May 30, 2012.

*Conference of Religiously Affiliated Law Schools*, Touro Law School, Islip, NY, May 3, 2012.

“Church-State Boundaries,” Fortnightly Club of Eugene, Eugene, OR, April 19, 2012.

“The School Question and the Second Disestablishment of the Nineteenth Century,” *Religious Freedom Symposium,* Oklahoma University, Norman, OK, April 2, 2012.

“Spirituality and Secularism: The Liberal Struggle over the Role of Religion in the Public Sphere,” *Nineteenth Century Studies Association*, Asheville, NC, March 22, 2012.

“Blaine Amendments,” *National Secular Humanist Conference*, Orlando, FL, March 2, 2012.

*Competing Claims of Law and Religion Conference*, Pepperdine U. Law School, Malibu, CA, Feb. 25, 2012.

“How America Became a Christian Nation, and Other Myths,” U-Think Pub, Salem, OR, Feb. 8, 2012.

“The Second Disestablishment,” *OSU Life-Long Learning*, Corvallis, OR, Dec. 1, 2011.

“The Image of the Ten Commandments in American Law,” *American Studies Association*, Baltimore MD, October 21-23, 2011.

“Unraveling the ‘Myth’ of America’s Christian Founding,” *Conference on Religion and the State*, Roger Williams University, Bristol, RI, April 1-3, 2011.

“The Christian Nation Myth” and “Church-State Update,” *Northwest Free-Thought Conference,* Portland State University, Portland, Or, March 26, 2011.

“Religious Expression in the Public Schools,” *Oregon School Boards Association Leadership Conference*, Salem, OR, February 18, 2011.

“School Vouchers,” Lewis and Clark University Law School, Portland, OR, February 17, 2011.

“Religious Dress and Religious Liberty,” *Northwest Religious Liberty Association*, Ridgefield, WA, October 4, 2010.

Panel on “Religious Symbols,” *Oxford Conference on Law and Religion*, Balliol College, Oxford, United Kingdom, June 6-9, 2010.

“Religious Dress in the Public Schools,” *Solomon’s Legacy Lecture,* Jewish Federation of Portland, Portland, OR, Nov. 4, 2009.

"Church-State Legal Cases," *Northwest Humanist Association*, Portland, OR, March 28, 2009.

"Freedom of Speech in the Public Schools," *National School Boards Association*, Orlando, FL, March 30, 2008.

"First Amendment Rights in America's Public Schools," University of California at Davis School of Law, Davis, CA, March 7, 2008.

"Educational Choice: Emerging Legal and Policy Issues," Brigham Young University Law School, Provo, Utah, October 22-23, 2007.

"The Supreme Court's 2006 Term," *Solomon's Legacy Lecture,* Jewish Federation, Portland, OR, October 2, 2007.

"Churches, the Sanctuary Movement, and the Law," *Ecumenical Ministries of Oregon and Center for Religion, Law, and Democracy*, Portland, OR, September 25, 2007.

"The Corruption of Charitable Choice," *Humanists of Greater Portland*, Portland, OR, September 9, 2007.

"Another Viewpoint: Religious Freedom and the Law – A Response to Justice Scalia," *American Constitution Society*, Portland, OR, May 23, 2007.

"The American Experiment: Religious Freedom Conference," University of Portland, Portland, OR, April 12-14, 2007.

"Religion Clauses in the 21st Century," West Virginia University College of Law, Morgantown, WV, April 12-13, 2007.

"Free Exercise Symposium," Albany Law School, Albany, NY, March 29, 2007.

"The Corruption of Charitable Choice," Lewis and Clark Law School, Portland, OR, March 15, 2007.

"Religious Expression in the Public Schools," *Oregon School Boards Association*, Salem, OR, March 9, 2007.

"Free Exercise as a Negative Right," Southern Methodist University Law School, Dallas, TX, March 6, 2007.

"Religion and the American Founding," George Fox University, Newberg, OR, March 3, 2007.

“Creationism on Trial,” *Center for Religion, Law and Democracy,* Willamette University, Salem, OR, February 9, 2007.

“Unparalleled Justice: The Legacy of Justice Hans Linde,” Willamette University College of Law, Salem, OR, October 27, 2006.

“Religious Expression in the Public Schools,” *Oregon Parent Teachers Association*, Portland, OR, April 22, 2006.

“Disentangling Church and State,” University of Oregon School of Law, Portland, OR, March 24, 2006.

“Legal, Cultural, and Political Conceptions of the Separation Between Church and State,” *Association for the Study of Law, Culture and the Humanities,* Syracuse University School of Law, Syracuse, NY, March 17, 2006.

“Fundamentalism and the Rule of Law,” Cardozo School of Law, New York, NY, March 14, 2006.

“Interactive Federalism: Filling the Gaps?” Emory University School of Law, Atlanta, GA, February 16, 2006.

“The (Re)Turn to History in Religion Clause Law and Scholarship,” *Association of American Law Schools*, Washington, DC, January 6, 2006.

“The Future of Religious Freedom in America,” *McCormick Tribune Foundation and the First Amendment Center*, Chicago, IL, October 10-11, 2005.

“Cities in the Middle: The Emerging Debate over Religion in Public Life,” UC Hastings Law School, San Francisco, CA, October 5, 2005.

“The Separation of Church and State: Should the Wall be Lowered?” *Solomon’s Legacy Lecture,* Jewish Federation of Portland, Portland, OR, June 9, 2005.

“Section 1983 Actions – Constitutional Law Update,” *Oregon Bar Association*, Portland, OR, April 1, 2005.

“Religious Expression in the Public Schools,” *Oregon School Boards Association*, Salem, OR, March 11, 2005.

Panel Discussion on the Ten Commandments’ Cases, Georgetown University Law Center, February 2, 2005.

“Gender, Religion and Morality in Nineteenth Century America,” *American Historical Association*, Seattle, WA, Jan. 9, 2005.

"Christians for Peace and Justice Summit," *Ecumenical Ministries of Oregon*, Portland, OR, Oct. 23, 2004.

"Reconciling the Free Exercise and Establishment Clauses," *Creighton University School of Law Centennial Symposium*, Omaha, NE, Oct. 9, 2004.

"Pledge of Allegiance Case," *Historical Society of the U.S. District Court of Oregon*, Portland, OR, Sept. 23, 2004.

Lawyers and Activists Summit, *National Center for Science Education*, Berkeley, CA, Sept. 10-12, 2004.

"Religion and the Law: Contrasting Views on Establishment Clause and Free Exercise Clause Developments," *National Association of Attorneys General Conference*, Santa Monica, CA, June 16, 2004.

"Elk Grove Unified School District v. Newdow" ("The Pledge of Allegiance Case"), *National Organization of Lawyers for Education Associations Conference*, San Diego, CA, June 3-5, 2004.

"Fifty Years after Brown: What Has Been Accomplished and What Remains to be Done?" Harvard University, *J.F.K. School of Government*, Cambridge, MA, April 22-24, 2004.

"When Hate Happens Here: Free Speech vs. Hate Speech," Chemeketa Community College, Salem, OR, March 5, 2004.

Debate on *Locke v. Davey* with Texas Solicitor General Ted Cruz, *The Federalist Society*, Houston and Austin, Texas Chapters, February 12 & 13, 2004.

"Supreme Court Preview, 2003-2004," *The Institute of Bill of Rights,* William and Mary School of Law, Williamsburg, VA, October 24-25, 2003.

Faith-Based Conference, Anchorage, AK, August 12, 2003.

"Pledge of Allegiance Case," *Inns of Court*, Salem, OR, April 17, 2003.

"Religion in Public Schools?" *Thomas J. White Center on Law and Government,* Notre Dame University Law School, South Bend, IN, April 13, 2003.

"Separation of Church and States," University of North Carolina School of Law, Chapel Hill, NC, March 28, 2003.

"Southwest Commission on Religious Studies," *American Academy of Religion*, Dallas, TX, March 15-16, 2003.

"Charitable Choice, Creating Change Conference," *National Gay, Lesbian Task Force Annual Conference*, Portland, OR, November 8, 2002.

"What's Next for Vouchers?" *John F. Kennedy School of Government*, Harvard University, Cambridge, MA, October 17-18, 2002.

"School Vouchers: Past Lessons and Future Prospects," *The Federalist Society*, Indianapolis, IN, June 28, 2002.

"Student Religious Expression in Public Schools," *National PTA Convention*, San Antonio, TX, June, 23, 2002.

"Shifting into Neutral? Emerging Perspectives on the Separation of Church and State," *Boston College Law School*, Newton, MA, April 5, 2003.

"Symposium on Law and Education," Willamette University College of Law, Salem, OR, March 2, 2002.

"School Choice, Charters, and Vouchers," University of San Diego School of Law and School of Education, San Diego, CA, January 18, 2002.

"First Amendment Review," *Oregon School Boards Association*, Portland, OR, November, 2001.

"Town Hall on Charitable Choice," Portland State University, Portland, OR, November 6, 2001.

**PREVIOUS LEGAL EMPLOYMENT**

**Legal Director and Special Counsel**, Americans United for Separation of Church and State, Washington, D.C.  January, 1992 to June, 2002.  Directed legal and legislative programs for national public interest organization committed to preserving religious liberty and separation of church and state; oversaw litigation and appeals; filed party and amicus briefs in U.S. Supreme Court and other appellate courts; reviewed and drafted proposed legislation; testified before Congress, state legislatures, and various government committees, agencies and boards.

**Trial Court Magistrate**, Alaska Court System, Palmer, Alaska, February 1984 to July 1985.  Judicial officer for the District Court for the Matanuska-Sustina Borough. Presided over misdemeanor jury and non-jury trials as well as felony criminal hearings, small claims trials and traffic trials. Also served as Superior Court Master for juvenile, child in need-of-aid, probate, and domestic matters.

**Staff Attorney**, Alaska Legal Services Corporation, Dillingham and Anchorage, Alaska, July 1982 to January 1984. Represented low-income clients in a civil practice consisting

of domestic, children's, landlord-tenant, public entitlements, and probate law. Also represented Alaska Natives in land claims, allotments, and fishing rights cases.

**Judicial Law Clerk**, Texas Court of Appeals, Houston, Texas, August 1981 to June 1982. Served as judicial law clerk for Associate Justice George Miller; preformed legal research, wrote legal memoranda and opinions.

**SIGNIFICANT LEGAL EXPERIENCE**

Served as co-Counsel in three Supreme Court church-state cases (*Simmons-Harris v. Zelman*, *Mitchell v. Helms; Chandler v. DeKalb County Schools*); assisted on other Supreme Court appeals (*Santa Fe Independent School Dist. v. Doe*, *Agostini v. Felton*, *Rosenberger v. Rector*, and *Kiryas Joel School Dist. v. Grumet*).

Authored/collaborated on more than 25 amicus briefs before the U.S. Supreme Court, including briefs in *Espinoza v. Montana Dept. of Revenue* (2019), *American Legion v. American Humanist Association* (2019), *Trump v. Hawaii* (2018), *Masterpiece Cakeshop v. Colorado Civil Rights Commission* (2018); *Trinity Lutheran Church v. Comer* (2017), *Zubik v. Burwell* (2016), *Hobby Lobby v. Burwell* (2014) and *Town of Greece v. Galloway* (2014).

Advised the Clinton Administration's Justice and Education Departments on matters concerning Charitable Choice and religious expression in the public schools (co-author of the Joint Statement on Current Law on Religion and Public Education, 1995).

Authored party and amicus briefs in various U.S. Courts of Appeals and in the supreme courts of Alabama, Alaska, Arizona, California, District of Columbia, Florida, Illinois, Maine, Minnesota, New Hampshire, North Carolina, Ohio, Puerto Rico, Texas, and Wisconsin.

Served as co-counsel in challenges to private school voucher programs in Wisconsin, Ohio, Vermont, Maine, Florida, Pennsylvania, Puerto Rico, Arizona and Illinois. Also co-counsel in Alabama "Student-Initiated Prayer" and "Ten Commandments" cases as well as in several school prayer cases.

**PROFESSIONAL ASSOCIATIONS AND ACTIVITIES**

Bar of the Supreme Court of the United States
Licensed to Practice Law in Texas, Alaska, Minnesota, and Maryland
Admitted to Practice Law before the United States Courts of Appeals for the Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits
American Bar Association
American Society for Legal History
National Council of Churches, Religious Liberty Committee
National Center for Science Education, Legal Advisory Committee
*Journal of Church and State*, Editorial Council

Ecumenical Ministries of Oregon, Public Policy Advisory Committee
American Constitution Society, Oregon Lawyers Chapter, Board of Directors

Member, Oregon Law Commission Work Group on Standing, 2014-2015
Convener, Oregon Task Force on Religious Attire in the Public Schools, 2010
Author, Oregon Law Commission Study on the Faith-Based Initiative, 2002-2004

# Reply to Steven K. Green's Report

*Donna Cave v. John Thurston*

No. 4: 18-cv-00342-KGB

*Anne Orsi v. John Thurston*

No. 4: 18-cv-343-KGB

Mark David Hall

Herbert Hoover Distinguished Professor of Politics

Faculty Fellow William Penn Honors Program

George Fox University

January 24, 2020

Exhibit D

# TABLE OF CONTENTS

The Nature of the Evidence ....................................................1

Why History Matters....................................................7

Ten Commandments as a Source and Symbol of Law ....................................................9

Alleged Sectarian Versions of the Ten Commandments....................................................21

Conclusion ....................................................23

1. The historic understanding of the First Amendment permits a State to erect, or allow to be erected, a Ten Commandments monument on public property. Such a practice is "deeply embedded in the history and tradition of this country"[1] Nothing in Professor Steven K. Green's rebuttal report provides a substantive challenge to these conclusions of my principal report.[2]

**The Nature of the Evidence**

2. Professor Green fundamentally mischaracterizes the nature of the evidence presented in section IV of my report ("The Historical Understanding of the Establishment Clause"). He states that I "invite[] the Court to make conclusions about the constitutionality of modern Ten Commandments monuments based on a narrative that asserts a high degree of religiosity among members of the founding generation and their use of religious rhetoric."[3] But my report does not rely on the religiosity of the founding generation, and it does not consider merely rhetorical uses of religious language. Instead, it offers a 28-page discussion of a number of concrete actions, laws, and constitutional provisions that demonstrate that America's founders had no desire to build a wall of separation between church and state.[4] They opposed the creation of a national church, and many objected to state establishments as well, but in their public life they consistently acknowledged religion's role in society. Brief reflection on the significance of a few events discussed in my principal report underscores the differences between my arguments and Professor Green's mischaracterizations.

---

[1] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

[2] Mark David Hall, First Supplemental Report (November 18, 2019).

[3] Steven K. Green, Report (December 6, 2019), ¶ 12.

[4] Hall, Report, ¶¶ 28-91.

3. Beginning in paragraph 75 of my report, I describe the congressional debate over the propriety of asking President Washington to issue a Thanksgiving Day proclamation. That debate—which took place in the House of Representatives just a day after representatives agreed on language that would become the First Amendment—is *not* important because members of Congress thought prayer was a good, useful, or virtuous practice. Rather, it is significant because it shows that the representatives and senators who proposed what became the First Amendment did not think presidential Thanksgiving Day Proclamations were inappropriate or unconstitutional.[5] It also reveals that America's first president did not think that it was inappropriate or unconstitutional to issue a Thanksgiving Day Proclamation brimming with religious claims such as "it is the duty of all nations to acknowledge the providence of Almighty God, to obey His will, to be grateful for His benefits, and humbly to implore His protection and favor."[6]

4. Similarly, the importance of Thomas Jefferson's decision to attend church services in the U.S. Capitol is *not* that he and members of Congress went to church.[7] If they had merely attended local Anglican, Presbyterian, or Methodist churches, their actions would tell us nothing about their views of church–state relations. However, Congress's willingness to let the Capitol be used for church services, and Jefferson's decision to attend them, shows that these civic leaders did not think these actions were either inappropriate or unconstitutional. That Jefferson went to church services in the U.S. Capitol two

[5] Hall, Report, ¶¶ 75-78.

[6] *Ibid.*, ¶ 77.

[7] *Ibid.*, ¶¶ 83-85.

days after he penned his famous letter to the Danbury Baptist Association suggests that even he was not the sort of separationist that contemporary separationists wish him to be.

5. Professor Green recognizes that members of the "founding generation were biblically literate" and that "religious imagery infused public discussions."[8] My report identifies biblical references that did not contain citations in the original texts (for instance, in President Adams's 1799 call for prayer and President Madison's 1813 call for prayer).[9] The point of calling attention to these uses of Scripture is *not* that Adams and Madison were godly, pious men who looked to the Bible as an authority; instead, it is that neither thought that including Scripture in presidential calls for prayer was inappropriate or unconstitutional. Like the rest of the founding generation, they did not understand the First Amendment to create a wall of separation between church and state that prevents civic leaders from using religious language or symbols in public acts.[10]

6. Professor Green ignores the vast majority of the specific actions, laws, and constitutional provisions that I discuss, but to explain away some of them he turns to the work of a scholar widely known for his commitment to church-state separationism. Derek Davis is a former director of the J.M. Dawson Institute of Church-State Studies (named after Joseph Dawson, a founder and first executive director of Protestants and

[8] Green, Report, ¶ 18.

[9] Hall, Report, ¶¶ 80, 89.

[10] Madison questioned such calls for prayer in a private document written after he left the presidency that remained unpublished during his lifetime. This text, commonly referred to the "Detached Memoranda," has little relevance to the historic understanding of the First Amendment, as I have explained in "Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment," *American Political Thought* 3 (Spring 2014): 32-63 and Mark David Hall, *Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth* (Nashville: Nelson Books, 2019), 57-120.

Other Americans United for Separation of Church and State).  Ironically, the book from which Professor Green quotes, *Religion and the Continental Congress, 1774-1789*, documents the many ways the Continental and Confederation Congresses *encouraged* religion and religious practices.  With refreshing honesty, Davis writes in the book's conclusion that "the present writer will confess that he had expected to find considerably more evidence than he did from the confederation period that would support separationist arguments."[11]  Despite that lack of evidence, Davis nevertheless asserts that "separationism . . . best captures the progressively evolving intentions of the founding fathers."[12]  That claim, which Professor Green quotes in his report, is almost completely unsupported by the evidence and arguments Davis presents in this book, and it is contradicted by the views and actions of civic officials documented in paragraphs 64-91 of my principal report.[13]

7.  As my report suggests, and as I argue in detail elsewhere, even Jefferson and Madison were not the sort of strict separationists that later separationists wish them to be.[14]  Professor Green ignores the reality that Madison voted to pay chaplains in the Confederation Congress, served on a committee to appoint chaplains in the first federal Congress, voted to pay military and congressional chaplains in the new republic, issued four

---

[11] Derek H. Davis, *Religion and the Continental Congress, 1774-1789* (New York: Oxford University Press, 2000), 202.

[12] *Ibid.*, 227.

[13] Green, Report, ¶ 20.  I provide additional evidence and arguments supporting this point in Hall, *Did America Have a Christian Founding?* and Daniel L. Dreisbach and Mark David Hall, ed., *The Sacred Rights of Conscience*: *Selected Readings on Religious Liberty and Church-State Relations in the American Founding* (Indianapolis: Liberty Fund, 2009).

[14] Hall, *Did America Have a Christian Founding?*, 57-86

presidential calls for prayer, and attended church services in the U.S. Capitol Building.[15] Whatever his later thoughts, in his public life Madison did not act as if he understood there to be a "high and impregnable" wall of separation between church and state.[16]

8. Green complains that I "minimize" Madison's role in drafting the First Amendment.[17] To the contrary, I state that he was an important advocate of it.[18] However, I place his contributions in context of the many men who drafted and ratified the Amendment.[19] Given this context, it makes little sense to interpret the First Amendment solely in light of Madison's views. Professor Green may wish the historic understanding of the Establishment Clause could be determined simply by considering a few documents penned by Madison (and ignoring actions such as his presidential calls for prayer), but there is no good reason to accept this conclusion as a matter of history.

9. America's founders did not wish to strictly separate church and state. The historical evidence presented in my report—much of which Professor Green ignores—supports Professor Michael McConnell's already well-documented conclusion that the founders understood the Establishment Clause to prohibit "government control over the doctrine and personnel of the established church; mandatory attendance in the established church; government financial support of the established church; restrictions on worship in

[15] Hall, Report, ¶¶ 53, 89, and *Did America Have a Christian Founding?*, 81-84.

[16] *Everson v. Board of Education*, 330 U.S. 1, 18 (1947). This is not to deny that Madison and Jefferson desired a greater degree of separation between church and state than most founders, a reality I acknowledge in paragraph 91 of my principal report.

[17] Green, Report, ¶ 22.

[18] Hall, Report, ¶¶ 66, 74.

[19] *Ibid.*, ¶¶ 65-74.

dissenting churches; restrictions on political participation by dissenters; and use of the established church to carry out civil functions."[20]

10. The historic understanding of the Establishment Clause prohibits States from doing things such as creating official churches, adopting religious tests for civil offices, and legislating ecclesiastical structures. But it does not forbid them from selecting and paying chaplains, opening legislative sessions with prayer, or permitting religious organizations to participate in State-funded programs. And there is absolutely no reason to conclude that the historic understanding of the Establishment Clause prohibits the use of religious language or images by public officials or on public property.

11. To briefly reiterate an example from my principal report, in 1776 the Continental Congress appointed Benjamin Franklin, John Adams, and Thomas Jefferson to a committee to begin the process of creating a national seal. Jefferson, who desired a greater degree of separation between church and state than almost any other founder, proposed that the nation adopt one with the images of:

> Pharaoh sitting in an open chariot, a crown on his head & a sword in his hand, passing through the divided waters of the Red Sea in pursuit of the Israelites: rays from a pillar of fire in the cloud, expressive of the divine presence & command, reaching to Moses who stands on the shore &, extending his hand over the sea, causes it to overwhelm Pharaoh.[21]

[20] Michael McConnell, "Establishment and Disestablishment at the Founding, Part I: Establishment of Religion," *William and Mary Law Review* 44 (April 2003): 2131. See also, Philip Hamburger, *The Separation of Church and State* (Cambridge: Harvard University Press, 2002), 53-107.

[21] Dreisbach and Hall, *Sacred Rights of Conscience*, 229.

His motto for the new nation would have been: "Rebellion to tyrants is obedience to God."[22] Franklin's proposal was virtually identical to Jefferson's.

12. Note that Jefferson thought it appropriate to portray a miraculous event involving the prophet Moses *on the national seal*.[23] According to Exodus 19-20, it was Moses who received the Ten Commandments from God on Mount Sinai. It thus seems unlikely that even the Sage of Monticello would have a principled objection to a State allowing a monument commemorating the Ten Commandments to be erected on public property.

**Why History Matters**

13. Professor Green suggests that my principal report "makes a broad claim about the relevance of history for legal decision-making in the areas of church-state adjudication."[24] But it does no such thing. Instead, the report shows that from *Everson v. Board of Education* (1947) to *American Legion v. American Humanist Association* (2019) the United States Supreme Court has insisted that the Establishment Clause must be interpreted in light of its "generating history."[25] As well, the Court sometimes goes beyond the founding era to determine if a practice is "deeply embedded in the history and tradition of this country."[26] Professor Green's suggestion that "courts *occasionally* opine on

---

[22] *Ibid*. Jefferson "later suggested it as an alternative motto for the Great Seal of Virginia, and he later added it to his personal seal." Davis, *Religion and the Continental Congress*, 138.

[23] Exodus 14 (describing God parting the Red Sea); Deuteronomy 34:10 (referring to Moses as a prophet).

[24] Green, Report, ¶ 11.

[25] *Everson v. Board of Education*, 330 U.S. 1, 33 (1947); Hall, Report, ¶¶ 10, 10-27.

[26] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

the historical understanding of church–state separation" is misleading at best.[27]  Not only does the Court regularly make historical arguments, in *Town of Greece v. Galloway* (2014) it issued, in the words of the United States Court of Appeals for the Eighth Circuit, "an unequivocal directive" that "the Establishment Clause must be interpreted by reference to historical practices and understandings."[28]

14. The Supreme Court's most recent Establishment Clause decision, *American Legion v. American Humanist Association* (2019), likewise emphasizes the importance of history.  The Court there observes that justices have not relied on the *Lemon* test to resolve recent Establishment Clause cases, but have instead "taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance."[29]  It points to both *Marsh v. Chambers* and *Town of Greece v. Galloway* as cases where the Court relied on founding era history *and* American traditions.  It concludes that where "categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are likewise constitutional."[30]

---

[27] Green, Report, ¶ 17 (emphasis added).  I document the Supreme Court's extensive use of history in Establishment Clause cases in "Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases," *Oregon Law Review* 85 (2006): 563-613.  A slightly revised version of the article was reprinted in the *High Court Quarterly Review* 5 (2009): 109-153.

[28] *New Doe Child #1 v. United States*, 901 F.3d 1015, 1020 (8th Cir. 2018) (internal quotation marks omitted).

[29] 139 S. Ct. 2067, 2087 (2019).

[30] *Ibid*., 2089.

15. Professor Green suggests that my report "invit[es] the Court to participate in a longstanding . . . scholarly debate."[31] Again, it does no such thing, and I would not presume to do so. Instead, section III of my report shows that the United States Supreme Court has insisted for decades that the Establishment Clause must be interpreted in light of its "generating history."[32] As well, the Court has increasingly looked to the history of our nation to determine if a practice is "deeply embedded in the history and tradition of this country."[33] Professor Green may not agree with such an approach, but his complaint is not with me; it is with the United States Supreme Court.

**Ten Commandments as a Source and Symbol of Law**

16. In section V of his report, Professor Green spends a great deal of space criticizing the proposition that the "commandments serve as a leading basis for American law."[34] But I never make this claim—a fact that this section of Professor Green's report recognizes by its complete lack of any reference to my report. But it is clearly the case that the Ten Commandments are *a* basis for *aspects* of American law. Further, because of the close association between the Ten Commandments and law, images of them are used to represent law in a variety of contexts; including in public spaces and on public buildings.

17. Professor Green's report concedes that the Ten Commandments are a basis for some aspects of American law, acknowledging that there are "[c]ourt decisions pertaining

[31] Green, Report, ¶ 17.

[32] *Everson v. Board of Education*, 330 U.S. 1, 33 (1947); Hall, Report, ¶¶ 10-27.

[33] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

[34] Green, Report, ¶ 26.

to the Sabbath and other subject matter addressed in the Ten Commandments"—which of course includes both the criminal and civil law bearing on murder and the taking of human life, property rights and theft, marriage and divorce, fraud and perjury, etc.[35]

18. Some early colonial laws were directly based on the Ten Commandments and related Scriptures. Although many examples could be given, the Laws and Liberties of Massachusetts (1647/1648) contain the following references to the Ten Commandments:

> 1. If any man after legal conviction shall HAVE OR WORSHIP any other God, but the LORD GOD: he shall be put to death. Exod. 22. 20. Deut. 13.6. & 10. Deut. 17. 2. 6.
>
> 2. If any man or woman be a WITCH, that is, hath or consulteth with a familiar spirit, they shall be put to death. Exod. 22. 18. Levit. 20. 27. Deut. 18. 10. 11.
>
> . . .
>
> 4. If any person shall commit any wilfull MURTHER, which is Man slaughter, committed upon premeditate malice, hatred, or crueltie not in a mans necessary and just defence, nor by meer casualty against his will, he shall be put to death. Exod. 21. 12. 13. Numb. 35. 31.
>
> . . .
>
> 6. If any person shall slay another through guile, either by POYSONING, or other such devilish practice, he shall be put to death. Exod. 21. 14.
>
> . . .
>
> 9. If any person commit ADULTERIE with a married or espoused wife; the Adulterer & Adulteresse shall surely be put to death. Lev. 20. 19. & 18. 20 Deu. 22. 23. 27.
>
> 10. If any man STEALETH A MAN, or Man-kinde, he shall surely be put to death Exodus 21. 16.
>
> 11. If any man rise up by FALSE-WITNES wittingly and of purpose to take away any mans life: he shal be put to death. Deut. 19. 16. 18. 16.[36]

[35] *Ibid.*, ¶ 36; see also generally ¶¶ 33-36.

[36] Dreisbach and Hall, *Sacred Rights of Conscience*, 93.

19. Massachusetts was not alone in looking to the Ten Commandments for guidance when crafting legislation. For instance, Connecticut had capital laws very similar to Massachusetts's; including the biblical citations.[37] The "Articles, Laws, and Orders, Virginia" (1610) were likewise informed by the commandments, but biblical citations were not included in the text of these laws. They held, for instance, that "no man blaspheme God's holy name upon paine of death . . . ." and "no man or woman shall dare to violate or breake the Sabbath . . . ." (referencing the Third and Fourth Commandments).[38] Even Quaker Pennsylvania enforced the Third Commandment with a 1682 law that punished individuals who "shall speak loosely and profanely of almighty God, Christ Jesus, the Holy Spirit, or the scriptures of truth . . ."[39] This law was slightly revised in 1700, and in 1824 the Pennsylvania Supreme Court upheld a conviction for blasphemy based it.[40] Over time, colonial and then state governments repealed some of these statutes, altered others, and removed biblical references.[41] But the historical influence of the Ten Commandments remains clear.

---

[37] *The code of 1650, being a compilation of the earliest laws and orders of the General court of Connecticut: also, the constitution, or civil compact, entered into and adopted by the towns of Windsor, Hartford, and Wethersfield in 1638-9* (Hartford: 1822), 30-33.

[38] Dreisbach and Hall, *Sacred Rights of Conscience*, 84, 85.

[39] Quoted in Donald Lutz, ed., *Colonial Origins of the American Constitution: A Documentary History* (Indianapolis: Liberty Fund Press, 1998), 289.

[40] *Updegraph v. Commonwealth* (Pa. 1824) available in Dreisbach and Hall, *Sacred Rights of Conscience*, 561-570.

[41] David D. Hall, *A Reforming People: Puritanism and the Transformation of Public Life In New England* (New York: Alfred A. Knopf, 2011), 86-87.

20. The indelible influence of the Ten Commandments on American law is particularly evident with respect to legislation concerning the Ten Commandments' admonition to:

> Remember the sabbath day, to keep it holy.  Six days shalt thou labour, and do all thy work: But the seventh day is the sabbath of the LORD thy God: in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates: For in six days the LORD made heaven and earth, the sea, and all that in them is, and rested the seventh day: wherefore the LORD blessed the sabbath day, and hallowed it (Exodus 20: 8-11).

Historically, colonies and states have had laws prohibiting many types of work on Sunday.[42]  When upholding a statute banning a citizen from pursuing "his business or the work of his ordinary calling on the Lord's day, works of necessity or charity only excepted,"[43] the Court of Appeals of Georgia noted:

> It has been well said: ". . . The observance of Sunday is one of our established customs. It has come down to us from the same Decalogue that prohibited murder, adultery, perjury, and theft.  It is more ancient than our common law or our form of government.  It is recognized by constitutions and legislative enactments, both State and Federal.  On this day legislatures adjourn, courts cease to function, business is suspended, and nation-wide our citizens cease from labor.  The observance of the Sabbath is regarded as essential to the proper upbuilding of the mental and physical, as well as the moral life of a great people.  Laws and ordinances respecting its observance are clearly within the genius of our institutions and the spirit of our national life."[44]

21. In the 1960s, the constitutionality of these laws was challenged on a variety of grounds—including the Establishment Clause.  In *McGowan v. Maryland,* Chief Justice

---

[42] For examples of nineteenth-century courts upholding laws based on the same commandment in the States of South Carolina, New York, Connecticut, and Georgia, see Steven K. Green, "The Fount of Everything Just and Right?  The Ten Commandments as a Source of American Law," *Journal of Law and Religion* 14 (1999-2000), 553-555.

[43] *Rogers v. State*, 4 S.E.2d 918, 920 (Ga. Ct. App. 1939).

[44] *Ibid.*, 919 (quoting Marchetti, *Law of Stage, Screen, and Radio*, 347, § 163).

Earl Warren's opinion for the Court and Justices Frankfurter and Harlan's concurring opinion provided detailed histories showing that English and American legislatures had long passed legislation to protect the Sabbath.[45]  Moreover, as late as 1961, 49 of 50 states continued have such legislation.[46]  In upholding these laws, both opinions emphasized that there are "secular justifications . . . for making Sunday a day of rest."[47]  This is certainly true, but as a matter of history these statutes have their roots in the belief that men and women should "[r]emember the sabbath day, to keep it holy."

22. Professor Green thinks it significant that the Ten Commandments were not cited at the Constitutional Convention or the ratification debates.[48]  But these debates concerned constitutional design, not criminal or civil laws.  It would make little sense to reference any of the commandments when debating topics such as the enumeration of Congress's power, federalism, or judicial review.  Even so, Professor Green neglects to note that the Constitutional Convention met every day of the week except Sunday, and

---

[45] *McGowan v. Maryland*, 366 U.S. 420, 420-543 (1961).

[46] *Ibid.*, 495.

[47] *Ibid.*, 434, 491, 507.  Justices Frankfurter and Harlan, in their concurrence, and Justice Douglas, in his dissent, specifically link Sunday closing laws to the Fourth Commandment. *Ibid.*, 470 (1961) (Frankfurter, J., concurring); *ibid.*, 566-67 (1961) (Douglas, J., dissenting).

Many of these laws have since been repealed, but some states continue to have statutes requiring businesses to be closed on Sunday, forbidding hunting on Sunday, etc. See, for instance, Maine State Title 17, §3204 (prohibiting keeping a place of business open to the public on Sunday) and Maine State Title 12, §11205 (forbidding hunting on Sunday).

[48] Green, Report, ¶ 32.

that the delegates assumed that Congress would not conduct business on Sunday.[49] Article I, Section 7, Clause 2 of the United States Constitution stipulates that:

> If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a law.

Congress is not formally prohibited from convening on Sunday, but prior to the twentieth century the House of Representatives did so only on one occasion.[50]

23. Professor Green makes the broad assertion that there "is no significant reliance on the Commandments in early American case law."[51] He bases this conclusion on his study of "400 church-state cases of the nineteenth century."[52] But courts are just as likely to have referred to the Ten Commandments when deciding non-church/state cases (e.g., cases involving murder, theft, and adultery). Professor Green does not even consider twentieth- or twenty-first-century courts' references to the Ten Commandments. In fact, a 2002 study identified roughly 1,000 judicial citations to the Ten Commandments—citations that continued well into the twentieth century.[53]

---

[49] See Gordon Lloyd, "Day-by-Day Summary of the Convention," available at http://teachingamericanhistory.org/convention/summary/ (accessed November 20, 2018); Max Farrand, ed., *The Records of the Federal Convention of 1787* (New Haven: Yale University Press, 1966), vols. 1 and 2.

[50] See U.S. House of Representatives, "List of All Weekend Sessions," available at https://history.house.gov/Institution/Saturday-Sunday/All/ (accessed November 20, 2018). I was unable to find a similarly comprehensive study for the U.S. Senate, but for a partial study, see U.S. Senate, "Sunday Sessions of the Senate (since 1861)," available at https://www.senate.gov/pagelayout/reference/five_column_table/Sunday_Sessions_of_the_Senate.htm (accessed November 28, 2018).

[51] Green, Report, ¶ 34.

[52] *Ibid.*

[53] John A. Eidsmoe, "The Use of the Ten Commandments in American Courts," *Liberty University Law Review* 3 (2009), 15-46. This figure is based on a series of Lexis com-

24. Throughout history, the Ten Commandments have been viewed as a symbol of morality and/or law. For instance, John Quincy Adams wrote to his son that:

> The law given from Sinai was a civil and municipal as well as a moral and religious code; it contained many statutes adapted to that time only, and to the particular circumstances of the nation to whom it was given; but many others were of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws.[54]

25. In 1997, the House of Representatives recognized that "the Ten Commandments have had a significant impact on the development of the fundamental legal princi-

puter searches, but Eidsmoe also quotes from and cites dozens of cases where jurists utilize one or more of the Ten Commandments in substantive ways. Many of these cases are from the twentieth century. Other scholars have written on the influence of Biblical law, in general, and the Decalogue, specifically, on western and American law. See, for instance, John T. Noonan, Jr., *The Believer and the Powers That Are: Cases, History, and Other Data Bearing on the Relation of Religion and Government* (New York: MacMillan, 1987), 4 (the Ten Commandments "have been the most influential law code in history"); Stephen Botein, *Early American Law and Society* (New York: Alfred A. Knopf, 1982), 25 ("the ideal polity of early Puritan New England was thought to comprehend divine intentions as revealed through Mosaic law"); John W. Welch, "Biblical Law in America: Historical Perspectives and Potentials for Reform," *Brigham Young University Law Review* (2002), 611-642; and even Green, "The Fount of Everything Just and Right?," 525 ("[i]t is axiomatic that many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition . . . of which the American legal system is a part.").

[54] Quoted in Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers* (New York: Oxford University Press, 2017), 46. Professor Green recognizes that "Calvinist clergy saw Old Testament Israel as a model" (Green, Report, ¶ 31). Nevertheless, he states that they "generally believed that Christians were not bound by the Old Testament, including the Ten Commandments." *Ibid.* The latter statement is false if it is meant to suggest that Calvinist clergy did not regard the Ten Commandments as morally binding law. See, for instance, the answer to question 98 of the American version of the Westminster Larger Catechism, adopted by the Presbyterian church in 1788: "The moral law is summarily comprehended in the Ten Commandments . . . : the first four commandments containing our duty to God, and the other six our duty to man." Westminster Larger Catechism, available at https://www.pcaac.org/wp-content/uploads/2019/11/LargerCatechismwithScriptureProofs1.pdf (accessed January 17, 2020); see also questions 98-148.

ples of Western Civilization" and "the Ten Commandments set forth a code of moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society."[55] As such, the House resolved that: "(1) the Ten Commandments are a declaration of fundamental principles that are the cornerstones of a fair and just society; and (2) the public display, including display in government offices and courthouses, of the Ten Commandments should be permitted."[56]

26. Numerous courts have likewise recognized the Ten Commandments' influence. For instance, when holding that an Eagles-inspired monument of the Ten Commandments on public land does not violate the Establishment Clause, the United States Court of Appeals for the Tenth Circuit observed that "[i]t is noteworthy that the Order of the Eagles is not a religious organization—it is a fraternal order which advocates ecclesiastical law as the temporal foundation on which all law is based . . . So the Decalogue is at once religious and secular . . . ."[57] A decade after this decision, a federal judge noted that "the Ten Commandments have had immeasurable effect on Anglo-American legal development."[58]

---

[55] *Journal of the House of Representatives of the United States: One Hundred and Fifth Congress: First Session* (Washington: U.S. Government Printing Office, 2000), 173.

[56] *Ibid*.

[57] *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 33 (10th Cir. 1973).

[58] *Crockett v. Sorenson*, 568 F. Supp. 1422, 1428 (W.D. Va. 1983).

27. When the United States Supreme Court upheld the constitutionality of a Ten Commandments monuments in 2005, the Court's plurality observed that "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America."[59] To illustrate this point, it noted that:

> We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.
>
> Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital. For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress' Jefferson Building since 1897. And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8). A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives. Inside the Department of Justice, a statue entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet. In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments. So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia. Moses is also prominently featured in the Chamber of the United States House of Representatives.[60]

28. More recently, the Court stated in *American Legion v. American Humanist Association* (2019) that the Ten Commandments "have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the mar-

[59] *Van Orden v. Perry*, 545 U.S. 677, 688 (2005) (plurality opinion).

[60] *Ibid*., 688-89.

ble frieze in our courtroom and in other prominent public buildings in our Nation's capital."[61]  Indeed, Monica Miller, the attorney for the American Humanist Association in *American Legion*, remarked in oral arguments that the Ten Commandments can have "some sort of dual secular meaning"; they are "basically shorthand for law itself."[62]  Even Professor Green agrees that many others hold similar views.[63]

29. The Office of the Curator of the United States Supreme Court explains the Ten Commandments' historic role as a condensed symbol of law:

> Throughout the history of western art, tablets have been used to signify the Law. This tradition is closely associated with Moses, the Hebrew lawgiver, who, according to the Book of Exodus, descended from Mount Sinai with two stone tablets inscribed with the Ten Commandments. Over time, the use of two tablets has become a symbol for the commandments, and more generally, ancient laws.[64]

30. Many Ten Commandments monuments are located in or around public buildings where laws are made or interpreted.  In paragraphs 102-106 of my principal report, I document more than a hundred examples of monuments or representations of the Ten Commandments on public property.  This list includes, among others, the following monuments located in or around state capitols and courthouses:

---

[61] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2083 (2019). Justice John Paul Stevens observed that "a carving of Moses holding the Ten Commandments, if that is the only adornment on a courtroom wall, conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law." *County of Allegheny v. ACLU*, 492 U.S. 573, 652 (1989) (Stevens, J., concurring in part and dissenting in part).

[62] Tr. of Oral Arg. at 55, *The Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019) (No. 17-1717).  Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2018/17-1717_7l48.pdf, 55 (accessed July 8, 2019).

[63] See Green, Report, 17.

[64] "Symbols of Law" information sheet, available at https://www.supremecourt.gov/about/SymbolsofLawInfoSheet%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_Final.pdf (accessed January 17, 2020).

a. an Eagles-inspired granite monument commemorating the Ten Commandments on the Texas State House grounds,[65]

b. an Eagles-inspired granite monument commemorating the Ten Commandments on the Colorado State Capitol Complex Grounds,[66]

c. an Eagles-inspired granite monument commemorating the Ten Commandments on the Missouri State Capitol grounds,[67]

d. a framed copy the Ten Commandments in Georgia's State Capitol,[68]

e. a mural of Moses with the Ten Commandments in the Rumford District Court courtroom in Rumford, Maine,[69]

f. a mural of Moses receiving the Ten Commandments in the Capitol Courtroom in Saint Paul, Minnesota,[70]

g. a mural of Moses holding the Ten Commandments at the Queens Supreme Court Building, New York,[71]

h. a mural of Moses carving the Ten Commandments at the State Supreme Court building in Harrisburg, Pennsylvania, and[72]

---

[65] See http://www.eaglesmonuments.com/states/Texas.html (accessed July 3, 2019); Sue A. Hoffman, *In Search of God and the Ten Commandments: One Person's Journey to Preserve a Small Part of America's God-given Values and Freedoms* (self-published, 2014), 233.

[66] See http://www.eaglesmonuments.com/states/Colorado.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 165. Case dealing with this monument: *State v. Freedom From Religion Found., Inc.*, 898 P.2d 1013, 1015 (Colo. 1995).

[67] See http://www.eaglesmonuments.com/states/Missouri.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 205.

[68] See http://tencommandmentsga.org/downloads/PlacingHistoricalDisplays.pdf (accessed June 28, 2019).

[69] See https://www.sunjournal.com/2019/03/10/art-courts-and-the-legacy-of-monmouths-harry-cochrane/ (accessed June 28, 2019).

[70] See http://www.mnhs.org/capitol/learn/art/8949 (accessed June 28, 2019).

[71] See https://forgotten-ny.com/2015/11/queens-supreme-court-jamaica/ (accessed July 3, 2019).

[72] See Anna Marie Jehorek, *The Pennsylvania Capitol*, "Pull Over and Let Me Out," available at https://pulloverandletmeout.com/touring-the-pennsylvania-state-capitol-in-harrisburg/ (accessed July 3, 2019).

     i.   a mural of Moses holding the Ten Commandments in the Supreme Court Room, City-County Building, Pittsburg, Pennsylvania.[73]

From a historical perspective, the display of a Ten Commandments monument as a solemn symbol of law on the grounds of a building in which law is made is, at the very least, a common way to commemorate, and demonstrate proper respect for, the lawgiver's task and the sources from which contemporary lawmakers draw insight and inspiration.

    31. Finally, Professor Green suggests that Ten Commandment monuments are "of recent invention."[74]  Yet several of the murals of Moses and the Ten Commandments in the above list predate or are contemporaneous with the Bladensburg Cross, and many of the Eagle-inspired monuments were erected in the 1950s.[75]  An almost seventy-year-old practice is not "of recent invention."

    32. Professor Green's report states his disagreement with the United States Supreme Court's recognition that the Ten Commandments "have historical significance as one of the foundations of our legal system."[76]  But he concedes that this understanding is

---

[73] See Albert M. Tannler, *Architecture Feature: Edward Trumbull in Pittsburgh*, Pittsburgh History & Landmarks Foundation, available at https://phlf.org/2017/10/02/architecture-feature-edward-trumbull-pittsburgh/ (accessed July 3, 2019).

    There is a relief sculpture on the external wall of the Arkansas Supreme Court's courtroom that contains a depiction of Moses.  *Welcome to The Arkansas Supreme Court Justice Building*, available at https://www.arcourts.gov/sites/default/files/2015%20building%20brochure%20no%20crops%20%283%29.pdf (accessed August 28, 2019).

[74] Green, Report, ¶ 38.

[75] Hall, Report, ¶¶ 102-106.

[76] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2083 (2019).

"widely embraced."[77] And even he acknowledges as "axiomatic" that "many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition . . . of which the American legal system is a part."[78]

**Alleged Sectarian Versions of the Ten Commandments**

33. In section VII of his report, Professor Green argues that "any public ten commandments monument is inevitably religious-specific and sectarian."[79] It is telling that he largely ignores my principal report's discussion of the origins of the Eagle-inspired monuments. Their leading proponent, Judge E.J. Ruegemer, formed a committee "consisting of fellow judges, lawyers, various city officials, and clergy of several faiths" to develop a "version of the Ten Commandments which was not identifiable to any particular religious group."[80] Nevertheless, when the first monuments were erected, "people who were not Catholic or Lutheran were quick to point out that the numbering sequence was inconsistent with their religious background."[81] Although English translations of the original Hebrew text differ in the placement of textual pauses and thought-breaks, there is virtually no disagreement among Jewish and Christian traditions as to the overall substance of the Ten Commandments. Nevertheless, in response to such comments, the Ea-

---

[77] Green, Report, ¶ 26.

[78] Green, "The Fount of Everything Just and Right?, 525.

[79] Green, Report, section title immediately before ¶ 39.

[80] Declaration of Judge E.J. Ruegemer for *Card v. City of Everett*, No. CV03-2385L, Sept. 19, 2003, 3. See also, Brief of the Fraternal Order of Eagles as *amicus curiae* in Support of Respondents. *Van Orden v. Perry*, 2005 WL 263789, 2005 U.S. S. Ct. Briefs LEXIS 134 (Supreme Court of the United States January 31, 2005), 5-9.

[81] Hoffman, *In Search of God and the Ten Commandments*, 71.

gles altered the way in which the commandments were presented to overcome "any possible objection to the version of the Ten Commandments."[82]  The most significant change involved removing the numbers before each commandment.  Most post-1958 Ten Commandments monuments include this version of the text—including the monuments at issue in *Van Orden v. Perry* and the present litigation.[83]

34. Because the lines of these Ten Commandments monuments are not numbered, it is possible to read them with thought-breaks in different places.  For instance, a Jewish citizen may read the line, "I AM the Lord thy God," as the First Commandment, while a Protestant might read the lines "I AM the Lord thy God.  Thou shalt have no other gods before me" as the First Commandment (or as a preface and the First Commandment).  Similarly, one could understand the phrase "Thou shalt not take the name of the Lord they God in vain" to be either Second or the Third Commandment.  And so on.  A specialist could always argue that the monument's language leans toward one tradition or another in some respect, but even a religiously-literate citizen would have a difficult time identifying any sectarian consequences of the chosen language.  It would seem that Judge Ruegemer's committee succeeded in developing a version of the Ten Commandments not readily "identifiable to any particular religious group."[84] Contrary to Professor Green's

---

[82] Judge E.J. Ruegemer to Robert W. Hansen, January 21, 1958.  Quoted in Hoffman, *In Search of God and the Ten Commandments*, 73.

[83] For further discussion, see Hoffman, *In Search of God and the Ten Commandments*, 70-74.

[84] Declaration of Judge E.J. Ruegemer, 3.  See also *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 773 (8th Cir. 2005) (recognizing the nonsectarian nature of a monument that is virtually identical to the one at issue in this case).

claim, the monument's language simply does not plausibly support the suggestion that Arkansas has taken sides in a sectarian controversy.

**Conclusion**

35. As my report demonstrates, the historic understanding of the First Amendment permits a State to erect, or allow to be erected, a Ten Commandments monument on public property. This practice is "deeply embedded in the history and tradition of this country."[85] Nothing in Professor Green's report provides a substantive challenge to these conclusions.

[85] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

Respectfully submitted,

Mark David Hall

Herbert Hoover Distinguished Professor of Politics

Faculty Fellow, William Penn Honors Program

George Fox University

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, JUDITH LANSKY,
PAT PIAZZA, and SUSAN RUSSELL PLAINTIFFS

VS. Case No. 4:18-CV-00342 KGB

JOHN THURSTON, Arkansas Secretary
of State, in his official capacity

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF KELLY BOYD**

**TAKEN IN LITTLE ROCK, ARKANSAS**

**JUNE 28, 2019**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**HENDRIX REPORTING SERVICE**
**1701 SOUTH ARCH**
**LITTLE ROCK, ARKANSAS 72206**
**(501) 372-2748**

Exhibit E

Deposition Exhibit 9 .............................. page 191
Letter of 12-1-15 from CPL, Inc.; and Response of 12-4-15 from Mr. Boyd Re: Proposed Dr. Martin Luther King, Jr. Monument
Deposition Exhibit 10 ............................ page 192
Two Letters of 9-9-15 from Mr. Boyd to Freedom from Religion Foundation
Deposition Exhibit 11 ............................ page 193
Letter of 8-17-15 from Mr. Boyd to Universal Society of Hinduism
Deposition Exhibit 12 ............................ page 194
Agenda of 9-13-16 Capitol Arts and Grounds Commission Hearing
Deposition Exhibit 13 ............................ page 195
Copy of A.C.A. § 22-3-221. Ten Commandments Monument Display Act
Deposition Exhibit 14 ............................ page 196
Transmittal Letter of 8-8-16 Re: Preliminary Application Request and Application for the Donation of a Permanent Memorial or Monument By the American History & Heritage Foundation
Deposition Exhibit 15 ............................ page 197
Email of 12-1-17 from Alexis Reaves to Andrew Drummond Re: Record of Speeches at 12-14-16 Arts and Grounds Commission Public Hearing
Deposition Exhibit 16 ............................ page 198
String of emails between Kelly Boyd and Darrell Hedden Re: Email of 7-4-17 from Abdiel Cabrera
Deposition Exhibit 17 ............................ page 199
Email of 5-12-17 from Kelly Boyd to Sid Rosenbaum Re: Monuments Hotline
Deposition Exhibit 18 ............................ page 200
Listing of Calls and Emails 8-24-16 through 6-28-17 on the Hotline
Deposition Exhibit 19 ............................ page 201
GoFundMe Page for the Ten Commandments Monument

(Witness sworn)

MR. SCHULTZ: Mr. Boyd, my name is Andy Schultz. You and I were just talking. I'll be the one taking most of your deposition today, but one of the other lawyers who needs to leave early is going to start, so we're going to let him do the questioning first and then you and I will get back at it.

MR. BOYD: Certainly.

MR. CANTRELL: And if I can, as yesterday, let's stipulate to reserve all objections other than to form. I don't know that you guys would have any objection to that. Today, not yesterday, okay.

Thereupon,

**KELLY BOYD,**

having been called for examination, and after being first duly sworn, was examined and testified as follows:

**EXAMINATION BY COUNSEL FOR THE SATANISTS PLAINTIFFS**

BY MR. KEZHAYA:

Q Mr. Boyd, I'm Matt Kezhaya. I represent the Satanic Temple. I'm going to be very quick. Have you ever done any depositions before?

A I did one back in 2002.

Q Okay. Have you ever read any transcripts before?

A I did transcripts of all the meetings.

administrative process that the Commission went through, specifically with regard to the Ten Commandments Monument?

A I believe so.

Q Okay. Is it fair to say that the Ten Commandments Monument has not been universally applauded?

A I'm not sure any monument ever was, so no, sir, it wasn't 100 percent unanimous.

Q In fact, people were pretty strong in their views about their opposition to the Ten Commandments Monument, correct?

A People were strong both ways.

Q Okay. So during the legislative hearings, are you aware that people spoke against the Ten Commandments Monument?

A There would have been. I can't remember the circumstances, and I was probably in most of them or all of the meetings, but I can't go back to that. I just don't remember.

Q Well, you do recall that the vote ultimately passing the bill was not unanimous?

A I do know that, yes.

Q Okay. And once it was before the Capitol Arts and Grounds Commission, the Secretary received a fair amount of mail about the Ten Commandments Monument, correct?

A Yes, sir.

Q That included a fair amount of mail from people who were opposed to the monument, is that correct?

A There were people opposed.

Q Well, not just people, there were a fair number of people.
A There were a fair number of people that responded to everything about both sides of it. I couldn't characterize the numbers to you for or against, for any monument, against any monument. I had a lot of response all across the board.
Q And at public hearings people spoke both for and against the monument?
A They certainly did.
Q Let me show you what I'm marking as Exhibit 15 to your deposition.

(Whereupon, the Email of 12-1-17 from Alexis Reaves to Andrew Drummond Re: Record of Comments at 12-14-16 Arts and Grounds Commission Public Hearing, was marked as Deposition Exhibit 15 and attached at Tab 15 in the transcript.)

MR. SCHULTZ: (Continuing)
Q So this was a document that's been produced in this case. First of all, do you know who Andrew Drummond is?
A I certainly do.
Q Who is that?
A He was on the maintenance staff at the Secretary of State's Office and became kind of an administrative function person once the girl that I had doing that began running the cafeteria. So he was a maintenance worker there that handled a variety of

administrative type functions for me.

Q What about Alexis Reaves, do you know who that is?

A That's who he replaced. She began running the Capitol Grill when we opened it up after we renovated it.

Q This appears to be an email from Alexis Reaves. It doesn't identify who it's to, but it indicates something about the December 14, 2016 Arts and Grounds Commission Public Hearing.

A Yes, sir.

Q Is this a hearing that you would have chaired?

A It is.

Q Okay. You indicated that you were present for the Secretary of State's staff, is that correct?

A That is correct.

Q Just from reading this, this appears to be, I don't know if minutes is the right word, but a record of who spoke at this meeting from members of the public, is that correct?

A That is correct.

Q And just going through, about halfway through it looks like it says: *"KB called to order at 11:01 am." I'm assuming KB is you?

A That would be me.

Q All right. And is this one of the subcommittee hearings or the Full Commission hearings?

A A subcommittee that conducted a public hearing.

Q And it was a subcommittee that allowed public comment?
A Yes.
Q And according to this, if I'm reading this right, there were a total of 31 people who signed up to speak about the Ten Commandments Monument, is that right?
A If that's what it says here. I don't remember the number.
Q Well.
A But I'm assuming -- Everything on this, I have no reason to doubt the authenticity or accuracy of it.
Q Okay. And according to this, 14 people spoke against the proposal and 17 people spoke --
A I don't know the number. I think she meant for the proposal and she typed that wrong.
Q I think so, too.
A I won't disagree with that.
Q But either way it looks like it was roughly 50/50, just one way or the other just a little bit more, is that --
A I would take it that way, yeah.
Q Okay. During the entire time that the Commission was considering the Ten Commandments Monument, how long did that whole process take?
A Our first meeting was September 13th. Now, there was a lot of work that went on prior to that, you know, starting with the passage of the bill and then the things I did behind the scenes to get ready for the meeting. But the first public hearing

A Yes, sir. Well, I couldn't tell you how they commented, but I'm aware of people commenting.

Q Were you aware that newspapers in Arkansas were writing editorials about the Ten Commandments Monument?

A I did see a few of those.

Q Were they for or against?

A Right now I can't recall. The against, the one that I remember was against any more monuments, you know, just why do we keep adding. Yeah, that was the general consensus of those type articles, if my memory serves me correctly.

Q And you were aware that during the whole time the Commission was considering the monument there were certain groups threatening that they were going to sue if the monument went up?

A Very aware.

Q Okay. And obviously you're aware that the first monument was destroyed in less than 24 hours after it was put up?

A Very aware.

Q And even after the first monument was destroyed, people continued to oppose putting up the monument a second time. Were you aware of that?

A Not so much. We held two public hearings and nobody showed up.

Q Let me show you what's been marked as Exhibit 16 to your deposition.

(Whereupon, the string of emails between Kelly Boyd and Darrell Hedden Re: Email of 7-4-17 from Abdiel Cabrera was marked as Deposition Exhibit 16 and attached at Tab 16 in the transcript.)

MR. SCHULTZ: (Continuing)

Q So I'll represent to you that the first monument was destroyed in June of 2017.

A Yes, sir.

Q And do you recall when the second monument was put up?

A No, I don't.

Q If I told you it was --

A I think maybe a year later.

Q If I told you it was April of 2018?

A I wouldn't argue. Yeah, that would be fine.

Q So what I'm showing you on Exhibit 16 appears to be a series of emails that start with one email from a guy named Abdiel Cabrera.

A Yes, sir.

Q You see on the bottom of page 1?

A I do.

Q Which he addresses to a whole lot of people, many of whom seem to be in Arkansas state government. And then from there, who is Darrell Hedden?

A Darrell Hedden serves then and currently as the Chief of

the State Capitol Police Department.

Q Okay.

A And was a direct report to me.

Q So on the bottom of page 1 you seem to be forwarding the email from Abdiel Cabrera to Darrell Hedden, is that correct?

A That's correct.

Q So you are forwarding an email to the Chief of this State Capitol Police?

A Correct.

Q And you're asking a question about who Mr. Cabrera is, correct?

A Correct.

Q And Mr. Hedden responds and then you tell him: "I need you to provide me printed copies of any and all contact with this individual please. Both your sent and inbox please." Correct?

A Correct.

Q Okay. So after the time the first Ten Commandments was destroyed in June 2017 and when it was rededicated in April of 2016 (sic), this email took place, correct?

A Correct.

Q And this is an email that you were concerned enough about that you contacted the Capitol State Police, correct?

A Correct.

Q Why would you contact the Capitol State Police?

A Because they'd contacted everybody on this list and I was

preparing myself in the event I heard from someone. I can't -- I'm in charge and I have to know what's going on. The way that I determine that is by asking questions.

Q Did you consider -- Were you trying to consider whether this email constituted a threat?

A I just wanted to know what it was.

Q What did you ultimately determine?

A It sat. There was no more contact as far as I'm aware. He was in Arizona, we were here.

Q Is it often that you forward emails to the Captain of the State Capitol Police?

A Probably monthly. There are probably more times he refers them to me. We have a list of people that we have to be on the watch for. Sadly these days, more so than not.

Q And of course you know that this present lawsuit, the one that we're here for for your deposition, this lawsuit was filed very soon after the second Ten Commandments Monument was erected?

A I remember.

Q Okay. Now, because you were involved in Arkansas state government for so long, from the time the General Assembly first passed the Ten Commandments Monument Display Act in 2015 until the second monument was put up in April of 2018, during that time frame are you aware whether anyone in the Governor's Office ever questioned whether the Ten

Commandments Monument should be placed at the State Capitol?

A I'm not.

Q Are you aware whether anyone in the Secretary of State's Office ever questioned whether the Ten Commandments Monument should be placed at the State Capitol?

A I have not heard that and it was not asked of me.

Q Are you aware of whether any member of the Capitol Arts and Grounds Commission ever questioned whether the Ten Commandments Monument should be placed on the State Capitol grounds?

A Extra of the committee meetings, and I don't recall them there, but extra of those, no.

Q And what do you mean by "extra of"?

A Outside conversations.

Q Okay.

A I was never privy to any conversation. And the reason that I clarify the meetings is, you can check the transcripts, there may have been someone ask the committee a question like in the public hearing, and that would be where someone might have made a response to a specific question, but I don't recall it exactly.

Q But do you recall, sitting here today, any member of the Commission in a meeting raising any question as to whether there should be a Ten Commandments Monument on the State

Capitol grounds?

A I do not.

Q Now unfortunately we were told yesterday that you were the guy to ask about a hotline established by the Secretary of State's Office.

A Uh-huh. I requested the establishment of that hotline.

Q Okay. So Ms. Moody wasn't lying to us when she threw you under the bus about this?

A No.

Q Okay. So first of all, what was this hotline?

A When it became public that we were going to have, when we started having the hearings, at that point we had 150 employees and we had about that many phone lines and about that many phone lines started lighting up with people wanting to make comment, and I recognized quickly that we could lose control. We could lose people's comment, we could lose information.

And I spoke to our folks and said, "Let's create a single phone number that we can give people to call and make a comment on." And it was a recording. The recording was emailed to my email account and I listened to every one of them.

Q And I want to get into that in just a second, but let me try and get a better handle on dates.

A Uh-huh.

Q Do you recall --

A I'm going to be really hard on that.

Q Okay. So just as a general matter, do you recall roughly when the hotline was established?

A I believe it was toward the end of August of 2016. It may have been in September, and then October was the heavy month. But it occurred around the time that we announced we were going to have the Commission meeting.

Q So you believe it was 2016?

A Well, whenever that September meeting occurred. I think it occurred right around then, but I can't tell you, I just don't remember.

Q All right. Let me try and put some more definite dates just so I can get --

A It may have been '15. We had a September 13th meeting, I don't remember the year. Was it '15 or '16? You can tell me that.

Q That was 2016.

A Okay. Well, then I think the hotline started around that.

Q Okay. So it's your testimony that the hotline was established before the first Ten Commandments Monument went up?

A Oh, absolutely.

Q Okay. Let me show you what has been marked as Exhibit 17.

(Whereupon, the email of 5-12-17 from Kelly Boyd to

Sid Rosenbaum Re: Monuments Hotline was marked as Deposition Exhibit 17 and attached at Tab 17 in the transcript.)

MR. SCHULTZ: (Continuing)

Q So this is an email from you to Sid Rosenbaum?

A Yes. He was my Business Office Director.

Q And I'm sorry, Sid Rosenbaum was who?

A The Business Operations Director for the Secretary of State.

Q This is an email dated May 12, 2017.

A Uh-huh.

Q At roughly 6:15 in the morning, correct?

A Correct.

Q And it says: "Really important to ensure our phone line for the monuments is up, functioning, and delivering messages to my computer. I expect an uptick in calls for a while."

A Yes.

Q So why would you -- If the hotline went into effect in 2016 --

A Uh-huh.

Q -- why would you have sent this email nine months later?

A Because I had quit receiving any email notifications of calls and I wanted to double-check and make sure that the hotline was functioning and I was not receiving calls versus the hotline is down and I didn't know it.

Q Okay.
A Because that's around the time we installed, the notices came out that we installed the monument, and I anticipated calls based on previous. So it was '16 when the hotline initially went in.
Q Was anyone else receiving the messages other than you?
A There would have probably been some, but they should have been referred to the hotline.
Q Okay. No, what I'm trying to figure out is did anyone else in the Secretary of State's Office receive the messages that were left on the hotline other than you?
A No, sir. No, sir.
Q Why were they delivered to you?
A Because I needed one person. You can't have six people looking at stuff like that.
Q Okay.
A I needed one person to deal with it. We also had a lot of other work going on at that time. We were in the budget season, we were in election season, we were -- And I had the time to do it.
Q So let me hand you what is marked as Exhibit 18 to your deposition.

(Whereupon, the list of calls and emails 8-24-16 through 6-28-17 on the Hotline was marked as Deposition Exhibit 18 and attached at Tab 18 in the transcript.)

MR. SCHULTZ: (Continuing)

Q This was produced by the Secretary of State's Office.

A This was produced by me.

Q Okay. So if I'm reading this --

MR. CANTRELL: By "produced" I think maybe we're equivocating.

THE WITNESS: Created.

MR. CANTRELL: Created, okay.

THE WITNESS: I created this.

MR. SCHULTZ: (Continuing)

Q Okay. You created this. All I'm saying is we received this during this lawsuit --

A Yes, yes.

Q -- from the Attorney General --

A I apologize.

Q -- on behalf of the Secretary of State.

A I apologize.

Q Not a problem.

What is Exhibit 18?

A This is a list of all the phone calls, unless I may have missed one or two, this is a list of all the email that came to my computer with the date and essentially the phone number it came from, the type of call I thought it was, and what those people were indicating.

There will be more numbers than there are phone calls probably because if you call me and said that you opposed the monument and you opposed any monument and you opposed -- You'll see there are different classifications -- I gave you as many answers as, I gave you as many checkmarks as you gave me what you opposed or were for.

Q Let me just start with call number 1 --

A Okay.

Q -- just to make sure I understand this.

So it's marked "Test" and it says "24-August."

A That proved that the system functioned and sent an email to my account.

Q My question, would that have been August 2016? There's no year, that's why I'm trying --

A There sure isn't, is there? Yes, was that -- 2016.

Q Okay. I'm asking because later, if you thumb all the way through to the last few pages, some of these are marked with the year. And for example, I'm looking at the second to last page and there are dates that appear to be in June 2017.

A And I did that to confirm the difference in the previous calls. These are the calls I wanted to make sure were occurring after I had notified Sid.

Q So does this refresh your memory that the hotline would have started in late August 2016?

A Yes, sir.

Q Okay. And it looks like it ran through June 2017?

A Looks like it.

Q Okay. So a few questions: Number one, why did you run it so long?

A It may still be running.

Q Okay. Why would it still be running?

A I don't know that I ever told them to turn it off.

Q Okay. And that was going to be my next question is why did you turn it off in June 2017?

A That's when I got the last phone call that I read an email. That's when the last email notification came to me that I had a message.

Q I want to make sure I understand how to read this.

A Sure.

Q Since you put it together. Let me ask you to turn to the very last page. Now going across the top, and this is true for all the pages, but going across the top it appears that, and I think you did this, you created different columns for different items or different things that people may have called in about, correct?

A Yes, correct.

Q So that includes the Satanic Temple, the Ten Commandments, Any Religious Monument, All monuments or no monuments, Saline Atheists & Skeptic Society, Gold Star Monument, and No additional monuments period.

A Correct.

Q These are columns that you created?

A Correct.

Q If I called the hotline when it was in operation, was I given that menu or was I just told I could leave a message?

A You were just told you could leave a message.

Q So I could have left a message saying, "I don't like Brittany Spears."

A I came very close to having one of those --

Q Okay.

A – from a gentleman purported to be Ron Swanson.

Q Oh, okay. And then on the very bottom on the very last page it says “Total,” and I'm assuming that what this is is this is the computer tallying up all the numbers from that column?

A In a specific column, correct.

Q So for example for the Satanic Temple, this shows that out of all the calls received that somebody gave an opinion about the Satanic Temple, only 16 were in favor but 473 were against?

A And they would have specifically used those words.

Q Whereas for the Gold Star Monument at the other end, eight people said they were in favor and six said they were opposed?

A Okay.

Q Am I reading this correctly?

A I didn't have my glasses on. Yes, sir, you're reading it very correctly.

Q And it's really small print. And to make sure I understand, if I called the hotline, I was told I could leave a message to express my view?
A Yes.
Q So I could say, "Please don't put up the Ten Commandments Monument," and hang up?
A Yes, sir.
Q Or I could say, "Please put up the Ten Commandments Monument, and whatever you do don't put up the monument to Satan"?
A Yes, sir.
Q I just had 30 seconds and I could say what I wanted?
A I don't know that it was limited to 30.
Q Well, so people could mention one monument, five monuments, no monuments?
A Any monuments, all monuments, no monuments.
Q Okay. And that's why, if I understand correctly, you tried to be as accurate as you could and put checkmarks for every monument?
A Uh-huh.
Q If somebody mentioned it, you wrote it down?
A While not having 48 columns.
Q Understood, understood.
A So what you're saying is correct.
Q So this doesn't necessarily represent separate calls, just

separate opinions?

A It does not represent -- The numbers in the far most left column represent separate calls.

Q Ah.

A The numbers in these columns, like look at column number, well, any of these here (Indicating on exhibit). The call, look at the very last one. They didn't leave an opinion that I could record, but I did hear what they had to say.

But that is the number of calls that had come in at that point, and the date and the type of call, and mostly the type of call represents if they hung up on me, you'll see some notations about that.

Q Right.

A And then you could have said something about every call. These numbers down here will not correlate to these numbers over here (Indicating on exhibit).

Q And you've now explained that. So in general there were roughly 823 calls that were recorded?

A Yes, sir.

Q Okay. And those calls may have given one opinion, six opinions, no opinions?

A And still talked.

Q Correct.

And on the Ten Commandments columns, when you add those two together, it appears there were 157 who spoke in favor

A It is installed and it is is our monument. There is a pretty clear separation there. It's not in our care, it's ours.

Q I'm showing you what's been marked as Exhibit 21.

(Whereupon, the emails of 6-1-18 between Jason Rapert and Kelly Moody was marked as Deposition Exhibit 21 and attached at Tab 21 in the transcript.)

MR. SCHULTZ: (Continuing)

Q This is sort of the flip side of the same point. This is some emails, an email exchange appearing between you and Senator Rapert on June 1, 2018. This would have been after or just about a year after the destruction of the first monument.

A Uh-huh.

Q Why were you communicating with Senator Rapert at this time?

A Senator Rapert wanted the old monument back. When they replaced it with a new monument, I had no further use of it except that there had been a criminal complaint filed and we had to await the conclusion of and the release by the prosecutor.

We were notified that that happened, and so I let the Senator know. If he hadn't come and taken it, I was going to throw it away, so --

Q And I'm looking at your wording in your email. It says, "We are prepared to release the monument, as you have

previously requested, back into your possession."

A Uh-huh.

Q Is that a yes?

A Yes, sir.

Q So this in essence was the State of Arkansas returning the old monument to the possession of who?

A Mr. Rapert himself.

Q Here is Exhibit 22 to your deposition.

(Whereupon, the email chain of 6-16-17 between Ryan James, Allen Kerr and others from Mark Guinee Re: Monument Insurance was marked as Deposition Exhibit 22 and attached at Tab 22 in the transcript.)

MR. SCHULTZ: (Continuing)

Q This focuses on a slightly different time frame. So this is June 16, 2017. First of all, who is Allen Kerr?

A Allen Kerr is the current Insurance Commissioner for the State of Arkansas.

Q Who is Jody Parker?

A Jody Parker when I was there was my Purchasing Director.

Q When you say you, meaning for the Secretary of State?

A Yes, sir, I'm sorry.

Q Okay.

A When I was at the Secretary of State's Office, she worked

A If someone knocked it in half, that's a different type of damage.

Q Okay. And that would include within that line 7 that entry for monuments/memorials, the Ten Commandments Monument currently sitting on the State Capitol grounds?

A It does include that.

Q Okay.

MR. SCHULTZ: I know you're going to be happy to hear this, Mr. Boyd, but for right now I think I've asked all the questions that I need.

THE WITNESS: Okay.

MR. SCHULTZ: I may be asking you a few more before we're done today, but I just wanted to thank you. I really appreciate your cooperation and how pleasant you've been to talk to.

THE WITNESS: Well, thank you. That goes two ways.

**EXAMINATION BY COUNSEL FOR**
**THE ORSI PLAINTIFFS**

BY MR. SCHULZE:

Q Mr. Boyd, I'm Gerry Schulze, and we have met a few times before.

A We have.

Q Mr. Schultz has covered pretty much everything I wanted to

ask, but I want to go through a few things if you don't mind. So I'm going to be revisiting things that he did just to say, here's my detail about it.

The first is the meetings that were held, the various public meetings.

A Uh-huh.

Q As I understand it, Mr. Martin only attended one of those meetings, and that was the one in September I think of 2016.

A That is correct.

Q After that you were the chair of all of the meetings?

A I was.

Q Was that because Mr. Martin was out of town all of those times or was it because it just got assigned to you?

A He had named me as designee, and so it was really my responsibility.

Q Okay. Chronologically the next meeting I've got is one of October 12 of 2016 at which Mr. Story appeared for the AHHF and Mr. Greaves appeared for The Satanic Temple. Do you remember that meeting?

A I do.

Q Do you remember how it started?

A Probably a long-winded discussion from me --

Q Okay.

A -- about what the procedure was.

Q Well, no, you started it with a Pledge of Allegiance. Do

Q Okay.
A (Examining document) And your question?
Q My question is: Is that the form that you recall?
A It is. And to that point I recall being extremely frustrated with how difficult it was to print it out in any coherent format.
Q And it's definitely --
A I never knew if I got it all.
Q It's definitely the right form then, cause it does have that problem.

MR. SCHULZE: What I guess I'd like to do is make this, make these two samples an exhibit just so that we know. I believe we're at Exhibit 26, is that right?

MR. SCHULTZ: I think so.

MR. SCHULZE: All right.

(Whereupon, the samples of form for comments was marked as Deposition Exhibit 26 and attached at Tab 26 in the transcript.)

MR. SCHULZE: (Continuing)
Q Now, we talked in detail about the hearing where we had the speakers, including me. You chaired that meeting, some were for and some were against. But a Reverend Burks was present. Do you remember Reverend Burks?
A I remember a preacher being there.
Q Do you remember that he brought you a stack of letters

about, and I'm showing an inch-and-a-half? Do you remember that?

A I recall that they were a standardized form.

Q Right. Let me show you a form here and ask you -- I'll give you again --

A Yeah, I wouldn't disagree that that's them.

Q Okay.

A I couldn't tell you how many there were, but I wouldn't disagree.

Q Okay. If you said in the hearing that you had received 355 or he said there were 355, or no, I'm sorry, 335, you wouldn't dispute that?

A No, I would not.

MR. SCHULZE: I guess I'd like to make this Exhibit 27 and save ourselves the trouble of introducing 300 of these.

MR. CANTRELL: You mean you don't want to attach all 335?

MR. SCHULZE: I do not.

(Whereupon, the Public Comment form was marked as Deposition Exhibit 27 and attached at Tab 27 in the transcript.)

MR. SCHULZE: (Continuing)

Q And they were all form letters just signed by different

people?
A Correct.
Q Okay.
MR. CANTRELL: I think we all appreciate you not attaching all 335.
MR. SCHULZE: Good. I'm glad I can make somebody happy.

MR. SCHULZE: (Continuing)
Q Now at one point did the same Reverend Burks send you another letter complaining about the design of the monument?
A Yes.
Q Do you recall what his objection was to the design of the monument at that time?
A Some of the features that were on it, it was not the wording, but at the bottom there are some features, and one of them is what he referred to as the all-seeing eye.
Q All-seeing eye, yes. And he felt that that was inconsistent with the message on the monument, I believe, is that correct?
A Yes, sir.
Q And I thought I had a copy of his letter, but once again, I'm showing how well I've organized things here.
Let me ask you if you recall Secure Arkansas, a group called Secure Arkansas?
A I do.

Q Do you recall if they also had an objection to the symbolism on the monument?
A I do.
Q Okay. What was the nature of their objection?
A I don't recall. I know they were at the meeting. In fact, both of these, what you're referring to, occurred at the meeting where we made the final approval of the monument.
Q Uh-huh.
A But I do not recall the nature of their complaint.
Q Actually I think it's an exhibit to Ms. Jucas' deposition, Ms. Moody's deposition.
Yes, I'd like to ask you to look at Exhibit 13 to Ms. Jucas' deposition.
A (Examining the documents in Moody Exhibit 13) I believe this was taken from either a Facebook page or a website posting that they had made.
Q Okay.
A But I --
Q Does that refresh your recollection on the nature of their objections?
A According to what they've written, it’s the all-seeing eye.
Q Okay. Well, they had a few more objections, did they not? They also objected to the flag being upside down and to the Star of David or what we call Star of David. I believe they called it something different.

Q Okay. Now, on these spreadsheets, and I know that they're difficult to read, but I want to ask you just a couple of more questions about them.

One of them is there was a category for "Any Religious Monuments," is that right?

A Yes, sir.

Q Which monuments were considered religious monuments for purposes of that question?

A The specific, the person making the call said there shouldn't be any religious monuments on the grounds at all.

Q Okay. So, I mean, I guess my question was if you would take that as being no Ten Commandments, no Satanic Temple, no Saline Atheists and Sceptics Society I would assume, but would that also include like the Gold Star Family?

A I don't see why it would.

Q Okay. Because that monument was not at all religious in any way, was it?

A I don't know that any of these are. That's not my place to call.

Q Well, I mean, the Ten Commandments Monument was certainly perceived by your callers as religious, was it not?

A I don't know. I'm not going to tell you what they perceived.

Q Well, you can tell me what they said. You listened to 600, 800 of them.

A I did, and it's in this report. I just, I tried to take their words exactly, as close as I could, and it was really difficult in some cases, so in some places it may have been overly broad.
Q Okay. But it would be fair to say that at least a substantial number of the people calling both for and against considered the Ten Commandments Monument a religious monument, did they not?
A The ones that called about the Ten Commandments specifically.
Q And the same thing would be true of The Satanic Temple's proposed monument, that at least a fair majority of them, of the callers considered it religious in nature.
A The ones that called in support of it, I would disagree with you.
Q Really?
A The ones that called in support of it, first off were very polite, very clear in what they were trying to say, and they were talking more about the overall fairness.
Q You had a category there for people who said that either all or no monuments --
A Uh-huh.
Q -- is that right?
A Uh-huh.
Q There was a substantial number of people who took that position, is that correct?

A There were.
Q Did anybody -- Well, the total is at the end, if we want to look and see how many, is that right?
A Yes, sir.
Q Okay. Did anybody call you and say, "We need a monument to the law out there"?
A There was a reference to the Code of Hammurabi or Hammurabi, or however you pronounce it.
Q Okay.
A I'm from Arkansas. But I can remember that comment being made, but I don't -- I mean, there's not a lot of people that know about that.
Q So that would be -- Of all of those comments, the only one who seemed to think we needed a monument to law was someone who said, "We need a monument to the Code of Hammurabi," which she will spell and nobody will know whether you or I could pronounce correctly.
A Okay.
Q You've read the Ten Commandments Monument Act, have you not? I mean, we've talked about it here today, I know you have.
A Numerous times.
Q How many Commandments are listed in there?
A I'd have to go back and look. The monument is ten, but I can't tell you --

Q Do you want to count?

A I can't tell you how many are on the form. If you'll give me just a second, I will go through here.

The Ten Commandments Monument under Section (B)(1), yeah, (B)(1), the Ten Commandments: It's Thou Shalt -- There's one Thou Shalt, two, three, four is a Remember, five is an Honor, six is a Thou Shalt, seven is a Thou Shalt, eight is a Thou Shalt, nine is a Thou Shalt, ten is a Thou Shout and eleven is a Thou Shalt.

Q So would you say there are 11 commandments on there?

A I just counted them.

Q That's how I counted them.

You said there were nine entities that originally proposed monuments?

A And that's -- I would have to go back and look at the exact number. The Freedom from Religion, the Universalists, PETA, the MLK, the Heritage & History Foundation, SASS, Gold Star Family. Seems like there was one more, but maybe there were only seven, maybe there were only six.

Q Okay. I never have understood the difference between the Capitol Arts and Grounds Commission and the other one, the Commission that you deal with, the Secretary of State.

A We're the Capitol Arts and Grounds Commission.

Q Oh, you're the Arts -- Okay, then there's the other one, the Capitol Zoning Board.

**Sid Rosenbaum**

| | |
|---|---|
| **From:** | Kelly Boyd |
| **Sent:** | Friday, May 12, 2017 6:17 AM |
| **To:** | Sid Rosenbaum |
| **Subject:** | Phones |

Really important to ensure our phone line for the monuments is up, functioning, and delivering messages to my computer. I expect an uptick in calls for a while.

KB

| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| 1 | 24-Aug | Test | | | | | | | | | | | | | |
| 2 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 3 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 4 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 5 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 6 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 7 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 8 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 9 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 10 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 11 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 12 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 13 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 14 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 15 | 24-Aug | Hang-up | | | | | | | | | | | | | |
| 16 | 24-Aug | Opinion | 1 | | | | | | | | | | | | |
| 17 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 18 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 19 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 20 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 21 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 22 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 23 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 24 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 25 | 24-Aug | Hang-up | | | | | | | | | | | | | |
| 26 | 24-Aug | Opinion | | | | | | | | | | | | | Tired of Political Correctness |
| 27 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 28 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 29 | 24-Aug | Opinion | 1 | | | | | | | | | | | | |
| 30 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 31 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 32 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 33 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 34 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 35 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 36 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 37 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 38 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 39 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 40 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 41 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 42 | 24-Aug | Opinion | | | | | | | | | | | | | Against Sec. Martin |
| 43 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 44 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 45 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 46 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 47 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 48 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 49 | 24-Aug | Opinion | | 1 | | 1 | | | | | | | | | |
| 50 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 51 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 52 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| | | | | | 5 | 7 | | | | | | | | | |

DEPOSITION EXHIBIT 18 Boyd

PENGAD 800-631-6989

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 54 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 55 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 56 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 57 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 58 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 59 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 60 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 61 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 62 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 63 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 64 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 65 | 24-Aug | Opinion | | | 1 | | | | | | | | | | |
| 66 | 24-Aug | Hang-up | | | | | | | | | | | | | |
| 67 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 68 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 69 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 70 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 71 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 72 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 73 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 74 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 75 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 76 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 77 | 24-Aug | Hang-up | | | | | | | | | | | | | |
| 78 | 24-Aug | Opinion | | | 1 | | | 1 | | | | | | | |
| 79 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 80 | 24-Aug | Opinion | | | 1 | | | | | | | | | | Wants call back Janelle Langhart |
| 81 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 82 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 83 | 24-Aug | Opinion | 1 | | 1 | | 1 | | | | | | | | |
| 84 | 24-Aug | Opinion | 1 | | 1 | | 1 | | | | | | | | |
| 85 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 86 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 87 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 88 | 24-Aug | Opinion | | | | | | | | | | | | | |
| 89 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 90 | 24-Aug | Opinion | 1 | | 1 | | | | | | | | | | |
| 91 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 95 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 93 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 94 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 95 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 96 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 97 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 98 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 99 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 100 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 101 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 102 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 103 | 24-Aug | Opinion | 1 | | | | | | | | | | | | |
| 104 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 105 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 106 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| | | | | | 10 | 6 | | | | | | | | | |

Cave.Suit.Def.SOS.Docs 433

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107 | 24-Aug | Opinion | | | | | | 1 | | | | | | | |
| 108 | 24-Aug | Opinion | | | | 1 | | 1 | | | | | | | |
| 109 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 110 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 111 | 24-Aug | Opinion | | | | 1 | | | | | | | | | |
| 112 | 24-Aug | Opinion | | | | 1 | | 1 | | | | | | | |
| 113 | 24-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 114 | 24-Aug | Opinion | 1 | | | | | | | | | | | | |
| 115 | 24-Aug | Opinion | | | | 1 | 1 | | | | | | | | |
| 116 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 117 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 118 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 119 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 120 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 121 | 24-Aug | Opinion | | 1 | | | | | | | | | | | |
| 122 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 123 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 124 | 24-Aug | Opinion | 1 | | | | | | | | | | | | |
| 125 | 24-Aug | Opinion | | 1 | | 1 | | | | | | | | | |
| 126 | 24-Aug | Opinion | | | | | | | 1 | | | | | | |
| 127 | 25-Aug | Hang-up | | | | | | | | | | | | | |
| 127 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 129 | 25-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 130 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 131 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 132 | 25-Aug | Opinion | | | 1 | | | | | | | | | | |
| 133 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 134 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 135 | 25-Aug | Hang-up | | | | | | | | | | | | | |
| 136 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 137 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 138 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 139 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 140 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 141 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 142 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 143 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 144 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 145 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 146 | 25-Aug | Opinion | 1 | | | | | | | | | | | | |
| 147 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 148 | 25-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 149 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 150 | 25-Aug | Opinion | 1 | | | | | | | | | | | | |
| 151 | 25-Aug | Opinion | 1 | | | | | | | | | | | | Out of State PA |
| 152 | 25-Aug | Opinion | 1 | | | | | | | | | | | | |
| 153 | 25-Aug | Opinion | | 1 | | | | | | | | | | | Out of State OK |
| 154 | 25-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 155 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 156 | 25-Aug | Opinion | | | 1 | | | | | | | | | | |
| 157 | 25-Aug | Opinion | | 1 | | | | | | | | | | | Legislator |
| | | | | | 7 | 5 | | | | | | | | | |

B-19-3

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 158 | 25-Aug | Opinion | | | | | | | 1 | | | | | | Wants a call back |
| 159 | 25-Aug | Opinion | | | | 1 | | | | | | | | | |
| 160 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 161 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 162 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 163 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 164 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 165 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 166 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 167 | 25-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 168 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 169 | 25-Aug | Opinion | | | | | | 1 | | | | | | | Out of State FLA |
| 170 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 171 | 25-Aug | Opinion | | | | | | 1 | | | | | | | |
| 172 | 25-Aug | Opinion | | | | | | 1 | | | | | | | |
| 173 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |
| 174 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 175 | 25-Aug | Opinion | | | | | | | 1 | | | | | | |
| 176 | 25-Aug | Opinion | | 1 | | | | | | | | | | | Repeat Call |
| 177 | 25-Aug | Opinion | | 1 | | | | | | | | | | | Repeat Call |
| 178 | 25-Aug | Opinion | | 1 | | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 179 | 26-Aug | Hang-up | | | | | | | | | | | | | |
| 180 | 26-Aug | Opinion | | 1 | | | | | | | | | | | |
| 181 | 26-Aug | Opinion | | | | | | | 1 | | | | | | |
| 182 | 26-Aug | Opinion | | 1 | | 1 | | 1 | | | | | | | |
| 183 | 26-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 184 | 26-Aug | Opinion | | 1 | | | | | | | | | | | |
| 185 | 26-Aug | Opinion | | | 1 | | | | | | | | | | |
| 186 | 26-Aug | Opinion | | | 1 | | | | | | | | | | |
| 187 | 26-Aug | Opinion | | 1 | | 1 | | 1 | | | | | | | |
| 188 | 26-Aug | Opinion | | 1 | | | | | | | | | | | |
| 189 | 26-Aug | Hang-up | | | | | | | | | | | | | Repeat Call |
| 190 | 26-Aug | Opinion | | 1 | 1 | | | | | | | | | | Out of State TX |
| 191 | 26-Aug | Opinion | | | | | | | 1 | | | | | | |
| 192 | 26-Aug | Opinion | | | | | | 1 | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 193 | 27-Aug | Opinion | | | | | | | 1 | | | | | |
| 194 | 27-Aug | Opinion | | | | | | 1 | | | | | | |
| 195 | 27-Aug | Opinion | | | | | | | 1 | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 196 | 28-Aug | Opinion | | | | | | 1 | | | | | | |
| 197 | 28-Aug | Opinion | | 1 | | 1 | | | | | | | | |
| 198 | 28-Aug | Hang-up | | | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 199 | 29-Aug | Opinion | | 1 | 1 | | | | | | | | | |

6 4

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200 | 29-Aug | Opinion | | | | | | 1 | | | | | | | |
| 201 | 29-Aug | Opinion | | | | 1 | | | | | | | | | |
| 202 | 29-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 203 | 29-Aug | Opinion | | 1 | | | | | | | | | | | |
| 204 | 29-Aug | Opinion | | 1 | | | | | | | | | | | |
| 205 | 29-Aug | Opinion | | 1 | | | | | | | | | | | |
| 206 | 29-Aug | Opinion | | 1 | | | | | | | | | | | |
| 207 | 29-Aug | Opinion | | | | 1 | | | | | | | | | |
| 208 | 29-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 209 | 29-Aug | Opinion | | | 1 | | | | | | | | | | |
| 210 | 29-Aug | Opinion | | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 211 | 30-Aug | Opinion | | | 1 | | | | | | | | | | |
| 212 | 30-Aug | Request | | | | | | | | | | | | | Angela wants call back to get information |
| 213 | 30-Aug | Opinion | | 1 | 1 | | | | | | | | | | |
| 214 | 30-Aug | Opinion | | 1 | | 1 | | | | | | | | | |
| 215 | 30-Aug | Opinion | | | | 1 | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 216 | 31-Aug | Opinion | | | 1 | | | | | | | | | |
| 217 | 31-Aug | Opinion | | 1 | 1 | | | | | | | | | |
| 218 | 31-Aug | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 219 | 1-Sep | Opinion | | 1 | | | | | | | | | | | |
| 220 | 1-Sep | Opinion | | | | | | | | | | | | | Opposes it, but did not say what it is. |
| 221 | 1-Sep | Opinion | | | | | | | 1 | | | | | | |
| 222 | 1-Sep | Opinion | | 1 | | | | | | | | | | | |
| 223 | 1-Sep | Opinion | | 1 | | | | | | | | | | | |
| 224 | 1-Sep | Hang-up | | | | | | | | | | | | | |
| 225 | 1-Sep | Opinion | | 1 | | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 226 | 2-Sep | Opinion | | 1 | | | | | | | | | | |
| 227 | 2-Sep | Opinion | | 1 | | | | | | | | | | |
| 228 | 2-Sep | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 229 | 5-Sep | Opinion | | 1 | | | | | | | | | | | Female |
| 230 | 5-Sep | Opinion | | 1 | | | | | | | | | | | Male |

| | | | Satanic Temple | Ten Commandments | Any Religious Monument | All monuments | Saline Atheist & Skeptic Society | Gold Star Monument | No additional |
|---|---|---|---|---|---|---|---|---|---|

8 4

B18-5

| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 231 | 6-Sep | Opinion | | 1 | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| 232 | 8-Sep | Opinion | | | | | | 1 | | | | | | | |
| 233 | 8-Sep | Opinion | | 1 | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| 234 | 9-Sep | Opinion | | 1 | | | | | | | | | | | |
| 235 | 9-Sep | Opinion | | 1 | | | | | | | | | | | |
| 237 | 9-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 238 | 9-Sep | Opinion | | | | 1 | | | 1 | | | | | | |
| 239 | 9-Sep | Opinion | | 1 | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional | |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period | |
| 240 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 241 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 242 | 12-Sep | Opinion | | 1 | | | | | | | 1 | | | | |
| 243 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 244 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 245 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 246 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 247 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 248 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 249 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 250 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 251 | 12-Sep | Opinion | | 1 | | | | | | | 1 | | | | |
| 252 | 12-Sep | Opinion | | 1 | 1 | | | | | | | | | | |
| 253 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 254 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 255 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 256 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 257 | 12-Sep | Opinion | | | | | | 1 | | | | | | | |
| 258 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 259 | 12-Sep | Opinion | | | | | | | | | | | | | |
| 260 | 12-Sep | Opinion | | 1 | | | | | | | | | | | Remove free publication stands. |
| 261 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |
| 262 | 12-Sep | Opinion | | | | | | | | | | | | | |
| 263 | 12-Sep | Opinion | | 1 | | | | | 1 | | | | | | |
| 264 | 12-Sep | Opinion | | | | | | | | | | | | | |
| 265 | 12-Sep | Opinion | | 1 | | | | | | | | | | | Repeat Call/No vote/spoke of religious be |
| 266 | 12-Sep | Opinion | | 1 | | | | | | | | | | | |

9 1

| Number | Date | Type | Satanic Temple |  | Ten Commandments |  | Any Religious Monument |  | All monuments or no monuments | Saline Atheist & Skeptic Society |  | Gold Star Monument |  | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  | For | Against | For | Against | For | Against |  | For | Against | For | Against |  |
| 267 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 268 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 269 | 12-Sep | Hang up |  |  |  |  |  |  |  |  |  |  |  |  |
| 270 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 271 | 12-Sep | Hang up |  |  |  |  |  |  |  |  |  |  |  |  |
| 272 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 273 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 274 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 275 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 276 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 277 | 12-Sep | Opinion |  |  |  |  |  |  | 1 |  |  |  |  |  |
| 278 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 279 | 12-Sep | Opinion |  | 1 |  | 1 |  | 1 |  |  | 1 |  | 1 | 1 |
| 280 | 12-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 281 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 282 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 283 | 13-Sep | Opinion |  |  |  | 1 |  |  |  |  | 1 |  | 1 | 1 |
| 284 | 13-Sep | Opinion |  | 1 |  | 1 |  |  |  |  |  |  |  |  |
| 285 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 286 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 287 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 288 | 13-Sep | Unintelligible |  |  |  |  |  |  |  |  |  |  |  |  |
| 289 | 13-Sep | Opinion |  | 1 | 1 |  |  |  |  |  |  |  |  |  |
| 290 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 291 | 13-Sep | Opinion |  | 1 |  | 1 |  | 1 |  |  |  |  |  |  |
| 292 | 13-Sep | Opinion |  |  |  |  |  |  | 1 |  |  |  |  |  |
| 293 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 294 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 295 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 296 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 297 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 298 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 299 | 13-Sep | Opinion |  | 1 | 1 |  |  |  |  |  |  |  |  |  |
| 300 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 301 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 302 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 303 | 13-Sep | Opinion |  | 1 | 1 |  |  |  |  |  |  |  |  |  |
| 304 | 13-Sep | Opinion |  | 1 | 1 |  |  |  |  |  |  |  |  |  |
| 305 | 13-Sep | Opinion |  |  |  |  |  |  | 1 |  |  |  |  |  |
| 306 | 13-Sep | Opinion |  |  |  |  | 1 |  |  |  |  |  |  |  |
| 307 | 13-Sep | Opinion |  |  |  |  | 1 |  |  |  |  |  |  |  |
| 308 | 13-Sep | Opinion | 1 |  | 1 |  | 1 |  |  | 1 |  | 1 |  |  |
| 309 | 13-Sep | Opinion |  |  |  |  |  |  | 1 |  |  |  |  |  |
| 310 | 13-Sep | No opinion |  |  |  |  |  |  |  |  |  |  |  |  |
| 311 | 13-Sep | Opinion | 1 |  | 1 |  | 1 |  |  | 1 |  | 1 |  |  |
| 312 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 313 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 314 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 315 | 13-Sep | Opinion |  | 1 |  | 1 |  | 1 |  |  | 1 |  | 1 |  |
| 316 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |
| 317 | 13-Sep | Opinion |  | 1 |  |  |  |  |  |  |  |  |  |  |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 318 | 13-Sep | Hang up | | | | | | | | | | | | |
| 319 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 320 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 321 | 13-Sep | Opinion | | | | | | 1 | | | | | | |
| 322 | 13-Sep | Hang up | | | | | | | | | | | | |
| 323 | 13-Sep | Opinion | | | | | | | | | 1 | | | |
| 324 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 325 | 13-Sep | Opinion | | | | | | 1 | | | | | | |
| 326 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 327 | 13-Sep | Against Statue | | | | | | | | | | | | |
| 328 | 13-Sep | Opinion | | 1 | | | 1 | | | | 1 | | | |
| 329 | 13-Sep | Opinion | | | | | | | | | | | | |
| 330 | 13-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 331 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 332 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 333 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 334 | 13-Sep | Opinion | | | 1 | | | | | | | | | |
| 335 | 13-Sep | Against Statue | | | | | | | | | | | | |
| 336 | 13-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 337 | 13-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 338 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 339 | 13-Sep | Hang up | | | | | | | | | | | | |
| 340 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 341 | 13-Sep | Hang up | | | | | | | | | | | | |
| 342 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 343 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 344 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 345 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 346 | 13-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 347 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 348 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 349 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 350 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 351 | 13-Sep | Opinion | | | | 1 | | 1 | | | | | | |
| 352 | 13-Sep | Opinion | | | | | | | | | | | | 1 |
| 353 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 354 | 13-Sep | Opinion | 1 | | | | | | | | | | | |
| 355 | 13-Sep | Hang up | | | | | | | | | | | | |
| 356 | 13-Sep | Opinion | | | | | | | | | | | | 1 |
| 357 | 13-Sep | Opinion | | 1 | | | | | | | | | | |
| 358 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 359 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 360 | 14-Sep | Take leadership | | | | | | | | | | | | |
| 361 | 14-Sep | Opinion | | | | | | | | | | | | 1 |
| 362 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 363 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 364 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 365 | 14-Sep | Opinion | | | | | | 1 | | | | | | |
| 366 | 14-Sep | Opinion | | | | | | | | | | | | 1 |
| 367 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 368 | 14-Sep | Opinion | | 1 | | 1 | | 1 | | | 1 | | | |

For Statue of Jason Rapert

5 2

8-81

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 369 | 14-Sep | Opinion | | 1 | | 1 | | 1 | | | 1 | | | |
| 370 | 14-Sep | Opinion | | 1 | | | | | 1 | | 1 | | | |
| 371 | 14-Sep | Opinion | | 1 | 1 | | | | | | | 1 | | |
| 372 | 14-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 373 | 14-Sep | Opinion | | 1 | 1 | | | | | | | 1 | | |
| 374 | 14-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 375 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 376 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 377 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 378 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 379 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 380 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 381 | 14-Sep | Opinion | | | | | | | | | | | | 1 |
| 382 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 383 | 14-Sep | Opinion | | 1 | | 1 | | 1 | | | 1 | 1 | | |
| 384 | 14-Sep | Opinion | | 1 | 1 | | | | | 1 | | 1 | | |
| 385 | 14-Sep | Opinion | | | | | | 1 | | | | 1 | | |
| 386 | 14-Sep | Opinion | | | | | | | | | | | | 1 |
| 357 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 388 | 14-Sep | Opinion | | | 1 | | | | | | | | | |
| 389 | 14-Sep | Opinion | 1 | | | 1 | | | | 1 | | | | |
| 390 | 14-Sep | Opinion | | | | | | | | | | | | 1 |
| 391 | 14-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 392 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 393 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 394 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 395 | 14-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 396 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 397 | 14-Sep | Against Statue | | | | | | | | | | | | |
| 398 | 14-Sep | Opinion | | | | 1 | | | | | | | | |
| 399 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 400 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 401 | 14-Sep | Hang up | | | | | | | | | | | | |
| 402 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 403 | 14-Sep | Opinion | | 1 | | 1 | | | | | 1 | | 1 | |
| 404 | 14-Sep | Opinion | | | | 1 | | | | | | | | |
| 405 | 14-Sep | Hang up | | | | | | | | | | | | |
| 406 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 407 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 408 | 14-Sep | Opinion | | 1 | 1 | | | | | | 1 | | 1 | |
| 409 | 14-Sep | Opinion | | | | | | 1 | | | | | | |
| 410 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 411 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 412 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 413 | 14-Sep | Opinion | | | | 1 | | | | | | | | 1 |
| 414 | 14-Sep | Opinion | | 1 | | | | 1 | | | | | | |
| 415 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 416 | 14-Sep | Hang up | | | | | | | | | | | | |
| 417 | 14-Sep | Opinion | | 1 | 1 | | | | | | 1 | | 1 | |
| 418 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 419 | 14-Sep | Should be ashamed | | | | | | | | | | | | |
| 420 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 421 | 14-Sep | Opinion | | 1 | | | | | | | | | | |
| 422 | 14-Sep | Read the Bible | | | | | | | | | | | | |

10 7

Cave.Suit.Def.SOS.Docs 440

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 423 | 14-Sep | US ruled by God | | 1 | 1 | | | | | | | | | |
| 474 | 14-Sep | Opinion | | | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 425 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 426 | 15-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 427 | 15-Sep | Opinion | | | | 1 | | 1 | | | | | | |
| 428 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 429 | 15-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 430 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 431 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 432 | 15-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 433 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 434 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 435 | 15-Sep | Opinion | | | | | | | | | | | | |
| 436 | 15-Sep | Opinion | | 1 | | | | | | | | | | 1 |
| 437 | 15-Sep | Can't really tell | | | | | | | | | | | | 1 |
| 438 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 439 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 440 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 441 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 442 | 15-Sep | Opinion | | 1 | | 1 | | 1 | | | | | | |
| 443 | 15-Sep | Hang up | | | | | | | | | | | | |
| 444 | 15-Sep | Opinion | | 1 | | | | | | | | | | |
| 445 | 15-Sep | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 446 | 16-Sep | Opinion | | | | | | | | | | | | 1 |
| 447 | 16-Sep | Opinion | | 1 | | | | | | | | | | |
| 448 | 16-Sep | Opinion | | | | | | | | | | | | |
| 449 | 16-Sep | Opinion | | 1 | | 1 | | | | | | | | |
| 500 | 16-Sep | Opinion | | 1 | | | | | | | | | | |
| 501 | 16-Sep | Opinion | | | | | | | | | | | | |
| 502 | 16-Sep | Opinion | | 1 | | | | | | | 1 | | | |
| 503 | 16-Sep | Opinion | | | | | | | | | | 1 | | |
| 504 | 16-Sep | Opinion | | | | | | | | | | | | |
| 505 | 16-Sep | Opinion | | 1 | | | | | | | | | | |
| 506 | 16-Sep | Opinion | | 1 | | | | | | | | | | |
| 507 | 16-Sep | Opinion | | | | | | 1 | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 508 | 17-Sep | Opinion | | | | | | | | | | | | |
| 509 | 17-Sep | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 510 | 18-Sep | Opinion | | 1 | | | | | | | | | | |
| 511 | 18-Sep | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

4 5

01-810

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 512 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 513 | 19-Sep | Opinion | | | 1 | | | | | | | | | |
| 514 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 515 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 516 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 517 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 518 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 519 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 520 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 521 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 522 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 523 | 19-Sep | Hang-up | | | | | | | | | | | | |
| 524 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 525 | 19-Sep | Hang-up | | | | | | | | | | | | |
| 526 | 19-Sep | Opinion | | | | | | | | | | | | |
| 527 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 528 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 529 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 530 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 531 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 532 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 533 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 534 | 19-Sep | Opinion | | 1 | | | | | | | | | | |
| 535 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 536 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 537 | 19-Sep | Opinion | | 1 | | | | | | | | | | |
| 538 | 19-Sep | Opinion | | 1 | | | | | | | | | | |
| 539 | 19-Sep | Opinion | | 1 | | | | | | | | | | |
| 540 | 19-Sep | Hang up | | | | | | | | | | | | |
| 541 | 19-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 542 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 543 | 19-Sep | Opinion | | | 1 | | | | | | | | | |
| 544 | 19-Sep | Opinion | | 1 | | | | | | | | | | |
| 545 | 19-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 546 | 20-Sep | Opinion | | 1 | | | | | | | | | | |
| 547 | 20-Sep | Hang up | | | | | | | | | | | | |
| 548 | 20-Sep | Opinion | | 1 | | | | | | | | | | |
| 549 | 20-Sep | Opinion | | 1 | | | | | | | | | | |
| 550 | 20-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 551 | 20-Sep | Opinion | | | 1 | | | | | | | | | |
| 552 | 20-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 553 | 20-Sep | Opinion | | 1 | | | | | | | | | | |
| 554 | 20-Sep | Opinion | | 1 | | | | | | | | | | |
| 555 | 20-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 556 | 20-Sep | Opinion | | | | 1 | | | | | | | | |
| 557 | 20-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 558 | 20-Sep | Opinion | | | 1 | | | | | | | | | |
| 559 | 20-Sep | Wants to buy | | | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |

51 1

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 560 | 21-Sep | Opinion | | 1 | | | | | | | | | | |
| 561 | 21-Sep | Opinion | | 1 | 1 | | | 1 | | | 1 | | | |
| 562 | 21-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 563 | 21-Sep | Opinion | | 1 | 1 | | | | | | 1 | | | |
| 564 | 21-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 565 | 22-Sep | Hang-up | | | | | | | | | | | | |
| 566 | 22-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 567 | 22-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 568 | 23-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 569 | 23-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 570 | 24-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 571 | 25-Sep | Opinion | | 1 | | | | | | | | | | |
| 572 | 25-Sep | Opinion | | 1 | | | | | | | | | | |
| 573 | 25-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 574 | 26-Sep | Opinion | | 1 | | | | | | | | | | |
| 575 | 26-Sep | Opinion | | 1 | | | | | | | | | | |
| 576 | 26-Sep | Opinion | | 1 | | | | | | | | | | |
| 577 | 26-Sep | Opinion | | 1 | | | | | | | | | | |
| 578 | 26-Sep | Opinion | | 1 | | | | | | | | | | |
| 579 | 26-Sep | Opinion | | 1 | | | | | | | | | | |
| Total | | | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 580 | 27-Sep | Hang-up | | | | | | | | | | | | |
| 581 | 27-Sep | Opinion | | 1 | | | | | | | | | | |
| 582 | 27-Sep | Opinion | | 1 | 1 | | | | | | | | | |
| 583 | 27-Sep | Opinion | | 1 | | | | | | | | | | |
| 584 | 27-Sep | Hang-up | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 585 | 28-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 586 | 29-Sep | Hang-up | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |

California

6 ϕ

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 587 | 30-Sep | Opinion | | 1 | | | | | | | | | | |
| 588 | 30-Sep | Opinion | | 1 | | | | | | | | | | |
| 589 | 30-Sep | Opinion | | 1 | | | | | 1 | | | | | |
| 590 | 30-Sep | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 590 | 3-Oct | Hang up | | | | | | | | | | | | |
| 591 | 3-Oct | Hang-up | | | | | | | | | | | | |
| 593 | 3-Oct | Wants to buy | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 594 | 5-Oct | Opinion | | 1 | | | | | | | 1 | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 595 | 6-Oct | Hang-up | | | | | | | | | | | | |
| 596 | 6-Oct | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 597 | 8-Oct | Opinion | | 1 | | | | | | | | | | |
| 598 | 8-Oct | Opinion | | 1 | | | | | | | | | | |
| 599 | 8-Oct | Opinion | | 1 | | | | | | | | | | |
| 600 | 8-Oct | Hang up | | | | | | | | | | | | |
| 601 | 8-Oct | Hang up | | | | | | | | | | | | |
| 602 | 8-Oct | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 603 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 604 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 605 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 606 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 607 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 608 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 609 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 610 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 611 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| 612 | 10-Oct | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 613 | 11-Oct | Opinion | | 1 | | | | | | | | | | |
| 614 | 11-Oct | What time meeting | | | | | | | | | | | | |
| 615 | 11-Oct | Opinion | | 1 | 1 | | | | | | | | | |
| 616 | 11-Oct | Opinion | | 1 | | | | | | | | | | |
| 617 | 11-Oct | Opinion | | 1 | 1 | | | | | | | | | |
| 618 | 11-Oct | Opinion | | 1 | | | | | | | | | | |

2 ∅

8-18-14

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 619 | 11-Oct | Opinion | | 1 | | | | | | | | | | |
| 620 | 11-Oct | Opinion | | 1 | | | | | | | | | | |
| 621 | 12-Oct | Opinion | | 1 | | | | | | | | | | |
| 622 | 12-Oct | Opinion | | 1 | | | | | | | | | | |
| 623 | 12-Oct | What time meeting | | | | | | | | | | | | |
| 624 | 12-Oct | Opinion | | 1 | | | | | | | | | | |
| 625 | 13-Oct | Opinion | | 1 | | | | | | | | | | |
| 626 | 14-Oct | Opinion | | | | | | | | | | | | |
| 627 | 14-Oct | Opinion | | 1 | | | | | | | | | | 1 |
| 628 | 16-Oct | Opinion | | 1 | 1 | | | | | | | | | |
| 629 | 16-Oct | Opinion | | 1 | | | | | | | | | | |
| 630 | 16-Oct | Hang-up | | | | | | | | | | | | |
| 631 | 16-Oct | Hang-up | | | | | | | | | | | | |
| 632 | 16-Oct | Opinion | | 1 | | | | | | | | | | |
| 633 | 17-Oct | Wants to talk | | | | | | | | | | | | |
| 634 | 19-Oct | What Time Meeting | | | | | | | | | | | | |
| 635 | 20-Oct | Hang-up | | | | | | | | | | | | |
| 636 | 20-Oct | Hang-up | | | | | | | | | | | | |
| 637 | 20-Oct | Opinion | | 1 | | | | | | | | | | |
| 638 | 21-Oct | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 639 | 24-Oct | Wants to talk | | | | | | | | | | | | |
| 640 | 31-Oct | Opinion | | 1 | | | | | | | | | | |
| 641 | 31-Oct | Opinion | | 1 | | | | | | | | | | |
| 642 | 8-Nov | Opinion | | | | 1 | | | | | | | | |
| 643 | 8-Nov | Opinion | | 1 | | | | | | | | | | |
| 644 | 8-Nov | Opinion | | | 1 | | | | | | | | | |
| 645 | 10-Nov | Request for call | | | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 646 | 14-Nov | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 647 | 17-Nov | Opinion | | 1 | | 1 | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 648 | 12/6/2017 | Test | | | | | | | | | | | | |
| 649 | 12/6/2017 | Test | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 650 | 9-Dec | Opinion | | | | 1 | | | | | | | | |
| | 10-Dec | | | | | | | | | | | | | |
| 651 | 11-Dec | Hang up | | | | | | | | | | | | |
| 652 | 12-Dec | Opinion | | | | 1 | | | | | | | | |
| 653 | 12-Dec | Opinion | | | | 1 | | | | | | | | |
| 654 | 12-Dec | Opinion | | | | 1 | | | | | | | | |
| 655 | 12-Dec | Opinion | | | | 1 | | | | | | | | |
| 656 | 12-Dec | Opinion | | | | 1 | | | | | | | | |
| 657 | 13-Dec | Opinion | | | | | | 1 | | | | | | |
| 658 | 13-Dec | Opinion | | | | 1 | | | | | | | | |
| 659 | 13-Dec | Opinion | | | 1 | | | | | | | | | |
| 660 | 13-Dec | Opinion | | | 1 | | | | | | | | | |
| 661 | 13-Dec | Opinion | | | | 1 | | | | | | | | |
| 662 | 13-Dec | Opinion | | | | | | 1 | | | | | | |
| 663 | 13-Dec | Opinion | | | 1 | | | | | | | | | |
| 664 | 13-Dec | Opinion | | | 1 | | | | | | | | | |
| 665 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 666 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 667 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 668 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 669 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 670 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 671 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 672 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 673 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 674 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 675 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 676 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 677 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 678 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 679 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 680 | 14-Dec | Hang up | | | | | | | | | | | | |
| 681 | 14-Dec | Opinion | | | 1 | | | | | | | | | |
| 682 | 14-Dec | Opinion | | | | 1 | | | | | | | | |
| 683 | 14-Dec | Hang-up | | | | | | | | | | | | |
| | 15-Dec | | | | | | | | | | | | | |

14 15

818-18

| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 684 | 19 Dec | Opinion | | | | 1 | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 685 | 21-Dec | Opinion | | | 1 | | | | | | | | | |
| 686 | 21-Dec | Opinion | | | 1 | | | | | | | | | |
| 687 | 21-Dec | Wants Address | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |

2 1

61-818

| Number | Date | Type | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 688 | 1/6/2017 | Opinion | | | 1 | | | | | | | | | |
| 689 | 1/6/2017 | Opinion | | | | | | | | | | | | |
| 690 | 1/6/2017 | Opinion | | | 1 | | | | | | | | | |
| 690 | 1/7/2017 | No Msg Left | | | | | | | | | | | | |
| 691 | 1/8/2017 | Opinion | | | 1 | | | | | | | | | |
| 692 | 1/8/2017 | Opinion | | | 1 | | | | | | | | | |
| 693 | 1/9/2017 | Opinion | | | 1 | | | | | | | | | |
| 694 | 1/9/2017 | Opinion | | | 1 | | | | | | | | | |
| 695 | 1/9/2017 | Opinion | | | 1 | | | | | | | | | |
| 696 | 1/9/2017 | Opinion | | | 1 | | | | | | | | | |
| 697 | 1/9/2017 | Opinion | | | 1 | | | | | | | | | |
| 698 | 1/9/2017 | Opinion | | | 1 | | | | | | | | | |
| 699 | 1/9/2016 | Opinion | | | 1 | | | | | | | | | |
| 700 | 1/10/2017 | Opinion | | | 1 | | | | | | | | | |
| 701 | 1/11/2017 | Opinion | | | 1 | | | | | | | | | |
| 702 | 1/12/2017 | Opinion | | | 1 | | | | | | | | | |

| Number | Date | Type | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 703 | 17-Jan | Opinion | | | | 1 | | | | | | | | |
| 704 | 20-Jan | Opinion | | 1 | | | | | | | | | | |
| 705 | 20-Jan | Opinion | | 1 | | | | | | | | | | |
| 706 | 23-Jan | Opinion | | 1 | | | | | | | | | | |
| 707 | 25-Jan | Hang-up | | | | | | | | | | | | |
| 708 | 25-Jan | Wants Call | | | | | | | | | | | | |
| 709 | 26-Jan | Opinion | | 1 | | | | | | | | | | |
| 710 | 26-Jan | Opinion | | 1 | | | | | | | | | | |
| 711 | 26-Jan | Opinion | | 1 | | | | | | | | | | |
| 712 | 26-Jan | Opinion | | 1 | | | | | | | | | | |
| 713 | 26-Jan | Opinion | | 1 | | | | | | | | | | |
| 714 | 26-Jan | Hang-up | | | | | | | | | | | | |
| 715 | 26-Jan | Opinion | | 1 | | | | | | | | | | |
| 716 | 26-Jan | Opinion | | 1 | | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717 | 27-Jan | Opinion | | 1 | | | | | | | | | | |
| 718 | 27-Jan | Opinion | | | 1 | | | | | | | | | |
| 719 | 27-Jan | Opinion | | 1 | | | | | | | | | | |
| 720 | 27-Jan | Opinion | | 1 | | 1 | | | | | | | | |
| 721 | 27-Jan | Opinion | | | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 722 | 30-Jan | Wants Call Back | | | | | | | | | | | | |
| 723 | 30-Jan | Opinion | | 1 | | | | | | | | | | |
| 724 | 30-Jan | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 725 | 31-Jan | Opinion | | 1 | | | | | | | | | | |
| 726 | 31-Jan | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 727 | 1-Feb | Opinion | | 1 | | | | | | | | | | |
| 728 | 1-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 729 | 2-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 730 | 3-Feb | Opinion | | 1 | | | | | | | | | | |
| 731 | 3-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 732 | 5-Feb | Hang-up | | | | | | | | | | | | |
| 733 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 734 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 735 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 736 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 737 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 738 | 5-Feb | Hang-up | | | | | | | | | | | | |
| 739 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 740 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 741 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 742 | 5-Feb | Opinion | | 1 | | | | | | | | | | |

B18-22

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 743 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 744 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 745 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 746 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| 747 | 5-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 748 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 749 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 750 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 751 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 752 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 753 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 754 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 755 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 756 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 757 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 758 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 759 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 760 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 761 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 762 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 763 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 764 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 765 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| 766 | 6-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 767 | 7-Feb | Opinion | | 1 | | | | | | | | | | |
| 768 | 7-Feb | Opinion | | 1 | | | | | | | | | | |
| 769 | 7-Feb | Opinion | | 1 | | | | | | | | | | |
| 770 | 7-Feb | Req. for Info | | | | | | | | | | | | |
| 771 | 7-Feb | Opinion | | 1 | | | | | | | | | | |
| 772 | 7-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
| 773 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 774 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 775 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 776 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 777 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 778 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 779 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 780 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 781 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 782 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 783 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| 784 | 8-Feb | Opinion | | 1 | | | | | | | | | | |
| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |

8-18-23

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 785 | 9-Feb | Opinion | | 1 | | | | | | | | | | |
| 786 | 9-Feb | Opinion | | 1 | | | | | | | | | | |
| 787 | 9-Feb | Opinion | | 1 | | | | | | | | | | |
| 788 | 9-Feb | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 789 | 10-Feb | Opinion | | 1 | | | | | | | | | | |
| 790 | 10-Feb | Opinion | | 1 | | | | | | | | | | |
| 791 | 10-Feb | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 792 | 11-Feb | Hang-up | | | | | | | | | | | | |
| 793 | 11-Feb | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 794 | 12-Feb | Hang-up | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 795 | 13-Feb | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 796 | 15-Feb | Opinion | | 1 | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |
| Number | Date | Type | For | Against | For | Against | For | Against | or no monuments | For | Against | For | Against | monuments period |
| 797 | 22-Feb | Hang-up | | | | | | | | | | | | |
| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional |

| | | | Satanic Temple | | Ten Commandments | | Any Religious Monument | | All monuments or no monuments | Saline Atheist & Skeptic Society | | Gold Star Monument | | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number | Date | Type | For | Against | For | Against | For | Against | | For | Against | For | Against | |
| 798 | 27-Feb | Opinion | | 1 | | | | | | | | | | |
| 799 | 28-Feb | Opinion | | 1 | | | | | | | | | | |
| 800 | 28-Feb | Opinion | | 1 | | | | | | | | | | |
| 801 | 28-Feb | Opinion | | 1 | | | | | | | | | | |
| 802 | 28-Feb | Opinion | | 1 | | | | | | | | | | |
| 803 | 6/2/2017 | Info Request | | | | | | | | | | | | |
| 804 | 6/10/2017 | Opinion | | 1 | 1 | | | | | | | | | |
| 805 | 6/10/2017 | Opinion | | 1 | 1 | | | | | | | | | |
| 806 | 6/10/2017 | Opinion | | | | 1 | | | | | | | | |
| 807 | 6/11/2017 | Hang-up | | | | | | | | | | | | |
| 808 | 6/12/2017 | Opinion | | | 1 | | | | | | | | | |
| 809 | 6/13/2017 | Opinion | | | 1 | | | | | | | | | |
| 810 | 6/13/2017 | Opinion | | | 1 | | | | | | | | | |
| 811 | 6/13/2017 | Hang-up | | | | | | | | | | | | |
| 812 | 6/14/2017 | Opinion | | | 1 | | | | | | | | | |
| 813 | 6/14/2017 | Opinion | | | 1 | | | | | | | | | |
| 814 | 6/14/2017 | Opinion | | | 1 | | | | | | | | | |

| Number | Date | Type | Satanic Temple For | Satanic Temple Against | Ten Commandments For | Ten Commandments Against | Any Religious Monument For | Any Religious Monument Against | All monuments or no monuments | Saline Atheist & Skeptic Society For | Saline Atheist & Skeptic Society Against | Gold Star Monument For | Gold Star Monument Against | No additional monuments period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 815 | 6/16/2017 | Opinion | | | 1 | | | | | | | | | |
| 816 | 6/19/2017 | Opinion | | 1 | 1 | | | | | | | | | |
| 817 | 6/19/2017 | Opinion | | | 1 | | | | | | | | | |
| 818 | 6/19/2017 | Opinion | | 1 | 1 | | | | | | | | | |
| 819 | 6/19/2017 | Opinion | | 1 | 1 | | | | | | | | | |
| 820 | 6/22/2017 | Opinion | | 1 | 1 | | | | | | | | | |
| 821 | 6/27/2017 | Opinion | | | | 1 | | | | | | | | |
| 822 | 6/28/2017 | Opinion | | | 1 | | | | | | | | | |
| 823 | 6/28/2017 | Opinion | | | | 1 | | | | | | | | |
| Total | | | 16 | 473 | 157 | 68 | 8 | 56 | 39 | 4 | 38 | 8 | 6 | 14 |

**Public Comment**
**for the Capitol Arts & Grounds Commission**
**Public Hearing**
**at 11:00 a.m. December 14, 2016**
**Re: Arkansas General Assembly Enactment to**
**erect a Ten Commandment monument on the grounds of the**
**Arkansas State Capitol**

**Comment/Message:**

**I wish to express my appreciation to the Arkansas General Assembly for the passage of Act 1231 of 2015.**

**I am submitting this, my written request to the Capitol Arts & Grounds Commission for the purpose of communicating my expectation of seeing a state of the art monument of a reverent and biblical and historical design, erected in an attractive manner and in a location on the front lawn of the Capitol grounds that is prominent and easily accessible for visiting and photography by the general public—i.e. a monument that is befitting of the greatness and eternal endurance of the declaration of God's Law, upon Whose blessing the founders of our great state of Arkansas acknowledged as being "grateful to Almighty God for the privilege of choosing our own form of government...secure{ing} the same to our selves and posterity..." in the Preamble of our Constitution of the State of Arkansas of 1874.**

**Being of the posterity of the founders of our state and/or our American nation, I am hereby also declaring my support of our General Assembly's enactment to properly memorialize the greatest foundation of Law ever given to mankind—originally engraved by the finger of Almighty God in stone tablets and given to Moses on the Mount Sinai for the benefit of all mankind as the rule of law to be obeyed in honor and expectation of God's Son, the Prince of Peace, Jesus Christ, upon Whose shoulders all government shall ultimately rest.**

**I further request that the Secretary of State (who has been given the final authority of approval of the monument) submit a complete plan to all the sponsors of the enactment pertaining to the design and location of the monument, *prior* to its placement, to ensure that the Secretary of State and/or Commission has fulfilled the original intent of the sponsors *and the language of the enactment*. I understand that the monument has been constructed and produced with private funds and is ready for permanent placement now awaiting action by the Secretary of State/Grounds Commission. It is my strong opinion that no more delay should occur from the Secretary's office, being that it has now been more than a year and a half since this enactment of law occurred (April 2015). I request that the opening day of the Legislative Session in January 2017 be the day for a ceremonial unveiling of the new Ten Commandment monument in its permanent place on the front lawn of the Arkansas State Capitol building.**

**Please enter this comment into the official records of the Secretary of State and of the Arts & Grounds Commission, and notify me in writing that it is done at the address below:**

Shirley Shelton
**Name**

PO Box 682
**Address**
Jasper, AR. 72641

**I am mailing this to:**
**Arkansas Secretary of State**
**Attn: Capitol Arts & Grounds Commis.**
**Arkansas State Capitol Room 256**
**Little Rock, Ark 72201**

**or will have it hand delivered**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, JUDITH LANSKY,
PAT PIAZZA, and SUSAN RUSSELL PLAINTIFFS

vs. Case No. 4:18-CV-00342 KGB

JOHN THURSTON, Arkansas Secretary of State, in his official capacity

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF KERRY MOODY**

**TAKEN IN LITTLE ROCK, ARKANSAS**

**JUNE 27, 2019**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**HENDRIX REPORTING SERVICE**
**1701 SOUTH ARCH**
**LITTLE ROCK, ARKANSAS 72206**
**(501) 372-2748**

Exhibit F

Taken on behalf of the Plaintiffs on the 27th day of June, 2019 at the Office of the Attorney General, 323 Center Street, Suite 200, Little Rock, Arkansas, commencing at 9:00 a.m. Said deposition was taken according to the terms and provisions of the Federal Rules of Civil Procedure under Rule 26 for all purposes.

All forms and formalities as to the taking, transcribing, transmitting and certification of said deposition in this action are hereby waived. The right to object to the testimony of the witness on the grounds of incompetency, irrelevancy, and immateriality is expressly reserved, except as to the form of the question as propounded to the witness, and may be hereinafter asserted at the time of trial without the necessity of noting same at the time of taking of said deposition.

* * * * * * * * * * * * *

(Witness sworn)

Thereupon,

**KERRY MOODY,**

having been called for examination, and after being first duly sworn, was examined and testified as follows:

**EXAMINATION BY COUNSEL FOR THE CAVE PLAINTIFFS**

BY MR. SCHULTZ:

Q Ms. Moody, we already met. My name is Andy Schultz. I'm an attorney in Albuquerque, New Mexico.

A Okay.

Q But I think before you and I start talking, all the other people in the room are going to go around and say who they are.

MR. SCHULTZ: So again, my name is Andrew Schultz. I'm an attorney with the Rodey Law Firm in Albuquerque, and I'm here on behalf of the Cave Plaintiffs. With me is John Burnett, who is also on behalf of the Cave Plaintiffs.

MR. KEZHAYA: And Matt Kezhaya. I practice up in Bentonville, Arkansas. I'm at Kezhaya Law and I represent the Satanists.

MR. SCHULZE: I'm Gerry Schulze. I'm here on behalf of the Orsi Plaintiffs.

MR. WAGNER: I'm Vincent Wagner, I'm the Deputy

transcript.)

MR. SCHULTZ: (Continuing)

Q I'm showing you what's been marked as Exhibit 10. This was a document that was produced in this case by the Secretary of State's Office.

A Uh-huh.

Q This looks to be -- Well, first of all, do you know who Brittany Garcia is?

A Yes, she works as an administrative assistant, I believe, in our Legal Division.

Q Okay. If you keep going down, this appears to be an email sent by Susan Carter.

A Uh-huh.

Q And I think you identified her as the Events Coordinator--

A Uh-huh.

Q -- when you were the Director of the Communications and Education Division.

A I was Deputy when she --

Q Oh, Deputy, excuse me, I'm sorry, Deputy Secretary of State.

A So Susan Carter worked under your line of command?

A Correct.

Q Okay. So she was the Events Coordinator, correct?

A Correct, as well, that was part of her duties when she was

A Yes.
Q -- somewhere within the Secretary of State's Office?
A Yes.
Q And this email appears to be setting out the details of an event that's going to be held at 11:30 in the morning on July 6, 2017, correct?
A Correct.
Q This event specifically was the check presentation news conference which appears to be held in the -- this calls it the Rotunda --
A Uh-huh.
Q -- by the Executive Producers of the "God's Not Dead" film series.
A Correct.
Q And it talks about that they will presenting a check to the American History & Heritage Foundation for the Arkansas Ten Commandments Monument Restoration Project.
A Correct.
Q It talks about how many people they -- Now, it says Senator Jason Rapert.
A Correct.
Q Was he the organizer of the event? Why is his name there?
A He could have been. What this looks like is an update to the calendar that Susan would send out on Fridays, and so this

Secretary of State's Office during your tenure being responsible for processing those requests?

A Yes.

Q Okay. Again, time frame wise, we were talking about the period of time between when the first monument was destroyed and the second monument was constructed.

I want to shift towards the end of that time period now and talk about the dedication ceremony for what we've called the second Ten Commandments Monument, okay?

A Uh-huh.

Q So do you understand what I'm asking?

A (Nodding head up and down)

Q Now, that occurred on April 26, 2018, does that sound right?

A Yes.

Q And you were present for that?

A Yes.

Q So I'd like to talk to you, because you were present, I'd like to talk to you about that ceremony.

So as an initial matter, I've probably asked you way more questions than I should have about ceremonies that take place inside the State Capitol building. This event took place outside of the State Capitol building but on State Capitol grounds, is that fair?

A Yes, yes.

assumed you were there to accept the monument on behalf of the State of Arkansas?

A Correct.

Q Did anyone tell you where you were supposed to stand?

A I'm sure I was asked to -- I wouldn't have -- Yeah, I don't know who told me, but it was more of a, 'Here, go over here,' type of situation.

Q Do you recall, were you told that before the dedication ceremony or when you showed up for the dedication ceremony?

A When I showed up.

Q So nobody in the Secretary of State's Office said, 'When you go, be sure to stand up front'?

A No.

Q Now, I've seen a video from several TV stations covering the event.

A Uh-huh.

Q And from the video, which I only know what the news showed me, it appears that about the only speaker was Senator Jason Rapert, is that consistent with your recollection?

A Correct.

Q Okay. Do you recall whether Jason Rapert, Senator Rapert, excuse me, was the person who said, 'Please stand over here'?

A I don't remember.

Q Okay. Do you remember if anyone else would have told

MR. SCHULTZ: You're absolutely correct.

(Whereupon, the Series of Photographs from the Agape Church Facebook page was marked as Deposition Exhibit 12 and attached at Tab 12 in the transcript.)

MR. SCHULTZ: (Continuing)

Q I'm now going to hand you what we are marking as Exhibit 12, which are two pages with more photographs, okay?

So let's start with the -- Now, I will represent to you that I obtained these, as it appears, from the Agape Church in Little Rock, Arkansas' Facebook page.

First of all, there are two photographs in the center of the page, do you see those?

A Yes.

Q In the top photograph standing in the middle, is that you?

A Yes.

Q Okay. And in fact, the top caption -- Can you read the top caption above that photograph?

A Yes. Do you want me to read it for you?

Q Please.

A "Our pastoral team representing at the State Capitol today for the unveiling of the Ten Commandments monument. Pictured with Deputy Secretary of State Kerry Jucas."

Q Now, let me go back and ask you to look at Exhibit 11 --

A Uh-huh.

ceremony?

A I don't know.

Q Okay.

MR. SCHULTZ: Again, I really appreciate your cooperation and I don't have any further questions for now. Thank you.

THE WITNESS: Thank you.

## EXAMINATION BY COUNSEL FOR THE ORSI PLAINTIFFS

BY MR. SCHULZE:

Q I'm Gerry Schulze. I represent another set of Plaintiffs. Mr. Schultz has already asked you I think pretty much everything, but there are a few things I want to ask you about the process that went on for the approval of the design of the monument.

A Okay.

Q Were you involved in that at all?

A No.

Q Okay. At some point there was an email forwarded to you from a group called Secure Arkansas?

A Uh-huh.

Q Forwarded to you by Susan Carter.

Do you recall why she would have forwarded you the email, any email?

A I was Susan's supervisor, so --

Q Okay.

MR. SCHULZE: I don't have a bunch of copies, but if you could, everyone look at it briefly.

MR. CANTRELL: Is this all one email?

MR. SCHULZE: I think, I understand that to be all one email. Now, part of it’s hard to read because it's cut off over at the right edge, and I've got another version of it that --

MR. CANTRELL: Is this part of it as well?

MR. SCHULZE: Actually, no, that shouldn't be on there. And what I'm handing you is just another version of the same one that perhaps we ought to maybe make that, put that at the back so that you can read the edges of that.

MR. CANTRELL: Okay. Let me -- What are we –

MR. SCHULZE: (Continuing)

Q Really I just want to know why would you have -- Why would that have been provided to you?

A It looks like it was provided to everyone in the Secretary of State's Office. It looks like Secure Arkansas blanket emailed that to everyone. ARSOS is, I want to say either all of us or maybe it was a general Secretary of State email address that they would have sent it to.

Q Okay. So did you have any involvement whatsoever with dealing with Secure Arkansas?

A No, no.

Q Okay. Did you have any involvement in responding to Freedom of Information requests?

A Yes. At that time my press secretary would be responsible for responding to FOIAs.

Q And who was your press secretary?

A Chris Powell.

Q Chris Powell. So if Secure Arkansas submitted a FOIA request, Chris Powell would have been the one to respond?

A Correct.

Q If later the ACLU sent you a FOIA request, Chris Powell would have been the one to respond?

A Correct.

Q Okay. Have you seen an FOIA request that was allegedly provided by the Secretary of State's Office to the ACLU?

A Over the years I have.

Q Okay.

A Lots of them.

Q Okay. Well, I'm talking about in regard to the Ten Commandments Monument.

A I probably saw it. I don't recall the specific Freedom of Information Act request.

Q Okay. Did you attend any of the hearings? I think Kelly

MR. CANTRELL: Thank you.

(Whereupon, the Email dated 5-11-17 from Kerry Jucas to Susan Carter Re: FOIA Request from Secure Arkansas was marked as Deposition Exhibit 13 and attached at Tab 13 in the transcript.)

MR. SCHULZE: And that's all I have.

**EXAMINATION BY COUNSEL FOR THE SATANISTS PLAINTIFFS**

BY MR. KEZHAYA:

Q Hey, Kerry, I'm Matt Kezhaya. As I said earlier, I represent the Satanists in this. I want to follow up on some of the questions that Andy asked you, some of your answers.

A Okay.

Q I noticed in this Exhibits 1 and 2, this list of monuments, the Ten Commandments Monument is not on this list.

A Correct.

Q Is that accurate?

A Yes.

Q Why not?

A I think I had shared earlier, we had not published this and had not made any large revisions to it other than color schemes of the Secretary, the two different administrations.

Q Okay. So there's not a conscious decision not to include it, it just hasn't been updated yet?

**Kerry Jucas**

**From:** Kerry Jucas
**Sent:** Thursday, May 11, 2017 2:03 PM
**To:** Susan Carter
**Subject:** FW: Concern over Ten Commandments Monument; FOIA Request Submitted

**From:** Secure Arkansas [mailto:actionalerts@securetherepublic.com]
**Sent:** Thursday, May 11, 2017 11:15 AM
**To:** AR SOS <ARSOS@sos.arkansas.gov>
**Subject:** ADV: Concern over Ten Commandments Monument; FOIA Request Submitted

Secure Arkansas greatly questions the symbolism on the Arkansas Ten Commandments monument! Veterans, Christ people of all faiths will find the symbolism offensive!

**We are requesting an FOIA from the Arkansas Secretary of State on May 11, 2017 for the agenda of the Ten Commandments Monument authorization and presentation.**

**Chris Powell**

---

**From:** Kerry Jucas
**Sent:** Thursday, May 11, 2017 11:21 AM
**To:** Chris Powell
**Subject:** FW: Concern over Ten Commandments Monument; FOIA Request Submitted

FOIA

**From:** Secure Arkansas [mailto:actionalerts@securetherepublic.com]
**Sent:** Thursday, May 11, 2017 11:15 AM
**To:** AR SOS <ARSOS@sos.arkansas.gov>
**Subject:** ADV: Concern over Ten Commandments Monument; FOIA Request Submitted

Secure Arkansas

Protecting The Rights Of Arkansas



Secure Arkansas greatly questions the symbolism on the Arkansas Ten Commandments monument! Veterans, Christians, and people of all faiths will find the symbolism offensive!

**We are requesting an FOIA from the Arkansas Secretary of State on May 11, 2017 for the agenda of the Ten Commandments Monument authorization and presentation.**

This request shall include the following under the Arkansas Freedom of Information Act 93 of 1967:

1. The agenda for the Ten Commandments monument dedication ceremony
2. The date and time scheduled for the Ten Commandments monument dedication ceremony
3. Each person and their title who is scheduled to speak at the Ten Commandments monument dedication ceremony
4. The person and their title authorizing the symbols on the Ten Commandments

Please return all replies to Jack Abrahamson at oaklogman@gmail.com and Jeannie Burlsworth at jburlsworth77@gmail.com .

Secure Arkansas supported the Ten Commandments 2015 legislation SB 939, that was passed by both houses and approved by the governor on April 7, 2015 as Act 1231, but Secure Arkansas does **not** support all the hidden symbolism added to the monument after SB939/Act 1231 was signed by the governor.

Per SB 359/Act 1231:

Page 2, Line 36 (2)(A) The Secretary of State shall arrange for the monument to

3

13
M3

Page 3, Line 1 be designed, constructed, and placed on the State Capitol grounds by private

Page 3, Line 2 entities at no expense to the State of Arkansas.

It was the responsibility of the Arkansas Secretary of State Mark Martin to follow the legislation approved, **not** to allow the symbolism.

We will be addressing some of this symbolism on the monument below.



Credit



The above monument is from Oklahoma. This is the same design that was used for Arkansas and Texas.

Credit



Credit

1. **All-Seeing Eye (top Center of the monument) Arkansas' version:** the All-Seeing Eye originated from the Egyptian Mysteries Religion and represents Horus, who is Lucifer! Look at the pyramid symbol, for it is loaded (pregnant) in its meaning! In the "Guardians of the Grail", J.R. Church states that the All-Seeing Eye may represent a god, but it is not the God of the Bible. It is a human eye indication that man is god. It represents so-called 'mind power', the ability to

manipulate one's world with thought" p. 165. Today, the all-seeing eye is more likely to be seen as an "Illuminati" symbol of control and surveillance by global elite who, to a large degree, "run the show" on this planet today.

Look at an American One Dollar Bill and turn it over over to the back side so we can study the symbol on the left, called the Obverse of the Great Seal. This unfinished pyramid with the Eye of Lucifer hovering over the Old World Order is ready to bring about the change to the New World Order. This symbolism dates back through Freemasonry to the Egyptian Satanic Mysteries, the religion God cursed when He led Moses and the children of Israel out of bondage!

You will see that this symbol, the unfinished pyramid, is highly Satanic and is constructed using occult numbers and an occult hexagram. Doc Marquis, former Illuminist Satanist, explained it: *"The Pyramid represents the past. Note that the capstone of this pyramid is not in place, thus denoting an unfinished situation. This unfinished situation was planned to remain in effect until the Old World Order was destroyed and replaced with The New World Order."*

1

BM-1

* ***Annuit Coeptis*** - Announcing The Birth - How does Jesus describe the appearance of Antichrist? Matthew 24:8, says "sorrows" which means birth pangs! The Illuminati has a plan!

* ***Novus Ordo Seclorum*** - New World Order

* ***Capstone*** - Eye of Horus [Lucifer in Egyptian Mysticism] = Eye of Satan

* ***Thirteen Steps*** = Depravity and Rebellion Number

* **MDCCLXXVI** = 1776 [May 1, Beltaine, Second High-Holy Day of the Year]

*Annuit coeptis* is the Latin motto suggested in 1782 by Charles Thomson, the Founding Father chosen by Continental Congress to come up with the final design for the Great Seal of the United States. He adapted it from Virgil's *The Georgics*, the renowned Roman writer's evocative instruction manual for farmers written in the first century B.C.

"**Da facilem cursum, atque audacibus annue cœptis.**"

This sentence (Book I, line 40) has been translated as:

"**Give me an easy course, and favor my daring undertakings.**"

"**Audacibus annue coeptis**" is also found in Book IX of Virgil's *Aeneid*, his epic masterpiece about the foundation of Rome. English translations include: "Assent to my bold attempt" and "Grant me success in this brave venture" and "Nod assent to the daring work I have in hand."

8

13M8

Charles Thomson, an expert in Latin, changed the second-person "annue" to its third-person form "annuit" and coined the motto: "***Annuit Coeptis***" – placing it above the eye of Providence where he explained it signified the "**many signal interpositions of providence in favor of the American cause**."

An accurate translation of *Annuit Coeptis* is:

"**Providence Has Favored Our Undertakings**."

And the motto *Novus Ordo Seclorum* was also coined by Charles Thomson in June 1782. He adapted it from a line in Virgil's *Eclogue IV*, a pastoral poem written by the famed Roman writer in the first century B.C. that expresses the longing for a new era of peace and happiness.

The original Latin in Virgil's *Eclogue IV* (line 5) is:

"***Magnus ab integro seclorum nascitur ordo***."

2. **The six-pointed star (both on the bottom left and right of monument)** is the supreme symbol of Satanic tyranny, which has been used by people throughout history to directly or indirectly worship Satan. It was used by Babylonian astrologers for Sun worship. This six-pointed star has long been used in magic, occultism, witchcraft, and astrology. ✡

3. **The Chi Rho symbol (bottom center of monument) has pre-Christian connections and is believed to have been revered by the pagan Greeks as representative of good fortune. Pagan Greek scribes used the symbol in the margin to mark passages they considered especially significant or relevant, with the letters Chi and Rho denoting 'chreston' that means 'good'. The sign has also been found on the coins of Ptolemy III (246-222 BCE)** ☧

9

13M-9



4. **The upside down flag** (located top center of the monument right under the All-Seeing Eye) is a symbol of an official signal of distress. The following U.S. Code explains the signal of distress.

**Title 36, U.S.C., Chapter 10, § 176.** Respect for flag No disrespect should be shown to the flag of the United States of America; the flag should not be dipped to any person or thing. Regimental colors, State flags, and organization or institutional flags are to be dipped as a mark of honor.

(a) The flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property.

5. **The Eagle/Phoenix:** According to esotericists like Manly P. Hall, the extraordinary truth about the number 13 so affixed to the Great Seal was actually more than representation of the

original colonies. It was a marker for those who understood it as a Masonic 'power number,' sacred to the Moon and representative of the head of Isis, while the Eagle, Hall wrote, was a shrewd masquerade for the mythical Phoenix so important to Masonic mysticism. Hall partly came to this conclusion based on the early seal prototype of William Barton showing a Phoenix in its nest of flames.

"Most of the designs originally submitted had the Phoenix bird on its nest of flames as the central motif," Hall said. "Its selection would of course have been appropriate.... [because] the Phoenix is one sign of the secret orders of the ancient world and of the initiate of those orders, for it was common to refer to one who had been accepted into the temples as a man twice-born, or re-born. Wisdom confers a new life, and those who become wise are born again."

Hall went on in *The Secret Destiny of America:*

The Phoenix symbol is important in another way, as an emblem among nearly all civilized nations of royalty, power, superiority, and immortality. The Phoenix of China is identical in meaning with the Phoenix of Egypt; and the Phoenix of the Greeks is the same as the Thunder Bird of the American Indians...

It is immediately evident that the bird on the original seal is not an eagle... but the Phoenix.... The beak is of a different shape, the neck is much longer, and the small tuft of hair at the back of the head leaves no doubt as to the artist's intention.

Hall then acknowledged that if the design "on the obverse side of the seal is stamped with the signature" of the Masons, the design on the reverse was even more related to the Order's "mysteries," casting the United States within the society's secret scheme to fulfill the Baconian dream of a New Atlantis by establishing America as the capital of the New World Order.

Hall continues:

Here is represented the great pyramid of Gizah, composed of 13 rows of masonry, showing 72 stones. The pyramid is without a cap stone, and above its upper platform floats a triangle containing the All-Seeing Eye surrounded by rays of light...

The Pyramid of Gizah was believed by the ancient Egyptians to be the shrine tomb of the god Hermes, or Thot, the personification of Universal Wisdom.

No trace has ever been found of the cap of the great pyramid. A flat platform about thirty feet square gives no indication that this part of the structure was ever otherwise finished; and this is appropriate, as the Pyramid represents human society itself,



imperfect and incomplete. The structure's ascending converging angles and faces represent the common aspiration of humankind; above floats the symbol of the esoteric orders, the radiant triangle with its all-seeing eye…

There is a legend that in the lost Atlantis stood a great university in which originated most of the arts and sciences of the present race. The University was in the form of an immense pyramid with many galleries and corridors, and on the top was an observatory for the study of the stars. This temple to the sciences in the old Atlantis is shadowed forth in the seal of the new Atlantis. Was it the society of the unknown philosophers who sealed the new nation with the eternal emblems, that all the nations might know the purpose for which the new country had been founded?

NOTE: The combination of the Phoenix, the pyramid, and the all-seeing eye is more than chance or coincidence. There is nothing about the early struggles of the colonists to suggest such a selection to farmers, shopkeepers, and country gentlemen. There is only one possible origin for these symbols, and that is the secret societies which came to this country 150 years before the Revolutionary War. Most of the patriots who achieved American independence belonged to these societies, and derived their inspiration, courage, and high purpose from the ancient teaching. There can be no question that the great seal was directly inspired by these orders of the human Quest, and that it set forth the purpose for this nation as that purpose was seen and known to the Founding Fathers.

The monogram of the new Atlantis reveals this continent as set apart for the accomplishment of the great work—here is to arise the pyramid of human aspiration, the school of the secret sciences.

Besides Manly Hall, late scholars who recognized the occult symbolism of the Great Seal as pointing to this 'secret destiny of America' included Rhodes Scholar James H. Billington and Harvard Professor Charles Eliot Norton, who described the Great Seal as hardly other than an "emblem of a Masonic Fraternity." In 1846, 33rd Degree Freemason and noted author James D. Carter inadvertently confirmed this as well when he admitted the Masonic symbolism is clearly known whenever "an informed Mason examines the Great Seal."

Quote from Hall's Book, The Secret Teachings of All Ages: *European mysticism was not dead at the time the United States of America was founded. The hand of the Mysteries controlled in the establishment of the new government, for the signature of the Mysteries may still be seen on the Great Seal of the United States of America. Careful analysis of the seal discloses a mass of occult and Masonic symbols, chief among them the so-called American eagle--a bird which Benjamin Franklin declared unworthy to be chosen as the emblem of a great, powerful, and progressive people. Here again only the student of symbolism can see through the subterfuge and realize that the American eagle upon the Great Seal is but a conventionalized phœnix, a fact plainly discernible from an examination of the original seal.*

***Biography***

*Manly P. Hall (1901-1990) founded the Philosophical Research Society in 1934, a non-profit organization dedicated to the dissemination of useful knowledge in the fields of philosophy, comparative religion and psychology. In his long career, spanning more than 70 years of dynamic public activity, Mr. Hall delivered over 8000 lectures in the United States and abroad, authored over 150 books and essays, and wrote countless magazine articles.*

Quote from John F. Kennedy in 1961 before the American Newspaper Publishers Association; " The very word "secrecy" is repugnant in a free and open society; and we are as a people inherently and historically opposed to secret societies, and secret oaths and to secret proceedings. We decided long ago that the dangers of excessive and unwarranted concealment of pertinent facts far outweighed the dangers which are cited to justify it."

---

The American History & Heritage Foundation is the private entity funding the Ten Commandments monument. The registered agent is Travis W. Story. He is also shown as the Incorporator/Organizer.

*This email is being sent to Governor Asa Hutchinson, to the legislators, and the office of Secretary of State Mark Martin ONLY at this time. Secure Arkansas has NOT sent this to the media or to our extensive list of people in the state YET. We will be waiting on your decisions and the information from the FOIA submitted today, May 11, 2017.

As always, you can find our email articles posted on our website: SecureArkansas.com. The Search box is a handy tool. For more information about a topic, just type it into the Search box on our website, and click Enter!

And remember:

13

13 M 13



Securing the blessings of liberty,

Secure Arkansas
securetherepublic.com/arkansas
info@securetherepublic.com

**Disclaimer**:

Legal Advice is Not Provided

The material in our emails/alerts and on our websites is only intended to provide general information and comment to the public. We make an effort to ensure that the information found in our emails/alerts and on our websites is accurate and timely, but we can't and don't guarantee that. Nor do we guarantee the accuracy or timeliness of any information contained on websites to which our websites or emails provide links.

Information found in our emails/alerts and on our websites should not be taken as legal advice. Legal matters can be complicated. For assistance with a specific legal problem or question, please contact a knowledgeable lawyer for assistance.

Click here to unsubscribe from our email list(s).

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, JUDITH LANSKY, PAT PIAZZA, and SUSAN RUSSELL, PLAINTIFFS

vs. NO. 4:18-CV-00342 KGB

JOHN THURSTON, Arkansas Secretary of State, in his official capacity, DEFENDANT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**VOLUME I**

**DEPOSITION OF JASON RAPERT**

**TAKEN IN LITTLE ROCK, ARKANSAS**

**SEPTEMBER 12, 2019**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**HENDRIX REPORTING SERVICE**
**1701 SOUTH ARCH**
**LITTLE ROCK, ARKANSAS 72206**
**(501) 372-2748**

Exhibit G

MR. BYRD: Paul Byrd from Little Rock, and I'm representing Jason Rapert in his individual capacity.

VIDEOGRAPHER: Would the witness be sworn?

(Witness sworn)

Thereupon,

**JASON RAPERT,**

having been called for examination, was examined and testified as follows:

**EXAMINATION BY COUNSEL**
**FOR CAVE PLAINTIFFS**

**BY MR. SCHULTZE:**

Q Senator, good morning. We had a chance to talk for just a few minutes. My name is Andy Schultz, I'm an attorney in Albuquerque, and I represent the Cave Plaintiffs, and I'm here this morning to ask you some questions, and I want to make that very clear. I'm not here for a debate, and I'm not here to argue with you.

A Uh-huh.

Q I've been preparing for this deposition. I've read a lot about you, and I've read a lot about things that you have done as a state senator and in some other capacities, and I simply have some questions that I'd like you to help clarify for me.

If there's any question that I ask that you're not sure about what I'm asking, please let me know, and I'll do my best to rephrase it.

A That's all right, that's all right.

Q Exhibit Eight is another page --

A Uh-huh.

Q -- from your "Re-Elect Senator Jason Rapert" web page, and it shows in the middle, "You can donate using one of the methods below, and one of the methods is by mail."

A Correct.

Q "Jason Rapert for Senate, P.O. Box 10388, Conway, Arkansas, 72034," correct?

A Correct, uh-huh.

Q All right.

A That's where we get -- try to get all of our mail.

Q Senator, I'm handing your lawyer what's been marked as Cave Plaintiffs Exhibit Nine, 'cause the next hat I want to talk about that you wear is in your role as the founder and president of the National Association of Christian Lawmakers.

A Uh-huh.

Q You're familiar with that organization?

A Yes, sir.

Q Okay. My understanding is you started that in November 2018, is that right?

A That's when we -- that's when we announced the formation, yes, sir.

Q All right. And to announce the formation, you sent out a letter or an email to all 7,300+ members of state legislatures all

Lawmakers."

A Uh-huh.

Q "P.O. Box 10388, Conway, AR, 72034," is that right?

A Correct.

Q Okay.

A That's where we collect all of our mail.

Q And the phone number that you provided was area code 501-336-0918?

A To reach me, yes.

Q Okay. I'm handing your lawyer what's been marked as the Cave Plaintiff Exhibit Ten.

While your lawyer is looking at that, my understanding is that when you started the National Association of Christian Lawmakers --

A Uh-huh.

Q -- you also created what's called a GoFundMe page.

A That's correct.

Q Is that correct?

A Uh-huh.

Q I'll wait for him.

A Uh-huh.

Q I went to the GoFundMe website and this is what I was able to find --

A Uh-huh.

Q -- for the National Association of Christian Lawmakers.

Q Okay.
A That is a postal mailing address where we receive -- try to receive all of our mail for any entity that I'm involved with, business, everything.
Q Senator, thank you. As I said, I wanted to start off just going through wear --
A Uh-huh.
Q -- the different hats that you wear --
A Well --
Q -- and I'm sure it's not all of them, but it's the ones I wanted to ask you about, and I appreciate that.
A You're welcome.
Q So --
A And that sounds like people are going to know where to send my mail.
Q I certainly do, yes, sir.
A Yeah.
Q Senator, I'd like to turn now and talk about the Ten Commandments Monument Display Act.
A Okay.
Q So you were the primary sponsor of this bill that originated in the Arkansas -- Arkansas State Senate, correct?
A Correct.
Q You introduced --
MR. BYRD: Object to form.

MR. SCHULTZ: (Continuing)

Q You introduced the bill in March 2015?

A I -- I would say, yes.

Q Is that a “yes”?

A I -- I’d say approximately, yeah.

Q Okay.

A You would have to look at the date. I’ve -- I’ve actually -- As you know, I’ve served for nearly 10 years and we do thousands of bills every year, so I don’t know exactly the date --

Q And --

A -- that it was filed, right.

Q And, Senator, this is not meant as a gotcha question.

A Uh-huh.

Q I’ve got copies of the bill.

A Right.

Q I’m going to show you that in just a second.

A Yeah, yeah.

Q I just wanted to know if that date sounded about right to you?

A 2015 is correct.

Q Yes, sir.

A Yeah.

Q And if my understanding of Arkansas civics is correct, the bill was introduced in the Senate, it passed in the Senate, and then went to the House for consideration?

A That's correct.

Q And in the House, Kim Hammer, who was then a state representative --

A Correct.

Q -- was the primary sponsor for the legislation in the House chamber.

A Correct.

Q Okay. Senator, it's my understanding that Mr. Hammer is a Pastor at the Saline Missionary Baptist Church in Tull, Arkansas. Is that consistent with your understanding?

A Am I to be answering for other people?

MR. BYRD: No.

MR. SCHULTZ: No, sir. I just wanted to let you know.

THE WITNESS: I don't know the full name of his -- his church, but I know that he has been a chaplain, I think, with hospice in the past, and I think he also was a pastor of a church, which, again, I don't know the exact full name.

MR. SCHULTZ: Fair enough.

THE WITNESS: Yeah.

MR. SCHULTZ: (Continuing)

Q The bill for the Ten Commandments Monument Display Act then passed the House, correct?

A Correct.

Q And went to the Governor's desk?
A Correct.
Q And Governor Hutchison signed it --
A Yes.
Q -- into law in April 2015.
A Correct.
Q Does that sound about right?
A Sounds correct, yes.
Q Okay. And the bill is now codified in Arkansas state law under Section 22-3-221. Do you know if that's correct?
A I don't --
Q Okay.
A -- know if what -- I don't know if what you've cited is correct, because the subpoena itself had the incorrect act number.
Q Okay. Well, let me see if I can help.
A It's Act 1231. That's incorrect on your subpoena.

MR. SCHULZE: It's on my subpoena.

THE WITNESS: On Gerry's subpoena. On a old one, another subpoena that I haven't seen. Okay.

MR. SCHULTZ: (Continuing)
Q What I'm going to hand you, Senator, are Cave Plaintiff Exhibits 11 and 12, and then I've got some questions about the --

So, Senator, Exhibit 11 is what looks to be the bill that was

introduced in the Arkansas State Senate.

A Uh-huh.

Q And it shows on the very top "As Engrossed," but then there's two dates, but they're both in March 2015, did I --

A Uh-huh.

Q -- is that correct?

A That's correct.

Q Okay. And then Exhibit 12 is from the Arkansas statutes, and it is labeled the Ten Commandments Monument Display Act, Section 22-3-221. Do you see that?

A Yes. Yes, sir.

Q Okay. So you've been very kind in helping with my -- my Arkansas civics, which is a little bit different than New Mexico, so I have another question for you.

When I looked at the bill that was introduced and the -- and the statute as it is codified, they are not exactly the same.

A Uh-huh.

Q And the difference is Section 1 of the Bill titled "Legislative Findings" are not in the state statute, is that correct?

A Okay. That's -- that's typically -- they are not codified.

Q Okay. And this is what I want to find out, so --

A That's right. Typically they are not codified.

Q Let me -- let me --

A And that is for any bill.

Q I'm sorry. Is that a "yes"?
A Yes, sir. Yes.
Q Okay. Thank you.
So let me start with Section 22-3-221(b)(1). It's on the first page.
A Okay.
Q Do you see where that is?
A Yes.
Q Okay. Now this section of -- of the Act specifies the precise text that's supposed to appear on the face of the monument, is that right?
A Correct.
Q Okay. And according to the Act, this text is taken from a monument that was at issue in a United States Supreme Court case back in 2005 dealing with a monument that appears on the front of the state capitol in Austin, Texas, is that correct?
A Correct.
Q Okay. Now, as a -- as a minister, I know you're aware that there are different versions of the Ten Commandments that appear both in different denominations, different religious dominations, and actually different versions that appear in the Old Testament. Am I correct in my reading?
A I would say you're correct.
Q Okay. Did you consider using any of those other versions of the Ten Commandments other than the text that appeared in

Q -- correct?

A I think it's cited even probably in the decisions that upheld them, yes.

Q Okay. But in the Ten Commandments Monument Display Act, Section (b) (1) refers only to the text of the monument from Van Orden versus Perry. Is that also correct?

A Yes, that's correct.

Q Okay.

A As you stated, it only -- it did not list the findings, which are not codified.

Q I understand.

Now, the -- the Act, the Ten Commandments Monument Display Act, specifies that the word "Commandments" be used, correct?

A Where are you looking, sir, so that I'm tracking --

Q Under Section (b) (1) --

A Okay.

Q -- where you list the text, the very first text is titled "The Ten Commandments."

A That's correct.

Q Okay. So that was a requirement under the state law for the words that must be used on the face of the monument?

A We had to describe what was going to be on the monument, yes, sir.

Q Senator, why did you have to describe the words that were

MR. JACOBS: Big capital letters, "COMMANDED."

MR. SCHULTZ: Yeah. "YOU ARE COMMANDED."

THE WITNESS: Do you mind if I ask you a question?

MR. SCHULTZ: I'll try and answer, sir.

THE WITNESS: Because, you know, mentioned that there's errors in that, and there was an error even in the other subpoena with that.

When there are errors in these legal documents, what's the effect of that?

MR. SCHULTZ: A lot of it depends on what the error is, and that's --

THE WITNESS: Because we're being very technical, and I just want to make that point.

MR. SCHULTZ: And I appreciate that.

THE WITNESS: Okay. Thank you.

MR. SCHULTZ: (Continuing)

Q Going back to -- And we're going to continue working through Exhibit 12, which is a copy of the Ten Commondments (sic) -- Ten Commandments Monument Display Act.

A Okay.

Q Okay. Now the act is very --

A So you're back to 12?

Q Yes, sir.

A All right.

Q Yes, sir.

The act is very specific about the words of the Commandments that must appear on the face of the monument, correct?

A Again -- and now you're -- I'm assuming that there's not a mistake on your online version of this.

Q I understand. And again, I'm -- this isn't a gotcha question.

A This is -- this is not -- this is a replication of the statute.

Q Okay.

A So I can't tell you whether this is correct or not, sir.

Q Let me try and rephrase the question.

As you said, when -- when the bill was introduced and the act was codified --

A Uh-huh.

Q -- to require there to be a Ten Commandments monument --

A Sure.

Q -- one of the things that the bill and now the act states is what text --

A That's correct.

Q -- of the Ten Commandments --

A That's correct.

Q -- is to be -- appear, is that correct?

A Yes, sir.

Q All right. And the -- the legislation does not specify any

was it?

A No.

Q You are aware, Senator, that even after the -- the bill became law, the monument still had to be considered by the Capitol Arts and Grounds Commission?

A That's correct.

Q Okay. When --

And I know that you had some involvement with that process. You appeared at several of their hearings, not all of them, but several of them.

A I did not represent the history and heritage foundation in those hearings.

Q I understand.

A That was Travis Story.

Q But you were present at several of the hearings?

A Some, but not all.

Q Correct.

Was it your understanding, however, that when the commission considered the application for the monument, are you aware whether the commission could alter any of the text set out in the statute?

A The law -- Act 1231 speaks for itself, so they're going to -- obviously they were going to comply with the law, but they also have their process by which they make sure that a monument adheres to the intent of the legislation that is authorized to put

it up.
Q And in this context, both the intent and the specific wording of the statute is that this particular text of the Ten Commandments was to appear on the face of the monument?
A Yes. We've said that several times.
Q Okay.
A But again, I want to point out, so that we don't misinterpret, that it says that the monument shall contain that specific text, which means there could be other things if it were proposed on that monument if they approved it.
Q All right.
A But this is the specific text that must be there for it to comply.
Q Yeah. I think we've kind of beaten that horse to death --
A I think we have.
Q -- Senator, so I want to move on.
A Let's ride another one.
Q I want to move on.
A Okay, all right. Let's do.
Q So let me ask you to turn the page.
I now want to focus on Section (b)(2)(A), which is at the very top of the page. Do you see that?
A Okay.
Q And this section says, "The Secretary of State shall arrange for the monument to be designed, constructed, and placed on

Q Let me give you a copy of what's been marked as the Cave Plaintiff Exhibits 15.

A (Clearing throat) Excuse me.

Q So you've been handed a copy of the Cave Plaintiff Exhibit 15. These are additional pages that were produced during this case from the Secretary of State, and these are a list of people who appeared at a hearing of the commission on December 14, 2016.

And, Senator, if you'll turn to Page 23, the second page, you'll see that you are listed, your name appears.

A Where -- I'm sorry -- Page 23?

Q Yes. You are listed as the 36th speaker?

A Correct.

Q And you are listed as speaking for the proposal?

A Correct.

Q But you can see from this that a total of 42 people signed up to speak.

A Uh-huh.

Q And if you just eyeball it, Senator, you can see that a fair number of people wanted to speak for it and a fair number of people wanted to speak against it, is -- and when I say "it," I mean the monument. Is that a fair description?

A This is your document --

Q Okay.

A -- and their document, it's not mine, so I don't even know

if this is -- I don't know if this is complete or not.

Q Well, Senator, you were at the --

A Yeah.

Q -- December 14 --

A Yeah.

Q -- 2016 --

A There was a tremendous amount of people there for that as well that did not speak.

Q But there were also people who spoke against it?

A That's correct, yes, sir.

Q Yeah. Thank you.

And during the entire --

A I do recognize that one of them -- Is that your plaintiff Eugene Levy?

Q Not my Plaintiff, no, sir.

So, Senator, if you'll focus on me.

A Well, I'm just making sure I know which -- you told me to take a look at it.

Q Okay. I'm done with those questions.

A Okay.

Q You're aware during the entire process that there were citizens who wrote letters to the editor of various newspapers speaking out against having a Ten Commandments monument at the state capitol?

A Yes. And there were letters written for it.

Q Yes, there were. And you're aware that certain newspapers wrote editorials speaking out against having a Ten Commandments monument placed on the state capitol grounds?

A I'm sure.

Q Okay. In fact, in December 2016, you posted an online response to one editorial from the Arkansas Democrat Gazette. Do you recall doing that?

A That's correct, uh-huh.

Q Okay. I'm going to hand you what's been marked as Cave Plaintiff Exhibit 16. We are now back into my technologically-challenged area.

While your counsel is looking at the pages, I will represent to you that I went to the GoFundMe page for the Ten Commandments monument created by the American History and Heritage Foundation.

A Correct.

Q And what I printed out, Senator, was an update posted by Jason Rapert. The GoFundMe page doesn't give the date, it just says how many months ago. And I'll wait for your counsel to finish it.

A Uh-huh.

Q And on the second page of Exhibit 16 is that posting from you that starts off "Merry Christmas and Happy New Year," and this is the online post that you made that refers to comments from the Arkansas Democrat Gazette Editorial Board --

A Uh-huh.

Q -- is that correct?

A Yes.

Q Okay. Senator, you're also aware that before this lawsuit was filed, during both the legislative process and during the commission's consideration, there were groups that were threatening to file suit if the Ten Commandments monument was placed, correct?

A They're typically the same groups that have always threatened to strike down our pro-life bills as well in the state, yes.

Q But these were groups that were specifically talking about filing suit against the Ten Commandments monument?

A Yes. They're obviously again typically the same voices.

Q Understood. And obviously, as you've already made reference to this morning, you're aware that -- I think it was less than 24 hours after the first monument was erected, one individual put his pickup truck through it and destroyed the first monument, correct?

A Actually, he was driving a car.

Q Car. He took his vehicle and destroyed the first monument.

A That's correct.

Q There's no question about that, right?

A Yes. I'm told he set up a GoFundMe account to fix his car

before he ran over the monument.

Q And you're also aware that, even after that event, after the first monument had been destroyed, people were still opposed to placing a second monument on the state capitol grounds?

A A very small portion of people that reside in our state have been cooperating with mainly outside interests to war against the Ten Commandments monument on our state capitol grounds, some of which are in here today.

Q And obviously, this lawsuit was filed very soon after the second monument -- after the second monument -- excuse me -- was placed permanently --

A That's correct.

Q -- on the state capitol grounds?

A That's correct.

Q Okay.

A Uh-huh.

Q Okay. Senator -- and I really don't want you to get into any details, but you've brought this up a few times this morning and I just want to follow up -- we've talked about the opposition to the monument throughout this entire process.

From the comments you made earlier this morning, I gather that you and it sounds like your family have received personal threats arising from your sponsorship of this monument. Is that a fair description?

A Yes. And some people articulate when they are making

would other things, I'm sure.

Q Okay. Have you ever seen the results of this hotline?

A I don't recall that I've seen anything formal, no, sir.

Q Have you ever spoken with anyone in the Secretary of State's office about this hotline?

A I've asked. You know, I -- I can recall, I think, that we asked about them and see what you get, but nothing that's -- I don't have any official report or anything of that nature, other than saying, "Hey, have you gotten much response," and that's just something normal you would do at the time when they were having the hearings, but.

Q Do you have a recollection of how many people took the time to call in one way or the other?

A I actually don't.

Q Okay.

A I don't. I know that there's over -- when we announced the -- the second installation, the monument, we had over 800 people that had actually donated in one form or another to erection of the monument.

Q But still focusing on the hotline set up by the Secretary of State.

A Yeah. I don't know, sir, because I -- I don't have access to that. Other than hearing about it and discussing it, if somebody -- I -- I don't have any idea.

Q Okay. And has anybody ever told you what the final tally

was in terms of how many for or how many against?
A If I asked them, I can't recall what they would have said, sir, no.
Q Fair enough, that's fair enough.
I want to switch topics again, and I'm trying to give you as much of a roadmap as I can so you're -- you've got a mindset as to where I'm going as well, the kind of questions we're going to get into.
I want to talk to you now about fundraising --
A Okay.
Q -- for the Ten Commandments monument.
A Okay.
Q Just as a general matter -- let's start -- do you have a dollar figure for how much the first Ten Commandments monument cost?
A It's been so long I can't give you an exact. I have an accountant, you know.
Just as you mentioned earlier, if there are dona- -- you know, when we handle our mail, if there's something that came in by mail, that's handled, put in separate accounts for whatever entity that it's involved in, and I have accountants and CPAs that work with us to make sure that they handle everything and keep it straight, sir.
Q Okay. Do you have a rough idea? Was it more than 20,000, 10,000, rough idea?

A Again, I don't want to say something that boxes in -- I don't -- I would have to have them have that out there. And, of course, you've asked to depose me personally here today, so I didn't -- I don't have all the official things here to look at to reference for you, but obviously we've got invoices with the entities that we paid and things of that nature, so -- but --

And you have to understand, we had to immediately raise again for the second monument, so I'm a little bit -- now right here you can see that what's been recorded here is 86,711 that was raised, and, of course, when we raised funds for the monument, we said if there's anything additional raised, that it goes toward the mission and the -- of the entity, so that's long gone.

Q Okay.

A You're talking a couple of years now we're -- it was installed in 2018, so I can't tell you, sir, to an exact number on everything that has been paid for.

Q And is your answer the same if I would ask you how much did the second monument cost?

A Again, you'd -- we'd have to go pull that up because that is -- once all the bills were sent in and once all the bills were paid, that's my -- what my role was, make sure you get them paid and take care of the things that are needed to be done.

Q Right.

A I can't recall exactly how much it is, but that could be

tallied up.

Q Sure.

A Yeah.

Q But just in terms of you sitting here today under oath, you just don't -- don't recall.

A I can't recall --

Q That's fine.

A -- exact -- exactly the amount because, again, I don't have any references to look at with me.

Q That's fine.

A Yeah.

Q Senator, I -- I lied just a little. I do have one more question, but it ties into fundraising, and that question has to do --

A Did you just admit to lying?

Q Yes, sir, just a little.

A You didn't lie. Maybe you just forgot.

Q Well --

A No. Did you lie?

Q I hope not, I hope not. But let me ask you to go back to Exhibit 12. I know I told you we were done with that, Senator.

A Okay.

Q So if you'd go back and look at Exhibit 12 --

A Yeah.

Q -- Section 22-3-21 (sic) -- this is the act.

A Yep.

Q And I have a question about one section, but it ties into fundraising, which is why I waited.

A Yeah.

Q If you'll turn to the second page --

A Uh-huh.

Q -- it's (b)(2)(A) -- it's near the top -- "The Secretary of State shall arrange for the monument to be designed, constructed, and placed on the State Capitol grounds by private entities at no expense to the State of Arkansas."

A That's correct.

Q That's what the -- that's what the law requires?

A That's right.

Q Okay. And if I understand correctly, the -- the primary private entity that assumed financial responsibility for raising the money was the American History and Heritage Foundation?

A That's correct.

Q Okay.

A Created after the fact.

Q And, Senator, this is getting kind of scary. You keep saying things and it's exactly where I'm going next in my notes, so.

A Sometimes I have a little extra help.

Q So let me turn and talk to you about -- about timing, because I do -- I -- just a real short chronology because I want

to make sure I've got my dates straight.

So I think we already established that in April 2015, Governor Hutchinson signed the Ten Commandments bill into law.

A Okay.

Q Is that correct?

A Approximately, yes.

Q Yes. And I'm -- I'm not pinning you down to the day.

A Yeah, right.

Q But it was April of 2015 --

A Yes, sir.

Q -- after it passed both houses of the General Assembly. And then we already looked at that in October 2015, that's when the American History and Heritage Foundation filed its paperwork with the Secretary of State --

A Uh-huh.

Q -- is that right?

A Uh-huh.

Q Is -- is that it a "yes"?

A Yes, sir, yes, sir.

Q Thank you.

A With this video going, I sometimes forget I need to make that audible for you. Sorry.

Q I understand. And if I'll ask you to take a quick look at Exhibit 16, which was from that GoFundMe page I just showed

monuments? Do you -- do you know?

A Well, again, even while we were raising the second monument, we did not know the full cost of that until you get the final bills. They were -- there's security bollards that are going in, so -- and we got -- so we got some surprise billing that I -- I didn't expect along the way, which happens in any project, which there was something extra you didn't know about. So I don't know exactly on where the -- when you say the total raised, you know, we raise, in a calen- -- you know, we're raising all the time, and there are people that come on and donate that was even past the original project.

And what we did is, when we saw that was happening, we put a -- if you'll -- you may not have printed that off for introduction into the record, but there is a -- should be a clause there that was stated in an update that be advised, anything raised above and beyond the cost of the monuments will be utilized for other projects for the history and heritage foundation.

Q And I understand that.

A Right.

Q But what I'm trying to figure out is on exactly that point.

Do you know how much was raised for the monuments as compared to for other projects?

A Well, from what you have in your exhibit, Number 16, $86,711 was donated. The monuments did not cost that much.

Q Okay.

A Therefore, it was the clause to state that anything raised above and beyond is just going to go for our projects --

Q All right --

A -- which I'd be glad to talk to you about some of those other projects so that you know what it means to educate people on history and heritage.

Q Well, I only have a limited amount of time, Senator. But let me just go back to something you just said.

A Uh-huh.

Q So you know the monuments cost less than 86,711?

A Yes, of course, because we raised more than what the -- ended up being the total cost, yeah.

Q And I'm sure as a member of the board of the American History and Heritage Foundation, you take your fiduciary duty to the organization very seriously?

A Correct, but I'm not the accountant.

Q I understand. Do you know how much of the total amount raised for the Ten Commandments monuments came from private individuals, either --

A You would have to go look at that.

Again, you know, you're -- you're skating very close into foundation business, but I can tell you even -- actually, every person primarily on this GoFundMe, you can go through here and look, and you even took a snapshot which will show you

A Right.

Q -- has a seal on the front --

A Uh-huh.

Q -- and my understanding is that's the seal of the State of Arkansas.

A That is a podium that is used by public, private, anybody that chooses. If they need a podium, it's -- that's the podium. There's no significance of the seal being on it or not.

Q Other than to show it's state property, right?

A That's right, yeah.

Q Okay. So someone doesn't walk off with it.

All right. Let me turn, and I want to talk about the ceremonies for the dedication of both the first Ten Commandments monument and then the second Ten Commandments monument.

So my understanding, when the first Ten Commandments monument was finally installed, it was June 27, 2017, is that correct?

A Should be the date, yes.

Q Okay.

A In fact, June 28, 2017. And there was no first ceremony. There was no ceremony at all.

Q Senator, you have to stop doing this. That's just what I wanted to get to.

My understanding was this was a pretty low -- low-key

affair.

A It was just --

Q It was just you --

A -- installed.

Q -- correct?

A It was installed.

Q Right. And --

A And I -- I -- I drove up to see it.

Q And I think you might have been interviewed by someone from the press?

A There was -- there was media roaming around, different ones that, you know, when they realized it was being installed, come by to take a picture or to do whatever. So there was people roaming about in and out.

And, unfortunately, it was destroyed less than 24 hours later.

Q Right. But, Senator, you did one other thing besides just drive up.

I've handed your lawyer what's been marked as Exhibit 22.

A Uh-huh.

Q So Exhibit 22, Senator, is a still shot taken from YouTube, and the caption is "Arkansas State Senator Jason Rapert thanks Pastor of" -- and is it "Agape Church for Christian Activism"? Did I read that correctly?

A You read it correctly, but we did not post this. Neither

A Yes, uh-huh.
Q Okay. And would you have any -- have you ever seen the YouTube posting?
A I don't know if I have ever fully seen this, to be honest with you, but I see -- because it's state -- you can see -- I know we didn't do it -- it shows who did it.
Q So let's turn now and go to April 26, 2018 for the -- the dedication ceremony for the second Ten Commandments monument, all right?
A Right, uh-huh.
Q Now this time around, you did have a dedication ceremony, correct?
A We did.
Q All right.
A The people of Arkansas had made it well-known they were very upset with the fact that, through all of the cries to tear down the monument by all of these groups like the Satanic Temple, that they were very upset, and it was good and proper, because you understand the foundation gifted the monument.
Q And I --
A The monument was now the property of the State of Arkansas, and it was torn down through a violent criminal act, and the only reason he was not held accountable is he was deemed mentally unfit to do so.
Q Well, I want to talk about the second -- the ceremony for

the second monument.

So who was responsible for planning that ceremony?

A Planning that ceremony?

Q Correct.

A That would be me --

Q Okay.

A -- and us.

Q And when you -- Who's "us"?

A The foundation.

Q The American History and Heritage Foundation?

A Yes, sir, yes, sir.

Q Okay. And --

A There was never at any time any Secretary of State or state employees that planned anything that we did.

Q Okay. So if you planned the ceremony, you were also responsible for the content of what was said at the ceremony?

A I actually brought exactly what I said today. You want me to read it?

Q No, sir, you don't. But if you did, I'd like to attach it as an exhibit to this deposition.

A I'd be more than happy for you to do that. That's why I brought it for you.

Q Well, that's great. Let's --

A It's got everything and even the reason why we donated it, and the sole reason is to honor --

MR. SCHULTZ: And it will go with your deposition.

THE WITNESS: Yes, sir.

MR. SCHULTZ: All right.

THE WITNESS: This is historical to me.

MR. SCHULTZ: Understood, understood.

MR. SCHULTZ: (Continuing)

Q All right. So who was responsible for selecting who was going to stand at the front with you during the ceremony?

A People just -- That was random. People stood around, sir. We even had people that were opposed, the Satanic Temple, Mr. Misicko, you know, he tried his best to get in every camera shot he could that day.

Q Well, we're going to get to that in just a second.

Did anyone from the Secretary of State's office ever ask you who would be present at the ceremony?

A That I don't recall.

Q Okay.

A And you're -- you're asking questions that -- I'm going to answer your question as best I can, but, you know, I really don't see the relevance other than the fact people randomly came. There were all sorts of people in and out that day, sir, that --

Q Okay. Let me be very specific. I'm not talking about who was standing in the back.

I want to know, did anyone from the Secretary of State's office specifically ask you who will be standing with you at the

A Uh-huh.

Q There -- there is a quotation that I marked in red --

A Uh-huh.

Q -- and it's attributed to you, and the quotation reads --

A Uh-huh.

Q -- "I am well known that I stand up for God and country and that I take a stand for Judeo-Christian values in our country."

And my question, Senator, is whether they -- that's an accurate quotation?

A The full quote said: "My opponent is an actual member of atheist groups and has worn that on her sleeve for many years." That's the end of that full quote, and, yes.

Q Okay. So what -- The portion I read where you're describing yourself, not your opponent, but the portion describing yourself --

A Uh-huh.

Q -- "I am well-known that I stand up for God and country and that I take a stand for Judeo-Christian values in our country," that's an accurate quotation?

A Just like George Washington and John Adams, yes, sir, that's an accurate statement.

Q Good. Now --

A I was an ordained minister before I ever got into politics, and that was known when people elected me to office.

senatorjasonrapert@jasonrapert, correct?

A Correct.

Q And the date on this is February 20, 2015. It's on the bottom.

A If it can be authenticated, I don't have a problem with that.

Q Okay. But the statement, "To deny America was founded upon Judeo-Christian values is willful ignorance," is --

A Yes.

Q Is that the statement?

A Yes.

Q So that appeared on your Facebook account?

A No. That's actually Twitter.

Q Okay, Twitter. You'll teach me.

So it's on your Twitter account?

A Yes, sir.

Q All right. And that --

A And I do believe that's true.

As you say, I make postings that do not necessarily have to deal with one thing or the other on any occasion.

Q I'm going to hand you what's been marked as Exhibit 29, which is another posting from a Twitter account in March 2015, this showing a portion of a speech given by former United States Senator Robert Byrd, and the reference is, " The late Senator Robert Byrd wasn't afraid to honor the Judeo-Christian

heritage of our nation."

A Correct.

Q And this was something that you tweeted?

A Yes. That was a tweet with a picture caption of his speech, which is a fantastic quote, by the way. It mentions the Ten Commandments of the U.S. Supreme Court.

Q And speaking of Supreme Court, here is Cave Plaintiff Exhibit 30, and there are several quotations.

A Uh-huh.

Q Again, I wish I could explain how things pop up on Twitter, but.

A Yeah. You would have to expand them to have been able to see them better.

Q Yeah. But there are three quotations here starting in April 2015 in senator.jasonrapert@jasonrapert. "No matter what liberal revisionists may claim, they cannot ever erase America's Judeo-Christian heritage. We will never let it happen."

A Correct.

Q And similarly, several months later on March 26, 2016, the same Twitter account, "No matter what liberal revisionists may say or argue or post on social media, our nation was founded upon Judeo-Christian principles."

A Where are you at now?

Q I -- Sorry, sir. One from the bottom. I'm just working my way up.

A Okay. Yes.

Q Did I read that correctly?

A I think so.

Q Okay. And lastly, on -- at the top, on July 4, 2016 --

A Uh-huh.

Q -- this is you saying "Yes, #America was founded upon Judeo-Christian values. History solidifies this fact."

A Uh-huh.

Q Again, Senator, I have no social media presence whatsoever --

A Uh-huh.

Q -- but is it a -- a fair statement that he would not post something on your Twitter account or you would not tweet something that you didn't believe in?

A Now sometimes I retweet things just for the purposes of information and I don't necessarily believe in that, sir.

Q And I understand that, but I wasn't asking about retweeting. I was talking about something that you typed in with your name that you don't attribute to anyone else.

A Generally, you better believe, yes, yeah, if I'm -- if I -- I stand behind what I say or what I write, but I definitely won't testify that I'm infallible. I don't think any of us would.

Q And Exhibit 31 I'll ask you about as soon as your lawyer is finished.

This was another tweet with a large picture of Abraham

Lincoln's National Day of Thanksgiving Proclamation, but the words that you wrote in June 2017, "Thank God we have a clear record of our Judeo-Christian history. May the ACLU FFRF" -- which I'm assuming is the Freedom From Religion Foundation, is that correct?

A That's correct

Q -- "NEVER wipe it away."

Did I read that correctly?

A That's correct.

Q Okay. And this was a tweet -- this wasn't you retweeting, this was you tweeting?

A Yes, sir, uh-huh.

Q Okay. Senator, are you familiar with a document called the Declaration of Dependence Upon God and His Holy Bible"?

A Let me look at it.

And just for clarification, since we're -- we're getting later in the day, and is the Free --

Who represents the Freedom From Religion Foundation here today? Yeah, yeah, yeah.

The man that was just convicted for twice -- or actually for filing a false police report against me and was twice convicted said in a recorded interview at the Conway Police Department as he was making his false statement that he was working with the Freedom From Religion Foundation attorneys January of 2018. I want that stated for this record.

attributed to you is correct.

A You might want to put that in. It's got some good stuff in there.

Q It does, but I'd like to know if it's correct first.

A All right. We'll look.

(Off-record discussion between Mr. Schultz and Mr. Byrd)

Q Senator, you have the article in front of you now, and I believe it's on the third page I high- -- I put it in red, the paragraph. And as I read this, this is a quotation attributed to you. They were asking questions, and you responded.

This was the quotation: "When our state took a stand for the Ten Commandments in 2015, when we passed the strongest abortion prohibition in the country at the time in 2013, when our Secretary of State allowed me to have the Washington Cruiser(s) Flag hoisted and formally flown on Washington's Birthday in 2015, when we passed strong pro-Israel legislation in 2017, and every other time our state takes a stand for something that honors God and the Bible, it definitely sends a signal to everyone in the spiritual realm that Arkansas seeks to honor God and invites his blessing."

Did I read -- First of all, did I read the quotation correctly?

A That's my opinion, which is definitely separate from an act of law.

Q Sir, my only question is is this an accurate quotation?

A It's an accurate quotation and my opinion, which is separate from an act of law.

Q And I'm not disputing that.

All right. Let's -- If I can have you go back to Exhibit Nine --

A Do you know what the Washington Cruiser Flag is? It's the first flight that Washington ever fought under.

Q Yes, sir, I do.

A Go back to where?

Q Exhibit Nine.

A Well, you're really backtracking now.

Q Well, just want to make sure I'm keeping you on your toes, Senator.

A Well, I say were staying with each other, don't you?

Q Yes, sir.

A We might make a good team someday.

All right.

Q Are you back to Exhibit Nine?

Now Exhibit Nine, this is the email that you sent in November 2018 to every state legislator in the country --

A Uh-huh.

Q -- announcing the formation of the National Association of Christian Lawmakers, is that correct?

A Yeah. How did you get this?

Q From a state legislator.

A Uh-huh.

Q -- and I've -- I've gone by it and I have seen it and I have read it -- if you and I were standing there in front of it and the First Commandment that is listed under the Ten Commandments says, "I am the Lord thy God" --

A Uh-huh.

Q -- is that the God of the Old Testament? Is that Adonai and Yahweh?

A The Ten Commandments were given by Moses, who was cited even by Justice Rehnquist and stated that he was a religious person but also a lawgiver. And so formally, this is the Mosaic code, which is Jewish, Hebrew, could be stated many different ways, and it is as much a Jewish symbol as it is anything, but it is God. There is only, according to my faith and to the Jewish faith, there is only one God, and He's the God of the universe that created all things, and He's been honored in many different ways in our country from the very beginning of the nation from the colonial times.

If I'm not mistaken, every single colony that became the United States of America incorporated the Decalogue into their actual law, their colonial charters.

Q And I --

A Rhode -- Rhode Island incorporated a portion.

Q And I understand that, but that wasn't my question.

A Well, I wanted to give you a little information for context.

Q Well, and I appreciate that, but going back to that First Commandment, "I am the Lord thy God" --

A Uh-huh.

Q -- that is the God of the Old Testament who appeared to Moses and, as Exodus has it, provided him with the tablets. That is the voice. "I am the Lord thy God" was the God who appeared and spoke to Moses.

A Of course. If you are a religious person that believes in that faith, that's what you believe. Your question is presupposing that you are a person of faith that believes that.

There are some people even in this room that have no belief whatsoever in God, so they would not answer to you that that is the God of.

So again, I'm trying to be very specific with you and -- in what you're saying.

Q And I understand. But I'm talking about the words that you required to -- that the statue requires, the statue that you'll sponsor for the words to appear on the state capitol, I'm just trying to understand, "I am the Lord thy God" is the God from the Old Testament, and you put that in the legislative findings. You reference Exodus and Deuteronomy.

A Uh-huh.

Q That is -- that is the Lord that we are speaking about where the Ten Commandments originated, am I correct?

A I'll speak for myself.

Though a symbol may have religious and other meanings to other people, we utilized this and gave it to the State of Arkansas solely because the Ten Commandments are an important component of the foundation of the laws and legal system of the United States of America. The Ten commandments appears on the inside and on the outside of the United States Supreme Court. Moses is above the head of the Chief Justice of the United States Supreme Court --

Q And --

A -- and Moses is depicted on the outside in a frieze with the tablets, the Ten Commandments, at the United States Supreme Court.

Q And actually, Senator, I don't think you want to get into a debate with me about what's at the Supreme Court, because I work there. And actually, Moses does not appear on the frieze over the Chief Justice. It is a symbol of --

A Excuse me. You didn't -- you didn't listen closely.

Q No. But -- but --

A The -- the head of Moses --

Q Senator, I want to wrap up, because this is -- this is not --

A That's -- that's fine, and you know what, I'm going to clear it up for you.

Above the head of the Chief Justice appears Moses on the frieze -- it's called the South frieze -- is Moses with the Ten Commandments, sir.

been throwing in front of him on different exhibits.

MR. SCHULTZ: Well, I'll be very clear about my question.

MR. SCHULTZ: (Continuing)

Q The question you've told me about what you believe about -- when I said the statement "I am the Lord thy God," your view that it is the creator, that is Jason Rapert's view, it is not Senator Rapert's view, because Senator Rapert cannot talk about what he intended when he wrote the bill, is that correct?

MR. BYRD: I'm going to --

Okay. I'm going to go -- object to the form. You asked him many, many exhibits ago the things that he believed. And then you went to --

MR. SCHULTZ: And they were all on his personal email account or Twitter.

MR. BYRD: Exactly.

MR. SCHULTZ: So --

MR. BYRD: And now you have moved to the statue, the statue itself, the code.

MR. SCHULTZ: All I'm -- all I'm trying to do is clarify or be consistent that what we're talking about is Jason Rapert's personal views, not Senator Rapert.

MR. BYRD: Okay. But you've already said and he has said that the legislative findings state the source of that language, but now you have kind of flipped and twisted the

A That's correct.

Q And --

A Uh-huh.

Q -- did the AHHF do anything, have any function whatsoever, before commissioning this monument?

A No.

Q Okay.

A But we've had several projects done since --

Q Okay.

A -- and during.

Q Okay. I'm not interested in the projects since or during, I'm interested in this particular project. Can you get me those records?

MR. BYRD: I'm going to object to the vagueness of that statement, those records.

MR. SCHULZE: (Continuing)

Q The records that have to do with the A-H-H- -- I mean with the monument, the Ten Commandments monument on the state capitol grounds, such as did -- did -- did they -- did someone send you a proposal about here's how we can manufacture a -- a monument that looks like the one you want. Is there something like that?

A The history and heritage foundation is not on trial, and we're not a party to this suit.

Q The -- That objection is for your lawyer who didn't make

the video of that.

Q Okay.

A Okay.

Q Let's get to the case.

You were the lead sponsor of -- let me get it right -- Act 1231, right, of 2015?

A Yes, sir.

Q And that Act, as we discussed earlier, provided the specific language that was to appear on the monument?

A Correct.

Q Now, I'm going to ask you a question your lawyer is going to object to, and we're just going to have to go to the Judge about it, but I'm going to ask you, where did you get the language for that bill? Did you write it yourself, or did you get it from some -- some -- somebody that provided you with a copy of a bill that they'd like for you to introduce?

MR. JACOBS: Object on legislative privilege grounds. Instruct witness not to answer.

MR. SCHULZE: Okay.

MR. SCHULZE: (Continuing)

Q You'd agree with me, I guess, at least that the Ten Commandments are religious in nature?

A I think Justice Rehnquist even made reference to that in the 2005 case, yes.

Q Well, I've never gotten the chance to depose Justice

Rehnquist, but I've got you. Would you agree with me that the Ten Commandments are religious in nature?

A I agree with what Justice Rehnquist said, that Moses was both a spiritual leader and a lawgiver.

Q But they are sacred text in the Jewish and Christian faith?

A Yes, sir.

Q And --

A And to Jews and Christians, they would be sacred.

Q And you're aware that different traditions enumerate the Ten Commandments in different ways? And the enumeration in the bill is non-traditional to say the least, isn't it?

A Again, I testified earlier that the design, which has been put in an exhibit --

Q Uh-huh.

A -- is an exact replica of not only the 2005 monument at play, the Texas monument, but it is the same as a monument that I've personally seen in Phoenix, Arizona, in Denver, Colorado, I've seen pictures of from Jefferson City, Missouri, and I think there's maybe 180-plus monuments that have virtually the same design.

Q I'm showing the witness a book called *In Search of God and the Ten Commandments* by Sue A. Hoffman and ask are you familiar with this book?

A I've seen a copy of the -- I've seen that picture, which may have been used in different things, but I have not -- I don't

Q Okay.

MR. SCHULZE: I'd like to go ahead and make that an exhibit simply for purposes that we will all know what we're talking about. That would be -- what is it -- Number Two?

THE WITNESS: Orsi Two.

MR. SCHULZE: Orsi Two.

MR. SCHULZE: (Continuing)

Q Now I'm going to provide your counsel with Orsi Three.

A This ought to be interesting.

Q Do you know the -- the people from Secure Arkansas?

A Yes. They're the ones that declared that the legislature was trying to kill our children by having fluoridation in our water.

Q Okay. Did they -- Were you aware that they also objected to your monument, not because of the Ten Commandments, but because of the symbolism?

A I would tell you on the record that I would not agree with a great deal of what that particular group says when they wear gas masks in to say that we are trying to kill young children in Arkansas because they've got fluoride in their water to keep them from having cavities.

So I haven't seen or read all of this, but I can tell you you know my opinion from just what I've stated, sir.

MR. BYRD: I'll just make a note of it.

THE WITNESS: Which, by the way, I was an advocate to do what was recommended by the dental society.

MR. SCHULZE: (Continuing)

Q And I assume that was to go ahead and fluoridate the water?

A You bet, when I've seen kids' teeth falling out, seen families that suffer from that, and seen what the effects are of not having good healthcare when I've been on the mission field. I think it's a wonderful thing for medicine to be able to help people.

Q Well, you and I agree on something.

A Now what in this massive thing do you want me to look at?

Q What I -- what I wanted you to look at was just the fact that they objected to the symbolism, and then I want to ask you --

A What do they object to?

Q They object to the star -- the star -- what I call the Star of David.

A Where is that at that they do this? I don't know. I mean --

Q Here on Page, it looks like --

A Oh, Lord have mercy.

Q -- the page with the --

I'll tell you what. Let's just start with what they've got

did I make the Secure Arkansas anti-fluoridation documents an exhibit, Court Reporter?

COURT REPORTER: Was that Exhibit Three, sir?

MR. SCHULZE: Exhibit Three, yes.

MR. JACOBS: Orsi Three.

COURT REPORTER: You -- you did not introduce it --

MR. SCHULZE: Okay. I'd like to introduce that as Exhibit Three.

MR. BYRD: I'm assuming you've authenticated it in some other --

MR. SCHULZE: Yeah. As a matter of fact, it -- it was in the deposition of Ms. Moody.

MR. BYRD: I wasn't part of that.

MR. SCHULZE: That's right.

MR. SCHULZE: (Continuing)

Q Now, what is a Star of Remphan, do you have any idea?

A Where are you referring to?

Q That's what I'm getting ready to show you. And I don't know if we need to put these in the record or not, but do you recognize these --

MR. BYRD: Let me look at it.

MR. SCHULZE: Okay.

MR. BYRD: Just a second.

MR. SCHULZE: I'll go ahead and pass -- pass these

around, but I need one set.

THE WITNESS: What are you looking at, sir?

MR. SCHULZE: (Continuing)

Q I'm looking at the line from Tashia Summers right under the "Everybody Gets a Statue!"

"**Tashia Summers** Please explain why there are 2 stars of Remphan and the all seeing eye on a Ten Commandments monument?????"

I --

A Sir, you're talking about people posting things that -- that has nothing to do -- I don't know what they're --

Q You don't know what they're talking about?

A Well, now, we can make an assumption to what they're talking about, because are you talking about the Star of David?

Q I don't -- you --

Well, the answer to that question is in this response from the American History and Heritage Foundation, which I would like to make an exhibit.

Who --

MR. BYRD: You're not going to make a --

MR. SCHULZE: (Continuing)

Q -- who handles --

MR. BYRD: You're not making an exhibit of that?

MR. SCHULZE: Oh, I -- I suppose I ought to.

THE WITNESS: And you've got different ones here,

sir.

MR. SCHULZE: Yeah. There should be four pages, all of which has the same lady making the same complaint.

THE WITNESS: This is a very odd way of doing legal work. I mean, there's people posting. You don't even know if they're real people.

MR. SCHULZE: (Continuing)

Q Well, what's important to me is your -- is somebody's response.

Now who -- who manages --

A Where -- where -- where are you talking a response? You --

Q I'm getting ready to show it to you, but --

A Okay, yeah.

Q -- first I want to make sure, who manages the American History and Heritage Foundation Facebook page?

A I do mostly now.

Q Okay.

A You know, there are times when I have a lot of things going on where I'll have a volunteer that has done stuff in the past, but I mostly do now because I'm not nearly as busy with some of the other things I had on my plate.

Q Okay. If you would, Senator, I'm going to ask you to stick the sticker on the top.

All right. Thank you.

only thing that would seem to be what she's trying to describe -- because I think the two Stars of David -- but I don't even address and acknowledge what she's talking about. She's just throwing that out.

Q No. So were you -- you, of course, were aware of the all seeing eye of God before --

A Right, right.

Q -- you know, we ever --

You -- are you -- Were you familiar with the Chi Rho symbol?

A Not as familiar, but I've come to learn of it, because obviously we stayed with the monument that was ruled upon as constitutional by the United States Supreme Court and, of course, some of that symbolism on there, I mean, that's -- we didn't personally decide all those things. We used the design that was on the monument that had -- Justice Rehnquist and others had said was perfectly fine.

Q Okay. I think we've already talked about that you formed the American History and Heritage Foundation with Mr. Story, Doctor Conley, and Mr. Quattlebaum in 2015, right?

A Right. And actually, the minutes that we gave to you --

Q Uh-huh.

A -- left off Kim Hammer, but actually he was there from the beginning. He just left his name off of that minute.

Q All right. I'm glad to ask that, then.

A That's right.
Q And the AHHF did engage in the fundraising. We've talked about that.
A Yes, sir.
Q And we've talked about how they didn't -- really didn't have any activity before the --
A It was a brand-new entity, so that was the first activity.
Q Okay. You've mentioned the GoFundMe page is basically how you raised funds?
A That was the primary source, yes.
Q Were there any funds raised outside of that, in other words, that wouldn't show up on the GoFundMe page?
A What we tried to do is, if it came in, so that we could keep up and -- and divulge to people for transparency that there are off-line donations, we tried to add those right along. Is there one that got missed? I don't know, but --
Q Could be.
A -- but the -- the arbiter obviously of that is our records.
Q Now, a lot of people who contributed also made comments.
A And I can't be responsible for what everybody's comments are.
Q However, would you agree with me that a lot of those comments were religious in nature?
A Gerry, there are tens of thousands if not hundreds of thousands of comments made by people all over, sir. I've even

seen people -- One of the exhibits that was given earlier made -- stated they wanted something from the American Legion.
Q Wrong place.
A You know, we're not the American Legion. They just -- They made a statement that was not even relevant --
Q Uh-huh.
A -- and put that on there.
So, Gerry, there's comments that I've never even seen --
Q Okay.
A -- so, I mean, I have no idea.
Q All right. You wrote a guest editorial for the Arkansas Democrat Gazette which they published, I would say, at least part of, and there was a link to the rest of it, but you did pub- -- publish -- let me see if I can find it here.
A If it's what I think, they called the Ten Commandments "capitol clutter," which I thought --
Q I believe that's right.
A -- was so offensive.
Q Okay. And --
A I couldn't really believe that they had actually said that. It may be why they no longer have a real circulation anymore and it's just available online.
Q You think that was it?
A I have no idea.
Q What number is that last exhibit?

A You said this is Five.

Q Then this one is Six. I'm going to go ahead and make this guest column --

A I -- I can tell you that people wrote in and said to cancel their subscriptions when they did that, so that is true.

Q Okay.

A You probably could find that information, and I should have thought about that before they were so mean to the Ten Commandments.

Q Okay. You said second -- or third paragraph, "I am guilty as charged for supporting the Ten Commandments and write today to take" --

A Wait a minute. Whoa, whoa. Where are you at?

Q Oh, right -- right here.

A Third paragraph first page?

Q First page, about the middle of the paragraph.

"I am guilty as charged for supporting the Ten Commandments and write today to take full responsibility for being so bold as to believe that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mount Sinai." That's -- that's your quote?

A Writing in my personal capacity --

Q Yes.

A -- under the First Amendment of the United States

what you're trying to change.

Q Okay.

A (Coughing) Excuse me.

Q You have taken the position throughout this deposition and indeed basically throughout this entire controversy that this Ten Commandment monument is not a religious monument, but is a monument to law, is that right?

A Being -- Obviously, you're getting close to, I think, an area -- but Act 1231 speaks for itself, and it states the reasoning why. And in my -- my comments, which you alluded to --

Q Uh-huh.

A -- which by the way, I -- I stated when I made those comments I appear on behalf of the American History and Heritage Foundation to dedicate this monument to the people of Arkansas. And in that we state, and I've stated in writing many times, the sole reason we donated the monument to the State of Arkansas is because the Ten Commandments are an important component to the foundation of the laws and legal system of the United States of America and the State of Arkansas.

And my full quote is: "Passive acknowledgments of the role played by the Ten Commandments in our nation's heritage are common throughout America, and the Supreme Court ruled in 2004 that such monuments are constitutional."

And to be technical, Van Orden started in '04 --

Q Yeah.

CAVE PLAINTIFFS EXHIBIT NUMBER ELEVEN

Draft of Senate Bill 939 - 3/5/15

(Three Pages)

Stricken language would be deleted from and underlined language would be added to present law.
Act 1231 of the Regular Session

State of Arkansas *As Engrossed: S3/16/15 S3/25/15*
90th General Assembly
Regular Session, 2015

# A Bill

SENATE BILL 939

By: Senators Rapert, *Bledsoe, Caldwell, A. Clark, Collins-Smith, J. Cooper, J. English, Flippo, J. Hendren, Hester, B. Johnson, U. Lindsey, Rice, D. Sanders, G. Stubblefield, E. Williams*
*By: Representatives Hammer, Beck, Brown, Copeland, Cozart, Davis, Della Rosa, L. Fite, Gates, M. Gray, House, Ladyman, Lemons, McNair, D. Meeks, Miller, Ratliff, Petty, Richmond, Rushing, Sorvillo, Speaks, Sullivan, Tosh, Vaught, Wardlaw*

## For An Act To Be Entitled

AN ACT CONCERNING THE PLACEMENT OF A TEN COMMANDMENTS MONUMENT DISPLAY ON THE STATE CAPITOL GROUNDS; AND FOR OTHER PURPOSES.

## Subtitle

THE TEN COMMANDMENTS MONUMENT DISPLAY ACT.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

*SECTION 1. LEGISLATIVE FINDINGS.* *The General Assembly finds that:*

*(1) The Ten Commandments, found in the Bible at Exodus 20:1-17 and Deuteronomy 5:6-21, are an important component of the moral foundation of the laws and legal system of the United States of America and of the State of Arkansas;*

*(2) The courts of the United States of America and of various states frequently cite the Ten Commandments in published decisions;*

*(3) The Ten Commandments represent a philosophy of government held by many of the founders of this nation and by many Arkansans and other Americans today, that God has ordained civil government and has delegated limited authority to civil government, that God has limited the authority of civil government, and that God has endowed people with certain unalienable rights, including life, liberty, and the pursuit of happiness;*

03-05-2015 10:22:17 MBM110

EXHIBIT
tabbies
11



*(4) In order that they may understand and appreciate the basic principles of the American system of government, the people of the United States of America and of the State of Arkansas need to identify the Ten Commandments, one of many sources, as influencing the development of what has become modern law; and*

*(5) The placing of a monument to the Ten Commandments on the grounds of the Arkansas State Capitol would help the people of the United States and of the State of Arkansas to know the Ten Commandments as the moral foundation of the law.*

*SECTION 2.* *Arkansas Code Title 22, Chapter 3, Subchapter 2 is amended* to add an additional section to read as follows:

22-3-221. Ten Commandments Monument Display Act.

(a) This section shall be known and may be cited as the "Ten Commandments Monument Display Act".

(b)(1) The Secretary of State *shall* permit and arrange for the placement on the State Capitol grounds of a suitable monument commemorating the Ten Commandments and containing the following text, which was displayed on the monument declared constitutional in Van Orden v. Perry, 545 U.S. 677 (2005):

"The Ten Commandments
I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

(2)(A) The Secretary of State shall arrange for the monument to

be designed, constructed, and placed on the State Capitol grounds by private entities at no expense to the State of Arkansas.

(B) The monument shall be placed on the State Capitol grounds where there are other monuments.

(3) The Secretary of State *shall:*

*(A) Approve the design and site selection for the monument under this subsection; and*

(B) Arrange a suitable time for its placement.

*(4)(A) Before approving the design and site selection for the monument under this subsection, the Secretary of State shall consult the Capitol Arts and Grounds Commission and obtain the commission's views on design and site selection.*

*(B) The monument under this subsection shall be exempt from §§ 22-3-301 et seq. and 22-3-501 et seq.*

*(c)* In the event that the legality or constitutionality of the monument under *subsection (b)* of this section is challenged in a court of law, the Attorney General may:

(1) Prepare and present a legal defense of the monument; or

(2)(A) Request that Liberty Legal Institute prepare and present a legal defense of the monument.

(B) A request that Liberty Legal Institute prepare and present a legal defense of the monument shall not be subject to § 25-16-702.

*(d)* The placement of the monument under this section shall not be construed to mean that the State of Arkansas favors any particular religion or denomination over others.

/s/Rapert

*APPROVED: 04/07/2015*

280

CAVE PLAINTIFFS EXHIBIT NUMBER FIFTEEN

List of Appearances at Arts and Grounds

Commission Hearing - 12/14/16

(Three Pages)

**HENDRIX REPORTING SERVICE**
**1701 SOUTH ARCH**
**LITTLE ROCK, ARKANSAS 72206**
**(501) 372-2748**

**Andrew Drummond**

**From:** Alexis Reaves
**Sent:** Friday, December 1, 2017 9:19 AM
**:** Andrew Drummond

Arts and Grounds Commission Public Hearing
December 14, 2016
11:00 a.m.

Present
Kelly Vanhook
Melonaie Gullick
Tony Leraris

SECRETARY OF STATE STAFF
Chief Deputy Kelly Boyd
Keith Diemer- Capitol Facilities Director
Alexis Reaves-Project Coordinator

KB Called to order at 11:01 am.

Proposal of the 10 commandments.
14 AGAINST PROPOSAL
17 FOR AGAINST

~~3 MINUTE TIME LIMIT FOR SPEAKING FOR AND AGAINST THE~~ PROPOSAL.

1ST PERSON AGAINST PROPOSAL BRUCE HILL
2ND FOR PROPOSAL LONNY BURKS
3RD AGAINST PROPOSAL KATIE HOLDER
4TH FOR PROPOSAL CHARLES SCOTT
5TH AGAINST DR. ROBERT JOHNSTON
6TH FOR PROPOSAL ROGER HUMBER
7TH AGAINST ROBERT WALKER
8TH FOR PROPOSAL SHIRLEY ADAMS- PASS WRITTEN SUPPORT
TH AGAINST GERRY SHULZE

10TH FOR PROPOSAL JOSHUA DYE
11TH AGAINST EUGENE LEVY
12TH FOR PROPOSAL GENE WOODY-PASS WRITTEN SUPPORT
13TH AGAINST TONY ALLEN
14TH FOR PROPOSAL JOHN CREEKMORE- PASS WRITTEN SUPPORT
15TH AGAINST STEVE WARNOCK
16TH FOR BETHANY ROBERTS- PASS
17TH AGAINST PROPOSAL RITA SKLAR
18TH FOR GALYON PHIFER
19TH AGAINST PROPOSAL JIM LENSLEY
20TH FOR BRIAN ROBERTS PASS WRITTEN SUPPORT
21ST AGAINST PROPOSAL RITA SKLAR
22ND FOR JUDY ROBERTSON
23RD AGAINST PROPOSAL ANNE ORSI
24TH FOR TONI ROSE
25TH AGAINST PROPOSAL ADAM CORKEN
26TH FOR JUNE MATHENY
27TH AGAINST PROPOSAL JEREMY BRASHER
28TH FOR ARVIN ADAMS
29TH AGAINST SCHARMEL ROUSSEL
30TH FOR TRAVIS STORY
31ST AGAINST PROPOSAL LEEWOOD THOMAS
32ND FOR JEANNIE BURLSWORTH
33RD AGAINST DARLEN GAINES
34TH FOR KENNETH WALLIS
35TH AGAINST RITA SKLAR
36TH FOR SENATOR JASON RAPERT
37TH AGAINST JIM LENSLEY

TONY SPEAKS ON BEHALF OF THE COMMISSION AND WHAT THEIR RESPONSIBILITY IS FOR THIS BOARD.

38TH AGAINST GERRY SHULZE
39TH FOR CHARLES SCOTT
40TH AGAINST BRUCE HILL
41ST FOR KENNETH WALLIS

42ND AGAINST DARLEN GAINES

KB SPEAKS THANKS EVERYONE FOR BEING HERE
THE NEXT STEP PAPER WORK AND PAPER WORK WILL BE GIVEN .O COMMISSION.
THEN THERE WILL BE A COMMISSION MEETING INCLUDING ALL OF THEIR

CALL MEETING ADJOURNED 12:46

Alexis Reaves
Project Coordinator
Capitol Facilities
alexis.reaves@sos.arkansas.gov
501-366-1334

Sent from my iPad

CAVE PLAINTIFFS EXHIBIT NUMBER TWENTY-FIVE(A)

Text of Senator Rapert's Speech from

Dedication Ceremony of Second Monument

(Two Pages)

I appear here today on behalf of the American History & Heritage Foundation to formally dedicate the Arkansas Ten Commandments Monument to the people of Arkansas and celebrate the fulfillment of Arkansas ACT 1231

On April 8, 2015, the Arkansas General Assembly passed SB939 – THE TEN COMMANDMENTS MONUMENT ACT – and Gov. Asa Hutchinson signed the bill into law becoming ACT 1231. He asked me to once again voice his support for the monument here today. On June 27, 2017, the original Ten Commandments Monument was installed on the grounds of the Arkansas State Capitol using private donations. In the early hours of June 28, 2017, less than 24 hours after the monument was erected, it was intentionally destroyed when a man rammed his vehicle into the monument. Today, just over three years since the laws as first enacted, and less than one year since the monument was destroyed, the replacement monument is being installed and given to the State of Arkansas by the American History & Heritage Foundation, which has fully funded the project.

We wish to thank all the legislators who supported ACT 1231 and all those who gave private donations to fund the monument and the security bollards. As of today, 825 people from Arkansas and around the nation have made donations to ensure this monument is installed and the law fulfilled.

The sole reason we donated this monument to the State of Arkansas is because the Ten Commandments are an important component to the foundation of the laws and legal system of the United States of America and of the State of Arkansas. Passive acknowledgements of the role played by the Ten Commandments in our nation's heritage are common throughout America and the Supreme Court ruled in 2004 that such monuments are constitutional.

**Arkansas Ten Commandments Headlines**

• The Supreme Court has determined that privately funded, passive displays of the Ten Commandments are constitutional.

• The Ten Commandments are an important component to the foundation of the laws and legal system of the United States of America and of the State of Arkansas.

• Passive acknowledgements of the role played by the Ten Commandments in our nation's heritage are common throughout America.

• The ACLU's attack on the Ten Commandments display is another attempt to undermine the historic ideals foundational to our common heritage.

• The ACLU wants to knock down the history of our nation's legal history.

EXHIBIT
tabbies
25A

**Proof Points**

• "Simply having religious content or promoting a message consisted with a religious doctrine does not run afoul of the establishment clause." (Justice Rehnquist (writing for the majority), Van Orden v. Perry, 545 U.S. 677, 690 (2005)).

• "[T]he establishment clause does not compel the government to purge from the public sphere all that in any way partakes of the religious." (Justice Breyer (concurring) Van Orden v. Perry, 545 U.S. 677, 699 (2005)).

• "The setting does not readily lend itself to meditation or any other religious activity. But it does provide a context of history and moral ideals. It . . . communicates to visitors that the State sought to reflect moral principles, illustrating a relation between ethics and law that the State's citizens, historically speaking, have endorsed." (Justice Breyer (concurring), Van Orden v. Perry, 545 U.S. 677, 702 (2005)).

For more information please visit www.americanhistoryandheritage.org

Thank you all for coming today.

300

ORSI PLAINTIFFS EXHIBIT NUMBER TWO

Letter to Secretary of State's Office

in Support of Ten Commandments Monument

(One Page)

**HENDRIX REPORTING SERVICE**
**1701 SOUTH ARCH**
**LITTLE ROCK, ARKANSAS 72206**
**(501) 372-2748**

Public Comment
for the Capitol Arts & Grounds Commission
Public Hearing
at 11:00 a.m. December 14, 2016
Re: Arkansas General Assembly Enactment to
erect a Ten Commandment monument on the grounds of the
Arkansas State Capitol

Comment/Message:

I wish to express my appreciation to the Arkansas General Assembly for the passage of Act 1231 of 2015.

I am submitting this, my written request to the Capitol Arts & Grounds Commission for the purpose of communicating my expectation of seeing a state of the art monument of a reverent and biblical and historical design, erected in an attractive manner and in a location on the front lawn of the Capitol grounds that is prominent and easily accessible for visiting and photography by the general public—i.e. a monument that is befitting of the greatness and eternal endurance of the declaration of God's Law, upon Whose blessing the founders of our great state of Arkansas acknowledged as being "grateful to Almighty God for the privilege of choosing our own form of government…secure{ing} the same to our selves and posterity…" in the Preamble of our Constitution of the State of Arkansas of 1874.

Being of the posterity of the founders of our state and/or our American nation, I am hereby also declaring my support of our General Assembly's enactment to properly memorialize the greatest foundation of Law ever given to mankind—originally engraved by the finger of Almighty God in stone tablets and given to Moses on the Mount Sinai for the benefit of all mankind as the rule of law to be obeyed in honor and expectation of God's Son, the Prince of Peace, Jesus Christ, upon Whose shoulders all government shall ultimately rest.

I further request that the Secretary of State (who has been given the final authority of approval of the monument) submit a complete plan to all the sponsors of the enactment pertaining to the design and location of the monument, *prior* to its placement, to ensure that the Secretary of State and/or Commission has fulfilled the original intent of the sponsors *and the language of the enactment*. I understand that the monument has been constructed and produced with private funds and is ready for permanent placement now awaiting action by the Secretary of State/Grounds Commission. It is my strong opinion that no more delay should occur from the Secretary's office, being that it has now been more than a year and a half since this enactment of law occurred (April 2015). I request that the opening day of the Legislative Session in January 2018 be the day for a ceremonial unveiling of the new Ten Commandment monument in its permanent place on the front lawn of the Arkansas State Capitol building.

Please enter this comment into the official records of the Secretary of State and of the Arts & Grounds Commission, and notify me in writing that it is done at the address below:

Shelby Sheets
Name

PO Box 682
Address
Jasper, AR 72641

I am mailing this to:
Arkansas Secretary of State
Attn: Capitol Arts & Grounds Commis.
Arkansas State Capitol Room 256
Little Rock, Ark 72201

or will have it hand delivered

EXHIBIT
ORS1 2

ORSI PLAINTIFFS EXHIBIT NUMBER FIVE

Post from AHHF Facebook Page

(One Page)

Like Reply 4d

Tashia Summers Please explain why there are 2 stars of Remphan & the all seeing eye on a Ten Commandments monument?????

Like Reply 4d

American History & Heritage Foundation, Inc. The monument is an exact replica of the monument at the Texas Capitol. This is a design used on all of the Order of the Eagles monuments.

The "All Seeing Eye of God" is an artistic rendering originally used to represent God looking out over everything from heaven above. The Masons later adopted it - it is not "their" symbol. Just as the KKK uses a cross for evil. Christians don't abandon the cross because one group uses it for evil.

The Chi-Rho symbol is commonly used as a symbol for Christ:

"One of the most common symbols in Christian art is the Chi-Rho. It is created by superimposing the first two letters (XP) of the Greek word for Christ, ΧΡΙΣΤΟΣ.

The monogram (also called a "christogram") primarily represents Jesus Christ, while also being a common representation of the crucifixion scene. It is similar in style to the Tau-Rho (T and P superimposed), but has a distinct origin."

We know some people try to infer "nefarious" or "evil" connotations to these symbols - but they are badly mistaken.

Thanks for asking rather than accusing. Lots of research on these items.

Like Reply 4d



304

ORSI PLAINTIFFS EXHIBIT NUMBER SIX

Guest Column - *Arkansas Democrat-Gazette* - 1/8/17

(Five Pages)

**HENDRIX REPORTING SERVICE**
**1701 SOUTH ARCH**
**LITTLE ROCK, ARKANSAS 72206**
**(501) 372-2748**

Guest column

# Support for the Capitol monument

*JASON RAPERT*
*SPECIAL TO THE DEMOCRAT-GAZETTE*

After multiple personal insults printed by your newspaper and turning the cheek several times, it is time to set the record straight. Error left unanswered sometimes gets mistaken for the truth.

Of all the things I ever thought the *Arkansas Democrat-Gazette* editorial board would ever decide to oppose, I would never have imagined they would actually dare come out vengefully against honoring the Ten Commandments. In various editorial columns and articles since 2015 they have called the Ten Commandments monument a "graven image," an "eyesore," a "garish monument," and used general derogatory comments to intimidate me, the Arkansas Legislature and Gov. Asa Hutchinson for passing Act 1231 of 2015 to honor the Ten Commandments as the historical moral foundation of law.

Of course, dear readers, they would have you to believe that this is all my fault, and they have engaged in an effort to demonize me personally for being the prime sponsor of the Arkansas Ten Commandments Monument Act. Well, my fellow Arkansans, I am guilty as charged for supporting the Ten Commandments and write today to take full responsibility for being so bold as to believe that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mount Sinai.

EXHIBIT
ORSI 6

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, JUDITH LANSKY,
PAT PIAZZA and SUSAN RUSSELL PLAINTIFFS

ANNE ORSI, AMERICAN HUMANIST ASSOCIATION, FREEDOM FROM RELIGION FOUNDATION, INC., ARKANSAS SOCIETY OF FREETHINKERS, JOAN DIETZ, GALE STEWART, RABBI EUGENE LEVY, REVEREND VICTOR H. NIXON, TERESA GRIDER and WALTER RIDDICK CONSOLIDATED PLAINTIFFS

THE SATANIC TEMPLE, DOUG MISICKO a/k/a LUCIEN GREAVES and ERIKA ROBBINS INTERVENORS

vs. CASE NO. 4-18-CV-00342 KGB/BD

JOHN THURSTON, Arkansas Secretary of State, in his official capacity DEFENDANT
DEFENDANT

---

ORAL DEPOSITION
OF
ANNE ORSI

AUGUST 7,2019

---

Exhibit H

(The witness was sworn.)

ANNE ORSI,

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CANTRELL:

Q. Okay. So we're on the record. This deposition is being conducted under the Federal Rules of Civil Procedure. My name is Michael Cantrell. I work for the Attorney General's office, and I represent the defendant in this case, Secretary of State John Thurston.

Can you state your name and date of birth for the record?

A. Anne Orsi. July 2, 1962.

Q. And have you ever been deposed before?

A. I don't think so. I've always been sitting in your seat.

Q. Right. I was about to ask you about that.

So you're an attorney. Is that right?

A. Right.

Q. And you've taken depositions before?

A. Yes.

Q. Okay. And so you're familiar with the process and --

A. I hope so.

Q. We don't need to go through all of the preliminaries.

research, essentially.
Q. That's from --
A. Boston University.
Q. -- Boston University. Okay.
A. Uh-huh.
Q. Okay. Okay. I would like to ask you about your religious beliefs or lack thereof.
A. I don't have any.
Q. Okay. So how would you characterize yourself then?
A. As agnostic atheist.
Q. Agonistic atheist?
A. Agonistic being an adjective.
Q. Okay. That's interesting. Tell me -- tell me about that. Why that particular way?
A. Well, there's a difference between gnosticism, which is knowledge, and agnosticism, which is lack of knowledge. And I think most people are somewhere on the agnostic spectrum. Those who are generally on the Gnostic spectrum have special knowledge nobody else has and they can't really prove it when it comes to religion. So those people are usually I would say delusional.
You know, frankly, if you know it with complete certainty beyond any doubt whatsoever, then, you know, I want some of what you're smoking.
Q. Okay. Okay. So an agnostic atheist, is it based on

And, unfortunately, we have somebody just like him in Washington. Maybe not on the religious stand, but on other issues. And I find that appalling. That's not how government is supposed to work. It's supposed to be for all the people.

Q. So would you say that is what this lawsuit is about? Or if I asked you the question, can you tell me in your own words what this lawsuit is about.

MR. SCHULZE: I need to throw in the objection about -- this is her opinion. For legal purposes, I reserve the right to state what the lawsuit is about.

BY MR. CANTRELL:

Q. Okay. I appreciate that. And I'm not asking you for any legal conclusions even though --

A. The reason I wanted to be a plaintiff in this lawsuit and the reason I wanted to be the first named plaintiff in this lawsuit is because this issue makes me so angry I can't see straight. It offends me to my core.

The fact that there would be a public official who would attempt to establish religion and use his soap box as a public official and a minister using the same address as his state Senate office and his religious foundation to raise money for a blatantly religious structure to go on public grounds is contrary to everything the First Amendment stands for. Well, not everything, but certainly

the first two clauses.

Q. I think I know the answer to this question, but are you familiar with the Ten Commandments monument?

A. As a matter of fact, I am.

Q. Okay. I figured you were.

And I'll ask how did you first learn about the Ten Commandments monument that's the subject of this litigation?

A. In 2015 I was following legislation as I do during every legislative session. I follow the bills that will impact civil liberties and especially First Amendment issues, and I came across the bill. I got fired up about it. I testified before the legislative committee. I don't remember if it was the House committee or the Senate committee. And it may have been both. I don't remember. But I'm sure that the State would have records of who testified at those public hearings.

Q. Okay. So you said you got fired up about it. Were you offended by the bill, what the bill stood for?

A. You know, I don't know that offended is the right word to use in this context. There was so much going on during that legislative session that I thought was contrary to public policy and contrary to the best interest of the public. And, you know, if I'm going to pick something out to be offended by, yeah, that was

something I could grab hold of because it was definitely in my wheelhouse to object to this, and I knew the issue inside and out. So, yeah, let's take this one on. This -- this one, among several others, is very, very wrong. Let's do something about it.

Q. Okay. That was in 2015. That was during the legislative session when the bill had been proposed and was still under consideration.

A. Right.

Q. Okay. Okay. I need to ask you about your visits to the Arkansas State Capitol grounds. And the way that I'm going approach that is, whenever I use the phrase Arkansas State Capitol grounds, I'm including both the capitol building, everything inside it, and the grounds surrounding it. So just for clarity sake, that's what I mean when I'm using the phrase, Arkansas State Capitol grounds.

You've been to the Arkansas State Capitol grounds?

A. I certainly have.

Q. Do you by any chance remember the first time you ever went?

A. No. I'm sure it was a school tour when I was in probably elementary school.

Q. Okay. When did -- when did you move back to Arkansas? Were you in private practice in Arkansas?

A. Uh-huh.
Q. Okay. So --
A. I moved back to Arkansas in 1985 to go to law school and never left.
Q. I see. Okay.
A. Other than, you know, I escaped periodically, but never to actually live anywhere else.
Q. Got you. And so you've listed a number of things, a number of activities and events that you've been to on the Arkansas State Capitol grounds. We need to go through those. I want to understand your involvement and what the event was, where it took place, and --
A. Okay.
Q. -- if you recall specifically how you got there, if you parked, where you went to the event?
A. You know, for each individual event, I'm not going to remember. I can tell you what my general -- what I generally do when I go to the State Capitol grounds and where I generally park. It depends on what part of the State Capitol grounds I'm aiming for.
Q. Right.
A. And, generally, if it's for a rally or something like that, I tend to park either in the lot that's across 7th Street from the -- kind of between the Justice Building and the Capitol. It's on 7th Street right where you enter

the freeway. Either there or in the Justice Building parking lot or that big lot between the Justice Building and the Revenue Building. That's where I tend to park for rallies and such.

The other place would be in the lot that's on Capital directly in front of the State Capitol.

Q. Okay. And so I've pulled out -- this is something that we've used in several depositions. This is --

A. Oh, okay.

Q. I don't guess you would recognize this.

A. No.

Q. Okay. This -- this I'll represent this is a publication by the Secretary of State called "Walk on the Hill." It is -- it's published under John Thurston as -- as indicated on the second page. It's useful because it contains a map a few pages in of the Capitol grounds. And I was hoping you could indicate on the map as best you can where -- where the parking is that you're referring to.

A. Sure.

Q. Okay.

A. Okay. So the one in front of the State Capitol is obviously off. It's across Woodlane Street. I guess kind of where number 4 is marked on the map.

Q. Okay.

A. That looks like the edge of that parking lot.

Q. Okay.

A. So that's one of the places. Obviously, when I got to the Justice Building, I'm parking in the Justice Building parking lot. There's kind of an area over here that's marked 20. And then where the -- oh, it's the word for that, the thing that says north, south, east, west?

Q. Right.

A. The compass star. Yes, that thing. In that lot or in the lot that's kind of marked 15.

Q. Okay.

A. So that's when I'm going to rallies, I would park there, I would park in the Justice Building lot. There is another lot that is on West 7th Street almost directly across from the Justice Building. That's another place that you can find parking for those big events.

Other times, like when I'm going to the winter solstice display, I'll park in this area that's marked G because that's -- or on the side where it's 4 and 3 and 6.

Q. So you're pointing to the -- to the south of Arkansas State Capitol on that little median?

A. Yes, yes, because that is where the winter solstice display is. So we park over there when we're going to it or when we're putting it up or taking it down.

When I go to the History Commission, I tend to park -- the History Commission is in the Big Mac Building, and

I tend to park in this lot that's it's directly west --

Q. To the west?

A. -- of the Big Mac Building.

Q. Okay. Okay.

A. Before -- before they -- sometimes when I know the legislature is not in session, I'll steal a legislator's parking spot. But, yeah, often I'm walking past the Justice Building toward the Capitol.

Q. Okay. Let's go through some of these that you've listed. So the Capitol lighting ceremony in conjunction with the holiday parade, where was that event held?

A. It's held at the State Capitol.

Q. Inside?

A. It's been several years since I've been there, and I don't remember. No. It was outside. Outside, so you can see the lights. Outside.

And, typically, I watched it from -- I think I've only been there once, maybe twice. And I think I watched it from close to the -- I know it was at the solstice display and may have walked to the front of the Capitol. I don't remember.

Q. So if you were at the solstice display, that would have been south of the Capitol building on that median?

A. Uh-huh.

Q. And you would have walked up to the front of the

where the Governor's office is. I think it was when Susan Inman was declaring her candidacy for Secretary of State the first time.

Q. So to go into the Capitol, where would you generally park to go into an event like that?

A. Well, now, if -- I don't remember if that was on a weekday or weekend. If it was a weekend, I would have parked in one of the legislator's spot somewhere close to the perimeter of the Capitol if there wasn't a huge crowd, and there wouldn't have been for something like that. And if it was on a weekday, I would have parked in this lot to the -- to the east of the Capitol or probably behind the -- between the Revenue Office and the Justice Building -- the Revenue Building and the Justice Building.

Q. Okay. But you don't have a specific recollection of --

A. No.

Q. -- of that or --

A. No.

Q. -- parking?

A. No.

Q. The -- let's see. You mentioned rallies for reproductive autonomy.

A. Reproductive rights and -- yeah, that's held every January.

And, again, wherever you can find parking. Depends on if I got there early or late, you know, where you could find parking.

Q. Right.

A. So --

Q. Would that have been on the front steps --

A. Yes.

Q. -- of the capitol?

A. Uh-huh.

Q. Do you know about how many of those you've been to?

A. I've been to every one they've ever had except in 2017.

Q. Okay.

A. Although, actually, no. I don't think I went this year. I think I was out of town. So I don't think I went this year either.

Q. So every one you -- every one except 2017 and 2019?

A. Right.

Q. Okay.

A. And I think they've been doing it, I want to say, seven or eight years maybe, but I could be wrong.

Q. Okay. Whenever you're going, I take it -- you tell me if this is right. If I'm going, I'm going to try to find a parking spot closest to the place I need to go.

A. Sure.

Q. Okay. So, generally, if you know you're going to the front steps, you're going to try to find parking somewhere close to that --
A. Right. And then --
Q. -- as close as --
A. -- it depends on whether I get there early enough to get in this lot across the street, and usually I don't because I'm late to everything. So usually I'm parking way over here in Saline county, you know.
Q. Okay. Then --
A. Not literally Saline county. I'm pointing to that parking lot by the Ledbetter Building.
Q. Right.
So the March For Science, I recall from previous depositions that that was held on the front steps. Is that right?
A. Yes. Yeah. And it actually came down Capitol Avenue toward the State Capitol from the east.
Q. Okay.
A. So I may have parked somewhere on one of those side streets, like on 4th Street or I may have found street parking for that one.
Q. Okay. Then the Women's March is the same situation?
A. Same thing, yeah. They were held real close together.

Q. And that comes down the street --
A. Right.
Q. -- from the --
A. So same thing. And, again, if I got there late, I parked over by the Ledbetter Building and then walked past and then back.
Q. Okay. Let's see. You've attended you said possibly other rallies or protests. Do you recall any others, other than those we've mentioned? Any other rallies or protests that you've been a part of?
A. I know there have been, but what they were about has completely left my mind. I think there was an immigration rally within the last couple of years maybe, probably when all of those detentions started in 20 -- no. Would I -- yeah, because I was in a cast when I went down there. So I did go to that one.

The reason I didn't do anything in 2017 was I had foot surgery twice, so mostly I wasn't mobile. But I know I went down for that one even though I was still in a cast.
Q. Okay. Just to back up a bit. I apologize. The March For Science, do you recall when that was held?
A. March of 2016 I think.
Q. Is that --
A. Spring of 2016. I don't recall the date.

Q. Is that a yearly event?

A. I think that they tried to do something yearly, but I have not been involved in it.

Q. Okay. So you've only been --

A. Just the one.

Q. -- to one of those?

A. Yeah.

Q. Okay. And then the Women's March, that's also a yearly event, right?

A. Yeah. Now, I know I went in 2016. I did not go in 2017. I don't remember if I went last year or not.

Q. Okay.

A. I didn't go this year, I don't think.

One of my friends has joked that hanging around with me means going to a lot of rallies. So I don't know. There's a rally, oh, cool, I'll show up, what are we protesting.

Q. Okay. Okay. Then you've been to public hearings. Those are held inside the State Capitol building?

A. Yes.

Q. Okay. And how many of those did you attend?

A. With respect to the monument or?

Q. With respect to any -- any --

A. Anything?

Q. Yeah.

A. I couldn't even begin to tell you. I'm usually at the Capitol for a hearing at least once during a legislative session and maybe multiple times.
Q. Okay.
A. So -- and, you know, I couldn't even begin to tell you.
Q. Okay. Do you remember how many specifically relating to the Ten Commandments Monument?
A. At least one and maybe two.
Now, I also went to a public hearing where there was a public hearing -- did I go to it that was held in the old Supreme Court chambers I think in the State Capitol. I can't remember if I went up there that day or not. It was on my calendar probably. Whether I went, I don't remember.
Q. Okay. And does -- the events you're speaking of, do those include legislative committee hearings?
A. Yes.
Q. And you spoke against the monument at one of those?
A. At lest one of them, maybe two, yeah.
Q. Okay. How about Capitol grounds commission meetings?
A. Yes. Went to one that was held at the -- I think it was in the Real State Commission office.
Q. Where is that located?
A. It's on the west side of the Revenue Building.

Q. On the west side?
A. West -- west of the -- down 7th Street.
Q. Okay.
A. Yeah.
Q. Okay. Was that where you also spoke against the monument?
A. Yes. I don't think they were taking public comments at any of the others.
Q. Okay. You've done history and genealogy research at the archives, and that's in the Big Mac Building?
A. Right.
Q. Okay. And when you go there to the Big Mac Building, where do you generally try to park?
A. Well, originally, I would park in that oval-shaped area and then walk in from -- from the south side of the building. But then they moved the parking so you could only park down there, and all this is reserved parking now -- or all that's in the oval is -- is reserved parking.
Q. You were pointing at that long median just south of the Big Mac Building?
A. Right.
Q. Okay.
A. So, normally, it's in the lot that's west of Big Mac Building.
Q. Okay. And you've -- you mentioned a winter solstice

display --

A. Uh-huh.

Q. -- that was on the south of the Capitol.

A. Right.

Q. Tell me about your involvement with that. How many years have you done that?

A. Ever since it was first erected.

Q. Do you remember the year that was?

A. It's either 2008 or 2009. I don't remember which.

Q. Okay. That's in connection with the winter -- a winter solstice event sponsored by the Arkansas Society of Freethinkers. Is that right?

A. Uh-huh.

Q. Tell me about that event.

A. Well, it's generally been kind of a fun little ceremony to mark the shortest day of the year. And we might have a couple of readings, read a poem, read a -- one of our members used to love to read the -- a speech by Robert Ingersoll who was a 19th century free thinker who was adamantly opposed to religion.

Then we usually light candles and then go have a beer somewhere. So it's a very important ceremony.

Q. Okay.

A. And I say that sarcastically. I'm sorry that doesn't translate well.

Q. Okay. Are those things that you would have put on your calendar --

A. Sure.

Q. -- at some point?

A. Sure. Because I would have made an appointment to do either the appearance or the video call or whatever.

Now, there have been some news interviews where it's been spur of the moment and, you know, I've just gotten a call from a reporter that says can you meet me in 20 minutes at this location and --

Q. Yeah.

A. -- you know, then it's -- yeah --

Q. Okay.

A. -- not on the calendar.

Q. You mentioned -- you mentioned sometimes you'll park in the legislator's parking spots.

A. Yeah. Probably I'm going to get a ticket for that now, hu?

Q. I was going to ask you. Have you ever gotten a ticket?

A. No, I haven't. Well, I don't do it when they're in session or if -- you know, normally not on a weekday either when they might be in meetings. So no.

Q. Okay. In 2015 you said there were a number of bills that -- or I think you said there were a number of bills

you found objectionable.

A. Uh-huh.

Q. Do you remember what the bills were other than the Ten Commandments monument?

A. I think there was at least one abortion bill that session. I'm sure there was at least one abortion bill that session. That seems to be a favorite topic. And, honestly, I don't remember specifically any of the others from session to session.

Q. Did you --

A. Oh, there may have been a religious freedom. I don't know if that was that year or if it was the session before. There was a religious freedom thing that was -- I don't think it passed. I think it was proposed, but I don't think it passed. I don't think it got out of committee, but I could be wrong.

Q. Okay. Did you -- did you have any action with respect to those? Did you oppose them or take any action to express your views about those?

A. I'm sure I wrote letters or emails or made phone calls.

Q. Okay. Do you recall specifically?

A. No. No. I think I went to the one of the abortion hearings, but I didn't -- I didn't speak.

Q. Okay. I wanted to ask you about -- again, looking

So I don't know what happened to it. Maybe somebody drove over it with a car and it didn't make the news that time.

Q. So you mentioned that you had passed the Ten Commandments monuments. Can you give me a specific example of a time when you've when you passed the Ten Commandments monument on the Capitol grounds?

A. I passed it just yesterday.

Q. Oh, you did?

A. Yeah. I mean, I -- I was at the archives yesterday and I drove out to the 7th Street exit this way because I was going down to my son's place, which is down on the east end of -- near the MacArthur museum or not -- yeah, the MacArthur museum. So I was headed out that way to -- so, yeah, I drove past it yesterday.

But, I mean, several times, like, if I've parked over here, I walked past it or, you know.

Q. How many times would you say that you've walked past the Ten Commandments monuments?

A. Three or four maybe.

Q. Do you remember specifically what you were doing on the Capitol grounds when you passed the monument?

A. Going from point A to point B. I don't remember. But I know that I have -- I know that I've walked past it.

Oh, I was with a friend who was playing Pokémon Go at

the State Capitol once, and it was -- I mean, we were all over the grounds that day. I had no idea -- I mean, my son plays the game and I had never thought that people my age did, but I was informed that I was wrong.

Q. Okay.

A. And, yeah, I walked past the monument that day and were sort of bemused by it. But, you know, I don't even remember why I was there, but I know I've walked past it at least a couple of times if not more.

Q. Okay. So other than playing Pokémon Go, do you remember the specific reason why you would have passed it?

A. I don't. I don't. And, you know, I was there the day of the second dedication.

Q. Okay.

A. But other than that, I just don't remember. And I drove by it yesterday, but that was -- I mean, it wasn't because, oh, gee, I want to drive by the monument; it's because that's on my way to get where I want to go.

Q. When you -- let me ask. How many times have you driven by the monument?

A. I don't know. I cannot tell you. Probably the same. Approximately three or four times.

Q. Okay.

A. I mean, that's just a guess just because, you know, I'm at the Capitol and my path might take me that way.

monument, but, you know, just in general because this is what we do.

Q. Okay. You're using that as an example of the activities of the Freethinkers?

A. Of the violations that we want to eliminate on the Arkansas landscape, yeah.

Q. I may ask you some more about some of those things before we're done, but I wanted to ask about those right now.

A. I'm sorry to be so vague about it, but I really don't track my movements that closely.

Q. Do you recall specifically any other events that you've attended at the Capitol other than those discussed?

A. I used to work at the Capitol, so, I mean, I interned when Clinton was governor. So I worked there and then.

Q. How about we limit it to the past five years. So actually --

A. You don't want to go back to the Stone Age?

Q. Actually, let's limit it to 2015. So January 1, 2015, anything that you can recall in that time period.

A. Well, rallies, legislative hearings, genealogy research, probably to the Justice Building for a meeting or to go to the clerk's office because I still do the occasional appeal or write the occasional appeal. I may have gone to an oral argument at the Supreme Court. I

don't remember why I would have gone -- oh, on the same sex marriage case. Sure.

I don't know. I'm kind of drawing a blank. There are just -- it's just part of one of the places I go occasionally to do stuff.

Q. Okay. You said you attended the installation of the second monument.

A. Yes.

Q. Tell me about that. What do you recall from that event?

A. There were a whole lot of people standing with Senator Rapert. There were a whole lot of people close to it. I mean, there were people on both sides of the issue who were there. You know, he pulled the cover off the monument and said, here it is.

I don't -- I'm not real sure what you're wanting to get from me. Maybe if you could be more specific.

Q. No. That's fine.

Let me ask you this. Why -- why did you go to the installation?

A. To protest it, yeah. To protest it, to make my voice heard that I was not happy with that thing going up.

Q. Did you -- I'm trying to understand. Did you take a sign? Did you carry a sign or anything like that?

A. I think I did have a sign. I think I may even had

brought down from Sinai the second time, but hooked together rather than separate. But, yeah, it looks like a giant tombstone.

Q. I've heard that before.

A. I bet you have.

Q. Yeah.

A. I've heard that our winter solstice display looks like an outhouse, so.

Q. So here on these -- on these curved -- I don't know what to call it, -- I guess tablets.

A. At the top?

Q. Yeah. There's some script in there. It's hard to see on this, but you -- do you --

A. Yeah. I think that's hilarious, quite frankly.

Q. Why so?

A. Because it looks like it came out of that Cecil B. DeMille movie. I mean, it's just so ludicrous. It's -- it's obviously not Hebrew. Maybe it's some sort of representation of Aramaic or something. I don't know what they think it is, but it looks like it came straight out of that Charlton Heston movie.

Q. That's interesting.

So, I mean, any other significance? It strikes you -- it makes you think of Charlton Heston and that movie.

A. Yeah. It's stupid to use a word that I used when I

was nine. It's idiotic.

Q. Okay. How about here between those -- this pyramid with the eye in it and there's a --

A. The all-seeing eye. Yeah. That's a symbol that's often associated with Free Masonry and it's on our money as well. I've heard it call the eye of Ra. Maybe that's some sort of sop to, oh, we're going to have another religion in here, you know, the ancient Egyptian ones that nobody ever worships anymore. I don't know what's up with that. It also sort of reminds me of the all-seeing eye of god is a voyeur and it's creepy.

Q. Okay. Then just below that there's this eagle with a flag.

A. The upside down flag with the weird stars and the -- yeah, uh-huh. I don't know what that's all about. I guess freedom and flag waiving.

Q. Okay.

A. I mean, they're American symbols and they're poorly constructed on that monument. It's just not very artistically done. But, you know, art is in the eye of the beholder, obviously.

Q. So how about down toward the bottom there's these two six-pointed stars on either side?

A. The stars of David. Yeah, those are associated with both Judaism and Christianity.

Q. And then between those there is --
A. The chi rho. It's a symbol that stands for Jesus Christ. You see it in a lot of illuminated manuscripts.
Q. And then there is this part at the bottom that says, "Presented to the people of Arkansas by the American History and Heritage Foundation."
A. That's also hilarious.
Q. Why so?
A. Because Jason Rapert, a state Senator, created that foundation for the sole purpose of raising money to build this monument that violates the constitution. It's not a gift from some organization that really cares about American history and heritage. I doubt the man understands American history or heritage and I doubt that he's read very much of it. He certainly has a different interpretation.
Q. I want to ask you about a few of the commandments. And we're not going to go through all of the commandments.
A. Oh, please. Lets. Oh, no. I have great things to say about all of them. I'm prepared for this one.
Q. I'm sure. I just want to know what -- so this says -- it says at the top, "I am the Lord thy God." And I'm curious, who do you take the I to be?
A. I am is the nameless god of the Old Testament, the Abrahamic god that wouldn't give anybody his name or whose

passed to put it up, and that was the one in Oklahoma. I think there was one in either New Mexico or Arizona, Florida. They've been erected and then taken down all over the country.

Q. Have you visited any of those monuments?

A. No.

Q. Do you find those monuments offensive as well?

A. I find them to be an affront to the Constitution. And if you think an affront to the Constitution is offensive, then, yeah.

Q. Well, do you think an affront to the Constitution is offensive?

A. Pretty much.

Q. Pretty much. I'm not surprised that that's your answer.

So are you aware -- other than what we've talked about, are you aware of any of the history behind the display of Ten Commandments monuments in the United States?

A. Somewhat. Not -- not in any great depth, no.

Q. What are you aware of?

A. I'm aware that there was an organization I think called the Eagles or something like that -- that first started erecting these monuments around. And I think it was in the mid 20th century maybe that they started

putting them up. And some of those monuments have come down and some of them have remained based on the context in which they were displayed.

Q. Okay. Do you let me ask you this. Are you aware that the Ten Commandments is sometimes used as a symbol of law?

A. Yes.

Q. Okay.

A. In conjunction with other symbols of law, like the lady -- blindfolded lady holding the scales of justice, not by themselves like this one is.

Q. So you've never seen just the Ten Commandments itself used as symbol of law?

A. Not by itself like this one is, no. Usually, it's in conjunction -- I mean, I think any other time it's used as a symbol of law, it's in conjunction with other symbols of law.

Q. Okay. Have you seen tablets used as symbols of law?

A. Tablets?

Q. Uh-huh.

A. A legal pad. Beyond that, no, I don't think so.

Q. I'm talking about, you know, the curved -- like what's on the monument?

A. The tombstone looking thing?

Q. Yeah.

right.

Q. And I want to -- I want to try to ask you for as many details as you can provide me about each of those instances.

So let's just take walking by. Do you recall what route you were taking when you were walking by it?

A. I remember I was walking along side the side of the Justice Building. And I think I might have been going to the clerk's office that day. I'm reaching here so this may not be accurate. I think I was headed to the clerk's office that day and there was no parking in the court parking lot and I ended up parking in one of the legislator's spots up here and then walking down the sidewalk to the clerk's office, which is on this -- on the north end of the Justice Building and then back.

Q. Okay. Do you recall whether you were in your cast or your boot --

A. No --

Q. -- at that time?

A. -- I wasn't. I wouldn't have been able to walk that far in my boot.

Q. Okay. Do you recall what time of year it was?

A. No, I don't.

Q. Whether it was sunny or raining or hot or cold?

A. I don't remember it being raining. Honestly, I

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, JUDITH LANSKY, PAT PIAZZA, AND SUSAN RUSSELL — PLAINTIFFS

ANNE ORSI; AMERICAN HUMANIST ASSOCIATION; FREEDOM FROM RELIGION FOUNDATION, INC.; ARKANSAS SOCIETY OF FREETHINKERS; JOAN DIETZ; GALE STEWART; RABBI EUGENE LEVY; REV. VICTOR H. NIXON; TERESA GRIDER; AND WALTER RIDDICK — CONSOLIDATED PLAINTIFFS

THE SATANIC TEMPLE; DOUG MISICKO, AKA "LUCIEN GREAVES"; AND ERIKA ROBBINS — INTERVENORS

VS. CASE NO. 4:18-CV-00342 KGB/BD

JOHN THURSTON, ARKANSAS SECRETARY OF STATE, IN HIS OFFICIAL CAPACITY — DEFENDANT

---

ORAL DEPOSITION

OF

EUGENE HENRY LEVY

---

August 9, 2019

Baker, Schulze, Murphy & Patterson
2311 Biscayne Drive
Little Rock, Arkansas 72227

Shyloa Myers, RPR, CCR

Arkansas Lic. No. 710

Exhibit I

(Deposition commences at 9 a.m.)

PROCEEDINGS

EUGENE HENRY LEVY,

Called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. CANTRELL:

Q. All right. So we're on the record. Good morning.

A. Good morning.

Q. And I'll say for the record this deposition is being conducted under the Federal Rules of Civil Procedure.

My name is Michael Cantrell. I work for the Attorney General's Office; and I represent the defendant, Secretary of State John Thurston.

A. Okay.

Q. And can you state your name and date of birth for the record.

A. Eugene Henry Levy. July 9, 1945.

Q. Okay. Have you ever been in a deposition before?

A. No.

Q. Okay. And a few ground rules just to go over. The court reporter has to transcribe our conversation. And what she produces is basically a -- it's a stenographic record, so it's the text of the words that we say.

official legal position. However, with that understanding in mind, you can go ahead and answer this question.

Q. Yeah.

So my question is: Can you tell me in your own words what this lawsuit is about?

A. What this lawsuit is about?

Q. Yes, yes.

A. Well, in my own words, it's about a opposition to a religious object on the State -- on public property. A separation of Church and State issue, basically.

Q. Okay. Okay. And which religious object is that that you're referring to?

A. The monument itself.

Q. Okay. The Ten Commandments monument.

A. The Ten Commandments monument.

Q. Okay. So you're familiar with the Ten Commandments monument?

A. Oh, yes.

Q. Okay.

A. Yes, I am.

Q. Okay. How did you first learn of the Ten Commandments monument?

A. I think -- in the discussions leading to the public forum, I think there were discussions in the Legislature.

I'm not sure exactly how it began, but it -- you know, the -- the papers began to -- to say this is what was being discussed, and -- and a monument was going to be put up to emulate a couple other states. And, you know, that's how I learned about it.

Q. Okay. So would this have been while the General Assembly was considering whether or not to --

A. Probably. I'm not sure the year, but I -- I have the -- you know, the -- that open forum, I think that was in the winter of 2016. '15, '16. I mean, I've got it here. It was a couple of years ago, so it must have been just before that.

Q. Okay.

A. When -- you know, how are we going to get this out to the public? Well, obviously it was a fait accompli before it got to the public.

Q. Okay. And so you referred a few times to a public forum.

What are you specifically referring to when you say that?

A. Well, December -- if I could look here, if you'll give me a second.

Q. Sure.

A. Let's see. December 14, 2016, forum. It was at the Agriculture Building, I believe.

Q. Okay.

A. And it was for the -- I think I have it in my -- in there somewhere.

Q. Are -- are you referring to your responses to --

A. Yes.

Q. -- our Interrogatories and Requests for Production?

A. Yes.

Q. Okay.

A. And the fact that I spoke when I was there. I was -- I was one of the speakers in opposition.

Q. Okay.

A. And I have that, you know, what -- what I said here too.

Q. Okay.

A. Bushman Court Reporting. I guess that's . . .

Q. Okay. Okay. Would this have been at a meeting of the Capitol Arts and Grounds Commission? Do you recall?

A. I think so. Yes, uh-huh. I believe so.

Q. Okay.

A. And I believe it was open to the public for discussion, but I think it was already a fait -- it had already been passed, so I -- I don't know what the purpose of opening it to the public -- if you're going to open it to the public, you should do it before, before the vote is taken, not after.

Q. Okay.

A. So . . .

Q. So going back to whenever you first heard about the Ten Commandments monument.

A. Uh-huh.

Q. What did you think of that idea when you first heard of it?

A. Well, I was totally opposed to it.

Q. And -- and explain that for me.

A. Well, because it's a religious symbol and it's on public property. And it -- to me that's a -- a perfect example of the violation of the separation of Church and State. I have no objection to the Ten Commandments in a church, a synagogue, where it belongs.

Q. Huh.

A. Every synagogue has a depiction of the Ten Commandments somewhere on the pulpit or -- because it is a religious symbol.

Q. Huh.

A. And it -- and it bothered me. I may be getting ahead of the game, but it bothered me to hear, "Well, this is not really religious. It's cultural and historical," and yet it was promoted by religious people and not promoted at all by anybody historical or -- or cultural.

Q. When was it that you -- you heard that it was

historical and cultural?

A. It may have been at that meeting, or it may have been in some -- something in the paper before. I think because of the -- the -- the proponent was the Arkansas Historical and Cultural Commission. And I looked that up to see if that actually existed.

Q. Uh-huh.

A. And I saw that it was the same address as Senator Rapert's gospel ministry.

Q. Huh.

A. So I said, well, that -- that proves it right there.

Q. Okay.

A. I mean, that's just as overt as it could be.

Q. Okay. Now I'm going to ask you about your visits to the Arkansas State Capitol grounds.

A. Okay.

Q. And when I -- when I say "Arkansas State Capitol grounds," I want to be clear what I'm referring to is -- is the Arkansas Capitol building, everything inside that building, as well as the -- the grounds surrounding the building.

A. Uh-huh.

Q. So have you ever been to the Arkansas State Capitol grounds?

A. Oh, many times.

Q. Okay. Can you give me a ballpark figure how many times you would have been?

A. Gosh. 25, 30, something like that.

Q. Okay. And do you recall your first visit to the Capitol grounds, by any chance?

A. I think it was not long after we moved to town, 19- -- maybe '88, '89 when -- when Bill Clinton was governor. And it was some meeting of -- of an education committee, and he wanted some input from the Interfaith Arkansas or whatever we were called by at that time. And I was on that committee, and we met in his office.

Q. Okay. And so going back to -- let's say to 2015.

A. Okay.

Q. And tell me what visits have you made to the Capitol grounds since, say, January 1, 2015, that you can recall?

A. Okay. I know there were a number of them with regard to the State Board of Education, because I was on the Civic Advisory Committee back when Baker Kurrus was the superintendent for that one year.

Q. Huh.

A. And we were discussing public education versus charter schools.

Q. Huh.

A. So there were numerous committee meetings and hearings. And the -- you know, I guess in the -- in the education part

of the -- you know, the building.

Q. Huh.

A. Because I've had a kind of a spinal stenosis the last couple of years, it's prevented me from going to things that are like marches where you're going to be standing out for a long period of time.

Q. Huh.

A. So probably since 2016 or '17, I haven't done many of those. But prior to that, there were numerous rallies on the Capitol steps, mostly against some of the things that the State Legislature was proposing.

Q. Uh-huh.

A. Women's rights, freedom of -- the prochoice rallies. But not too many since 2015 or '16, other than that education forum where I was able to sit down. That really wasn't a rally. That was more of a forum where you sat and you listened to speakers. And I -- I would -- from time to time I had a role of speaking there too.

Q. Okay.

A. For the public school.

Q. Okay. Any other things that have taken you to the Capitol since 2015?

A. Well, to take a look at the monument.

Q. Okay.

A. And to -- and to figure out why it was not considered a

religious monument when everything on it was religious.

Q. Okay. Okay. Anything else since 2015 that you can recall?

A. No, I don't -- I can't -- I can't recall.

Q. Okay. I want to ask you more specifically about each of the ones that you mentioned.

A. Okay.

Q. And so the -- State Board of Education meetings --

A. Uh-huh.

Q. -- where were those held?

A. I believe that it was -- I think there's an Education Building. I don't think it's far from the Supreme Court Building. It's kind of tough -- I can't . . .

Q. Yeah. I'll tell you what, let's do this.

A. See if I can . . .

Q. So I've referred to this in several depositions.

A. Sure.

Q. This is a publication from the Secretary of State called "A Walk on the Hill."

A. Okay.

Q. It's published under John Thurston, our current Secretary of State.

A. Uh-huh.

Q. And it's a few pages in. It's got a map of the Capitol grounds.

A. Okay.

Q. And then we'll come back and I'll have more questions for you, for sure.

A. Okay. Sure.

(Recess taken.)

Q. (Mr. Cantrell) All right. Okay. So we're back on the record.

A. Yes.

Q. And I was talking to you about your visits to the Capitol. Give me one second.

Okay. You had mentioned some rallies that you had attended.

A. Uh-huh.

Q. And I believe the first one, women's rights rallies?

A. Usually right around the time of the Roe V. Wade decision anniversary.

Q. Okay.

A. Maybe a week before or so.

Q. Okay.

A. And, again, it was -- I don't know how many of them I went to, maybe three or four. But I stopped going when I couldn't stand for a long period of time in one place. So it's probably been three years since I've been, four years maybe, something like that.

Q. Okay. And -- and those rallies, I think you indicated

those were held on the front steps.

A. Uh-huh.

Q. Of the Arkansas State Capitol?

A. (Witness nods head.)

Q. Is that right?

A. Yes.

Q. And was that a march? Were those marches?

A. No.

Q. Okay.

A. The -- the prolife rallies were usually marches. I don't know if they had a rally first. And they would march from downtown. I don't know the exact route.

Q. Okay.

A. But, as far as I recall, at least the way I was participating, it was really more of a rally with speeches and placards and, you know, that.

Q. Okay. And whenever you're attending those rallies, was there -- do you recall where you would park?

A. Well, I would try to park in those slanted, slanted areas here.

Q. Huh.

A. It just depended on when they were. Because if the Legislature was in session, you know, those were taken by various members by -- I guess by assigned number.

Q. Okay.

A. And then sometimes I would -- there are streets headed --

Q. To the east --

A. -- east so there would be some parking areas there.

Q. Okay.

A. And sometimes just depending -- it just depended. Sometimes I'd drive around. Sometimes I could park over by the education wing over here.

Q. Okay.

A. There was a time when -- when you could actually park in a kind of a lot over here. But now I think it's chained off.

Q. Okay. And, for the record, so it's clear, so you've indicated you would park on Woodlane Street?

A. When I could, right.

Q. When you could?

A. Right.

Q. Sometimes along the streets to the east of Woodlane?

A. Uh-huh. And then sometimes in that -- where I mentioned before the break over here.

Q. Okay. To the south?

A. To the south where there's a -- there's some kind of a office complex or -- I'm not sure, but there's a lot of -- there's plenty of parking there. And especially on a weekend, there's nobody there; so there was a lot of -- a

lot of places to park.

Q. Okay.

A. It just meant walking a lot further, but . . .

Q. Okay. So you've indicated that office building is to the south of West Seventh Street.

A. I think somewhere right in here.

Q. Okay. And also you indicated up in the -- the -- what is this? The northeast corner around the --

A. Yes, uh-huh.

Q. -- Capitol Hill Apartments or the Education Building?

A. Uh-huh, uh-huh.

Q. This was parking up here?

A. There was a lot right next to the Education Building.

Q. Okay.

A. But I think it's -- it chained off now. Because I guess sometimes people would park in there, and it would start raining and they'd get their wheels -- the tires get stuck in the -- in the dirt there. It was not paved.

Q. Okay. Oh, okay.

A. But I haven't seen it in a while, so I don't know what the situation is now.

Q. Okay. And whenever you would attend those rallies, you would -- is it correct you would -- you would park and then walk to the rally at the front steps?

A. Uh-huh.

Q. And then would you return to your car wherever you parked?

A. Generally, yeah.

Q. Okay.

A. Now, there was -- there -- I don't know how long ago it was. I'm going to say maybe 12, 15 years ago there was -- and it was during the Christmas holidays there was a full-size creche right in front of the Capitol, which was to me an overt, overt usurpation of Church and State. I mean, it was -- you couldn't get into the Capitol without going --

Q. Huh.

A. Without either going through it or and it. And it was the size of a hotel room.

Q. Huh.

A. And I think it was removed by the next year.

Q. Did -- did you raise any objection to that creche?

A. Absolutely.

Q. What did you do?

A. I went to an attorney who was a member of the congregation and took pictures. And he was not aware of it because he -- or at least at that -- at the early stages he wasn't aware of it, because he hadn't been in the -- you know, in the vicinity of it.

The problem is that it's hard to take it down when you're in the middle of the season. And you don't know that

it's going to go up until the season.

Q. Uh-huh.

A. The emotional part about, you know, if it were discussed rationally in March in July -- you know, but in December when you're in -- you know, a week before Christmas when you talk about this needs to be removed, it adds an emotional aspect to the already violation of the Church and State.

Q. Uh-huh.

A. But by the next year I think it was gone. It was moved up here or moved away altogether.

Q. Okay.

A. It was huge.

Q. Huh.

A. Like I said, it was probably half the size of this room here.

Q. Wow.

Did you wind up sending a letter? Or did the attorney send a letter? Or --

A. I don't know what -- I don't know. I just -- I met with him a couple of times, and he said he was going to take care of it.

Q. Okay.

A. So I guess he did.

Q. All right. What was the attorney's name?

A. That was Dick Williams.

Q. Okay. And you said he was a member of your congregation?

A. Yes, yes.

Q. Okay. Okay. So we -- we talked about the -- the women's rights rally. The -- you also mentioned a prochoice rally.

Is that a different --

A. Pretty much the same thing.

Q. Okay. And you said you had attended three or four of those?

A. Yes.

Q. But you hadn't been in a few years?

A. Right.

Q. Okay.

A. I think the last thing I went to there was a -- it was not the -- it was an education rally when the Legislature was getting ready to pass some kind of bill about charter schools.

Q. Uh-huh.

A. Maybe 2016 or so.

Q. Okay. And you mentioned having a spinal stenosis.

A. Uh-huh.

Q. Okay. And I'm not familiar with that. Could you --

A. It's a -- well, you know what sciatica is?

A. Correct.
Q. Okay.
A. Sorry.
Q. Any -- any other rallies that you can recall attending since 2015?
A. No.
Q. Okay. You mentioned that you had been to --
A. I think maybe there was an antigun one a few years ago after one of the shootings.
Q. Huh.
A. Because I remember there was a counter -- there was a progun rally kind of down in here. And, interestingly enough, the progun rally had Nazi flags and --
Q. Huh.
A. -- and white national flags --
Q. Huh.
A. -- to go along with it. And I tried to avoid -- I remember I think there was a counterprotest to what was going on here.
Q. Huh.
A. So I tried -- I guess I walked here to avoid getting caught up in that.
Q. Okay. So you indicated the -- the grassy area to the southeast?
A. Uh-huh.

A. Sure.
Q. Okay. And you mentioned going to the Capitol grounds to take a look at the Ten Commandments monument.
A. Uh-huh.
Q. Do you recall when that was?
A. I think it was after it was erected the second time, not long after that. So I would have to work back and figure out when that was set up and when the -- when those barriers were put around it.
Q. Uh-huh.
A. After the truck had hit it.
Q. Uh-huh.
A. So soon after that, whenever that was. That's probably been a couple years.
Q. Okay. Did you -- did you go with anybody else to see it?
A. No.
Q. Okay. Do you recall the -- the time of day you went? Or . . .
A. Well, afternoon I think.
Q. Afternoon?
A. Yeah.
Q. Okay. Was it a weekday? Or a weekend? Or . . .
A. Probably a week -- I don't know. I don't recall.
Q. Okay. Do you recall where you parked?

A. Unless you take a -- a careful look at the actual text and the -- and the context of Exodus 19 and 20, then you realize that this is not historical at all.

Q. Okay.

A. It's just part of -- it's part of a whole number of other commandments that were brought down.

Q. Okay.

A. It's the first -- the first 10.

Q. Okay. And then here at the top, there are these two tablet-looking shapes with some kind of script inside.

A. Uh-huh.

Q. What significance do you attribute to that?

A. Well, it's -- it looks like it's kind of a paleo-Hebrew -- I couldn't read it, but I imagine it's -- it may be the -- it may be five commandments on one side and five on the other.

Q. Uh-huh.

A. If you could translate that Hebrew into the modern Hebrew. That's what I'm -- I'm guessing, but I couldn't --

Q. Okay.

A. It was so vague and so sketchy that I couldn't -- I couldn't tell.

Q. And so -- so you -- you know Hebrew, right?

A. Uh-huh. Yes.

Q. And are you familiar with -- with ancient Hebrew as

well?
A. Biblical Hebrew?
Q. Yes, Biblical Hebrew.
A. Yes, yes.
Q. Okay. And is -- the text here is -- you're saying --
A. That's pre-Biblical Hebrew.
Q. Okay.
A. I don't know what that -- that's a -- that's a script that is not -- is not familiar to me from the -- either from the print or the -- or the -- either the print in the block version or the italic version, so it's some -- as I said, it's some kind of a -- of a pre-Hebrew Hebrew.
Q. Okay.
A. So I don't know what's -- I'd have to study it. I'd have to get a magnifying glass and -- and see an equivalent, you know, letter for letter.
Q. Okay. And, just for my own curiosity, do you -- just from looking at it or from what you can recall, is it -- is it legible to someone who -- who knows Biblical Hebrew?
A. No.
Q. Okay.
A. They'd have to know a kind of a pre-Biblical Hebrew. They would have to know Akkadian or Sanskrit or something that led to Hebrew.
Q. Okay.

A. Because it's not -- it's not a Biblical Hebrew that -- in other words, I could point out the Biblical Hebrew in here and the modern Hebrew, and it's not any of those.

Q. Okay. Okay.

A. I don't know what the purpose was of putting it up there.

MR. SCHULZE: The purpose of -- going -- when he said "in here" he pointed to the Tanna.

THE WITNESS: Yes, right. To the Hebrew scriptures, yes.

MR. CANTRELL: That's right. Thank you, Gerry.

Q. (Mr. Cantrell) Okay. And then between those two tablets, there's this pyramid with the eye and the circle with lines around it.

A. Uh-huh.

Q. What significance do you attribute to that?

A. I don't know. It looks like a droopy eye to me. I don't know if's supposed to the seeing eye of God. I don't know.

Q. Okay. And then there's a --

A. There's an eagle.

Q. Yeah, eagle and the flag there.

A. And an upside down flag. I don't know why it would be upside down.

Q. Does that suggest anything to you?

(Deposition commences at 12:40 a.m.)

PROCEEDINGS

GALE STEWART,

Called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. CANTRELL:

Q. All right. Good morning. Or I guess it's afternoon. So we're on the record, and this deposition is being conducted under the Federal Rules of Civil Procedure.

My name is Michael Cantrell. I work for the Attorney General's Office; and I represent the defendant, Secretary of State John Thurston.

Can you state your name and date of birth for the record.

A. My name is Gale, G-A-L-E; Stewart, S-T-E-W-A-R-T.

I was born December 6, 1947.

Q. Okay. And have you ever been deposed before?

A. I do not recall with complete certainty, but I don't think so.

Q. Okay. And, as I recall, you -- you're an attorney; is that right?

A. Yes.

Q. Okay. Have you taken depositions before?

Exhibit J

would you teach these children to read before they get to the 10th grade.

Q. Okay. Yeah. All right. Well, I certainly appreciate all of that.

Anything that we've not discussed in your work history or education history?

A. Not that I recall.

Q. Okay. So how about preparing, preparing for this deposition? Did you review any -- any documents?

A. Yes.

Q. Okay. What -- what did you look over?

A. I looked over the items that are referenced in my Answers to Interrogatory No. 5, which are contained in the Book of Confessions of the Presbyterian Church, USA.

Q. Okay. Any other documents?

A. Not to my knowledge.

Q. Okay. Other than your attorney, did you speak with anybody to prepare for today?

A. No.

Q. Okay. And I'd like to ask you about your religious beliefs.

So how would you characterize your religious beliefs?

A. I'm Christian.

Q. Okay. And this may -- this is a general question; but when you say "Christian," what does that mean to you?

A. I referenced the Apostles' Creed in my response to Interrogatory No. 5. I believe in the items that are stated in the Apostles' Creed.

Q. Okay. And how long have you considered yourself a Christian?

A. Since I was eight years old.

Q. Okay. What -- what was it that happened when you were eight to cause you to consider yourself a Christian?

A. I became a member of my church, the Presbyterian church in Des Arc.

Q. Okay. And what -- what affiliation did -- what denomination? Was it Presbyterian?

A. It was a Southern Presbyterian church at that time.

Q. Okay.

A. It became later affiliated with the Presbyterian Church USA. And it no longer exists.

Q. Okay. Do you recall having any other religious beliefs before you became a Christian at age eight?

A. No.

Q. Okay. So since, since becoming a Christian, is there any -- any specific books or anything -- any reading material that has influenced your thinking about religion?

A. I think every book I read influences my thinking about religion. I -- I can't get more specific than that.

I have referenced the Book of Confessions in my

A. And I do not know.

Q. Okay. Yeah. It's an interesting question, though.

Are you a member -- so here -- here's some groups, and tell me -- let me know if you're a member of any of these groups.

The Freedom from Religion Foundation?

A. No.

Q. The American Humanist Association?

A. No.

Q. The Arkansas Society of Freethinkers?

A. No.

Q. Americans United for Separation of Church and State?

A. No.

Q. Okay. Have you ever been a member of any of those groups?

A. No.

Q. Okay. And I recall from looking at your written responses that you're an ordained elder; is that right?

A. Yes.

Q. Okay. And an ordained elder in the Presbyterian Church USA?

A. Yes.

Q. Okay. Can you tell me about that process of becoming an ordained elder?

A. Well, it involves laying on of hands.

Q. Okay.

A. And I can assist with communion.

Q. Okay.

A. I get -- I get to handle the bread and wine. Other than that, I can't -- one must be chosen, and one must affirm their belief in Jesus as Lord and savior.

Q. Okay.

A. To become an elder.

Q. Okay. Is there any -- any requirements beyond those you've mentioned in terms of commitment or belief or?

A. No.

Q. Okay. Is it -- is there a -- like, a time -- what am I trying to say? Is there a -- is it a lengthy process of becoming an elder?

A. No.

Q. Okay.

A. It takes about -- the -- the process is that nominations are -- are taken. The -- from the -- the church. And, as I recall -- and I might be wrong about this. The -- the session of the ruling body of the church votes on who becomes -- from the nomination becomes an elder.

And then the -- the ordination takes about a minute, because you have to make a public affirmation.

Q. Okay.

A. It seems to me that it came up during a couple of sessions before it was passed. And it was discussed.

Q. Okay.

A. Before it -- it passed.

Q. Okay.

A. But I'm not certain. That's just my impression.

Q. Okay. What did you think of the proposal to put a Ten Commandments monument up when you first learned of it?

A. I thought it was ill advised.

Q. And why is that?

A. Because I think that the principles of separation of -- of Church and State prohibit it.

Q. Okay. And what is it about a Ten Commandments monument that is -- would be prohibited by principles of separation of Church and State?

A. The -- the Ten Commandments monument is an expression of a particular type of religion. If you go to the Arkansas Supreme Court Building, there is a historical display, a tapestry that was designed to go around the rotunda. And it depicts the history of the development of law, laws or rules for ethics and laws.

And I think that in that context, it's probably acceptable, if it's a history of law in general, but not a specific statement of a particular religious group.

Q. Okay. So you've seen the Ten Commandments used as a

So have you ever been to the Arkansas State Capitol grounds?

A. Yes. Many times.

Q. Okay. Do you have any recollection of your first visit to the Capitol grounds?

A. Yes. I think I was three or four years old.

Q. Okay.

A. I went with my aunt to pick up her husband, who was a member of the State Police. And we went there. And also at about that same age, I went to -- at Christmas to see the lights and to see the nativity scene.

Q. Okay. You were about -- you said you were about three or four went you went to see the lights and the nativity scene?

A. Yes. I don't -- it's so long ago, I don't remember how old I was exactly.

Q. Sure. But you were a child?

A. Right, I was young.

Q. Okay. Got you.

So, in your adult life, what -- what visits have you made to the Capitol grounds?

A. I have made many.

It has places to picnic.

Visits to the Supreme Court library. Many, many of those.

Many to the court proceeding, both in the Supreme Court Building and in the old Supreme Court chambers, where I've been to a lot of meetings or -- or public -- public meetings for advocacy groups.

I've been out to the State Capitol to lobby for passage or -- or failure of laws.

I've been in and out of the Secretary of State's Office doing research.

I've been -- when it was still in the Capitol, I've been across the street; I've been to the Governor's Office.

I've been to Game and Fish and many state agencies.

I've been there to see to the tulip trees.

I've been there to check -- look at the monuments. I've been there to take another look at the monuments after I realized that not everybody was in favor of the Sons and Daughters of the Confederacy. That took a while.

You know, I've -- I've -- those in my childhood, the monuments at the State Capitol were the only public statuary that we had in Arkansas or -- or there was -- there wasn't any in Prairie County, anyway.

Q. Huh.

A. So I visited often.

Q. Okay. So thinking about -- thinking about -- let's -- let's go back to say roughly, you know, 2010.

So since that time frame, what -- what have you -- what

trips have you made that you specifically recall to the Arkansas State Capitol grounds?

A. I went to the Department of Education to public hearings on the takeover of the Little Rock School District.

I believe I went to a protest on the same issue.

I have been to demonstrations for reproductive freedom.

And the last one I went to was spring a year ago when I went to -- when we first learned that immigrant children were being separated from their parents and held in cages. I went to that one. And I remember that very specifically, because I had a new car and I locked my keys in it.

Q. That was the last time you've been to the Arkansas State Capitol grounds?

A. I think so.

Q. Okay. And --

A. Well, I have been to -- I -- well, it's the last that I recall specifically, yes.

Q. Okay. And you said that was spring of 2018?

A. Yes.

Q. Okay.

A. All of that, that time period is a bit vague; because my -- my husband died on October 2, 2017. So about -- for about a year after that, things are a little bit vague in my mind.

Q. Okay.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, JUDITH LANSKY, PAT PIAZZA, AND SUSAN RUSSELL — PLAINTIFFS

ANNE ORSI; AMERICAN HUMANIST ASSOCIATION; FREEDOM FROM RELIGION FOUNDATION, INC.; ARKANSAS SOCIETY OF FREETHINKERS; JOAN DIETZ; GALE STEWART; RABBI EUGENE LEVY; REV. VICTOR H. NIXON; TERESA GRIDER; AND WALTER RIDDICK — CONSOLIDATED PLAINTIFFS

THE SATANIC TEMPLE; DOUG MISICKO, AKA "LUCIEN GREAVES"; AND ERIKA ROBBINS — INTERVENORS

VS. CASE NO. 4:18-CV-00342 KGB/BD

JOHN THURSTON, ARKANSAS SECRETARY OF STATE, IN HIS OFFICIAL CAPACITY — DEFENDANT

---

ORAL DEPOSITION

OF

TERESA GRYDER

---

October 3, 2019

Baker, Schulze, Murphy & Patterson
2311 Biscayne Drive
Little Rock, Arkansas 72227

Exhibit K

Shyloa Myers, RPR, CCR
Arkansas Lic. No. 710

(Deposition commences at 9 a.m.)

PROCEEDINGS

TERESA GRYDER,

Called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. CANTRELL:

Q. All right. So we're on the record. Good morning.

A. Good morning.

Q. My name is Michael Cantrell, and I work for the Arkansas Attorney General's Office. I represent the defendant, the Secretary of State, John Thurston, in this litigation.

A. Okay.

Q. And, just for the record, this deposition is being conducted under the Federal Rules of Civil Procedure.

And can you state your name and date of birth for the record.

A. It's Teresa Gryder. And my date of birth is 3/5/62.

Q. Okay. And how do you spell your last name?

A. It's G-R-Y-D-E-R.

Q. Okay. Okay. Have you ever been in a deposition before?

A. No.

all I had.

Q. Okay. Were there any -- any particular pieces of paper that -- that you looked at to prepare for today?

A. Well, yes. I did look at a -- a photocopy of the commandment monument.

Q. Okay. Okay. Anything else?

A. No, not really.

Q. Okay. And, other than your attorney, did you speak with anybody else in preparing for today?

A. No.

Q. Okay. Okay. I -- so I want to ask you about your really interesting religious beliefs.

A. I don't see it as that interesting, but okay.

Q. Well, I find it really fascinating.

A. Okay. So what do you want to know?

Q. Yeah.

So how would you characterize your religious beliefs?

A. Okay. Well, I'd classify myself as wiccan. Now, wicca of course is a neopagan religion that is based off of ancient pagan rituals and beliefs.

Q. Okay.

A. I was raised Missionary Baptist and was Missionary Baptist up until probably my mid-thirties before I found it just -- it wasn't resonating with me, and so I went in search of something that resonated a little bit more.

Q. Okay.

A. That's when I found wicca, and I found that it did resonate with me.

Q. Okay.

A. Now, since then -- because I believe that it's a constant, ongoing process with the human, I have also taken up in the last three years a personal study in Theravada Buddhism.

Q. Okay. And let me ask you about -- let's go back to -- well, let me ask you this.

So you said in your mid-thirties you -- you were missionary Baptist; and that wasn't resonating so you became wiccan, a wicca?

A. Well, I mean, that -- you know, wiccan.

Q. Wiccan. Okay. Yeah, I want to --

A. Wicca is what it is.

Q. Right.

A. And "wiccan" means we are of.

Q. Right. Okay. Sorry.

A. That's fine.

Q. I'll try to get that right, yeah.

A. It's fine.

Q. So what -- what was it that caused you to -- to change your mind?

A. I just found that the Christian religion did -- it

and state separate for the security of both.

Q. Okay. And, just for the record, you're referring to notes that you've prepared?

A. Yeah. This is my thoughts.

Q. Okay.

A. Yeah.

Q. Okay.

A. In my terrible writing.

THE COURT REPORTER: Did you say, "In my terrible writing"?

THE WITNESS: Yeah. But that was just a thought.

MR. SCHULZE: You have to speak up.

Q. (Mr. Cantrell) Okay. And are you familiar with the Ten Commandments monument?

A. Yes, I am.

Q. Okay. How did you first learn about the Ten Commandments monument?

A. I heard about it on the news, TV news.

Q. Okay. Do you remember what was being reported?

A. It was just that it was -- that there was -- it was happening. It was just as the process of it being voted on and all that stuff, yeah.

Q. Okay. So you heard news reports that there was a -- a Bill that the legislature was considering?

A. Yes, yes.

Q. A bill? Okay.
A. Yes, yes.
Q. Okay. And what did you think of the monument when you heard that news report?
A. No, not on the State Capitol grounds. Just simply no. It doesn't belong there.
Q. Okay. So you had I guess a disagreement with --
A. Yeah. I just don't believe that it should be there. I think it sends the wrong message.
Q. Okay. And so what do you mean when you say that it "sends the wrong message"?
A. Okay. Now, I'm aware that our state constitution is very much like the nation's constitution. I do know that we have an emoluments clause. I do know that the emoluments clause states that the State cannot support any type of religion, okay.

By placing a religious monument on grounds that are publicly funded, it sends the message that the State is backing this particular version of a religion.
Q. Okay. And had -- had you seen the actual monument at that time when you --
A. No. My husband and I went and saw it last summer.
Q. Okay.
A. It was actually kind of a side thing. We were in the area. We thought about the firefighters' memorial, so I

went by actually to see it. Then I realized, yes, the Ten Commandments monument is up. And I haven't seen it yet; let me see what it looks like.

Q. Okay. Okay. And that was when you first saw it?

A. Yes.

Q. Okay. So I'm going to ask you about your visits to the Arkansas State Capitol grounds. And -- and just for clarification purposes, by "Arkansas State Capitol grounds," when I say that, I mean to include both the Capitol Building, everything inside it, and everything outside it on the grass and -- and the -- just the surroundings.

A. Right.

Q. So have you ever been to the Arkansas State Capitol grounds?

A. Yes, sir.

Q. Okay. About how many times?

A. Well, a lot. That's hard to say, sir. I was born and raised right here in central Arkansas. I've lived here my whole life. Going to the Capitol is not even a big deal anymore.

Q. Uh-huh.

A. So probably every year that I was in elementary school. Every year that my kids were in elementary school. Various trips whenever we'd go down to the ice rink. You've got to go by the Capitol if you go to the ice rink, you know,

so . . .

Q. Okay.

A. Any number.

Q. And so can you give me -- do you recall specific visits that you've made there and a specific purpose for why you would have gone?

A. Oh, let's see.

My kids have sung in the rotunda.

Just to go see the lights.

Took my stepdaughter, who had never been there, I took her and her husband and kids there when they came down for a visit.

Just various random reasons like that.

Q. Okay. Okay. So I want to focus on the time period from January 1, 2015, to today.

A. Okay.

Q. So going back about four years or so, four or five years.

Can you remember specific visits that you've made since that time?

A. Let's see.

My husband and I did go by to see the firefighter thing and saw the Ten Commandments monument at the same time.

My stepdaughter visit.

Actually, I was up there this past summer; because I

was trying to determine where a particular building was, because I was applying for a job there with the Parks Department.

Q. Okay.

A. Actually, a lot of times we'll come up here and just drive through the grounds if we're in the area. But we don't necessarily make specific trips just to see the Capitol unless it's a holiday or something's happening.

Q. Okay.

A. So that's all I can remember.

Q. Okay. And all of those would have been since January 1?

A. Yeah, they would have been since then.

Q. 2015?

A. Yes, sir. I can't think of anything else.

Q. Okay. And tell me about those visits.

Actually, tell me this: Whenever you go, are you typically driving from your home or --

A. Uh-huh.

Q. So whenever you approach the Capitol, which direction are you approaching it from?

A. Depends on -- a lot of times we'll come in from the east side and come straight down Capitol.

Q. Uh-huh.

A. Straight up.

Q. Okay.
A. And come around or come down Broadway and up.
Q. Uh-huh.
A. It's just easier traffic-wise.
Q. Yeah. Okay.
Okay. And let me ask you about the visit to the -- the firefighters' memorial.
A. Uh-huh.
Q. Tell me, do you recall, I mean, how you got to the Capitol that day?
A. We were -- we actually had an errand to run in the area. And, while we were there, we just had time to kill. And we were there and I thought about that one.
Q. Uh-huh.
A. Because my husband and I are former volunteer firefighters. And so we said, Yeah, we've got time; so we went over there. And as we were driving through and around, we passed by where the Ten Commandments monument is.
And I was, like, Oh, that one's there too. We need stop and look at that one, because I really need to take a look at this.
Q. Okay. Why did you want take a look at the Ten Commandments monument?
A. Well, I really wanted to see what it -- I'm interested in iconography. That's my anthropology angle there. I'm

A. Not necessarily, no. I -- I'd say mid-month maybe.
Q. Okay.
A. I really couldn't tell you what day.
Q. Okay.
A. And I'm not even sure if it was April. It could have been May.
Q. Okay.
A. I just know that the weather was warm.
Q. Okay. Okay. Good.
All right. And do you remember having any other conversations with anyone else about that visit, either before or after?
A. I mean, other than just telling friends and family, Oh, by the way, I went by to see, you know. I saw the firefighters' memorial while I was there. I saw that one too, you know.
Q. Okay. Do you remember any specific conversations?
A. No.
Q. Okay. Do you remember specific people that you talked to about it?
A. Oh, I might have mentioned it to my neighbor or something.
Q. Okay.
A. Really no, because nobody really cares.
Q. Okay. All right. And just -- your neighbor, you said

MR. CANTRELL: All right. Thanks.

(Recess taken.)

Q. (Mr. Cantrell) All right. And so we're back on the record.

And you understand you're still under oath?

A. Yes, sir.

Q. Okay. I want to follow up again and -- and try to ask you to help me; if you can narrow down when you visited the Capitol and saw the Ten Commandments monument. So --

A. That is going to be difficult.

Q. Yeah.

A. Really, it really is.

Q. So you mentioned either April or --

A. It was April or May.

Q. I think late April or May was --

A. Yeah, because I know it was really pretty hot that day.

Q. And when you say "pretty hot," what do you mean?

A. Well, I mean, you know, you didn't want to be outside too long.

Q. Okay. So --

A. It was already getting up into the upper nineties -- I mean, low nineties, upper eighties. It was already at that temperature level.

Q. Okay. And did you say you were -- when you made that trip, you were on an errand?

A. Yeah. My husband -- he had -- he had to go deliver something to somebody. I don't know. Something -- it was work related or whatever. But, yeah, my husband, he had to go take something to somebody he knew that lived down in the area.

Q. Okay.

A. I'm trying to remember what it was. A leaf blower or something. Anyway, we just happened to be around the area.

Q. Okay.

A. And we had, you know, an afternoon to kill, a little bit of time together.

Q. Okay. And so do you remember what time of day it was?

A. Oh, it was probably early/mid afternoon. I would say one, two o'clock.

Q. Okay. And was it on a weekend? Or a weekday?

A. That would have been a weekend.

Q. Okay.

A. I know it was a weekend, because the Capitol was closed. There wasn't anybody there.

Q. Okay.

A. It was a weekend.

Q. Okay. Do you know if it would have been a Saturday or a Sunday?

A. Most likely a Saturday.

Q. Okay. Okay. Are there -- okay. So you said a

---

ARTS AND GROUNDS COMMISSION PUBLIC HEARING

December 14, 2016
11:00 a.m.

Arkansas Real Estate Commission
612 S. Summit Street Street
Little Rock, Arkansas 72201

---

BUSHMAN COURT REPORTING
620 West Third, Suite 302
Little Rock, Arkansas 72201
501.372.5115

Exhibit L

A P P E A R A N C E S

CHIEF DEPUTY SECRETARY: Kelly Boyd

DIRECTOR OF CAPITOL FACILITIES: Keith Diemer

CAPITOL FACILITIES COORDINATOR: Alexis Reaves

SUBCOMMITTEE TWO MEMBERS: Melonaie Gullick
Tony Leraris
Kelly VanHook

MR. BOYD: If I could have your attention, please. I'm Kelly Boyd, Chief Deputy Secretary of State. I'm going to call the meeting to order --

This is a public hearing for the purpose of taking public comment regarding the proposal placed in effect by the American Heritage History Foundation to erect a permanent monument of the Ten Commandments on the State Capitol grounds.

In September we had a first meeting of the full commission. This subcommittee -- Melonaie Gullick from Conway, Tony Leraris from Fort Smith, and Kelly VanHook from Searcy -- were selected to Subcommittee Two for the purpose of hearing this and one other proposal.

They selected a meeting date. We held that meeting, and the group went back and did some further work.

They came back for a meeting last month. At that time the proposal was deemed sufficient to move forward to the public hearing phase, and that's where we are today.

It's a long process. The bill was passed in the 2015 General Assembly, but a lot of work has to go in, because this is a permanent memorial.

It has to be -- if it goes on the grounds, it has to be done correctly. So we're moving along with the process, and we'll go ahead and get started.

Any questions by members of the Subcommittee before we move?

MS. GULLICK: How many people do we have signed up so far?

MR. BOYD: At this point 17 have signed up to speak for the proposal and 14 have signed up to speak against the proposal. That's 31.

MS. GULLICK: I would like to make a motion that we limit the speaking time to three minutes per person going in.

MS. VANHOOK: I'll second.

MR. BOYD: I heard a second. All in favor?

(A vote was taken, and the committee was in unanimous agreement.)

MR. LERARIS: What was it, two?

MS. GULLICK: Three.

MS. VANHOOK: Three.

MR. BOYD: Any opposed? Since you all three voted I, I'll take that as no opposed. We do have a timer here.

We have gone through several meetings now where the American Heritage and History Foundation has been allowed to present their proposal.

Obviously they're for the proposal, so out of a sense of fairness, we will start out with someone from the opposition side.

We will just take these down the order, and we will go back and forth, for, and against, and for, until we complete both sides.

If other people come in and sign up, they will be given a chance to speak. We have to be out of this building at 3:45, so we can -- right now we can get everybody in with no problem.

The first person that has signed up to speak against the proposal is Bruce Hill. Mr. Hill, go ahead.

MR. HILL: Good morning. I wish you

would have given me five minutes instead of three minutes; however, I will work with three minutes.

I am the president of the Arkansas Universalist Unitarian Justice Ministry, which is a new organization. We have applied for a 501(C)(3) status with the appropriate government agencies so that we can educate and lobby as appropriate on public matters that involve UU beliefs.

We read and rely upon a number of sources. We are against the intermingling of state and religion.

And I realize that we are a day short -- a day late and a dollar short -- excuse me -- because the State Legislature in its infinite wisdom has passed the statute, and you are tasked with the obligation of looking at this proposal.

This monument is not appropriate. I don't know which version of the Ten Commandments it celebrates or which Bible that it got its verses from.

There are a number of source documents that we as UU's believe and read and learn

from, and, obviously, the Old Testament is part of it.

There's also the New Testament, where there are eight Beatitudes. And we may ask the question, What is Christianity? What does it believe in?

If the Ten Commandments were part of a larger monument that celebrates the teachings of Buddha, or Confucius, or Islam, as I mentioned, the New Testament, or earth-based religions, or humanist teachings, then this monument may be appropriate. I'd want to look at the design.

But as it stands right now, it celebrates one religion over another, and we do not believe in that.

We accept all religions. We accept all faiths. We accept all beliefs, and we honor the struggle that individuals have to come to their own conclusions about what to believe in, what god, if you will, small "g," that they might believe in or not believe in, for that matter.

If you want to celebrate something,

that is the basis of our laws, then why not a monument to the U.S. Constitution, the Arkansas Constitution, and the Bill of Rights? I think that would be much more appropriate for the State Capitol grounds.

The idea of celebrating the Ten Commandments is just not correct. I know that you have the statute, but if you want it to pass muster in front of the Supreme Court, that should be part of a broader design.

And the only people who are really going to be happy with this monument are the attorneys when we argue it before the Supreme Court.

Thank you.

MR. BOYD: Next we'll take an individual that wishes to speak for the proposal. Mr. Robert Johnston.

MR. JOHNSTON: No, I changed to against.

MR. BOYD: You changed to against?

MR. JOHNSTON: I scratched out and signed up against.

MR. BOYD: Not a problem. Mr. Larry

Burks.

MR. BURKS: Thank you ladies and gentlemen of the commission. Thank you for hearing us today.

I'm a pastor from northwest Arkansas representing a lot of other pastors and people of several different denominations by being here to deliver a comment that has been multiplied many times over and signed by a lot of people who trusted me to deliver this message to you.

We've only found out about this hearing last week, so I have been quite amazed at how fast word has spread in such a short time. If we had much time, no doubt there would be many more here today and many more requests.

We intend to continue to inform pastors, people in churches as more information is gathered.

I also know that you have been and will be receiving more of these comments by mail, and we intend to continue to inform pastors, people in churches as more information is gathered and until the Ten

Commandment monument is properly placed as the Act 1231 provides.

I have with me 355 comments just to hand to you, and we reserve the right with the Secretary of State to submit these comments for a future hearing if for any reason that should become necessary.

I'm submitting this by written request to the Capitol Arts and Grounds Commission for the purpose of communicating my expectation of seeing a state-of-the-art monument of a reverent, and Biblical, and historical design erected in an attractive manner and in a location on the front lawn of the Capitol grounds that is prominent and easily accessible for visiting and photography by the general public.

A monument that is befitting the greatness and the eternal endurance of the desperation of God's law upon whose blessings the founders of our great state of Arkansas acknowledge as being grateful to all mighty God for the privilege of choosing our own form of government and securing the same for ourselves and other

posterity that is in the Preamble of the Constitution in the State of Arkansas 1874.

Being in the posterity of the founders of our state and our American nation I'm hereby also declaring my support thereto the General Assembly's enactment to properly memorialize the greatest law ever given to mankind originally engraved by the finger of all mighty God in stone tablets and given to Moses on Mount Sinai for the benefit of all mankind as the rule of law to be obeyed and honored in expectation of God's son, the Prince of Peace, Jesus Christ, upon whose shoulders all government shall ultimately rest.

I further request that the Secretary of State who has been given the final authority of approval of the monument submit a complete plan for all of the sponsors of this enactment pertaining to the design, location of the monument prior to its placement to ensure that the Secretary of State and our commission has fulfilled the original intent of the sponsors and the language of the enactment.

I understand the monument has been constructed and produced with private funds and is ready for permanent placement now awaiting action by the Secretary of State's --

MR. BOYD: Time is up, please.

MR. BURKS: -- Grounds Commission.

MR. BOYD: Okay.

MR. BURKS: I have these to submit to you. Whose receives those?

MR. BOYD: Put them right here is fine, sir.

MR. BURKS: Thank you very much.

MR. BOYD: Next up against the proposal is Katie Holder.

MS. HOLDER: Thank you for listening to our comments. My name is Katie Holder, and I'm not here to represent any group. I'm just here as a private concerned citizen.

There's two pillars here that I want to argue against the placement of this monument. The first is that it is a violation of our laws of the Arkansas State Constitution and the U.S. Constitution.

The Arkansas State Constitution says, No preference shall ever be given by law to any religious establishment, denomination, or mode of worship above any other.

This monument would give a nod of preference and approval to Judeo-Christian religions.

In the U.S. Constitution, the first amendment, the first statement of the first amendment, Congress shall make no law respecting the establishment of religion.

We do not live in a theocrasy. We do not want to live in a theocrasy. Theocrasies do not fair well.

In May of 2016 a Supreme Court precedent *Prescott versus the Oklahoma Capitol Preservation Commission* ordered the tear down and removal of their Ten Commandments monument.

The second pillar I would like to state is the cost to taxpayers. The cost of the legal fees in Pulaski County, Kentucky of the privately-funded Ten Commandments monument that was placed on the grounds of their state capitol --

exactly the same scenario we have today -- the legal fees amounted to $460,000.

Right now a total of $231,662 have been paid from the county coffers. They had to take out loans to cover this.

This would be a waste of taxpayer money. I certainly can find many reasons and many more worthwhile places to put my money, your money than this boondoggle.

I propose that this boondoggle, that every legislator who voted for this and who spearheaded this project be personally liable for the cost of its defense, instead of passing it on to the taxpayers. Thank you.

MR. BOYD: Next up to speak for the proposal is Charles Scott.

MR. SCOTT: I won't need the three minutes, but I just was going to stand up and say that I am for, obviously, and have submitted my comments as well with the list that Lonny Burks handed forward.

MR. BOYD: Okay. Next up to speak against, I believe I have you correct now, Dr. Johnston, Dr. Robert Johnston.

MR. JOHNSTON: Thank you. I'm Robert Johnston. I'm a practicing physician. I used to teach constitutional law and American government.

As I think you're aware, but you ought to be very aware, the U.S. Supreme Court in March of '05 heard two cases involving religious displays almost identical to this, somewhat like this anyway: *Van Orden versus Perry* and *McCreary County versus ACLU* of Kentucky.

These were the first two cases directly dealing with this since 1980. They were decided in June of '05.

In the first of those, the Court upheld by a five to four vote the legality of the Ten Commandments display in the Texas State Capitol due to the monument's secular, secular purpose.

In the McCreary case, however, the Court ruled five to four that displays of Ten Commandments in several Kentucky courthouses were unconstitutional, unconstitutional, because they were not clearly integrated with the secular

displays and, thus, were considered to have a religious purpose.

If the State of Arkansas, this commission, is counting on the U.S. Supreme Court changing because of the vacancy of Justice Scalia, note that Justice Scalia was in the minority of those two cases.

The five majority remains. And unless the State depends on one of the five changing, which is highly unlikely, given the strong propensity of the U.S. Supreme Court to follow the -- of the standards, you should be very aware that this display is unduly religious, archaic, and narrow.

There are far better versions of the Ten Commandments that could be displayed, but that is not what is before this commission.

But if it's going to be displayed, it ought to be displayed in line with two, or four, or ten secular documents in order to satisfy the Constitutional requirements.

I think you need to turn this down. And I have here, and others will come forward, a proposal that would be much more

likely to pass Constitution muster.

Thank you.

MR. BOYD: Thank you, Dr. Johnston.

Next up to speak for -- and I'm going to butcher this last name -- Roger Humber. There you go. I got it right. Come on up.

MR. HUMBER: I'm not going to take three minutes. I just have a statement. I have submitted a written form comment, as has been handed to you. I stand in support of the monument.

MR. BOYD: Thank you, sir. Mr. Robert Walker wishes to speak against the proposal.

MR. WALKER: Thank you, sir. I'm Robert Walker. I was a state employee for decades. I'm retired. I now work the polls when there's an election, and I'm a dog sitter.

When I'm a dog sitter, that's easy. I feed the dogs. I take them for a walk around the block. I take the female dog around. She sniffs the flowers and trees and the bushes, and then we go back home.

I take the male dog out, and he marks

the trees and the bushes and the flowers. I don't argue with him. That's what male dogs do. We walk around the block, and we go back.

Now besides being a state employee, I was a member of the Arkansas Army National Guard 23 years and 6 months. I served you. I served me.

I was happy to go out in bad weather to help everybody out. I was happy to go to Louisiana for Katrina.

I was in a medical company. It takes two people to run an ambulance. Somebody has to drive; somebody has to take care of the patients.

My last battle buddy, we were assigned together. I had never met her before. We spent weeks together taking care of our ambulance.

After a week or two I felt comfortable, and one Sunday morning I said, What religion are you? She said she was a Wiccan. It took me a few seconds to say, Well, should we get you some candles or something? And she said, No. That's all

we talked about it.

She deployed to Iraq. She took her weapon. She operated there. She served you. She served me. She protected us from our enemies. She was a Wiccan.

Now people in the Legislature have decided to mark the State Capitol in a way that I find offensive to her. It's repulsive. It is shameful. It is slapping her in the face, and she served you and me as a combat veteran.

That's repulsive. Only a poltroon would do that, a rapscallion. I know other words. I was in the Army, but I won't use them now.

I urge you not to take this action. Send it back to the Legislature. Arkansas belongs to Arkansans. It should not be marked. There should not be something like this on the State Capitol grounds.

There's plenty of other places to put it, plenty of other places to express yourselves. Do not insult my battle buddy.

It's -- and if you do it, you go ahead, be sure that you can take it away

and replace it, because I don't think it's going to last, and it's going to cost us a lot of money.

That is my plea. Don't do it to her. Don't do it to me. Don't do it to the people. Just because there's a supermajority in favor of something doesn't mean that it should happen.

Each and every one of us belongs to a minority in some way, and if the majority tramples on the minority, eventually each of us who will face that will be trampled on.

MR. BOYD: Time is up, please.

Next up for the proposal is Shirley Adams.

MS. ADAMS: Mine is also included on the written support we turned in.

MR. BOYD: Next up to speak against the proposal is Gerry Shulze.

MR. SHULZE: Good morning, I'm Gerry Shulze. I appreciate this opportunity to speak to you on why this sectarian monument should not -- it's a monument to a particular religious tradition, and I'm not

going to call that tradition Christianity, because there will be Christians here for it and Christians here against it.

I will say that it is sectarian, and it should not be placed on the Capitol grounds.

First, the religious motivation here is transparent. Act 1231, the law we're talking about, was drafted to pretend that the Ten Commandments are being presented as part of the secular history of law.

That's simply not true. The Ten Commandments are unquestionably religious in nature, an aversion set up by the Legislature, and there has been some question about this. There are three different versions, at least: The Jewish version, the Roman Catholic version, and the Protestant version.

This version is an amalgamation of all three, which only by some very clever formatting manages to remain ten. There are actually eleven or twelve if you count them.

Second, this version of the Ten

Commandments as prescribed by the General Assembly is -- it is -- if you look at the first four using their version, the first four are so clearly religious, they couldn't even be enforced under our law. They are absolutely religious.

I'm not going to speak for Christians, or Jews, or any other religions people. They can all speak for themselves, but I would also say that Jesus of Nazareth was a secular philosopher as well.

He was a world philosopher ahead of his time and probably ahead of ours. And I think from my reading of the Christian gospel that Jesus of Nazareth would be appalled by this.

This monument is clearly designed so that a, what a perceived majority -- and I'm not even sure it's a real majority, because I think there are a lot of Christians out there who would be appalled by this as well.

A perceived majority can show we, not you, are the top of the rank here. We are number one. And I think that Jesus would

be offended by this.

Further, I'm amazed that Christians are not offended by the very idea that this is somehow a secular set of rules.

The Ten Commandments are supposed to be the word of God, as the preacher said, "written by the hand of God on the tablets given to Moses."

What are we talking about here? We're talking about something that is religious in nature, not secular. And unlike -- in Act 1231 to the contrary, the Ten Commandments have nothing to say about civil government, limited government, or inalienable rights.

Finally, I'm a lawyer, and I intend to be one of the lawyers who will file a lawsuit if this monument goes on the State Capitol grounds. I anticipate that we will be successful.

I anticipate, as has been mentioned earlier, I will be awarded fees. I'm here to ask you today not to pay me. I'm here to ask you here don't give me a great lawsuit that let's me make a bunch of

money.

Thank you.

MR. BOYD: Next up to speak for is Joshua Dye.

MR. DYE: I have no intention of saying anything but siding with this and saying that I submitted my form and agreed to have the monument put up.

But I believe I should say something. I'm just a 19-year-old evangelist who loves this country and loves this state, and I believe that I know God, and I know what has made this nation great from the time it was founded.

And it was God. It was the power of God and the will of God. And the Bible clearly states that a nation that forgets God will perish.

And I believe it will turn into hell, is what the Bible says. And I love 2 Chronicles 7:14. It says, If my people which are called by my name shall humble themselves, seek my face, pray, turn from their wicked ways, then will I hear from Heaven, forgive their sin, and will heal

their land.

And I believe if our land ever needed healing, it is today. And I don't believe that the commands that were given by God were given to us so we could hide them and, and only keep them in the confines of our house.

But I believe that they were, that they were given to us to be declared, and to be put out so that this world can see, so that this nation can see what this nation was founded on.

We can look back at history, and we can look back at what the men and women that founded this country stood for, and we can see the state that this country was in in the days when it was, when it was governed by men that feared God, and I believe we can see that the state of our country then was far better than it is today.

We can see George Washington, a man that knew God, a man that prayed to God, and we can also see a man that fought in battle. And guess what, he was victorious.

We can see a man that had bullet holes through his jacket because he knew God, because he had God on his side.

And I believe when we restore what God has meant for this, for this nation and this state once again, then I believe this nation can come back to what it was, but only, only when we remember God, when we observe his commandments.

You know, the Bible says that we are to be a city set on a hill that cannot be hid. This thing isn't, it's not meant to be -- it's not meant to be put away, but it's meant to be declared.

And I want to say one more thing, that I believe that if this nation and this state would observe the Ten Commandments and live in it, don't you believe this would be a much more peaceful nation? Don't you believe this would be a much more whole nation, if there was no murder, Thou shalt not kill.

And if there was no bearing false witness, if there was no back biting, if every man loved his neighbor, if every man

didn't covet what his neighbor had, if every man observed and done what the Ten Commandments say to do, don't you believe it would be to the betterment of this entire nation and to everybody under it?

Thank you.

MR. BOYD: Next on the list this time to speak against the proposal is Eugene Levy.

MR. LEVY: Thank you all very much. I'm a retired rabbi. With all due respect to the first speaker and the previous speaker, you can tell that it's religious motivation to have this Commandment monument up.

They spoke totally in religious terms, and they actually probably took away what I was going to say on the other side.

My three minutes are in terms of some questions that I think the panel should be able to answer to the, to the community.

We have yet to hear what the real motivation for placing this monument is. What is the real motivation? Why are we putting it up there?

And if it's not religious, if it's called secular, why are there Jewish stars at the bottom of the monument, and what's on the tablets that are at the top of the monument?

Are these commandments to be suggested or commanded? If they are Ten Commandments, who is doing the commanding? If it's God doing the commanding, then, of course, it's religious. If it's the state doing the commanding, then who needs to follow them?

Where does it say in the book of Exodus or Deuteronomy that these, in fact, are the Ten Commandments? There's no place that says, The following are the Ten Commandments: You shall love -- you know.

Where it does say the Ten Commandments is in Exodus Chapter 34, and it has six or seven commandments that are different than the commandments that are on the monument.

What you are doing on the monument is putting on something and saying the Ten Commandments, and nowhere in the Bible does it say, quote, These are the Ten

Commandments.

Which version? Picking one makes it religious. And if you're going to put it out there, why not have the original Hebrew? And why not the full commandments, which include many more things of not to do on the Sabbath day that are just listed, and, by the way, which Sabbath day are we talking about: Friday? Saturday? Or Sunday? No mention.

And if it's observing the Sabbath day, in Arkansas it's Sunday -- I'm sorry -- or Saturday, no more football.

Why not the commandments -- there are 603 other commandments. One of them that's mentioned dozens of times throughout the scripture is to love your neighbor as yourself. Another one is to love the stranger. Why don't we put those up there? I think I know the reason why.

Should we demand that the people most interested in erecting these actually follow them? Not only pay for them, but follow them. And should they be the standards for those running for office?

Why are we putting them up?

And when it comes to bearing false witness, thank God we didn't put these up before the election campaign.

Can we hold those running for office to the same standards and have them check the ones that they follow and check the ones that they don't follow?

MR. BOYD: Time is up, please.

MR. LEVY: It is a religious monument.

MR. BOYD: Next up to speak for the proposal is Gene Woody.

MR. WOODY: My comments were said by the pastor.

MR. BOYD: Thank you, sir.

Next up to speak against the proposal Tony Allen.

MR. ALLEN: Bringing this to the subcommittee, I wish to register my opposition to any religious-based monument on the grounds of the State Capitol; however, if such a monument were to be said to have a site for affecting human behavior, probably the best place for it to be is in the chambers of our Legislature.

Authorizing public displays in some states is a clear violation of the First Amendment's prohibition of government endorsement religion.

Additionally, allowing any monument averting to the philosophy of one religion but later disallowing such displays for other religious groups also fails such a test for constitutionality.

Public spaces should be free of any displays that promote a specific religion. There is no shortage of private property on which any religious group may exercise their opinion to express or promote their specific beliefs as they see fit.

The exercise of spiritual beliefs free of government sanction or government prohibition is a cornerstone of civil society and this nation.

To allow the placement in a public space, as in this case, that appears to be an endorsement of any religion by the government is inimical to the free exercise of the beliefs of any citizens be whether they have any faith or no faith at all.

Thank you.

MR. BOYD: Thank you, sir. Next up to speak for the proposal is John Creekmore. Did I pronounce that correctly?

MR. CREEKMORE: Sir, I chose to pass. My comments have already been entered.

MR. BOYD: Thank you, sir.

Next up to speak against the proposal is Steve Warnock.

MR. WARNOCK: Good morning. I'm Steve Warnock, and I'm a retired teacher, former architect in the Little Rock area. I am the president of the Arkansas chapter of Americans United in the Separation of Church and State, and I'm also a member of the Freedom From Religion Foundation.

I am opposed to the monument. I believe it is a conscious and intentional and unconstitutional endorsement of religion, possibly malicious.

There will be lawsuits. And if it is built, I think there's got to be a suggestion that there is going to be a forum where other people could put in monuments to the -- I'm skeptical of it.

Design guidelines could be used to block other monuments.

Public officials know better than try something like this. I feel it's a form of malfeasance for them to spend this kind of money, and they mention $465,000 that had to be paid to lawyers on this issue. I think public officials should be kept responsible for this.

One thing Pastor Burks mentioned that got my attention, I think, is one of the problems that causes this type of thinking is that he kept talking about more, and majority. Well, the majority can be a mob, and it can be a mob that dominates minorities.

So, in closing, I believe this violates the establishment clause in the Constitution, and I believe that it degrades minority rights.

Thank you.

MR. BOYD: Thank you, Mr. Warnock. Next up to speak for the proposal is Bethany Roberts.

MS. ROBERTS: I pass, but I have

turned mine in for it.

MR. BOYD: Okay. Next up to speak against the proposal is Rita Sklar.

MS. SKLAR: Thank you, and good morning members of the commission. I'd like to ask before I start and the clock starts a procedural question.

It was publicized that there would be plenty of time to talk, that the hearing would go on until four.

Mr. Boyd, I'm partly addressing you. I don't know if this involves staff, but I believe two-thirds, if not more, of the people that signed up to speak have already spoken, and we are barely at 11:36.

I did not get notice of the three minutes until I got here, and I have a little more like five minutes that I feel is important for the commission to hear.

And I believe if everyone speaks who has signed up, we will be done in an hour.

MR. BOYD: I would like to present to the subcommittee, she has signed up in three different locations.

MS. SKLAR: Well, that was a mistake.

MR. BOYD: Well, no, it's not a problem. You will get a chance to speak then, so if you would like to combine them all at one time, I don't -- I'll leave that up to the commission.

MR. LERARIS: I think everyone else has limited there's to three minutes so far, Ms. Sklar.

MS. SKLAR: Sklar.

MR. LERARIS: Sklar, I'm sorry.

MS. SKLAR: Would you like me to come back two times more and finish my remarks? I'll do that. That's fine.

MR. LERARIS: That's fine.

MS. GULLICK: We can hear everyone, and then if anyone wants to speak again, we can --

MR. LERARIS: The reason we put the limits on this is we could be here for two days.

MS. SKLAR: I understand that, but three people at 30 -- 30 people at three minutes is 90 minutes.

MR. LERARIS: Okay.

MS. SKLAR: But several people have

chosen not to speak, as you know.

MR. LERARIS: That's their choice.

MS. SKLAR: I understand. Leaving us much more time than originally anticipated. See my logic?

MS. GULLICK: So if you don't mind, there's plenty of time to sign up. So at the end if everyone comes through, if you want to come back up --

MS. SKLAR: I just think that it is a chilling on the expression of the people. This is their one chance for a public hearing. And I think that motion and this decision is an effort to squelch speech, as the reality shows that there are fewer people and more time than there is --

MS. GULLICK: We didn't know how many people were going to sign up.

MS. SKLAR: But now you do.

MS. GULLICK: So if you don't mind, if you don't finish now, and then you can come back after everyone else who is supposed to speak, and you can continue on.

MS. SKLAR: Okay. Thank you.

Well, for almost a hundred years the

ACLU nationwide has worked to defend and preserve the individual rights and liberties guaranteed by the Constitution and laws of the United States, and that includes the rights to religious liberty and religious expression.

I can give you several examples, but one includes defending the rights of student athletes to have copies of the Ten Commandments in their private lockers, and the rights of students to wear crosses and other religious symbols not beneath their clothing but on top of it where students and teachers have told them they could not wear them.

We know that in America everyone knows you have the right to worship as your conscience dictates. We enjoy a freedom of diversity that is equal nowhere in the world.

It is because the Ten Commandments have a deep religious significance for many people that we're here today. Because of the First Amendment people are free to display the Ten Commandments in their

homes, houses of worship, on their t-shirts, anywhere without the fear of many people around the world who have to practice their religion in secret for fear of imprisonment or death. And we support and fight for that right year round.

All of these examples of religious expression, the two that I have shown you, showed the right of an individual to religious liberty.

Our Founders insured this right in the First Amendment; however there is a distinction between individual expression and expression by the government. And this is a distinction that many people are not taught, unfortunately.

If government has no individual rights. When the state favors one religion over another, it is considered establishment of religion, not individual expression, and it is barred by the establishment clause of the First Amendment.

The placement of the Ten Commandments monument of the grounds of the seat of

Arkansas state government sends an unmistakable message to the people that the state endorses a particular religion and, therefore, is unconstitutional as a clear violation of the establishment clause of the First Amendment.

MR. BOYD: Time for now.

MS. SKLAR: Does that include when I started my --

MR. BOYD: We knocked that out.

MS. SKLAR: Pardon?

MR. BOYD: We knocked the conversation with the commission out.

MS. SKLAR: So it started with one of America's -- okay. Thank you.

MR. BOYD: Next up to speak for the proposal is Galyon Phifer. Did I get that correct?

MR. PHIFER: Yes. I have already submitted my support for the monument.

Thank you.

MR. BOYD: Next up to speak against the proposal is Mr. Jim Lensley.

MR. LENSLEY: Thank you very much. My name is Jim Lensley, and I would that the

verbal comments carry the same weight during deliberations as do those that are handed in and written down.

If that is not the case, then if some accommodation would be made for that, I would appreciate it.

This is an unconstitutional amendment that is a waste of taxpayers' dollars, dollars that all Arkansas citizens paid for, all of us, and this is directed strictly at the Christian community.

My family has Native American roots, and Muslim, Hindu, Native American, and Wiccans, and many others who do not have the same Christianity background do not support this kind of thing. This is a discrimination against those people. This is an unconstitutional action.

Even as a Christian, I did not believe in governmental stamps of approval on any religion. If all religions were to be permitted to deploy their religious -- excuse me -- monument on the State Capitol grounds, the State Capitol grounds would begin to look like a New Orleans

above-ground cemetery, cluttered with monuments from every conceivable religion or religious background.

I ask for the sake of all of the taxpayers of Arkansas, do not approve this installation of this or any religious monuments on state property.

This is a waste of taxpayers and all people, and I mean all people of the state of Arkansas pay, and it is a very -- it's aimed at only one particular section of the population, and it does not serve all of the people.

This is not a theocrasy, and we do not need to make strides toward that end. I encourage you to do not approve this monument.

Thank you.

MR. BOYD: Thank you, sir. Next to speak for the proposal is Brian Roberts.

MR. ROBERTS: I have presented my written, written support of this monument, so I will pass.

MR. BOYD: Would you like to speak again now at this point Ms. Sklar, or would

you like to wait until the other --

MS. SKLAR: If somebody is waiting who hasn't spoken, I would be happy to wait.

MR. BOYD: There are other people on the against side right now, but we will call upon you again.

Your name came up on the list --

MS. SKLAR: On the list --

MR. BOYD: I did not want to skip you.

MS. SKLAR: I don't want us to be here all day any more than you all do.

Thank you.

The monument itself is a visual symbol of what the text says. The text is an indisputably religious statement dealing with religions concepts and obligations and with moralities that are subject to religious sanctions.

The Ten Commandments are religious. The objective of the placement of the monument is unambiguous. They are the tenets of a religion foreign to many of our citizens who will be made to feel like outsiders.

The text of the commandments cannot be

separated from significance, as the text calls individuals who adhere not only to moral principles but also to uniquely religious obligations, as I know has been pointed out.

The placement of the monument is religiously divisive. No other religious -- this monument is present on the Capitol grounds, and there is no context in this placement for the allegedly secular history related purpose.

They -- the commandments proclaim existence of a monotheistic god, no other god. They regulate the details of religious obligation: No graven images, no Sabbath breaking, no vain or swearing.

And they understate and address even the universally-accepted prohibitions against murder, and -- some light on the sanction of divinity proclaimed at the beginning in the text.

In our successful challenge to a similar monument in Oklahoma, our plaintiff was a Baptist minister who said in part, As a Christian, the Ten Commandments are

sacred to me, and that's exactly why I feel compelled to take actions to protect them.

They are a covenant between God and people of faith. By erecting a plainly religious monument under sham secular pretenses serves only to trivialize the holiness of a sincere religious covenant.

It undermines religion by negating the significance of the most sacred simple divine religious language.

The personal beliefs of the government officials who initiated and endorsed the Ten Commandments monument request their clear religious purpose in erecting the monument. They are Judeo-Christians for whom the Ten Commandments hold deep significance.

Members of the commission, it is your duty to distinguish a sham secular purpose from a sincere one.

The fact that the Ten Commandments monument would stand alone on one prominent section of the Capitol grounds shows us a historical purpose of the sham, a sham that sets out the Ten Commandments as standing

alone, not part of an arguably secular historical display.

And so it can send only one message, the reasonable observer can only think that the State means to emphasize and celebrate the Commandments of a religious nature.

No reasonable observer could swallow -- the State has cast off the objections so unmistakably --

MR. BOYD: Time.

MS. SKLAR: -- in a decision to place the Ten Commandments in this fashion on the Capitol grounds.

Thank you.

MR. BOYD: Next up to speak for the proposal is Judy Robinson.

MS. ROBERTSON: I understand I am just a concerned citizen, a private citizen. I didn't have a prepared speech, but as I'm hearing everything, I think about we do have some displays right now, the manger scene, and the free thinkers by it, and I believe that was put up privately.

And I'm looking at this monument that is being put up, and it says, Presented to

the people of Arkansas by the American History and Heritage Foundation.

I believe this is funded by people. It's not the State doing this. And I have been to the federal state capitol myself. Inside it I have seen the Ten Commandments, and the Supreme Court with Moses holding the Ten Commandments.

And I'm sitting here reading the Ten Commandments: Thou shalt not kill. Thou shalt not commit adultery. Thou shalt not steal. Thou shalt not bear false witness. Thou shalt not covet thy neighbor's house. I could go on and on.

I think these are moral values even though, quote, they were given by God to Moses. That's all I want to say.

MR. BOYD: Thank you. Next up to speak against the proposal is Anne Orsi. Did I pronounce that correctly?

MS. ORSI: Yes. My name is Anne Orsi. I'm a lawyer and historian. I am completely opposed to this monument on a number of grounds.

Despite the passage of this

ill-advised and ill-considered law, this monument is simply not constitutionally appropriate for the State Capitol grounds.

It's perfectly appropriate for private display, but not on government property, any government property.

The divisive nature of this monument should be obvious from the comments that you've received today.

Every other permanent monument on the State Capitol grounds is completely non-controversial.

The nativity scene and the winter solstice displays, which are the only religious monuments on the Capitol grounds at this point, are temporary in nature. They go up, and they come down within a 30-day window.

And just to get something other than Christianity represented on the State Capitol grounds, it was necessary to file a suit.

You may remember that in 2008 or 2009. The federal court ordered the State of Arkansas not to establish religion, not to

allow just one religious display.

This will be the same result if the Ten Commandments monument goes up, and, once again, a lawsuit is filed. The State of Arkansas is going to be told to take it down or allow other religions to have equal time eventually.

This monument and the bill that created the fact that we're here today seeks to give legitimacy to a particular version of religious text as the basis for U.S. and Arkansas law.

It has patently religious in nature. It arrogantly assumes that it is the definitive word on not only law, but the interpretation of religion, and it's wrong on both counts.

It's premised on distortion of the legal history of the U.S. legal system and the Arkansas legal system. A reading of the Federalist Papers and James Madison's notes of the 1787 Constitutional Convention will make that abundantly clear.

The best thing this commission can do is to report to the Secretary of State and

to the Legislature that there is no appropriate place on the State Capitol grounds for this monument.

The lawsuit to remove it will be successful. Please save the state money. I love what Mr. Schulze had to say about that.

It's just going to cost the state money. And it was written into this law that the Attorney General wouldn't even be defending it.

We're going to get to pay a private law firm to defend this. It's completely inappropriate on so many levels.

Thank you for your time.

MR. BOYD: Thank you. Next up to speak for the proposal is Toni Rose.

MS. ROSE: Good morning. My name is Toni Rose. I represent America Speaks. I'm glad that the last speaker brought up some things about our Founding Fathers.

What I would like to do is to speak to the historical importance of the Ten Commandments.

We are a nation based on

Judeo-Christian values. We certainly welcome people of other faiths. As our forefathers fled England and other nations that had commanded a single church, they came here with the hope and the dreams of living out their religious faith as they saw fit.

But you can't deny the fact that Muhammad was not in the room with the Founding Fathers when they were trying to decide how to create the core values that would guide our nation.

They did not read the Quran as direction for the Constitution of the United States of America.

I believe that the Ten Commandments are as much a historical document to the United States of America as the Constitution and the Bill of Rights, and they have every right to be on the grounds of our State Capitol.

And I would hope that our Legislature as they walk these grounds will see the Ten Commandments and be reminded of their moral obligations to the citizens to whom they

are responsible and to who put them there.

I was recently on 9/11 on the Washington Mall and the Arlington National Cemetery. On the mall you cannot turn left or right; you cannot turn around and look behind you or ahead of you without seeing monuments based on our Judeo-Christian values.

This is not ground-breaking stuff here. Washington D.C. has God on almost every building and is a recognition of the values on which our nation is founded.

It is a historical document, and it belongs on the grounds of our State Capitol. Thanks for your time.

MR. BOYD: Thank you.

Next up to speak against the proposal is Adam Corkenson?

MR. CORKEN: It's Corken.

MR. BOYD: Corken.

MR. CORKEN: I didn't prepare anything. There have been a bunch of people against that have spoken legally and logically against this.

I don't want to bring up anything to

add to that because I just don't know how much more eloquently I can do it.

I just want to say that I was born in Arkansas. I went through public education in Arkansas.

I went through UCA to get my bachelor's, and I went to UAMS to get my doctorate, so I'm as Arkansan as anybody else here, but I'm also a non-Christian.

And that doesn't necessarily make me an atheist or anything like that, but what I simply want to say is that when it comes to mistakes, on which you're aware this monument is gong to be placed at the State Capitol, the State sets something aside for religion, it's supposed to serve the people.

Religions don't necessarily serve all people, so that's why the State is a separate entity.

And when there's something at our State Capitol which is supposed to serve and represent me that would be some -- that would have a monument that does not represent me up there, it kind of sets a

precedent symbolically about what the state might be able to do after that.

It's really just a slippery slope. I mean, because I don't plan on going on tangents, but, you know, it's another thing that you might not see with me from my red hair and my white skin is I'm actually third generation Japanese.

Well, a little while ago in the sixties it was illegal for biracial or for interracial couples to be married, and that was my grandparents. But the State issued that.

And all I'm getting at is when you set precedents, you're putting up a symbol that represents really just a certain portion of Arkansas, then you wonder which way the State may flow when it comes to legislation that may only serve a few.

Really this is just kind of off the cuff, but that's just my thing is that the State is supposed to represent everybody.

Having a monument to one specific theology would be representing only a certain portion. And it sets a symbolic

precedent which then turns into a legal precedent for representing only a certain portion of the State of Arkansas.

Thanks.

MR. BOYD: Thank you, sir.

Next up to speak for the proposal is June Matheny.

MS. MATHENY: Yes, I'm coming here today as a private citizen, but I'm also a retired teacher. I see the Ten Commandments as something that all people should be able to live by.

If we -- I remember when all of this was taken out of our schools, one person did it, and it just kind of snowballs and snowballs.

When I started teaching in West Memphis, Arkansas, it was wonderful, and I watched gradually all of this go downhill.

We have more violence. We have more people who do not respect thou shalt Not kill, or thou shalt honor thy mother and thy father.

If we had this in our state, and we lived by it, and we lived as an example for

our children, I think we would see a turnaround in our culture. I think we would see a turn around in our society, but especially in our schools.

Our public education, as we all know, is in distress, so we need things that will help.

And I do believe that the Ten Commandments were put here for a purpose more than just religion. I hear a lot of people, I'm going to sue you. I'm going to do this. There's a lot of animosity.

Let's get back to what it really says. Let's respect each other. Let's live by this and set examples for what we do need.

If the children, when they come to the State Capitol to go on tours, and they see all, see the monument. They see the Ten Commandments, it is another reinforcement of this is the way we should live. This is the way we should raise our children.

We don't want to raise them to be -- just like yesterday, there were two in Maumelle that were arrested for carrying guns.

I mean, we've got to have a turnaround in this country. And I hope you will respect everybody's opinion, everybody's thoughts but also give precedence to what is -- what is our future, what is happening in our society.

Why are our policemen being murdered? Why are our children turning against their parents? Why do we have parents turning against their children?

We need to come back -- just as one gentleman said, we need to come back to what we started out as, as a Judeo-Christian community and nation.

Thank you.

MR. BOYD: Thank you, ma'am.

Up next to speak against the proposal is Jeremy Brasher.

MR. BRASHER: Hello everyone. I'm Jeremy Brasher. I work at a law firm, and I'm a musician, so I'm not really used to speaking in the day.

I am the Lord your God, and you shall have no gods except me, on the Capitol grounds. Do you want to Baphomet statue,

because that's how you get a Baphomet statue.

A have lived here in this neighborhood for the better part of 25 years. My house is less than a mile away. It's just on the other side of the railroad tracks.

Our neighborhood here in Little Rock is mixed. It's mixed racially, economically, politically, religious affiliation.

The city is multicultural. We value different viewpoints and beliefs. There is no one religion we should have preference for, and this Ten Commandments statue, if erected by itself, represents just that, a preference for one religion over others.

It certainly isn't representative of me, and I'm the one that physically has to live with this thing.

When I talk to people around here about the statue they usually say, Why don't they just build the statute somewhere in their own district? That is a good question.

And to the legislators who bring

forward this proposal -- I don't see them here, but I say why not build it in your district? Go build it where your base is. Go build it where the people that financed the statute live.

Go build it on some private ground in Enola, or Conway, or Pickles Gap Road, or Pinesville, or Goshen, or wherever. Better yet, build it at your church and keep it there, where religious laws should be, at church, not intersecting or interfering with government. We don't really need the Ten Commandments on the Capitol grounds.

Aside from the obvious federal challenge on monumental -- Article II, Section 18 of the Arkansas state Constitution states that the General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens.

Just because the state's statue sponsor has the power and privilege to make arbitrary laws propping up their personal religion doesn't make it acceptable under

the Constitution.

Even if the state -- the future of theocracy, not in -- Act 1231 that created this monument stunt even goes on with the language, The placement of the monument shall not be construed to mean that the State of Arkansas favors a particular religion over others.

I mean, just because you can tack a disclaimer at the end doesn't make it right in practice.

That's like me putting up a sign that says, I'm the best. And then saying, Look, just because I put up a sign that says I'm the best, and I won't let you put up a sign saying your the best doesn't mean you aren't the best too. It's ridiculously disingenuous.

And if you somehow manage to drop the church law statue on the Capitol lawn, other religions and viewpoints must be respected equally and given the same treatment under federal and state constitution.

Thank you.

MR. BOYD: I would like to point out that I managed to butcher the number of names on both sides. I just thought I would bring that up.

Than you, sir.

Next up is -- I'm going to butcher another name, Arvin Adams.

MR. ADAMS: My name is Arvin Adams, and I've written a statement already. I've heard so much talk today. You know, what I see here is we need more of the Ten Commandments posted, because I believe our children do need to see this often and see that this is how we have chose to live.

I think everybody in here probably enjoys the peace and quiet of a neighborhood that people respect each other, and if -- if we had more people that would look at the Ten Commandments and just -- they don't have to go to my church.

But if they live by those and apply them to their lives and just treated people like the Ten Commandments express, we probably wouldn't have half as many lawyers, you know, because we would treat

each other like we wanted to be treated.

And I'm thankful for that. I think -- my roots in Arkansas run back before Arkansas became a state. I had forefathers who were already here before it became a state.

And they totally agreed on our form of government being Judeo-Christian. And I've got uncles that are already passed away.

They, they weren't Godly men. They didn't believe much about the Bible, but let me tell you something, they believed that their word was their commitment. Their handshake was a contract, and that was based on Judeo-Christianity, and it was based on the Ten Commandments.

And I'm glad to be in Arkansas.

MR. BOYD: Thank you, sir.

Scharmel, how do you pronounce your last name?

MS. ROUSSEL: I'm Scharmel Roussel. I'm not representing any -- I'm a 60 year old grandmother. I'm a Christian. My grandson goes to a private Christian school. I have Bibles in my home and in my

church.

Our common property should unit us and not divide us. Those who want to publicly proclaim the Ten Commandments are perfectly free to do so on the property of their house of worship.

I serve my neighbors through mission projects in our community. I love my state. I love my nation. I love my fellow man.

It won't bother me if these Ten Commandments are erected on the state property, but what will bother me is when we are forced to spend taxpayer money that all of us pay to defend them when we know that this is unconstitutional, and that's taxpayer money that we need for government services to our fellow neighbors.

Thank you very much.

MR. BOYD: Thank you, ma'am.

Next up to speak for the proposal is Mr. Travis Story.

MR. STORY: Good morning again. Members of the subcommittee, my name is Travis Story. I represent the American

History and Heritage Foundation. We are the sponsor of the monument, and I just want to say again thank y'all for your hard work.

We're simply here today asking again that you would comply with the act, as you have dutifully done.

We have looked, and as we have reflected and been through the process of finding placement and ultimately coming back with our proposal for how the monument will be erected and affixed to the Capitol grounds, we just are simply thanking you for your hard work.

We're asking that -- this legislation was originally passed, as Mr. Boyd said, in the '15 session, that we would be able to move forward ultimately to try to get this placed as quickly as possible.

The monument is ready, and it is ready to be installed as soon as the Capitol Grounds Commission and the Secretary of State sign off on it.

So I am very grateful or your hard work. Thank you for everything that you

have put into it, and we look forward to getting this completed.

Thank you.

MR. BOYD: Thank you, sir.

Next up to speak against the proposal is Mr. Leewood Thomas.

MR. THOMAS: Hello, good afternoon. I have got a quick fix. You guys can simply not place this commandment, and you will be saving the taxpayer the money.

So you guys can be the hero in all of this. You know what, this can just be another bad law that's on Arkansas books. If you go through the Arkansas Code, we have a couple of the old laws that are kind of antiquated, and kind of, you know, no dogs barking after 9:00 p.m., or cows walking down Main Street.

We've got some that have been stricken from the record. This will be another one, because I'm sure we all know that our government is secular, and it's an all or nothing.

That's why there is the nativity scene and the solstice display, after we went

through the highest court in the state.

All of the people have to be represented, so if this religious monument goes in the ground, other religions will also have to be represented in order to remain constitutional.

And there may even be litigation leading up to that that's going to waste taxpayer dollars.

So the quick out of that is for you guys just to say, I'm sorry. You can take that Ten Commandments monument, and you can place it on your church property that's private.

You can place it on your own personal property. We are not trying to hide it at all. That's not the point. We're trying to save taxpayer dollars.

So this can be a challenge to all Christians, why don't you get all of your churches to display the Ten Commandments, and, furthermore, how about all of the parishioners that attend those churches, put the Ten Commandments on your property?

Then you would see the city littered

with Ten Commandments as much as you want.

And that's fine. You would be perfectly free. There would not be anybody arguing against that.

But so here we've got a situation where it's going to be on public property, so it's going to be either secular with none of this, which is what I'm asking you to do is just say, No, sorry, Mr. Rapert, this is a bad law that you created. And our House and Senate and Governor just agreed to it. But it's a bad one, and we don't want to waste taxpayer dollars.

You guys can be the hero of all of this in stating that you're not going to place it on the Capitol.

Thank you.

MR. BOYD: Thank you, Mr. Thomas.

Next up to speak for the proposal is Jeannie Burlsworth.

MS. BURLSWORTH: Members of the subcommittee, I'm Jeannie Burlsworth and the chair of Secure Arkansas. We're a group that was founded back in 2008, and we've been around for quite a long time.

And we have carried a couple of state petitions, and that's what we are here today to talk about is a petition that looks like may have to go forward if need be because I feel like the majority of the people in the State of Arkansas really want this Ten Commandments to go up.

The people do not want it -- they see it -- the calls that I have, they see it as a historical memorial of the foundation of the legal system of our nation and state.

And, you know, looking at this as just a religious symbol, I don't see that, because our whole nation was founded on these principles.

I mean, they would have to -- people would have to go around our whole nation and uproot a bunch of monuments.

They would have to tear up Washington D.C. They would have to go down and take the Liberty Bell by the Little Rock Nine out that says "In God We Trust."

I mean, this reshapes our nation and our government. And so I agree with what Tony said and these ladies well spoken here

have said, what Travis Story has said, and we're simply asking the commission to comply with Act 1231 that says in the last paragraph, The placement of the monument under this session shall not be construed to mean that the State of Arkansas favors any particular religion or denomination over others.

So, again, I want to thank the subcommittee because I know you serve as a great sacrifice in an appointed position, and we leave it in your hands.

MR. BOYD: Thank you, ma'am.

Next up to speak against the proposal is Darlen Gaines.

MS. GAINES: Good afternoon, subcommittee members and all who are present today.

I am preaching in the name of Jesus Christ. I am a Christian, and my cause is to implore you not to put up this Ten Commandments, because it is a slippery slope.

It will open up the door for other religious organizations to come in and put

up statutes and memorials as they see fit.

It is forbidden -- the second commandment is that we shall not make any graven images. It is idolatry to worship false goods or the true God by statute or memorial.

God is not wood. He is not stone. He is not metal. He will not be worshiped as if he is a manmade item.

To put up this Ten Commandments goes against not only the word of God, but it goes against us as citizens of Arkansas.

Exodus 20:4-6, You must not make yourself any idols of any kind or any image, anything in Heaven or earth or in the sea. You must not bow down to them, worship them for I, your God, is a jealous God.

Now as far as this Ten Commandments is concerned, I have heard everybody here talk about the constitutional rights and so forth. And, yes, the Ten Commandments says a lot of great things.

These things should be on our hearts and in our minds. But if we look deeper

past this Ten Commandment monument, the organization that's willing to fund this, there are motives that are not of God.

We will definitely open up a Pandora's box. Already the United States is under attack. We are dealing with a lot of issues that are very dark, a lot of spiritual issues that are coming down.

Generational curses from the third to fourth generation, we are seeing this on a daily basis. We cannot allow this monument to come up.

I know that they have good intentions, and that's great, but this will open up doors.

I don't want to go to the State Capitol and have to look at a statue of Baphomat.

I don't want to have to explain to my children who Satan is and why it is that he is so boldly represented on the State Capitol, because that is what's going to happen.

You allow this Ten Commandment monument come up, and you will have to

honor every religion, whether it's for God or against God.

It will be a modern day -- it's going to be awful. So I just ask that you do not allow this monument to come up.

People have good intentions, like the young man mentioned before, if you feel that boldly and that --

MR. BOYD: Time.

MS. GAINES: -- please put it up in your own homes and in your own yards, but we cannot allow this to go on at the Capitol.

Thank you.

MR. BOYD: All right. Next up to speak for the proposal is Kenneth Wallis.

MR. WALLIS: Well, thank you commission for allowing us to speak here.

I was not aware that I could sign up more than once. I promise I will not complain because I am not part of the victim culture.

The Ten Commandments and Christianity were part of the founding of this nation. It's blatantly obvious about that.

As the ladies mentioned before, the monuments are literally all over several government buildings, and it was there for almost a century until the anti-Christian left began filing lawsuits to remove them from our schools and remove prayer and the Ten Commandments from the government.

So we have actually -- our precedence was actually Christianity before in government. We are a government that, a Judeo-Christian based government that tolerates other religions.

We allow Wiccans and Buddhists to set up their own places of worship to serve our country, but yet we still have prayer and the Ten Commandments in our government buildings.

I believe this commission should honor the will of the Legislature and the people that voted to have this in place.

I also would like to remind the Legislature that there are organizations that do some of the defense of Christian, Judeo-Christian rights when the left attacks them in the courts with judicial

activism. I believe one is called the Thomas Moore Law Center. I believe another group is called the ACLJ.

I would also like to remind people that when I thought about this, the threat of lawsuits, I'm reminded of the founder of the Republican party who had to fight against slavery, and he too had to go up against a court, specifically the Dred Scott case.

He's, of course, on the five dollar bill, which also says "In God We Trust." And if you -- I know the joke is well, if you support the Ten Commandments, then you should put it on your grounds.

I would like those who are opposed to the founders who don't want God or any form of religion in government to hand over all of their dollar bills, you know.

Anyway, you can check out footage of this and other issues on the YouTube account Keep Arkansas Legal, as well as Arkansas Tea Party.

I urge you to pass this monument, to support it. And I also would like to

remind folks that the Supreme Court is likely to change due to the national election, as well as all of the other federal courts.

Anyway, I see that my time is almost up, so I would like to say thank you again for allowing me to speak.

MR. BOYD: Thank you, sir.

Next up to speak against the proposal is Ms. Sklar, and you can summarize.

MS. SKLAR: Thank you very much.

Again, I just want to say, to reiterate the fact that each of these objections is based on our right to protect religious liberties, and that that in sum or part is by protecting the appearance of the State from lawsuits.

Again, no reasonable observer who has followed the claims with the State has cast off the objective as so unmistakable in a decision to place the Ten Commandments in this fashion on the Capitol grounds.

When it appears the government acts with the ostensible or predominant purpose of advancing religion, it violates the

central establishment's law values of official religious neutrality.

There is no neutrality when the government -- sorry -- when the government's object is to pick sides.

The hard reality is that this monument with its sectarian King James version of the text is likely to be perceived by appearance of the controlling denominations as an endorsement and by the non-adherents as disapproval of their individual religious choice.

Liberty and social stability demand a religions tolerance that respects the religious views of all citizens.

By favoring one religious perspective, the government sends the message to non-adherents they are outsiders, not full members of the political community, and an accompanying message to appearance they are insiders favored members of the community.

We do not count heads before enforcing the First Amendment, nor can we accept the theory that Americans who do not accept the Commandments as validity are outside the

First Amendment protection.

The religion clauses of the First Amendment protect the appearance of all words. This Ten Commandments monument carries an explicit message or civil religious collusion and thus is a violation of the First Amendment.

In today's world, in a nation of so many different religious and comparable non-religious fundamental beliefs, the contemporary state efforts to focus attention upon religious text is certainly likely to prove that this in the way that a longstanding pre-existing monument has not, and this is the kind that has been referred to by many people before this, a longstanding pre-existing monument.

This new display of the Ten Commandments will be perceived as an endorsement of religion by the government, rather than one in which there is legitimate historical perspective.

No viewer would think that it occupies this location without the support and approval of the government, State, setting

an unambiguous message that promotes the monument's religious message.

This commission, like any government body, has an ultimate responsibility to the constitution. In our nation our elected officials take an oath to uphold the constitution, not a person, not anything else but the constitution.

You should send this commission's own message loud and clear by denying permission for this monument.

Thank you very much.

MR. BOYD: Thank you, ma'am.

Next up to speak for the proposal is Senator Jason Rapert.

SENATOR RAPERT: Thank you, Mr. Chairman, and I want to also echo and say thank you to the Capitol Grounds Commission. I thank you for the time and effort that you have given to this.

And I appreciate also and echo the sentiments that we thank you for fulfilling your duties.

I stand here today on behalf of the Legislature. 99 out of 135 state

legislators representing over three million constituents in the State of Arkansas passed this bill in 2015. We appreciate the good work that the Secretary of State and the Capitol Grounds Commission is doing on this behalf.

Of everything that's been said, the great thing is in your position you don't have to decide whether you do put up this monument or not. It's about where you put it up and if it's esthetically pleasing for the State of Arkansas.

What I would like to say is that much of what I have heard today is really just an attempt to inject fear and to in some ways intimidate the commission about what its duties are.

The debate has already been had. The bill has already been passed. The Governor has already signed the bill, and it is the law in the State of Arkansas.

I leave you with probably the greatest quote that you'll hear today, which is from Chief Justice Rehnquist in the decision in Texas, Van Orden, in the case related to

the Van Orden superior case in Texas.

He states, In this case we are faced with a display of the Ten Commandments on government property outside the Texas State Capitol. Such acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America. We need only look within our own courtroom -- being the Supreme Court, of course.

Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten commandments written in Hebrew, among other lawgivers in the south frieze.

Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom.

Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.

Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital. For example, a large statue of

Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress Jefferson Building since 1897.

And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament, Micah 6:8.

A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives. Inside the Department of Justice a statute entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet.

In front of the Ronald Reagan Building is another structure that includes a depiction of the Ten Commandments, and so too a 24-foot-tall, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia. Moses is also prominently

featured in the chamber in the U.S. House of Representatives.

Our opinions, says Justice Rehnquist, like our building have recognized the role the Decalogue plays in America's heritage.

And also the Executive and Legislative branches have also acknowledged the historical role of the Ten Commandments.

We thank you for listening to Justice Rehnquist's words, and we thank you for fulfilling your duty here today.

Thank you very much.

MR. BOYD: Thank you, sir.

That is my list. Have we missed anyone, or would someone like to speak? Yes, sir?

MR. LENSLEY: I just signed up.

MR. BOYD: Okay. Please state your name, so we can get you down. All right. You have already been up?

MR. LENSLEY: I have. I have, but there's a list out there that has a lot of blank space on it too.

My name is Jim Lensley. I would like to point out the fact that our Forefathers

came over here from England, which was pointed out earlier by somebody in support of this amendment, and they came over here to escape religion, to escape a religious state. And that's what we need to do for our forefathers is to continue that tradition.

To say that Thomas Jefferson was not influenced by the Quran is incorrect as well.

I have, I have a question for the board. What is your mission? What is your responsibility? Is it to do what the people want, or is it just to listen to what people say and then go ahead and do what is rubber stamped?

And I hope you will listen to what is logical, and what is reasonable, and what is going to benefit all of the taxpayers, not just a few, because we are all -- every one of us in this room, assuming we are all from the State of Arkansas, are taxpayers for the State of Arkansas.

And we all, regardless of religion or non-religion, we deserve to have the state

to promote the thing that promotes all people of this state and not just a few.

Thank you.

MR. LERARIS: Mr. Lensley, before you leave --

MR. LENSLEY: Uh-huh.

MR. LERARIS: Did you not hear what the senator said about our job? The three of us were appointed on this commission to find a location.

We did not vote for this. We did not vote against it. It was done in prior session. It was signed by the Governor.

The three of us plus six others are on a committee to place this on the Capitol grounds.

MR. LENSLEY: Exactly.

MR. LERARIS: That is our job.

MR. LENSLEY: Exactly.

MR. LERARIS: So to sit here and say, You need to deny this, you need to deny that --

MR. LENSLEY: I'm sorry, you misunderstood me.

MR. LERARIS: -- that's not my job.

MR. LENSLEY: You misunderstood me. I asked you what is your job.

MR. LERARIS: That is my job.

MR. LENSLEY: And that is correct. Let me explain. If that is your goal, then why do we have this discussion?

MR. LERARIS: Because it is in the laws to have this public discussion, and we are obligated to listen to that.

MR. LENSLEY: And for what end reason?

MR. LERARIS: Good question. I really don't know.

MR. LENSLEY: Evidently, there is no purpose for this discussion, because it's already been decided, and you just have to figure out where.

Is there any way you can decide not to place it on the, on the lawn?

MR. LERARIS: We are one of nine folks.

MR. LENSLEY: Okay.

MR. LERARIS: We were appointed on this subcommittee for this purpose.

MR. LENSLEY: Right.

MR. LERARIS: This is our fourth trip

down here. This is a public hearing.

MR. LENSLEY: Right.

MR. LERARIS: The granite statue has been proposed to us. We know exactly what it's going to look like. We know exactly where it is to be placed. We voted on that last time.

So we were asked to come down here for a public hearing, and we're -- I think we're giving you the time that --

MR. LENSLEY: Right.

MR. LERARIS: -- you all are due.

MR. LENSLEY: Right. So there is no decision that will be made in this decision, in this hearing, nor will there be any influence on a decision that will be made; is that correct?

MR. LERARIS: A decision about what?

MR. LENSLEY: About the monument being placed.

MR. LERARIS: As far as I know, no.

MR. LENSLEY: So this is not -- so this is just a celebratory appearance?

MS. GULLICK: That's incorrect. There are some situations --

MR. LENSLEY: I'm just trying to get information.

MS. GULLICK: There are some situations when people send proposals to the commission and to the Secretary of State's office that have not been passed into law.

This is one instance where there has already been a law passed by the Legislature, and we cannot go against the state law that has already been passed.

So it's in the Arkansas code that we have to have a public hearing, because it gives Arkansans a voice and can be -- what we wanted to do.

We are listening to everyone's comments -- we are listening to the comments, but we can't change the law. You know, that's not what this commission is for.

MR. LENSLEY: Right.

MS. GULLICK: But we thank everyone for your comments. We do.

MR. LENSLEY: Okay. So it is strictly for comments. It's not for --

MS. GULLICK: Yeah, we are not going to give you any kind of ruling today. We are here just to listen to comments from the public.

MR. LENSLEY: Okay. I thank you for being clear about that. Thank you very much.

MS. GULLICK: Thank you.

MR. SHULZE: If I might take a couple of seconds to address what your obligation is.

MS. GULLICK: One question. Do we need to have one for and then -- because he was against it, so we need to have someone for it.

MR. BOYD: Do we have someone who wishes to speak for it?

MS. GULLICK: Okay. Go ahead.

MR. SHULZE: Very quickly. Every one of you took an oath to uphold and defend the Constitution of the State of Arkansas and the United States of America.

That is your obligation. If you are being asked to perform an act that violate the Constitution of the State of Arkansas

or the Constitution of the United States of America, your oath requires you to refuse to take that act.

MR. BOYD: Does anyone else wish to speak for the proposal?

MR. SCOTT: I'd like to speak for it. And I'm not political in any, any sector, or shape, or form.

I like what a lot of the fors and againsts have said. You guys made it really clear what we are for.

You know, you know your obligation and to just, you know, keep beating a dead -- I feel like it's almost like beating a dead horse.

You know, you guys are here to hear what we have to say. The law has been made, and for someone to -- you know, you're giving us a voice.

You said that clearly, and I don't understand -- I'm a simple northwestern Arkansas boy, and I don't understand where the difficulty is in understanding that you guys are here to listen to what we have to say.

You know, we're not here to beat you guys to death, and I hope that nobody would want to do that. I'm definitely for, and I wouldn't be swayed against.

But we do live in a free country. Like has been mentioned, you know, we have the right to whatever, more or less anymore now days, to serve who we want to serve, serve what we want to serve.

And I like the fact that, you know, like I said, you guys are here to hear us, and thank you for that.

You know, I wouldn't want anybody to not want to hear us. You know, whether, you're for or against, we have that right, so thank you.

MR. BOYD: Excuse me, sir. I need to get you name for the --

MR. SCOTT: Charles Scott.

MR. BOYD: Charles Scott.

Anybody wish to speak against?

MR. HILL: My name is Bruce Hill. I want to tank you for your candor in explaining what your mission is here today.

I thank you for your admission that my

time and effort to come down here and speak on behalf of myself, as well as Universalist Unitarians in the State of Arkansas is futile, that it was a waste of my time and my effort.

It was a waste of my time in thinking about what comments I wanted to make to be appreciative of the fact that there are many people of good faith who have strong beliefs in this monument, and that I wanted to speak out for those who also have strong beliefs in faith against this monument, because it, with all due respect, places Christianity above all other religions, rather than on an even table.

I understand the concept of how God has come into the public life through the government. I understand how it feels. I can believe in the phrase "In God We Trust," because it is not the Christian God. It is not the Catholic God.

It is not the God of the Old Testament, and it's not Yahweh. It is not Elohim. It's not Allah. It is not Zion. I could use many other names for God that

people use.

But all of that -- I'm so frustrated right now that all of that, all of the passion that people have is wiped out because the state Legislature made a demand, and you are going through the hoops that you have to go through by the Arkansas State statutes to sit there and listen.

And all you're going to do is decide where is this monument going to go. No discussion at all as to whether or not this monument fits the definition of the state statute.

This monument is a monument to a certain Ten Commandments that may or may not be legitimate as written in the Bible.

This monument is a glorification of a certain group of a certain document. It is not a glorification of law.

It is not a glorification of the fact that, yes, we have Judeo-Christian values in our law. We also have Buddhist values in our law. And we also have -- name a religion. Our values are written into that law.

There's a lot made in the public about how we do not like Sharia. I don't want a Judeo-Christian equivalent of Sharia. I want a law that is based upon reason and logic and, yes, faith.

Thank you for listening to my words. I know it's a waste of your time. I appreciate it.

MS. GULLICK: Mr. Hill, I'm sorry you feel that it was a waste of our time. We don't, otherwise we wouldn't serve on this commission. Every one's comments mean something to us.

MR. HILL: The statute is written, and I heard the comments made before. Excuse me, I know I am upset. I do apologize for that, but I hate living in a system where this happens. I will sit down and be quiet.

MR. BOYD: Do we have anyone else who wishes to speak for the proposal?

MR. WALLIS: I'm speaking for the proposal. The rules of how this commission was set up on what it could and couldn't do are clearly explained.

The time to block this monument from being set up was during the last session when Act -- I can't remember the name or number for it -- the act to set this up was established.

You could also say that perhaps during the elections that this is the time. I believe you are appointed by elected officials, if I'm not mistaken. Is that correct, you're appointed by an elected official?

MR. BOYD: That's correct.

MR. WALLIS: So that's the time to have blocked this. And then I suppose if the anti-Christian left decides to file a lawsuit requiring the removal or that another religion be placed, then it can be decided then.

But the law also states for public comments, and so that's why we are allowed to come here and speak. I have to bring this up equally, in some cases, just because public comment is allowed does not mean that the group that you're speaking to has the ability to change a certain law.

That's just the way it's set up.

I have been through this for a while. I have been through public speaking on several issues. I have testified before the state legislature, as well as numerous city council meetings and such.

And so, anyway, that's pretty much it. And as I state, I believe what we are doing is we are turning back to the precedence that this was a Judeo-Christian nation that tolerated other religions, and that it was part of our history.

And we'll let -- I guess eventually if there is a lawsuit filed, we will let the Courts decide.

But, anyway, I thank you for your time here. That's about it.

MR. LERARIS: Thank you.

MR. BOYD: Does anyone wish to speak against the proposal? If we are bringing something new to the table, that would be appreciated, but I don't want to restrict anyone from the opportunity to speak.

You had stood up. Were you wanting to speak against the proposal?

MS. ROUSSEL: I don't feel like anybody's time was wasted here today. Everybody had a chance to speak up, and I respect everyone's opinion, and I thank you for this opportunity for everyone --

MR. LERARIS: Thank you. That's the way we all feel. But as Melonaie has said, our job is to find the place.

Had we been here a year ago before this ever came up to the session, things might have been different for the three of us.

But when we were asked to be on this commission I thought, you know, it's my civic duty to do this. I was very honored that the Governor wanted me to be on this commission, but I thought he'll look to find someone anywhere --

(Laughter)

MR. LERARIS: So I -- you know, I have given up my day today to leave my office and drive down here to listen to this all day because I feel like I owed it to you. I owed it to my two constitutes right here and everybody else to here what everybody

has to say.

But as far as me being able to change the way the session voted for it, I can't do that.

MS. GAINES: This is Darlen Gains again. It breaks my heart to know that these things even take place, something that's already established.

I understand that you're here just to discuss where to put it. How about just put it on the land of the organization that's willing to pay for it?

This is a Trojan horse. These Ten Commandments is like a Trojan horse, and in the midst of the night, it is going to open and allow so many other things into the atmosphere. We're already wrestling with so much.

So how about they just place it on their property? That would be a good place, but not at the Capitol. My family, we go to the Capitol, and we enjoy the Capitol.

You know, I've done work with Asa Hutchison dealing with the, the prison

program, bringing the prisoners back into the community, but I take my family there because it's a beautiful place, and it represents so much, and it's all we know.

But to have these monuments and these statutes that represent so many different things, that open up so many different doors, please, don't have it at the Capitol. Put it -- let them put it on their property. Let them put it on their land, but not at the Capitol.

MR. BOYD: Okay. First off, thank you to everyone for coming today. I do want to give everybody an update about where we'll proceed from here.

I've got a lot of paperwork to get together, a lot of copies to make. I am still getting a lot of phone calls. I will create all of these documents and get it to the three members of the subcommittee, and they have a lot of information to assimilate.

At some point in the future, and I cannot today tell you when until I have spoken with the Secretary and with the

members of the commission, a commission meeting will be scheduled.

At that commission meeting this subcommittee will present their recommendations to the commission, and the commission will vote.

Most likely the morning of that commission meeting we'll ask the subcommittee to get together to allow them to create what that proposal will be. There won't be an interim meeting.

MR. SHULZE: Will that be public?

MR. BOYD: Oh, absolutely it will be public. I cannot tell you today where or when it will meet, because I just don't know, but we will -- I like this place.

There's also a large meeting room over at the Association of Counties, so we will have a good place where everybody can come and take part in the meeting.

Thank you again for coming. It's not always an easy thing to do, and all of you spoke very well.

I appreciate your courtesy and your well-formed thoughts very well, very much.

It was a pleasure to hear everything.

So with that, we will call the meeting adjourned.

(The meeting was adjourned at 12:44 p.m.)

COURT REPORTER'S CERTIFICATE

STATE OF ARKANSAS)
)ss.
COUNTY OF SALINE )

I, JANESS FERGUSON SMITH, CCR, RPR, a Notary Public in and for Saline County, Arkansas do hereby certify that the facts stated by me in the caption of the foregoing matter are true; and that the foregoing matter was transcribed by me, to the best of my ability and understanding, from my machine shorthand notes taken at the time and place set out in the caption hereto.

In accordance with Rule 30(e) of the Rules of Civil Procedure, review of the transcript was waived by the deponent or a party thereto.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, not financially interested or otherwise, in the outcome of this action.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on, this, the 14th day of December, 2016.

________________________________
JANESS FERGUSON SMITH, CCR, RPR
Notary Public for Saline County
and Court Reporter.
Certificate Number 453

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25