**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

| | |
|---|---|
| **DONNA CAVE, JUDITH LANSKY,** | **PLAINTIFFS** |
| **PAT PIAZZA, and SUSAN RUSSELL** | |
| | |
| **ANNE ORSI, AMERICAN HUMANIST** | **CONSOLIDATED PLAINTIFFS** |
| **ASSOCIATION, FREEDOM FROM** | |
| **RELIGION FOUNDATION, INC.,** | |
| **ARKANSAS SOCIETY OF FREETHINKERS,** | |
| **JOAN DIETZ, GALE STEWART, RABBI** | |
| **EUGENE LEVY, REV. VICTOR H. NIXON,** | |
| **TERESA GRIDER, and WALTER RIDDICK** | |
| | |
| **THE SATANIC TEMPLE, DOUG MISICKO** | **INTERVENORS** |
| **Aka "LUCIEN GREAVES," and, ERIKA** | |
| **ROBBINS** | |
| | |
| **v.** | **Case No. 4:18-cv-00342-KGB** |
| | |
| **JOHN THURSTON, Arkansas Secretary of State,** | |
| **in his Official Capacity** | **DEFENDANT** |


**BRIEF IN SUPPORT OF *ORSI* CONSOLIDATED PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

STANDARD FOR GRANTING SUMMARY JUDGMENT ........................................................2

MATERIAL FACTS ...............................................................................................................3

ARGUMENT ..........................................................................................................................9

   I. Historically, the Establishment Clause has unconditionally prohibited legislative action that elevates one religion or sectarian belief to favored status.........................................................9

     a. The First Amendment was designed to prohibit governmental preference for any faith or religion................................................................................................................................12

     b. A law meant to promote the Ten Commandments' religious message is an archetypical Establishment Clause violation. ...................................................................................14

   II. There's no established history of laws ratifying the Ten Commandments. ......................17

     a. Government ratification of the Ten Commandments through legislation lacks any significant historical pedigree...........................................................................................18

     b. The religious divisiveness caused by Act 1231 is precisely the type of harm the Establishment Clause was meant to prevent. ..................................................................24

CONCLUSION ......................................................................................................................27

## INTRODUCTION

"The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 638 (1943).

When the Arkansas General Assembly passed Act 1231 of 2015 ("Act 1231"), it created a political controversy centered on a quintessentially religious subject—the Ten Commandments. The Framers of the Bill of Rights designed the Establishment Clause specifically to keep such religious matters in the private sphere, wholly separate from the government, which must act free from religious preference. As James Madison, the principal architect of the First Amendment, put it, "Religion & Govt. will both exist in greater purity, the less they are mixed together." Letter from Madison to Edward Livingston (July 10, 1822) (Br. Ex. A).[1]

Plaintiffs brought this action within one month of the installation of the Ten Commandments on the Arkansas State Capitol grounds. Christians, Jews, other persons of faith, and non-believers objected to the placement of the monument at public hearings. Despite the widespread objections, and substantial publicity, the State went forward with the installation of the monument, which has brought nothing but division to the people of Arkansas.

The Supreme Court "has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2428 (June 27, 2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). This means that "the line that courts and governments must draw between the permissible and the impermissible has to 'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Id.* For the purposes of this case, the historical

---

[1] The Orsi Plaintiffs have included Exhibits to this Brief, which are each designated as "Br. Ex.," so as not to be confused with the separate Exhibits to Plaintiffs' Motion, which are designated simply as "Ex."

evidence demonstrates first that the Establishment Clause was unquestionably designed to prohibit the government from wielding its power, derived from the people, to commit the type of legislative act at issue in this case: an act that abuses government authority to elevate one religion's beliefs to favored status. *See* Sec. I, *infra*. Second, there is no historical practice of the government ratifying the Ten Commandments that would undercut the clear command of the Establishment Clause to prohibit such acts. *See* Sec. II, *infra*. For these reasons, an historical understanding of the principles that undergird the First Amendment squarely prohibits the government action at issue, and no historical practices save it from being held unconstitutional.

## STANDARD FOR GRANTING SUMMARY JUDGMENT

This Court is familiar with the well-settled standard for grant of summary judgment, which is:

> Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*J & J Sports Prods., Inc. v. Ramirez,* Case No. 4:17-cv-00277-KGB, 2019 WL 1449612 at *4 (E.D. Ark., Mar. 31, 2019).

## MATERIAL FACTS

### <u>The Plaintiffs</u>

Anne Orsi is an agnostic atheist who objects to the Ten Commandments monument at issue in this case. Ex. H, Orsi Depo., at 11, 30–31, 63–65, 75–76. At the time of her deposition, she was president of the Arkansas Society of Freethinkers. *Id*. at 17. She is also a member of other similar organizations. *Id*. at 18. She visits the Arkansas State Capitol Grounds for many purposes. *Id*. at 3334. She attends rallies. *Id.* at 33, 38–42. She goes to the History Commission in the Big Mac building to do historical and genealogy research. *Id*. at 35–36, 44. She goes to the Solstice display on the median south of the Capitol building to celebrate the solstice. *Id*. at 36, 44–45. She goes to the Justice Building to file papers and attend meetings. *Id*. at 59, 60, 80. She has testified at legislative committee meetings. *Id*. at 50–51. She has walked past the monument and driven past the monument. *Id*. at 56–57. She attended the installation ceremony of the second monument to protest it. *Id*. at 60.

Rabbi Eugene Levy is a Rabbi who opposes the Ten Commandments monument. Ex. I, Levy Depo., at 43, 45–46. He was involved with Interfaith Arkansas, an organization involving members of various faiths, which was organized in response to the Central High School crisis. *Id*. at 34–36. He was president one year, and treasurer for three or four years. *Id.* at 34–35. He visits the State Capitol from time to time. He estimates that he has been to the Arkansas State Capitol Grounds 25 or 30 times. *Id*. at 46–47. He has been to the State Capitol Grounds for political meetings, rallies, and meetings of the State Board of Education. *Id*. at 47–52, 57, 66–67.

