IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONNA CAVE, et al                                          PLAINTIFF

v.                                    Case No. 4:18-cv-00342-KGB

JOHN THURSTON, Arkansas Secretary of State
in his Official Capacity                                    DEFENDANT

### **PLAINTIFFS' EXHIBITS TO THE BRIEF FOR SUMMARY JUDGMENT**

| Document Description | Exhibit |
|---|---|
| Letter from James Madison to Edward Livingston (July 10, 1822) | Ex. A |
| *Commentaries on the Constitution of the United States*, Joseph Story | Ex. B |
| *A Letter Concerning Toleration,* John Locke | Ex. C |
| Letter from Benjamin Franklin to Richard Price (Oct. 9, 1780) | Ex. D |
| Letter from James Madison to William Bradford (Apr. 1, 1774) | Ex. E |
| *Memorial and Remonstrance Against Religious Assessments,* James Madison | Ex. F |
| *Detached Memoranda,* James Madison | Ex. G |
| Letter from Thomas Jefferson to Danbury Baptist Association (Jan. 1, 1802) | Ex. H |

EXHIBIT

A

# Founders Online

[Back to normal view]

## From James Madison to Edward Livingston, 10 July 1822

### To Edward Livingston

Dear Sir                                        Montpellier July 10. 1822.

I was favored some days ago with your letter of May 19. accompanied by a copy of your Report to the Legislature of the State on the subject of a Penal Code.

I should commit a tacit injustice if I did not say that the Report does great honor to the talents & sentiments of the Author. It abounds with Ideas of conspicious value, and presents them in a manner equally elegant & persuasive.

The reduction of an entire code of Criminal Jurisprudence into Statutory provisions, excluding a recurrence to foreign or traditional codes, & substituting for technical terms, more familiar ones with or without explanatory notes, can not but be viewed as a very arduous task. I sincerely wish your execution of it may fulfil every expectation.

I can not deny at the same time, that I have been accustomed to doubt the practicability of giving the desired simplicity to so complex a subject, without involving a discretion, inadmissable in free govt; to those who are to expound and apply the law. The rules & usages which make part of the law tho' to be found only in elementary treatises, in respectable Commentaries, and in adjudged cases, seem to be too numerous & too various to be brought within the requisite compass; even if there were less risk of creating uncertainties by defective abridgments, or by the change of Phraseology.

This risk would seem to be particularly incident to a substitution of new words & definitions for a technical language, the meaning of which had been settled by long use, and authoritative expositions. Where a technical term may express a very simple idea, there might be no inconveniency or rather an advantage in exchanging it for a more familiar synonime [*sic*], if a precise one could be found. But where the technical terms & phrases have a complex import, not otherwise to be reduced to clearness and certainty than by practical applications of them, it might be unsafe to introduce new terms & phrases, though aided by brief explanations. The whole law expressed by single terms, such as "Trial, jury, evidence &c." fill volumes when unfolded into the details which enter into their meaning.

I hope it will not be thought that by this intimation of my doubts, I wish to damp the enterprize from which you have not shrunk. On the contrary I not only wish that you may overcome all the difficulties which occur to me; but am persuaded that if compleat success should not reward your labours, there is ample room for improvements in the criminal jurisprudence of Louisiana, as elsewhere, which are well worthy the exertion of your best Powers, and which will furnish useful examples to other members of the Union. Among the advantages distinguishing our Compound Government, it is not the least, that it affords so many opportunities & chances in the local Legislatures, for salutary innovations by some which may be adopted by others; or for important experiments, which, if unsuccessful, will be of limited injury, and may even prove salutary as beacons to others. Our Political System is found also to have the happy merit of exciting a laudable emulation among the States composing it, instead of the enmity marking competitions among Powers wholly alien to each other.

I observe with particular pleasure the view you have taken of the immunity of Religion from Civil Jurisdiction, in every case where it does not trespass on private rights or the public peace. This has always been a favorite point with me: and it was not with my approbation, that the deviation from it took place in Congress when they appointed Chaplains to be paid from the national Treasury. It would have been a much better proof to their Constituents of their pious feelings, if the members had contributed for the purpose, a pittance from their own pockets. As the precedent is not likely to be rescinded, the best that ⟨can⟩ now be done may be, to apply to the Constitution, the maxim of the law, de minimis non curat.[1]

There has been another deviation from the strict principle, in the Executive Proclamations of fasts and festivals; so far at least as they have spoken the language of *injunction*, or have lost sight of the equality of *all* Religious Sects in the eye of the Constitution. Whilst I was honored with the Executive Trust, I found it necessary on more than one occasion to follow the example of predecessors. But I was always careful to make the Proclamations absolutely indiscriminate, and merely recommendatory; or rather mere *designations* of a day, on which all who thought proper might *unite* in consecrating it to

religious purposes, according to their own faith & forms. [2]  In this sense, I presume, you reserve to the Government a right to *appoint* particular days for religious worship throughout the State; without any particular [3]  sanction *enforcing* the worship. I know not what may be the way of thinking on this subject in Louisiana. I should suppose the Catholic portion of the people at least, as a small and even unpopular Sect in the U. S., would rally, as they did in Virginia, when religious liberty was a Legislative topic, to its broadest principle.

Notwithstanding the general progress made within the two last Centuries in favor of this branch of liberty, and the full establishment of it, in some parts of our Country, there remains in others, a strong bias towards the old error, that without some sort of alliance or coalition between Government & Religion, neither can be duly supported. Such indeed is the tendency to such a Coalition, and such its corrupting influence on both the parties, that the danger can not be too carefully guarded against. And in a Government of opinion, like ours, the only effectual guard must be found in the soundness & stability of the general opinion on the subject. Every new & successful example therefore of a perfect separation between ecclesiastical & Civil matters is of importance. And I have no doubt that every new example will succeed, as every past one has done, in shewing that Religion & Govt. will both exist in greater purity, the less they are mixed together. It was the belief of all Sects at one time that the establishment of Religion by law was right & necessary; that the true Religion ought to be established in exclusion of all others; and that the only question to be decided was, which was the true Religion. The example of Holland proved that a toleration of Sects dissenting from the established Sect, was safe and even useful. The example of the Colonies now States, which rejected Religious establishments altogether, proved that all Sects might be safely & advantageously put on a footing of equal & entire freedom. And a continuance of their example since the Declaration of Independence has shewn, that its success in Colonies was not to be ascribed to their connection with the parent Country. If a further confirmation of the truth could be wanted, it is to be found in the examples furnished by the States which have abolished their religious Establishments. I can not speak particularly of any of the cases excepting that of Virginia, where it is impossible to deny that Religion prevails with more zeal, and a more exemplary priesthood, than it ever did when established and patronized by Public authority. We are teaching the World the great truth, that Governments do better without Kings & Nobles than with them. The merit will be doubled by the other lesson, that Religion flourishes in greater purity, without than with the aid of Government.

My pen, I perceive, has rambled into reflections for which it was not taken up. I recall it to the proper object of thanking you for your very interesting pamphlet, and of tendering you my respects & good wishes.

James Madison

---

RC (NjP: Edward Livingston Papers); draft (DLC). Beneath his initials on the draft, JM drafted a letter to John R. Livingston, dated 11 July 1822: "J.M. presents his respects to Mr. Livingston and requests the favor of him to forward the above enclosed letter to N. Orleans or to retain it as his brother may or may not be expected at N. York." Minor differences between the copies have not been noted.

1. *De minimis non curat lex:* "the law does not concern itself with trifles" (*Black's Law Dictionary* [9th ed.], 496).

2. During his presidency, JM issued proclamations declaring particular days of public prayer on 9 July 1812, 23 July 1813, 16 Nov. 1814, and 4 Mar. 1815: each was in response to a congressional request (*PJM-PS* 4:581–82, 6:458–59; *Annals of Congress*, 13th Cong., 3d sess., 1828–29; *Daily National Intelligencer*, 6 Mar. 1815). For a similar warning against religious proclamations by the executive branch, see JM's "Detatched Memoranda," ca. 31 Jan. 1820, *PJM-RS* 1:615–17.

3. In draft, JM wrote "penal."

---

*Note:* The annotations to this document, and any other modern editorial content, are copyright © The Rector and Visitors of the University of Virginia. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Madison Papers |
| TITLE | From James Madison to Edward Livingston, 10 July 1822 |
| AUTHOR | Madison, James |
| RECIPIENT | Livingston, Edward |
| DATE | 10 July 1822 |
| CITE AS | "From James Madison to Edward Livingston, 10 July 1822," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/04-02-02-0471. [Original source: *The Papers of James Madison*, Retirement Series, vol. 2, *1 February 1820−26 February 1823*, ed. David B. Mattern, J. C. A. Stagg, Mary Parke Johnson, and Anne Mandeville Colony. Charlottesville: University of Virginia Press, 2013, pp. 542−545.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

EXHIBIT
B

a criminal disobedience of the precepts of natural, as well as of revealed religion.

§ 1871. The real object of the amendment was, not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity ; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government. It thus cut off the means of religious persecution, (the vice and pest of former ages,) and of the subversion of the rights of conscience in matters of religion, which had been trampled upon almost from the days of the Apostles to the present age.[1] The history of the parent country had afforded the most solemn warnings and melancholy instructions on this head ;[2] and even New-England, the land of the persecuted puritans, as well as other colonies, where the Church of England had maintained its superiority, would furnish out a chapter, as full of the darkest bigotry and intolerance, as any, which could be found to disgrace the pages of foreign annals.[3] Apostacy, heresy, and nonconformity had been standard crimes for public appeals, to kindle the flames of persecution, and apologize for the most atrocious triumphs over innocence and virtue.[4]

§ 1872. Mr. Justice Blackstone, after having spoken with a manly freedom of the abuses in the Romish church respecting heresy ; and, that Christianity had been deformed by the demon of persecution upon the continent, and that the island of Great Britain had

---

[1] 2 Lloyd's Deb. 195.
[2] 4 Black. Comm. 41 to 59.
[3] Ante, Vol. I. § 53, 72, 74.
[4] See 4 Black. Comm. 43 to 59.

Digitized by Google

had almost said none but an atheist, will presume to say that any sincere and upright worshipper of God could, with a safe conscience, obey their several decrees.   To conclude, It is the same thing whether a king that prescribes laws to another man's religion pretend to do it by his own judgment, or by the ecclesiastical authority and advice of others.   The decisions of church-men, whose differences and disputes are sufficiently known, cannot be any sounder, or safer than his: nor can all their suffrages joined together add any new strength unto the civil power.   Though this also must be taken notice of, that princes seldom have any regard to the suffrages of ecclesiastics that are not favourers of their own faith and way of worship.

But after all, the principal consideration, and which absolutely determines this controversy, is this: Although the magistrate's opinion in religion be sound, and the way that he appoints be truly evangelical, yet if I be not thoroughly persuaded thereof in my own mind, there will be no safety for me in following it.   No way whatsoever that I shall walk in against the dictates of my conscience, will ever bring me to the mansions of the blessed.   I may grow rich by an art that I take not delight in; I may be cured of some disease by remedies that I have not faith in; but I cannot be saved by a religion that I distrust, and by a worship that I abhor. It is in vain for an unbeliever to take up the outward show of another man's profession.   Faith only, and inward sincerity, are the things that procure acceptance with God. The most likely and most approved remedy can have no effect upon the patient, if his stomach reject it as soon as taken; and you will in vain cram a medicine down a sick man's throat, which his particular constitution will be sure to turn into poison.   In a word: Whatsoever may be doubtful in religion, yet this at least is certain, that no religion, which I believe not to be true, can be either true or profitable unto me. In vain therefore do princes compel their subjects to come into their church-communion, under pretence of saving their souls.   If they believe, they will come of their own accord; if they believe not, their coming will

Case 4:18-cv-00342-KGB   Document 256-1   Filed 03/06/23   Page 7 of 39

nothing avail them.   How great soever, in fine, may be the pretence of good-will and charity, and concern for the salvation of men's souls, men cannot be forced to be saved whether they will or no; and therefore when all is done, they must be left to their own consciences.

Having thus at length freed men from all dominion over one another in matters of religion, let us now consider what they are to do.   All men know and acknowledge that God ought to be publicly worshipped.   Why otherwise do they compel one another unto the public assemblies? Men therefore constituted in this liberty are to enter into some religious society, that they may meet together, not only for mutual edification, but to own to the world that they worship God, and offer unto his divine majesty such service as they themselves are not ashamed of, and such as they think not unworthy of him, nor unacceptable to him; and finally, that by the purity of doctrine, holiness of life, and decent form of worship, they may draw others unto the love of the true religion, and perform such other things in religion as cannot be done by each private man apart.

These religious societies I call churches: and these I say the magistrate ought to tolerate. For the business of these assemblies of the people is nothing but what is lawful for every man in particular to take care of; I mean the salvation of their souls : nor in this case is there any difference between the national church, and other separated congregations.

But as in every church there are two things especially to be considered ; the outward form and rites of worship, and the doctrines and articles of faith ; these things must be handled each distinctly, that so the whole matter of toleration may the more clearly be understood.

Concerning outward worship, I say, in the first place, that the magistrate has no power to enforce by law either in his own church, or much less in another, the use of any rites or ceremonies whatsoever in the worship of God. And this, not only because these churches are free societies, but because whatsoever is practised in the worship of God, is only so far justifiable as it is

EXHIBIT D

# Founders Online

[Back to normal view]

## From Benjamin Franklin to Richard Price, 9 October 1780

### To Richard Price

<sub>AL</sub> (draft) and two copies: Library of Congress

Dear Sir,                                                                 Passy, Oct. 9. 1780

   Besides the Pleasure of their Company, I had the great Satisfaction of hearing by your two valuable Friends, & learning from your Letter, that you enjoy a good State of Health.[3] May God continue it as well for the Good of Mankind as for your Comfort. I thank you much for the second Edition of your excellent Pamphlet.[4] I forwarded that you sent to Mr. Dana, he being in Holland.—[5] I wish also to see the Piece you have written as Mr Jones tells me, on Toleration.—[6] I do not expect that your new Parliament will be either wiser or honester than the last. All Projects to procure an Honest one, by Place Bills, &c appear to me vain and Impracticable. The true Cure I imagine is to be found only in rendring all Places unprofitable, and the King too poor to give Bribes & Pensions. Till this is done, which can only be by a Revolution, and I think you have not Virtue enough left to procure one, your Nation will always be plundered; & obliged to pay by Taxes the Plunderers for Plundering & Ruining. Liberty & Virtue therefore join in the Call, Come out of her, my People![7] I am fully of your Opinion respecting Religious Tests; but tho' the People of Massachusetts have not in their new Constitution kept quite clear of them; yet if we consider what that People were 100 Years ago, we must allow they have gone great Lengths in Liberality of Sentiment, on religious Subjects; and we may hope for greater Degrees of Perfection when their Constitution some years hence shall be revised.[8] If Christian Preachers had continued to teach as Christ & his Apostles did, without Salaries, and as the Quakers now do, I imagine Tests would never have existed: For I think they were invented not so much to secure Religion itself, as the Emoluments of it.— When a Religion is good, I conceive that it will support itself; and when it cannot support itself, and God does not take care to support, so that its Professors are oblig'd to call for the help of the Civil Power, 'tis a Sign, I apprehend, of its being a bad one. But I shall be out of my Depth if I wade any deeper in Theology, & I will not trouble you with Politicks, nor with News which are almost as uncertain: But conclude with a heartfelt Wish, to embrace you once more, & enjoy your sweet Society in Peace, among our honest, worthy, ingenious Friends at the London.

