IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DONNA CAVE, *et al.*,                                                    PLAINTIFFS,

ANNE ORSI, *et al.*,                                      CONSOLIDATED PLAINTIFFS,

THE SATANIC TEMPLE, *et al*.,                                         INTERVENORS,

v.                                  No. 4:18CV00342 KGB/BD

JOHN THURSTON, Arkansas Secretary of State,
in his official capacity,                                              DEFENDANT.


BRIEF IN SUPPORT OF SECRETARY THURSTON'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Table of Contents .................................................................................................... ii

Introduction ........................................................................................................... 1

The Ten Commandments and Public Acknowledgments of Religion ........................... 1

Religious Displays around the State Capitol ............................................................. 4

The Ten Commandments Monument ......................................................................... 5

The Satanic Temple and the Baphomet Monument .................................................... 7

The Vetting Efficiency Act ....................................................................................... 11

Summary Judgment Standard ................................................................................... 12

Argument ................................................................................................................ 12

    I.    Plaintiffs lack standing. ............................................................................. 13

        A.    Offended-observer standing relies on an obsolete legal standard. ......... 14

        B.    Plaintiffs cannot manufacture standing through self-inflicted injury ...... 14

        C.    The organizational Plaintiffs lack associational standing. ..................... 17

        D.    The Satanic Temple lacks standing. ...................................................... 18

    II.    The Ten Commandments monument fits with history and tradition. ................ 20

    III.    Intervenors have not been denied equal protection. ............................................ 22

        A.    Arkansas need not sponsor messages with which it disagrees. .............. 22

        B.    Arkansas didn't deny the Satanic Temple equal protection. .................. 23

        C.    Any differential treatment would pass muster. ...................................... 25

Conclusion ............................................................................................................. 27

## INTRODUCTION

Publicly displaying the Ten Commandments is a longstanding tradition, and the challenged Ten Commandments monument squarely fits within it. Such displays don't violate the Constitution, and Plaintiffs' contrary claims fail.

Plaintiffs' claims fail on standing and the merits. They lack standing because their purported injuries are entirely self-inflicted and rest on discarded legal theories. And on the merits, they fail to show the Ten Commandments monument violates the Constitution. To the contrary, under *American Legion v. American Humanist Association*, 139 S. Ct. 2067 (2019), and *Van Orden v. Perry*, 545 U.S. 677 (2005), the challenged monument survives because it fits within the longstanding tradition of publicly displaying such monuments.

The Satanic Temple (TST) Intervenors' peculiar claims fair no better. Their equal-protection claim fails from the get-go because they made no serious effort to locate a sponsor for legislation that would place their "Baphomet with Children" monument on the Capitol grounds. Indeed, far from attempting to state a valid claim, TST's intervention claims are an attempt to diminish or deter speech with religious significance. This Court should treat it accordingly and grant summary judgment to Secretary Thurston.

### THE TEN COMMANDMENTS AND PUBLIC ACKNOWLEDGMENTS OF RELIGION

The Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion*, 139 S. Ct. at 2083. In the 1950s, the Fraternal Order of Eagles began distributing Ten Commandments monuments across the nation. *Id.* at 2083. A Minnesota juvenile-court judge, E.J. Ruegemer,[1] formed a committee consisting of "fellow judges, lawyers, various city officials, and clergy of several faiths from the St. Cloud area." Ex. 1, Ruegemer Decl.,

---

[1] Judge Ruegemer submitted the declaration in *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008). *See* Ex. 1, Ruegemer Decl. This is the source of the history of the Eagles' Ten

at 3. "[T]he committee developed a version of the Ten Commandments which was not identifiable to any particular religious group." *Id.* at 3. The commandments were left unnumbered. *Id.* at 3. "The Eagles, 'while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments' role in shaping civic morality.'" *Am. Legion*, 139 S. Ct. at 2083 (quoting *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring in judgment)); *see* Ex. 1, Ruegemer Decl., at 4 (the Eagles intended "to set forth a code of conduct, not an endorsement of any or one particular religion at all."). In all, the Eagles placed over 140 monuments in communities across the nation. Ex. 1, Ruegemer Decl., at 4. In addition, the Eagles donated "over a thousand paper replicas . . . to state and local governments throughout the Nation." *Van Orden*, 545 U.S. at 713 (Stevens, J., dissenting).

One of the Eagles-donated monuments was placed on public grounds between the Texas State Capitol Building and the Texas Supreme Court Building. *Van Orden v. Perry*, Case No. A-01-CA-833-H, 2002 WL 32737462, at *1 (W.D. Tex. 2002). That monument was challenged on Establishment Clause grounds and ultimately upheld by the U.S. Supreme Court. *Van Orden*, 545 U.S. 677. The *Van Orden* plurality expressly recognized that "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America," and surveyed such monuments in the Supreme Court, the Capitol, the Library of Congress, and

---

Commandments monuments in *Van Orden v. Perry*, 545 U.S. 677 (2005), as well as in *Books v. City of Elkhart*, 235 F.3d 292, 294-95 (7th Cir. 2000), and *State v. Freedom From Religion Foundation, Inc.*, 898 P.2d 1013, 1017 (Colo. 1995). *See Card*, 520 F.3d at 1012 n.4 (citing *Van Orden v. Perry*, No. 01-833, ECF 52 (W.D. Tex. Aug 9, 2002) (trial brief)).

others. *Van Orden*, 545 U.S. at 688-89 (plurality).[2] More than 100 Ten Commandments monuments on public property across the nation have been specifically catalogued. Ex. 3, Hall Report, at 46-56.

Relief portrait plaques in the House Chamber of the Capitol provide an instructive example of the Ten Commandments in our Nation's traditions. They "depict historical figures noted for their work in establishing the principles that underlie American law." Ex. 7, "About Relief Portrait Plaques of Lawgivers."[3] The portraits are arranged chronologically—except for Moses, whose portrait is centered, directly across from the speaker's chair. Ex. 7, House Chamber Relief Portrait Plaques; Ex. 8, House Chamber Map. "The 11 profiles in the eastern half of the chamber face left and the eleven in the western half face right, so that all look towards the full-face relief of Moses in the center of the north wall." Ex. 7, House Chamber Relief Portrait Plaques, at 2; *see* Ex. 8, House Chamber Map. Only Moses is represented by a full-face portrait. Exh. 7, House Chamber Relief Portrait Plaques; Ex. 9, House Chamber Portrait Montage; Ex. 10, House Chamber Full-Faced Moses Portrait. Moses is identified as a "Hebrew prophet and lawgiver" who "received the Ten Commandments." Ex. 11, "Moses."[4] Similarly, the Arkansas Supreme Court Justice Building contains a wall sculpture of Moses as one of the "figures represent[ing] the development of the law throughout ancient history." Ex. 12, Ark. Sup. Ct. Justice Bldg., at 2.

