Reply to Steven K. Green's Report

*Donna Cave v. John Thurston*

No. 4: 18-cv-00342-KGB

*Anne Orsi v. John Thurston*

No. 4: 18-cv-343-KGB

Mark David Hall

Herbert Hoover Distinguished Professor of Politics

Faculty Fellow William Penn Honors Program

George Fox University

January 24, 2020

## TABLE OF CONTENTS

The Nature of the Evidence ..................................................................................1

Why History Matters.............................................................................................7

Ten Commandments as a Source and Symbol of Law ..........................................9

Alleged Sectarian Versions of the Ten Commandments ....................................21

Conclusion ..........................................................................................................23

1.   The historic understanding of the First Amendment permits a State to erect, or allow to be erected, a Ten Commandments monument on public property.  Such a practice is "deeply embedded in the history and tradition of this country"[1]  Nothing in Professor Steven K. Green's rebuttal report provides a substantive challenge to these conclusions of my principal report.[2]

## The Nature of the Evidence

2.   Professor Green fundamentally mischaracterizes the nature of the evidence presented in section IV of my report ("The Historical Understanding of the Establishment Clause").  He states that I "invite[] the Court to make conclusions about the constitutionality of modern Ten Commandments monuments based on a narrative that asserts a high degree of religiosity among members of the founding generation and their use of religious rhetoric."[3]  But my report does not rely on the religiosity of the founding generation, and it does not consider merely rhetorical uses of religious language.  Instead, it offers a 28-page discussion of a number of concrete actions, laws, and constitutional provisions that demonstrate that America's founders had no desire to build a wall of separation between church and state.[4]  They opposed the creation of a national church, and many objected to state establishments as well, but in their public life they consistently acknowledged religion's role in society. Brief reflection on the significance of a few events discussed in my principal report underscores the differences between my arguments and Professor Green's mischaracterizations.

---

[1] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

[2] Mark David Hall, First Supplemental Report (November 18, 2019).

[3] Steven K. Green, Report (December 6, 2019), ¶ 12.

[4] Hall, Report, ¶¶ 28-91.

3.   Beginning in paragraph 75 of my report, I describe the congressional debate over the propriety of asking President Washington to issue a Thanksgiving Day proclamation.  That debate—which took place in the House of Representatives just a day after representatives agreed on language that would become the First Amendment—is *not* important because members of Congress thought prayer was a good, useful, or virtuous practice.  Rather, it is significant because it shows that the representatives and senators who proposed what became the First Amendment did not think presidential Thanksgiving Day Proclamations were inappropriate or unconstitutional.[5]  It also reveals that America's first president did not think that it was inappropriate or unconstitutional to issue a Thanksgiving Day Proclamation brimming with religious claims such as "it is the duty of all nations to acknowledge the providence of Almighty God, to obey His will, to be grateful for His benefits, and humbly to implore His protection and favor."[6]

4.   Similarly, the importance of Thomas Jefferson's decision to attend church services in the U.S. Capitol is *not* that he and members of Congress went to church.[7]  If they had merely attended local Anglican, Presbyterian, or Methodist churches, their actions would tell us nothing about their views of church–state relations.  However, Congress's willingness to let the Capitol be used for church services, and Jefferson's decision to attend them, shows that these civic leaders did not think these actions were either inappropriate or unconstitutional.  That Jefferson went to church services in the U.S. Capitol two

---

[5] Hall, Report, ¶¶ 75-78.

[6] *Ibid.*, ¶ 77.

[7] *Ibid.*, ¶¶ 83-85.

days after he penned his famous letter to the Danbury Baptist Association suggests that even he was not the sort of separationist that contemporary separationists wish him to be.

5.   Professor Green recognizes that members of the "founding generation were biblically literate" and that "religious imagery infused public discussions."[8]  My report identifies biblical references that did not contain citations in the original texts (for instance, in President Adams's 1799 call for prayer and President Madison's 1813 call for prayer).[9]  The point of calling attention to these uses of Scripture is *not* that Adams and Madison were godly, pious men who looked to the Bible as an authority; instead, it is that neither thought that including Scripture in presidential calls for prayer was inappropriate or unconstitutional.  Like the rest of the founding generation, they did not understand the First Amendment to create a wall of separation between church and state that prevents civic leaders from using religious language or symbols in public acts.[10]

6.   Professor Green ignores the vast majority of the specific actions, laws, and constitutional provisions that I discuss, but to explain away some of them he turns to the work of a scholar widely known for his commitment to church-state separationism. Derek Davis is a former director of the J.M. Dawson Institute of Church-State Studies (named after Joseph Dawson, a founder and first executive director of Protestants and

---

[8] Green, Report, ¶ 18.

[9] Hall, Report, ¶¶ 80, 89.

