IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


DONNA CAVE, et al.,                                                    PLAINTIFFS

ANNE ORSI, et al.,                             CONSOLIDATED PLAINTIFFS

THE SATANIC TEMPLE, et al.,                               INTERVENORS

v.                        Case No. 4:18-cv-00342-KGB

JOHN THURSTON, Arkansas Secretary
of State, in his official capacity                            DEFENDANT



BRIEF IN SUPPORT OF CAVE PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

# T A B L E   O F   C O N T E N T S

Table of Contents ................................................................................i

INTRODUCTION ...............................................................................1

I.   THE CAVE PLAINTIFFS HAVE STANDING TO BRING
     THIS ACTION...........................................................................1

     A.   Injury-in-Fact ..................................................................3

     B.   Causation and Redressability ..............................................6

     C.   Prudential Standing Concerns .............................................7

II.  EVOLUTION OF THE ANALYSIS REQUIRED FOR CLAIMS
     UNDER THE ESTABLISHMENT CLAUSE ................................7

III. THERE IS NO HISTORICAL BASIS FOR SINGLING OUT THE
     TEN COMMANDMENTS AS HAVING A SIGNFICANT ROLE
     IN THE FOUNDATION OF AMERICAN LAW AND
     GOVERNMENT ........................................................................14

     A.   Public Displays of the Text of the Ten Commandments Lack
          a Historical Pedigree ........................................................16

     B.   There is an Absence of Historical Evidence that the Framers
          Considered the Ten Commandments to be a Basis for Either
          American Law or Government ..............................................19

          1.   Documents From the Pre-Colonial and Colonial Eras
               Are Generally Devoid of References to the Ten
               Commandments .........................................................21

          2.   Religious Influences Further Declined During the
               Founding Era ............................................................24

IV.  THE TEN COMMANDMENTS MONUMENT CONVEYS A
     MESSAGE THAT RELIGION IS FAVORED OR PREFERRED .............29

i

A.  The Text of the Ten Commandments is Unmistakably
Religious ...............................................................................................30

B.  The Location of the Ten Commandments Monument
Promotes its Religious Message ..........................................................34

C.  The Recent and Controversial History of the Ten
Commandments Monument Demonstrates the State's
Preference for its Religious Message ...................................................36

D.  Government Officials Had a Clear Religious Purpose
For Erecting the Ten Commandments Monument ...............................41

    1.  Jason Rapert Publicly Interchanged His Roles as a
State Senator, Minister and Christian Advocate .........................41

    2.  Senator Rapert's Public Statements About the
Purpose of the Ten Commandments Monument
Were Religious in Nature .............................................................43

E.  The Circumstances of the Monument's Financing and
Unveiling Show Support for Its Religious Message ............................46

CONCLUSION......................................................................................................48

## INTRODUCTION

A granite monument, displaying a prescribed version of the Ten Commandments, weighing nearly three tons, and standing over six feet high, stands beside the Arkansas State Capitol.  This permanent display was mandated by the Ten Commandments Monument Display Act enacted by the Arkansas Legislature.  The Act specifies the precise text of the Ten Commandments that must appear on the monument and obligates the Secretary of State to approve both the design and site selection for the monument and arrange for its placement. Considering the historical practices and understandings related to Ten Commandments monuments and the specific context of the monument at issue here, the Ten Commandments Monument violates the Establishment Clause of the First Amendment.

Because there are no genuine issues as to any material fact and the Cave Plaintiffs are entitled to judgment as a matter of law, this Court should enter an order granting summary judgment in their favor.

## I.   THE CAVE PLAINTIFFS HAVE STANDING TO BRING THIS ACTION

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quoting U.S. Const. art. III, § 2, cl. 1).  "As an incident to the elaboration of this bedrock requirement, [the Supreme Court] has always required that a litigant have

1

'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc*., 454 U.S. 464, 471 (1982); *see also Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012).  The standing doctrine incorporates both constitutional requirements and prudential considerations.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992).

> To establish Article III standing, a plaintiff must satisfy three requirements:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560 (internal quotes & citations omitted).

But even if a plaintiff meets the Article III standing requirements, she may still be denied standing:

> if [s]he runs afoul of certain judicially-constructed prudential limits on standing . . . . These prudential concerns include limiting standing to cases where the plaintiff asserts [her] own rights and interests, not those of third parties, . . . and where the complaint falls within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." . . . The final prudential limitation on standing teaches that a plaintiff has no standing to assert "abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches.

*ACLU Nebraska Found. v. City of Plattsmouth*, 358 F.3d 1020, 1027 (8th Cir. 2004), *reh'g granted and opinion vacated* (Apr. 6, 2004), *on reh'g en banc sub nom. ACLU Nebraska Found. v. City of Plattsmouth*, 419 F.3d 772 (8th Cir. 2005) (internal citations omitted). "The standing inquiry is not, however, an assessment of the merits of a plaintiff's claim." *Red River Freethinkers*, 679 F.3d at 1023 (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989)).

The Cave Plaintiffs meet the jurisdictional requirement to demonstrate they have standing to bring their Establishment Clause claim.

## A.    Injury-In-Fact

Ms. Cave and Ms. Piazza both have established a constitutionally sufficient injury-in-fact to confer standing. "The injury-in-fact requirement 'serves to distinguish a person with a direct stake in the outcome of a litigation – even though small – from a person with a mere interest in the problem.'" *ACLU Nebraska Found.*, 358 F.3d at 1028 (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973)). "[A]n invasion of a legally protected interest" is an injury sufficient for the purposes of standing when it is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560.  "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1.

3

With regard to monument cases, the Eighth Circuit has held a "direct and unwelcome personal contact" with a Ten Commandments monument is, by itself, a sufficient injury for standing purposes to maintain a claim pursuant to the Establishment Clause.  In *Red River Freethinkers*, the Eighth Circuit found that members of the Freethinkers association who lived in Fargo, North Dakota, had individual standing to challenge a permanent Ten Commandments monument.  679 F.3d at 1023-24. The Eighth Circuit held that individuals who "encountered the [Ten Commandments] monument were caused 'to feel isolated and unwelcome in the city'" and therefore had suffered an injury-in-fact sufficient for standing purposes. *Id*. at 1023. The Eighth Circuit specifically determined that the Freethinkers, who did not allege that any of their members altered their behavior to avoid the Ten Commandments monument, had standing due to the "direct and unwelcome personal contact." *Id.*

Both of the Cave Plaintiffs "experience[] direct, offensive, and alienating contact with the Ten Commandments monument." *Id.* at 1030. The State's first display of the Ten Commandments monument began in June 2017, and continued after the installation of the second Ten Commandments Monument in April 2018. Statement of Undisputed Fact ("SUMF") ¶¶ 70 & 75. Ms. Cave and Ms. Piazza are part of a group of women who walk or bicycle most weekends, and several of the routes taken by this group go through the grounds of the Arkansas State

4

Capitol. SUMF ¶¶ 11-12. The Cave Plaintiffs passed by the second Ten Commandments Monument on one of their routes shortly after it was installed and stopped long enough to read it. SUMF ¶ 13. And because both Ms. Cave and Ms. Piazza found the Ten Commandments Monument to be so offensive and alienating, they altered the walking/bicycling routes they take so that they no longer go past the monument. SUMF ¶ 14.

