# 4:18-cv-342

---

In the United States District Court
For the Eastern District of Arkansas
Central Division

---

Donna Cave; Anne Orsi, The Satanic Temple, *et al.*
*Plaintiffs*,

*v.*

John Thurston, in his official capacity
*Defendant*.

---

## Brief in support of
## TST's motion for summary judgment

---



| | |
|---|---|
| **Matt Kezhaya** | **matt@crown.law** |
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

100 S. Fifth St., Suite 1900, Minneapolis, MN 55402

# Table of contents

Table of contents............................................................2

Summary of argument....................................................3

Argument .......................................................................6

    Legal standard..........................................................6

    1: Thurston violated the Equal Protection Clause. ...................7

        1.1: TST is a "suspect class." ................................8

        1.2: TST has a "fundamental right" to compete with Christianity..............................................................15

        1.3: TST's equal competition was intentionally preempted..16

        1.4: The refusal to emplace Baphomet does not survive scrutiny. ...........................................................23

    2: Thurston violated the Establishment Clause. .....................25

        2.1: The monument is new. ...............................26

        2.2: The monument prompted a religious controversy.........27

        2.3: The monument endorses a particular set of religious beliefs. ..............................................................28

    3: The Court should direct the emplacement of Baphomet......29

Conclusion / prayer for relief .....................................32

Certificate of service ..................................................33

# Summary of argument

This case requires a determination of the constitutionality of two Acts of the General Assembly. First, the Display Act (Act 1231 of 2015) in which the General Assembly directs the Secretary of State to erect and maintain a Ten Commandments monument and which purports to declare that the moral foundation of law is irretrievably rooted in a series of religious laws. Second, the Usurping Act (Act 274 of 2017) in which the General Assembly modified the order of procedure to seek the emplacement of monuments on Arkansas Capitol grounds.

By operation of both Acts, a Ten Commandments monument has stood on Arkansas Capitol grounds as the only monument of religious significance since April 2018. The Usurping Act was introduced one month after approval of TST's Baphomet monument, the only other monument of religious significance to obtain Arts & Grounds Commission approval. By operation of the Usurping Act, TST was deprived of the public comments period and

the subsequent Secretary of State proposal to the General Assembly. See Appx. 55 (on 2/10/2017, Kelly Boyd scheduled TST for a public comments period to take place on 5/11/2017); but see Appx. 52 (the Usurping Act was made effective on 2/22/2017).

Undeterred by the Usurping Act, TST requested of every member of the General Assembly to sponsor a bill to require emplacement of the Baphomet monument. None would sponsor a bill. State Sen. Rapert explained on his government-official Facebook page that no legislator would sponsor such a bill because it would result in that legislator never being reelected and because it was politically impossible for such a bill to pass.

In accordance with these discriminatory statutes, Secretary Thurston deprived TST of its right to compete with Christianity on equal footing in the public sphere. Political impossibility is no answer to TST's constitutional right to be free from religious discrimination, for TST is entitled to equal protection of the law regardless of a majoritarian opposition to its minority viewpoint.

Secretary Thurston saw fit to erect and maintain a religious monument and to refuse to provide TST equal treatment under the law. The appropriate relief is to order the removal of the Ten Commandments monument and give TST the benefit of what it was deprived: an equal amount of time in the public sphere.

# Argument

## Legal standard

The standard for a summary judgment is well established. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011). Summary judgment is proper where the record shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* (citing FRCP 56(c)(2)). The movant bears the initial responsibility to inform the district court of the basis of the motion and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmovant to respond with evidentiary materials that set out specific facts showing there is a genuine issue for trial. *Id.* The facts are to be viewed in the light most favorable to the nonmoving party, but only if there is a genuine dispute as to those facts. *Id.* The nonmovant must show more than a "metaphysical doubt" as to the material facts and must come forward with specific facts showing there is a genuine issue for trial.

