IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | |
|---|---|
| **DONNA CAVE, JUDITH LANSKY,** <br> **PAT PIAZZA, and SUSAN RUSSELL** | **PLAINTIFFS** |
| | |
| **ANNE ORSI, AMERICAN HUMANIST** <br> **ASSOCIATION, FREEDOM FROM** <br> **RELIGION FOUNDATION, INC.,** <br> **ARKANSAS SOCIETY OF FREETHINKERS,** <br> **GALE STEWART, RABBI EUGENE LEVY,** <br> **and TERESA GRIDER,** | **CONSOLIDATED PLAINTIFFS** |
| | |
| **THE SATANIC TEMPLE, DOUG MISICKO** <br> Aka "LUCIEN GREAVES," and, **ERIKA** <br> **ROBBINS** | **INTERVENORS** |
| | |
| v. | Case No. 4:18-cv-00342-KGB |
| | |
| **JOHN THURSTON, Arkansas Secretary of State,** <br> in his Official Capacity | **DEFENDANT** |

**BRIEF IN SUPPORT OF *ORSI* CONSOLIDATED PLAINTIFFS'**
**RESPONSE TO SECRETARY THUIRSTON'S MOTION TO EXCLUDE**
**DR. GREEN'S OPINIONS**

**I.**

**INTRODUCTION**

Defendant moves to exclude the testimony of Dr. Green under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). The primary complaint appears to be that Dr. Green's report contains legal argument. Plaintiffs do not offer Dr. Green as an expert on the law, but as an expert on the historical practices and understandings of the First Amendment. Dr. Green's testimony was presented to aid the Court in its understanding and analysis of the historical events and writings raised in Dr. Hall's report, and to inform the court .

1

Dr. Green's report was a response to Dr. Hall's report. Contrary to the implications of the Secretary of State's motion, Dr. Hall does discuss legal precedents, at length. *See* Hall Report, at 4–11 (quoting and discussing the holdings in *Everson v. Bd. of Educ.*, *Sch. Dist. of Abington Twp. v. Schempp*, *Marsh v. Chambers*, and six other Supreme Court opinions). Dr. Green responds to that discussion.

There is no doubt that the legal landscape has changed since Dr. Hall and Dr. Green authored their reports. But the history has not changed. It is the history which should be the focus of both reports, and it is Dr. Green's analysis of history, and experience with proper historical interpretation, that the Orsi Plaintiffs point to as valuable in their Brief in support of their Motion for summary judgment.

Unlike the methodology of scientists and technicians, the general methodology of historians is easily comprehensible to the layperson. Historians read and interpret primary and secondary resources. What historians add as experts is a detailed study of relevant and significant resources and the application of sound judgment as to which of those resources are reliable. Historians distinguish the specific from the general, and hone in on the particular issue at hand. It is clear from the language of Dr. Green's report that he applied the historical method in reaching his conclusions. Nevertheless, if there was any doubt as to the methodology applied by Dr. Green, his affidavit, supplied with this response, explains his methodology.

## II.

## LEGAL STANDARD

**A. There is a "relaxed" standard for Daubert in a bench trial.**

There is a relaxed Daubert standard in bench trials:

> However, Daubert is meant to "protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig. (In re Zurn)*, 644 F.3d 604, 613 (8th Cir. 2011) (emphasis added). When the district court sits as the finder of fact, "'[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" *Id*. (alteration in original) (*quoting United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)). Thus, we relax *Daubert's* application for bench trials. *Id*.

*David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012).

In no way do Plaintiffs believe that this relaxed standard is necessary here. Dr. Green's methodology is acceptable under any standard. But the correct legal standard should be observed.

### B. Purpose and effect of the gatekeeping analysis

The Eighth Circuit recently discussed the *Daubert* standard in *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768 (8th Cir. 2021), *cert. denied sub nom. 3M Co. v. Amador*, 212 L. Ed. 2d 791, 142 S. Ct. 2731 (2022):

> [W]e have stated numerous times that, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *E.g., United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011); *see also Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829-30 (8th Cir. 2019) (distinguishing cases where we affirmed the exclusion of experts' opinions as too speculative because, in those cases, the experts' opinions were "wholly speculative," "connected to the facts by only the expert's *ipse dixit*," "patent speculation," "pure conjecture," and "vague theorizing based upon general principles"). Thus, excluding an expert's opinion for being fundamentally unsupported is an exception to the general rule that "[g]aps in an expert witnes''s ... knowledge" go to weight, not admissibility. *See Robinson v. GEICO Gen. Ins.*, 447 F.3d 1096, 1100 (8th Cir. 2006); cf. Finch, 630 F.3d at 1062 ("Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." (brackets omitted)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of addressing "shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