Gale Stewart is an ordained elder in the Presbyterian Church, U.S.A. who opposes the Ten Commandments monument. Ex. J, Stewart Depo., at 16–17, 23–24, 29. She has made many visits to the Arkansas State Capitol grounds, to picnic, to visit the Supreme Court library, to attend court proceedings, to go to public meetings, and to lobby for passage or failure of

proposed legislation. She had been in and out of the Secretary of State's office doing research when it was on the State Capitol Grounds, she's been to the Governor's office, to Game and Fish and many state agencies, she has been to rallies and demonstrations, and she's been there to see the tulip trees. *Id*. at 31–33, 39–40. She has seen the Ten Commandments monument. *Id*. at 50.

Teresa Gryder is a Wiccan who opposes the Ten Commandments monument. Ex. L, Gryder Depo., at 13–14, 25–27. She is a member of the Arkansas Society of Freethinkers. *Id*. at 24–25. She has been to the State Capitol Grounds often. *Id*. at 28. She has visited the Firefighters memorial. *Id*. at 29, 74–75. She and her family drive through the grounds if they are in the area. *Id*. at 30. She has applied for a job at the Parks Department. *Id*. at 39.

### The Ten Commandments Monument Display Act

The Arkansas General Assembly enacted Act 1231 of 2015, providing for the placement of a Ten Commandments monument on the grounds of the Arkansas State Capitol. The Act was titled, the "Ten Commandments Monument Display Act." Ark. Code § 22-3-221(a). The law states that the Secretary of State "shall permit and arrange for the placement on the State Capitol grounds of a suitable monument commemorating the Ten Commandments." Ark. Code § 22-3-221(a)(b)(1). It also provided the specific language used to signify the Ten Commandments on the monument, which was provided as follows in the law:

> "The Ten Commandments
>
> I AM the LORD thy God.
>
> Thou shalt have no other gods before me.
>
> Thou shalt not make to thyself any graven images.
>
> Thou shalt not take the Name of the Lord thy God in vain.
>
> Remember the Sabbath day, to keep it holy.

> Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
>
> Thou shalt not kill.
>
> Thou shalt not commit adultery.
>
> Thou shalt not steal.
>
> Thou shalt not bear false witness against thy neighbor.
>
> Thou shalt not covet thy neighbor's house.
>
> Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

Ark. Code Ann. § 22-3-22(b)(1). There are eleven commandments on the monument. *See* Ex. E, Boyd Depo., at 177.

The General Assembly anticipated that the Ten Commandments monument would be legally challenged as the law included a provision for a legal defense of the Ten Commandments monument. *See* § 22-3-22(c). State Senator Jason Rapert introduced the legislation in March 2015 and was the lead sponsor. *See* Ex. G, Rapert Depo., at 39–41, 175. The bill passed.

Toward the end of August of 2016, a public hotline was set up for the Secretary of State to handle the volume of calls it received about the monument. Ex. E, Boyd Depo., at 125–26. Mr. Kelly made a list of the phone calls received by the hotline. *Id*. at 129. Roughly 823 calls were recorded. *Id*. at 134; Ex. E-1, Boyd Depo. Ex. 17. The callers expressed opinions. One of the opinions expressed was "no religious monuments." Only one caller made a reference to the Code of Hammurabi. Ex. E, at 176. Not only did the Secretary of State's office receive numerous calls about the monument itself, it received some complaints about the imagery on the monument. *See* Ex. F-1, Moody Depo. Ex. 13, at 84–85; Ex. E at 170–71.

A public hearing was held on December 14, 2016. *See* Ex. L, Transcript of Arts & Grounds Comm'n Pub. Hearing (Dec.14, 2016). At this hearing, thirty-one supporters and opponents of the monument voiced their opinions. Most speakers perceived the monument as religious. Pastor Larry Burks presented 335 comments, identical except for the signature. *Id*. at 9–10; *see also* Ex. E-3, Boyd Depo. Ex. 27. Those comments also show an understanding of the monument as religious in nature, describing the monument as "befitting of the greatness and eternal endurance of the declaration of God's Law upon Whose blessing the founders of the great state of Arkansas acknowledged as being 'grateful to Almighty God for the privilege of choosing our own form of government . . . .'" Ex. E-3; *see also* Ex. E, at 168–69.

On or about June 27, 2017, a monument was placed on the State Capitol grounds. Ex. A-10, Orsi Aff., Ark. Democrat Gazette (June 28, 2017), at 1A. That monument was destroyed within 24 hours. *See* Ex. A-7, Orsi Aff., Ark. Democrat Gazette (June 29, 2017), at 1A.

On April 26, 2018, a second monument was placed, with barriers to prevent intentional destruction. A ceremony was held on April 26, 2018 to unveil the monument. Both supporters and protesters appeared. At least one of the Orsi Plaintiffs and one of the intervenors were present at the protest. *See* Ex. A-5, Orsi Aff., Ark. Democrat Gazette (Apr. 27, 2018), at 1B.

Senator Rapert has made it clear that his intention was to honor God and the Bible. In his deposition, he conceded that he had made the following statements and adopted them again:

> "When our state took a stand for the Ten Commandments in 2015, when we passed the strongest abortion prohibition in the country at the time in 2013, when our Secretary of State allowed me to have the Washington Cruiser(s) Flag hoisted and formally flown on Washington's Birthday in 2015, when we passed strong pro-Israel legislation in 2017, and every other time our state takes a stand for something that honors God and the Bible, it definitely sends a signal to everyone in the spiritual realm that Arkansas seeks to honor God and invites his blessing."

Ex. G, Rapert Depo., at 150–51.

> "I am guilty as charged for supporting the Ten Commandments and write today to take full responsibility for being so bold as to believe that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mount Sinai."

*Id.* at 196; *see also id.* at 84; Ex. A-4, Orsi Aff., Ark. Democrat Gazette (Jan. 8, 2017), at 3H.