   Adieu

Dr Price

---

*[Note numbering follows the Franklin Papers source.]*

   3. The two friends were John Paradise and William Jones. Price's most recent extant letter, which <sub>BF</sub> had already answered, was sent the previous October: xxx, 532–3; xxxi, 452–3.

   4. *An Essay on the Population of England, from the Revolution to the Present Time* (1st separate edition, London, 1780). Benjamin Vaughan had sent the pamphlet to <sub>BF</sub> in May: xxxii, 380.

   5. Price became acquainted with Francis Dana when he was in London in 1775: D.O. Thomas and W. Bernard Peach, eds., *The Correspondence of Richard Price* (3 vols., Durham, N.C., and Cardiff, Wales, 1983–94), i, 200–1. <sub>BF</sub> also passed on a copy of the pamphlet to Turgot: *ibid.*, ii, 68.

   6. Price replied on Dec. 22, 1780, that although he had written a great deal on toleration he had not published on the subject: *Correspondence of Price*, ii, 91.

   7. "And I heard another voice from heaven, saying, Come out of her, my people, that ye be not partakers of her sins, and that ye receive not of her plagues." Revelation 18:4.

   8. The draft of the Massachusetts Constitution of 1780 stipulated that no person be eligible for election to the House of Representatives "unless he be of the christian religion." Although the provision was deleted, attempts were made in the convention to restore it and add "Protestant" to the requirement. The constitution

did require the governor to be a Christian: *Adams Papers*, VIII, 248, 250, 267.

*Note:* The annotations to this document, and any other modern editorial content, are copyright © the American Philosophical Society and Yale University. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Franklin Papers |
| TITLE | From Benjamin Franklin to Richard Price, 9 October 1780 |
| AUTHOR | Franklin, Benjamin |
| RECIPIENT | Price, Richard |
| DATE | 9 October 1780 |
| CITE AS | "From Benjamin Franklin to Richard Price, 9 October 1780," *Founders Online,* National Archives, https://founders.archives.gov/documents/Franklin/01-33-02-0330. [Original source: *The Papers of Benjamin Franklin,* vol. 33, *July 1 through November 15, 1780*, ed. Barbara B. Oberg. New Haven and London: Yale University Press, 1997, pp. 389–390.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

EXHIBIT

E

# Founders Online

[Back to normal view]

## FROM JAMES MADISON TO WILLIAM BRADFORD, 1 APRIL 1774

### To William Bradford

RC (Historical Society of Pennsylvania). Addressed: "To Mr. William Bradford Junior At the Coffee-House Philadelphia." A copy of this letter, made by Bradford, is also at the Historical Society of Pennsylvania.

MY WORTHY FRIEND                                    April 1st. 1774. VIRGINIA ORANGE CY.

I have another favour to acknowledge in the receipt of your kind Letter of March the 4th. I did not intend to have written again to you before I obtained a nearer communication with you but you have too much interest in my inclinations ever to be denied a request.

Mr. Brackenridge's illness gives me great uneasiness: I think he would be a loss to *America:* His merit is rated so high by me that I confess if he were gone, I could almost say with the Poet That His Country could furnish such a Pomp for Death no more.[1] But I solace myself from Finley's ludicrous description as you do.

I agree with you that the World needs to be peopled but I should be sorry it should be peopled with bastards as my old friend Dod and —— —— seem to incline.[2] Who could have thought the old monk had been so letcherous. I hope his Religion, like that of some enthusiasts, was not of such a nature as to fan the amorous fire.

Our Assembly is to meet the first of May When It is expected something will be done in behalf of the Dissenters: Petitions I hear are already forming among the Persecuted Baptists and I fancy it is in the thoughts of the Presbyterians also to intercede for greater liberty in matters of Religion. For my part I can not help being very doubtful of their succeeding in the Attempt. The Affair was on the Carpet during the last Session; but such incredible and extravagant stories were told in the House of the monstrous effects of the Enthusiasm prevalent among the Sectaries and so greedily swallowed by their Enemies that I believe they lost footing by it and the bad name they still have with those who pretend too much contempt to examine into their principles and Conduct and are too much devoted to the ecclesiastical establishment to hear of the Toleration of Dissentients, I am apprehensive, will be again made a pretext for rejecting their requests. The Sentiments of our people of Fortune & fashion on this subject are vastly different from what you have been used to. That liberal catholic and equitable way of thinking as to the rights of Conscience, which is one of the Characteristics of a free people and so strongly marks the People of your province is but little known among the Zealous adherents to our Hierarchy. We have it is true some persons in the Legislature of generous Principles both in Religion & Politicks but number not merit you know is necessary to carry points there. Besides[,] the Clergy are a numerous and powerful body[,] have great influence at home by reason of their connection with & dependence on the Bishops and Crown and will naturally employ all their art & Interest to depress their rising Adversaries; for such they must consider dissenters who rob them of the good will of the people and may in time endanger their livings & security.

You are happy in dwelling in a Land where those inestimable privileges are fully enjoyed and public has long felt the good effects of their religious as well as Civil Liberty. Foreigners have been encouraged to settle amg. you. Industry and Virtue have been promoted by mutual emulation and mutual Inspection, Commerce and the Arts have flourished and I can not help attributing those continual exertions of Gen[i]us which appear among you to the inspiration of Liberty and that love of Fame and Knowledge which always accompany it. Religious bondage shackles and debilitates the mind and unfits it for every noble enterprize every expanded prospect. How far this is the Case with Virginia will more clearly appear when the ensuing Trial is made.[3]

I am making all haste in preparing for my Journey: it appears as if it would be the first of May before I can start which I can the more patiently bear, because I may possibly get Some company by that time and it will answer so exactly with the meeting of the Synod.[4] George Luckey talks of Joining me if I can wait till then. I am resolutely determined to come if it is in my power: If any thing hinders me it will be most likely the indisposition of my Mother who is in a very low state of health

and if she should grow worse I am afraid she will be more unwilling to part with my brother as she will be less able to bear a Separation. If it should [so un]fortunately happen that I should be forced [to put][5] off or give out coming, Luckey on his Return to Virginia will bring me whatever publications you think worth sending and among others Calpipnis[6] Letters. But whether I come or not[7] be assured I retain the most ardent affection and esteem for you and the most cordial gratitude for your many generous Kindnesses. It gives me real pleasure when I write to you that I can talk in this Language without the least Affectation and without the suspicion of it, and that if I should omit expressing my love to you your friendship can supply the Omission or if I make use of the most extravagant expressions of it your Correspondent Affection can believe them to be sincere. This is a satisfaction & delight unknown to all who correspond for business or conveniency; but richly enjoyed by all who make pleasure and Improvement the business of their Communications.

Farewell

JM

P.S. You need no longer direct to the Care of Mr. Maury.[8]

---

1. "America" is italicized because JM underlined it. "The Poet" could have been Seneca, Francis Bacon, or John Milton. Bacon attributed the phrase "Pompa mortis magis terret quam mors ipsa" (The pomp of death alarms us more than death itself) to Seneca. Though Seneca did use the words "pompa mortis" in *Oedipus* i. 126, it was in quite a different sense from that which Bacon implied. Bacon was probably thinking of "Stultitia est timore mortis mort" (It is folly to die of the fear of death) from Seneca's Epistle 70 (W. Gurney Benham, ed., *Putnam's Dictionary of Thoughts* [New York, 1930], p. 622). Lines 15–16 of Milton's "On Shakespeare" are:

> And so sepulchered in such pomp does lie,
> That kings for such a tomb would wish to die.

2. JM probably intended Bradford to interpolate the name of Dod's wife in the blank (Bradford to JM, 4 March 1774, n. 10).

3. Although the Presbyterians and Baptists, beginning in 1769, brought more and more pressure on the colonial legislature to grant them religious toleration or liberty, they were unsuccessful until 1776. In the session of 1774, however, when the dissenters again petitioned for redress, the House of Burgesses appeared to be more sympathetic but eventually adjourned without extending relief (*Journals of the House of Burgesses of Virginia, 1766–1769*, pp. 205, 252; *1770–1772*, pp. 186, 249; *1773–1776*, pp. 92, 102, 103, 189, 225).

4. The Synod of New York and Philadelphia of the Presbyterian Church met in the latter city from 18 to 26 May 1774. Although JM was an Anglican, many, if not most, of his college friends were Presbyterians.

5. The bracketed syllable and words are editorial inserts to replace those which the breaking of the letter's seal probably effaced.

6. "Caspipina."

7. At the bottom of Bradford's copybook version of this letter, he wrote: "NB. The beginning of May Mr Maddison arrived at Philada. & spent a few days: he the[n] proceeded on his way to Albany & returned in a fortnigh[t] staid a little while with us & then set of[f] for Virginia." This note is the only known record telling of JM's northern trip. Why he should have gone to Albany is especially puzzling.

8. Probably James Maury (1746–1840), friend and business agent of JM, well-known Fredericksburg merchant in the 1770's, and U.S. consul at Liverpool, 1790–1830 (*Virginia Magazine of History and Biography*, XXVII [1919], 375–76; *Journal of the Executive Proceedings of the Senate of the United States of America* [Washington, 1828——], I, 48; IV, 52).

---

*Note:* The annotations to this document, and any other modern editorial content, are copyright © University of Chicago Press. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Madison Papers |
| TITLE | From James Madison to William Bradford, 1 April 1774 |
| AUTHOR | Madison, James |
| RECIPIENT | Bradford, William |
| DATE | 1 April 1774 |
| CITE AS | "From James Madison to William Bradford, 1 April 1774," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-01-02-0031. [Original source: *The Papers of James Madison,* vol. 1, *16 March 1751–16 December 1779,* ed. William T. Hutchinson and William M. E. Rachal. Chicago: The University of Chicago Press, 1962, pp. 111–114.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

EXHIBIT

F

# Founders Online

[Back to normal view]

## Memorial and Remonstrance against Religious Assessments, [ca. 20 June] 1785

### Memorial and Remonstrance against Religious Assessments

#### EDITORIAL NOTE

The most striking element in JM's authorship of the Memorial and Remonstrance was the pains he took to keep the public ignorant of his heavy involvement in this battle over state-subsidized religion. So successful was he in maintaining anonymity that a few libraries still have a printed version with speculative attributions of the work to other public men. Although in 1786 printer Isaiah Thomas used JM's name in the title when he issued *A Memorial and Remonstrance … by his Excellency James Madison* (Sabin 43719), JM himself waited until 1826 to make an explicit acknowledgment of his authorship. In reply to a query from George Mason's grandson, JM recalled that Mason and George Nicholas "and some others, thought it adviseable, that a Remonstrance against the Bill should be prepared for general circulation & signature, and imposed on me the task of drawing up such a paper" (JM to George Mason [of Green Spring], 14 July 1826 [ViHi]). After forty years, the legislative undercurrents moving the General Assessment bill toward passage in 1785 had been forgotten, and the surviving documents standing alone did not tell the whole story.

The importance of formal religion in the 1780s is a concept difficult for a secularistic society to grasp. JM had a decent respect for the opinions of his peers and must have been aware of the intensity with which his Baptist and Presbyterian neighbors approached religious worship. He was also conscious of loyalties held by such patriots as Edmund Pendleton and Patrick Henry for the former established church, and of their conviction that taxes should be offered to all churches through a general assessment lest public morality languish.

Nonetheless, disestablishment was an accomplished fact, a social symptom of declining interest in organized Christianity. Church-going in Virginia had long been on the decline as communicants found more reasons for attending Sunday horse races or cock fights than for being in pews. In 1784 a foreign traveler in Richmond noted that the village had only "one small church, but [it was] spacious enough for all the pious souls of the place and the region. If the Virginians themselves did not freely and openly admit that zeal for religion, and religion generally, is now very faint among them, the fact might easily be divined from other circumstances" (Schoepf, *Travels in the Confederation*, II, 62). In the face of such realities there were still many members of the General Assembly disposed to aid the Protestant Episcopal church, and they seemed determined to carry the General Assessment bill despite widespread but inarticulate opposition from their constituents. In this confused situation the Presbyterians occupied an ambiguous position. Convinced that a religious subsidy would pass, the Hanover Presbytery first declared that "Religion as a spiritual System is not to be considered an object of human Legislation," and in the next breath made a bid to share in the proceeds of a general assessment for teachers of Christianity (ViHi: Records of the Proceedings of Hanover Presbytery from the year 1755 to the year 1786 [typed copy by George S. Wallace, 1930], pp. 326–27).

Such a compromise was anathema to JM, who had no intention of retreating from the high ground he occupied when helping fashion Article XVI of the Virginia Declaration of Rights. He had seen conservative forces in the General Assembly come within an eyelash of passing the "Bill establishing a provision for the teachers of the Christian religion" at the October 1784 session—with some sly maneuvering needed by its opponents to postpone final action on the bill and publicize its provisions in the interim. George Nicholas in neighboring Albemarle County had entreated JM to bestir himself so that apathy would not allow the bill to become law (letter to JM, 22 Apr. 1785). Surely JM discussed the matter with his neighbors, including the

obstreperous Elder John Leland, a Baptist minister who loathed all forms of church-state alliances. A host of Episcopalians as well as dissenters were eager to cut all church-state ties. However, a focal point for the opposition was needed, and the usual way to protest pending legislation in the 1780s was by a petition.

Partly from pressure then, and partly from personal conviction, JM took pen in hand and wrote a cogently reasoned attack on the measure, which was popularly called a General Assessment bill. By the end of June it was ready for distribution, most likely through Nicholas and other young men in the Piedmont whom Madison could trust to keep his secret—Archibald Stuart, John Breckinridge—and the tidelands patriarch at Gunston Hall who was eager to knock the tax-subsidy props from beneath the church he attended and loved, George Mason. The Library of Congress copy of the protest is in JM's hand. No doubt he sent a copy to Mason, who was eager to see it in print. From an Alexandria press Mason broadcast copies of the Memorial and Remonstrance to friends and neighbors. Mason sent with it a covering letter which honored JM's request for anonymity. The petition, Mason explained, was "confided to me by a particular Freind, whose Name I am not at Liberty to mention" (Mason to Washington, 2 Oct. 1785, Rutland, *Papers of George Mason*, II, 830). So active was Mason in supporting JM's remonstrance that there was speculation that he was its real author (Rowland, *Life of George Mason*, II, 87).