---

[2] *See also* Ex. 4, "Courtroom Friezes: South and North Walls," Office of the Curator, Supreme Court of the United States, at 1 (depiction of Moses on the Supreme Court South Frieze); Ex. 5, "Reliefs on the Exterior Medallions and the Great Hall Frieze," Office of the Curator, Supreme Court of the United States, at 1-2 (Moses portrait medallion on the Supreme Court building's west facade and Moses ornamental metope in the Supreme Court building's Great Hall).

[3] https://www.aoc.gov/art/relief-portrait-plaques-lawgivers/about-relief-portrait-plaques-lawgivers

[4] https://www.aoc.gov/art/relief-portrait-plaques-lawgivers/moses

### RELIGIOUS DISPLAYS AROUND THE STATE CAPITOL

Arkansas' Capitol grounds consist of "all land, parking areas, and streets which are under the jurisdiction of the Secretary of State." Ark. Code Ann. 22-3-501(4); *see* Ex. 14, Boyd Dep., at 27-36. The grounds contain a panoply of displays with historic significance, including displays with religious symbolism and language. For example, the American Revolution Bicentennial monument contains a Liberty Bell replica that pays tribute to "the Spirit of '76" and contains a biblical quotation from the Old Testament, "Proclaim liberty throughout all the land unto all the inhabitants thereof." Ex. 13, Ware Aff., aff. exs. I-2 to I-7, J-1. The bell also displays the words "IN GOD WE TRUST" in large letters. *Id.* aff. ex. I-1. Another example of religious symbolism is the Little Rock Nine Monument, which honors the courage of African-American students who enrolled in Little Rock's Central High School in 1957, and contains the words, "To God be the glory." *Id.* aff. exs. I-8 to I-9, J-1.

The Capitol building's interior contains more than 250 additional displays, including plaques, portraits, composites, murals, busts, and various other exhibits commemorating Arkansas's history and heritage. *See generally* Ex. 13, Ware Aff. These include four large murals over the grand staircases portraying the themes of "Education," "Justice," "War," and "Religion," *id.* aff. ex. J-3, and a stained glass rendering of the Great Seal of the State of Arkansas, *id.* aff. ex. G-4; *see id.* aff. exs. J-4 to J-5. That seal prominently includes Libertas—the goddess of Liberty—standing in the clouds and an angel of mercy. *Id.* aff. exs. J-4 to J-5.

The nearby Justice Building likewise contains historic displays with religious significance. Ex. 12. For instance, the Arkansas Supreme Court's courtroom contains a large tapestry behind the Justices' bench created by a nationally known religious artist that prominently displays the wings of Shekinah, a visual allusion to the divine presence drawn from the Bible. *See*

*id.* In addition, the courtroom is surrounded by marble relief sculptures representing the development of the law throughout ancient history that include representations of Moses, David, and Solomon, "who demonstrated that the law could be applied wisely and humanely to concrete situations." *Id.*

### THE TEN COMMANDMENTS MONUMENT

At all times relevant to this action, to place a monument on the Capitol grounds two things were required: (1) an act of the Arkansas General Assembly, Ark. Code Ann. 22-3-503(c); *see id.* 22-3-503(d) (1997) (former statute); and (2) review by the Capitol Arts and Grounds Commission. *Id.* 22-3-503.

In April 2015, the Arkansas General Assembly enacted the Ten Commandments Monument Display Act, providing for the placement of a Ten Commandments monument mirroring "the monument declared constitutional in *Van Orden v. Perry*, 545 U.S. 677 (2005)." Ark. Code Ann. 22-3-221(b)(1); Ex. 2 at 2. In August 2016, the American History and Heritage Foundation (AHHF), a private group, applied to donate a Ten Commandments monument. Ex. 14, Boyd Dep., dep. ex. 14. The application emphasized the role of the Ten Commandments in legal history and noted that similar displays appear on government grounds throughout the country. *Id.* Five days later, TST submitted its application to place a "Baphomet with Children" monument. *Id.* dep. exs. 1 & 2. Around the same time, applications were also submitted by the Marine Corp League and Arkansas Run for the Fallen to erect a Gold Star Families monument and by the Saline Atheist and Skeptic Society for establishing a Wall of Separation monument. *See id.* at 88-90.

In October 2016, a subcommittee of the Capitol Arts and Grounds Commission met to review the financial and "shovel-ready" sufficiency of both AHHF's application to donate a Ten Commandments monument and TST's application to donate the Baphomet monument. Ex. 16 at

5. The subcommittee determined that the two applications would proceed independently, on their own track, to allow plenty of time for adequate consideration of each. *Id.* at 6. Once sufficiency of an application was determined, a public hearing would be held, then the Commission would vote on whether to move forward. *Id.* If the Commission voted to move forward, then the applicant would be required to pay a fee equal to ten percent of the monument's construction cost plus ten percent of its installation cost to cover the cost of maintaining it. *Id.* at 6-7; *see* Ark. Code Ann. 19-5-1125(c)(1)(A) (Monument and Memorial Preservation Fund).

After vetting the AHHF's application, the Commission voted to allow it to proceed. Ex. 18 at 11-12. AHHF paid the required fee, and in June 2017, the monument was installed. But a mentally unstable man with an extensive history of erratic behavior drove his car over the monument in the early hours of the next morning, destroying it.[5]

A replacement monument with security bollards was installed in April 2018. At an installation ceremony, AHHF explained that "the sole reason" it "donated this monument to the State of Arkansas is because the Ten Commandments are an important component of the foundation of the laws and the legal system of the United States of America and of the State of Arkansas." Ex. 49, Monument Installation. A Secretary of State representative accepted the monument on behalf of the State, and the monument was thereafter unveiled. *See id.* The entire dedication lasted six-

---

[5] The man had previously rammed his car into a Ten Commandments monument in Oklahoma. *St. of Okla. v. Michael Tate Reed, II*, No. MI-2014-818 (Okla. Cty. Dist. Ct.) https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=MI-2014-818&cmid=3190890; *cf. In re Michael Tate Reed II*, No. 66FPR-20205 (Fort Smith Dist. Ct.) (subsequent civil commitment); *State v. Reed*, No. PCS-20-5088 (Pulaski Cty. Dist. Ct.) (subsequent charges); John Lynch, "Marker's destroyer is back in custody; incidents noted at State Hospital," *Arkansas Democrat-Gazette,* https://www.arkansasonline.com/news/2020/aug/10/markers-destroyer-is-back-in-custody/.