[10] Madison questioned such calls for prayer in a private document written after he left the presidency that remained unpublished during his lifetime.  This text, commonly referred to the "Detached Memoranda," has little relevance to the historic understanding of the First Amendment, as I have explained in "Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment," *American Political Thought* 3 (Spring 2014): 32-63 and Mark David Hall, *Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth* (Nashville: Nelson Books, 2019), 57-120.

Other Americans United for Separation of Church and State).  Ironically, the book from which Professor Green quotes, *Religion and the Continental Congress, 1774-1789*, documents the many ways the Continental and Confederation Congresses *encouraged* religion and religious practices.  With refreshing honesty, Davis writes in the book's conclusion that "the present writer will confess that he had expected to find considerably more evidence than he did from the confederation period that would support separationist arguments."[11]  Despite that lack of evidence, Davis nevertheless asserts that "separationism . . . best captures the progressively evolving intentions of the founding fathers."[12]  That claim, which Professor Green quotes in his report, is almost completely unsupported by the evidence and arguments Davis presents in this book, and it is contradicted by the views and actions of civic officials documented in paragraphs 64-91 of my principal report.[13]

7.   As my report suggests, and as I argue in detail elsewhere, even Jefferson and Madison were not the sort of strict separationists that later separationists wish them to be.[14]  Professor Green ignores the reality that Madison voted to pay chaplains in the Confederation Congress, served on a committee to appoint chaplains in the first federal Congress, voted to pay military and congressional chaplains in the new republic, issued four

---

[11] Derek H. Davis, *Religion and the Continental Congress, 1774-1789* (New York: Oxford University Press, 2000), 202.

[12] *Ibid.*, 227.

[13] Green, Report, ¶ 20.  I provide additional evidence and arguments supporting this point in Hall, *Did America Have a Christian Founding?* and Daniel L. Dreisbach and Mark David Hall, ed., *The Sacred Rights of Conscience*: *Selected Readings on Religious Liberty and Church-State Relations in the American Founding* (Indianapolis: Liberty Fund, 2009).

[14] Hall, *Did America Have a Christian Founding?*, 57-86

presidential calls for prayer, and attended church services in the U.S. Capitol Building.[15] Whatever his later thoughts, in his public life Madison did not act as if he understood there to be a "high and impregnable" wall of separation between church and state.[16]

8.   Green complains that I "minimize" Madison's role in drafting the First Amendment.[17]   To the contrary, I state that he was an important advocate of it.[18]   However, I place his contributions in context of the many men who drafted and ratified the Amendment.[19]   Given this context, it makes little sense to interpret the First Amendment solely in light of Madison's views.   Professor Green may wish the historic understanding of the Establishment Clause could be determined simply by considering a few documents penned by Madison (and ignoring actions such as his presidential calls for prayer), but there is no good reason to accept this conclusion as a matter of history.

9.   America's founders did not wish to strictly separate church and state.   The historical evidence presented in my report—much of which Professor Green ignores—supports Professor Michael McConnell's already well-documented conclusion that the founders understood the Establishment Clause to prohibit "government control over the doctrine and personnel of the established church; mandatory attendance in the established church; government financial support of the established church; restrictions on worship in

---

[15] Hall, Report, ¶¶ 53, 89, and *Did America Have a Christian Founding?*, 81-84.

[16] *Everson v. Board of Education*, 330 U.S. 1, 18 (1947).   This is not to deny that Madison and Jefferson desired a greater degree of separation between church and state than most founders, a reality I acknowledge in paragraph 91 of my principal report.

[17] Green, Report, ¶ 22.

[18] Hall, Report, ¶¶ 66, 74.

[19] *Ibid.*, ¶¶ 65-74.

5

dissenting churches; restrictions on political participation by dissenters; and use of the established church to carry out civil functions."[20]

10. The historic understanding of the Establishment Clause prohibits States from doing things such as creating official churches, adopting religious tests for civil offices, and legislating ecclesiastical structures.  But it does not forbid them from selecting and paying chaplains, opening legislative sessions with prayer, or permitting religious organizations to participate in State-funded programs.  And there is absolutely no reason to conclude that the historic understanding of the Establishment Clause prohibits the use of religious language or images by public officials or on public property.

11. To briefly reiterate an example from my principal report, in 1776 the Continental Congress appointed Benjamin Franklin, John Adams, and Thomas Jefferson to a committee to begin the process of creating a national seal.  Jefferson, who desired a greater degree of separation between church and state than almost any other founder, proposed that the nation adopt one with the images of:

> Pharaoh sitting in an open chariot, a crown on his head & a sword in his hand, passing through the divided waters of the Red Sea in pursuit of the Israelites: rays from a pillar of fire in the cloud, expressive of the divine presence & command, reaching to Moses who stands on the shore &, extending his hand over the sea, causes it to overwhelm Pharaoh.[21]

---

[20] Michael McConnell, "Establishment and Disestablishment at the Founding, Part I: Establishment of Religion," *William and Mary Law Review* 44 (April 2003): 2131.  See also, Philip Hamburger, *The Separation of Church and State* (Cambridge: Harvard University Press, 2002), 53-107.