Ms. Cave, who is an agnostic, considers the Ten Commandments Monument to be an insult to the people of Arkansas who do not follow the Judeo-Christian tradition. SUMF ¶¶ 2-3. She disagrees with the First Commandment displayed on the Ten Commandments Monument ("I am the Lord thy God") because it is exclusionary and does not include her, and because it makes her "feel like a second-class citizen." SUMF ¶ 4. She thinks it is wrong for the State of Arkansas to dictate religious belief by placing the Ten Commandments Monument on the grounds of the State Capitol. SUMF ¶ 5. Similarly, Ms. Piazza, who also is agnostic and who is committed to the principle of separation of church and state, does not believe that the State has any right to put up religious monuments on state grounds. SUMF ¶¶ 7-8. To Ms. Piazza, the Ten Commandments Monument is divisive in that it says that everyone must believe only one thing, and tells people what they should think and believe and the rules by which they should live. SUMF ¶¶ 9-10.

## B. Causation and Redressability

The Cave Plaintiffs also have established the causation and redressability elements of standing for their Establishment Clause claim. First, the Cave Plaintiffs' injuries are more than "fairly traceable" to the State's unlawful conduct. *See Allen,* 468 U.S. at 751. They are a direct consequence of it. As explained above, the alleged injury is direct and unwelcome contact with an Establishment Clause violation. If the State's Ten Commandments Monument violates the Establishment Clause, then its continued display is the cause of that injury. *See Red River Freethinkers*, 679 F.3d at 1025 (allegations that the defendant displayed a Ten Commandments monument, enacted an ordinance prohibiting the removal of that monument, and had a policy of not accepting other monuments were sufficient to establish that the claimed injury was "fairly traceable" to the defendant's acts). Accordingly, the Cave Plaintiffs have demonstrated that their injuries are caused by the State's unlawful conduct.

Second, invalidation of the Ten Commandments Monument Display Act and removal of the Ten Commandments Monument from State Capitol grounds clearly would redress the Cave Plaintiffs' injury under the Establishment Clause. Because the State's display is causing the Cave Plaintiffs' injuries, and because the varied relief at the judiciary's disposal can redress those injuries, the Cave Plaintiffs have met the causation and redressability elements of standing.

### C.    Prudential Standing Concerns

Finally, the Cave Plaintiffs' ability to bring their Establishment Clause claim does not implicate any of the judicially-created prudential standing concerns. Government establishment of religion causes "very real injuries" of the sort experienced by the Cave Plaintiffs: "official alienation, perceived political diminution and pressure to conform one's views to those of the majority." *ACLU Nebraska Found.*, 358 F.3d at 1030; *see also Suhre v. Haywood Cnty*., 131 F.3d 1083, 1086 (4th Cir. 1997) ("[T]he Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss. Rather the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion.") (internal quotation omitted).  To demand a different or more tangible injury than that suffered by the Cave Plaintiffs "would belittle the effect of government proselytization on nonadherents of the religion or religions championed." *ACLU Nebraska Fndn.*, 358 F.3d at 1030. Accordingly, the Cave Plaintiffs' injuries land squarely within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," the prohibition on government establishment of religion.  *Id.*

## II.    EVOLUTION OF THE ANALYSIS REQUIRED FOR CLAIMS UNDER THE ESTABLISHMENT CLAUSE

"Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. 1.   Despite the simplicity of that sentence, "pinning down the

meaning of a 'law respecting an establishment of religion' has proved to be a vexing problem." *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2080 (2019).

The test developed fifty years ago by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), focused on the purposes and effects of a challenged government action, as well as any entanglement with religion that it might entail.  Over the years, the Court used these factors to resolve a host of Establishment Clause cases, including invalidation of public displays of the Ten Commandments.  *See Stone v. Graham*, 449 U.S. 39 (1980) (striking down state law requiring Ten Commandments to be posted in public school classrooms); *McCreary County v. American Civil Liberties Union*, 545 U.S. 844 (2005) (enjoining display of Ten Commandments in county courthouses).

But although designed as a framework to resolve all Establishment Clause cases, the three-part *Lemon* test ultimately was honored more in its avoidance than its observance.  Indeed, both the Supreme Court and the Eighth Circuit discarded *Lemon* in deciding the constitutionality of other passive religious displays including Ten Commandments monuments.  In *Van Orden v. Perry*, 545 U.S. 677 (2005), decided the same day as *McCreary*, the Court upheld a Ten Commandments display on the Texas state capitol grounds.  The Court found that *Lemon* was "not useful" and focused instead on "the nature of the monument" and

8

on "our Nation's history."  *Id.* at 686.  Similarly, in *American Legion*, the Court criticized *Lemon* in challenges to "longstanding monuments, symbols and practices."  139 S. Ct. at 2082-85.  *See also ACLU Nebraska Fndn.*, 419 F.3d at 776 (8th Cir. 2005) (adhering to analysis used in *Van Orden* and not *Lemon*).

Most recently, in *Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2507, 2427 (2022), the Supreme Court – without overruling *Lemon* – nonetheless observed that *Lemon* and its offshoots had been "long ago abandoned."  In its place, "this Court has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"  *Id.* at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).  In particular, the Court stressed that the line "'between the permissible and the impermissible' has to 'accord with history and faithfully reflect the understanding of the Founding Fathers.'"  *Id.* (quoting *Town of Greece*, 572 U.S. at 577).

Other than this general description, the Court in *Kennedy* provided little guidance as to what this type of historical analysis might entail.  Previous Supreme Court cases that have dealt with the Establishment Clause in historical terms, however, suggest the proper approach to be taken.

- In *Town of Greece*, the Court examined a challenge to the practice of opening a town's monthly board meetings with a prayer.  The Court focused on whether "history shows that the specific practice is permitted"

9

and held that "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." 572 U.S. at 577.

- *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970), involved a challenge to a property tax exemption for religious organizations. The Court upheld the exemption analyzing the "history and uninterrupted practice" of these kinds of exemptions. *Id.* at 680; *see id.* at 681-85 (Brennan, J., concurring) (concentrating on the use of exemptions "from the beginning of the Nation's life").

- In *McGowan v. Maryland*, 366 U.S. 420, 437-39  (1961), the Court upheld a state's Sunday closing laws looking at the "historical position Sunday Closing Laws have occupied with reference to the First Amendment," and focusing on the laws of the Virginia General Assembly at the time Congress adopted the First Amendment.

- The Court in *Torcaso v. Watkins*, 367 U.S. 488 (1961), reaffirmed that the First Amendment prohibits any kind of religious test for public office. The Court scrutinized the history of religious qualifications in colonial Maryland and at the time "[w]hen our Constitution was adopted." *Id.* at 490-91.

- And in *American Legion*, 139 S. Ct. at 2087, the Court held that the 90-year old Bladensburg Peace Cross did not violate the Establishment Clause.

Justice Alito's opinion approved the historical analysis the Court earlier used in *Marsh v. Chambers*, 463 U.S. 783 (1983), upholding a state legislature's practice of opening each session with a prayer by an official chaplain that "focuse[d] on the particular issue at hand" and on the practices and "other prominent actions taken by the First Congress."

The Eighth Circuit's ruling in *Doe v. United States*, 901 F.3d 1015 (8th Cir. 2018), further helps to illuminate the attributes of the pertinent historical inquiry. *Doe* presented a challenge to the inscription of the national motto ("In God We Trust") on United States currency. Without ever citing *Lemon*, the court ruled instead that it would analyze the plaintiff's Establishment Clause challenge "under the guidance of new Supreme Court precedent" in *Town of Greece*. *Id.* at 1019.

The Eighth Circuit noted the Supreme Court's "unequivocal directive: 'The Establishment Clause *must* be interpreted by reference to historical practices and understandings'" in a manner that "faithfully reflects the understanding of the Founding Fathers.'" *Id.* at 1020 (quoting *Town of Greece*, 572 U.S. at 77). To comply with the Supreme Court's mandate, the Eighth Circuit "ask[ed] two questions. First, what do historical practices indicate about the constitutionality of placing the national motto on money? Second, is the motto impermissibly coercive?" *Id.* at 1021. Focusing on the "early understandings of the Establishment Clause as illuminated by the actions of the First Congress," *id.*, the

11

court held that putting "In God We Trust" on U.S. money comported with historical practices and thus found no Establishment Clause violation. *Id.* at 1023.