*Id.* There is no "genuine issue for trial" where a rational trier of fact could not find for the nonmoving party. *Id.*

## 1: Thurston violated the Equal Protection Clause.

TST's first count asserts Equal Protection liability. ECF 89, at 7-8. The Equal Protection Clause provides that "No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. Under the Equal Protection Clause, a challenged policy must survive "strict scrutiny" if it either discriminates against a "suspect class" or impinges upon a "fundamental right." *Plyler v. Doe*, 457 U.S. 202, 216-218 (1982). "Strict scrutiny" means the challenged policy is presumptively unconstitutional and only survives if the State demonstrates its classification has been precisely tailored to serve a compelling governmental interest. *Id.*, at 217.

As further developed below, TST is a "suspect class" because it is a historically disadvantaged minority religion. TST has a "fundamental right" to be free from religious oppression. Under

either construction, Thurston's refusal to emplace the Baphomet monument despite maintaining the Ten Commandments monument must survive strict scrutiny. The ongoing refusal does not even survive rational basis. The Court should enter summary judgment in favor of TST and direct Thurston to emplace the Baphomet monument on Arkansas's Capitol Grounds for a period of time equal to the time that the Ten Commandments monument was maintained (1776 days, as of this motion).

*1.1: TST is a "suspect class."*

Strict scrutiny applies because the challenged acts targeted TST, which is a suspect class. A "suspect class" is one which has historically been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Plyler*, 457 U.S. at 216 n. 14. The Colonial experience included "zealous sectarians entrusted with governmental power" who were wont to "torture, maim, and kill" those they deemed "heretics, atheists, and agnostics." *Compare*

*Zorach v. Clauson*, 343 U.S. 306, 319 (1952) (Black, J., dissenting) (quoting Wertenbaker, *The Puritan Oligarchy*, 213—214 (Scribner, 1970)).

*1.11: TST is a religion.*

TST is a suspect class because it is a religion. Religion is a suspect classification. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 816 (8th Cir. 2008). TST's religious *bona fides* have been established by the IRS,[1] by the District of Arizona,[2] by academics,[3] and in popular

---

[1] App. 84-85 (501(c)(3) ruling letter, noting public charity status under IRC § 170(b)(1)(A)(i) ("a church or a convention or association of churches")

[2] *Satanic Temple v. City of Scottsdale*, No. CV18-00621-PHX-DGC, 2020 WL 587882, at *6–7 (D. Ariz. Feb. 6, 2020), *aff'd sub nom. Satanic Temple, Inc. v. City of Scottsdale*, 856 F. App'x 724 (9th Cir. 2021)

[3] *E.g.* Joseph Laycock, *Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion* (Oxford University Press, 2020); Angela R. Pruitt, *Maybe Today, Satan: A Christian Supreme Court, Unbalanced Religious Clauses, and the Rise of the Satanic Temple*, 26 J. Gender Race & Just. 271 (2023); *Pandora's Box of Religious Exemptions*, 136 Harv. L. Rev. 1178 (2023).

culture.[4] TST is a "religion" because it is a cohesive system of beliefs, morals, symbols, and ceremonies for an identifiable sect. *Scottsdale, 2020 WL 587882, at \*6–7*; *see also Black's Law Dictionary*, Religion (11th ed. 2019) ("courts have interpreted the term *religion* broadly to include a wide variety of theistic and nontheistic beliefs"); *Malnak v. Yogi*, 592 F.2d 197, 207 (3d Cir. 1979) (Abrams, J., concurring) (explaining why Theism is not the *sine qua non* of religion, and hasn't been since the early 20th Century).

TST provides its congregants regular religious services, has a ministry program,

 has religious symbols (one of which, Baphomet, is at the heart of this case), engages in religious ceremony, and generally constitutes a comprehensive moral framework utilized to answer the fundamental questions of life. In a word, TST is a "religion."