\*     \*     \*

> Thus, excluding an expert's opinion for being fundamentally unsupported is an exception to the general rule that "[g]aps in an expert witness's ... knowledge" go

3

> to weight, not admissibility. *See Robinson v. GEICO Gen. Ins.*, 447 F.3d 1096, 1100 (8th Cir. 2006); *cf. Finch,* 630 F.3d at 1062 ("Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." (brackets omitted)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of addressing "shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 778 (8th Cir. 2021), *cert. denied sub nom*. *3M Co. v. Amador*, 212 L. Ed. 2d 791, 142 S. Ct. 2731 (2022).

Again, this is not intended to suggest that Dr. Green's testimony is in any way "shaky." The purpose is just to show how the *Daubert* standard is applied in the Eighth Circuit.

### C. Not all Daubert factors apply in every case.

The factors identified in Daubert are only intended as guidelines or matters to be considered. It is not required that the proponent of evidence prove that each Daubert factor exists in order to present expert testimony. Obviously, the methodology of a historian is different from the methodology of a scientist, an engineer, or a technician. "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993). This factor simply does not apply to historical research. Historians cannot perform experiments to support their conclusions.

On the other hand, peer review and publication are common in the historical field. "Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 2797, 125 L. Ed. 2d 469 (1993). Historical research can be subjected to peer review and

publication. Dr. Green refers to numerous secondary sources in his report, showing that the matters he discusses have been published and reviewed by his peers.

Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error. There is no "rate of error" in history. Historians do not rely on complicated mathematical calculations.

General acceptance, while no longer controlling, can be relevant to the inquiry. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community," may properly be viewed with skepticism." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594, 113 S. Ct. 2786, 2797, 125 L. Ed. 2d 469 (1993) [citation omitted].

"Because there are areas of expertise, such as the "social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies", *Jenson*, 130 F.3d at 1297, trial judges are given broad discretion to determine "whether *Daubert'*s specific factors are, or are not, reasonable measures of reliability in a particular case". *Kumho Tire Co.*, 526 U.S. at 153, 119 S.Ct. 1167." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006).

Reliability of the expert testimony is key. The Daubert factors have been summarized as:

> (1) the reliability of the underlying scientific principle; (2) the reliability of the technique or process that applies the principle; (3) the condition of any instrumentation used in the process; (4) adherence to proper procedures; (5) the qualifications of the person who performs the test; and (6) the qualifications of the person who interprets the results.

§ 702:5 Reliability "gatekeeping" under Daubert/Kumho/rule 702: historical development and assessment, 5 Handbook of Fed. Evid. § 702:5 (9th ed.)

The United States Supreme Court has explained, **"a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that

5

testimony's reliability." But, as the Court stated in *Daubert,* the test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999). With regard to nontechnical expert testimony, "these factors are 'neither definitive nor exhaustive and ... a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability.'" *Fish v. Kobach*, 304 F. Supp. 3d 1027, 1040 (D. Kan. 2018)

### D. The reasons for Dr. Green's report

It should be remembered that the way these reports were generated was that the Secretary of State offered Dr. Hall's opinion. The Orsi Plaintiffs responded with Dr. Green's report. Green Report, ¶5. Dr. Hall then replied to Dr. Green's report. Contrary to the argument of Defendant, Dr. Hall engaged in substantial legal analysis in his report, and Dr. Green responded to it.

Although Dr. Green does discuss legal standards to place his report in context, it is not for the legal standards that the Orsi Plaintiffs offer Dr. Green's report. Dr. Green's comments as to the law (and for that matter Dr. Hall's comments as to the law as well) should be read only to put the historical circumstances into context. The significant portions of Dr. Green's report are those which identify the historical practices and understandings that apply to the particular practice of erecting monuments to the Ten Commandments. In particular, these historical facts are relevant and are the product of the proper application of the methodology relied on by historians:

- The Ten Commandments are numbered and listed in different ways by various faith traditions.

- Historically, Protestants and Roman Catholics have used different translations of the Bible.

- Ten Commandments monuments are a mid-twentieth century phenomenon.

- The earliest Ten Commandments monument identified by Dr. Hall was erected in 1955.  The others were erected between 1956 and 1983 inclusive.

- The vast majority of those monuments were promoted and created by the Fraternal Order of the Eagles, who chose the specific wording and emblems that appeared on the monuments.

- The Fraternal Order of the Eagles is a non-governmental association well-known for its charitable and eleemosynary activities.