The State Capitol building is the seat of government. *See* Ex. G, Rapert Depo., at 61. It is home to the offices of the Deputy Secretary of State, Kerry Moody, who attended the unveiling ceremony. *See id*. at 124. Senator Rapert called Deputy Secretary Moody to the podium to hand off the monument to the State of Arkansas. *See id*. at 125.

The Ten Commandments are religious in nature. They are a sacred text in the Jewish and Christian faiths. Different traditions state the "Ten Commandments" differently. In particular, there are different versions recognized by Jews, Roman Catholics, and most Protestant denominations. The Ten Commandments text selected by the General Assembly is a combination of the Protestant and Catholic traditions. Even the bill's sponsor, Senator Rapert, was aware that there are different versions of the Ten Commandments that appear in different denominations and different versions that appear in what is commonly referred to as the Old Testament. *See* Ex. G, Rapert Depo., at 47:10–15.

The public presentation of the monument also shows the understanding that the monument was religious in nature. The headline in the Arkansas Democrat Gazette when the bill was passed was "Bill Passes to display holy rules at Capitol." Ex. A-5, Orsi Aff., Ark. Democrat Gazette (Apr. 2, 2015), at 1A. Objections to the placement of the Ten Commandments monuments were voiced at public hearings. *See* Ex. A-6, Orsi Aff., Ark. Democrat Gazette (Dec. 15, 2016), at 1B.

A monument containing the wording prescribed by the General Assembly was proposed by the American History & Heritage Foundation. Sen. Jason Rapert was one of the organizers of

the American History & Heritage Foundation. *See* Ex. G, Rapert Depo., at 193. At the time the monument was proposed, the American History & Heritage Foundation was not yet formed. *See id.* It had no function before commissioning the monument. *See id.* at 92–93, 169. It had not performed any charitable function before it became involved in raising funds for the monument. *See id.* The American History & Heritage Foundation founded a GoFundMe page to raise money to build the monument. *See id*. at 94.

Sen. Rapert is also the founder and president of the National Association of Christian Lawmakers. *See id.* at 34. He also created a GoFundMe page for that organization. *See id*. at 36.

 Sen. Rapert also responded to an inquiry on the American History and Heritage Foundation Facebook page. The question was "Please explain why there are 2 stars of Remphan & the all seeing eye on a Ten Commandments monument?" Sen. Rapert responded:

> The monument is an exact replica of the monument at the Texas Capitol. This is a design used on all of the Order of the Eagles monuments.
> The "All Seeing Eye of God" is an artistic rendering originally used to represent God looking out over everything from heaven above. The Masons later adopted it - it is not "their" symbol. Just as the KKK uses a cross for evil, Christians don't abandon the cross because one group uses it for evil.
> The Chi-Rho symbol is commonly used as a symbol for Christ:
> "One of the most common symbols in Christian art is the Chi-Rho. It is created by superimposing the first two letters (XP) of the Greek word for Christ, ΧΡΙΣΤΟΣ.
> The monogram (also called a "christogram") primarily represents Jesus Christ, while also being a common representation of the crucifixion scene. It is similar in style to the Tau-Rho (T and P superimposed), but has a distinct origin."
> We know some people try to infer "nefarious" or "evil" connotations to these symbols - but they are badly mistaken.
> Thanks for asking rather than accusing. Lots of research on these items.

Ex. G-5, Rapert Depo., post from Am. Heritage & History Found. Facebook page.

**ARGUMENT**

I.      **Historically, the Establishment Clause has unconditionally prohibited legislative action that elevates one religion or sectarian belief to favored status.**

Fully cognizant of the centuries of persecution resulting from government entanglement with religious orthodoxy that led colonists to flee the Old World, the Framers of our Constitution and Bill of Rights sought to build a nation founded on the principle that civil government and religious authorities must operate in separate spheres. The Framers' vision was meant to safeguard religious freedom for all, for, they reasoned, religions will grow organically if free from governmental influence and interference, allowing all to practice religion, or not, according to the dictates of their conscience. By prohibiting the comingling of secular and religious power, the Framers undertook to "cut off the means of religious persecution." 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1871, at 728 (1833) (Br. Ex. B). The use of our secular government for the advancement of one religion's beliefs above all others is, to put it plainly, un-American.

The origins of the principle of strict separation between government and religion has deep historical roots that predate the Founding Era. One can draw a direct connection, for instance, between the separation principle and the thirteenth-century teaching of Thomas Aquinas, who wrote that conscience must be a moral guide and that acting against one's conscience constitutes sin. *See* Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77 N.Y.U. L. Rev. 346, 356–57 (2002). Aquinas's philosophy was echoed and expanded upon by Martin Luther, who taught that the church lacks authority to bind believers' consciences on spiritual questions: "the individual himself c[an] determine the content of his conscience

based on scripture and reason," *id.* at 358–59, and John Calvin, who applied the principle to civil government, preaching that it lacked the authority to dictate matters of faith. *See id.* at 359–61.

The philosophical emphasis on individual conscience, free from the dictates of civil authority, became a central tenet to our Founders when they sought to design a country where religious freedom could flourish. Roger Williams—the Baptist theologian and founder of Rhode Island—for instance, preached that people must arrive at religious truth of their own free will for it to constitute genuine belief. Faith achieved through compelled observance or the punishment of dissenters was not, in his view, true faith at all. *See* Roger Williams, *The Bloudy Tenent of Persecution for Cause of Conscience* (1644) (available at https://archive.org/details/bloudytenent ofpe00will_1/page/n9/mode/2up). This same philosophy was championed by John Locke:

> Whatsoever may be doubtful in Religion, yet this at least is certain, that no Religion, which I believe not to be true, can be either true, or profitable unto me. In vain therefore do Princes compel their Subjects to come into their Church communion, under pretence of saving their Souls. [W]hen all is done, they must be left to their own Consciences.

John Locke, *A Letter Concerning Toleration* 38 (James H. Tully ed., Hackett Publ'g Co. 1983) (1689) (Br. Ex. C). Locke thus concluded that "civil government" should not "interfere with matters of religion except to the extent necessary to preserve civil interests." Feldman, *Intellectual Origins*, *supra* at 368. In other words, Locke believed that government power must be confined to regulating secular matters, and must not be abused to touch on religious belief.