JM's motive in seeking a cloud of anonymity over his attack on the General Assessment bill is uncertain. JM told Jefferson copies had been dispatched "thro' the *medium of confidential persons*" (italicized words in code, <u>JM to Jefferson, 20 Aug. 1785</u>). Eckenrode speculated that most Virginians were inclined to support the bill until the protest movement began to swell (Eckenrode, *Separation of Church and State in Virginia*, p. 95). The phalanx committed to its passage was imposing. A fortuitous circumstance was the fact that Patrick Henry was still governor and thus unable to use his oratory in the House of Delegates to overwhelm the opposition. Carter Henry Harrison, Charles Mynn Thruston, Wilson Miles Cary, John Page, and lesser lights also were convinced that religion needed bolstering. Richard Henry Lee and Edmund Pendleton were not legislators, but in Richmond their support of the General Assessment bill was certainly no secret (Mays, *Papers of Edmund Pendleton*, II, 474).

In these circumstances JM may have thought it prudent to eschew the role of rabble-rouser. There was much to be done at the October 1785 session of the legislature and JM was too good a politician to go out of his way to alienate those men whose votes or support he would need if the reforms of the court system and the whole legal code were to pass a House of Delegates fairly balanced in terms of conservative-progressive members. So it may have been prudence and expediency that caused JM to mantle his authorship of what has been called "one of the truly epoch-making documents in the history of American Church-State separation" (Anson Phelps Stokes, *Church and State in the United States* [3 vols.; New York, 1950], I, 391).

A comparison between the Memorial and Remonstrance and John Locke's "Letter on Toleration" (1685) leads to the speculation that JM had occasion to use Locke's treatise in preparing his own. Assertions of intellectual dependence are often based on slender textual coincidences, but there are a number of similarities between the views of JM and Locke toward religious ties between church and state. For example, JM speaks of the "metes and bounds" between the temporal and spiritual establishments while Locke marked "the true bounds between the church and the commonwealth" (John Locke, *Epistola de Tolerantia: A Letter on Toleration*, Raymond Klibansky and J. W. Gough, eds. [Oxford, 1968], p. 65). JM denies to "the Civil Magistrate" any power over religion because "Religious truth" and "the means of salvation" are beyond the concerns of the state. With Locke, the whole jurisdiction of the magistrate is concerned only with "civil goods" such as life, liberty, and property and ought not "in any way to be extended to the salvation of souls" (ibid., p. 67). Indeed, Locke held that "the magistrate ought not to forbid the holding or teaching of any speculative opinions in any church, because they have no bearing on the civil rights of his subjects" (ibid., p. 121).

If this comparison of Locke and JM is strained, there is one indisputable similarity between the "Letter on Toleration" and the Memorial and Remonstrance. Neither Locke nor JM wanted their authorship revealed. A modern scholar has noted that "Locke's timid anxiety to conceal his identity was excessive"; JM sent his petition to a close circle of friends who were enjoined to secrecy (Locke, *Letter on Toleration*, p. 45; Rutland, *Papers of George Mason*, II, 830, 832). "My choice is that my name may not be associated with it," <u>JM wrote Randolph (26 July 1785)</u>.

Whether JM gleaned his arguments from a growing number of volumes in his personal library or drew upon experience and practical politics as his guides, the result is beyond doubt. Because of his labors the campaign against the General Assessment bill had all the aspects of a well-organized endeavor. What is not generally known is that JM was not only seeking anonymity but was so circumspect that another opponent of the General Assessment bill actually had a more active following. While at least thirteen of JM's petitions were circulated (and in time bore 1,552 signatures), another (and still anonymous) petition writer found that his attack on the "Teachers of Christian Religion" measure gained more widespread support. Twenty-nine petitions, signed by 4,899 Virginians, came from the pen of this unknown opponent of a church-state tie. These petitions were based on an argument that carries beyond JM's—the General Assessment bill was not only contrary to the Virginia Declaration of Rights and to the enlightened republicanism pronounced there, but the proposed act was in conflict with "the Spirit of the Gospel." Whoever wrote this petition, which was easily the most popular of the several circulating protests, was clearly an active Christian who believed the General Assessment bill would do nothing to check "that Deism with its banefull Influence [which] is spreading itself over the state" (Vi: Westmoreland County petition).

Obviously, more Virginians were made aware of this zealous protest than JM's calmer one, and it is also notable that in Westmoreland County at least eleven women signed the remonstrance based on "the Spirit of the Gospel." Thus, while JM's role in shaping opposition to the bill is noteworthy, his protest was signed by less than one-fifth of all the protesting Virginians who were recorded as opponents of the General Assessment bill (since some 10,929 signed some kind of anti-assessment petition). About eighty petitions opposed to the General Assessment bill flowed into the legislative hopper after 27 October 1785. Some were printed, and some came in longhand, but less than one-fifth of them were based entirely on JM's work. Only eleven counties mustered enough support for the bill to send favorable petitions to Richmond. Faced with such odds, the conservatives retreated. The bill which seemed so certain of passage in November 1784 was, just a year later, allowed to die in the pigeonhole.

With the passing of time, history tended to forget the other protests of 1785–1786 and focused upon Madison's. JM himself was no longer shy about his role, and in his seventy-fifth year he remembered that chiefly because of the Memorial and Remonstrance the churchmen in the General Assembly were "entirely frustrated, and under the influence of the public sentiment thus manifested the celebrated Bill 'Establishing Religious freedom' [was] enacted into a permanent Barrier agst. future attempts on the Rights of Conscience as declared in the great Charter affixed to the Constitution of the State" (JM to George Mason [of Green Spring], 14 July 1826 [ViHi]). His latter allusion was to the benchmark Article XVI of the Virginia Declaration of Rights which had opened the door for the winds of change, toppled the established church, and left men "equally entitled to the free exercise of religion, according to the dictates of conscience." JM remembered that entering wedge with some satisfaction for (with Mason's help) he had written that, too.

[ca. 20 June 1785]

# To the Honorable the General Assembly of the Commonwealth of Virginia
## A Memorial and Remonstrance

We the subscribers, citizens of the said Commonwealth, having taken into serious consideration, a Bill printed by order of the last Session of General Assembly, entitled "A Bill establishing a provision for Teachers of the Christian Religion,"[1] and conceiving that the same if finally armed with the sanctions of a law, will be a dangerous abuse of power, are bound as faithful members of a free State to remonstrate against it, and to declare the reasons by which we are determined. We remonstrate against the said Bill,

1.   Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence."[2] The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because

what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him. This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governour of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no mans right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance. True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true that the majority may trespass on the rights of the minority.[3]

2.  Because if Religion be exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body. The latter are but the creatures and vicegerents of the former. Their jurisdiction is both derivative and limited: it is limited with regard to the co-ordinate departments, more necessarily is it limited with regard to the constituents. The preservation of a free Government requires not merely, that the metes and bounds which separate each department of power be invariably maintained; but more especially that neither of them be suffered to overleap the great Barrier which defends the rights of the people.[4] The Rulers who are guilty of such an encroachment, exceed the commission from which they derive their authority, and are Tyrants. The People who submit to it are governed by laws made neither by themselves nor by an authority derived from them, and are slaves.

3.  Because it is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of Citizens, and one of the noblest characteristics of the late Revolution. The free men of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle.[5] We revere this lesson too much soon to forget it. Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? that the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?

4.  Because the Bill violates that equality which ought to be the basis of every law, and which is more indispensible, in proportion as the validity or expediency of any law is more liable to be impeached. If "all men are by nature equally free and independent,"[6] all men are to be considered as entering into Society on equal conditions; as relinquishing no more, and therefore retaining no less, one than another, of their natural rights. Above all are they to be considered as retaining an "*equal* title to the free exercise of Religion according to the dictates of Conscience."[7] Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offence against God, not against man: To God, therefore, not to man, must an account of it be rendered. As the Bill violates equality by subjecting some to peculiar burdens, so it violates the same principle, by granting to others peculiar exemptions. Are the Quakers and Menonists the only sects who think a compulsive support of their Religions unnecessary and unwarrantable? Can their piety alone be entrusted with the care of public worship? Ought their Religions to be endowed above all others with extraordinary privileges by which proselytes may be enticed from all others? We think too favorably of the justice and good sense of these denominations to believe that they either covet pre-eminences over their fellow citizens or that they will be seduced by them from the common opposition to the measure.

5.  Because the Bill implies either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy.[8] The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: the second an unhallowed perversion of the means of salvation.

6.  Because the establishment proposed by the Bill is not requisite for the support of the Christian Religion. To say that it is, is a contradiction to the Christian Religion itself, for every page of it disavows a dependence on the powers of this world: it is a contradiction to fact; for it is known that this Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them, and not only during the period of miraculous aid, but long after it had been left to its own evidence and the ordinary care of Providence. Nay, it is a contradiction in terms; for a Religion not invented by

human policy, must have pre-existed and been supported, before it was established by human policy. It is moreover to weaken in those who profess this Religion a pious confidence in its innate excellence and the patronage of its Author; and to foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies to trust it to its own merits.

7.   Because experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation. During almost fifteen centuries has the legal establishment of Christianity been on trial. What have been its fruits? More or less in all places, pride and indolence in the Clergy, ignorance and servility in the laity, in both, superstition, bigotry and persecution. Enquire of the Teachers of Christianity for the ages in which it appeared in its greatest lustre; those of every sect, point to the ages prior to its incorporation with Civil policy. Propose a restoration of this primitive State in which its Teachers depended on the voluntary rewards of their flocks, many of them predict its downfall. On which Side ought their testimony to have greatest weight, when for or when against their interest?

8.   Because the establishment in question is not necessary for the support of Civil Government. If it be urged as necessary for the support of Civil Government only as it is a means of supporting Religion, and it be not necessary for the latter purpose, it cannot be necessary for the former. If Religion be not within the cognizance of Civil Government how can its legal establishment be necessary to Civil Government? What influence in fact have ecclesiastical establishments had on Civil Society? In some instances they have been seen to erect a spiritual tyranny on the ruins of the Civil authority; in many instances they have been seen upholding the thrones of political tyranny: in no instance have they been seen the guardians of the liberties of the people. Rulers who wished to subvert the public liberty, may have found an established Clergy convenient auxiliaries. A just Government instituted to secure & perpetuate it needs them not. Such a Government will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another.

9.   Because the proposed establishment is a departure from that generous policy, which, offering an Asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country, and an accession to the number of its citizens. What a melancholy mark is the Bill of sudden degeneracy? Instead of holding forth an Asylum to the persecuted, it is itself a signal of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority. Distant as it may be in its present form from the Inquisition, it differs from it only in degree. The one is the first step, the other the last in the career of intolerance. The magnanimous sufferer under this cruel scourge in foreign Regions, must view the Bill as a Beacon on our Coast, warning him to seek some other haven, where liberty and philanthrophy in their due extent, may offer a more certain repose from his Troubles.

10.   Because it will have a like tendency to banish our Citizens. The allurements presented by other situations are every day thinning their number. To superadd a fresh motive to emigration by revoking the liberty which they now enjoy, would be the same species of folly which has dishonoured and depopulated flourishing kingdoms.

11.   Because it will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion has produced among its several sects. Torrents of blood have been spilt in the old world, by vain attempts of the secular arm, to extinguish Religious discord, by proscribing all difference in Religious opinion. Time has at length revealed the true remedy. Every relaxation of narrow and rigorous policy, wherever it has been tried, has been found to assuage the disease. The American Theatre has exhibited proofs that equal and compleat liberty, if it does not wholly eradicate it, sufficiently destroys its malignant influence on the health and prosperity of the State. [9]  If with the salutary effects of this system under our own eyes, we begin to contract the bounds of Religious freedom, we know no name that will too severely reproach our folly. At least let warning be taken at the first fruits of the threatened innovation. The very appearance of the Bill has transformed "that Christian forbearance, love and charity," [10]  which of late mutually prevailed, into animosities and jealousies, which may not soon be appeased. What mischiefs may not be dreaded, should this enemy to the public quiet be armed with the force of a law?

12.   Because the policy of the Bill is adverse to the diffusion of the light of Christianity. The first wish of those who enjoy this precious gift ought to be that it may be imparted to the whole race of mankind. Compare the number of those who have as yet received it with the number still remaining under the dominion of false Religions; and how small is the former! Does the policy of the Bill tend to lessen the disproportion? No; it at once discourages those who are strangers to the light of revelation [11] from coming into the Region of it; and countenances by example the nations who continue in darkness, in

shutting out those who might convey it to them. Instead of Levelling as far as possible, every obstacle to the victorious progress of Truth, the Bill with an ignoble and unchristian timidity would circumscribe it with a wall of defence against the encroachments of error.

13.   Because attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society. If it be difficult to execute any law which is not generally deemed necessary or salutary, what must be the case, where it is deemed invalid and dangerous? And what may be the effect of so striking an example of impotency in the Government, on its general authority?

14.   Because a measure of such singular magnitude and delicacy ought not to be imposed, without the clearest evidence that it is called for by a majority of citizens, and no satisfactory method is yet proposed by which the voice of the majority in this case may be determined, or its influence secured. "The people of the respective counties are indeed requested to signify their opinion respecting the adoption of the Bill to the next Session of Assembly."[12] But the representation must be made equal, before the voice either of the Representatives or of the Counties will be that of the people. Our hope is that neither of the former will, after due consideration, espouse the dangerous principle of the Bill. Should the event disappoint us, it will still leave us in full confidence, that a fair appeal to the latter will reverse the sentence against our liberties.

15.   Because finally, "the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience" is held by the same tenure with all our other rights. If we recur to its origin, it is equally the gift of nature; if we weigh its importance, it cannot be less dear to us; if we consult the "Declaration of those rights which pertain to the good people of Virginia, as the basis and foundation of Government,"[13] it is enumerated with equal solemnity, or rather studied emphasis. Either then, we must say, that the Will of the Legislature is the only measure of their authority; and that in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: Either we must say, that they may controul the freedom of the press, may abolish the Trial by Jury, may swallow up the Executive and Judiciary Powers of the State; nay that they may despoil us of[14] our very right of suffrage, and erect themselves into an independent and hereditary Assembly or, we must say, that they have no authority to enact into law the Bill under consideration. We the Subscribers say, that the General Assembly of this Commonwealth have no such authority: And that no effort may be omitted on our part against so dangerous an usurpation, we oppose to it, this remonstrance; earnestly praying, as we are in duty bound, that the Supreme Lawgiver of the Universe, by illuminating those to whom it is addressed, may on the one hand, turn their Councils from every act which would affront his holy prerogative, or violate the trust committed to them: and on the other, guide them into every measure which may be worthy of his [blessing, may re]dound[15] to their own praise, and may establish more firmly the liberties, the prosperity and the happiness of the Commonwealth.