and-a-half minutes. *See id.* There was no singing, biblical recitation, prayer, or any other religious activity. *See id.*

### THE SATANIC TEMPLE AND THE BAPHOMET MONUMENT

*The Satanic Temple.* The intervenor labeled the "Satanic Temple" is a shifting constellation[6] of entities created, owned, and run by Massachusetts residents Doug Misicko (a.k.a. Doug Mesner, a.k.a. Lucien Greaves) and Cevin Soling (a.k.a. Malcolm Jarry). Ex. 26, TST Dep., at 148-49, 183, 187, 228. These entities include the for-profit commercial enterprise United Federation of Churches, LLC, *id.* at 137, 157-59, 228; the fundraising nonprofit Reason Alliance, Ltd., *id.* at 160-69; the nonprofit The Satanic Temple, Inc., *id.* at 170-79; and another for-profit commercial enterprise, Cinephobia, LLC. *Id.* at 180-84. These disparate entities purport to be "all part of the larger—The Satanic Temple Organization."[7] *Id.* at 183.

TST is an antireligious group founded in 2013 with the goal of suppressing religious expression. Indeed, Intervenors' Second Amended Complaint links to and cites an article that explains that TST cofounder Soling originally conceived TST as a way to undermine President George W. Bush's White House Office of Faith-Based and Community Initiatives. DE 89 at 4 ¶ 8; *see* Ex. 26, TST Dep., dep. ex. 55 at 4 (Mark Oppenheimer, "A Mischievous Thorn in the Side of Conservative Christianity," *New York Times*, July 10, 2015). "There should be some kind of

---

[6] TST has claimed that "'[t]he Satanic Temple' is an umbrella term for a religion which is given legal structure by a constellation of affiliate entities. There is no entity named 'The Satanic Temple' . . . ." DE 217 at 19.

[7] It's unclear which entity, if any, is Intervenor the "Satanic Temple." TST has never filed a corporate disclosure statement under Rule 7.1 of the Federal Rules of Civil Procedure. Further, TST's filings and responses to Defendant's discovery requests provide wildly conflicting information. *Compare* DE 25-1 at 1 (identifying itself as "The Satanic Temple, LLC"), *with* DE 93-2 at 20 ("On information and belief, the full legal name of the organization is still United Federation of Churches, LLC."), *and with* DE 93-4 at 8 (TST "is given corporate structure by 'The Satanic Temple, Inc.' which is a Massachusetts non-profit corporation."); *see also* DE 24; DE 29; DE 124.

counter," Soling thought, and he came up with "the idea of starting a faith-based organization that met all the Bush administration's criteria for receiving funds, but was repugnant to them." *Id.* He believed that "if a Satanic organization applied for funds . . . [i]t would sink the whole program." *Id.*

Misicko and Soling met in 2012 and immediately "bonded over a shared distaste for organized religion and an inclination to fight back with mischief." Ex. 26, TST Dep., dep. ex. 55 at 4. They formed TST and conceived what they acknowledge to be its first "campaign," the so-called "Rally for Governor Rick Scott." *Id.* at 77; *see id.* at 65-72; Ex. 45, Mock Scott Rally. TST "created this mock rally . . . where we were coming out to say how happy we were because now our Satanic children could pray to Satan in school" after Gov. Scott signed a bill authorizing students to give inspirational messages at school assemblies. Ex. 26, TST Dep., dep. ex. 55 at 4. A casting call was posted to the website Actor's Access to find actors to play Satanic "minions" at the "rally." Ex. 32, Misicko Dep., at 15. The second "campaign" was a so-called "pink mass" on top of the grave of a deceased woman, Ms. Catherine Johnson. Ex. 26, TST Dep., at 72-79. TST claimed that the contrived ritual "change[d] [Ms. Johnson's] sexual orientation . . . in the afterlife." Ex. 26, TST Dep., at 73 & dep. exs. 11, 13. It involved two (ostensibly) same-sex couples kissing over the top of the gravestone and Misicko placing his genitals on it. *Id.* at 72-79 & dep. ex. 11, 13. This stunt resulted in a warrant being issued for Misicko's arrest for grave desecration. *Id.* at 78.

TST's modus operandi is to use threats of litigation to suppress expression with religious significance. For example, shortly after the Supreme Court upheld the Town of Greece's practice of prayer at town board meetings in *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565 (2014), TST sought to deliver an invocation there in hopes of stopping the practice. Ex. 26, TST Dep., at

85-87 & dep. ex. 16. Indeed, TST frequently trolls municipalities that have such invocation prac-
tices. *See id.* at 198 (effort to give invocation in Scottsdale, Arizona, city council meeting); *Sa-
tanic Temple v. City of Boston*, No. 1:2021-cv-10102 (D. Mass.) (effort to give invocation in
Boston city council meeting).

As a counter to the Supreme Court's decision in *Good News Club v. Milford Central
School*, 533 U.S. 98 (2001), TST announced that it would sponsor what it called an "After
School Satan" (not coincidentally: "ASS") Club in public schools—but *only* in schools where
there was already a Good News Club (i.e., an evangelical-Christian after-school group). Ex. 26,
TST Dep., at 90-100. Misicko admitted, "[W]e only offer our club in schools where the evangeli-
cal presence already exists." Ex. 32, Misicko Dep., dep. ex. 12 at 5. Misicko created a disturbing
video purportedly to promote the After School Satan Club, incorporating devil-worship tropes.
Ex. 46, After School Satan Video; Ex. 26, TST Dep., at 94-100. TST wanted people who
"freaked out" at the video to rethink giving permission to the Good News Club to meet in their
school so they would not be forced to allow an After School Satan Club as well.[8] *Id.* at 99-100.

This lawsuit is not TST's first effort to remove a Ten Commandments monument by pre-
senting a Baphomet monument as its foil. After Oklahoma installed a Ten Commandments mon-
ument on its Capitol grounds, the local ACLU sued to remove it. *Prescott v. Okla. Capitol Pres.
Comm'n*, 2015 OK 54, 373 P.3d 1032 (Okla. Sup. Ct. 2015) (per curiam). Wanting to appear to
be in on the action, TST courted media attention by applying to erect its Baphomet monument.

---

[8] In 2015, TST members similarly sought to protest high-school football coach Joe Ken-
nedy's practice of praying after football games by requesting to conduct an invocation on the
football field. *See* https://www.cbsnews.com/news/satanists-to-attend-high-school-game-over-
prayers-on-field/. Notably, the Supreme Court held that the school's decision to punish Coach
Kennedy for his prayer practice violated the Free Exercise Clause. *Kennedy*, 142 S. Ct. at 2422.