[21] Dreisbach and Hall, *Sacred Rights of Conscience*, 229.

His motto for the new nation would have been: "Rebellion to tyrants is obedience to God."[22] Franklin's proposal was virtually identical to Jefferson's.

12. Note that Jefferson thought it appropriate to portray a miraculous event involving the prophet Moses *on the national seal*.[23] According to Exodus 19-20, it was Moses who received the Ten Commandments from God on Mount Sinai. It thus seems unlikely that even the Sage of Monticello would have a principled objection to a State allowing a monument commemorating the Ten Commandments to be erected on public property.

## Why History Matters

13. Professor Green suggests that my principal report "makes a broad claim about the relevance of history for legal decision-making in the areas of church-state adjudication."[24] But it does no such thing. Instead, the report shows that from *Everson v. Board of Education* (1947) to *American Legion v. American Humanist Association* (2019) the United States Supreme Court has insisted that the Establishment Clause must be interpreted in light of its "generating history."[25] As well, the Court sometimes goes beyond the founding era to determine if a practice is "deeply embedded in the history and tradition of this country."[26] Professor Green's suggestion that "courts *occasionally* opine on

---

[22] *Ibid*. Jefferson "later suggested it as an alternative motto for the Great Seal of Virginia, and he later added it to his personal seal." Davis, *Religion and the Continental Congress*, 138.

[23] Exodus 14 (describing God parting the Red Sea); Deuteronomy 34:10 (referring to Moses as a prophet).

[24] Green, Report, ¶ 11.

[25] *Everson v. Board of Education*, 330 U.S. 1, 33 (1947); Hall, Report, ¶¶ 10, 10-27.

[26] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

7

the historical understanding of church–state separation" is misleading at best.[27]  Not only

does the Court regularly make historical arguments, in *Town of Greece v. Galloway*

(2014) it issued, in the words of the United States Court of Appeals for the Eighth Cir-

cuit, "an unequivocal directive" that "the Establishment Clause must be interpreted by

reference to historical practices and understandings."[28]

    14. The Supreme Court's most recent Establishment Clause decision, *American*

*Legion v. American Humanist Association* (2019), likewise emphasizes the importance of

history.  The Court there observes that justices have not relied on the *Lemon* test to re-

solve recent Establishment Clause cases, but have instead "taken a more modest approach

that focuses on the particular issue at hand and looks to history for guidance."[29]  It points

to both *Marsh v. Chambers* and *Town of Greece v. Galloway* as cases where the Court re-

lied on founding era history *and* American traditions.  It concludes that where "categories

of monuments, symbols, and practices with a longstanding history follow in that tradi-

tion, they are likewise constitutional."[30]

---

[27] Green, Report, ¶ 17 (emphasis added).  I document the Supreme Court's extensive use
of history in Establishment Clause cases in "Jeffersonian Walls and Madisonian Lines:
The Supreme Court's Use of History in Religion Clause Cases," *Oregon Law Review* 85
(2006): 563-613.  A slightly revised version of the article was reprinted in the *High Court
Quarterly Review* 5 (2009): 109-153.

[28] *New Doe Child #1 v. United States*, 901 F.3d 1015, 1020 (8th Cir. 2018) (internal quo-
tation marks omitted).

[29] 139 S. Ct. 2067, 2087 (2019).

[30] *Ibid.*, 2089.

15. Professor Green suggests that my report "invit[es] the Court to participate in a longstanding . . . scholarly debate."[31]  Again, it does no such thing, and I would not presume to do so.  Instead, section III of my report shows that the United States Supreme Court has insisted for decades that the Establishment Clause must be interpreted in light of its "generating history."[32]  As well, the Court has increasingly looked to the history of our nation to determine if a practice is "deeply embedded in the history and tradition of this country."[33]  Professor Green may not agree with such an approach, but his complaint is not with me; it is with the United States Supreme Court.

**Ten Commandments as a Source and Symbol of Law**

16. In section V of his report, Professor Green spends a great deal of space criticizing the proposition that the "commandments serve as a leading basis for American law."[34]  But I never make this claim—a fact that this section of Professor Green's report recognizes by its complete lack of any reference to my report.  But it is clearly the case that the Ten Commandments are *a* basis for *aspects* of American law.  Further, because of the close association between the Ten Commandments and law, images of them are used to represent law in a variety of contexts; including in public spaces and on public buildings.

17. Professor Green's report concedes that the Ten Commandments are a basis for some aspects of American law, acknowledging that there are "[c]ourt decisions pertaining

---

[31] Green, Report, ¶ 17.