Two important caveats are necessary to use this analysis to evaluate the constitutionality of the Ten Commandments Monument in the present case. First, because the Supreme Court in *Kennedy* did not overrule *Lemon* or any other holding, "as a lower court . . . [this Court must] continue to apply the [Supreme] Court's earlier tests when directly applicable." *Id.* at 1021 n.8. As the Supreme Court directed in *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989), "[i]f a precedent of this Court has direct application in a case, yet appears to rest of reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *See also Agostini v. Felton*, 521 U.S. 203, 237, 239 (1997) (confirming the rule from *Rodriguez de Quijas* that lower courts may not "conclude [that] recent cases have, by implication, overruled an earlier precedent"). Thus this Court should continue to examine and adhere to the Supreme Court's most recent Ten Commandments cases – *Van Orden* and *McCreary* – in considering the instant case. *See Red River Freethinkers*, 764 F.3d at 949 (using "the standard in *Van Orden v Perry*" to evaluate a Ten Commandments monument because the two monuments were "essentially the same").

12

Second, the portion of the Eighth Circuit's analysis in *Doe* focusing on "coercion" has no application to the present case.  The Eighth Circuit identified this element solely because "[a] majority of the Court" in *Town of Greece* "considered whether the prayer at issue was unduly coercive."  *Doe*, 901 F.3d at 1020.[1]  But that portion of the opinion arose solely in response to an argument put forward by the plaintiffs challenging the town's prayer practice.  572 U.S. at 577-78; 586-90.  There is no indication that the Court would have addressed this issue as an essential element of its analysis but for the plaintiffs' contentions.

More importantly, the Establishment Clause does far more than protect individual religious autonomy from government coercion.  The Establishment Clause is also about governmental evenhandedness on all matters religious. Indeed, the Supreme Court has often referred to government neutrality towards religion as its guiding principle in applying the Establishment Clause.  As the Court noted in *Epperson* v. *Arkansas,* 393 U.S. 97, 104 (1968), "[t]he touchstone for our analysis is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."

---

[1] This statement is misleading.  In fact, the portion of the opinion in *Town of Greece* addressing coercion (Part II-B) commanded the votes of only three Justices.  *See* 572 U.S. at 568-69 & n.1.  In his concurring opinion, Justice Thomas (joined by Justice Scalia) briefly addressed coercion, but stressed that "to the extent that coercion is relevant to the Establishment Clause analysis, it is [only] actual legal coercion that counts".  *Id.* at 610 (Thomas, J., concurring in part and concurring in the judgment).

*See also County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 593 (1989) ("Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same"); *Edwards v. Aguillard*, 482 U.S. 578, 593 (1987) ("preference" for particular religious beliefs constitutes an endorsement of religion); *Engel v. Vitale*, 370 U.S. 421, 443 (1962) ("By reason of the First Amendment, government is commanded to have no interest in theology or ritual, for on those matters government must be neutral." (internal citation omitted); *Everson* v. *Board of Ed. of Ewing,* 330 U.S. 1, 18 (1947) (the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers").

Thus, to the extent that this Court believes that it needs to ask a second question in addition to its historical inquiry to follow the Eighth Circuit's analytical structure in *Doe*, the Court should probe whether the Ten Commandments Monument "convey[s] a message that religion or a particular religious belief is favored or preferred." *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J. concurring).

## III. THERE IS NO HISTORICAL BASIS FOR SINGLING OUT THE TEN COMMANDMENTS AS HAVING A SIGNIFICANT ROLE IN THE FOUNDATION OF AMERICAN LAW AND GOVERNMENT

There is no question but that the Ten Commandments are a religious document.  They derive from the Torah.  Exodus 20:1-17; Deuteronomy 5:4-21.

Jewish tradition teaches that God gave the Ten Commandments to Moses on Mt. Sinai, and thus many Jews and Christians deem the Ten Commandments to be sacred.  For this reason, the Supreme Court consistently has acknowledged the religious nature of the Ten Commandments.  *See Stone v. Graham*, 449 U.S. at 41; *Van Orden*, 545 U.S. at 690; *McCreary*, 545 U.S. at 859.  But that aspect of the display does not resolve the present case.  The Ten Commandments also have secular significance.  *See American Legion*, 139 S. Ct. at 2083, *Van Orden*, 545 U.S. at 701-02 (Breyer, J., concurring).  Arkansas purportedly enacted the Ten Commandments Monument Act given its view that the Ten Commandments reflect "an important component of the moral foundation of the laws and legal system of the United States of America and of the State of Arkansas."  SUMF ¶ 44.

Consistent with the historical analysis mandated by the Supreme Court, the essential inquiry is whether "history shows that the specific practice is permitted," *Town of Greece*, 572 U.S. at 577, *i.e.*, whether there is evidence of a long-standing tradition of government mandated Ten Commandments monuments on government property.  This investigation also would examine the "understanding of the Founding Fathers," *Kennedy*, 142 S. Ct. at 2428, as to whether there is a direct relationship between the Ten Commandments and the foundational principles of republican governance.  If this investigation shows there is no such long-standing tradition and that no such direct relationship exists, then given the

15

profoundly religious nature of this Ten Commandments Monument, this historical analysis confirms that the Ten Commandments Monument violates the Establishment Clause.

### A.     Public Displays of the Text of the Ten Commandments Lack a Historical Pedigree.

As shown earlier, *supra* at 9-11, when the Supreme Court has undertaken a historical analysis in the context of an Establishment Clause challenge, it has placed significant emphasis on the actions taken by the First Congress that drafted the First Amendment's religion clauses.  In *Marsh v. Chambers*, for example, the Court cited to the historical evidence showing that contemporaneously with its approval of the Bill of Rights, the First Congress adopted the policy of selecting a chaplain to open each session with prayer and enacted a statute providing for the payment of these chaplains.  463 U.S. at 788.  "In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress – their actions reveal their intent."  *Id.* at 790.

There is no similar evidence regarding government mandated displays of the text of the Ten Commandments.

Displays of the text of the Ten Commandments have a relatively recent ancestry, dating primarily to the mid-twentieth century.  *See* Douglas Laycock, *Theology Scholarships, the Pledge of Allegiance, and Religious Liberty: Avoiding*

16

*the Extreme But Missing the Liberty*, 118 Harv. L. Rev. 155, 236 (2004) ("[T]here is no long and ubiquitous history of large monuments displaying the text of the Commandments.")   Numerous court decisions have discussed the advent of modern Ten Commandments monuments in the 1950s.   *See*, *e.g.*, *Card v. City of Everett*, 520 F.3d 1009, 1012-13 (9th Cir. 2008); *Books v. City of Elkhart*, 235 F.3d 292, 294-95 (7th Cir. 2000).   Unlike the practice of prayer at the opening of a legislative session, displays of the text of the Ten Commandments – like the one standing beside the Arkansas State Capitol – do not have an "unambiguous and unbroken history of more than 200 years" such that it "has become part of the fabric of our society."   *Town of Greece*, 572 U.S. at 576.   Such a display thus does not "accord with history and faithfully reflect the understanding of the Founding Fathers," and clearly falls on the "impermissible" side of "the line that [the Court] must draw."   *Kennedy*, 142 S. Ct. 2428; *see also Town of Greece*, 572 U.S. at 577 (challenged government action falls within "boundary of the Establishment Clause where history shows that the specific practice is permitted").

Even beyond the displays of the text of the Ten Commandments, there is scant history of a historical tradition of placing religious displays on public property.   As one court noted, there "is a complete lack of evidence that our founding fathers were aware of the practice of placing crosses" or other religious displays on public land.   *Greater Houston Chapter of ACLU v. Eckels*, 589 F.