---

[4] Penny Lane, *Hail Satan?* (Magnolia Films, 2019); La Carmina, *The Little Book of Satanism: A Guide to Satanic History, Culture, and Wisdom* (Ulysses Press, 2022)

Thurston's objection to TST's religiosity was doomed from the start. See ECF 24 (objecting to TST's intervention on this ground); ECF 92 ¶ 5 (Thurston's answer denies that TST is a religion). The argument was irretrievably rooted in internet hearsay, which may be good enough for a Twitter war but is flatly *not* evidence. FRE 802 (rule against hearsay); ECF 38 (granting TST intervention).

Thurston's sole proffer of evidence to support this meritless argument that TST is not a 'real' religion rested on a miscalculated ploy to make this courtroom a proxy battle in a doctrinal war over who the 'real' Satanists are. ECF 237, at 16; *see also*, *e.g.*, *Serbian E. Orthodox Diocese for the U.S. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976) (courts do not resolve religious disputes, for that would defy the Establishment Clause bar against governmental endorsement of particular religious beliefs). But Thurston has now abandoned all effort to seek support from that witness,[5] so there is no genuine dispute whether TST is a religion.

---

[5] October 24, 2022 email from Michael Cantrell; Appx. 231.

*1.12: TST is a historically persecuted religion.*

More than simply a religion, TST is a minority religion; one which has been historically relegated to political powerlessness. *Zorach*, 343 U.S. at 319 (1952) (Black, J., dissenting). One need not dig deep into the history books to find that, until relatively recently, heretics, atheists, and agnostics were common targets for persecution. Martin, Michael *The Cambridge Companion to Atheism*, pp. 250–253, 260–62 (Cambridge University Press., 2006).[6] Even today, the Arkansas Constitution purports to disqualify any person

---

[6] From p. 252:

> Prior to the development of modern conceptions of religious liberty, atheists had no effective legal protection. The legitimacy of premodern governments rested on claims of divine right, which were directly threatened by atheistic beliefs that denied the existence of the divinity. Because of the political threat posed by atheists, premodern governments denied any protection to atheists, and indeed targeted atheists for the most serious kinds of legal persecution.

"who denies the being of a God" from holding "any office in the civil departments of this State" and from being deemed "competent to testify as a witness in any Court." Ark. Const. art. 19 § 1.

Against this historical backdrop, there can be no genuine dispute that TST's membership is politically powerless to overcome a tyranny by the majority. TST's regularly-meeting membership in Arkansas at the time in question numbered about 25-30 people. Appx. 174-75 (Depo. Hargett), at 28:24-25, 29:1-7, 11-23. Not exactly the numbers to turn elections. Despite some show of support from the community for TST's equal rights, the louder voice came from those who deem TST's very existence to be an existential threat. See Appx. 13, 43-45, 79-80, 82-83 (public outcry emails); Appx. 18-42; 46; 48-50; 76 (call logs).

On January 26, 2017, State Sen. Rapert posted a video on his Facebook page which explained why none of the Arkansas legislators would support a bill to erect the Baphomet monument:

> And if they find a legislator that actually
> would file a bill to put up the statue of a goat

headed person they call Baphomet, that might be the last time you ever see that legislator in this session again, because they probably would never be re-elected…even if they did, you are not going to get the Arkansas legislature to approve any such statue or any such monument to be put up on the Capitol grounds…There is no possible way that a bill is going to be passed in the legislature to authorize the Satanic Temple or any other crazy outfit from out of our state to come in and force us to put up a monument to anything.

Appx. 245, (Aff. Kezhaya), at 3.

During his deposition, State Sen. Rapert expounded further that he finds the organizational belief structure of TST to be "vile," "unnecessary," and "an affront to every American citizen." Appx. 141 (Depo. Rapert) at 216:24-25. He testified that he does not "foresee in the near future in the State of Arkansas the Satanic Temple passing a bill to do anything just because most people probably feel the way I do." Appx. 143. (id.) at 218:21-24.