- There is no historical basis for assuming that the leading political figures who drafted the Constitution relied on religious principles to any significant degree.

- There is no evidence that the Framers relied on, or considered, the Ten Commandments to undergird either the political or legal systems.

- The Ten Commandments is first and foremost a religious document exclusive to Jewish and Christian traditions.

- "During the founding period, one finds occasional references to the Ten Commandments or Mosaic law, most commonly in sermons where clergy drew parallels to Old Testament Israel.  But even though Calvinist clergy saw Old Testament Israel as a model, they generally believed that Christians were not bound by the Old Testament, including by the Ten Commandments. Considering political writings rather than sermons, there is a general dearth of references to Mosaic law, the Decalogue, or the Ten Commandments. Of the central legal

documents, the Declaration of Independence contains four natural law/rights allusions to God; in contrast, the Constitution and the Bill of Rights did not include even a perfunctory or formalistic reference to God. Rather than relying on divine authority, the Constitution is "ordained" by "the People of the United States."

- The Ten Commandments was not mentioned in the debates and publication surrounding the founding documents.

- There is no significant reliance on the Ten Commandments in Early American case law.

### E. Methodology for Historians

The historical method relies on review of documentation and other evidence. "Historians may reasonably rely on a combination of primary and secondary sources while maintaining sound methodology. *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 WL 13561776, at *6 (N.D. Ga. Dec. 4, 2020). A law review article cited by the Secretary of State in its brief explains the methodology for historians.

> At its essence, professional historians' goal is, "to portray, whether in writing, in the classroom, or in the courtroom, an objective historical interpretation." They aim to achieve their objectives by surveying a daunting amount of historical sources, choosing only the reliable sources, reading them reliably, and putting "them] together in ways that provide reliable narratives about the past." Additionally, historians must "consider the conditions under which a source" originated and whether there were any intentions that motivated its production. Furthermore, for purposes of objectivity and clarity, historians are required to disclose to their audience whether their factual assertions are derivative of the actual source or the historian's own interpretation of that source. Objectivity, however, is by no means an easy task. Objectivity requires historians to "abandon wishful thinking, assimilate bad news, discard pleasing interpretations that cannot

> pass elementary tests of evidence and logic, and, most important of all, suspend or bracket one's own perceptions long enough to enter sympathetically into the alien and possibly repugnant perspectives of rival thinkers." It is because of this daunting task that historians have been susceptible to criticisms relating to objectivity and reliability.

Alvaro Hasani, *Putting History on the Stand: A Closer Look at the Legitimacy of Criticisms Levied Against Historians Who Testify As Expert Witnesses,* 34 Whittier L. Rev. 343, 355 (2013).

In describing what a historian does, and what a historian should do, the Court in *United States v. Kantengwa* described "the historian's role" as "'surveying a daunting amount of historical sources,' evaluating their reliability, and providing a basis for a 'reliable narrative[ ] about the past.'" 781 F.3d 545, 562 (1st Cir. 2015); *see also Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 WL 3954858, at *8 (E.D. Wis. Aug. 16, 2018) ("[P]roper historical work involves surveying the full array of available sources, evaluating the reliability of the sources, and thus "providing a basis for a 'reliable narrative about [the] past.'"). The bulk of Dr. Green's expert report is devoted to this task, or to the substantively identical task of critiquing the flaws in Dr. Hall's report. There is thus no basis for excluding Dr. Green's report.

## CONCLUSION

The evidence shows that Dr. Green applied an appropriate historical methodology. The Secretary of State's *Daubert* motion is without merit and should be denied.

                                    Respectfully Submitted

                                    Katherine McKerall
                                    Virginia State Bar: #95400
                                    AMERICAN HUMANIST ASSOCIATION
                                    1821 Jefferson Place, NW
                                    Washington, D.C. 20036
                                    Attorney for Plaintiffs
                                    Telephone: (202) 238-9088
                                    Facsimile: (202) 238-9003

Email:  kmckerall@americanhumanist.org


Patrick C. Elliott
Senior Counsel
WI Bar No. 1074300
Sam Grover
Associate Counsel
FREEDOM FROM RELIGION FOUNDATION
PO Box 750
Madison, WI 53701
(608) 230-8443



BAKER SCHULZE AND MURPHY
2311 Biscayne Drive
Suite 300
Little Rock, AR 72227
Telephone: (501) 537-1000
Facsimile: (501) 537-1001
www.bsm.law

*Gerry Schulze*
J.G. "Gerry" Schulze
Attorney at Law
Ark. Bar No. 83156
gschulze@bsm.law