The writings of many of our Nation's Founders, including Benjamin Franklin, Thomas Jefferson, and James Madison, all point to the great influence that the principle of strict separation played during the Founding Era. Benjamin Franklin, for instance, wrote:

> When a Religion is good, I conceive it will support itself; and when it does not support itself, and God does not care to support [it], so that its Professors are oblig'd to call for the help of the Civil Power, 'tis a Sign, I apprehend, of its being a bad one.

Letter from Benjamin Franklin to Richard Price (Oct. 9, 1780) (Br. Ex. D). James Madison, in turn, viewed governmental support for religion as "[r]eligious bondage [that] shackles and debilitates the mind and unfits it for every noble enterprize." Letter from James Madison to William Bradford (Apr. 1, 1774) (Br. Ex. E).

Madison's steadfast commitment to freedom of conscience informed his opposition to Patrick Henry's proposal in 1784 that Virginia fund religious education with property taxes. *See* Carl H. Esbeck, *Protestant Dissent and the Virginia Disestablishment, 1776-1786*, 7 Geo. J.L. & Pub. Pol'y 51, 77–78 (2009). Madison objected that Henry's proposal would infringe "the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience," intruding on religious freedom and threatening civil governance. James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶¶ 12–13, 15, *reprinted in Everson* v. *Bd. of Educ.*, 330 U.S. 1, 63–72 (1947) (appendix to dissent of Rutledge, J.) (Br. Ex. F). These principles led to the defeat of Henry's proposal and spurred adoption instead of the Virginia Statute for Religious Freedom, which supplanted Virginia's state-established church with a law that ensured strict separation between a secular government and private religious enterprise. *See Everson*, 330 U.S. at 11–13 (summarizing this history with citation). Madison would go on to describe the Virginia Statute for Religious Freedom, and its strict separation between church and state, as "a true standard of Religious liberty: its principle the great barrier agst. usurpations on the rights of conscience. As long as it is respected & no longer, these will be safe." JAMES MADISON, *Detached Memoranda* (ca. Jan. 31, 1820), *in* THE PAPERS OF JAMES MADISON, RETIREMENT SERIES, at 1:611 (David B. Mattern, et. al., eds., Univ. of Va. Press 2009) (Br. Ex. G).

Thomas Jefferson—who authored the Virginia statute and monitored the Virginia debate with interest while acting as an ambassador in Paris—considered the statute's passage to be

among his most crowning achievements. When he learned of the bill's passage, he famously had

it translated into French and Italian and distributed as widely as possible. Jefferson later asked

that the Statute be one of the three things to be preserved on any memorial erected after his

death—alongside the Declaration of Independence and the founding of the University of

Virginia. In short, the principle of strict separation between government and religion was

critically important to the Framers, and played a defining role in the character of the nation they

sought to build. For this reason, they worked the principle of strict separation in to the First

Amendment to the Constitution.

> **a.    The First Amendment was designed to prohibit governmental preference for any faith or religion.**

In accordance with the Founding-Era principles discussed above, the Framers designed

the Establishment Clause of the First Amendment to prohibit government support or preference

for any faith or denomination. They knew that "[t]he centuries immediately before and

contemporaneous with the colonization of America had been filled with turmoil, civil strife, and

persecutions, generated in large part by established sects determined to maintain their absolute

political and religious supremacy." *Everson*, 330 U.S. at 8–9. Religious pluralism thus

represented not just a great national strength but also a profound threat to civil order, if religion

were allowed to remain comingled with government. Thus, the principle of strict separation

between religion and government—embodied in the Establishment Clause—and religious

practice free from government interference—embodied in the Free Exercise Clause—became the

Framers' two-pronged solution to protect religious freedom in a pluralistic nation.

In its first case where it endeavored to interpret the Constitution's religion clauses, the

Supreme Court "recognized that the provisions of the First Amendment, in the drafting and

adoption of which Madison and Jefferson played such leading roles, had the same objective and

were intended to provide the same protection against governmental intrusion on religious liberty

as the Virginia [S]tatute [for Religious Freedom]." *Everson*, 330 U.S. at 13 (citing *Reynolds v.*

*U.S.*, 98 U.S. 145, 164 (1878)). The *Reynolds* Court, faced with the question of how to interpret

the religion clauses, looked to the allusion used in Thomas Jefferson's famous letter to the

Danbury Baptist Association, where he wrote:

> Believing with you that religion is a matter which lies solely between man and
> his God; that he owes account to none other for his faith or his worship; that
> the legislative powers of the government reach actions only, and not
> opinions,—I contemplate with sovereign reverence that act of the whole
> American people which declared that their legislature should 'make no law
> respecting an establishment of religion or prohibiting the free exercise thereof,'
> thus building **a wall of separation between church and State**.

*Reynolds*, 98 U.S. at 164 (quoting Letter from Thomas Jefferson to the Danbury Baptist Asso.

(Jan. 1, 1802) (Br. Ex. H)) (emphasis added).

It is a matter of established legal precedent, then, that the Establishment Clause embodies

the same principles as the Virginia statute, which declared openly and boldly the Framers'

intention to prevent government interference within the religious sphere and create a strict "wall

of separation." The Virginia statute first declares that "'to suffer the civil magistrate to intrude

his powers into the field of opinion, and to restrain the profession or propagation of principles on

supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious

liberty.'" *Reynolds*, 98 U.S. at 164 (quoting the Virginia Bill, 12 Hening's Stat. 84). It then

defines the limited role of a secular government, through the declaration that "'it is time enough

for the rightful purposes of civil government for its officers to interfere when principles break

out into overt acts against peace and good order.'" *Id.* (quoting 12 Hening's Stat. 84). The

*Reynolds* Court—echoing Thomas Jefferson's urging "that the legislative powers of the

government reach actions only, and not opinions"—thus concluded, "[i]n these two sentences is found the true distinction between what properly belongs to the church and what to the State." *Id.*