---

Ms (DLC); Ms (DLC: Breckinridge Family Papers); Broadside (Vi). JM's may have been the original draft which he then copied and sent to George Nicholas, who acknowledged its receipt on 7 July 1785. Undoubtedly a third copy was posted to George Mason. The date is fixed by circumstances. JM was concerned that his authorship of the petition not become known. He did not mention the subject in his 21 June letter to Monroe but George Nicholas, one of those who had urged JM to prepare a remonstrance, appears to have received his copy from a friend who was present at the Orange County court day on 23 June. JM's wish for anonymity led to speculation on the petition's proper date. The Breckinridge Ms is headed, "Copy of Remonstrance written by Madison, Aug 1785," in an unknown hand; and in a tribute to JM, Joseph Blau writes that the "brilliant" Memorial and Remonstrance was "written during the session of 1784–85 of the Virginia House of Delegates" (Joseph L. Blau, ed., *Cornerstones of Religious Freedom in America* [Boston, 1949], p. 71). The anonymous broadside was the most familiar form of the petition as George Mason procured a copy, had it published in Alexandria, and then widely distributed. In addition to the Mason-sponsored printing of 1785, the petition was reprinted by Isaiah Thomas in Worcester, Massachusetts, in 1786 where JM is acknowledged as the author (Sabin 43719). Nonetheless, in Mathew Carey's *American Museum … for the Year 1789*, pp. 120–23, the petition is printed without attribution of authorship. *Niles' Weekly Register*, XII (1817), 295–97, carried the petition as JM's, and ibid., XXX (1826), published JM's pertinent correspondence with George Mason (of Green Spring) of July 1826 and the petition, pp. 188–91 and passim. Mason told JM he had heard the Memorial and Remonstrance "attributed to yourself, as well as to others" (Mason to JM, 6 July 1826 [DLC]).

1. This measure, introduced under the aegis of Patrick Henry at the Oct. 1784 session, had passed two readings and was close to final passage when the opposition obtained a respite by a parliamentary tactic. They pleaded the need for public consideration of the bill and were able to postpone another reading until the Oct. 1785 session (*JHDV*, Oct. 1784, p. 82).

2. In the margin JM noted the source of this quotation—Article XVI of the Virginia Declaration of Rights of 1776. JM had a large role in the final form of the article although this section was written by George Mason (*Papers of Madison*, I, 171–75).

3. JM's historical studies along with his experience in the legislature had convinced him of the dangers of unfettered majority rule. He pointed this out later in his friendly disagreement with Jefferson over a federal bill of rights (JM to Jefferson, 17 Oct. 1788, Madison, *Writings* [Hunt ed.], V, 272). JM reaffirmed his fear of oppression by the majority during debates at the Federal Convention (6 June 1787, James Madison, *Notes of Debates in the Federal Convention* [Athens, Ohio, 1966], p. 77). He also brought up the same point in *Federalist No. 10* (Cooke, ed., *The Federalist*, pp. 60–61).

4. For long-range evidence of JM's tenacity on the separation of church and state "metes and bounds," see JM's annual message to Congress of 3 Dec. 1816 (James D. Richardson, ed., *A Compilation of the Messages and Papers of the Presidents, 1789–1897* [10 vols.; Washington, 1898–99], I, 580).

5. This idea, that revolutions spring from those groaning not under oppression but in anticipation of it, was central to the argument presented in Jefferson's "Declaration of the Causes and Necessity for Taking Up Arms" of 1775. "Parliament … for the first time asserted a right of unbounded legislation over the colonies of America and pursuing with eagerness the newly assumed thought in the space of 10 years during which they have exercised this right have given such decisive specimens of the spirit of this new legislation as leaves no room to [doubt the] consequence of acquiescence under it" (Boyd, *Papers of Jefferson*, I, 194).

6. JM noted in the margin that this was a quotation from Article I, Virginia Declaration of Rights.

7. Article XVI, ibid.

8. Locke states these ideas differently but to the same end. "The commonwealth seems to me to be a society of men constituted only for preserving and advancing their civil goods. What I call civil goods are life, liberty, bodily health and freedom from pain, and the possession of outward things, such as lands, money, furniture, and the like. It is the duty of the civil magistrate, by impartially enacted equal laws, to preserve and secure for all the people … these things that belong to this life.… The whole jurisdiction of the magistrate is concerned only with these civil goods" (*Letter on Toleration*, pp. 65–67).

9. Surry County supporters of the General Assessment bill took the opposite view. Their petition favoring passage of the bill observed "that [the] United State[s] of America exhibit[s] to the World the singular Instance of a free & enlighten'd Government destitute of a legal Provision for the support of Religion" (Vi: Ms, quoted in Eckenrode, *Separation of Church and State in Virginia*, p. 112).

10. JM noted in the margin, "+ Decl. Rights Art: 16."

11. Changed by JM from his original "light of truth."

12. Opponents of the General Assessment bill had staved off its enactment by passing a resolution late in the Oct. 1784 session, for which JM extracted this quotation. The ostensible purpose of the postponement was to canvass voters' attitudes toward the bill (William Taylor Thom, *The Struggle for Religious Freedom in Virginia: The Baptists* [Baltimore, 1900], pp. 75–76).

13. JM noted in the margin that this quotation was "Per Decl. Rights title." In fact it is a rather loose rendering of Mason's original introductory title.

14. Originally JM wrote, "nay that they can abolish."

15. Words within brackets are faded on the Ms and restored from the broadside text.

*Note:* The annotations to this document, and any other modern editorial content, are copyright © University of Chicago Press. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Madison Papers |
| TITLE | Memorial and Remonstrance against Religious Assessments, [ca. 20 June] 1785 |
| AUTHOR | Madison, James |
| DATE | 20 June 1785 |
| CITE AS | "Memorial and Remonstrance against Religious Assessments, [ca. 20 June] 1785," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-08-02-0163. [Original source: *The Papers of James Madison,* vol. 8, *10 March 1784–28 March 1786,* ed. Robert A. Rutland and William M. E. Rachal. Chicago: The University of Chicago Press, 1973, pp. 295–306.] |

The <u>National Historical Publications and Records Commission</u> (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

EXHIBIT
G

# Founders Online

[Back to normal view]

## Detatched Memoranda, ca. 31 January 1820

### Detatched Memoranda

[ca. 31 January 1820]

### Doctor Franklin

I did not become acquainted with Dr. Franklin till after his return from France and election to the Chief Magistracy of Pennsylvania. During the session of the Grand Convention, *of which he was a member* and as long after as he lived, I had opportunities of enjoying much of his conversation, which was always a feast to me. I never passed half an hour in his company without hearing some observation or anicdote worth remembering.

Among those which I have often repeated, and can therefore be sure that my memory accurately retains, are the following.

Previous to the Convention, and whilst the States were seeking by their respective regulations, to enlarge as much as possible their share of the general commerce, the Dr. alluding to their jealousies and competitions remarked that it would be best for all of them to let the trade be free, in which case it would level itself, and leave to each its proper share. These contests he said, put him in mind of what had once passed between a little boy & little girl eating milk & bread out of the same bowl, "Brother," cried the little girl, "eat on your own side, you get more than your share."

In the Convention, the difference of opinions was often very great, and it occasionally happened that the votes *of the States* were equally divided, and the questions undecided. On a particular day, when several subjects of great importance were successively discussed, and great diversity of opinions expressed, it happened that on each of them this was the case; so that nothing was done *through the whole day* and appearances were not a little discouraging, as to a successful issue to the undertaking. After the adjournment the Docr. observed to several of us who were near him, in allusion to the poor sample wch had been given, of human reason that there was on board a ship in which he once crossed the atlantic, a man who had from his birth been without the sense of smelling. On sitting down to dinner *one day* one of the Mess, cut off a piece of beef, and putting it to his nose, cried out, this beef stinks. The one next to him, cutting and smelling a piece, said not at all, it is as sweet as any meat I ever smelt. A third passing a piece across his nose several times; stinks, says he, no, I believe not: yes, I believe it does, repeating the opposite opinions as often as he made the trial. The same doubts and contrarieties went round as the company, one after the other, expressed their opinions. Now, gentlemen, exclaimed the man, without the Sense of smelling, I am satisfied of what I have long suspected, that what you call smelling has no existence, and that it is nothing but mere fancy & prejudice.

For the anicdote *at the close of the Convention* relating to the rising son [*sic*] painted on the wall behind the Presidts chair see note at the end of the Debates. [1]

In a conversation with him one day whilst he was confined to his bed, the subject of religion with its various do[c]trines & modes happening to turn up, the Dr. remarked that he should be glad to see an experiment made of a religion that admitted of no pardon for transgressions; the hope of impunity being the great encouragement to them. In illustration of this tendency, he said that when he was a young man he was much subject to fits of indigestion brought on by indulgence at the table. On complaining of it to a friend, he recommended as *a* remedy a few drops of oil of wormwood, whenever that happened; and that he should carry a little viol [*sic*] of it about him. On trial he found the remedy to answer, and then said he, having my absolution in my pocket, I went on sinning more *freely* than ever.

On entering his chamber *in his extreme age* when he had been much exhausted by pain and was particularly sensible of his weakness, Mr. M. said *he*, these machines of ours however admirably formed will not last always. Mine I find is just worn out. It must have been an uncommonly good one *I obse[r]ved* to last so long especially under the painful malady which had co-operated with age in preying on it, *adding that I could not but hope that he was yet to remain some time with us, and that the cause of his suffering might wear out faster than his Constitution. The only alleviation he said to his pain was Opium,*

*and that he found as yet to be a pretty sure one. I told him I took for granted he used it as sparingly as possible as frequent doses must otherwise impair his constitutional strength. He was well aware he said that every dose He took had that effect; but he had no other remedy; and thought the best terms he cd make with his complaint was to give up a part of his remaining life, for the greater ease of the rest.*

The following anecdotes are from the report of others.

Among the measures of the first Revolutionary Congress, it was proposed that a Committee should be appointed to provide a Medical Chest for the army. The Docr. voted agst. it. Much surprize being manifested by some members, the Docr. in his justification, related an anecdote of the Celebrated Dr. Fothergill,[2] who being desired by a philosophical friend to say candidly whether he thought Physicians of real service to mankind, replied by observing that he must first know whether his friend included old women among Physicians; If he did he thought they were of great service.

Whilst the plan of the original "Articles of Confederation" were depending,[3] great difficulty was found in agreeing on the powers proper to be granted by the States to the general Congress, much jealousy being entertained by the former lest the latter being possessed of too many powers, should by degrees swallow up those of the States. The Docr. was more apprehensive of encroachments by the States, and in support of his opinion related what had occurred when the Union *in 1706* between England & Scotland was on foot. The Scotch Orators & patriots opposed the measure as pregnant with ruin to their Country. In a Sermon one of their Preachers vehemently declaimed agst. it. Not only would the dignity the independence & commerce of Scotland be lost. Her religious as well as civil interests would be sacrificed in favor of England. In a word the Whale would swallow Jonas. But how said the Docr. has it turned out. Why that Jonas had in fact swallowed the Whale (Bute[4] & other Scotsmen having then the sway in the Br. Cabinet).[5]

---

Case of the story concerning Abraham & *the angels against* persecution—see the sundry accts. of it in [6] & his improvemt by adding to the alleged original *in* the appeal to Abraham—the words "who art thyself a sinner."[7]

---

Dialogue with ephemeral insect—see Fs. *Franklin's* Gazette.[8]

## General Washington

(See the papers referred to in this, annexed to the letters to Genl. Washington.)[9]

See correspondence with him and memoranda of conversations.[10]

The strength of his character lay in his integrity *his love of justice* his fortitude, the soundness of his judgment, and his remarkable prudence *to which he joined an elevated sense of patriotic duty, and a reliance on the enlightened & impartial world as the tribunal by which a lasting sentence on his career would be pronounced. Nor was he without the advantage of a Stature & figure, which however insignificant when separated from greatness of character, do not fail when combined with it to aid the attraction. But what particularly distinguished him, was a modest dignity which at once commanded the highest respect, and inspired the purest attachment.*

*Although not idolizing public opinion, no man could be more attentive to the means of ascertaining it. In comparing the candidates for office, he was particularly inquisitive as to their standing with the public, and the opinion entertained of them by men of* public weight. On *important* questions to be decided by him, he spared no pains to gain information from all quarters; freely asking from all whom he held in esteem, and *who* were intimate with him, a free communication of their sentiments, receiving with great attention the different arguments and opinions offered to him, and making up his own judgment with all the leisure *that was permitted. If any erroneous* changes took place in his views of persons and public affairs, *near the close of his life as has been insinuated*, they may probably be accounted for by circumstances which threw him into an exclusive communication with men of one party, who took advantage of his *retired situation*, to make impressions *unfavorable to* their opponents.

---

Note the circumstances relating to his *first* inaugural Address to Congress.[11]

---

Explain what passed in relation to the title & place proper in answering him.[12]

When the navigation bill (at the 1st. Congress under the new Constitution) in which the proposed discrimination between foreign nations *& against G. Britain* had been defeated by the Senate, he (Gen W.) was *so* much disappointed, that he told Mr. Dalton one of the Senators from Massachussetts, that he would not have signed the Bill, but for the expectation given him that the Senate would provide for the object in some other mode deemed more eligible.[13]

The constitutionality of the National Bank, was a question on which his mind was greatly perplexed. His belief in the utility of the establishment & his disposition to favor a liberal construction of the National powers, formed a bias on one side. On the other, he *had witnessed*[14] what passed in the Convention which framed the Constitution, and he knew the tenor of the reasonings & explanations under which it had been ratified by the State Conventions. His perplexity was increased by the opposite arguments and opinions of his Official Advisers *Mr. Jefferson & Mr. Hamilton.*[15] He held several free conversations with me on the subject, in which he listened favorably as I thought to my views of it, but certainly without committing himself in any manner whatever.[16]

Not long before the expiration of the ten days allowed for his decision, he desired me to reduce into form, the objections to the Bill, that he might be prepared, in case he should return it without his signature. This I did in a paper which the following is a copy.[17] (which see & here insert).

From this circumstance, with the manner in which the paper had been requested & received, I had inferred that he would not sign the Bill: but it was an inference nowise implying that he had precluded himself from consistently signing it.

As it was, he delayed to the last moment, the message communicating his signature.[18]

The delay had begotten strong suspicions in the zealous friends of the Bill, that it would be rejected. One of its ablest Champions, under this impression, told me he had been making an exact computation of the time elapsed, and that the Bill would be a law, in spite of its return with objections, in consequence of the failure to make the return within the limited term of ten days. I did not doubt that if such had been the case advantage would have been taken of it, and that the disappointed party would have commenced an open opposition to the President; so great was their confidence in the wealth and strength they possessed, and such the devotion of the successful speculators in the funds, and of the anti:republican partizans, to the plans & principles of the Secretary of the Treasury. The conversation had scarcely ended, when the message arrived with notice that the Bill had been approved and signed.