*See id.* at 1045 n.8; Ex. 27, Okla. Records, at 7-16. TST "meticulously contrived a legal argument for the inclusion of the Baphomet on the Oklahoma Capitol grounds" that it believed "paralleled the 10 Commandments' Bill in every way." Ex. 32, Misicko Dep., at 132 & dep. ex. 12 at 13. It expressly sought to place the Baphomet monument only "where there is a pre-existing 10 Commandments monument." Ex. 32, Misicko Dep., dep. ex. 12 at 4; Ex. 26, TST Dep., at 130. Therefore, when, in July 2015, the Oklahoma Supreme Court ordered the removal of the Ten Commandments monument on state-law grounds, *see Prescott*, 2015 OK 54, at ¶ 6, 373 P.3d at 1034, TST withdrew its request to place the Baphomet monument in Oklahoma and instead set its sights on Arkansas. Ex. 26, TST Dep., at 131.

 *The Baphomet Monument.* TST's Baphomet monument depicts a winged goat, seated and flanked by two adoring children. In August 2015, after unveiling the monument at a party in Detroit, Michigan, Exs. 47, 48, TST sent a letter to Arkansas's Secretary of State asking to place it on the Capitol grounds. TST maintained that "[t]he Baphomet statue has the *wholly secular purpose* of promoting an understanding and appreciation of the history and evolution of law in the United States." Ex. 25 at 2 (emphasis added). A year later, TST submitted an application to place such a monument. Ex. 14 dep. exs. 1 & 2. It mockingly requested that the Baphomet monument be placed "[d]irectly in front of the proposed 10 Commandments monument (within 1 foot)." *Id.*

 The Capitol Arts and Grounds Commission's subcommittee II considered TST's application at its October 12, 2016, meeting. Ex. 16. There, TST emphasized, "Baphomet is meant to complement and contrast the Ten Commandments monument if the Ten Commandments monument is to go up. If the Ten Commandments monument does not go up, we withdraw our case . . . ." *Id.* at 38; *see id.* at 37, 53-54. In due course, the subcommittee voted to move

forward, Ex. 21 at 10, and the Commission Chair explained that regardless of how the Commission ultimately voted, existing law required that any new monument must be approved by an act of the General Assembly. Ex. 21 at 11-12.

Yet TST made no effort to comply with that requirement. Instead, it waited until February 2017, after the Arkansas General Assembly had adopted the Vetting Efficiency Act (discussed below), to seek any sponsorship. And even then, that effort consisted of nothing more than an email from TST member Mason Hargett (from his Gmail account) to all members of the General Assembly threatening litigation if the legislature failed to approve the Baphomet monument. *See* Ex. 34, Hargett email, at 23, 35 & dep. ex. 2 (sent February 27, 2017). The email contained no personal contact information and did not seek to arrange a personal meeting with the legislators but merely "request[ed] that you contact us before the end of the current Legislative session as to whether you wish to sponsor our monument proposal or not." *Id.*

No other efforts were made to obtain support for the Baphomet monument in the General Assembly until, nearly two months later, when Misicko sent a second mass email—this time arguing that if legislators did not sponsor its monument "the 10 Commandments monument will be deemed illegal and will come down." Ex. 28, Misicko email; *see* Ex. 34, Hargett Dep, at 38. That email stated, "We are simply establishing our due diligence." Ex. 28, Misicko email.

TST made no further effort to seek a sponsor during either the 2017 legislative session or any subsequent session. Ex. 26, TST Dep., at 22-23; Ex. 34, Hargett Dep., at 23.

### THE VETTING EFFICIENCY ACT

Responding to concerns about the efficiency of the process of vetting applications for monuments on the capital grounds, the General Assembly adopted Act 274 of 2017, the Vetting Efficiency Act, to simplify the monument-application process. Ex. 22; *see* Ark. Code Ann. 22-3-

503. It required that legislative approval—the most challenging hurdle for applications—be obtained first. That ensures that private sponsors and the Commission don't waste resources on vetting potential monuments that lack the support of the General Assembly. Ex. 14, Boyd Dep., at 90; *see also* Ex. 18 at 15-17; Ex. 23 at 18-20.

That Act did not require any applicant to begin the approval process over again. Nor did any applicant lose the benefit of any work that it had done prior to that point. And no additional steps were added to the process.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The movant bears the initial burden of demonstrating the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute only exists where the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

ARGUMENT

Arkansas's Ten Commandments monument stands in the established tradition of recognizing the important role religion plays in our nation's heritage. *Am. Legion*, 139 S. Ct. at 2085. Plaintiffs lack standing to challenge that monument, and in any event their claims fail on the merits. This Court should grant summary judgment to Secretary Thurston.

# I.   Plaintiffs lack standing.[9]

"Standing is a 'threshold inquiry' and 'jurisdictional prerequisite that must be resolved before reaching the merits of a suit.'" *Medalie v. Bayer Corp.*, 510 F.3d 828, 829 (8th Cir. 2007) (quoting *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007)). Plaintiffs bear the burden to establish standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and must show standing for each claim. *Webb as next friend of K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019). At the summary judgment stage, Plaintiffs cannot rest on allegations, but must set forth specific facts. *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561) (quotation and citation omitted).

For standing, Plaintiffs must show: (1) an injury-in-fact that is "concrete and particularized,"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that a favorable decision will redress the injury. *Lujan*, 504 U.S. at 560-61. Additionally, as a prudential matter, courts "refrain[] from adjudicating abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches" and to have standing "the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee" and that the plaintiff asserts his own rights and interests. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982) (citations omitted); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Plaintiffs cannot carry this burden.

---

[9] The Orsi plaintiffs assert a claim under the Arkansas Constitution. DE 1 at 18 ¶ 57. Because Article III standing is necessary for a federal court to have jurisdiction, *see Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1546-47 (2016), the standing analysis that follows equally invalidates their state-law claim.

### A.   Offended-observer standing relies on an obsolete legal standard.

Plaintiffs claim offended-observer standing based on the theory that "if the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion, then such an observer must be able to sue." *Am. Legion*, 139 S. Ct. at 2101 (Gorsuch, J., concurring in the judgment). But the Supreme Court never adopted that theory, and *Kennedy v. Bremerton School District* expressly overruled *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and the derivative endorsement test. 142 S. Ct. 2407, 2427-28 (2022). "The Establishment Clause does not include anything like a 'modified heckler's veto, in which . . . religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" *Id.* at 2427 (quoting *Good News Club*, 533 U.S. at 119). With *Lemon* overruled, *Valley Forge* controls. 454 U.S. at 471, 482, 485; *see generally Am. Legion*, 139 S. Ct. at 2103 (Gorsuch, J., concurring in the judgment) ("With *Lemon* now shelved, little excuse will remain for the anomaly of offended observer standing, and the gaping hole it tore in standing doctrine in the courts of appeals should now begin to close."). The same standing requirements that apply generally to constitutional claims certainly apply to Establishment Clause claims. *Valley Forge*, 454 U.S. at 489 ("[W]e know of no principled basis on which to create a hierarchy of constitutional values or a complementary 'sliding scale' of standing."). Therefore, Secretary Thurston is entitled to summary judgment.