[32] *Everson v. Board of Education*, 330 U.S. 1, 33 (1947); Hall, Report, ¶¶ 10-27.

[33] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

[34] Green, Report, ¶ 26.

to the Sabbath and other subject matter addressed in the Ten Commandments"—which of course includes both the criminal and civil law bearing on murder and the taking of human life, property rights and theft, marriage and divorce, fraud and perjury, etc.[35]

18. Some early colonial laws were directly based on the Ten Commandments and related Scriptures.  Although many examples could be given, the Laws and Liberties of Massachusetts (1647/1648) contain the following references to the Ten Commandments:

> 1. If any man after legal conviction shall HAVE OR WORSHIP any other God, but the LORD GOD: he shall be put to death. Exod. 22. 20. Deut. 13.6. & 10. Deut. 17. 2. 6.

> 2. If any man or woman be a WITCH, that is, hath or consulteth with a familiar spirit, they shall be put to death. Exod. 22. 18. Levit. 20. 27. Deut. 18. 10. 11.

> . . .

> 4. If any person shall commit any wilfull MURTHER, which is Man slaughter, committed upon premeditate malice, hatred, or crueltie not in a mans necessary and just defence, nor by meer casualty against his will, he shall be put to death. Exod. 21. 12. 13. Numb. 35. 31.

> . . .

> 6. If any person shall slay another through guile, either by POYSONING, or other such devilish practice, he shall be put to death. Exod. 21. 14.

> . . .

> 9. If any person commit ADULTERIE with a married or espoused wife; the Adulterer & Adulteresse shall surely be put to death. Lev. 20. 19. & 18. 20 Deu. 22. 23. 27.

> 10. If any man STEALETH A MAN, or Man-kinde, he shall surely be put to death Exodus 21. 16.

> 11. If any man rise up by FALSE-WITNES wittingly and of purpose to take away any mans life: he shal be put to death. Deut. 19. 16. 18. 16.[36]

---

[35] *Ibid.*, ¶ 36; see also generally ¶¶ 33-36.

[36] Dreisbach and Hall, *Sacred Rights of Conscience*, 93.

19. Massachusetts was not alone in looking to the Ten Commandments for guidance when crafting legislation.  For instance, Connecticut had capital laws very similar to Massachusetts's; including the biblical citations.[37]  The "Articles, Laws, and Orders, Virginia" (1610) were likewise informed by the commandments, but biblical citations were not included in the text of these laws.  They held, for instance, that "no man blaspheme God's holy name upon paine of death . . . ." and "no man or woman shall dare to violate or breake the Sabbath . . . ." (referencing the Third and Fourth Commandments).[38]  Even Quaker Pennsylvania enforced the Third Commandment with a 1682 law that punished individuals who "shall speak loosely and profanely of almighty God, Christ Jesus, the Holy Spirit, or the scriptures of truth . . ."[39]  This law was slightly revised in 1700, and in 1824 the Pennsylvania Supreme Court upheld a conviction for blasphemy based it.[40]  Over time, colonial and then state governments repealed some of these statutes, altered others, and removed biblical references.[41]  But the historical influence of the Ten Commandments remains clear.

---

[37] *The code of 1650, being a compilation of the earliest laws and orders of the General court of Connecticut: also, the constitution, or civil compact, entered into and adopted by the towns of Windsor, Hartford, and Wethersfield in 1638-9* (Hartford: 1822), 30-33.

[38] Dreisbach and Hall, *Sacred Rights of Conscience*, 84, 85.

[39] Quoted in Donald Lutz, ed., *Colonial Origins of the American Constitution: A Documentary History* (Indianapolis: Liberty Fund Press, 1998), 289.

[40] *Updegraph v. Commonwealth* (Pa. 1824) available in Dreisbach and Hall, *Sacred Rights of Conscience,* 561-570.

[41] David D. Hall, *A Reforming People: Puritanism and the Transformation of Public Life In New England* (New York: Alfred A. Knopf, 2011), 86-87.

20. The indelible influence of the Ten Commandments on American law is particularly evident with respect to legislation concerning the Ten Commandments' admonition to:

> Remember the sabbath day, to keep it holy.  Six days shalt thou labour, and do all thy work: But the seventh day is the sabbath of the LORD thy God: in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates: For in six days the LORD made heaven and earth, the sea, and all that in them is, and rested the seventh day: wherefore the LORD blessed the sabbath day, and hallowed it (Exodus 20: 8-11).