17

Supp. 222, 237 (S.D. Tex. 1994). *See Glassroth v. Moore*, 335 F.3d 1282, 1298 (11th Cir. 2003) ("[T]here is no evidence of an unambiguous and unbroken history of displaying religious symbols in judicial buildings").

To be clear, not every depiction or use of the Ten Commandments is unlawful. Instead, the "specific practice" at issue in this case is a monument that displays the full text of the Ten Commandments. The State chose to mandate a display of the *text* of the Ten Commandments, not a mere symbolic representation (such as Moses carrying stone tablets or tablets containing Roman numerals I through X). The depiction of Moses carrying two stone tablets on the two friezes at the Supreme Court thus differs materially from the Ten Commandments display here. Those friezes are nonverbal displays with no visible English text of the Commandments, and Moses is grouped with other famous lawgivers, both religious and secular, including lawgivers from cultures outside the Jewish and Christian traditions.[2] Artistic depictions of the Ten Commandments as symbols of law are not issue in this litigation. As Justice Stevens explained:

> . . . [A] carving of Moses holding the Ten Commandments, if that is the only adornment on a courtroom wall, conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law. The addition of carvings depicting Confucius and Mohammed

---

[2] *See* Office of the Curator, Supreme Court of the United States, *Courtroom Friezes: North and South Walls*, at www.supremecourtus.gov/about/north&southwalls.pdf; Office of the Curator, Supreme Court of the United States, *The East Pediment*, at www.supremecourtus.gov/about/eastpediment.pdf.

may honor religion, or particular religions, to an extent that the First Amendment does not tolerate any more than it does "the permanent erection of a large Latin cross on the roof of city hall." . . . Placement of secular figures such as Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall alongside these three religious leaders, however, signals respect not for great proselytizers but for great lawgivers. It would be absurd to exclude such a fitting message from a courtroom, as it would be to exclude religious paintings by Italian Renaissance masters from a public museum.

*County of Allegheny*, 492 U.S. at 652-53 (Stevens, J., concurring) (footnote & internal citations omitted).

### B. There is an Absence of Historical Evidence that the Framers Considered the Ten Commandments to be a Basis for Either American Law or Government

In enacting the Ten Commandments Monument Act, the Arkansas legislature found that "[t]he Ten Commandments represent a philosophy of government held by many of the founders of this nation." SUMF ¶ 44. The historical evidence does not support this assertion. To the contrary, there is a dearth of legal commentary and case law in the eighteenth and nineteenth century to indicate that judges, lawyers, or legal scholars believed that the Ten Commandments served as any basis for American law generally or for the American form of government.

The pertinent question is not whether religion, in general, has been closely identified with our nation's history and government. It has. *See Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("There is an unbroken history of official

acknowledgement by all three branches of government of the role of religion in American life from at least 1789.")  Similarly, the dispositive issue is not whether the Founding Fathers were religious.  Most of them were.  *See generally* David L. Holmes, *The Faiths of the Founding Father*s 134 (2006).  Instead, focusing on the "specific practice" at issue – as required by the Supreme Court – the Court's inquiry must focus solely on whether the text of the Ten Commandments served as the foundation of American law.  The answer to that question is no.

The sources of law for the American colonies and later the United States were broad and varied. The principal early sources were the common and statutory law of England, but also influential was the law of the non-common law courts of England, such as equity, chancery, admiralty, orphans, and ecclesiastical courts. Other sources of American law include Roman law, the civil law of continental Europe in the post-Roman period, private international law, and Germanic tribal law.  *See generally* Lawrence M. Friedman, *A History of American Law* 33-104 (2nd ed. 1985).

The various documents and texts that figured prominently in these developments include, but certainly are not limited to such works as:

- the Magna Carta

- the writings of Sir Edward Coke

- the English Bill of Rights

- William Blackstone's *Commentaries on the Laws of England*

- John Locke's *Second Treatise on Government* and *A Letter Concerning Toleration*

- Adam Smith's *The Wealth of Nations*

- Baron Montesquieu's *The Spirit of the Laws*

- the Mayflower Compact

- the Declaration of Independence

- the debates in the Constitutional Convention of 1787

- the *Federalist Papers*

- the United States Constitution

- Joseph Story's *Commentaries on the Constitution*

*See* Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 Fordham L. Rev. 1477, 1500-01 (2005) ("Finkelman"). Each of these documents had a far greater influence on America's laws than the Ten Commandments.

### 1.   Documents From the Pre-Colonial and Colonial Eras Are Generally Devoid of References to the Ten Commandments

Most legal historians consider the Magna Carta of 1215 to be a seminal source of modern English, and later American, law. Bernard Bailyn, *The Ideological Origins of the American Revolution* 22-54 (1967). The Magna Carta addressed various legal subjects, including inheritance; land ownership and sale;

21

taxation; jury trials and trial procedure; proportionality in punishment; and the taking of property without compensation. The Magna Carta also contains principles that are central to modern legal culture, including assertions that no person can be "seized or imprisoned, or stripped of his rights or possessions . . . except by the lawful judgment of his equals or by the law of the land."  Magna Carta, in 1 *Documents of American Constitutional Law and Legal History* (Melvin I. Urofsky & Paul Finkelman eds.) (2d ed. 2002).  Yet the Magna Carta "made no reference to either the Ten Commandments as a whole or any particular one of the Commandments."  Finkelman at 1502.

The concessions granted by King John in the Magna Carta were largely limited to the baronial families at the top of the structured feudal system. In the early seventeenth century, however, Sir Edward Coke used the Magna Carta to argue for an expansion of rights and liberties to all people in Britain.  J.R. Tanner, *English Constitutional Conflicts of the Seventeenth Century, 1603-1689* 62-63 (1983).  As a result of Coke's influence, "[w]hen American colonists spoke of their 'rights as Englishmen,' whether in the early colonial period or later at the time of the Revolution, they had in mind, among other things, the rights and privileges found in the Magna Carta."  Finkelman at 1502.

Biblical law was also among the myriad influences that shaped early colonial statutory and common law.  Steven K. Green, *The Fount of Everything*

22

*Just and Right? The Ten Commandments as a Source of American Law*, 14 J. Law & Religion 525, 537-40 (1999-2000) ("Green").  Even in those colonies most influenced by the Bible, however, reliance on the Ten Commandments (as opposed to the influence of biblical law as a whole) was insignificant and largely limited to particular criminal and domestic laws, such as blasphemy and adultery. Bradley Chapin, *Criminal Justice in Colonial America*, *1606-1660* 4-15 (1983).  Reliance on biblical principles was even less pronounced in the non-Puritan colonies like Virginia.  *Id.*  In sum, the vast majority of the colonial codes, and the English sources from which they were principally derived, developed separately from the Ten Commandments.  *See* Zechariah Chafee, Jr., *Colonial Courts and the Common Law,* in *Essays in the History of Early American Law* 72-73 (D. Flaherty ed., 1969) ("[T]he view that colonial law was . . . drawn from the Bible is dispelled by a study of court records, at least after the earliest periods of settlement.").

The Mayflower Compact – the written agreement signed by the male settlers of the Plymouth Colony – highlights the lack of influence given to the Ten Commandments.  The document begins with references to God and acknowledges that the colonists moved to the new world "for the Glory of God and the advancement of the Christian Faith."  The Mayflower Compact, in 1 *Documents of American Constitutional Law and Legal History*, *supra*.  Yet "in setting out the legal foundation of their new society, the deeply religious Pilgrims . . . did not turn

to the Bible or the Ten Commandments as source for their law."  Finkelman at 1505.  Instead, the Plymouth settlers pledged themselves to create a "Civil Body Politic" and to "enact . . . such just and equal Laws . . . as shall be thought most meet and convenient for the general good of the Colony."  The Mayflower Compact.