In the January 26, 2017 video, State Sen. Rapert closes with an assurance that the Baphomet monument will never get equal treatment as the Ten Commandments monument:

> It will be a very cold, cold day in the pits of Hell before you'll ever see a statue from The Satanic Temple or some other group like that at the Arkansas Capitol. It is not going to happen. So, rest easy.

### 1.2: TST has a "fundamental right" to compete with Christianity.

Classifications that impinge upon the exercise of a "fundamental right" triggers strict scrutiny. *Plyler*, 457 U.S. at 217. A "fundamental right" is one enumerated in the Constitution, like the Free Exercise Clause. *Id.*, at n. 15; U.S. Const. amend. I. The Free Exercise Clause forbids even "covert suppression of particular religious beliefs." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993); *see also Native Am. Council of Tribes v. Solem*, 691 F.2d 382 (8th Cir. 1982) (the Equal Protection Clause prohibits religious discrimination).

Similar to the argument that TST is a suspect class, TST's right to compete with Christianity in the public sphere is implicated by the two Acts at issue. TST was denied equal treatment as Christianity because the General Assembly endorsed the Ten Commandments through the Display Act yet communicated official opprobrium against Baphomet through the Usurping Act. By refusing to emplace Baphomet in reliance on these discriminatory statutes, Thurston deprived TST of an equal opportunity to compete with the Ten Commandments in the public sphere. As a result, Thurston's refusal must survive strict scrutiny.

*1.3: TST's equal competition was intentionally preempted.*

Thurston's refusal to treat TST equally is predicated on the unconstitutional Acts at issue. See ECF 24, at 14 (in contesting redressability, Thurston's predecessor in office asserted that the Secretary of State "is without authority to place any monument without legislative approval. Because the Acts are intentionally

discriminatory, Thurston's conduct in reliance on the Acts is also intentionally discriminatory.

An Equal Protection challenge requires proof of discriminatory intent or purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). To determine whether invidious discriminatory purpose was a motivating factor demands a fact-sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Id.*, at 266. Courts look to the historical background of the decision, whether the normal procedure was followed, and contemporary statements by members of the decision-making body. *Id.*, at 266-68. There is no genuine issue of material fact that the General Assembly had discriminatory intent in enacting the subject Acts.

*1.31: The historical background betrays an anti-Satanic purpose.*

The historical background of these Acts betrays an anti-Satanic purpose. The Display Act is part and parcel of the same lobbying

effort that resulted in an identical, and "obviously religious,"[7] Ten Commandments monument being permanently affixed to the Oklahoma Capitol grounds. The Oklahoma statute and the Arkansas statute both designate Liberty Legal Institute as defense counsel. Compare OS 74 § 4110(C) with ACA § 22-3-221(c). Both Display Acts are predicated on identical legislative findings. Compare Appx. 5 (Oklahoma) with Appx. 7 (Arkansas). And both rely on the outcome in *Van Orden v. Perry*, 545 U.S. 677 (2005). Compare OS 74 § 4110(B) with ACA § 22-3-221(b).[8]

Whereas the Oklahoma legislature stopped short of communicating an official opprobrium for Satanism, the Arkansas legislature crossed that constitutional line. *See Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 588 (2014) ("The analysis would be different if town board members … singled out dissidents for opprobrium"); *see also McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*,

---

[7] *Prescott*, 2015 OK 54 ¶ 6

[8] *Van Orden* is distinguished throughout § 2.