In the Supreme Court's second extended analysis of the meaning of the Constitution's religion clauses, the Court rooted its Establishment Clause analysis in Madisonian neutrality, ultimately finding that the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers." *Everson*, 330 U.S. at 17. The Court also relied heavily on Jeffersonian separationism, describing the First Amendment's "wall between church and state" as "high and impregnable," and concluding that it "could not approve the slightest breach" of this wall. *Id.* Numerous other cases would follow, and all would echo that this philosophy of strict separation was historically rooted and represented the definitive interpretation of the Establishment Clause. *See McCollum v. Bd. of Educ.*, 333 U.S. 203, 211 (1948) ("In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.'"); *Torcaso v. Watkins*, 367 U.S. 488, 493 (1961) (reaffirming the "wall of separation"); *Sch Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963) (describing the "wholesome 'neutrality' of which this Court's cases speak," which "stems from a recognition of the teachings of history" as prohibiting "official support of the State . . . behind the tenets of one or of all orthodoxies").

> **b.   A law meant to promote the Ten Commandments' religious message is an archetypical Establishment Clause violation.**

It is undeniable that the Establishment Clause was designed to prohibit the government from wielding its authority to take sides in matters of religious belief. But that is precisely what the Arkansas General Assembly sought to do with the enactment of Act 1231. The Assembly chose to pass a law meant to promote the Ten Commandments, by placing a monument to those religious beliefs on public property. Promoting the Ten Commandments is undeniably an act that

establishes a governmental preference on a quintessentially religious matter. A law designed to elevate one religion's beliefs above all others in the public eye is anathema to our Constitution's design, which limited the government's sphere of influence to actions only, not beliefs.

The Supreme Court has long recognized that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, . . . [that] do not confine themselves to arguably secular matters." *Stone v. Graham*, 449 U.S. 39, 41 (1980); *McCreary Cnty.*, 545 U.S. at 869 ("[T]he original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction."). "Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Stone*, 449 U.S. at 42. Therefore, "[w]hen the government initiates an effort to place this statement *alone* in public view, a religious object is unmistakable." *McCreary Cnty.*, 545 U.S. at 869 (emphasis added).

The Supreme Court's only decision allowing a Ten Commandments monument to remain on government property reaffirms the basic principle that the government must not display the Ten Commandments "alone," because a standalone display would promote the Commandments' undeniably religious message. In *Van Orden v. Perry*, the Court allowed Texas to maintain a Ten Commandments monument as one of "17 monuments and 21 historical markers commemorating the 'people, ideals, and events that compose Texan identity,'" placed around the state capitol. 545 U.S. 677, 681 (2005). Within this context, Justice Rehnquist, writing for the Court's plurality, reasoned, "Texas has treated its Capitol grounds monuments as representing the several strands in the State's political and legal history," *id.* at 691 (Rehnquist, C.J., plurality op.), and concluded that "it is clear from the record that there is no evidence of [a primarily religious]

purpose in this case." *Id.* at 691 n.11 (Rehnquist, C.J., plurality op.). Thus, the *Van Orden* decision was *context dependent* and was never meant to undermine the core principles of the Establishment Clause. *See id.* at 700 (Breyer, J., concurring) (the Establishment Clause inquiry "must take account of context and consequences").

Subsequent cases have likewise affirmed that context matters: religious imagery in a secular display may pass constitutional muster, but official display of religious symbols to promote religious messages falls squarely within the Establishment Clause's prohibition. In *Salazar v. Buono*, for instance, the Court upheld the display of a Latin cross on government property due to its history as a war memorial, which, the Court reasoned, gave the monument a primarily secular purpose. *See* 559 U.S. 700, 715 (2010) (Kennedy, J., plurality op.) ("Private citizens put the cross on Sunrise Rock to commemorate American servicemen who had died in World War I."). The Court took care to contrast this outcome with language from its decision in *County of Allegheny*, where all Justices agreed that "the [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall . . . because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion." *Cnty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 606–07 (1989); *see also id.* at 661 (Kennedy, J., concurring in part) (writing same).

When the government erects a Ten Commandments monument, context matters. In this instance, the Arkansas General Assembly chose to pass legislation approving of a standalone monument "commemorating the Ten Commandments." Ark. Code § 22-3-221(b). The Assembly did not seek to commemorate the state's religious heritage, the alleged role the Ten Commandments played in developing modern law, or any secular idea whatsoever. Instead, the

Assembly sought to commemorate the Ten Commandments *themselves*—"an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction." 545 U.S. at 869. Coupled with the religious statements made by the bill's sponsor, which contributed to the immediate public backlash when the bill was initially adopted, the context makes clear that Act 1231 is an unconstitutional establishment of religion. Furthermore, the "unmistakable" religious object of Arkansas's legislative act cannot be saved through an appeal to history and tradition. There is no longstanding history of government legislation ratifying the Ten Commandments.

## II.        There's no established history of laws ratifying the Ten Commandments.

In describing the Supreme Court's methodology for evaluating historical practices, Justice Alito has written that the Court has taken a "modest approach that focuses on the *particular* issue at hand and looks to history for guidance." *Am. Legion v. Am. Humanist Asso.*, 139 S.Ct. 2067, 2087 (2019) (Alito, J., plurality op.) (emphasis added); *see also Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014) ("[I]t is not necessary to define the precise boundary of the Establishment Clause where history shows that the *specific practice* is permitted."). Thus, for the purposes of this case, Arkansas's action—passing Act 1231—must be evaluated against any history of Congress or state legislatures approving of Ten Commandments monuments.

History, moreover, does not trump the Establishment Clause, it simply informs the Establishment Clause analysis. While the "Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" that approach "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." *Town of Greece*, 572 U.S. at 576; *see also Marsh*, 463 U.S. at 790 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees . . . .");

*Walz v. Tax Comm'n*, 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it. Yet an unbroken practice . . . is not something to be lightly cast aside."). Therefore, any governmental action that is at odds with the Founding-Era values that motivated the Framers to pass the Bill of Rights should be evaluated by courts with a skeptical eye. And when there is no longstanding history of the government undertaking the specific practice at issue, the practice must not be permitted to continue.