In explaining the grounds on which he refused to comply with the call of the House of Reps. for the papers relating to Mr. Jay's negociations & Treaty with G. B. in 1795,[19] he was led into a reference to a vote in the Grand Convention negativing a proposition to allow the H. of Reps. a participation in concluding Treaties, as an argument agst. their right to the papers called for. The reference and inference were misjudged.[20] 1. The question on wch. the vote in the Convention was taken, was not the same with that on wch. the call for papers turned; since the House tho' not a party to a Treaty might, as in the case of the British Parlt. have a legislative right to deliberate on the provisions depending on them for its execution. 2. The vote in the Convention, as nakedly stated, did not necessarily imply a negative on the powers of the House, as it might have proceeded from collateral motives distinct from the merits of the question, such as its being out of time or place, or a belief that without an affirmative vote, an agency of the House of Reps. in the case of Treaties, *sufficiently* resulted from the text of the Constitutional plan then before the Convention. 3. If the meaning of the Constitution was to be looked for elsewhere than in the instrument, it was not in the General Convention, but the State Conventions. The former proposed it only; it was from the latter that it derived its validity and authority. The former were the Committee that prepared the Bill, the latter the authoritative Bodies which made it a law, or rather through which the Nation made it its own Act. It is the sense of the nation therefore not the sense of the General Convention, that is to be consulted: and that sense, if not taken from the act itself, is to be taken from the proceedings of the State Conventions & *other public indications*, as the true keys to the sense of the Nation. *4.* But what rendered the argument *from the case cited* particularly unfortunate was the circumstance, that the Bank-Bill had been signed, notwithstanding the vote in the *General* Convention negativing expressly a proposition to give to Congress a power to establish a Bank.[21]

On the other hand the Call of the H of Reps. for papers which might be of a confidential nature, was *in terms* too peremptory and unqualified;[22] and the President might therefore justifiably decline, on his responsibility to the Nation, to comply with it. Having *myself* at the time, taken this view of the *subject* I proposed that the call should be so varied, as to limit it to such papers as in the judgment of the President might with propriety be communicated. The proposition was very disagreeable to the warmest advocates for the Call, and brought on me some displeasure from a few with whom I was most

intimate. The proposition being rejected, I voted for the call, in its unqualified terms, tho taking for granted that *the President* would exercise his responsible discretion on the subject. The practice of the House has since *expressly* limited the calls for Executive communications to such as *in the judgment of the President* the public interest might not forbid.

In the original plan of the Bank contained in the Bill of 179    :[23] was a clause making the Bank co-durable with the public debt. It was not without some difficulty limited to the period of years fixed in the law. A more impolitic mode of regulating its duration than the original one could not have been devised. Instead of motives with the B. to aid the Govt. in making the most of its resources, *it gave the B. a direct & powerful interest in prolonging the Pub. debt, by embarrassing them, & even promoting wars & wasteful ⟨expenditure establishmts military as well as civil⟩. See Sheet headed "Bank."*

On the 28th. of Feby. 1793. Mr. Giles moved in the House of Reps. certain Reso⟨l⟩utions charging the Secy. of the Treasury with drawing a sum of money borrowed in Europe, into the U. S. and applying it, contrary to the legal appropriation, and also contrary to the instruction of the President (accompanying his commission to the Secy. as the agent for borrowing). [24] It was suspected that the object of the Secy. had been to divert money from an intended payment to France, which he disliked, and to aid the Bank to which he was partial.

As the instruction of the President to the Secy. which was before the House was violated by the Act of the latter, his friends contended that he *might, as was to be presumed*, have recd. subsequent instructions authorizing it, which had not been communicated, and that in any view, if there had been a violation of the appropriating law the President was *the* responsible functionary, and that the charge was an imputation on him, rather than on the Secretary.

On the other side it was insisted that if subsequent & different instructions had been given by the Presidt. the Secy. would not have failed to make them known in his own defence, which had not been done.

The perfect confidence *felt* in the integrity of the President, and the delicacy & respect for his feelings, had their natural effect on the occasion. Still it was considered as not a little remarkable that if he had given a sanction to the conduct of the Secy. he should not have protected him agst. the Charge by authorizing the Secy to disclose the fact: and if the Secy. had proceeded contrary to his instructions as well as *to* the law, that he shd. have exposed himself to the inferences from his reserve under such circumstances.

The mystery is explained by *the following extracts from* letters from Ed: Randolph at that *time* Attorney Genl. of the U.S. [25]

"July 9. 1811. E R. to J. Madison.

"Without one feeling left of the character of a partizan, but still living to friendship, a man whose hand is known to Mr. Madison asks him whether he r[e]collects or ever heard that after Col: Hamilton had been severely pressed for a supposed misappropriation of the money devoted by law to special purposes, he Col: H produced a letter, authorizing it, signed by President Washington, while on his tour to South Carolina; that the President at first denied its existence in positive & vehement terms, **not having preserved a copy of it;** but that it was afterwards acknowledged by him, and registered in the Treasury Department, ut valeret quantum valere potuit." [26]

*From the same to the same.*

Aug. 8. 1811. [27]

"The following clue (to) a second search at the Treasury may perhaps succeed. Giles' Resolutions had been defeated before Col: H. suggested thro' one of his indirect conduits to the ear of the President, that during his tour in the South, he had sanctioned by two letters, the measure which was so severely criminated. He (the P.) mentioned the circumstance to me, with surprize & passion, declaring in the most excluding terms, that he never did write or cause to be written letters to that purport. Some days afterwards Col: H. put them into the *Presidents* hands, and by him they were communicated to me, with an instruction to write to Col: H. avowing them. This I did, and it would seem impossible that upon a subject on which his sensibility was so much kindled, that a document of justification should have been laid aside as a private paper. These facts are most distinctly recollected." [28]

The communication in these letters is to be ascribed to the friendly feeling in the writer to J. M. who had taken an active part in the discussions produced by Mr. Giles' Resolutions. The second letter, was written in consequence of an intimation, that from an enquiry at the Treasury Department it did not appear that any such paper as that described had been deposited there.

The inference from the whole seems to be that the Secretary of *the* Treasury may have prepared as was not unusual with Heads of Depts. in the ordinary course of business, & forwarded to the P. letters to be signed by him, that the Presidt. in the hurry of a journey, & regarding them as [29] fiscal operations merely requiring his formal sanction, signed & returned them without particularly attending to or charging his memory with them: & that the Secy. of the Treasury aware that this might be the case, forebore to avail himself of the document he possessed, or to involve the President in the responsibility he was willing to take on himself.

It is proper to remark that Mr. Randolph's statement came from a dismissed officer, and that it was subsequent to a paralytic stroke which ended in greatly effeebling his mind. But there is reason to confide in his declaration that he retained no feeling of a partizan; and the tenor of his letters indicates no incompetency to the task assumed in them. The explanatory facts stated carry indeed the greatest probability on the face of them. If the acknowledgt by President Washington referred to, [30] shd. not *have* escaped the search made in the Treasury Dept. it must be among the papers of Col: Hamilton, unless indeed *involved in some destruction of the files of that Department; for it can not be* presumed that the preservation of such a paper could have been wholly neglected.

# Bank

(These essays belong with the printed ones in Freneau to the class of political economy.) [31]

Banks, in their accomodations to prudent borrowers & in furnishing a currency more easy to be counted and transmitted *than the metals* have acquired so many friends, that if it were desirable to abolish them entirely & every where, the attempt would be hopeless. But the more impossible *or inadvisable it may be* to abolish them, the more necessary it is to guard agst. the evils resulting from their number, and agst. the abuses incident to the ordinary constitution of them. These *abuses* may be diminished by a variety of particular regulations. Might not a more radical remedy be found in *a different* Construction and organization of the administrative Body?

The greatest, [32] certainly the most offensive abuses of Banks proceed from the opportunity and interests of the Directors. They can obtain discounts for themselves, even it is said to **privileged amounts:** They *can* suspend limit and resume the discounts to others as they please: Their stations inform them of the wants and business of all who deal with and depend on the Bank under their management. With these advantages *alone* they may by first lending money to themselves, and then *immediately* shutting the Bank to others, with a knowledge of the effect on others, carry on speculations as gainful as reproachful. Whether the *following* case happened or not, it will illustrate this *source* of abuse. A combination of a few influencial Bank Directors, who were Shippers of flour, after drawing under the rules of the B. the amount permitted *to Directors*, procured a curtailment of discounts, which compelled the Holders of flour, as was foreseen, to sell at reduced prices. As soon as the *Mercantile Directors* had loaded their ships, and appearances would allow, the ordinary *course of* discounts was restored. [33] A *candid* or an incatious Bank Director many years *ago* was heard to say, that altho' there was no salary annexed to the place; it was **fairly** worth five thousand dollars a year.

As a remedial *Plan of a Bank* the Directors might be converted into impartial Judges, in the discharge of their trust, by receiving a liberal salary paid out of the Bank dividends, *might be* disabled from holding Bank Stock & from borrowing directly or indirectly from the Institution, and *might* take a customary Oath of Office. Under these regulations, they might without bias, at least without the temptations now before them, exercise the functions required from them *& fulfill the ends of the Institution*. If it be objected that by holding an interest in the Institution they will be more solicitous to increase its profits, the answer is that at present they may promote their particular interest, in ways impairing those profits. If objected that the men engaged in the business connecting people with the Banks make the best directors, because best acquainted with the Affairs of the Customers of the Bank; the answer is that the Directors soon acquire in their places, more of that sort of information than they carry into them. And it is a general answer to objections, that the question is whether all the advantages claimed for the present constitution of Boards of Directors, are not overbalanced by its disadvantages, and by the advantages of a Board such as that suggested.

Force of precedents in case of the Bank—& in expounding the Constn. [34] Equal division of Senate, when the Bill negatived by V. P. not occasioned by unconstitutionality *but inexpediency of the Bill*. [35]

reasoning [36] of Supreme Ct. founded on erroneous views &—1. as to the ratification of Const: by people if meant people collectively & not by States. 2. imputing concurrence of those formerly opposed to changes of opinion, instead of precedents superceding opinions 3. endeavoring to retain right of Court to pronounce on the consty. of a law after making Legisl. omnipotent as to the expediency of means. 4: expounding power of Congs.—as if no other Sovereignty existed *in the States* supplemental to the enumerated powers *of Congs.* 5. making the Judy. exclusive expositor of the Constitutionality of laws; the co-ordinate authorities Legisl: & Execut. being equally expositors within the scope of their functions. [37]

Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments.

Monopolies tho' in certain cases useful, ought to be granted with caution, and guarded with strictness agst. abuse. The Constitution *of the U. S.* has limited them to two cases, the authors of Books, and of useful inventions, in *both* which they are considered as a compensation for a benefit *actually* gained to the community, as a purchase of property which the owner might otherwise withold from public use. There can be no just objection to a temporary monopoly in these cases: but it ought to be temporary because under that limitation a sufficient recompence and encouragement may be given. The limitation is particularly proper in the case of inventions, because they grow so much out of preceding ones that there is the less merit in the authors: and because, for the same reason, the same discovery might be expected in a short time from other hands.

Monopolies have been granted in other Countries, and by some of the States in this, on another principle, that of supporting some useful undertaking, untill experience and success should render the monopoly unnecessary, & lead to a salutary competition. *This was the policy of the monopoly granted in Virga. to Col: Jno. Hoomes to establish a passenger-Stage from          to          .* [38] But grants of this sort can be justified in very peculiar cases only, if at all; the danger being very great that the good resulting from the operation of the monopoly, will be overbalanced by the *evil* effect of the precedent; and it being not impossible that the monopoly itself, in its original operation, may produce more evil than good.

In all cases of monopoly, not excepting those in favor of Authors & inventors, it would be well to reserve to the State, a right to extinguish [39] the monopoly by paying a specified *and reasonable sum*. This would guard against the public discontents resulting from the exorbitant gains of individuals, and *from* the inconvenient restrictions combined with them. This view of the subject suggested the clause in the bill *relating to J. Rumsey* in the Virga. Legislature in the year 178 , [40] providing that the State might cancel his privilege by paying him ten thousand dollars. And to secure him agst. the possibility of a payment in depreciated medium, then a prevalent apprehension, it was proposed that the sum should be paid in metal *& that* of a specified weight & fineness.

One objection to a Bank is that it involves a qualified Monopoly; and the objection certainly has weight in proportion to the degree & duration of the Monopoly.

Perpetual monopolies of every sort, are forbidden not only by the genius of free Govts: but by the imperfection of human foresight. (Among such monopolies, cannot be included the grants in perpetuity of public lands to individuals, the grants being made according to rules of impartiality, for a valuable consideration; and all lands being held equally by that tenure from the public, the vital principle of monopoly is lost. The benefit is not confined to one or a few, but is enjoyed by the whole or a majority of the Community. *The evil of an excessive & dangerous cumulation of landed property in the hands of individuals* is best precluded by the prohibition of entails, by the suppression of the rights of primogeniture, and by the liability of landed property to the payment of debts. *In Countries where there is a rapid increase of population as the U.S. these provisions are evidently sufficient; and in all Countries wd. probably be found so*). Where Charters of incorporation, even the Common ones to towns for the sake of local police, contain clauses implying contracts, and irrevocably [*sic*], they are liable to objections of equal force. The ordinary limitation on incorporated Societies is a proviso that their laws shall not violate the laws of the land. But how easily may it happen that *redress for* such violations may not be *pursued into effect?* How much injury may accrue during the pursuit of redress. And above all how much local injustice and oppression may be committed by laws & regulations, not in strict construction violating any law of the land. Within the local limits, parties generally exist founded on different sorts of *property, sometimes* on divisions by streets or little streams; frequently on political and religious differences. Attachments to rival individuals, are not seldom a source of the same divisions. In all these cases, the *party* animosities are the more violent as the *compass of the* Society may more easily admit of the contagion & collision of the passions; and according to that violence is the danger of oppression by one party on the other; by the majority on the Minority. The ways in which this can be effected, even beyond the cognizance of the paramount law, *of the land* have

scar[c]e any other limits than the ingenuity and interest of those who possess the power. Is a tax to be collected? What inequality may attend the rule or mode of assessment? Is a public building to be erected, what is to guard agst. partiality or favoritism in fixing its site? Is there a single regulation of police which will not differently affect the component parts of the society, and afford an opportunity to the majority to sacrifice to *their prejudices or* their conveniency the conveniency or the interests of the minor party.

When the town incorporated is not only a market town for the neighbourhood, but a port for an external commerce the effect of its police has a wider range, and its corporate powers the greater need of some other controul than the vague & inefficient one, of the law of the land.

The best illustration of these remarks is to be found in the recorded proceedings of the various *local* Corporations. What is generally known sufficiently justifies them. Without even a recurrence to facts a common knowlege of human nature, would suggest the probability of the abuses on which they are founded.

The most effectual *& perhaps the least exceptionable* provision agst. them seems to be that of super-adding to the *general* restraint of the law of the land, a *previous* veto in some impartial & convenient quarter on each particular by law. The Executive authority of the State or that authority in consultation with a judge or judges of the highest grade might perhaps be relied on for the controul on these local legislatures, most likely to preserve a just, a uniform, and an impartial exercise of their subordinate powers. [41]

The *danger of* silent accumulations & encroachments by Ecclesiastical Bodies have not sufficiently engaged attention in the U.S.