### B.   Plaintiffs cannot manufacture standing through self-inflicted injury.

Even under the offended-observer standard, Plaintiffs' intentional encounters with the Ten Commandments monument can't confer standing. Under that framework, Plaintiffs would have to demonstrate "direct and unwelcome personal contact with the monument." *Red River Freethinkers v. Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012) ("*Freethinkers I*").

But personal contact "cannot be manufactured for the purpose of litigation." *Barber v. Bryant*, 860 F.3d 345, 354 (5th Cir. 2017); *see Ctr. for Biological Diversity v. EPA*, 937 F.3d

533, 541 (5th Cir. 2019) ("[S]omeone who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it."). That's because the "Establishment Clause does not provide [Plaintiffs] a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." *Valley Forge*, 454 U.S. at 487; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (litigants "cannot manufacture standing merely by inflicting harm on themselves"); *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."); *Am. Atheists, Inc. v. Thompson*, No. CIV-14-42-C, 2015 WL 1061137, at *1 (W.D. Okla. Mar. 10, 2015) (plaintiff who sought out Ten Commandments monument lacked "the direct injury required for standing").

Yet that's exactly what happened here. Each of the individual Plaintiffs purposefully sought out the Ten Commandments monument after hearing about it. This is true, for example, of Plaintiffs Cave and Piazza. *See* Ex. 36, Cave Dep., at 81 ("[W]e wanted to see it."); Ex. 38, Piazza Dep., at 67 ("We *all* wanted to see it." (emphasis added)); *id.* at 68 "(the "visit to the monument . . . *wasn't an unwelcome thing*." (emphasis added)); *id.* dep. ex. A (discussing Plaintiffs' plan to "meet at Community Bakery at 7 for a walk to the state capitol to view the resurrection of our favorite monument.").

Others also did not sustain unwelcome contact with the Ten Commandments monument. For instance, Plaintiff Orsi's purposeful contact with the monument before filing suit involved a detour to see the monument that was motivated by her intense belief in the monument's unconstitutionality. *See* Ex. 40, Orsi Dep., at 30-32, 58, 60. The same is true of Plaintiff Stewart. *See* Ex. 41, Stewart Dep., at 28-29, 52, 68. That said, Stewart does *not* actually find the monument offensive or alienating. *See id.* at 62; *id.* at 66-67 (planned a candlelight vigil at the monument); *see also id.* at 58-59 (she is a "big fan" of the King James Bible and wore a Ten Commandments

necklace). Plaintiff Levy similarly encountered the monument only when he went specifically to see it. Ex. 42, Levy Dep., at 42-43, 45, 68-69. And Teresa Gryder likewise deliberately sought out the monument, explaining to her husband, "We need [to] stop and look at that one, because I really need to take a look at this."[10] Ex. 43, Gryder Dep., at 26-27, 31, 31, 62.[11]

Intervenors Misicko and Robbins purposefully sought out the monument as well. Misicko traveled from Massachusetts with the object "to see the Ten Commandments Monument be installed,"[12] along with Robbins. Ex. 32, Misicko Dep., at 55, 58, 60-61, 154; Ex. 33, Robins Dep., at 19-20, 32-33, 81. In fact, after arriving in Little Rock, Misicko did not wait for the monument's installation. Rather, the night before, Misicko searched out the uninstalled monument on the back of a flatbed truck, climbed aboard, and "took a selfie" with it. Ex. 32, Misicko Dep., at 61-62.

The individual Plaintiffs' contact with the monument was not unwelcome. *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (contact must be "uninvited" to be unwelcome); *Am. Atheists*, 2015 WL 1061137, at *1. Plaintiffs cannot convert their generalized opposition to the monument into an injury-in-fact by seeking out the object of their offense. *Ctr. for Biological Diversity*, 937 F.3d at 540-41; *see also Clapper*, 568 U.S. at 416. Further,

---

[10] Gryder's other visits to the Arkansas Capitol occurred either before the monument existed, Ex. 43, Gryder Dep., at 38, or after the lawsuit was filed. *Id.* at 40-41.

[11] For his part, Plaintiff Nixon has never seen the Ten Commandments monument in person, and even if he had, seeing the monument would not make him feel excluded or alienated. Ex. 44, Nixon Dep., at 37, 39, 52; *see Valley Forge*, 454 U.S. at 485-86; *Freethinkers I*, 679 F.3d at 1023.

[12] Other intentional visits occurred after the litigation began. Ex. 32, Misicko Dep., at 58-59; 60-61; Ex. 34, Hargett Dep., at 14. And although Robbins visits the Capitol occasionally to picnic, she does not pass the monument. She parks behind the Capitol and uses a picnic area behind the Capitol and down the hill from the Ten Commandments monument. *See* Ex. 33, Robbins Dep., at 35. The route between the parking lot and the picnic area does not pass the monument. *See id.* dep. ex. A.

contact sufficient to establish standing must also "occur in the course of a plaintiff's regular activities" and "cannot be manufactured for the purpose of litigation." *Barber*, 860 F.3d at 354. Plaintiffs all lack a cognizable injury-in-fact because they deliberately sought the monument out—often going to great lengths to do so. *See Valley Forge*, 408 U.S. at 487. Therefore, this Court should grant summary judgment to Secretary Thurston.

      **C.**    **The organizational Plaintiffs lack associational standing.**

      Associational standing to bring suit exists where a group (1) has members who meet the standing requirements themselves; (2) the lawsuit is pertinent to the organization's purpose; (3) and neither the claim nor the relief requested requires individual participation in the case. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Freethinkers I*, 679 F.3d at 1022. To satisfy the first requirement, each entity must "show that one of its members has individual standing." *Owner-Operator Indep. Drivers Ass'n v. Dep't of Transp.*, 878 F.3d 1099, 1101 n.2 (8th Cir. 2018).