Historically, colonies and states have had laws prohibiting many types of work on Sunday.[42]  When upholding a statute banning a citizen from pursuing "his business or the work of his ordinary calling on the Lord's day, works of necessity or charity only excepted,"[43] the Court of Appeals of Georgia noted:

> It has been well said: ". . . The observance of Sunday is one of our established customs.  It has come down to us from the same Decalogue that prohibited murder, adultery, perjury, and theft.  It is more ancient than our common law or our form of government.  It is recognized by constitutions and legislative enactments, both State and Federal.  On this day legislatures adjourn, courts cease to function, business is suspended, and nation-wide our citizens cease from labor.  The observance of the Sabbath is regarded as essential to the proper upbuilding of the mental and physical, as well as the moral life of a great people.  Laws and ordinances respecting its observance are clearly within the genius of our institutions and the spirit of our national life."[44]

21. In the 1960s, the constitutionality of these laws was challenged on a variety of grounds—including the Establishment Clause.  In *McGowan v. Maryland,* Chief Justice

---

[42] For examples of nineteenth-century courts upholding laws based on the same commandment in the States of South Carolina, New York, Connecticut, and Georgia, see Steven K. Green, "The Fount of Everything Just and Right?  The Ten Commandments as a Source of American Law," *Journal of Law and Religion* 14 (1999-2000), 553-555.

[43] *Rogers v. State*, 4 S.E.2d 918, 920 (Ga. Ct. App. 1939).

[44] *Ibid.*, 919 (quoting Marchetti, *Law of Stage, Screen, and Radio*, 347, § 163).

Earl Warren's opinion for the Court and Justices Frankfurter and Harlan's concurring opinion provided detailed histories showing that English and American legislatures had long passed legislation to protect the Sabbath.[45]  Moreover, as late as 1961, 49 of 50 states continued have such legislation.[46]  In upholding these laws, both opinions emphasized that there are "secular justifications . . . for making Sunday a day of rest."[47]  This is certainly true, but as a matter of history these statutes have their roots in the belief that men and women should "[r]emember the sabbath day, to keep it holy."

22. Professor Green thinks it significant that the Ten Commandments were not cited at the Constitutional Convention or the ratification debates.[48]  But these debates concerned constitutional design, not criminal or civil laws.  It would make little sense to reference any of the commandments when debating topics such as the enumeration of Congress's power, federalism, or judicial review.  Even so, Professor Green neglects to note that the Constitutional Convention met every day of the week except Sunday, and

---

[45] *McGowan v. Maryland*, 366 U.S. 420, 420-543 (1961).

[46] *Ibid.*, 495.

[47] *Ibid.*, 434, 491, 507.  Justices Frankfurter and Harlan, in their concurrence, and Justice Douglas, in his dissent, specifically link Sunday closing laws to the Fourth Commandment. *Ibid.*, 470 (1961) (Frankfurter, J., concurring); *ibid.*, 566-67 (1961) (Douglas, J., dissenting).

Many of these laws have since been repealed, but some states continue to have statutes requiring businesses to be closed on Sunday, forbidding hunting on Sunday, etc. See, for instance, Maine State Title 17, §3204 (prohibiting keeping a place of business open to the public on Sunday) and Maine State Title 12, §11205 (forbidding hunting on Sunday).

[48] Green, Report, ¶ 32.

that the delegates assumed that Congress would not conduct business on Sunday.[49]  Article I, Section 7, Clause 2 of the United States Constitution stipulates that:

> If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a law.

Congress is not formally prohibited from convening on Sunday, but prior to the twentieth century the House of Representatives did so only on one occasion.[50]

23. Professor Green makes the broad assertion that there "is no significant reliance on the Commandments in early American case law."[51]  He bases this conclusion on his study of "400 church-state cases of the nineteenth century."[52]  But courts are just as likely to have referred to the Ten Commandments when deciding non-church/state cases (e.g., cases involving murder, theft, and adultery).  Professor Green does not even consider twentieth- or twenty-first-century courts' references to the Ten Commandments.  In fact, a 2002 study identified roughly 1,000 judicial citations to the Ten Commandments—citations that continued well into the twentieth century.[53]

---

[49] See Gordon Lloyd, "Day-by-Day Summary of the Convention," available at http://teachingamericanhistory.org/convention/summary/ (accessed November 20, 2018); Max Farrand, ed., *The Records of the Federal Convention of 1787* (New Haven: Yale University Press, 1966), vols. 1 and 2.

[50] See U.S. House of Representatives, "List of All Weekend Sessions," available at https://history.house.gov/Institution/Saturday-Sunday/All/ (accessed November 20, 2018). I was unable to find a similarly comprehensive study for the U.S. Senate, but for a partial study, see U.S. Senate, "Sunday Sessions of the Senate (since 1861)," available at https://www.senate.gov/pagelayout/reference/five_column_table/Sunday_Sessions_of_the_Senate.htm (accessed November 28, 2018).

[51] Green, Report, ¶ 34.