### 2.    Religious Influences Further Declined During the Founding Era

The most important source of the founding generation's attitudes toward law and government was the common law as brought over from Great Britain and adapted to meet America's indigenous needs.  Bailyn, *Ideological Origins* 22-54; Friedman, *History of American Law* 34-35.  A developing market economy, dependent on trade with England and between the colonies, required a more formalized legal system with consistent procedural and substantive rules based on British common law.  And increasing religious heterogeneity in the colonies further militated against reliance on biblical law.

Rather than seeing the law as biblically based, the founding generation viewed the common law as a repository of human experience, embodying concepts of justice, equity, and the rule of law, not as representing divine principles.  For example, William Blackstone's *Commentaries on the Laws of England*, considered the dominant law book in England and America for many years after its publication in 1765, does not include a single reference to the "Decalogue" or the

24

"Ten Commandments." William Blackstone, *Commentaries on the Laws of England* (Charles Harr ed., 1962). The founding generation also read and applied the writings of non-legal writers such as Adam Smith and David Hume. *See* Bailyn, *Ideological Origins* 35-54; Gordon S. Wood, *The Creation of the American Republic, 1776-1787* 291-305 (1969). Neither based their writings on the Ten Commandments.

The founding generation was also heavily influenced by the works of Enlightenment thinkers, principally John Locke's *Second Treatise on Government* (1690) and Baron Montesquieu's *Spirit of the Laws* (1748). *See* Green at 545 ("The influence of Locke and other Enlightenment thinkers on late colonial attitudes toward the law cannot be overstated.") Locke's political writings refuted the doctrine of the divine and absolute right of Kings and established a theory of a "social contract" by which people – the ultimate sources of authority – delegated to government the responsibility to create an ordered society. John Locke, *Two Treatises of Government* 408-412. Locke's theories stand in sharp contrast to the notion that secular law is subject to religious mandates. In his influential *A Letter Concerning Toleration*, Locke wrote that "the law of Moses," which includes the Ten Commandments, "in no way obligates Christians." "The business of law," he noted, was not to protect religious beliefs but rather to provide for "the security and safety of the commonwealth and each man's goods and person." John Locke, *A*

*Letter Concerning Toleration* 115-17, 123.  These writings significantly influenced the legal and political documents of the founding era, including the Declaration of Independence, the United States Constitution, and the Bill of Rights.  *See* Bailyn, *Ideological Origins* 22-54.

To be sure, the Declaration of Independence includes prefatory references to the "Laws of Nature and of Nature's God," a "Creator," and a reference to "divine Providence," but these are all non-biblical references.  Equally as important, Jefferson appealed to notions of popular sovereignty and self-determination in the Declaration.  In asserting the right of the colonists to create their own nation, he did not invoke God's name or even "nature's God" as justification. He also did not claim that the new nation was formed on the basis of biblical law.  Instead, Jefferson asserted that "[g]overnments are instituted among Men, deriving their just Powers from the Consent of the Governed." The Declaration of Independence is devoid of any references either to biblical law or the Ten Commandments.

The absence of any mention of the Decalogue in the Declaration of Independence is consistent with Jefferson's personal skepticism regarding both the authenticity and authority of the Ten Commandments. In a letter to John Adams, Jefferson wrote that "the whole history of [the Ten Commandments] is so defective and doubtful that it seems vain to attempt minute enquiry into it; and such tricks have been plaid with their text . . . that we have a right, from that cause, to

26

entertain much doubt what parts of them are genuine." Jefferson to Adams, Jan. 24, 1814, *The Adams-Jefferson Letters* 421 (Lester J. Cappon ed., 1959). Jefferson went on to refute the claim that Christianity served as a basis of the common law. *Id.* at 422-23. Adams' response was supportive, writing that Jefferson's research "in the laws of England, establishing Christianity as the Law of the Land and part of our common Law, are curious and very important . . . . In what sense and to what extent the Bible is Law, may give rise to as many doubts and quarrels as any of our civil political military or maritime Laws and will intermix with them all to irritate Factions of every sort." Adams to Jefferson, March 3, 1814, *in id.* at 427.

These expressions appear to have been widely held. As one scholar observed

> Statements to the contrary among leading figures of the time – of claims of a scriptural basis for the law – are virtually nonexistent. More particularly, as can best be determined, the historical record is devoid of *any* statements by the Founders about the legal significance of the Ten Commandments. . . . Thus while it is impossible to state with certainty that such sentiments were not held by some of the Founders, the lack of supporting documentation suggests that such views were not widely held, if at all. Rather, the prevailing view among the leading figures of the founding era was that the law generally, and the common law in particular, had a secular basis and function.

Green at 545 (footnote omitted).

The central legal documents of the United States – the Constitution and the Bill of Rights – also do not include even a perfunctory reference to God. Rather

27

than relying on divine authority, the Constitution is "ordained" by "the People of the United States." The foundation of the law of the United States thus emanates from the nature of representative government – what Jefferson called "the consent of the governed" – and needs no external or divine authority for its support. Clearly, the founders did not see the foundational basis for American government as grounded in God's words as expressed in the Ten Commandments.

The debates of the Constitution in the Philadelphia Convention further demonstrate the cursory role of both the Bible and the Ten Commandments in American law. "In the wide-ranging debates the founders mentioned Roman law, European Continental law, British law, and various other legal systems, but no delegate ever mentioned the Ten Commandments or the Bible." Finkelman at 1512. "There was not one mention of the Ten Commandments, or of the Bible, anywhere in James Madison's almost verbatim notes of the convention's debates." Peter Irons, *Curing A Monumental Error: The Presumptive Unconstitutionality of Ten Commandments Displays*, 63 Okla. L. Rev 1, 24 (2010).

Similarly, neither the "Bible" nor "Scripture" nor the "Ten Commandments" appears in the index of the *Federalist Papers*. *See generally The Federalist Papers* (Clinton Rossiter ed., 1961). In those discussions regarding the meaning of the Constitution at the time of ratification, there are passing references to "God," the "Almighty," "Heaven," and to religion (both ancient and modern). *See*, *e.g.*,

28

*Federalist 38* (referring to "a finger of that Almighty hand which has been so frequently and signally extended to our relief"). But no author who participated in these forceful and influential debates called upon the Ten Commandments as authoritative support for his position.

The historical record pertaining specifically to the Ten Commandments demonstrates that the Founding Fathers did not turn to, and did not rely on, the Ten Commandments either as source of law or as the foundation for American government. Thus, there is no historical foundation for a claim that a monument displaying the text of the Ten Commandments – such as the one that presently stands before the Arkansas State Capitol – is rooted in this nation's legal and political history.

## IV. THE TEN COMMANDMENTS MONUMENT CONVEYS A MESSAGE THAT RELIGION IS FAVORED OR PREFERRED

"The theme of neutrality has been a mainstay of Establishment Clause analysis since the beginning of the modern era." Steven G. Gey, *Religion and the State* 275 (2d ed. 2006). As noted by Justice Black more than 75 years ago: "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can . . . pass laws which aid one religion, aid all religions or prefer one religion over another." *Everson* v. *Board of Ed. of Ewing,* 330 U.S. 1, 15 (1947). "When the government acts with ostensible and predominant purpose of advancing religion, it violates the Establishment

29

Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary*, 545 U.S. at 860. And regardless of the Court's historical analysis, "history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *County of Allegheny*, 492 U.S. at 602.

Viewed from this perspective, the State's enactment of the Ten Commandments Monument Act and placement of a monument displaying the text of the Ten Commandments violates the Establishment Clause.