545 U.S. 844, 878 (2005) ("the Framers intended the Establishment Clause to require governmental neutrality in matters of religion, *including neutrality in statements acknowledging religion*") (emphasis added). The General Assembly passed the Usurping Act which resulted in the permanent exclusion of only the Baphomet monument.[9] The timing of the Usurping Act's introduction, relative to the Arts & Grounds Commission's approval of the Baphomet monument, was about one month. Appx. 10; 51. The bill was introduced just two days after State Sen. Rapert declared that it would be a "cold, cold day in the pits of Hell before you'll ever see a statue from The Satanic Temple … at the Arkansas Capitol." Appx 245, (Aff. Kezhaya), at 3. For so long as majoritarian politics are allowed to trump TST's equal right to the public sphere, State Sen. Rapert is right. See Appx. 18-46, 48-50, 76, 82 (written public comments opposing TST's monument as, *e.g.*, "an insult to the God

---

[9] The Gold Star Families monument was also affected by the Usurping Act but not detrimentally so. See Appx. 92. (Depo. Boyd), at 81:7-15.

of heaven"–quote at Appx. 82); *cf. W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("fundamental rights [including equal protection] may not be submitted to vote; they depend on the outcome of no elections"); *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (fundamental rights are those guaranteed by the U.S. Constitution).

This anti-Satanic background is indistinguishable from the anti-Santeria background in *Lukumi Babalu Aye* which prompted the finding that the ordinances there were not neutral. *Lukumi Babalu Aye*, 508 U.S. at 540-42 (*e.g.*, that Santeria was "an abomination to the Lord," *id.*, at 541).

*1.32: Contemporary statements by Arkansas legislators.*

Contemporary statements by members of the General Assembly further betray an anti-Satanic purpose. State Sen. Rapert has explicitly and repeatedly stated that it will be a cold day in Hell before TST will see its monument on the Capitol grounds. Appx. 127 (Depo. Rapert), at 156:8-15. The stated explanation behind this

political impossibility is that the majority of Arkansas residents would consider the Baphomet monument to be "vile." Appx. 141 (Depo. Rapert) at 216:24-25. None of the Arkansas legislators would sponsor a Baphomet bill:

- "Hell no! And you can quote me on that!" Appx. 61.

- "[W]e have to be selective about which monuments we believe the people of Arkansas want on the grounds of their Capitol." Appx. 68.

- "I could not get it passed. I would just spend what little political capital I have as a member of the very minority Party in the legislature." Appx. 61.

- "I do not support satan" Appx. 74.

*1.33: The Acts substantively departed from normal procedure.*

It further tends to prove an anti-Satanic purpose that each Act substantively departed from normal procedure. The Display Act exempts the Ten Commandments monument from ACA §§ 22-3-301 et seq. (which exempts the monument from the Master Plan) and 22-3-501 *et seq.* (which exempts the monument from the

otherwise-applicable approval rights of the Arts & Grounds Commission); and is the only monument statute to do so. *Compare* ACA § 22-3-221(b)(4)(B) *with* ACA §§ 22-3-215, –216, –219, and –222. The Ten Commandments monument was prompted by legislative action, but the norm is for an outside entity to initiate the process. See Appx. 112 (Depo. Boyd), Ex. 5.

Whereas the General Assembly specially exempted the Ten Commandments monument from otherwise-applicable statutes, the General Assembly specially modified the otherwise-applicable statutes which precluded the Baphomet monument's comment period and subsequent proposal. See id.

Once it is shown that discriminatory intent was a "motivating" factor behind enacting the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Nothing provided in discovery suggests that the General Assembly would have enacted the Usurping Act but for the fact that TST

obtained approval for the Baphomet monument from the Arts & Grounds Commission. The Court should therefore apply strict scrutiny.

### 1.4: The refusal to emplace Baphomet does not survive scrutiny.

Based on the foregoing discussion, the complained-of Acts had a discriminatory purpose: both to show a governmental preference for Christianity and an ancillary message to TST's membership "that they are outsiders, not full members of the political community." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10 (2000); see also Appx. 241 (Aff. Hargett), at ¶ 5 ("When I see the Ten Commandments monument on our State Capitol grounds, I feel like my State government deems me lesser-than because I reject the religious laws it purports to command.") Thurston's enforcement of these statutes is therefore presumptively unconstitutional.