A government law ratifying the religious beliefs that form the core message of the Ten Commandments—including that one should have "no other gods" than "the LORD, thy God," among others—is antithetical to the principle of government neutrality toward religion on which the United States was founded. The Establishment Clause, therefore, dictates that Arkansas's ratification of the Ten Commandments, through legislation calling for a standalone monument, is unconstitutional. That conclusion survives after undertaking the specific historical inquiry prescribed by the Supreme Court, because government ratification of the Ten Commandments through legislation does not enjoy a specific or longstanding historical pedigree. Arkansas's legislative action, therefore, remains both un-American and unconstitutional.

       **a.**       **Government ratification of the Ten Commandments through legislation lacks any significant historical pedigree.**

In *Marsh v. Chambers* the Supreme Court laid out the rationale for analyzing constitutional questions through an historical lens, noting that in the case of legislative prayer, "there is far more [evidence] here than simply historical patterns," because "historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent." 463 U.S. 783, 790 (1983). Specifically, the Court reasoned, "[i]t can

hardly be thought that in the same week Members of the First Congress voted to appoint and to

pay a Chaplain for each House and also voted to approve the draft of the First Amendment for

submission to the States, they intended the Establishment Clause of the Amendment to forbid

what they had just declared acceptable." *Id.* In the case of government legislation ratifying the

Ten Commandments, "publicly-erected and publicly-owned Ten Commandments monuments

lack the historical pedigree of other forms of government religious expression, such as with

legislative chaplains, *see Marsh* . . . ." Ex. C, Green Expert Report at 4–5.

       The Arkansas General Assembly cannot point to a longstanding history of legislation or

similar government action ratifying the Ten Commandments that even approaches the

"unambiguous and unbroken history of more than 200 years" found sufficient to uphold

legislative prayer in *Marsh*. *Id.* at 792. Such a history simply does not exist. Ten Commandments

monuments "were chiefly an invention of the mid-twentieth century" that do not possess 'a long

history' or 'a distinctive constitutional warrant by virtue of tradition.'" *Id.* at 24. Indeed, the

design of the Ten Commandments monument upon which the Arkansas monument was based

dates back to only the mid-1940s, when a Minnesota juvenile court judge approached the

Minnesota Eagles with the idea of distributing paper copies of the Commandments to be posted

in courthouses nationwide." 545 U.S. at 713 (Stevens, J., dissenting). Subsequently, "[w]hen

Cecil B. DeMille, who at that time was filming the movie The Ten Commandments, heard of the

judge's endeavor, he teamed up with the Eagles to produce the type of granite monolith now

displayed in front of the Texas Capitol [and elsewhere]." *Id.* The actual erection of these

monuments did not begin until the mid-1950s. *See* Ex. B, Hall Expert Report, ¶ 102. The brief—

and contentious—history of these monuments certainly falls short of shedding any light on how

the Founders would have viewed them, and even then, they are a step removed from the

legislative act at the heart of this case—a literal "law respecting an establishment of religion." U.S. Const. amend. I.

The Arkansas General Assembly, through its reliance on Dr. Hall's Report, encourages this Court to ignore the lack of any Founding-Era legislative action commemorating the Ten Commandments and instead uphold Arkansas's ahistorical act based on a more abstract, generalized history of religious references by government actors or on government property. This Court should see this argument for what it is: a bait-and-switch. The idea that religion was important to the Founders and played a role in both their daily lives and decision-making is both undeniable and completely beside the point. When stripped of its appeals to a generalized history that does not address the specific legislative action at issue in this case, the remainder of Dr. Hall's report fails to establish anything close to an unambiguous or unbroken history of analogous government action commemorating the Ten Commandments.

In the section of Dr. Hall's report where he attempts to directly address the issue of religious displays on government property, he begins not with examples of Founding-Era Ten Commandments legislation, but instead with a laundry list of crosses, presumably displayed on public property, that he readily admits "have often been used to commemorate and honor the dead." Ex. B, Hall Report at 40; *see id.* at 40–42 (listing crosses). He also discusses religious references on/inside the Washington Monument—a monument commemorating an undeniably religious man, the symbols on which were placed between 1884 and 1888, nearly one hundred years after the First Amendment was ratified—*see id.* ¶¶ 108–09; biblical quotes on three other government buildings, without identifying when those were established or identifying why those examples are significant to the Court's present inquiry, *see id.* ¶ 110; and contemporary monuments—all from the twentieth or twenty-first century—that include minority religious

symbols. *See id.* ¶¶ 61–65. None of these examples sheds light on what the Framers would have thought of a law respecting an establishment of the Ten Commandments, nor do they demonstrate an enduring history of such enactments in the United States.

The abstract, generalized historical analysis encouraged by Dr. Hall cannot support the actual actions undertaken by the Arkansas General Assembly, which sought to erect a standalone religious monument "commemorating the Ten Commandments"—not commemorating "law" or any other secular value—on public property. Ark. Code § 22-3-221(b). First, the cross displays listed by Dr. Hall are not analogous. The Supreme Court did not indicate that a Christian cross on government property would be constitutional if it served to commemorate the cross itself, or the underlying religious beliefs of Christians. The Court stated the opposite, writing that the Christian cross "took on an added secular meaning when used in World War I memorials." *Am. Legion*, 139 S.Ct. at 2089. Similarly, none of the contemporary examples of memorials with symbols or language from minority faiths cited by Dr. Hall served to commemorate those religious symbols or their underlying religious beliefs themselves. *See* Ex. B, Hall Report, ¶¶ 61–65. Instead, they all served to commemorate or mark secular historical events, such as the Holocaust. They are not analogous to Arkansas's monument commemorating the Ten Commandments.