They have the *noble* merit of first unshackling the conscience from persecuting laws, and *of* establishing among religious Sects a legal equality. If some of the States have not embraced this just and this truly Xn principle in its proper latitude, all of them present examples by which *the most enlightened States of* the old world may be instructed; and there is one *State* at least, Virginia, where religious liberty is placed on its true foundation and *is* defined in its full latitude. The *general* principle is contained in her declaration of rights, prefixed to her Constitution, but it is unfolded and defined, in its precise extent, in the Act of the Legislature, usually named the Religious Bill, which passed into a law in the year 1786. [42] Here the separation between the authority of human laws, and the natural rights of Man excepted from the grant on which all political authority is founded, is traced as distinctly as words can admit, and the limits to this authority established with as much solemnity as the forms of legislation can express. *The law has the further advantage of having been the result of a formal appeal to the sense of the Community, and a deliberate sanction of a vast majority, comprizing every Sect of Christians in the State*. This Act is a *true* standard of Religious liberty: *its principle the great* barrier agst. usurpations on the rights of conscience. As long as it is respected *& no longer*, these will be safe. Every provision for them—short of this principle, will be found to leave crevices at least, thro' which bigotry may introduce persecution; a monster, that feeding & thriving on its own venom, gradually swells to a size & strength [43] overwhelming all laws divine & human. Ye States of America which retain in your Constitutions or Codes any aberration from the sacred principle of religious liberty, by giving to Caesar what belongs to God, or joining together what God has put asunder, hasten to revise [44] your systems, and make the example of your Country as pure & compleat, in what relates to the freedom of the mind and its allegiance to its maker, as in what belongs to the legitimate objects of political & civil institutions.

*Strongly guarded as is the separation between Religion & Govt. in the Constitution of the United States*, the danger of encroachment by Ecclesiastical Bodies, may be illustrated by precidents [*sic*] already furnished in their short history. (See the cases in which negatives were put by J.M. on *two* bills passd by Congs. and his signature witheld from another). [45] See also attempt in Kentucky, for example, where it was proposed to exempt Houses of Worship from taxes. [46]

The most notable attempt was that in Virga. to establish a Genl. assessment for the support of all Xn sects: This was proposed in the year _____ [47] by P. H. and supported by all his eloquence, aided by the *remaining* prejudices of the Sect which before the Revolution had been established by law. [48] The *progress of the* measure was arrested by urging *that* the respect due to the people *required* in so extraordinary a case an appeal to their deliberate will. The bill was accordingly printed & published with that view. At the instance of Col. George Nicholas, Col. George Mason & others, the memorial & remonstrance agst. it, was drawn up, (which see) [49] and printed Copies of it circulated thro' the State, to be signed by the people at large. [50] It met with the approbation of the Baptists, the Presbyterians, the Quakers, and the *few* Roman Catholics, universally; of the Methodists in part; and even of not a few of the Sect formerly established by law. When the Legislature

assembled, the number of Copies & signatures presented displayed such an overwhelming opposition of the people, that the plan of a Genl. Assessmt. was crushed under it; and advantage taken of the crisis to carry thro' the Legisl. the Bill above referred to, establishing religious liberty. In the course of the opposition to the bill *in the House of Delegates*, which was warm & strenuous from *some of* the minority, an experiment was made on the reverence entertained for the name & sanctity of the Saviour, by proposing to insert the words "Jesus Christ" after the words "our lord" in the preamble, the object of which, would *was* [*sic*] have been, to imply a restriction of the liberty defined in the Bill, to those professing his religion *only*. The amendment was discussed, and rejected by a vote of             agst             *(See letter of J. M. to Mr. Jefferson dated*

_____ )[51] the opponents of the amendment having turned the feeling as well as judgment of the House agst. it, by successfully contending that the better proof of reverence for that holy name wd. be not to profane it by making it a topic of legisl. discussion & particularly by making his religion the means of abridging the natural and equal rights of *all* men, in defiance of his own declaration that his Kingdom was not of this World. This view of the subject was much enforced by the circumstance that it was espoused by some members who were particularly distinguished by their reputed piety and Christian zeal.

But besides the danger of a direct mixture of Religion & civil Gover[n]ment, there is an evil which ought to be guarded agst. in the indefinite accumulation of property from the capacity of holding it in perpetuity by ecclesiastical Corporations. The power of all corporations, ought to be limited in this respect. The *growing* wealth acquired by them never fails to be a source of abuses. A warning on this subject is emphatically given in the example of the *various* Charitable establishments in G. B. the management of which has been lately scrutinized.[52] The excessive wealth of ecclesiastical corporations and the misuse of it in many Countries of Europe has long been a topic of complaint. In some of them the Church has amassed half *perhaps* the property of the nation. When the reformation took place, an event promoted if not caused by that disordered state of things, how enormous were the treasures of religious societies, and how gross the corruptions engendered by them; so enormous & so gross as to produce *in the Cabinets & Councils of the Protestant States*, a disregard, of all the pleas of the interested party drawn from the sanctions of the law, and the sacredness of property held in religious trust. The history of England during the period of the reformation offers a sufficient illustration for the present purpose.

Are the U.S. duly awake to the tendency of the precedents they are establishing, in the multiple incorporations of Religious Congregations with the faculty of *acquiring &* holding property real as well as personal? Do not many of these acts give this faculty, without limit either as to ti⟨me⟩ or as to amount? And must not bodies, perpetual in their existence, ⟨a⟩nd *which* may be always gaining, without ever losing, speedily gain more than is useful, and in time more than is safe? Are there not already examples in the U.S. of ecclesiastical wealth equally beyond its object and the foresight of those who laid the foundation of it? In the U. S. there is a double motive for fixing limits in this case, because wealth may increase not only from additional gifts, but from exorbitant advances in the value of the primitive one. In grants of vacant lands, and of lands in *the* vicinity of growing towns & Cities the increase of value is often such as if foreseen, would essentially controul the liberality conferring them. The people of the U. S. owe their Independence & their liberty, to the wisdom of descrying in the minute tax of 3 pence on tea, the magnitude of the evil comprized in the precedent. Let them exert the same wisdom, in watching agst. every evil lurking under plausible disguises, and growing up from small beginnings. Obsta principiis.[53]

See the Treatise of Father Paul on beneficiary matters.[54]

Is the appointment of Chaplains to the two Houses of Congress consistent with the Constitution, and *with* the pure principle of religious freedom?

In strictness the answer on both points must be in the negative. The Constitution of the U.S. forbids every thing like an establishment of *a national* religion. The law appointing Chaplains[55] establishes *a* religious worship for the national representatives, to be performed by Ministers of religion, elected by a majority of them; and these are to be paid out of the national taxes. Does not this involve the principle of a national establishment, applicable to a provision for a religious worship for the Constituent as well as of the representative Body, approved by the majority, and conducted by Ministers of religion paid by the entire nation.

The establishment of the chaplainship to Congs. is a palpable violation of equal rights, as well as of Constitutional principles. The tenets of the Chaplains elected shut the door of worship agst. the members whose creeds & consciences forbid a participation in that of the Majority. To say nothing of other sects, this is the case with *that of* Roman Catholics & Quakers who have always had members in one or both of the Legislative branches. Could a Catholic clergyman ever hope to be

appointed a Chaplain? To say that [his] religious principles are obnoxious or that his sect is small, is to lift the veil at once and exhibit in its naked deformity the Doctrine th⟨at⟩ religious truth is to be tested by numbers, or that the major sects have a right to govern the minor.

If Religion consist in voluntary acts of individuals, singly, or voluntarily associated, and it be proper that public functionaries, as well as their constituents shd. discharge their religious duties, let them like their Constituents, do so at their own expense. How small a contribution from each member of Congs. wd. suffice for the purpose? How just wd. it be in its principle? How noble in its exemplary sacrifice to the genius of the Constitution; and the divine right of conscience? ⟨Why⟩ should the expence of *a* religious worship for the Legislature, be paid by the public, more than that for the Ex. or Judiciary branch of the Govt.

Were the establishment to be tried by its fruits, are not the daily devotions conducted by these legal Ecclesiastics, already degenerating into a scanty attendance, and a tiresome formality?

Rather than let this step beyond the landmarks of power have the effect of a legitimate precedent, it will be better to apply to it the aphorism de minimis non curat lex: [56] or to class it "cum maculis quas aut incuria fudit, aut humana parum cavit natura." [57]

Better *also* to disarm in the same way the precedent of Chaplainships for the army and navy, *than erect it* into a political authority in matters of religion. The object *of this establishment* is seducing; the motive *to it* is laudable. But is it *not* safer to adhere to a right principle, & trust to its consequences, than confide in the reasoning however specious in favor of a wrong one. Look thro the armies & navies of the world, and say whether in the appointment of their ministers of religion, the spiritual interest of the flocks or the temporal interest of the Shepherds, be most in view: whether here, as elsewhere the political care of religion, is not a nominal more than a real aid. If the spirit of ar⟨m⟩ies be devout, the spirit out of the armies will never be less so; and a failure of religious instruction & exhortation from a voluntary source within or without, will rarely happen: and if such be not the spirit of armies, the official services of their Teachers are not likely to produce it. It is more likely to flow from the labours of a spontaneous Zeal. The armies of the puritans had their appointed Chaplains, but without these there would have been no lack of public devotion in that devout age.

The case of navies with insulated crews may be less within the scope of these reflections. But it is not entirely so. The chance of a devout officer, might be of as much worth to religion, as the service of an ordinary chaplain. [58] But we are always to keep in mind that it is safer to trust *the consequences* of a right principle, than reasonings in support of a bad one.

Religious proclamations by the Executive recommending thanksgivings & fasts are shoots from the same root with the legislative acts reviewed.

Altho' recommendations only, they imply a religious agency, making no part of the trust delegated to political rulers.

The objections to them are 1. that Govts. ought not to interpose *in relation to those subject to their authority* but in cases where they can do it with effect. An **advisory** Govt. is a contradiction in terms. 2. The members of a Govt. as such can in no sense, be regarded as possessing an advisory trust from their Constituents in their religious capacities. They can not form a Convocation, [59] Council or Synod, and *as such* issue decrees or injunctions addressed to the faith or the Consciences of the people. In their individual capacities, as distinct from their official station, they might unite in recommendations of any sort whatever; in the same manner as any other individuals might do. But then their recommendations o⟨ught?⟩ to express the true character from which they emanate. 3. They see⟨m⟩ ⟨to⟩ imply and certainly nourish the erronious idea of a **national** religion. Th⟨is⟩ idea just *as* it related to the Jewish nation under a theocracy, *having been* improperly a⟨d⟩opted by so many nations which have embraced Xnity, is too apt to lurk ⟨in?⟩ the bosoms even of Americans, who in general are aware of the disti⟨nction⟩ between religious & political societies. The idea also of a union of all w⟨ho?⟩ form one nation under one Govt. in acts of devotion to the God of all is an imposing idea. But reason and the principles of the Xn religion require that ⟨if?⟩ *all* the individuals composing a nation *were of the same precise creed & wished to* unite in a universal act of religio⟨n⟩ at the same time, the union ought to be effected thro' the intervention of their religious not of their political representatives. In a nation composed of various sects, some alienated widely from others, and where no agreement cou⟨ld⟩ take place thro' the former, the interposition of the latter is doubly wrong; 4. the tendency of the practice, to narrow the recommendation to the standard of the predominant sect. The [60] 1st. Proclamation of Genl. Washington *dated Jany. 1. 1795.* [61] recommending a day of thanksgiving, embraced all who believed in a supreme ruler of the Universe. That of Mr. Adams called for a *Xn* wors⟨hip.⟩ [62]

Many private letters reproached the Proclamations issued by J.M. [63] for *usin⟨g⟩* ⟨the⟩ general terms, used in that of Presidt. W—n; and some of them for not inserting particular⟨s⟩ according with the faith of certain Xn sects. The practice if not strictly guarded, naturally terminates in a conformity to the creed of the major⟨ity⟩ of and a single sect, if amounting to a majority. 5. the last & not the least Objection is the liability of the practice, to subserviency to political views; to the scandal of religion, as well as the increase of party animosities. Candid *or incautious* politicians will not *always* disown such views. In truth it is difficult to frame such a religious Proclamation, generally suggested by a political State of things, without referring to them in terms having some bearing on party questions. The Proclamation of Pres: W. *which* was issued *just* after the suppression of the Insurrection in Penna. [64] and at a time when the public mind was divided on several topics, was so construed by many. Of this the *Secretary of State* [65] himself, E. Randolph seems to have had an anticipation.

The original draught of that Instrument *filed* in the Dept. of State [66] ⟨in⟩ the hand writing of Mr. Hamilton the Secretary of the Treasury. It appears ⟨th⟩at several slight alterations only had been made at the suggestion of ⟨the?⟩ Secretary of State; and in a marginal Note in his hand, it is remark⟨ed⟩ ⟨th⟩at "In short this proclamation ought to savour as much as possible of religion, & ⟨not⟩ ⟨too?⟩ much of having a political object." In a subjoined note in the hand of Mr. Ha⟨mil⟩ton, this remark is answered by the counter-remark that "A proclamation ⟨of?⟩ a government which is a national act, naturally embraces objects which are ⟨po⟩litical." So *naturally*, is the idea of policy associated with religion whatever be ⟨the⟩ mode or the occasion, when *a function of* the latter is assumed by those in power. During the administration of Mr. Jefferson no religious proclama⟨tion⟩ issued. It being understood that his successor was disinclined to such interpo⟨si⟩tions of the Executive, and *by some supposed* moreover that they might originate with more propri⟨e⟩ty with the Legislative Body, a resolution was passed requesting him to issue a ⟨p⟩roclamation (See the resolution in the Journals of Congress[)]. [67]

It was thought not proper to refuse a compliance altogether; but a ⟨for⟩m & language were employed, which were meant to *deaden* [68] as much as pos⟨sib⟩le any *claim of* political right to enjoin religious observances by resting these expressly on the voluntary ⟨c⟩ompliance of individuals, and even by limiting the recommendation to such as wished a simultaneous as well as voluntary performance of a religious act on the occasion. The following is a copy of the proclamation: (see it in [69] Niles Reg. Vol 8 p. 17).

## Popular elections

On the purity of these depend the reputation & success of Representative Govts. In some of the States whilst they were Colonies, the original manners & usage of the people maintained this purity. It was much favored also by the frequency of elections, which were annual; nor were half yearly elections without example. The rule of voting by ballot was another *precaution* guard agst. the use of undue means by Candidates for the popular suffrage. In a number of the Colonies Candidates were in the practice not only of publicly offering their services, but of soliciting the votes *of the people* and of giving *them* treats, particularly of intoxicating drinks. In Virga. when the elections *for* the Colonial Legislature were septennial, & the original Settlers of the prevailing sentiments & manners of the *parent* [70] nation, the modes of canvassing for popular votes in that Country were generally practiced. The people not only tolerated, but expected and *even* required to be courted and treated. No Candidate who neglected these attentions could be elected. His forbearance wd. have been ascribed to a mean parsimony, or to a proud disrespect for the voters.