      The Freedom from Religion Foundation, American Humanist Association, the Arkansas Society of Freethinkers, and TST each fail to meet this standard. The Freedom From Religion Foundation and American Humanist Association advance Plaintiff Orsi as a member with standing, while the Arkansas Society of Freethinkers advances Plaintiffs Orsi and Gryder. DE 1 at 5 ¶ 17a, 7 ¶ 17d; *see* Ex. 41, Stewart Dep., at 23 (not a member of organizational Plaintiffs); Ex. 42, Levy Dep., at 32 (same). Neither the Freedom From Religion Foundation, the American Humanist Association, nor the Arkansas Society of Freethinkers have come forward with evidence that any members have sustained unwelcome contact with the monument. *See* DE 1 at 8-9 ¶ 17h-j; *Freethinkers I*, 679 F.3d at 1023. Because, as discussed above, neither Orsi nor Gryder have standing in their own right, the Freedom From Religion Foundation, the American Humanist Association, and the Arkansas Society of Freethinkers fail to demonstrate associational standing.

And as explained below, TST similarly lacks standing because Misicko and Robbins lack individual standing. Accordingly, all organizational Plaintiffs lack standing, and Secretary Thurston is entitled to summary judgment.

> **D.     The Satanic Temple lacks standing.**

TST and its members lack standing any of their claims, and this Court should dismiss them from this case. Indeed, reflecting its own skepticism of TST's ability to pursue this case, when TST and its members intervened, this Court was careful to recognize that its analysis of their standing was applicable only at that early stage of the litigation. *See, e.g.*, DE 38 at 19, 21. It's now clear TST and its members lack standing.

*1. The Satanic Temple isn't a real entity.* TST isn't a legally recognized entity with the ability to sue. As reflected in the style of this case, "The Satanic Temple" is a purported Intervenor. But Intervenors themselves assert that "[t]here is *no* entity named 'The Satanic Temple'" and "The Satanic Temple" is actually an "umbrella term" for a "constellation" of affiliated entities. DE 217 at 19 (emphasis added). Yet, despite that being their basis for intervention, the Intervenors also concede that "the affiliate entities are *not* parties to this lawsuit. The party is 'The Satanic Temple.'" DE 193 at 2. And while Intervenors attempt to sidestep that problem entirely by simply asserting that TST is a "religion," DE 89 at 3 ¶ 5, a religion—without more—cannot bring a lawsuit either. Only an actual entity can, and that's lacking here.

TST is an abstraction, and abstractions cannot sue. *See Moore v. Matthew's Book Co. Inc.*, 597 F.2d 645, 646 (8th Cir. 1979). To the contrary, "[i]n every action there must be a real plaintiff who is a person in law and is possessed of a legal entity or existence as a natural, artificial, or quasi-artificial person, and a suit brought in the name of that which is not a legal entity is a mere nullity." *Peacock, Inc. v. Hasko*, 184 Cal. App. 2d 142, 151-52 (Cal. Dist. Ct. App. 1960) (quoting 67 Corpus Juris Secundum (Parties) at 896).

*2. The Satanic Temple caused its own injury.* TST failed to get approval of its Baphomet statute not because the Commission discriminated against it but because it failed to get legislative approval. Ex. 26, TST Dep., at 21-22. TST was aware of that requirement. Ex. 21 at 11-12. Yet aside from a couple vaguely menacing emails asking all members of the General Assembly to contact it before the end of the legislative session or risk litigation, TST made no efforts to secure a legislative sponsor—let alone drum up support. Ex. 34, Hargett Dep., at 23, 35 & dep. ex. 2; Ex. 28. In fact, TST sent offensive replies to legislators who responded to its emails. Exs. 29, 30. It is, therefore, no surprise that Plaintiffs allege that "[n]o member of the General Assembly [was] willing to assist in the efforts of bringing the Baphomet Monument to the capitol grounds." DE 89 at 7 ¶ 34. Because that self-inflicted harm cannot manufacture standing, TST cannot sue. *Clapper*, 568 U.S. at 416.

*3. Misicko and Robbins have not been personally injured.* Individual Intervenors Misicko and Robbins have not personally been denied equal treatment. They did not personally apply to place the Baphomet monument on the Capitol grounds, and they do not allege that TST's application was their attempt to exercise any constitutional right. *See, e.g.*, Ex. 32 at 7. At most, Misicko and Robbins suffered a "generalized psychological injury" causing offense (though they have not even alleged that they were *offended*). But that's not enough for standing in equal-protection cases. *Allen v. Wright*, 468 U.S. 737, 755 (1984).[13]

*4. The Satanic Temple lacks associational standing.* TST "is suing solely in an associational capacity," not stating claims based on a purported injury to itself as a party that unsuccessfully sought to place the Baphomet monument. DE 99 at 5. Thus, because its members Misicko

---

[13] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) abrogated *Allen* on other grounds, but it remains good law and federal courts frequently rely on it.

and Robbins don't have standing to bring an equal-protection claim, it doesn't either. *Valley Forge*, 454 U.S. at 477 n.14.

*4. Removing the Ten Commandments monument wouldn't remedy Intervenors' alleged injury.* The Ten Commandments monument has nothing to do with TST's failure to place the Baphomet monument; tearing down the first would not magically erect the second. So Intervenors lack standing to seek removal of the Ten Commandments monument on equal-protection grounds. *See Women for American First v. De Blasio*, No. 20 CIV. 5746(LGS), 2021 WL 634695, at *4 (S.D.N.Y Feb. 18, 2021) (holding plaintiffs lacked standing to forbid "Black Lives Matter" murals because it would not redress any free-speech injury).

## II.    The Ten Commandments monument fits with history and tradition.

Even if the Plaintiffs had standing (and they do not), their claims fail on the merits. Plaintiffs sue under both the federal Establishment Clause and the substantively identical provision of Arkansas's Constitution.[14] *Cf. Viravonga v. Samakitham*, 372 Ark. 562, 569, 279 S.W.3d 44, 49 (2008) (applying federal precedent to a claim under article II, section 24 of the Arkansas Constitution). Plaintiffs' complaints are uniformly framed in terms of the obsolete *Lemon* and "endorsement" tests. *See* DE 20; DE 89; *Orsi v. Thurston*, No. 4:18-cv-00343-KGB, ECF 1. But last year, the Court unequivocally overturned both. *Kennedy v. Bremerton. Sch. Dist.*, 142 S. Ct. at 2427-2428. "In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings." *Id.*

---

[14] Plaintiffs' state-law claims are barred by sovereign immunity because *Ex parte Young*'s exception to sovereign immunity is "inapplicable in a suit against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also See Minnesota Voters All. v. Walz,* 492 F. Supp. 3d 822, 833 (D. Minn. 2020) (sovereign immunity barred claim brought under Minnesota's constitution). Further, all of Plaintiffs' federal claims are barred by sovereign immunity because there is no "ongoing violation of federal law." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

at 2428 (quotation omitted); *see also American Legion*, 139 S. Ct. at 2082, 2089 (plurality). A monument can pass that test regardless of when it was erected. *See, e.g.*, *Town of Greece*, 572 U.S. at 570, 584, 591-92 (holding that that a town's prayer practice of recent vintage did "not fall outside the tradition this Court has recognized"); *Woodring v. Jackson Cnty., Ind.*, 986 F.3d 979, 995-96 (7th Cir. 2021) (upholding 15-year-old nativity scene).