[52] *Ibid.*

[53] John A. Eidsmoe, "The Use of the Ten Commandments in American Courts," *Liberty University Law Review* 3 (2009), 15-46.  This figure is based on a series of Lexis com-

24. Throughout history, the Ten Commandments have been viewed as a symbol of morality and/or law.  For instance, John Quincy Adams wrote to his son that:

> The law given from Sinai was a civil and municipal as well as a moral and religious code; it contained many statutes adapted to that time only, and to the particular circumstances of the nation to whom it was given; but many others were of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws.[54]

25. In 1997, the House of Representatives recognized that "the Ten Commandments have had a significant impact on the development of the fundamental legal princi-

---

puter searches, but Eidsmoe also quotes from and cites dozens of cases where jurists utilize one or more of the Ten Commandments in substantive ways.  Many of these cases are from the twentieth century.  Other scholars have written on the influence of Biblical law, in general, and the Decalogue, specifically, on western and American law.  See, for instance, John T. Noonan, Jr., *The Believer and the Powers That Are: Cases, History, and Other Data Bearing on the Relation of Religion and Government* (New York: MacMillan, 1987), 4 (the Ten Commandments "have been the most influential law code in history"); Stephen Botein, *Early American Law and Society* (New York: Alfred A. Knopf, 1982), 25 ("the ideal polity of early Puritan New England was thought to comprehend divine intentions as revealed through Mosaic law"); John W. Welch, "Biblical Law in America: Historical Perspectives and Potentials for Reform," *Brigham Young University Law Review* (2002), 611-642; and even Green, "The Fount of Everything Just and Right?," 525 ("[i]t is axiomatic that many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition . . . of which the American legal system is a part.").

[54] Quoted in Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers* (New York: Oxford University Press, 2017), 46.  Professor Green recognizes that "Calvinist clergy saw Old Testament Israel as a model" (Green, Report, ¶ 31).  Nevertheless, he states that they "generally believed that Christians were not bound by the Old Testament, including the Ten Commandments." *Ibid.*  The latter statement is false if it is meant to suggest that Calvinist clergy did not regard the Ten Commandments as morally binding law.  See, for instance, the answer to question 98 of the American version of the Westminster Larger Catechism, adopted by the Presbyterian church in 1788: "The moral law is summarily comprehended in the Ten Commandments . . . : the first four commandments containing our duty to God, and the other six our duty to man." Westminster Larger Catechism, available at https://www.pcaac.org/wp-content/uploads/2019/11/LargerCatechismwithScriptureProofs1.pdf (accessed January 17, 2020); see also questions 98-148.

ples of Western Civilization" and "the Ten Commandments set forth a code of moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society."[55]  As such, the House resolved that: "(1) the Ten Commandments are a declaration of fundamental principles that are the cornerstones of a fair and just society; and (2) the public display, including display in government offices and courthouses, of the Ten Commandments should be permitted."[56]

26. Numerous courts have likewise recognized the Ten Commandments' influence.  For instance, when holding that an Eagles-inspired monument of the Ten Commandments on public land does not violate the Establishment Clause, the United States Court of Appeals for the Tenth Circuit observed that "[i]t is noteworthy that the Order of the Eagles is not a religious organization—it is a fraternal order which advocates ecclesiastical law as the temporal foundation on which all law is based . . . So the Decalogue is at once religious and secular . . . ."[57]  A decade after this decision, a federal judge noted that "the Ten Commandments have had immeasurable effect on Anglo-American legal development."[58]

---

[55] *Journal of the House of Representatives of the United States: One Hundred and Fifth Congress: First Session* (Washington: U.S. Government Printing Office, 2000), 173.

[56] *Ibid.*

[57] *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 33 (10th Cir. 1973).

[58] *Crockett v. Sorenson*, 568 F. Supp. 1422, 1428 (W.D. Va. 1983).

16

27. When the United States Supreme Court upheld the constitutionality of a Ten Commandments monuments in 2005, the Court's plurality observed that "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America."[59]  To illustrate this point, it noted that:

> We need only look within our own Courtroom.  Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze.  Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom.  Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.
>
> Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital.  For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress' Jefferson Building since 1897.  And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8).  A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives.  Inside the Department of Justice, a statue entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet.  In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments.  So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia.  Moses is also prominently featured in the Chamber of the United States House of Representatives.[60]

28. More recently, the Court stated in *American Legion v. American Humanist Association* (2019) that the Ten Commandments "have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the mar-

---

[59] *Van Orden v. Perry*, 545 U.S. 677, 688 (2005) (plurality opinion).