### A.    The Text of the Ten Commandments Is Unmistakably Religious

The monument contains the full text of the Ten Commandments.   "[T]he original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction." *McCreary*, 545 U.S.at 869.  And as the Supreme Court noted in *Stone v. Graham*:

> The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness.    *See* Exodus 20:12-7; Deuteronomy 5:16-21.   Rather the first part of the Commandments concerns the religious duties of believers, worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.   *See* Exodus 20:1-11; Deuteronomy 5:6-15.

449 U.S. at 41-42.  This language unquestionably has the effect of excluding the belief systems of nonadherents.

30

The Cave Plaintiffs are a case in point.  Both women are agnostic,  SUMF ¶¶ 2 & 7, meaning that they do not believe that they can have true knowledge about the existence of God.  Yet the language of the first Commandment declares "I AM the LORD thy God," and the second Commandment admonishes the reader that that "Thou shalt have no other gods before me."   SUMF ¶ 51.   These Commandments are statements of faith explicitly asserting the existence of a God.  By mandating that they appear on the monument, *id.*, the State explicitly endorses theistic beliefs over non-theistic sects or individuals.

The religious message of the Ten Commandments is explicit and obvious.  That the full text of these biblical passages appears on the monument reflects the State's apparent purpose to endorse this message.  For this endorsement to be credibly negated, other content in the challenged display must transmit a different message so clearly and strongly that it negates the usual message of endorsement.  For several reasons, such is not the case here.

*First*, the Ten Commandments Monument Act specifies the precise text of the Ten Commandments that must appear on the Monument placed at the State Capitol. SUMF ¶ 51.  Other than that text, however, the Act does not specify any other language that must appear on the face of the monument.  SUMF ¶ 52.

*Second*, nothing on the face of the monument says anything about the supposed secular reason for erecting the monument, *i.e.*, to "help the people of the

31

United States and of the State of Arkansas to know that the Ten Commandments [are] the moral foundation of the law."  SUMF ¶ 44.  And nothing in the Act requires that the State provide any explanation about the purpose of the monument or the manner in which the Ten Commandments supposedly provide the basic principles of the American System of government.  SUMF ¶ 43.  "Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view." *McCreary*, 545 U.S. at 868.

*Third*, the absence of a secular message is highlighted by the complete absence of information about the Ten Commandments Monument provided by the State.  The Arkansas Secretary of State publishes a pamphlet about the Arkansas State Capitol entitled "A Walk on the Hill:  A self-guided tour of the Arkansas State Capitol grounds and monuments."  SUMF ¶¶ 27-28.  That pamphlet contains both a listing of the monuments located on the State Capitol grounds and a picture and description of each of those monuments.  SUMF ¶ 28.  That on-line publication is revised and updated to show what is on the capitol grounds and, since 2018, each version of this pamphlet supposedly has listed all of the monuments constructed before 2017.  SUMF ¶¶ 29-30.

The second Ten Commandments Monument was dedicated in April 2018.  SUMF ¶ 752.  Despite listing and describing no fewer than 15 other monuments

32

that are located on the grounds of the State Capitol, the Secretary of State's official publication does not – and never has – included the Ten Commandments Monument. SUMF ¶¶ 31-32. This glaring lack of any effort by the Secretary of State to explain whatever historical value the Ten Commandments Monument may have is strong evidence of its clear religious purpose. *See ACLU v. Garrard County.*, 517 F. Supp. 2d 925, 942 (E.D. Ky. 2007) ("A display that sets out the text of the Commandments standing alone, not part of an arguably secular display, can only send one message.").

Unlike the challenged sculpture in *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1228 (10th Cir. 2005), that was part of a unified exhibit in a "typical museum setting" and where the school made "a brochure available in the campus art museum describing and mapping all of the statues on campus" that "would make clear . . . that the statues were part of a unified exhibit," the State of Arkansas has never published or disseminated any literature describing the Ten Commandments Monument or why it sits on the grounds of the State Capitol. SUMF ¶¶ 31-32. *See also Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1033 (10th Cir. 2008) (finding no Establishment Clause violation in the City of Las Cruces' use of three crosses in its city symbol, in part, because "the City has made these historical facts readily available in an explanatory brochure").

*Fourth*, besides the text of the Ten Commandments, the only other words that appear on the monument is an inscription at the base that states "Presented to the People of Arkansas by the American History and Heritage Foundation." SUMF ¶ 75 (photograph of current Ten Commandments Monument).  However, there is no explanation as to what this organization is, who its members are, or the reason why it presented this monument.

In short, the Ten Commandments Monument is given no meaningful context independent of the sacred text itself. And the State has done nothing to explain how or why those biblically-ordained words relate to anything apart from the religious teaching embodied in the displayed text.  The monument is not a display about the development of law with the Ten Commandments as an illustration, nor is it part of any larger display about the development of the law; it is just a display of the text of the Ten Commandments without even a comment about the development of law.

## B.    The Location of the Ten Commandments Monument Promotes its Religious Message

According to the Secretary of State, because the State Capitol is the seat of state government, "it is a natural setting for memorials to groups, individuals and events."   SUMF ¶ 20.   Consistent with that theme, a number of permanent monuments are located on the State Capitol grounds.  These monuments include, for example: (a) a Vietnam Veterans Memorial (honoring Arkansas soldiers killed

or wounded during the Vietnam war), (b) Memorials to Arkansas law enforcement officers and firefighters who died in the line of duty, (c) a replica of the Liberty Bell to commemorate the American Bicentennial, (d)  a boulder to mark a century of Arkansas statehood, (e) a sculpture honoring the nine school children credited with desegregating Little Rock's public schools, and (f) a marker in memory of the Union and Confederate prisoners who were held in a prison located on the grounds of what is now the State Capitol.  SUMF ¶ 21.  A number of these monuments contain plaques and other information explaining the purpose of the display and the significance of the groups, individuals and events they depict.  SUMF ¶ 22. Each monument is freestanding, spread out over the roughly 40 acres of grounds.[3]

The Ten Commandments Monument is isolated from the others. The monument has no coherent visual relationship to any other monument such that the message of other monuments can affect, much less amend, the message of the Ten Commandments. Nor is there any subject matter relationship between the Ten Commandments and any of the other monuments.  Most of the monuments are memorials to soldiers who died in military conflicts, honor military units or soldiers, or pay tribute to other classes of people, such as law enforcement officers,

_____

[3] For a map showing the approximate location of the monuments (not including the Ten Commandments Monument), prepared by the Arkansas Secretary of State, *see* https://www.sos.arkansas.gov/uploads/stateCapitol/2018_grounds_tour.pdf    (last accessed Mar. 4, 2023).)

firefighters, public officials, pioneer women, and children.  Two relate specifically to Arkansas history and industry, and two honor specific historical events.  No monument honors any belief about religion other than the Ten Commandments. And because the Ten Commandments Monument is omitted from the only official publication about the State Capitol grounds, there is no effort to explain any relationship between the Ten Commandments Monument and the other monuments. In other words, none of the other monuments do anything to modify or explain the biblical text appearing on the Ten Commandments Monument.

### C. The Recent and Controversial History of The Ten Commandments  Monument Demonstrates the State's Preference for its Religious Message

The Supreme Court decided two separate Ten Commandments cases on the same day with different outcomes, and the essential factor for the different outcomes appeared to be the age of the monuments and their acceptance by the public.  In *Van Orden*, the Court upheld a Ten Commandments monument which had stood legally uncontested for forty years.  545 U.S. at 702 (Breyer, J., concurring). In *McCreary*, on the other hand, the Court invalidated a Ten Commandments display which had been posted for only a few months and was challenged soon thereafter.  545 U.S. at 851-52.  Justice Breyer, whose vote was the only one that changed in those cases, found this difference to be "determinative."  *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring).