### 1.41: The proffered interest, administrative efficiency, is not "compelling."

The sole justification for the statutes' legitimacy is that they furthers efficiency for a monument's sponsor by avoiding the risk

that time and money expended on getting the monument approved by the Arts & Grounds Committee does not get wasted by the legislature's refusal to enact a bill. Appx. 257-58 (Depo. Boyd), at 90:7-91:4.

Administrative efficiency for monuments' sponsors is not a "compelling" interest. *See Republican Party of Minnesota v. White*, 416 F.3d 738, 749 (8th Cir. 2005) ("Attempts at definition generally use alternative, equally superlative language: 'interest[ ] of the highest order,' 'overriding state interest,' 'unusually important interest.'") Particularly when considering that the statute has only ever adversely impacted TST, administrative efficiency was not a *bona fide* concern of the General Assembly.

*1.42: The real interest, harming an unpopular group, is not rational.*

The real interest for the General Assembly was a prohibited "bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). As made plain by the

contemporary statements of the Arkansas legislators, the purpose of the Usurping Act was to deprive TST of an opportunity to compete with Christianity in the public sphere. Thurston's enforcement of the Act does not even survive rational basis scrutiny.

## 2: Thurston violated the Establishment Clause.

TST's second count asserts Establishment Clause liability. ECF 89, at 8-9. The "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Nor can governments constitutionally legislate on grounds of religion. *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687 (1994); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989). The Display Act, and its obligatory Ten Commandments monument by extent, is an affront to the Establishment Clause because they have a predominately religious purpose. *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005).

*2.1: The monument is new.*

To resolve whether a religious monument is an Establishment Clause violation, courts first look to the age of the monument in question. *See Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067, 2805 (2019) ("retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones"); *compare Van Orden v. Perry*, 545 U.S. 677, 702–03 (2005) (Breyer, J., concurring)[10] (the determinative factor in *Van Orden* was that "40 years passed in which the presence of this monument, legally speaking, when unchallenged") with *McCreary*, 545 U.S. at 851 (2005) (the *McCreary* monument was less than one year old before its challenge).

The Arkansas Ten Commandments monument is indistinguishable from the *McCreary* one, having been emplaced for less than one month before this litigation ensued. Contrary to the

---

[10] *Van Orden* is a plurality case, so Justice Breyer's concurrence controls, as the narrowest grounds to support the final outcome. *Marks v. United States*, 430 U.S. 188 (1977).

monuments at issue in *Van Orden* and *American Legion*, there has been no difficulty in obtaining "direct evidence regarding the specific motivations" (*American Legion*, 139 S.Ct. at 2082) of the sponsors of this monument. As evidenced by State Sen. Rapert's statements, the motivation was to advance a religious claim.

*2.2: The monument prompted a religious controversy.*

Another significant factor in resolving whether a monument is religious is to inspect its effect. The Establishment Clause was designed to preclude "political division along religious lines." Freund, Paul *Public Aid to Parochial Schools*, 82 Harv. L. Rev. 1680, 1692 (1969). The entire controversy surrounding the Ten Commandments monument has been notably religious in nature. State Sen. Rapert denies that they're trying to create a theocracy with the proffer that "We're just giving credit to God and reverence to God wherever it's due." Appx. 246 (Aff. Kezhaya), at 4. This is a religious purpose, not a secular one.

*2.3: The monument endorses a particular set of religious beliefs.*

Courts also look to whether the monument endorses a particular set of religious beliefs. *See McCreary*, 545 U.S. at 866. The majority of commenters considered the Ten Commandments monument to be religious in nature. Appx. 103 (Depo. Boyd), at 175:4-9. While there may be some historical justification for the Ten Commandments, "it is above all a religious symbol, and there is no basis to determine that the monument is primarily historical." *Prescott*, 2015 OK 54, ¶ 27 (Taylor, J., concurring);[11] *see also Stone v. Graham*, 449 U.S. 39, 41 (1980) ("The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no

---

[11] The Oklahoma Ten Commandments monument was identical in every respect to the Arkansas one. *Compare Prescott*, 2015 OK 54 at ¶ 6 and *id.* (Gurich, J., concurring) at ¶ 2 ("While the words and symbols on the monument at the Oklahoma State Capitol are the same as the Texas monument, the similarities between the two cases stop there") *with* ACA § 22-3-221(b)(1) (requiring the Ten Commandments monument to contain the text "which was displayed on the monument declared constitutional in *Van Orden v. Perry*, 545 U.S. 677 (2005)").

legislative recitation of a supposed secular purpose can blind us to that fact.")