The Arkansas General Assembly said the quiet part out loud by admitting that it intended to honor the Ten Commandments *itself* through its legislation. But even if it hadn't written that admission into Act 1231, the function of the law would have tipped the Assembly's hand, for, "[w]hen the government initiates an effort to place [the Ten Commandments] *alone* in public view, a religious object is *unmistakable*." *McCreary Cnty.*, 545 U.S. at 869 (emphasis added). Devoid of any context that would provide an alternative intent to the "unmistakable" religious

message expressed in a standalone display, Act 1231 must live or die by the historical acceptance—or lack thereof—of similar legislative acts commemorating the Ten Commandments. There simply is no specific history of analogous legislation seeking to erect standalone monuments to the Ten Commandments on public property.

When Dr. Hall's report does briefly turn to the specific issue of legislative acts commemorating the Ten Commandments, he identifies only *one* such act during the entire 234-year span since the Founders ratified the Constitution. *See* Ex. B, Hall Report, ¶ 98. The House of Representatives passed that specific resolution in 1997, as a reaction to a district court decision ordering Alabama Judge Roy Moore to remove a Ten Commandments display from the rotunda of the Alabama State Judicial Building. *See* H.C.R. 31, 105th Cong. (1997). Later, the Eleventh Circuit, "aided by the district court's meticulous findings of fact," which concluded that the context and setting of the display had created an "ineffable but still overwhelming holy aura," ultimately affirmed the decision to remove the display as an unconstitutional religious endorsement. *See Gassroth v. Moore*, 335 F.3d 1282, 1297 (11th Cir. 2003). One contemporary legislative resolution, meant to show support for an unconstitutional Ten Commandments display, is not particularly persuasive evidence of a longstanding and relevant history regarding Ten Commandments legislation in the United States.

The remainder of Dr. Hall's analysis concerning the Ten Commandments amounts to the following: a letter form John Quincy Adams to his son, *see* Ex. B, Hall Report, ¶ 97; a laundry list of monuments donated by the Eagles in the mid-1950s, *see id.* ¶ 102; a list of seven other plaques or murals of the Ten Commandments in courtrooms or state capitols, without identifying when those were installed, who installed them, or whether there was any legislative action involved, *see id.* ¶ 105; and a quote from Justice Rehnquist's plurality decision in *Van Orden*.

*See id.* ¶ 103. Justice Rehnquist's argument, of course, is not that the country has a long or established history of ratifying the Ten Commandments themselves or their underlying religious message, but rather, that some monuments—like the Texas monument upheld in the case—place the Ten Commandments within the context of larger displays that "acknowledg[e] the role played by the Ten Commandments in our Nation's heritage . . . ." 545 U.S. at 688 (Rehnquist, C.J., plurality op.). Justice Rehnquist lists a few examples of the Ten Commandments appearing on government buildings, but then characterizes all of his examples as demonstrating that "the Ten Commandments have an undeniable historical meaning," *id.* at 690, and concludes that the specific monument at issue is analogous: "Texas has treated its Capitol grounds monuments as representing the several strands in the State's political and legal history." *Id.* at 691. The Supreme Court more recently characterized the depiction of the Ten Commandments in the Court's marble frieze and the other depictions listed by Justice Rehnquist as "intended to serve secular purposes." *American Legion*, 139 S.Ct. at 2083. The Court went on, however, to caution that "retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones." *Id.* at 2085.

The lack of historical adoption of Ten Commandments monuments in the United States makes additional sense because the Commandments themselves were not intimately tied to the Founding-Era philosophical principles that served as the building blocks for the United States' system of government. "[T]here is a dearth of legal commentary and case law in the nineteenth century to indicate that judges, lawyers, and legal scholars believed that the Ten Commandments served as any basis for American law generally, much less for specific substantive areas of the law." Ex. C, Green Expert Report, at 4. The Constitution's Framers were outspoken and specific when it came to the sources from which they drew inspiration while forming our Republic, and

the Ten Commandments did not garner a mention. "In the wide-ranging debates . . . the Founders mentioned Roman law, European Continental law, British law, and various other legal systems, but as can best be determined, no delegate ever relied on the Ten Commandments or the Bible as a source of authority." *Id.* at 20 (referencing Madison's Notes, the Annals of Congress, Farrand's Records, Elliot's Debates, and others).

The lack of any notable citation to the Ten Commandments as a source of authority within the American legal system continued after the ratification of the Bill of Rights as well. The Federalist Papers, authored by James Madison—the primary author of the Bill of Rights— Alexander Hamilton, and John Jay—two other Founding-Era juggernauts—are generally considered among historians to contain "the most important discussions of the meaning of the United States Constitution at the time of ratification," *id.* at 20, and yet, "neither the 'Bible' nor 'scripture' nor the 'Ten Commandments' appears in the index of the Federalist Papers . . . ." *Id.* Similarly, early American case law demonstrates that there was no significant reliance on the Ten Commandments while operating America's newly formed governmental system. *See id.* at 21. So, while the Ten Commandments can, in some contexts, serve as a symbolic stand-in for the concept of "law" generally, it is dubious at best to claim that they hold some unique sway over the development of modern law in the United States. And either way, the text and history of Act 1231 demonstrate that it was not the Arkansas General Assembly's intention to use the Ten Commandments as a stand-in for a secular concept. The Assembly sought to commemorate the Ten Commandments themselves, due to their religious significance.

> **b.    The religious divisiveness caused by Act 1231 is precisely the type of harm the Establishment Clause was meant to prevent.**

Arkansas's decision to pass Act 1231 in order to erect a standalone monument commemorating the Ten Commandments lacks the historical pedigree needed to justify the

display in the face of the Establishment Clause's clear command that the government "make no law respecting an establishment of religion." The General Assembly seeks to protect its blatant religious favoritism from constitutional scrutiny by analogy to crosses on war memorials and the monument approved in *Van Orden*, despite the significantly different contexts in which those religious symbols operate. As argued above, *Van Orden* approved of a Ten Commandments monument based in part on its unique placement within a larger context of other historical monuments and markers, which informed the underlying secular message of the display. *See* Sec. I. b., *supra*. As Justice Breyer explained, however, there was an additional factor:

> If these [contextual] factors provide a strong, but not conclusive, indication that the Commandments' text on this monument conveys a predominantly secular message, a further factor is determinative here. . . . 40 years passed in which the presence of this monument, legally speaking, went unchallenged . . . those 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, [etc.].