The *spirit of the* revolution and the adoption of annual Elections seeming to favor a more chaste mode of conducting elections in Virga. My way of thinking on the subject determined me to attempt by an example to introduce one. It was found that the old habits were too deeply rooted to be suddenly reformed. Particular circumstances obtained for me success in the first election at which I was a Candidate. At the next I was outvoted by two Candidates, neither of them having superior pretensions and one peculiarly deficient in them; but both of them availing themselves of all the means of influence familiar to the people. My reserve was imputed to want of respect for them, if to no other unpopular motive.

Time, the genius of the Govt. and the shortness of *the* term, have considerably diminished the undue means of canvassing; but the practice still prevails too much of treating the people, and the Candidates failing to do so would be charged *with* or suspected of unworthy motives—As a remedy—Let one or more of the Candidates propose in the outset, that all should, instead of spending money on ardent spirits *and other treats* contribute the estimated amount, as a fund for supporting &

educating the poor; and if not agreed to by others Let him take that course as an example. So beneficent a substitute, for a corrupting practice wd. be espoused by all the most virtuous & respectable voters—& must soon triumph over the remaining prejudice.

## The "Federalist."

The papers, so entitled, were written *in the latter part of 1787, & the early part of 1788* by Alexander Hamilton, John Jay and James Madison. The original and immediate object of them was to promote the ratification of the *new* Constitution by the State of N. York where it was powerfully opposed, and where its success was deemed of critical importance. *According to the original plan &* In the early numbers, the papers went out as from a Citizen of N.Y. It being found however that they were republished in other States and were making a diffusive impression in favor of the Constitution, that limited character was laid aside.

The undertaking was proposed by A. Hamilton to J.M. with a request to join him & Mr. Jay in carrying it into effect. William Duer [71] *was also included in the Original plan &* wrote two or perhaps more papers, which tho' intelligent & sprightly, were not continued; nor did they make a part of the printed Collection. [72]

The papers were first published in the Newspapers of the City. They were written most of them in great haste, and without any special allotment of the different parts of the subject to the several writers. J.M. being at the time a member of the then Congress, and A.H. being also a member, and occupied moreover in his profession at the bar, it was understood that each was to write as their respective *situations* permitted, preserving as much as possible an *order &* connection in the *papers* successively published. This will account for any deficiency in that respect, and also for an occasional repetition of the views taken of particular branches of the subject. The haste with which many of the papers were penned, in order to get thro' the subject whilst the Constitution was before the public, and to comply with the arrangement by which the printer was to keep his newspaper open for four numbers every week, was such that the performance must have borne a *very* different aspect, without the aid of historical and other notes which had been used in the Convention, [73] and without the familiarity with the *whole* subject produced by the discussions there. In [*sic*] frequently happened that whilst the printer was putting into type parts of a number, the following parts were under the pen, & to be furnished in time for the press.

In the beginning it was the practice of the Writers, of A.H. & J.M. particularly to communicate each to the other, their respective papers before they were sent to the press. This was rendered so inconvenient, by the shortness of the time allowed, that it was dispensed with. Another reason was, that it was found most agreeable to each, not to give a positive sanction to all the doctrines and sentiments of the other; there being a known difference in the general complexion of their political theories.

The particular papers assigned to each of the writers have been differently presented to the public. The statement from a memorandum left with Mr. Benson [74] *by Mr. H.*, just before his death, is very erroneous, owing doubtless to the hurry in which the memorandum was made out. Besides the considerable number of papers written by J. M., and in the lump classed with those written by himself, he ascribes to himself No. 64 written by Mr. Jay; and to Mr. Jay. No.     [75] written not by him but by J. M. (see life of Mr. Jay by Delaplaine). [76] The paper *No. 49* also in which Mr. Jefferson is painted in such strong colours, was not likely to be even approved by Mr. H; and the paper No. 54. on the subject of the negroes as comprized in the ratio of representation, was most likely to be within the share executed by the Southern member of the Club. There can be little difficulty in admitting this instance of the fallibility of Mr. H.'s memory; on comparing it with a far more extraordinary one, furnished in his letter to Mr. Pickering [77] written at full leisure, in which, among other things which ought not to have been written, he says that in his plan of a Constitution deposited with J.M. he proposed that the President shd. be chosen for **three years** (see Niles's Register           ) [78] when in fact, as the original [*] in his own hand must shew, that there as elsewhere he desired a President **during good behaviour**.

A true distribution of the numbers of the Federalist among the three writers is contained in the Edition of that work by Jacob Gideon. [80] It was furnished to him by me, with a perfect knowlege of its accuracy as it related to myself, and a full confidence in its equal accuracy as it relates to the two others.

In the same volume, edited by J. G. he has published *along with Mr. H's pamphlet under the name of* "*Pacificus*" a pamphlet in answer to it by me under the name of "Helvidius" whose distinguished character was drawn by the pencil of Tacitus. [81] The Pamphlet "Pacificus" had been improperly included in a former Edition of the "Federalist" of which it could

not make a part, being not written as that was, conjointly with others, to recommend the adoption *of the Constitution*, but in opposition to one at least of the others, and as a comment on the Constitution long after its adoption. I suggested to Mr. Gideon the impropriety of what had been done, with a view to a publication of the Federalist without combining with it, what was entirely foreign to it. The Editor having determined to publish both of the pamphlets rather that [*sic*] omit what had been included in a former Edition, I sent him the copy of Helvidius which he published. [82]

I ought not perhaps to acknowlege my having written this polemic tract, without acknowleging at the same time my consciousness & regret, that it breathes a spirit which was of no advantage either to the subject, or to the Author. If an apology *for this, & for other faults* can be made it must be furnished by the circumstances, of the pamphlet being written in much haste, during an intense heat of the weather, and under an excitement stimulated by friends, agst. a publication breathing *not only* the intemperance of party, but *giving as was believed a perverted view of Presidt. Washington's proclamation of neutrality* [83] *and* calculated to put a dangerous gloss on the Constitution of the U.S.

---

Ms (DLC: Rives Collection, Madison Papers). Undated. For conjectural date, see Editorial Note at head of this document. One page extensively damaged at edge.

1. JM recalled in his Convention notes that on 17 Sept. 1787, "whilst the last members were signing it [the Constitution] Doctr. Franklin looking towards the Presidents Chair, at the back of which a rising sun happened to be painted, observed to a few members near him, that Painters had found it difficult to distinguish in their art a rising from a setting sun. I have, said he, often and often in the course of the Session, and the vicissitudes of my hopes and fears as to its issue, looked at that behind the President without being able to tell whether it was rising or setting: But now at length I have the happiness to know that it is a rising and not a setting Sun" (Farrand, *Records of the Federal Convention*, 2:648).

2. John Fothergill (1712–1780) was an influential English physician, botanist, and philanthropist and a good friend of Benjamin Franklin, with whom he drew up a plan of reconciliation about 1774 that aimed to avert the impending war between Great Britain and its North American colonies. The anecdote that JM recounts here was reported in a somewhat different fashion by Thomas Jefferson in a letter to Robert Walsh, 4 Dec. 1818 (Ford, *Writings of Thomas Jefferson*, 10:118 n.).

3. Here JM crossed out "in the Revolutionary Congs."

4. John Stuart, third Earl of Bute (1713–1792), a favorite of King George III though unpopular with the British public, served as prime minister, 1762–63.

5. This story was also included in Jefferson's letter to Robert Walsh Jr., 4 Dec. 1818 (Ford, *Writings of Thomas Jefferson*, 10:118–19 n.).

6. Left blank in Ms.

7. For Franklin's "A Parable against Persecution," see Labaree et al., *Papers of Benjamin Franklin*, 6:114–24. This work appeared in print many times, but it is likely that JM read the version included in Benjamin Vaughan's edition of Franklin's writings entitled *Political, Miscellaneous, and Philosophical Pieces* (London, 1779), 72–73.

8. For Franklin's bagatelle, "The Ephemera," see Labaree et al., *Papers of Benjamin Franklin*, 27:430–35. A reprint of this piece has not been found in surviving issues of the (Philadelphia) *Franklin Gazette*. It first appeared in the *Pennsylvania Gazette* in 1735.

9. Early in his retirement JM began to compile lists of correspondence with his political friends, including George Washington, as a preliminary step towards retrieving his whole correspondence prior to editing and publishing it ("Dates of letters from G. Washington to J.M. on the files of the *former* and not of J.M.," n.d. [DLC: Rives Collection, Madison Papers]). For JM's efforts to collect all of his correspondence with Washington, see JM to Bushrod Washington, 28 Aug. and 18 Dec. 1819, 14 Oct. 1820 (NN: Emmet Collection), and 1 Dec. 1822 (DLC), and Bushrod Washington to JM, 14 Sept. 1819, and 31 Jan. and 23 Mar. 1820 (DLC).

10.  For JM's memoranda, see <u>Memorandum for George Washington, ca. 8 Oct. 1789</u>, *PJM*, <u>12:433–34</u>; <u>Memorandum on the Residence Act, ca. 29 Aug. 1790</u>, ibid., 13:294–96; and <u>Memorandum on a Discussion of the President's Retirement, 5 May 1792</u>, ibid., 14:299–304.

11.  For JM's presumptive authorship of Washington's first inaugural address, see <u>Address of the President to Congress, 30 Apr. 1789</u>, ibid., 12:120–21.

12.  For JM's motion in the U.S. House of Representatives for a reply to the president's speech, see <u>Address of the House of Representatives to the President, 5 May 1789</u>, ibid., 132–33, 134 n. 1.

13.  For Washington's disappointment with the impost and tonnage bills, see his letter to David Stuart, 26 July 1789, Abbot et al., *Papers of George Washington: Presidential Series*, 3:321, 323–24. For JM's support of commercial discrimination, see Madison at the First Session of the First Federal Congress, 8 April–29 September 1789, *PJM*, <u>12:52–55</u>.

14.  Here JM first wrote and then crossed through "recollected what had."

15.  For the debate over a national bank, see Elkins and McKitrick, *Age of Federalism*, 225–33.

16.  At this point JM wrote "¶." For JM's opposition to the First Bank of the United States, see his speeches in the U.S. House of Representatives, 2 and 8 Feb. 1791, *PJM*, <u>13:372–81</u>, <u>383–87</u>.

17.  See <u>JM's Draft Veto of the Bank Bill, 21 Feb. 1791</u>, ibid., 395.

18.  At this point JM wrote "¶."

19.  For Edward Livingston's motion of 2 Mar. 1796, see *Annals of Congress*, 4th Cong., 1st sess., 400–401. For Washington's response, see his letter to the U.S. House of Representatives, 30 Mar. 1796, Fitzpatrick, *Writings of George Washington*, 35:2–5.

20.  In his letter to the U.S. House of Representatives (see n. 19 above), Washington noted that in the Journal of the Constitutional Convention "it will appear that a proposition was made, 'that no Treaty should be binding on the United States which was not ratified by a Law'; and that the proposition was explicitly rejected" (Fitzpatrick, *Writings of George Washington*, 35:4–5; Farrand, *Records of the Federal Convention*, 2:382–83).

21.  At this point JM wrote "¶." For the discussion and vote against a congressional power "to grant charters of incorporation where the interest of the U. S. might require & the legislative provisions of individual States may be incompetent," see Farrand, *Records of the Federal Convention*, 2:615–16.

22.  At this point JM placed an asterisk and interlined, then crossed out, "*(see unsuccessful motion of J.M. qualifying the call for papers) as the practice as since been." For the motion, see <u>JM's speech on the Jay treaty, 7 Mar. 1796</u>, *PJM*, <u>16:254</u>.

23.  JM left a blank for the last digit. The Bank bill originated in the Senate on 3 Jan. 1791, where it was amended to limit the life of the First Bank of the United States—to 4 Mar. 1815 (Matthew St. Claire Clarke and D. A. Hall, comps., *Legislative and Documentary History of the Bank of the United States: Including the Original Bank of North America* [Washington, 1832], 35–36).

24.  William Branch Giles introduced his resolutions of censure on 27 Feb. 1793, and they were taken up for debate the next day. All the resolutions were soundly defeated (*Annals of Congress*, 2d Cong., 2d sess., 895, 898, 899–906, 907–63). For a detailed discussion of the inquiry into Alexander Hamilton's conduct as secretary of the Treasury, see Elkins and McKitrick, *Age of Federalism*, 295–302. For the part played by JM and Thomas Jefferson in the Giles Resolutions, see Eugene R. Sheridan, "Thomas Jefferson and the Giles Resolutions," *WMQ*, 3d ser., 49 (1992): 589–608.

25.  JM wrote here and then crossed out "<u>to Js. Madison, dated Aug. 8, 1811</u>." Edmund Randolph (1753–1813), the son and grandson of distinguished attorneys, was the youngest member of the Virginia convention of 1775 and was appointed attorney general of the new state government that it established.

While governor of Virginia, 1786–88, he was a delegate to the Constitutional Convention of 1787, where he introduced the Virginia Plan. Though he did not sign the U.S. Constitution which resulted, he did cast his vote in favor of its adoption in the Virginia Ratifying Convention. Randolph served as attorney general of the United States, 1789–94, and on Jefferson's retirement, as secretary of state, 1794–95. He was forced to resign the latter post under suspicions that he had solicited bribes from the French minister to the United States, Jean Antoine Joseph Fauchet. (For a discussion of the circumstances that led to Randolph's resignation, see John J. Reardon, *Edmund Randolph: A Biography* [New York, 1974], 307–13). On his return to Richmond, Randolph resumed his place among the leading lawyers of Virginia until a paralytic attack in 1810 led to his retirement (ibid., 151, 179–80, 360–61).

26.  *Ut valeret quantum valere potuit:* That it may fare as well as it could. See Edmund Randolph to JM, 9 July 1811, *PJM-PS*, 3:376, 377 n. 3.

27.  At the beginning of this paragraph JM wrote and then crossed through "Giles Resol."

28.  See Edmund Randolph to JM, 8 Aug. 1811, *PJM-PS*, 3:403 and n. 1.

29.  Here JM wrote and crossed through "mere."

30.  For Washington's approbation of Hamilton's course, see his letter to Hamilton, 7 May 1791, Abbot et al., *Papers of George Washington: Presidential Series*, 8:160.

31.  This note refers to the series of eighteen unsigned essays written by JM in 1791–92 and published in Philip Freneau's Philadelphia newspaper, the *National Gazette*. For background and descriptions of the essays, see Madison's *National Gazette* Essays, 19 November 1791–20 December 1792, *PJM*, 14:110–12. JM had a lifelong interest in finance, and his views on banks and banking were well known (see nn. 16 and 17 above). This particular essay seems to have been provoked by the banking crisis of 1818–19 (see numerous articles of the period in *Niles' Weekly Register* indexed under "Banks" [March–September 1819]).

32.  JM wrote here and then crossed through "perhaps."

33.  While the editors have not identified this particular episode, Jefferson reported a similar scheme that took place in the winter of 1793, see Ford, *Writings of Thomas Jefferson*, 1:225.