Plaintiffs do not—and cannot—claim that the Ten Commandments monument falls outside of the longstanding tradition of publicly recognizing our nation's religious and moral heritage. *See id*. at 2085; *Town of Greece*, 572 U.S. at 577. The Ten Commandments are displayed widely in local, state, and federal buildings across the country. *See* Ex. 1, Ruegemer Decl., at 4-5 ¶ 13; Ex. 3, Hall Report, at 43-59 ¶¶ 95-106 & n.260; Ex. 4 at 1; Ex. 5 at 1-2; Ex. 7; Ex. 11. The Supreme Court has repeatedly noted that the Ten Commandments "have historical significance as one of the foundations of our legal system" and, thus, that Ten Commandments monuments are presumptively constitutional. *American Legion*, 139 S. Ct. at 2082-83; *accord Van Orden*, 545 U.S. at 689-90 (plurality). In fact, Arkansas's monument is *identical* to monuments upheld by the Supreme Court and Eighth Circuit. Ex. 13, Ware Aff., aff. ex. I-ll; Ex. 18 at 8-10; *Van Orden*, 545 U.S. at 736 (appendix to opinion of Stevens, J., dissenting) (photograph of Texas monument); *Freethinkers II*, 764 F.3d at 949 (upholding an Eagles-donated Ten Commandments monument with an identical design); *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 778 (8th Cir. 2005) (en banc) (same).

There is no "evidence of discriminatory intent in the selection of the design of the memorial or the decision of [Secretary Thurston] to maintain it," *Am. Legion* 139 S. Ct. at 2074, or evidence it was designed to "deliberately disrespect[]" others. *Id.* at 2089. To the contrary, the monument was the product of a respectful, ecumenical effort to develop a nonsectarian version of the

Ten Commandments. Ex. 1, Ruegemer Decl., at 3-4. The Ten Commandments monument plainly

fits within the longstanding tradition of displaying the Ten Commandments on public grounds

across the Nation. So this Court should reject Plaintiffs' claims and grant summary judgment to

Secretary Thurston.

## III.   Intervenors have not been denied equal protection.

Because Arkansas erected a Ten Commandments monument, TST argues, the State vio-

lated equal protection by not erecting its foil—the Baphomet monument—too. That is wrong.

For one, that's a free-speech claim, not an equal-protection one. And when the government

speaks for itself, it need not promote messages with which it disagrees. Besides, TST hasn't

shown that Arkansas treated its Baphomet monument differently from the Ten Commandments

monument in any way. And even if TST could point to differential treatment, that differentiation

would trigger only rational basis review—which it can't meet.

### A.   Arkansas need not sponsor messages with which it disagrees.

TST cites the Equal Protection Clause, but that's an odd fit for its allegations because it

repeatedly complains about supposed *viewpoint* discrimination—that accepting the Ten Com-

mandments monument requires accepting the Baphomet monument. *See* DE 89 ¶ 38; Ex. 26,

TST Dep., at 21, 22; Ex. 30. That is a First, not Fourteenth, Amendment claim. But TST couldn't

win under the First Amendment—and it doesn't fare any better dressing up its speech claims as

equal-protection ones instead.

The Capitol grounds aren't a public forum open to everyone; placing monuments there is

government speech under *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464 (2009).

Like Pleasant Grove, Arkansas is quite selective about which monuments it accepts. *Id.* at 470,

471. It imposes "prior submission requirements" and requires "design input, requested modifica-

tions, written criteria, and *legislative approvals of specific content proposals*." *Id.* at 472 (emphasis added). It has no obligation to erect monuments with which it disagrees. *Id.* at 479; *cf. Shurtleff v. Boston*, 142 S. Ct. 1538, 1590, 1592 (2022). TST can't avoid this conclusion by naming the Equal Protection Clause instead of the Free Speech Clause.[15]

## B.  Arkansas didn't deny the Satanic Temple equal protection.

To state an equal-protection (not free-speech) claim, TST would have to show that it was denied "the equal protection of the laws"—here, an equal opportunity to submit its Baphomet monument for review. U.S. Const. amend. 14. To do so, it tries two arguments. First, it says the General Assembly singled it out for religious discrimination by imposing new requirements in the Vetting Efficiency Act. DE 89 ¶ 29. Second, it says that the Ten Commandments monument was exempted from other requirements it had to meet. *Id.* ¶ 35. Both claims are false.

*1. The Vetting Efficiency Act did not deny TST equal protection.* TST says that the Vetting Efficiency Act changed the rules to stop it from placing its Baphomet monument. Not so. The Act kept in place the two pre-existing conditions for placing a monument on Capitol grounds: (1) the General Assembly has to authorize the monument and (2) it has to pass review by the Capitol Arts and Grounds Commission. Ark. Code Ann. 22-3-503. And it did not add any new hurdles. It simply fixed the *order* monument applicants had to follow. Before the Act, TST had to meet both requirements at some point; after, it had to get General Assembly approval first. Ex. 22 at 1.

---

[15] At least five federal courts of appeal have rejected the possibility of equal-protection challenges to government speech. *See Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017); *Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 707 F.3d 686, 698 (6th Cir. 2013); *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 970, 974-75 (9th Cir. 2011); *Simpson v. Chesterfield Cty. Bd. of Sup'rs*, 404 F.3d 276, 288 (4th Cir. 2005).

Fixing that order didn't disadvantage the Baphomet monument. To the contrary, the Commission explained that it would "pick back up" where its review of the monument had left off if TST secured legislative approval. Ex. 18 at 15-17. Requiring legislative approval first ensured that applicants and the Commission wouldn't waste their time and money working on monuments that may not get legislative approval. *See id.*; Ex. 14, Boyd Dep., at 90-91, dep. exs. 5-8 (explaining the Commission's requirements); Ex. 23 at 18-20.

   *2. The Ten Commandments monument received no special treatment.* TST baselessly asserts that the Ten Commandments monument was exempted from requirements that the Baphomet monument had to meet. That is false. In fact, in his deposition as TST's representative, Misicko could not identify *any* requirement the Baphomet monument had to meet that the Ten Commandments monument was exempted from. Ex. 26, TST Dep., at 15-16.