[60] *Ibid*., 688-89.

ble frieze in our courtroom and in other prominent public buildings in our Nation's capi-

tal."[61]   Indeed, Monica Miller, the attorney for the American Humanist Association in

*American Legion*, remarked in oral arguments that the Ten Commandments can have

"some sort of dual secular meaning"; they are "basically shorthand for law itself."[62]

Even Professor Green agrees that many others hold similar views.[63]

    29. The Office of the Curator of the United States Supreme Court explains the

Ten Commandments' historic role as a condensed symbol of law:

> Throughout the history of western art, tablets have been used to signify the Law.
> This tradition is closely associated with Moses, the Hebrew lawgiver, who, ac-
> cording to the Book of Exodus, descended from Mount Sinai with two stone tab-
> lets inscribed with the Ten Commandments. Over time, the use of two tablets has
> become a symbol for the commandments, and more generally, ancient laws.[64]

    30. Many Ten Commandments monuments are located in or around public build-

ings where laws are made or interpreted.  In paragraphs 102-106 of my principal report, I

document more than a hundred examples of monuments or representations of the Ten

Commandments on public property.  This list includes, among others, the following mon-

uments located in or around state capitols and courthouses:

---

[61] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2083 (2019).
Justice John Paul Stevens observed that "a carving of Moses holding the Ten Command-
ments, if that is the only adornment on a courtroom wall, conveys an equivocal message,
perhaps of respect for Judaism, for religion in general, or for law." *County of Allegheny v.
ACLU*, 492 U.S. 573, 652 (1989) (Stevens, J., concurring in part and dissenting in part).

[62] Tr. of Oral Arg. at 55, *The Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019)
(No. 17-1717).  Available at: https://www.supremecourt.gov/oral_arguments/argu-
ment_transcripts/2018/17-1717_7l48.pdf, 55 (accessed July 8, 2019).

[63] See Green, Report, 17.

[64] "Symbols of Law" information sheet, available at https://www.supremecourt.gov/
about/SymbolsofLawInfoSheet%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_Final.pdf (accessed January 17, 2020).

a. an Eagles-inspired granite monument commemorating the Ten Commandments on the Texas State House grounds,[65]

b. an Eagles-inspired granite monument commemorating the Ten Commandments on the Colorado State Capitol Complex Grounds,[66]

c. an Eagles-inspired granite monument commemorating the Ten Commandments on the Missouri State Capitol grounds,[67]

d. a framed copy the Ten Commandments in Georgia's State Capitol,[68]

e. a mural of Moses with the Ten Commandments in the Rumford District Court courtroom in Rumford, Maine,[69]

f. a mural of Moses receiving the Ten Commandments in the Capitol Courtroom in Saint Paul, Minnesota,[70]

g. a mural of Moses holding the Ten Commandments at the Queens Supreme Court Building, New York,[71]

h. a mural of Moses carving the Ten Commandments at the State Supreme Court building in Harrisburg, Pennsylvania, and[72]

---

[65] See http://www.eaglesmonuments.com/states/Texas.html (accessed July 3, 2019); Sue A. Hoffman, *In Search of God and the Ten Commandments: One Person's Journey to Preserve a Small Part of America's God-given Values and Freedoms* (self-published, 2014), 233.

[66] See http://www.eaglesmonuments.com/states/Colorado.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 165.  Case dealing with this monument: *State v. Freedom From Religion Found., Inc*., 898 P.2d 1013, 1015 (Colo. 1995).

[67] See http://www.eaglesmonuments.com/states/Missouri.html (accessed July 3, 2019); Hoffman, *In Search of God and the Ten Commandments*, 205.

[68] See http://tencommandmentsga.org/downloads/PlacingHistoricalDisplays.pdf (accessed June 28, 2019).

[69] See https://www.sunjournal.com/2019/03/10/art-courts-and-the-legacy-of-monmouths-harry-cochrane/ (accessed June 28, 2019).

[70] See http://www.mnhs.org/capitol/learn/art/8949 (accessed June 28, 2019).

[71] See https://forgotten-ny.com/2015/11/queens-supreme-court-jamaica/ (accessed July 3, 2019).

[72] See Anna Marie Jehorek, *The Pennsylvania Capitol*, "Pull Over and Let Me Out," available at https://pulloverandletmeout.com/touring-the-pennsylvania-state-capitol-in-harrisburg/ (accessed July 3, 2019).

     i.   a mural of Moses holding the Ten Commandments in the Supreme Court Room, City-County Building, Pittsburg, Pennsylvania.[73]

From a historical perspective, the display of a Ten Commandments monument as a solemn symbol of law on the grounds of a building in which law is made is, at the very least, a common way to commemorate, and demonstrate proper respect for, the lawgiver's task and the sources from which contemporary lawmakers draw insight and inspiration.

    31. Finally, Professor Green suggests that Ten Commandment monuments are "of recent invention."[74]  Yet several of the murals of Moses and the Ten Commandments in the above list predate or are contemporaneous with the Bladensburg Cross, and many of the Eagle-inspired monuments were erected in the 1950s.[75]  An almost seventy-year-old practice is not "of recent invention."