That the monument in *Van Orden* had stood for 40 years without objection showed that "few individuals, whatever their system of beliefs, [were] likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion." *Id.*  In sharp contrast, "a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that [a] longstanding, pre-existing monument has not." *Id*. at 703 (Breyer, J., concurring).  *See Card v. City of Everett*, 520 F.3d 1009, 1021 (9th Cir. 2008) (applying Justice Breyer's "longevity rationale").  *Cf. American Legion*, 139 S. Ct. at 2082 (finding a "presumption of constitutionality for longstanding monuments" like the 90-year old Bladensburg Peace Cross).

Similarly, the government's insistence on exhibiting a display containing religious text in the face of public opposition also highlights the clear promotion of that religious message.  With regard to the Ten Commandments display at issue in *Van Orden*, "40 years passed in which the presence of this monument, legally speaking, went unchallenged."  545 U.S. at 703 (Breyer, J., concurring).  The display in *McCreary*, on the other hand, was immediately and continually challenged.  545 U.S. at 852-58; *see also Van Orden*. 545 U.S. at 703 (Breyer, J., concurring) (describing the "short (and stormy) history of the courthouse Commandments' displays" in *McCreary*).  *See also Green v. Haskell County*

37

*Board of Commissioners*, 568 F.3d 784, 806-07 (10th Cir. 2009) (a "prompt litigation response" to the erection of a Ten Commandments monument supports the conclusion that "the symbol endorses a religious message.")

In the present case, both of these factors support a finding that the Ten Commandments Monument violates the Establishment Clause.

The monument is a new display. The Governor signed the Ten Commandments Monument Act in April 2015. SUMF ¶ 48. The first monument was erected June 2017, SUMF ¶ 70, and after its destruction the next day, the second monument was dedicated in April 2018. SUMF ¶ 75. "A new display of the Ten Commandments is much more likely to be perceived as an endorsement of religion by the government than one in which there is a legitimate preservationist perspective." *Glassroth v. Moore*, 335 F.3d 1282, 1300 (11th Cir. 2003) (internal quotation marks & citation omitted).

The Ten Commandments Monument has been controversial from the start and has not enjoyed a long, uninterrupted history. To the contrary, at every stage of its existence, it has been opposed and challenged.

• When the Arkansas General Assembly considered the bill that became the Ten Commandments Monument Display Act, more than one-quarter of the Legislators (36 of 135) voted against it. SUMF ¶ 100.

- While the Ten Commandments Monument was being considered by the Capitol Arts and Grounds Commission, the Secretary of State received mail about the monument, including letters from people who opposed the monument.  SUMF ¶ 101.

- At the public hearings held by the Capitol Arts and Grounds Commission, people spoke both for and against the monument.  At one meeting held in December 2016, of the 31 people who spoke about the Ten Commandments Monument, 17 people spoke in favor of the monument and 14 people spoke against it.  SUMF ¶ 102.  Some of those who spoke against the monument threatened litigation if the monument was erected.  SUMF ¶ 103.

- While the Commission was considering the application for the Ten Commandments Monument, the Secretary of State's office established a hotline for members of the public to call to give comments on the Ten Commandments Monument.  According to records maintained by the Secretary of State's office, over 40 percent of the people who called the hotline (68 of 157) spoke against the monument.  SUMF ¶¶ 110-111.

- During the State's deliberative process, citizens wrote letters to the editors of various newspapers speaking out against having a Ten Commandments Monument at the State Capitol, and certain newspapers wrote editorials

against having a Ten Commandments monument placed on the State Capitol grounds.  SUMF ¶ 104.

- Less than one day after the first Ten Commandments Monument was installed, an individual used his vehicle to destroy it.  SUMF ¶¶ 73 & 105.

- Senator Jason Rapert and his family received personal threats arising from his sponsorship of the Ten Commandments Monument some of which he took to law enforcement.   SUMF ¶ 106.

- The Secretary of State's office also received certain emails from individuals about the Ten Commandments Monument that were forwarded to the Capitol State Police.  SUMF ¶ 107.

- The present litigation was filed in May 2018, just weeks after the second Ten Commandments Monument was installed on the State Capitol grounds.  SUMF ¶ 112.

Despite this prolonged and persistent opposition to the Ten Commandments Monument, no one in the Governor's Office, the Secretary of State's Office or the Capitol Arts and Grounds Commission questioned whether the Ten Commandments Monument should be placed at the Capitol.  SUMF ¶¶ 108-109.

The Ten Commandments Monument was met with immediate objection by members of the community, consistent opposition through petition and public comments, and finally prompt litigation in response to its unveiling.  The State's

unwavering support for the monument in the face of this challenge to its religious nature "makes it difficult for us to glean 'a suggestion that an objective observer would not think that the symbol endorses a religious message.'" *Green*, 568 F.3d at 807 (quoting *Weinbaum*, 541 F.3d at 1031).

### D.   Government Officials Had a Clear Religious Purpose For Erecting the Ten Commandments Monument

The record in the present case is replete with "openly available data support[ing] a commonsense conclusion that a religious objective permeated the government's action." *McCreary*, 545 U.S. at 863.  This overt religious purpose is manifest through the words and conduct of State Senator Jason Rapert.

#### 1.   Jason Rapert Publicly Interchanged His Roles As A State Senator, Minister and Christian Advocate

Jason Rapert was an Arkansas State Senator who served in the Arkansas State Senate beginning in 2010.  SUMF ¶ 113.  Senator  Rapert was the primary sponsor of the bill that became the Ten Commandments Monument Display Act.  SUMF ¶ 43.  Senator Rapert also is an ordained minister.  SUMF ¶ 116.  With his wife, Senator Rapert founded the Holy Ghost Ministries in which they do evangelical and missionary work.  SUMF ¶ 117.  Senator Rapert listed the same mailing address for both his Arkansas State Senate webpage and for Holy Ghost Ministries.  SUMF ¶¶ 114 & 118-119.  The Facebook page for Holy Ghost

41

Ministries often contained postings identifying Jason Rapert as "Sen. Jason Rapert." SUMF ¶¶ 143-144.

Senator Rapert also was the founder and president of the National Association of Christian Lawmakers. SUMF ¶ 129. In describing the organization, Senator Rapert said that "The concept is that we would debate and discuss issues and formulate model statutes, ordinances and resolutions based upon a biblical world view for introduction in cities, counties, states and nationally at the federal level. . . . [I]t is important that Christian lawmakers come together to consider Biblical principles and how to better incorporate them into our society to honor God." SUMF ¶ 132. Holy Ghost Ministries served as the initial fiscal sponsor for the organization, SUMF ¶ 135, and the organization uses the same mailing address as both Holy Ghost Ministries and Senator Rapert. SUMF ¶¶ 114, 118-119, 131 & 136.

Finally, Senator Rapert also is an officer and director of the American History and Heritage Foundation. SUMF ¶ 124. This foundation submitted the preliminary application request for Ten Commandments Monument to the Arkansas Secretary of State in 2016. SUMF ¶ 58. The foundation also was the primary private entity that assumed financial responsibility for raising the money for the Ten Commandments Monument. SUMF ¶ 89. On the pages of its website designated both "contact" and "donate," the foundation lists the same mailing

42

address as Senator Rapert, Holy Ghost Ministries and the National Association of Christian Lawmakers.  SUMF ¶¶ 114, 118-119, 125-128 & 136.

### 2. Senator Rapert's Public Statements About the Purpose of the Ten Commandments Monument Were Religious in Nature

Senator Rapert – the primary sponsor of the Ten Commandments Monument Display Act – has spoken repeatedly and forcefully about his motivation for a monument containing the text of the Ten Commandments at the State Capitol.