There is no *bona fide* secular justification for the Ten Commandments monument. It is a transparent attack on the American bulwark which safeguards the freedom of thought that "no official, high or petty, can prescribe what shall be orthodox in … religion." *Barnette*, 319 U.S. at 642. The Ten Commandments monument is "obviously religious" (*Prescott*, 2015 OK 54 ¶ 6), and it has no place bearing the imprimatur of State government.

### 3: The Court should direct the emplacement of Baphomet.

Undeniably, the General Assembly intervened to preclude equal competition between Satanism and Christianity in the public sphere. This official denominational preference was an unconstitutional interference with the free marketplace of ideas. *See Larson*, 456 U.S. at 245 ("Madison's vision—freedom for all religion being guaranteed by free competition between religions—naturally

assumed that every denomination would be equally at liberty to exercise and propagate its beliefs.")

The appropriate remedy "must closely fit the constitutional violation; it must be shaped to place persons unconstitutionally denied an opportunity or advantage in the position they would have occupied in the absence of discrimination." *United States v. Virginia*, 518 U.S. 515, 547 (1996) (cleaned up). The opportunity denied to TST was the emplacement of the Baphomet monument on Arkansas Capitol grounds on equal footing as the Ten Commandments monument. Because of the General Assembly's intervention, the Ten Commandments monument has stood as an undisputed statement of religious orthodoxy in the land. Simply removing the Ten Commandments monument will do nothing to disrupt this governmental declaration of orthodoxy. Instead, a simple removal will be seen as a partial victory for its dominionist supporters, who will doubtlessly lambast this Court's opinion–no matter how well-reasoned or well-cited–as an affront against "God's word."

The only way to truly strike down this assault on the appropriate delineation between Church and State is to compel Thurston to afford to Satanism what he gave to Christianity: 1776 days, plus one per diem, of maintenance for the Baphomet monument. This alone will fully and unequivocally dislodge from the reasonable observer's psyche any perception of governmental preference. This alone will punish and deter the dominionist lobbying effort from attempting this same transparent scheme to erode the constitutional protections for the free marketplace of ideas.

For every action, there must be an equal and opposite reaction. The Court should place TST in the position it would be in but for the discrimination complained of: equal in every respect, so far as the public sphere is concerned, with Christianity. If the Court orders the Ten Commandments monument removed, it should direct Thurston to emplace the Baphomet monument in its same place, for the same period of time. If the Court does not order the Ten Commandments monument removed, it should direct Thurston to

permanently affix the Baphomet monument to Arkansas Capitol grounds.

# Conclusion / prayer for relief

WHEREFORE the Court should enter a summary judgment in favor of TST and enter the following injunctive relief:

- Direct Thurston to affix the Baphomet monument on Arkansas State Capitol grounds for an equal period of time as the Ten Commandments monument.

- If the Ten Commandments monument is ordered to be removed, the Baphomet monument should be emplaced in the same place as the Ten Commandments monument for the same duration.

- If the Ten Commandments monument is not ordered to be removed, the Baphomet monument should be emplaced at a location to be determined by the parties; subject to Court oversight.

Respectfully submitted on March 6, 2023 by,



| | |
|---|---|
| **Matt Kezhaya** | **matt@crown.law** |
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

100 S. Fifth St., Ste. 1900, Minneapolis, MN 55402

# Certificate of service

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on March 6, 2023, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*