*Van Orden*, 545 U.S. at 702 (Breyer, J., concurring). The passage of time, during which the monument existed without objection, is a "determinative" factor when analyzing a monument's apparent impact and meaning. The Supreme Court has echoed this same sentiment in later cases as well; when it has approved of seemingly religious government activities—like government prayer or a Latin cross display on government property—it has been deliberate in emphasizing that those actions had been long-enduring, without causing significant social upheaval, and that they were not meant to advance religious messages, but rather, had secular justifications. Those characteristics do not hold true for Arkansas's Ten Commandments monument.

Arkansas's monument is wholly unlike the century-long display of a cross as a war memorial that the Supreme Court allowed to remain on public land in *American Legion*. In that case, the Court reasoned that "retaining established, religiously expressive monuments, symbols,

and practices is quite different from erecting or adopting new ones," as "[t]he passage of time gives rise to a strong presumption of constitutionality." 139 S. Ct. at 2085. The plaintiffs in *American Legion* did not overcome that presumption: the Court concluded that the cross there communicated a secular message—honoring soldiers who perished during World War I— because it reflected and evoked the crosses marking the graves in Europe of the Americans who died in that war. *Id.* at 2074–76, 2085, 2089. The Court also emphasized that many additional war memorials without religious symbolism had been erected near the cross, further providing secular context to the display. *See id.* at 2077, 2089. And the Court determined that there was no evidence that the cross was used in the memorial with an intent to favor Christianity over other religions. *See id.* at 2074. The cross was not meant to memorialize Christianity.

Other Supreme Court decisions have similarly treated a display or practice's longevity and existence without creating social upheaval as significant evidence that it does not violate the Establishment Clause's core command. For example, in *Town of Greece*, the Court approved of a town's clergy-led prayer practice in part because the practice as a whole did not exhibit "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose," 572 U.S. at 585, and instead "ha[d] a permissible ceremonial purpose." *Id.* at 591. And in *Salazar v. Buono*, the Court noted, "[t]ime also has played its role" and that the Latin cross display at issue "had stood on Sunrise Rock for nearly seven decades." 559 U.S. at 716. In *Van Orden*, Justice Breyer went so far as to caution that "in today's world, in a Nation of so many different religious and comparable nonreligious fundamental beliefs, a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument has not." 545 U.S. at 703 (Breyer, J., concurring). That prediction is borne out fully in the present case.

The record in this case is akin to that of *McCreary County*, which Justice Breyer later described as a "short (and stormy) history" that "demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them." *Van* Orden, 545 U.S. at 702 (Breyer, J., concurring). Almost immediately after the enactment of Act 1231, the legislation received vocal public backlash. Members of the public voiced multiple objections to the placement of the Ten Commandments monuments—as well as statements in support of the monument—at the first available public hearings, *see* SUF ¶ 15, and in written statements and more than *eight hundred* telephone calls directed to the Secretary of State's office. *See* SUF ¶¶ 19–21. The public fight over the monument also played out in local media reports, in 2016 and 2017, *see* SUF ¶ 23, and through competing proposals for monuments meant to display other points of view. SUF ¶¶ 24–26. The public fervor over the proposed monument led its lead government sponsor, Senator Jason Rapert, to publicly defend the monument in a guest editorial, in which he wrote, "I am guilty as charged for supporting the Ten Commandments and write today to take full responsibility for being so bold as to believe that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mount Sinai." SUF ¶29.

This history is a textbook example of what the Supreme Court has long observed: "nothing does a better job of roiling society" than "when the government weighs in on one side of religious debate." *McCreary*, 545 U.S. at 876. Our Founders knew this all too well—and they sought to prevent it.

## CONCLUSION

"Voluntary religious belief and expression may be as threatened when government takes the mantle of religion upon itself as when government directly interferes with private religious

practices." *McCreary*, 545 U.S. at 883 (O'Connor, J., concurring). From an historical

perspective, the Constitution's Establishment Clause has always embodied the principle of strict

separation between government and religion precisely to ensure that government remain solely

concerned with secular matters and not intrude into the religious sphere. The Arkansas General

Assembly failed to live up to this foundational constitutional imperative when it chose to take

sides on a quintessentially religious matter, by ratifying the Ten Commandments in a standalone

monument. The First Commandment alone makes clear why the Ten Commandments monument

violates the First Amendment: it is not the business of the State of Arkansas to tell citizens which

gods to have, how many gods to have, or whether to have any gods at all. Act 1231 was, quite

literally, a "law respecting an establishment of religion." That law cannot be allowed to stand.

This Court should grant the *Orsi* plaintiffs' Motion for Summary Judgment and issue an

injunction directing the Defendant to remove this monument from the State Capitol grounds.

WHEREFORE, The *Orsi* Plaintiffs' Motion for Summary Judgment should be granted.


Dated: March 6, 2023                    Respectfully submitted,

                                        Samuel T. Grover
                                        Associate Counsel
                                        WI Bar No. 1096047
                                        sgrover@ffrf.org

                                        Patrick C. Elliott
                                        Senior Counsel
                                        WI Bar No. 1074300
                                        pelliott@ffrf.org

                                        Freedom From Religion Foundation
                                        PO Box 750
                                        Madison, WI 53701
                                        (608) 230-8443

Katherine McKerall
American Humanist Association
1777 T Street N.W.
Washington, D.C. 20009
Telephone: (202) 238-9088
Facsimile: (202) 238-9003
Email: kmckerall@americanhumanist.org


Baker Schulze and Murphy
2311 Biscayne Drive
Suite 300
Little Rock, AR 72227
Telephone: (501) 537-1000
Facsimile: (501) 537-1001
www.bsm.law

J.G. "Gerry" Schulze
Attorney at Law
Ark. Bar No. 83156
gschulze@bsm.law