34.  JM briefly explained the apparent inconsistency of his opposition to the First Bank of the United States with his support of the Second Bank in his veto message of 30 Jan. 1815, when he wrote that he waived "the question of the constitutional authority of the Legislature to establish an incorporated bank as being precluded in my judgment by repeated recognitions under varied circumstances of the validity of such an institution in acts of the legislative, executive, and judicial branches of the Government, accompanied by indications, in different modes, of a concurrence of the general will of the nation" (Madison, *Writings* [Hunt ed.], 8:327). He further expounded his views of the power of legislative precedents in his letter to Charles Jared Ingersoll, 25 June 1831, Madison, *Letters* (Cong. ed.), 4:183–87.

35.  For Vice President George Clinton's tie-breaking vote in the Senate in February 1811 that defeated a bill to renew the charter of the First Bank of the United States, see Albert Gallatin to JM, 26 Feb. 1811, *PJM-PS*, 3:184–85, 185 n. 1.

36.  JM first wrote then crossed out "opinions" and interlined "reasoning."

37.  This paragraph of notes criticized Chief Justice John Marshall's opinion in *McCulloch v. Maryland*, delivered on 6 Mar. 1819. For the text of that opinion, see Gunther, *John Marshall's Defense of McCulloch v. Maryland*, 23–51. Some of JM's criticisms are developed at greater length in his letter to Spencer Roane, 2 Sept. 1819.

38.  JM left blanks here. He was referring to "an act giving John Hoomes the exclusive privilege of conveying persons in stage carriages between certain places for a limited time," 4 Dec. 1787. This Virginia law authorized Hoomes to conduct a stage line between Alexandria, Fredericksburg, Richmond, and Hampton

for three years and regulated the fare to be charged (William Waller Hening, ed., *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* [13 vols.; 1819–23; reprint, Charlottesville, Va., 1969], 12:618–19).

39. Above the word "extinquish" JM interlined "terminate."

40. JM left a blank for the last digit and here referred to "an act giving James Rumsey the exclusive right of constructing and navigating certain boats for a limited time," passed in 1784, for a term of ten years beginning 1 Jan. 1785 (Hening, *Statutes at Large of Virginia* [1969 reprint], 11:502).

41. JM strongly supported the 8 June 1787 motion in the Constitutional Convention that "the National Legislature shd. have authority to negative all Laws which they shd. judge to be improper" and spoke in its favor each time the topic was introduced (Farrand, *Records of the Federal Convention*, 1:164–65, 168, 2:27–28, 390).

42. For JM's role in the passage of this law, see Act for Establishing Religious Freedom, 31 Oct. 1785, *PJM*, 8:399–401 and n. 1.

43. Following this, JM originally wrote and then crossed through several phrases: "capable of making its own laws," and "quickly becomes strong eno' to burst every [*illegible*] its own laws trampling on all laws, and making one suited to its own nature."

44. JM wrote here and then crossed through "& pacify."

45. The two bills were "an Act incorporating the protestant Episcopal Church in the Town of Alexandria in the District of Columbia," and "an act for the relief of Richard Turvin, William Coleman, Edwin Lewis, Samuel Mims, Joseph Wilson, and the Baptist Church at Salem Meeting House, in the Mississippi Territory." JM's veto messages, dated 21 and 28 Feb. 1811, respectively, are printed in *PJM-PS*, 3:176, 193. JM exercised a pocket veto in 1816 against "an act for the free importation of Stereotype plates, and to encourage the printing and gratuitous distribution of the Scriptures by the Bible societies within the United States" (*House Document No. 493*, 70th Cong., 2d sess., 2–3). For discussion of these vetoes, see Pfeffer, "Madison's 'Detached Memoranda,'" in Peterson and Vaughan, *Virginia Statute for Religious Freedom*, 288–95.

46. Despite JM's recollection, this "attempt" succeeded. A "bill to exempt houses of public worship, and the lands devoted to that object, on which they stand, from taxation," was introduced into the Kentucky General Assembly on 12 Dec. 1815 and passed on 21 Dec. The Senate also passed the bill, but with amendments that the House agreed to on 29 Jan. 1816, and the governor signed the bill into law two days later ("Journal of the House of Representatives of the Commonwealth of Kentucky,.…" [1815–16], in *Records of the States of the United States of America* [DLC microfilm ed., Ky. A.1b, reel 3], 37, 43, 49, 56, 58, 66, 69–70, 231, 232, 233, 242, 245).

47. Left blank in Ms. The bill for "establishing a provision for the teachers of the christian religion" was championed by Patrick Henry in 1784 (see Madison's Notes for Debates on the General Assessment Bill, *PJM*, 8:195–97).

48. The established church in Virginia, the Anglican, later the Protestant Episcopal church, was effectively disestablished in the first session of the Virginia legislature in 1776 (*PJM*, 8:195; Ketcham, *James Madison*, 75–76).

49. For the text of JM's Memorial and Remonstrance, ca. 20 June 1785, see *PJM*, 8:298–304.

50. JM here wrote and then crossed through "approving it."

51. Blanks left in Ms. For the Act for Establishing Religious Freedom, see *PJM*, 8:399–401. For JM's description of its passage, see JM to Thomas Jefferson, 22 Jan. 1786, ibid., 8:473–74. The two attempts to amend the bill were rejected by votes of 66–38 on 16 Dec., and 56–35 on 29 Dec. 1785 (ibid., 8:481 n. 5).

52. JM probably referred here to "The Speech of Henry Brougham, Esq., M. P. in the House of Commons, May 8th, 1818, on the Education of the Poor, and Charitable Abuses," in the *Edinburgh Review* 30 (September 1818): 486–502, and reviews of subsequent publications under the heading "Education Committee, and Abuse of Charities," on the same subject printed ibid., 31 (March 1819): 497–549.

53. *Obsta principiis*: Resist the first encroachment.

54. *A Treatise of Beneficiary Matters: or, A History of Ecclesiastical Benefices and Revenues … by Father Paul* [Paolo Sarpi] (Westminster, England, 1727). This critique of the Catholic Church traced in great detail the origin, growth, and management of the Church's vast temporal wealth and the influence, power, and corruption that resulted from it.

55. The offices of chaplain for the U.S. House of Representatives and the Senate were established by resolutions in both bodies under the provisions of article 1, sections 2 and 3, respectively, of the U.S. Constitution authorizing each house to choose its own officers (*Annals of Congress*, 1st Cong., 1st sess., 19, 21, 23, 24, 109, 174, 242). Section 4 of "An Act for allowing Compensation to the Members of the Senate and House of Representatives of the United States, and to the Officers of both Houses," 22 Sept. 1789, established the annual salary of each chaplain at $500 (*U.S. Statutes at Large*, 1:70, 71).

56. *De minimis non curat lex*: "The law does not concern itself with trifles" (*Black's Law Dictionary* [8th ed.], 464.

57. *Maculis quas aut incuria fudit, aut humana parum cavit natura*: "I shall not take offence at a few blots which a careless hand has let drop, or human frailty has failed to avert" (Hor. *Ars Poetica*, 352–53 in *Horace: Satires, Epistles, and Ars Poetica*, Loeb Classical Library [1970 reprint], 478–79).

58. Following this, JM first wrote and then crossed through "were it admitted that religion has a real ⟨i⟩nterest in the latter."

59. JM interlined "ecclesiastical Assembly" above "Convocation."

60. JM placed an asterisk here and in the left margin wrote "*See if this was the 1st."

61. President Washington's first proclamation calling for a day of thanksgiving was dated 3 Oct. 1789. He recommended such a day to acknowledge "the many signal favors of Almighty God," and to offer "our prayers and supplications to the great Lord and Ruler of Nations" (Abbot et al., *Papers of George Washington: Presidential Series*, 4:131–32). Washington's 1 Jan. 1795 proclamation proposed 19 Feb. 1795 as a day of public thanksgiving and prayer during which Americans could "acknowledge our many and great obligations to Almighty God," and "render their sincere and hearty thanks to the Great Ruler of Nations" (James D. Richardson, comp., *A Compilation of the Messages and Papers of the Presidents* [20 vols.; New York, 1897], 1:171–72).

62. In President John Adams's proclamations of 23 Mar. 1798 and 6 Mar. 1799 recommending days of thanksgiving, he referred in the first to the "Father of Mercies," the "Redeemer of the World," and "His Holy Spirit," and in the second to "the Most High God," the "Great Mediator and Redeemer," and "the grace of His Holy Spirit" (Richardson, *Compilation of the Messages and Papers of the Presidents*, 1:258–60, 274–76).

63. The editors have been unable to locate any such letters. For JM's proclamations of 9 July 1812, 23 July 1813, 16 Nov. 1814, and 4 Mar. 1815, see *PJM-PS*, 4:581–82, 6:458–59; and Richardson, *Compilation of the Messages and Papers of the Presidents*, 2:543, 545–46).

64. For the so-called Whiskey Rebellion, whose culminating events took place in the summer and fall of 1794, see Elkins and McKitrick, *Age of Federalism*, 461–85. For Washington's 1 Jan. 1795 proclamation, see n. 61 above.

65. Here JM crossed out "Attorney ⟨Gen⟩l" and interlined "Secretary of State."

66. JM placed an asterisk here and at the foot of the page wrote "*See copies of these papers on the files of J.M." For JM's request for a copy of this document, see his letter to James Monroe, 11 Dec. 1818, and Monroe's reply of 23 Dec. 1818.

67. For the joint resolution of Congress, 30 June 1812, see *Annals of Congress*, 12th Cong., 1st sess., 303, 310–11.

68. JM wrote and then crossed through "weaken" and interlined "deaden."

69. Left blank in Ms, with the later addition in pencil in an unidentified hand. The 9 July 1812 proclamation to which JM referred here was published in *Niles' Weekly Register* 2 (18 July 1812): 321. JM's 4 Mar. 1815 proclamation is printed in *Niles' Weekly Register* 8 (11 Mar. 1815): 17. For the text of both proclamations, see n. 63 above.

70. JM wrote and then crossed through "English" and interlined "parent."

71. William Duer (1747–1799) was born and educated in England, served a stint in the British army in India, and received from his wealthy father an inheritance comprised of West Indian plantations. Duer settled in New York in 1773 and quickly became an energetic Whig, taking a leading part in New York's revolutionary activities. He served in the Continental Congress, 1777–79, and was a signer of the Articles of Confederation. He negotiated large supply contracts with the Continental Army and built a fortune that he later used to speculate in land and securities. Duer's financial and land speculations led to charges against him by the government which precipitated a financial panic that involved many others. He was arrested for debt in 1792 and, except for a short period in 1797, was incarcerated until his death.

72. Here JM wrote and then crossed through: "(I suggested to Mr. H. that ⟨King?⟩ might be a proper auxiliary, as he had been a member of the Convention, and well understood the subject to be discussed. He spoke respectfully of Mr. ⟨K's?⟩ talents but did not consider them as altogether of the sort required for the task in view.)" The name is heavily blocked out but is probably "King," referring to Rufus King.

73. For JM's pre-Convention reading and notetaking, see the editorial notes and texts of his Notes on Ancient and Modern Confederacies, April–June 1786, and Vices of the Political System of the United States, April–June 1787, *PJM*, 9:3–22, 345–57.

74. For the Benson list, see Syrett and Cooke, *Papers of Alexander Hamilton*, 4:295–96.

75. Left blank in Ms. The paper was Federalist No. 54 (ibid., 4:294 n. 21).

76. Joseph Delaplaine noted in his "Life of John Jay" that Jay had written essays 2–5, and 64 of *The Federalist* (*Delaplaine's Repository of the Lives and Portraits of Distinguished Americans* [2 vols.; Philadelphia, 1817–18; Shaw and Shoemaker 34554], 1:173).

77. JM referred to Alexander Hamilton's letter to Timothy Pickering, 16 Sept. 1803, Syrett and Cooke, *Papers of Alexander Hamilton*, 26:147–49, and n. 7.

78. Left blank in Ms. The letter referred to (see n. 77 above) was published in *Niles' Weekly Register* 3 (7 Nov. 1812): 148–49.

79. See William Eustis to JM, 28 Apr. 1819.

80. For Jacob Gideon Jr.'s 1818 edition of *The Federalist* for which JM supplied his own copy of the book with an attribution of the authors of each essay, see Gideon to JM, 19 Jan., 12 Feb., and 15 Aug. 1818, and JM to Gideon, 28 Jan., 20 Feb., and 20 Aug. 1818.

81. Helvidius Priscus was a first-century Roman senator and Stoic, "distinguished by his love of liberty." His character and republican convictions along with his actions as praetor are described in the fourth book of Tacitus' *Historiae*. Helvidius was banished and finally executed by order of the emperor Vespasian (William Smith, ed., *Dictionary of Greek and Roman Biography and Mythology* [3 vols.; Boston, 1849], 3:526–27).

82. For the texts and background of JM's Helvidius essays, see Madison's "Helvidius" Essays, 24 August–18 September 1793, and Editorial Note, *PJM*, 15:64–73, 80–87, 95–103, 106–10, 113–20.

83. For President Washington's neutrality proclamation, 22 Apr. 1793, see Abbot et al., *Papers of George Washington: Presidential Series*, 12:472–73.

## Authorial notes

[The following note(s) appeared in the margins or otherwise outside the text flow in the original source, and have been moved here for purposes of the digital edition.]

\* This original stated by Mr. Mason to Mr. Eustis (see the letter of E. to J.M) [79] to be among the papers left by Mr. Hamilton: A copy is among the papers of J.M. with whom the document was placed for preservation by Mr H. who regarded *it* as *permanent* evidence of his opinion, on the subject.

*Note:* The annotations to this document, and any other modern editorial content, are copyright © The Rector and Visitors of the University of Virginia. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Madison Papers |
| TITLE | Detached Memoranda, ca. 31 January 1820 |
| AUTHOR | Madison, James |
| DATE | 31 January 1820 |
| CITE AS | "Detached Memoranda, ca. 31 January 1820," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/04-01-02-0549. [Original source: *The Papers of James Madison*, Retirement Series, vol. 1, *4 March 1817–31 January 1820*, ed. David B. Mattern, J. C. A. Stagg, Mary Parke Johnson, and Anne Mandeville Colony. Charlottesville: University of Virginia Press, 2009, pp. 600–627.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

EXHIBIT

H

# Jefferson's Letter to the Danbury Baptists
## The Final Letter, as Sent

To messers. Nehemiah Dodge, Ephraim Robbins, & Stephen S. Nelson, a committee of the Danbury Baptist association in the state of Connecticut.

Gentlemen

The affectionate sentiments of esteem and approbation which you are so good as to express towards me, on behalf of the Danbury Baptist association, give me the highest satisfaction. my duties dictate a faithful and zealous pursuit of the interests of my constituents, & in proportion as they are persuaded of my fidelity to those duties, the discharge of them becomes more and more pleasing.

Believing with you that religion is a matter which lies solely between Man & his God, that he owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, & not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof," thus building a wall of separation between Church & State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties.

I reciprocate your kind prayers for the protection & blessing of the common father and creator of man, and tender you for yourselves & your religious association, assurances of my high respect & esteem.

Th Jefferson
Jan. 1. 1802.

Back to June 1998 - Vol 57, No. 6