   Still, TST misrepresents language in the Ten Commandments Monument Display Act to make it appear as if the Ten Commandments monument received special treatment. The Act provides that the Ten Commandments monument "shall be exempt from §§ 22-3-301 et seq. and 22-3-501 et seq." Ex. 2; *see* Ark. Code Ann. 22-3-221(b)(4)(B). But those cross-references have nothing to do with monument approvals. The first cites to laws governing the Capitol Zoning Commission, which has "nothing to do with monuments." Ex. 14, Boyd Dep., at 178-80. The second cites to laws governing the Capitol Arts and Grounds Commission, which is responsible for approving monuments. But that language didn't exempt the Ten Commandments monument from the usual vetting process—not when the previous sentence required the Secretary of State to "consult the Capitol Arts and Grounds Commission and obtain the commission's views on design and site selection." Ex. 2; *see* Ark. Code Ann. 22-3-221(b)(4)(A); Ex. 14, Boyd Dep., at 96 (interpreting the Act to require the usual vetting process). Indeed, the Secretary of State required

the Commission to vet the Ten Commandments monument just like all other proposed monuments.

### C.      Any differential treatment would pass muster.

Even if TST could show differential treatment (and it cannot), any differentiation would survive this Court's review. TST certainly wasn't discriminated against on the basis of religion—and at any rate, it is a parody of religion not entitled to suspect-class status. And both the Vetting Efficiency Act and Ten Commandments Monument Display Act easily pass rational basis review.

### 1.      Heightened scrutiny does not apply.

For heightened scrutiny to apply, TST would have to plausibly allege religious discrimination. But it cannot, for two reasons. First, TST's failure to gain legislative approval for its Baphomet monument was not religious discrimination. TST did not make a good-faith effort to obtain legislative support: legislators reasonably ignored its vague and threatening emails. And legislators had legitimate reasons for declining to sponsor legislation for the monument: some declined because they lacked the political capital to get such legislation passed or because they didn't want to add to the crowding of statues on the Capitol grounds. Ex. 34, Hargett Dep., dep. ex. 2.

Second, TST is not a religion. TST has described itself as "less of a church and more of an affinity group." Ex. 26, TST Dep., dep. Ex. 56 at 4-5. Though it bears Satan's name, it "do[es] not promote belief in a personal Satan" or any other supernatural entity. Ex. 26, TST Dep., dep. ex. 9 at 3; *Meyers*, 95 F.3d at 1483. It has no scripture, sacred text, or holy writ. Ex. 26, TST Dep., at 226-27. It has no initiation; becoming a member is "about as easy as purchasing a shirt on Etsy." Ex. 32, Misicko Dep., dep. ex. 8 at 1. Indeed, its members may hold different individual religious beliefs. *See* Joseph P. Laycock, *Speak of the Devil: How the Satanic Temple is*

*Changing the Way We Talk About Religion* (2020); Ex. 26, TST Dep., at 28-29, 84. It has no required rituals. Ex. 26, TST Dep., at 51-52 & dep. ex. 9 at 5.

TST is an anti-religious group that "actively fights for . . . secular values." Ex. 32, Misicko Dep., at 133-34 & dep. ex. 13 at 3. Not surprisingly, TST's letter to the Secretary of State maintained that "[t]he Baphomet statue has [a] *wholly secular purpose*." Ex. 25 at 2 (emphasis added). It works to further that purpose by closing public schools as meeting spaces for after-school religious groups, trolling municipalities that open council meetings with prayer, and presenting the Baphomet monument as a foil to Ten Commandments monuments on State Capitol grounds. *See* Ex. 32, Misicko Dep., dep. ex. 12 at 13; Ex. 27, Okla. Records. TST's goal is not religious inclusion but religious censorship.

Although it is not necessary for a religion to prescribe belief in the existence of God, *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961), the law does require distinguishing between religious and nonreligious beliefs. *United States v. Seeger*, 380 U.S. 163, 165 (1965). Therefore, "a court must, at least to a degree, examine the content of the supposed religion, . . . to determine whether the subject matter it comprehends is consistent with the assertion that it is, or is not, a religion." *Africa v. Pennsylvania*, 662 F.2d 1025, 1035 n.18 (3d Cir. 1981) (quotation omitted). TST will protest that it holds strong beliefs. But strong beliefs do not a religion make. *Id.* at 1034; *see Cavanaugh v. Bartelt*, 178 F. Supp. 3d 819, 824, 829-31 (D. Neb. 2016) (holding that the Church of the Flying Spaghetti Monster, "designed to look very much like a religion," wasn't entitled to protection as a religion). Political advocacy is not worship, and an affinity group isn't a religion. So TST can't complain that Arkansas's failure to place the Baphomet statute was religious discrimination, and heightened scrutiny does not attach.

### 2.   The Vetting Efficiency Act and Ten Commandments Monument Display Act pass rational basis.

TST can't point to differential treatment. But even if the two Acts it identifies treated its monument differently from the Ten Commandments monument, that differentiation would be constitutional. For legislation that neither invades a fundamental constitutional right nor purposefully operates to the detriment of a suspect class need only be rationally related to a legitimate government interest. *Harris v. McRae*, 448 U.S. 297, 326 (1980).

The Ten Commandments Monument Display Act is certainly rational: the Ten Commandments symbolize law and moral conduct, and such public displays hold a significant place in our nation's history and traditions. So is the Vetting Efficiency Act. Capitol grounds are limited, and the State has a unique interest in requiring an applicant to demonstrate that it has substantial public support in the form of approval by the General Assembly before expending time and resources to vet an application. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 670, 683(1998); *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011)*; Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 47 (1983). Arkansas has not run afoul of the Constitution.

### CONCLUSION

The Establishment Clause doesn't require blotting religion out of the public square. Displays like the Ten Commandments monument represent our history and traditions and are perfectly constitutional. And neither the Equal Protection Clause nor any other provision requires the government to endorse a parody of religion simply because it wishes to recognize the significance of a legal and moral document with religious significance. This Court should reject all arguments to the contrary and grant summary judgment to Secretary Thurston.

Submitted: March 6, 2023

Respectfully,

TIM GRIFFIN
 Attorney General of Arkansas
NICHOLAS J. BRONNI (2016097)
 Solicitor General
DYLAN L. JACOBS (2016167)
 Deputy Solicitor General
MICHAEL A. CANTRELL (2012287)
 Assistant Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Main:  (501) 682-2007
Michael.Cantrell@ArkansasAG.gov

Hiram S. Sasser, III
Michael D. Berry
Lea E. Patterson
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel:  (972) 941-6162
Fax:  (972) 423-6162
*hsasser@firstliberty.org*
*mberry@firstliberty.org*
*lepatterson@firstliberty.org*

*Counsel for Secretary of State John Thurston*