    32. Professor Green's report states his disagreement with the United States Supreme Court's recognition that the Ten Commandments "have historical significance as one of the foundations of our legal system."[76]  But he concedes that this understanding is

---

[73] See Albert M. Tannler, *Architecture Feature: Edward Trumbull in Pittsburgh*, Pittsburgh History & Landmarks Foundation, available at https://phlf.org/2017/10/02/architecture-feature-edward-trumbull-pittsburgh/ (accessed July 3, 2019).

    There is a relief sculpture on the external wall of the Arkansas Supreme Court's courtroom that contains a depiction of Moses.  *Welcome to The Arkansas Supreme Court Justice Building*, available at https://www.arcourts.gov/sites/default/files/2015%20building%20brochure%20no%20crops%20%283%29.pdf (accessed August 28, 2019).

[74] Green, Report, ¶ 38.

[75] Hall, Report, ¶¶ 102-106.

[76] *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2083 (2019).

"widely embraced."[77]   And even he acknowledges as "axiomatic" that "many of the prin-

ciples contained in the Ten Commandments are fundamental to the Western legal tradi-

tion . . . of which the American legal system is a part."[78]

**Alleged Sectarian Versions of the Ten Commandments**

33. In section VII of his report, Professor Green argues that "any public ten com-

mandments monument is inevitably religious-specific and sectarian."[79]   It is telling that

he largely ignores my principal report's discussion of the origins of the Eagle-inspired

monuments.   Their leading proponent, Judge E.J. Ruegemer, formed a committee "con-

sisting of fellow judges, lawyers, various city officials, and clergy of several faiths" to

develop a "version of the Ten Commandments which was not identifiable to any particu-

lar religious group."[80]   Nevertheless, when the first monuments were erected, "people

who were not Catholic or Lutheran were quick to point out that the numbering sequence

was inconsistent with their religious background."[81]   Although English translations of the

original Hebrew text differ in the placement of textual pauses and thought-breaks, there is

virtually no disagreement among Jewish and Christian traditions as to the overall sub-

stance of the Ten Commandments.   Nevertheless, in response to such comments, the Ea-

---

[77] Green, Report, ¶ 26.

[78] Green, "The Fount of Everything Just and Right?, 525.

[79] Green, Report, section title immediately before ¶ 39.

[80] Declaration of Judge E.J. Ruegemer for *Card v. City of Everett,* No. CV03-2385L, Sept. 19, 2003, 3.   See also, Brief of the Fraternal Order of Eagles as *amicus curiae* in Support of Respondents.   *Van Orden v. Perry*, 2005 WL 263789, 2005 U.S. S. Ct. Briefs LEXIS 134 (Supreme Court of the United States January 31, 2005), 5-9.

[81] Hoffman, *In Search of God and the Ten Commandments*, 71.

gles altered the way in which the commandments were presented to overcome "any possible objection to the version of the Ten Commandments."[82]  The most significant change involved removing the numbers before each commandment.  Most post-1958 Ten Commandments monuments include this version of the text—including the monuments at issue in *Van Orden v. Perry* and the present litigation.[83]

34. Because the lines of these Ten Commandments monuments are not numbered, it is possible to read them with thought-breaks in different places.  For instance, a Jewish citizen may read the line, "I AM the Lord thy God," as the First Commandment, while a Protestant might read the lines "I AM the Lord thy God.  Thou shalt have no other gods before me" as the First Commandment (or as a preface and the First Commandment).  Similarly, one could understand the phrase "Thou shalt not take the name of the Lord they God in vain" to be either Second or the Third Commandment.  And so on.  A specialist could always argue that the monument's language leans toward one tradition or another in some respect, but even a religiously-literate citizen would have a difficult time identifying any sectarian consequences of the chosen language.  It would seem that Judge Ruegemer's committee succeeded in developing a version of the Ten Commandments not readily "identifiable to any particular religious group."[84] Contrary to Professor Green's

---

[82] Judge E.J. Ruegemer to Robert W. Hansen, January 21, 1958.  Quoted in Hoffman, *In Search of God and the Ten Commandments*, 73.

[83] For further discussion, see Hoffman, *In Search of God and the Ten Commandments*, 70-74.

[84] Declaration of Judge E.J. Ruegemer, 3.  See also *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 773 (8th Cir. 2005) (recognizing the nonsectarian nature of a monument that is virtually identical to the one at issue in this case).

claim, the monument's language simply does not plausibly support the suggestion that Arkansas has taken sides in a sectarian controversy.

**Conclusion**

35. As my report demonstrates, the historic understanding of the First Amendment permits a State to erect, or allow to be erected, a Ten Commandments monument on public property.  This practice is "deeply embedded in the history and tradition of this country."[85]  Nothing in Professor Green's report provides a substantive challenge to these conclusions.

---

[85] *Marsh v. Chambers*, 463 U.S. 783, 786 (1983).

23

Respectfully submitted,

Mark David Hall

Herbert Hoover Distinguished Professor of Politics

Faculty Fellow, William Penn Honors Program

George Fox University