- Senator Rapert repeatedly has talked about "America's Judeo-Christian heritage," and said that he takes "a stand for Judeo-Christian values in our country." *See* SUMF ¶¶ 137-138 & 140.

- Soon before he introduced the Ten Commandments Monument Display Act in the Arkansas Legislature, Senator Rapert posted on his Facebook twitter account "To deny America was founded upon Judeo-Christian values is willful ignorance. #arleg #God #AppealtoHeaven." SUMF ¶ 139  The same post quoted from an 1864 book entitled "The Christian Life and Character" that "This is a Christian nation. . . . It is preeminently the land of the Bible, of the Christian Church, and of the Christian Sabbath." SUMF ¶ 139.

- In drafting the Ten Commandments Monument Display Act, Senator Rapert understood that the "God" that is in the prescribed text of the Ten Commandments that appears on the Ten Commandments Monument is the

43

God of the Old Testament who appeared and spoke to Moses as described in the Old Testament Book of Exodus.  He also understood that the very word "commandment" is synonymous with the word "order."  SUMF ¶¶ 54-55.

- On the same day the Arkansas General Assembly passed the bill that became the Ten Commandments Monument Display Act, Senator Rapert tweeted "Bill passes to display holy rules at Capitol – Ten Commandments will be honored."  SUMF ¶ 50.

- After passage of the Act and before the first Ten Commandments Monument was installed, Senator Rapert's name appeared in an advertisement that was published in several national newspapers entitled "Declaration of Dependence Upon God and His Holy Bible."  SUMF ¶ 146.

- In an editorial that appeared in January 2017, Senator Rapert wrote that "our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mr. Sinai."  SUMF ¶ 141.

- Ten days before the installation of the first Ten Commandments Monument Senator Rapert tweeted "Thank god we have a clear record of our Judeo-Christian history.  May the @ACLU @FFRF NEVER wipe it away. #ThanksgivingDay #Lincoln #arpx."  SUMF ¶ 142.

44

- Several months after the dedication of the second Ten Commandments Monument, Senator Rapert was quoted in a published article as follows:

  When our state took a stand for the Ten Commandments in 2015, when we passed the strongest abortion prohibition in the country at the time in 2013, when our Secretary of State allowed me to have the Washington Cruiser(s) Flag hoisted and formally flown on Washington's birthday in 2015, when we passed strong pro-Israel legislation in 2017, and every other time our state takes a stand for something that honors God and the Bible, it definitely sends a signal to everyone in the spiritual realm that Arkansas seeks to honor God and invites his blessing.

SUMF ¶ 147.

All of these statements are clear evidence of both the religious motivation for a law that mandates the display of the text of the Ten Commandments and the clear preference for the religious principles explicit in this monument. *See Wallace v. Jaffree*, 472 U.S. 38, 60 (1985) (relying on testimony of prime sponsor of legislation to find that purpose of law was to return prayer to public school); *Edwards*, 482 U.S. at 586-88 (looking to the detailed public comments of the statute's sponsor to determine the purpose of a state law requiring that creationism be taught alongside evolution).

And all of these statements stand in startling contrast to the claim that Arkansas enacted the Ten Commandments Monument Act because the Ten Commandments reflect "an important component of the moral foundation of the laws and legal system of the United States of America and of the State of

45

Arkansas."  SUMF ¶ 44.  Indeed, other than this generic statement contained in the Act's legislative findings (which are not part of the enacted Ten Commandments Monument Act), SUMF ¶¶ 45 & 49, there is scant (if any) contemporaneous evidence of a manifest secular purpose for the Ten Commandments Monument. As a result, this Court cannot "swallow the claim that [the State] had cast off the objective so unmistakable" in its decision to mandate the placement of a monument containing the text of the Ten Commandments on the State Capitol grounds.  *McCreary*, 545 U.S. at 872.

## E.      The Circumstances of The Monument's Financing and Unveiling Show Support For Its Religious Message

After passage of the Ten Commandments Monument Display Act, Senator Jason Rapert created a GoFundMe page to help raise money for the monument. SUMF ¶¶ 88 & 90.  Of the approximately $18,200 raised for the monument, roughly 69% was donated by Agape Church in Little Rock and its Executive Administrator, which together donated at least $12,600 towards the Ten Commandments Monument.  SUMF ¶¶ 72 & 91-92.  After the first monument was destroyed, Pureflix Entertainment provided $25,000 for the reconstruction of the Ten Commandments Monument.  SUMF ¶ 93.  PureFlix Entertainment described itself as "a Christian movie studio" whose vision is "to influence the global culture for Christ through media" and whose mission is to "to strive to make a difference for His name."  SUMF ¶ 92.  The fact that the funds for financing a government

authorized Ten Commandments monument came primarily from religious organizations highlights the Ten Commandments Monument's religious significance. *See Felix v. City of Bloomfield*, 841 F.3d 848, 858 (10th Cir. 2016) (monument fundraising done through local churches); *Green*, 568 F.3d at 790 ("necessary funds" raised through religious groups).

The same is true for the dedication ceremony for the second Ten Commandments Monument in April 2018. At that ceremony, State legislators and a representative of the Secretary of State's office stood next to the monument facing the audience, alongside members of the pastoral team from Agape Church, including Pastor Scott Stewart. SUMF ¶¶ 78-80. Also standing near the podium next to the Ten Commandments Monument were several individuals associated with the Arkansas Family Council. That organization's stated mission was to "promote, protect, and strengthen traditional family values found and reflected in the Bible by impacting public opinion and public policy in Arkansas." SUMF ¶¶ 82-83. After the ceremony, the Deputy Secretary of State stayed and had her photograph taken with only the Agape Church pastoral team and no one else present at the dedication ceremony. SUMF ¶¶ 85-86. The unmistakable association of these religious groups with the Ten Commandments Monument makes a clear showing of the importance of the monument's religious message.

47

## CONCLUSION

"Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the [Rules of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Here, the undisputed facts establish that the State's action in enacting the Ten Commandments Monument Display Act requiring the placement of a permanent Ten Commandments Monument on the State Capitol grounds violates the Establishment Clause of the First Amendment. As a result, the Cave Plaintiffs are entitled to an Order granting summary judgment in their favor, invalidating the Ten Commandments Monument Display Act as a violation of the Establishment Clause, and ordering that the Ten Commandments Monument located on the Arkansas State Capitol grounds be permanently removed.

Respectfully submitted,

LAVEY AND BURNETT

By:___*John L. Burnett*_____.
    John L. Burnett (Arkansas Bar No. 77021)
904 West 2nd Street
Little Rock, AR 72201
Telephone:  (501) 376-2269
Facsimile:  (501) 372-1134
E-mail:  jburnett@laveyandburnett.com
*On behalf of the Arkansas Civil Liberties Union Foundation*

48

GREEN & GILLISPIE

By: *Joshua D. Gillispie* .
    Joshua D. Gillispie (Arkansas Bar No. 2010131)
1 Riverfront Place, Suite 605
North Little Rock, AR 72114
Telephone:  (501) 244-0700
Facsimile:  (501) 244-2020
E-mail:    josh@greenandgillispie.com
*On behalf of the Arkansas Civil Liberties Union Foundation*

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: *Andrew G. Schultz* .
    Andrew G. Schultz (*admitted pro hac vice*)
    Melanie B. Stambaugh (*admitted pro hac vice*)
P.O. Box 1888
Albuquerque, NM 87103-1888
Telephone:  (505) 765-5900
Facsimile:  (505) 768-7395
E-mail:    aschultz@rodey.com
        mstambaugh@rodey.com
*On behalf of the Arkansas Civil Liberties Union Foundation*

*Attorneys for Plaintiffs Donna Cave and Pat Piazza*

49